# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| In re: Consumer Vehicle Driving Data Tracking Collection Litigation | MDL Docket No. 3115<br>Case No. 1:24-md-3115-TWT |

## MASTER CONSOLIDATED CLASS ACTION COMPLAINT

*"We have received many questions about how we handle our customer data. Let me reassure you that all of us at OnStar value your trust in us when it comes to the handling of your personal data…. We will continue to honor your trust in us moving forward. Customer service is our top priority and we have taken your feedback very seriously."*[1]

Linda Marshall, President of OnStar, 2011

---

[1] *Video: OnStar Reverses Decision to Change Terms and Conditions*, GM PRESSROOM (Sept. 2011), *available at* https://pressroom.gm.com/gmbx/us/en/pressroom/home/videos.html#query=onstar.

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

JURISDICTION AND VENUE ............................................................2

PLAINTIFFS ........................................................................................3

DEFENDANTS .................................................................................171

STATEMENT OF FACTS ................................................................174

I.    The importance of consumer privacy in the auto industry. ............177

II.   GM transitions from automaker to data broker, amassing
      billions of miles of consumer Driving Data....................................185

    A.  GM sells consumers' Driving Data to Verisk, which uses it to
        develop products and power its insurance business.................193

    B.  GM sells consumers' Driving Data to LexisNexis, which uses it to
        build its telematics business and expand its market share......221

    C.  GM secretly arranges to sell consumers' Driving Data to
        other third parties. .................................................................236

    D.  GM uses consumers' Driving Data to build a lucrative
        insurance enterprise................................................................244

III.  Defendants conceal their Driving Data scheme from impacted
      consumers while duplicitously claiming they have consent. .......248

IV.   To maximize the amount and quality of Driving Data collected from its
      consumers, GM upgraded its technology and launched Smart Driver........267

V.    GM used Smart Driver to surreptitiously and continuously collect
      consumers' Driving Data...............................................................278

VI.   Plaintiffs did not consent to Defendants' interception, sale, or use of
      their Driving Data. ........................................................................284

    A.  GM's OnStar Terms do not ask for consumers' consent. ...........286

    B.  GM's Smart Driver Terms do not authorize the interception or sale of
        Plaintiffs' Driving Data to third parties. .................................291

VII.  GM structured OnStar and Smart Driver to force
      consumer participation. ................................................................293

    A.  GM told customers that OnStar was included with their purchase
        or made them pay for it. ..........................................................295

B. GM penalized dealership employees who failed to enroll consumers in OnStar.................................................................................................299

C. GM designed a deceptive "onboarding process" to establish OnStar's uninterrupted data connection. ..............................................................305

   1. GM's online enrollment at the dealership forced customers to have OnStar even if they did not consent to the terms.....................307

   2. GM threatened to take away services included with OnStar if the customer did not "opt in" to Smart Driver................................312

D. GM made it difficult for consumers to learn that they were enrolled in OnStar or Smart Driver without their consent. .........................................320

E. GM instituted deceptive cancellation requirements. ...................................321

VIII. The information collected by GM and shared with LexisNexis and Verisk is inaccurate, flawed, and materially misleading. ......................322

IX. Consumer advocates and regulators expose Defendants' surreptitious Driving Data practices. .................................................................328

A. *The Mozilla Foundation* sparks a congressional investigation and call for FTC action. .......................................................................328

B. *The New York Times* investigates and reveals Defendants' data collection scheme.................................................................................333

X. Public outcry and litigation prompt some Defendants to stop some of their illegal sharing practices. ...........................................................335

A. Within days of the litigation commencing, GM stops sharing Driving Data with LexisNexis and Verisk.................................................................335

B. Verisk discontinues its telematics exchange shortly after the litigation is commenced.................................................................................344

C. LexisNexis continues to market its telematics exchange: "shrouded in secrecy." .....................................................................................345

TOLLING ....................................................................................................346

CLASS ACTION ALLEGATIONS ........................................................................347

CLAIMS ON BEHALF OF THE NATIONWIDE CLASS

  COUNT 1....................................................................................................352

    VIOLATION OF THE FEDERAL WIRETAP ACT

  COUNT 2....................................................................................................357

VIOLATION OF THE FEDERAL WIRETAP ACT

COUNT 3......................................................................................361

VIOLATION OF THE STORED COMMUNICATIONS ACT

COUNT 4......................................................................................365

VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT

COUNT 5......................................................................................368

INVASION OF PRIVACY

COUNT 6......................................................................................373

CIVIL CONSPIRACY TO COMMIT INVASION OF PRIVACY

COUNT 7......................................................................................376

UNJUST ENRICHMENT

COUNT 8......................................................................................377

BREACH OF CONTRACT

COUNT 9......................................................................................379

TRESPASS TO CHATTELS

CLAIMS ON BEHALF OF THE FCRA SUBCLASS

COUNT 10 ...................................................................................380

WILLFUL VIOLATION OF THE FAIR CREDIT REPORTING ACT

CLAIMS ON BEHALF OF THE ALABAMA SUBCLASS

COUNT 11 ...................................................................................384

ALABAMA DECEPTIVE TRADE PRACTICES ACT

CLAIMS ON BEHALF OF THE ARIZONA SUBCLASS

COUNT 12 ...................................................................................388

ARIZONA CONSUMER FRAUD ACT

CLAIMS ON BEHALF OF THE CALIFORNIA SUBCLASS

COUNT 13 ...................................................................................392

CALIFORNIA CONSTITUTIONAL INVASION OF PRIVACY

COUNT 14 ...................................................................................395

CALIFORNIA INVASION OF PRIVACY ACT — WIRETAPPING LAW

COUNT 15 ...................................................................................402

CALIFORNIA INVASION OF PRIVACY ACT — ELECTRONIC TRACKING DEVICE

COUNT 16 ...................................................................................403

CALIFORNIA COMPUTER DATA ACCESS AND FRAUD ACT

COUNT 17 ...................................................................................409

CALIFORNIA CONSUMER PRIVACY ACT

COUNT 18 ...................................................................................411

CALIFORNIA UNFAIR COMPETITION LAW

COUNT 19 ...................................................................................415

CALIFORNIA CONSUMERS LEGAL REMEDIES ACT

COUNT 20 ...................................................................................418

CALIFORNIA FALSE ADVERTISING LAW

CLAIMS ON BEHALF OF THE CONNECTICUT SUBCLASS

COUNT 21 ...................................................................................420

CONNECTICUT UNFAIR TRADE PRACTICES ACT

CLAIMS ON BEHALF OF THE DELAWARE SUBCLASS

COUNT 22 ...................................................................................424

DELAWARE CONSUMER FRAUD ACT

COUNT 23 ...................................................................................428

DELAWARE WIRETAPING, ELECTRONIC SUVEILLANCE AND INTERCEPTION OF COMMUNICATIONS LAW

CLAIMS ON BEHALF OF THE FLORIDA SUBCLASS

COUNT 24 ...................................................................................434

FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT

COUNT 25 ...................................................................................438

FLORIDA SECURITY OF COMMUNICATIONS ACT

CLAIMS ON BEHALF OF THE GEORGIA SUBCLASS

    COUNT 26 ......................................................................................444

      VIOLATION OF THE GEORGIA UNIFORM DECEPTIVE TRADE
      PRACTICES ACT

    COUNT 27 ......................................................................................448

      RECOVERY OF EXPENSES OF LITIGATION

CLAIMS ON BEHALF OF THE IDAHO SUBCLASS

    COUNT 28 ......................................................................................449

      IDAHO CONSUMER PROTECTION ACT

CLAIMS ON BEHALF OF THE ILLINOIS SUBCLASS

    COUNT 29 ......................................................................................455

      ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS
      PRACTICES ACT

    COUNT 30 ......................................................................................459

      ILLINOIS WIRETAPING, ELECTRONIC SUVEILLANCE AND
      INTERCEPTION OF COMMUNICATIONS LAW

    CLAIMS ON BEHALF OF THE INDIANA SUBCLASS

    COUNT 31 ......................................................................................464

      INDIANA DECEPTIVE CONSUMER SALES ACT

CLAIMS ON BEHALF OF THE KANSAS SUBCLASS

    COUNT 32 ......................................................................................469

      KANSAS CONSUMER PROTECTION ACT

CLAIMS ON BEHALF OF THE KENTUCKY SUBCLASS

    COUNT 33 ......................................................................................475

      KENTUCKY CONSUMER PROTECTION ACT

CLAIMS ON BEHALF OF THE MARYLAND SUBCLASS

    COUNT 34 ......................................................................................480

      VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT

    COUNT 35 ......................................................................................486

MARYLAND WIRETAPING AND ELECTRONIC SURVEILLANCE ACT

COUNT 36 .........................................................................................493

MARYLAND STORED WIRE AND ELECTRONIC COMMUNICATIONS AND TRANSACTIONAL RECORDS ACCESS ACT

CLAIMS ON BEHALF OF THE MASSACHUSETTS SUBCLASS

COUNT 37 .........................................................................................496

MASSACHUSETTS CONSUMER PROTECTION ACT

COUNT 38 .........................................................................................500

MASSACHUSETTS WIRETAP ACT

CLAIMS ON BEHALF OF THE MICHIGAN SUBCLASS

COUNT 39 .........................................................................................506

VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT

CLAIMS ON BEHALF OF THE MISSISSIPPI SUBCLASS

COUNT 40 .........................................................................................511

VIOLATION OF THE MISSISSIPPI CONSUMER PROTECTION ACT

CLAIMS ON BEHALF OF THE NEBRASKA SUBCLASS

COUNT 41 .........................................................................................516

NEBRASKA WIRETAP LAW

COUNT 42 .........................................................................................522

NEBRASKA STORED COMMUNICATIONS LAW

CLAIMS ON BEHALF OF THE NEW HAMPSHIRE SUBCLASS

COUNT 43 .........................................................................................526

NEW HAMPSHIRE WIRETAPPING AND EAVESDROPPING ACT

CLAIMS ON BEHALF OF THE NEVADA SUBCLASS

COUNT 44 .........................................................................................534

NEVADA DECEPTIVE TRADE PRACTICES ACT

CLAIMS ON BEHALF OF THE NEW JERSEY SUBCLASS

COUNT 45 .........................................................................................539

NEW JERSEY CONSUMER FRAUD ACT

CLAIMS ON BEHALF OF THE NEW YORK SUBCLASS

COUNT 46 ................................................................542

VIOLATION OF NEW YORK GENERAL BUSINESS LAW

COUNT 47 ................................................................546

VIOLATION OF NEW YORK GENERAL BUSINESS LAW

COUNT 48 ................................................................548

VIOLATION OF NEW YORK GENERAL BUSINESS LAW

COUNT 49 ................................................................550

VIOLATION OF NEW YORK CIVIL RIGHTS LAW

CLAIMS ON BEHALF OF THE NORTH CAROLINA SUBCLASS

COUNT 50 ................................................................552

VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT

CLAIMS ON BEHALF OF THE OHIO SUBCLASS

COUNT 51 ................................................................556

VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT

CLAIMS ON BEHALF OF THE OKLAHOMA SUBCLASS

COUNT 52 ................................................................558

OKLAHOMA CONSUMER PROTECTION ACT

CLAIMS ON BEHALF OF THE OREGON SUBCLASS

COUNT 53 ................................................................561

OREGON UNLAWFUL TRADE PRACTICES ACT

CLAIMS ON BEHALF OF THE PENNSYLVANNIA SUBCLASS

COUNT 54 ................................................................565

UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW

COUNT 55 ................................................................568

PENNSYLVANIA WIRETAPPING AND ELECTRONIC SURVEILLANCE CONTROL ACT

COUNT 56 ..................................................................................575

PENNSYLVANIA UNLAWFUL ACCESS TO STORED COMMUNICATIONS ACT

CLAIMS ON BEHALF OF THE RHODE ISLAND SUBCLASS

COUNT 57 ..................................................................................579

RHODE ISLAND DECEPTIVE TRADE PRACTICES ACT

CLAIMS ON BEHALF OF THE SOUTH CAROLINA SUBCLASS

COUNT 58 ..................................................................................582

UNFAIR TRADE PRACTICES ACT

CLAIMS ON BEHALF OF THE SOUTH DAKOTA SUBCLASS

COUNT 59 ..................................................................................585

DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION LAW

CLAIMS ON BEHALF OF THE TEXAS SUBCLASS

COUNT 60 ..................................................................................589

TEXAS DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT

CLAIMS ON BEHALF OF THE UTAH SUBCLASS

COUNT 61 ..................................................................................593

UTAH TRUTH IN ADVERTISING ACT

CLAIMS ON BEHALF OF THE VERMONT SUBCLASS

COUNT 62 ..................................................................................597

VERMONT CONSUMER PROTECTION ACT

CLAIMS ON BEHALF OF THE VIRGINIA SUBCLASS

COUNT 63 ..................................................................................601

VIRGINIA CONSUMER PROTECTION AC

CLAIMS ON BEHALF OF THE WASHINGTON SUBCLASS

COUNT 64 ..........................................................................................604

WASHINGTON CONSUMER PROTECTION ACT

CLAIMS ON BEHALF OF THE WEST VIRGINIA SUBCLASS

COUNT 65 ..........................................................................................608

WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT

REQUEST FOR RELIEF ........................................................................612

DEMAND FOR JURY TRIAL ...............................................................613

# INTRODUCTION

1.     Modern cars are widely regarded as "computers on wheels." Or, for GM customers, "wiretaps on wheels."[2] In a flagrant abuse of consumer trust, GM misappropriated OnStar technology it pre-installed in nearly all GM-manufactured cars for the last decade and secretly intercepted highly private information about what consumers did inside their cars each and every time they drove. The data GM harvested from each consumer was tied to individual drivers and vehicles and included geolocation, route history, driving schedule, fuel or charging levels, hard braking events, hard acceleration events, tailgating, time spent idle, speeds over 80 miles per hour, vehicle speed, average speed, late night driving, driver attention, and more (hereinafter, "Driving Data").

2.     Over the course of nearly a decade, and in willful disregard of consumers across the United States, GM amassed petabytes of at least 16 million consumers' Driving Data[3] covering billions of miles of trips, and sold that data to Verisk, LexisNexis, and other third parties to advance Defendants' commercial

---

[2] Frank Bajak, *'Wiretaps on wheels': How your car is collecting and selling your personal data*, LA TIMES (Sept. 6, 2023), *available at* https://www.latimes.com/business/story/2023-09-06/carmakers-privacy-data-collection-drivers.

[3] *State of Texas v. General Motors LLC, and OnStar LLC*, No. 24-08-12392 at 25 (Montgomery Cty., Tex. Aug. 13, 2024) ("Texas Att. Gen. Pet."), *available at* https://www.texasattorneygeneral.gov/sites/default/files/images/press/General%20Motors%20Original%20Petition%20Filestamped.pdf.

interests—always in a manner that they knew would materially invade consumers' privacy and harm them financially.

3.     Plaintiffs are among the millions of consumers whose Driving Data was collected, transmitted and exploited by Defendants without their knowledge and consent.

4.     Plaintiffs, individually and on behalf of the Classes of similarly situated persons defined below, allege the following against General Motors LLC, OnStar LLC, LexisNexis Risk Solutions Inc. and Verisk Analytics, Inc. (collectively, "Defendants"), based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation of counsel and review of public documents as to all other matters.

5.     As detailed below, Plaintiffs and Class Members are entitled to compensatory, consequential, statutory, punitive, general, and nominal damages, disgorgement and restitution, and injunctive relief.

**JURISDICTION AND VENUE**

6.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves violations of federal law. This Court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.

7.     This Court has original subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a class action in which

at least one member of the proposed class is a citizen of a state different from that of defendants; the amount in controversy exceeds $5,000,000, exclusive of interests and costs; and the proposed class comprises more than 100 class members.

8.     This Court has personal jurisdiction over each Defendant and venue is proper pursuant to 28 U.S.C. § 1391 because LexisNexis and GM are registered to do business in this state, and all Defendants regularly conduct substantial business in this District, and a substantial part of the events giving rise to the claims emanated from activities within this District.

9.     This consolidated complaint is a superseding complaint intended to govern all pretrial proceedings in this multidistrict litigation, which was created pursuant to court order transferring actions to the Northern District of Georgia to "serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation." *In re Consumer Vehicle Driving Data Tracking Litig.*, No. MDL 3115, 2024 WL 2884378, at *2 (J.P.M.L. June 7, 2024).

## PLAINTIFFS

10.     Plaintiffs are persons whose Driving Data was intercepted, used, and/or disclosed by Defendants and they bring this action on behalf of themselves and all those similarly situated both across the United States and within their State of residence.

11.     The following allegations are made upon information and belief and are derived from, among other things, investigations of counsel, public sources, and the facts and circumstances currently known. Plaintiffs reserve their right to supplement their allegations with additional facts and injuries as they are discovered.

## ALABAMA

### Chad Weaver

12.     Plaintiff Chad Weaver is a resident and citizen of the state of Alabama. On or about April 17, 2023, Plaintiff Weaver purchased a 2023 Chevrolet Corvette from a GM dealer in Hoover, Alabama. GM equipped the 2023 Chevrolet Corvette with OnStar during the manufacturing process.

13.     When Plaintiff Weaver purchased the 2023 Chevrolet Corvette, he was told by the GM dealer that OnStar was included with the vehicle's purchase and that the vehicle came with a "free trial" of OnStar. The GM dealer activated OnStar before Plaintiff Weaver took possession of the vehicle. Plaintiff Weaver was never given a choice to activate, and never knowingly enrolled in, OnStar Smart Driver.

14.     Unbeknownst to Plaintiff Weaver, GM intercepted Driving Data relating to Plaintiff Weaver's 2023 Chevrolet Corvette using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff Weaver reasonably expected that his Driving Data would remain private unless he gave GM his express authorization to collect, use, or share it. Plaintiff Weaver did not know

that GM was intercepting his Driving Data for its own financial and commercial use, and never authorized GM to do so.

15. Unbeknownst to Plaintiff Weaver, GM also sold his Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and shared Plaintiff's Driving Data for their own financial and commercial benefit. Plaintiff Weaver has never knowingly opted in to sharing his Driving Data relating to his 2023 Chevrolet Corvette with anyone, including LexisNexis or Verisk, nor would he have done so. Plaintiff Weaver, who did not know that LexisNexis and Verisk had possession of his Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share his Driving Data with other third parties.

16. On September 18, 2024, Plaintiff Weaver received a copy of his LexisNexis Consumer Disclosure Report, which confirmed that Driving Data from his 2023 Chevrolet Corvette was intercepted, accessed, recorded, and disclosed by GM to LexisNexis without his consent. The report included detailed Driving Data for three trips on March 14, 2024, including, for each trip: the start and end date; the start and end time; the distance driven; acceleration events; high speed events; and hard brake events.

17. On June 4, 2024, Plaintiff Weaver received a copy of his Verisk Driving Behavior History Report, which confirmed that Driving Data from his 2023 Chevrolet Corvette was intercepted, accessed, recorded and disclosed by GM to

Verisk without his consent. The report included detailed Driving Data for 297 trips from December 2023 to March 2024 including, for each date: the number of trips, speeding events, hard braking events, rapid acceleration events, daytime driving minutes, nighttime driving minutes, and miles driven. Upon investigation, Plaintiff discovered errors in the report, including false indications that he was spending much more time driving his 2023 Chevrolet Corvette than was true. For example, the report indicated that on December 27, 2023, he drove the vehicle for approximately 19 hours, even though the vehicle only moved three miles.

18.    The LexisNexis and Verisk Reports omit important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

19.    On information and belief, much of the Driving Data Defendants collected and shared is improperly and inaccurately associated with Plaintiff Chad Weaver because his wife was also a driver of the vehicle.

20.    Plaintiff Weaver maintained insurance coverage for his 2023 Chevrolet Corvette through USAA.  In or around December 2023, USAA told Plaintiff Weaver that the insurance premium for the vehicle would increase by approximately $50 per month. USAA did not explain the decision. Plaintiff Weaver's LexisNexis Report

reveals that USAA accessed his LexisNexis Report on or about December 7, 2023, February 3, 2024, and August 6, 2024, which, upon information and belief, included his Driving Data.

21.     Plaintiff Weaver had not recently filed an insurance claim, been in an automobile accident, received a speeding ticket, or experienced any other incident that could account for the increase.

22.     Upon information and belief, the increased premiums suffered by Plaintiff Weaver were a result of USAA being provided with the uncontextualized, misleading, and unconsented-to personal Driving Data on Plaintiff's LexisNexis and Verisk Reports.

23.     If Plaintiff Weaver had known that GM would intercept and sell his Driving Data to LexisNexis, Verisk, and other third parties without his knowledge or consent, he would not have purchased the 2023 Chevrolet Corvette.

24.     Plaintiff Weaver's Driving Data has tangible value. Because of Defendants' conduct, Plaintiff Weaver has lost control over the use of his Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

25.     Plaintiff Weaver had a reasonable expectation of privacy in his vehicle, including that detailed data about his location, routes, schedule, and driving behaviors would not be collected or shared without his express consent or

authorization. Defendants' actions of secretly intercepting, using, and disclosing his Driving Data invaded Plaintiff Weaver's privacy rights.

## ARIZONA

### Brian Johnson

26.     Plaintiff Brian Johnson is a resident and citizen of the state of Arizona. On or about November 1, 2023, Plaintiff Johnson purchased a 2023 Chevrolet Tahoe from a GM dealer. GM equipped the 2023 Chevrolet Tahoe with OnStar during the manufacturing process.

27.     When Plaintiff Johnson purchased the 2023 Chevrolet Tahoe, he was told by the GM dealer that OnStar was included with the vehicle's purchase and that the vehicle came with a 30-day "free trial" of OnStar. The GM dealer activated OnStar before Plaintiff Johnson took possession of the vehicle. Plaintiff Johnson was never given a choice to activate, and never knowingly enrolled in, OnStar Smart Driver.

28.     Unbeknownst to Plaintiff Johnson, GM intercepted Driving Data relating to Plaintiff Johnson's 2023 Chevrolet Tahoe using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff Johnson reasonably expected that his Driving Data would remain private unless he gave GM his express authorization to collect, use, or share it. Plaintiff Johnson did not know

that GM was intercepting his Driving Data for its own financial and commercial use, and never authorized GM to do so.

29. Unbeknownst to Plaintiff Johnson, GM also sold his Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and shared Plaintiff's Driving Data for their own financial and commercial benefit. Plaintiff Johnson has never knowingly opted in to sharing his Driving Data relating to his 2023 Chevrolet Tahoe with anyone, including LexisNexis or Verisk, nor would he have done so. Plaintiff Johnson, who did not know that LexisNexis and Verisk had possession of his Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share his Driving Data with other third parties.

30. On August 21, 2024, Plaintiff Johnson received a copy of his LexisNexis Consumer Disclosure Report, which confirmed that Driving Data from his 2023 Chevrolet Tahoe was intercepted, accessed, recorded, and disclosed by GM to LexisNexis without his consent. The Report included detailed Driving Data for 155 trips from February 2024 to March 2024, including, for each trip: the start and end date; the start and end time; the distance driven; acceleration events; high speed events; and hard brake events. The Report confirmed that Plaintiff Johnson's Driving Data was collected by LexisNexis even after Plaintiff Johnson's "free trial" of OnStar had expired in December 2023.

31.     On September 17, 2024, Plaintiff Johnson received a copy of his Verisk Driving Behavior History Report, which confirmed that Driving Data from his 2023 Chevrolet Tahoe was intercepted, accessed, recorded and disclosed by GM to Verisk without his consent.

32.     The LexisNexis and Verisk Reports omit important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

33.     On information and belief, much of the Driving Data Defendants collected and shared is improperly and inaccurately associated with Plaintiff Johnson because his wife was also a driver of the vehicle.

34.     Plaintiff Johnson maintained insurance coverage for his 2023 Chevrolet Tahoe through American Family Insurance. In July 2024 American Family Insurance told Plaintiff Johnson that his insurance premium for the vehicle would increase. American Family Insurance did not explain the decision. Plaintiff Johnson's LexisNexis Report reveals that American Family Insurance accessed his LexisNexis Report on or about June 6, 2024 and December 13, 2023, which, upon information and belief, included his Driving Data.

35.    Plaintiff Johnson also sought auto insurances quotes from other insurance companies and was told that they were offering higher rates to him based on information received from LexisNexis. Progressive also denied coverage to Plaintiff Johnson.

36.    Plaintiff's LexisNexis Report reveals that USAA, Auto-Owners Insurance, Liberty Mutual, Progressive, State Farm, Farmers Insurance, The Ensurity Group of Arizona, Inc., GEICO, Nationwide, and Allstate accessed his LexisNexis Report in June 2024, which, upon information and belief, included his Driving Data. GEICO also accessed his LexisNexis Report on or about December 18, 2023, which, upon information and belief, included his Driving Data.

37.    Plaintiff Johnson had not recently filed an insurance claim, been in an automobile accident, received a speeding ticket, or experienced any other incident that could account for the increase.

38.    Upon information and belief, the increased premiums, inflated quotes, and coverage denial suffered by Plaintiff Johnson were a result of insurers being provided with the uncontextualized, misleading, and unconsented-to personal Driving Data on Plaintiff Johnson's LexisNexis and Verisk Reports.

39.    If Plaintiff Johnson had known that GM would intercept and sell his Driving Data to LexisNexis, Verisk, and other third parties without his knowledge or consent, he would not have purchased his 2023 Chevrolet Tahoe.

40.     Plaintiff Johnson's Driving Data has tangible value. Because of Defendants' conduct, Plaintiff Johnson has lost control over the use of his Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

41.     Plaintiff Johnson had a reasonable expectation of privacy in his vehicle, including that detailed data about his location, routes, schedule, and driving behaviors would not be collected or shared without his express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing his Driving Data invaded Plaintiff Johnson's privacy rights.

**David Loehr**

42.     Plaintiff David Loehr is a resident and citizen of the state of Arizona. On or about February 1, 2023, Plaintiff Loehr purchased a 2023 Chevrolet Colorado from a GM dealer in Las Vegas, Nevada. GM equipped the 2023 Chevrolet Colorado with OnStar during the manufacturing process.

43.     When Plaintiff Loehr purchased the 2023 Chevrolet Colorado, he was told by the GM dealer that OnStar was included with the vehicle's purchase. The GM dealer activated OnStar before Plaintiff Loehr took possession of the vehicle, even though Plaintiff Loehr requested that OnStar not be activated when he purchased it. Plaintiff Loehr was never given a choice to activate, and never knowingly enrolled in, OnStar Smart Driver.

44.     Unbeknownst to Plaintiff Loehr, GM intercepted Driving Data relating to Plaintiff Loehr's 2023 Chevrolet Colorado using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff Loehr reasonably expected that his Driving Data would remain private unless he gave GM his express authorization to collect, use, or share it. Plaintiff Loehr did not know that GM was intercepting his Driving Data for its own financial and commercial use, and never authorized GM to do so.

45.     Unbeknownst to Plaintiff Loehr, GM also sold his Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and shared Plaintiff Loehr's Driving Data for their own financial and commercial benefit. Plaintiff Loehr has never knowingly opted in to sharing his Driving Data relating to his 2023 Chevrolet Colorado with anyone, including LexisNexis or Verisk, nor would he have done so. Plaintiff Loehr, who did not know that LexisNexis and Verisk had possession of his Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share his Driving Data with other third parties.

46.     On March 26, 2024, Plaintiff Loehr received a copy of his LexisNexis Consumer Disclosure Report, which confirmed that Driving Data from his 2023 Chevrolet Colorado was intercepted, accessed, recorded, and disclosed by GM to LexisNexis without his consent. The Report included detailed Driving Data for 218

trips from September 2023 to December 2023, including, for each trip: the start and end date; the start and end time; the distance driven; acceleration events; high speed events; and hard brake events. The Report confirmed that Plaintiff Loehr's Driving Data was collected by LexisNexis, even though he requested that OnStar not be activated when he purchased his 2023 Chevrolet Colorado.

47.    On May 29, 2024, Plaintiff Loehr received a copy of his Verisk Driving Behavior History Report, which confirmed that Driving Data from his 2023 Chevrolet Colorado was intercepted, accessed, recorded and disclosed by GM to Verisk without his consent. The Report included detailed Driving Data for 35 trips during December 2023, including, for each date: the number of trips, speeding events, hard braking events, rapid acceleration events, daytime driving minutes, nighttime driving minutes, and miles driven. The Report confirmed that Plaintiff Loehr's Driving Data was collected by Verisk, even though he requested that OnStar not be activated when he purchased his 2023 Chevrolet Colorado.

48.    The LexisNexis and Verisk Reports omit important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

49.     Plaintiff Loehr maintained insurance coverage for his 2023 Chevrolet Colorado through State Farm. In or around December 2023, State Farm told Plaintiff Loehr that his insurance premium for the vehicle would increase by approximately $250 for the next six months. State Farm did not explain the decision. Plaintiff Loehr's LexisNexis Report reveals that State Farm accessed his LexisNexis Report on or about August 7, 2023, and November 10, 2023, which, upon information and belief, included his Driving Data.

50.     Plaintiff Loehr had not recently filed an insurance claim, been in an automobile accident, received a speeding ticket, or experienced any other incident that could account for the increase.

51.     In November 2023, Plaintiff Loehr also sought auto insurances quotes from Progressive, which denied coverage to him. Plaintiff Loehr's LexisNexis Report reveals that Progressive accessed his LexisNexis Report on or about November 10. 2023, which, upon information and belief, included his Driving Data.

52.     Upon information and belief, the increased premiums and coverage denials suffered by Plaintiff Loehr were a result of insurers being provided with the uncontextualized, misleading, and unconsented-to personal Driving Data on Plaintiff Loehr's LexisNexis and Verisk Reports.

53.     If Plaintiff Loehr had known that GM would intercept and sell his Driving Data to LexisNexis, Verisk, and other third parties without his knowledge or consent, he would not have purchased the 2023 Chevrolet Colorado.

54.     Plaintiff Loehr's Driving Data has tangible value. Because of Defendants' conduct, Plaintiff Loehr has lost control over the use of his Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

55.     Plaintiff Loehr had a reasonable expectation of privacy in his vehicle, including that detailed data about his location, routes, schedule, and driving behaviors would not be collected or shared without his express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing his Driving Data invaded Plaintiff Loehr's privacy rights.

## CALIFORNIA

### Dan Carnine

56.     Plaintiff Dan Carnine is a resident and citizen of the state of California. In July 2018, Plaintiff Carnine purchased a 2018 Chevrolet Bolt from a GM dealer in Roseville, California. GM equipped the 2018 Chevrolet Bolt with OnStar during the manufacturing process.

57.     When Plaintiff Carnine purchased the 2018 Chevrolet Bolt, he was told by the GM dealer that OnStar was mandatory, that OnStar was included with the

vehicle's purchase, and that the vehicle came with a "free trial" for three years of OnStar. The GM dealer activated OnStar before Plaintiff Carnine took possession of the vehicle. Plaintiff Carnine was never given a choice to activate, and never knowingly enrolled in, OnStar Smart Driver.

58. Unbeknownst to Plaintiff Carnine, GM intercepted Driving Data relating to Plaintiff Carnine's 2018 Chevrolet Bolt using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff Carnine reasonably expected that his Driving Data would remain private unless he gave GM his express authorization to collect, use, or share it. Plaintiff Carnine did not know that GM was intercepting his Driving Data for its own financial and commercial use, and never authorized GM to do so.

59. Unbeknownst to Plaintiff Carnine, GM also sold his Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and shared Plaintiff's Driving Data for their own financial and commercial benefit. Plaintiff Carnine has never knowingly opted in to sharing his Driving Data relating to his 2018 Chevrolet Bolt with anyone, including LexisNexis or Verisk, nor would he have done so. Plaintiff Carnine, who did not know that LexisNexis and Verisk had possession of his Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share his Driving Data with other third parties.

60.     On March 30, 2024, Plaintiff Carnine received a copy of his LexisNexis Consumer Disclosure Report, which confirmed that Driving Data from his 2018 Chevrolet Bolt was intercepted, accessed, recorded, and disclosed by GM to LexisNexis without his consent. The Report included detailed Driving Data for 629 trips from September 2023 to March 2024, including, for each trip: the start and end date; the start and end time; the distance driven; acceleration events; high speed events; and hard brake events. The Report confirmed that Plaintiff Carnine's Driving Data was collected by LexisNexis even after Plaintiff Carnine's "free trial" of OnStar had expired around July 2021.

61.     Upon investigation, Plaintiff Carnine discovered errors in the LexisNexis Report, including statements that he was driving at night when he was actually driving during the day.

62.     The LexisNexis Report omits important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

63.     On information and belief, much of the Driving Data Defendants collected and shared is improperly and inaccurately associated with Plaintiff Carnine because his family members also drove the vehicle.

64.     Plaintiff Carnine maintained insurance coverage for his 2018 Chevrolet Bolt through Nationwide. Nationwide told Plaintiff Carnine that his insurance premium for his vehicles, including the 2018 Chevrolet Bolt, would double from approximately $6,000 per year to approximately $12,000 per year starting in April 2024. Nationwide did not sufficiently explain the decision.

65.     Plaintiff Carnine had not recently filed an insurance claim, been in an automobile accident, received a speeding ticket, or experienced any other incident that could account for the increase.

66.     In September 2023 and March 2024, Plaintiff Carnine obtained auto insurances quotes from USAA from its website. He also obtained an auto insurance quote from GEICO's website in November 2023. They both offered him similar rates to his existing insurance company.

67.     Plaintiff Carnine's LexisNexis Report reveals that USAA accessed his LexisNexis Report on or about September 23, 2023 and March 15, 2024 which, upon information and belief, included his Driving Data. GEICO accessed his LexisNexis Report on November 6, 2023, which, upon information and belief, included his Driving Data.

68.     Upon information and belief, the increased premiums and inflated quotes suffered by Plaintiff Carnine were a result of insurers being provided with

the uncontextualized, misleading, and unconsented-to personal Driving Data on Plaintiff Carnine's LexisNexis Report.

69.     If Plaintiff Carnine had known that GM would intercept and sell his Driving Data to LexisNexis, Verisk, and other third parties without his knowledge or consent, he would not have purchased the 2018 Chevrolet Bolt.

70.     Plaintiff Carnine's Driving Data has tangible value. Because of Defendants' conduct, Plaintiff Carnine has lost control over the use of his Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

71.     Plaintiff Carnine had a reasonable expectation of privacy in his vehicle, including that detailed data about his location, routes, schedule, and driving behaviors would not be collected or shared without his express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing his Driving Data invaded Plaintiff Carnine's privacy rights.

**Donald Smith, Jr.**

72.     Plaintiff Donald Smith, Jr. is a resident and citizen of the state of California. In March 2021, Plaintiff D. Smith leased a 2020 Chevrolet Bolt from a GM dealer in California. GM equipped the 2020 Chevrolet Bolt with OnStar during the manufacturing process.

73.     Plaintiff D. Smith enrolled in OnStar Smart Driver from March 2021 to March 2024 so that he could privately learn about his own driving behavior.

74.     Unbeknownst to Plaintiff D. Smith, GM intercepted Driving Data relating to his 2020 Chevrolet Bolt using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff D. Smith reasonably expected that his Driving Data would remain private unless he gave GM his express authorization to collect, use, or share it. Plaintiff D. Smith did not know that GM was intercepting his Driving Data for its own financial and commercial use, and never authorized GM to do so.

75.     Unbeknownst to Plaintiff D. Smith, GM also sold his Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and shared Plaintiff D. Smith's Driving Data for their own financial and commercial benefit. Plaintiff D. Smith has never knowingly opted in to sharing his Driving Data relating to his 2020 Chevrolet Bolt with anyone, including LexisNexis or Verisk, nor would he have done so. Plaintiff D. Smith, who did not know that LexisNexis and Verisk had possession of his Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share his Driving Data with other third parties.

76.     On May 17, 2024, Plaintiff D. Smith received a copy of his LexisNexis Consumer Disclosure Report, which confirmed that Driving Data from his 2020

Chevrolet Bolt was intercepted, accessed, recorded, and disclosed by GM to LexisNexis without his consent. The Report included detailed Driving Data for 394 trips from November 2023 to March 2024 including, for each trip: the start and end date; the start and end time; the distance driven; acceleration events; high speed events; and hard brake events.

77.     On September 11, 2024, Plaintiff D. Smith received a copy of his Verisk Driving Behavior History Report, which confirmed that Driving Data from his 2020 Chevrolet Bolt was intercepted, accessed, recorded and disclosed by GM to Verisk without his consent.

78.     The LexisNexis and Verisk Reports omit important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

79.     On information and belief, much of the Driving Data Defendants collected and shared is improperly and inaccurately associated with Plaintiff D. Smith because his wife was also a driver of the vehicle.

80.     Plaintiff D. Smith maintained insurance coverage for his 2020 Chevrolet Bolt through GEICO. In December 2023, GEICO told Plaintiff D. Smith

that his insurance premium for the vehicle would increase. GEICO did not explain the decision.

81.  Plaintiff D. Smith had not recently filed an insurance claim, been in an automobile accident, received a speeding ticket, or experienced any other incident that could account for the increase.

82.  Plaintiff D. Smith also sought an auto insurance quote from USAA, but it offered him a higher rate than GEICO. Plaintiff D. Smith's LexisNexis Report reveals that USAA accessed his LexisNexis Report on or about November 5, 2023, which, upon information and belief, included his Driving Data.

83.  Upon information and belief, the increased premiums and inflated quotes suffered by Plaintiff D. Smith were a result of insurers being provided with the uncontextualized, misleading, and unconsented-to personal Driving Data on Plaintiff's LexisNexis and Verisk Reports.

84.  If Plaintiff D. Smith had known that GM would intercept and sell his Driving Data to LexisNexis, Verisk, and other third parties without his knowledge or consent, he would not have leased the 2020 Chevrolet Bolt, nor enrolled in Smart Driver.

85.  Plaintiff D. Smith's Driving Data has tangible value. Because of Defendants' conduct, Plaintiff D. Smith has lost control over the use of his Driving

Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

86.     Plaintiff D. Smith had a reasonable expectation of privacy in his vehicle, including that detailed data about his location, routes, schedule, and driving behaviors would not be collected or shared without his express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing his Driving Data invaded Plaintiff D. Smith's privacy rights.

### Nathaniel Haiden

87.     Plaintiff Nathaniel Haiden is a resident and citizen of the state of California. On or about December 3, 2022, Plaintiff Haiden purchased a 2023 Chevrolet Bolt from a GM dealer in Monrovia, California. GM equipped the 2023 Chevrolet Bolt with OnStar during the manufacturing process.

88.     When Plaintiff Haiden purchased the 2023 Chevrolet Bolt, he was told by the GM dealer that OnStar was included with the vehicle's purchase and that the vehicle came with a "free trial" of OnStar. The GM dealer activated OnStar before Plaintiff Haiden took possession of the vehicle. Plaintiff Haiden was never given a choice to activate, and never knowingly enrolled in, OnStar Smart Driver.

89.     Unbeknownst to Plaintiff Haiden, GM intercepted Driving Data relating to his 2023 Chevrolet Bolt using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff Haiden reasonably expected

that his Driving Data would remain private unless he gave GM his express authorization to collect, use, or share it. Plaintiff Haiden did not know that GM was intercepting his Driving Data for its own financial and commercial use, and never authorized GM to do so.

90.     Unbeknownst to Plaintiff Haiden, GM also sold his Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and shared Plaintiff Haiden's Driving Data for their own financial and commercial benefit. Plaintiff Haiden has never knowingly opted in to sharing his Driving Data relating to his 2023 Chevrolet Bolt with anyone, including LexisNexis or Verisk, nor would he have done so. Plaintiff Haiden, who did not know that LexisNexis and Verisk had possession of his Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share his Driving Data with other third parties.

91.     On September 20, 2024, Plaintiff Haiden received a copy of his LexisNexis Consumer Disclosure Report, which confirmed that Driving Data from his 2023 Chevrolet Bolt was intercepted, accessed, recorded, and disclosed by GM to LexisNexis without his consent. The Report included detailed Driving Data for 13 trips in March 2024, including, for each trip: the start and end date; the start and end time; the distance driven; acceleration events; high speed events; and hard brake events.

92.     On October 21, 2024, Plaintiff Haiden received a copy of his Verisk Driving Behavior History Report, which confirmed that Driving Data from his 2023 Chevrolet Bolt was intercepted, accessed, recorded and disclosed by GM to Verisk without his consent.

93.     The LexisNexis and Verisk Reports omit important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

94.     Plaintiff Haiden maintained insurance coverage for his 2023 Chevrolet Bolt through GEICO. In July 2024, GEICO told Plaintiff Haiden that his insurance premium for the vehicle would increase by an additional $23 per month. GEICO did not explain the decision. Plaintiff Haiden had not recently received a speeding ticket or experienced any other incident that could account for the increase.

95.     In the Summer of 2024, Plaintiff Haiden also sought auto insurances quotes from State Farm. State Farm offered a higher insurance rate than his existing auto insurance company. Plaintiff Haiden's LexisNexis Report reveals that State Farm accessed his LexisNexis Report on or about June 12, 2024, which, upon information and belief, included his Driving Data.

96. Upon information and belief, the increased premiums and inflated quotes suffered by Plaintiff Haiden were a result of insurers being provided with the uncontextualized, misleading, and unconsented-to personal Driving Data on Plaintiff Haiden's LexisNexis and Verisk Reports.

97. If Plaintiff Haiden had known that GM would intercept and sell his Driving Data to LexisNexis, Verisk, and other third parties without his knowledge or consent, he would not have purchased the 2023 Chevrolet Bolt.

98. Plaintiff Haiden's Driving Data has tangible value. Because of Defendants' conduct, Plaintiff Haiden has lost control over the use of his Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

99. Plaintiff Haiden had a reasonable expectation of privacy in his vehicle, including that detailed data about his location, routes, schedule, and driving behaviors would not be collected or shared without his express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing his Driving Data invaded Plaintiff Haiden's privacy rights.

## CONNECTICUT

### Amy Brunet

100. Plaintiff Amy Brunet is a resident and citizen of the state of Connecticut. In March 2021, Plaintiff Brunet purchased a 2021 Cadillac Escalade

from a GM dealer in Warwick, Rhode Island. GM equipped the 2021 Cadillac Escalade with OnStar during the manufacturing process.

101.   When Plaintiff Brunet purchased the 2021 Cadillac Escalade, she was told by the GM dealer that OnStar was included with the vehicle's purchase and that the vehicle came with a "free trial" of OnStar. The GM dealer activated OnStar at the dealership. Plaintiff Brunet subsequently purchased OnStar services after the initial "free trial" expired, including OnStar Smart Driver, from March 2021 to the summer of 2024, so that she could privately learn about her own driving behavior and because she believed that services such as roadside assistance, emergency calling and location assistance would be beneficial to her.

102.   Unbeknownst to Plaintiff Brunet, GM intercepted Driving Data relating to her 2021 Cadillac Escalade using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff Brunet reasonably expected that her Driving Data would remain private unless she gave GM her express authorization to collect, use, or share it. Plaintiff Brunet did not know that GM was intercepting her Driving Data for its own financial and commercial use, and never authorized GM to do so.

103.   Unbeknownst to Plaintiff Brunet, GM also sold her Driving Data to Verisk and other third parties, who then stored, manipulated, used, and shared Plaintiff Brunet's Driving Data for their own financial and commercial benefit.

Plaintiff Brunet has never knowingly opted in to sharing her Driving Data relating to her 2021 Cadillac Escalade with anyone, including Verisk, nor would she have done so. Plaintiff Brunet, who did not know that Verisk had possession of her Driving Data, never authorized Verisk to store, manipulate, use, sell, or share her Driving Data with other third parties.

104.   Plaintiff Brunet received a copy of her Verisk Driving Behavior History Report dated September 25, 2024, which confirmed that Driving Data from her 2021 Cadillac Escalade was intercepted, accessed, recorded and disclosed by GM to Verisk without her consent. The Report omits important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

105.   If Plaintiff Brunet had known that GM would intercept and sell her Driving Data to Verisk and other third parties without her knowledge or consent, she would not have purchased the 2021 Cadillac Escalade.

106.   Plaintiff Brunet's Driving Data has tangible value. Because of Defendants' conduct, Plaintiff Brunet has lost control over the use of her Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

107. Plaintiff Brunet had a reasonable expectation of privacy in her vehicle, including that detailed data about her location, routes, schedule, and driving behaviors would not be collected or shared without her express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing her Driving Data invaded Plaintiff Brunet's privacy rights.

## DELAWARE

### Michael Alamorian

108. Plaintiff Michael Alamorian is a resident and citizen of the state of Delaware. Over the years, Plaintiff Alamorian has owned many GM vehicles, including but not limited to the vehicles discussed below.

109. On or around February 7, 2022, Plaintiff Alamorian purchased a 2021 Cadillac CT5 from a GM dealer in Wilmington, Delaware. GM equipped the 2021 Cadillac CT5 with OnStar during the manufacturing process.

110. On or around May 2, 2024, Plaintiff Alamorian purchased a 2024 GMC Sierra from a GM dealer in Elkton, Maryland. GM equipped the 2024 GMC Sierra with OnStar during the manufacturing process.

111. When Plaintiff Alamorian purchased the 2021 Cadillac CT5, he was told by the GM dealer that OnStar was included with the vehicle's purchase and the GM dealer activated OnStar before Plaintiff Alamorian took possession of the vehicle.

112.    When Plaintiff Alamorian purchased the 2024 GMC Sierra, he refused to accept OnStar during delivery but was told by the GM dealer that OnStar was mandatory and included with the vehicle's purchase and that the vehicle came with a "free trial" of OnStar for 30 days. The GM dealer activated OnStar during delivery, before Plaintiff Alamorian took possession of the vehicle. Plaintiff Alamorian then went through the steps to cancel OnStar on his 2024 GMC Sierra within approximately three days of delivery. Unbeknownst to Plaintiff Alamorian, OnStar remained active on his vehicle for months. On or around September 1, 2024, Plaintiff Alamorian learned after taking his vehicle in for service that OnStar remained active on his vehicle despite his best efforts to cancel OnStar months prior and despite the expiration of the 30-day trial period.

113.    Unbeknownst to Plaintiff Alamorian, GM intercepted non-anonymized, personal Driving Data relating to Plaintiff Alamorian's vehicles using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff Alamorian reasonably expected that his Driving Data would remain private unless he gave GM his express authorization to collect, use, or share it. Plaintiff Alamorian did not know that GM was intercepting his Driving Data for its own financial and commercial use, and never authorized GM to do so.

114.    Unbeknownst to Plaintiff Alamorian, GM also sold his Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and

shared Plaintiff's Driving Data for their own financial and commercial benefit. Plaintiff Alamorian has never knowingly opted in to sharing his Driving Data relating to his GM vehicles with anyone, including LexisNexis or Verisk, nor would he have done so. Plaintiff Alamorian, who did not know that LexisNexis and Verisk had possession of his Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share his Driving Data with other third parties.

115.   On August 28, 2024, Plaintiff Michael Alamorian received a copy of his LexisNexis Consumer Disclosure Report, which confirmed that Driving Data from his 2021 Cadillac CT5 was intercepted, accessed, recorded, and disclosed by GM to LexisNexis without his consent. The Report included detailed Driving Data for 15 trips from February 22, 2024, to March 16, 2024, including, for each trip: the start and end date; the start and end time; the distance driven; acceleration events; high speed events; and hard brake events.

116.   The Report confirmed that Plaintiff Alamorian's Driving Data was collected by LexisNexis. The Report omits important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

117.   Plaintiff Alamorian maintained insurance coverage for his GM vehicles through State Farm, Liberty Mutual, and National General.

118. Plaintiff Alamorian has not recently filed an insurance claim, gotten into an automobile accident, nor received a speeding ticket.

119. Upon information and belief, the increased premiums suffered by Plaintiff Alamorian were a result of Liberty Mutual and National General being provided with the uncontextualized, misleading, and unconsented-to personal Driving Data on Plaintiff Alamorian's LexisNexis and Verisk reports.

120. If Plaintiff Alamorian had known that GM would intercept and sell his Driving Data to LexisNexis, Verisk, and other third parties without his knowledge or consent, he would not have purchased his GM vehicles.

121. Plaintiff Alamorian's private Driving Data has tangible value. Because of Defendants' conduct, Plaintiff Alamorian has lost control over the use of his Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

122. Plaintiff Alamorian had a reasonable expectation of privacy in his GM vehicles, including that detailed data about his location, routes, schedule, and driving behaviors would not be collected or shared without his express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing his Driving Data invaded Plaintiff Alamorian's privacy rights.

## FLORIDA

### Romeo Chicco

123.     Plaintiff Romeo Chicco is a resident and citizen of the state of Florida. On or about November 16, 2021, Plaintiff Chicco purchased a 2021 Cadillac XT6 from a GM dealer in Delray Beach, Florida. GM equipped the 2021 Cadillac XT6 with OnStar during the manufacturing process.

124.     When Plaintiff Chicco purchased the 2021 Cadillac XT6, he was told by the GM dealer that OnStar was included with the vehicle's purchase and the vehicle came with a "free trial" of OnStar.  The GM dealer recommended activation of OnStar before Plaintiff Chicco took possession of the vehicle, even though he stated that he did not want OnStar. Plaintiff Chicco was never given a choice to activate, and never knowingly enrolled in, OnStar Smart Driver.

125.     Unbeknownst to Plaintiff Chicco, GM intercepted Driving Data relating to Plaintiff Chicco's 2021 Cadillac XT6 using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff Chicco reasonably expected that his Driving Data would remain private unless he gave GM his express authorization to collect, use, or share it. Plaintiff Chicco did not know that GM was intercepting his Driving Data for its own financial and commercial use, and never authorized GM to do so.

126. Unbeknownst to Plaintiff Chicco, GM also sold his Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and shared Plaintiff Chicco's Driving Data for their own financial and commercial benefit. Plaintiff Chicco has never knowingly opted in to sharing his Driving Data relating to his 2021 Cadillac XT6 with anyone, including LexisNexis or Verisk, nor would he have done so. Plaintiff Chicco, who did not know that LexisNexis and Verisk had possession of his Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share his Driving Data with other third parties.

127. On December 18, 2023, Plaintiff Chicco received a copy of his LexisNexis Consumer Disclosure Report, which confirmed that Driving Data from his 2021 Cadillac XT6 was intercepted, accessed, recorded, and disclosed by GM to LexisNexis without his consent. The Report included detailed Driving Data for 258 trips from June 2023 to December 2023, including, for each trip: the start and end date; the start and end time; the distance driven; acceleration events; high speed events; and hard brake events.

128. On March 27, 2024, Plaintiff Chicco received a copy of his Verisk Driving Behavior History Report, which confirmed that Driving Data from his 2021 Cadillac XT6 was intercepted, accessed, recorded and disclosed by GM to Verisk without his consent.

129.   The LexisNexis and Verisk Reports omit important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

130.   On information and belief, much of the Driving Data Defendants collected and shared is improperly and inaccurately associated with Plaintiff Chicco because his wife and adult children occasionally drove the vehicle.

131.   Plaintiff Chicco maintained insurance coverage for his 2021 Cadillac XT6 through Farmers Insurance and received a substantial premium increase for 2023-2024 renewal period. Plaintiff Chicco's LexisNexis Report reveals that Farmers Insurance accessed his LexisNexis Report on or about July 20, 2023, which, upon information and belief, included his Driving Data. Plaintiff Chicco had not recently filed an insurance claim (other than broken windshield claims that were not his fault), been in an automobile accident, received a speeding ticket, or experienced any other incident that could account for the increase.

132.   In July 2023, Farmers Insurance announced that it would be exiting the Florida insurance market with its auto, home and umbrella policies, forcing Plaintiff Chicco to look elsewhere for coverage with another insurance carrier.

133. In December 2023, Plaintiff Chicco sought online auto insurance quotes from Progressive, GEICO, and Liberty Mutual to replace his coverage with Farmers Insurance. These insurers denied coverage to him. Liberty Mutual later explained its denial was based on information contained in Plaintiff Chicco's LexisNexis Report, which prompted him to request that Report.

134. Plaintiff's LexisNexis Report reveals that Progressive, GEICO, and Liberty Mutual accessed his LexisNexis Report on or about December 18, 2023, which, upon information and belief, included his Driving Data.

135. Upon information and belief, the increased premiums and insurance denials suffered by Plaintiff Chicco were a result of insurers being provided with the uncontextualized, misleading, and unconsented-to personal Driving Data on Plaintiff Chicco's LexisNexis and Verisk Reports.

136. If Plaintiff Chicco had known that GM would intercept and sell his Driving Data to LexisNexis, Verisk, and other third parties without his knowledge or consent, he would not have purchased the 2021 Cadillac XT6.

137. Plaintiff Chicco's Driving Data has tangible value. Because of Defendants' conduct, Plaintiff Chicco has lost control over the use of his Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

138.     Plaintiff Chicco had a reasonable expectation of privacy in his vehicle, including that detailed data about his location, routes, schedule, and driving behaviors would not be collected or shared without his express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing his Driving Data invaded Plaintiff Chicco's privacy rights.

**Suzanne Block**

139.     Plaintiff Suzanne Block is a resident and citizen of the state of Florida. On or about January 11, 2022, Plaintiff Block leased a 2022 Buick Encore from a GM dealer in Pompano, Florida. GM equipped the 2022 Buick Encore with OnStar during the manufacturing process.

140.     Plaintiff Block was never given a choice to activate, and never knowingly enrolled in, OnStar or Smart Driver for her 2022 Buick Encore. At all relevant times, Plaintiff Block did not know that OnStar was even active in the vehicle.

141.     Unbeknownst to Plaintiff Block, GM intercepted Driving Data relating to her 2022 Buick Encore using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff Block reasonably expected that her Driving Data would remain private unless she gave GM her express authorization to collect, use, or share it. Plaintiff Block did not know that GM was intercepting her

Driving Data for its own financial and commercial use, and never authorized GM to do so.

142. Unbeknownst to Plaintiff Block, GM also sold her Driving Data to Verisk and other third parties, who then stored, manipulated, used, and shared Plaintiff Block's Driving Data for their own financial and commercial benefit. Plaintiff Block has never knowingly opted in to sharing her Driving Data relating to her 2022 Buick Encore with anyone, including Verisk, nor would she have done so. Plaintiff Block, who did not know that Verisk had possession of her Driving Data, never authorized Verisk to store, manipulate, use, sell, or share her Driving Data with other third parties.

143. On or about October 8, 2024, Plaintiff Block received a copy of her Verisk Driving Behavior History Report, which confirmed that Driving Data from her 2022 Buick Encore was intercepted, accessed, recorded, and disclosed by GM to Verisk without her consent. The Report omits important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

144. Plaintiff Block maintained insurance coverage for her 2022 Buick Encore through State Farm. In the last several years, State Farm has increased Plaintiff Block's insurance premiums. For example, for the Policy Period March 11,

2023 to September 11, 2023, State Farm charged Plaintiff Block a premium of $869.24, but for the Policy Period March 11, 2024 to September 11, 2024, State Farm charged Plaintiff a premium of $1,046.88. State Farm did not explain the decision to increase her premium.

145.    In early 2022, Plaintiff Block was a passenger in a car accident and filed a claim for coverage with her uninsured motorist carrier. However, Plaintiff Block was not at fault for the accident. Plaintiff Block has otherwise not filed any insurance claim, received a speeding ticket in the last five years, or engaged in any driving behavior that could account for the increase in her insurance coverage.

146.    Upon information and belief, the increased premiums suffered by Plaintiff Block were a result of insurers being provided with the uncontextualized, misleading, and unconsented-to personal Driving Data on Plaintiff's Verisk Report.

147.    If Plaintiff Block had known that GM would intercept and sell her Driving Data to Verisk and other third parties without her knowledge or consent, she would not have purchased the 2022 Buick Encore.

148.    Plaintiff Block's Driving Data has tangible value. Because of Defendants' conduct, Plaintiff Block has lost control over the use of her Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

149. Plaintiff Block had a reasonable expectation of privacy in her vehicle, including that detailed data about her location, routes, schedule, and driving behaviors would not be collected or shared without her express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing her Driving Data invaded Plaintiff Block's privacy rights.

### Tory Skyers

150. Plaintiff Tory Skyers is a resident and citizen of the state of Florida. In March 2022, Plaintiff Skyers purchased a 2019 Cadillac CTS-V from a GM dealer in Tampa, Florida. GM equipped the 2019 Cadillac CTS-V with OnStar during the manufacturing process.

151. When Plaintiff Skyers purchased the 2019 Cadillac CTS-V, he was told by the GM dealer that OnStar was included with the vehicle's purchase and the GM dealer activated OnStar before Plaintiff Skyers took possession of the vehicle. Plaintiff Skyers was never given a choice to activate, and never knowingly enrolled in, OnStar Smart Driver.

152. Unbeknownst to Plaintiff Skyers, GM intercepted Driving Data relating to his 2019 Cadillac CTS-V using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff Skyers reasonably expected that his Driving Data would remain private unless he gave GM his express authorization to collect, use, or share it. Plaintiff Skyers did not know that GM was intercepting his

Driving Data for its own financial and commercial use, and never authorized GM to do so.

153.   Unbeknownst to Plaintiff Skyers, GM also sold his Driving Data to Verisk, and other third parties, who then stored, manipulated, used, and shared his Driving Data for their own financial and commercial benefit. Plaintiff Skyers has never knowingly opted in to sharing his Driving Data relating to his 2019 Cadillac CTS-V with anyone, including Verisk, nor would he have done so. Plaintiff Skyers, who did not know that Verisk had possession of his Driving Data, never authorized Verisk to store, manipulate, use, sell, or share his Driving Data with other third parties.

154.   On June 3, 2024, Plaintiff Skyers received a copy of his Verisk Driving Behavior History Report, which confirmed that Driving Data from his 2019 Cadillac CTS-V was intercepted, accessed, recorded and disclosed by GM to Verisk without his consent. The Report included detailed Driving Data for 258 trips from December 2023 to March 2024, including, for each date: the number of trips, speeding events, hard braking events, rapid acceleration events, daytime driving minutes, nighttime driving minutes, and miles driven. The Report omits important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by

themselves, says nothing of the driving conditions and factors experienced during each trip.

155. On information and belief, much of the Driving Data Defendants collected and shared is improperly and inaccurately associated with Plaintiff Tory Skyers because his wife was also a driver of the vehicle.

156. Plaintiff Skyers maintained insurance coverage for his 2019 Cadillac CTS-V through Progressive. In January 2024, Progressive told Plaintiff Skyers that his six-month insurance premium for his vehicles, including the Cadillac CTS-V would increase from $3,869 in August 2023 to $6,135 starting in February 2024, a total price increase of $2,266. Progressive did not provide a satisfactory explanation for the decision. Plaintiff Skyers had not recently filed an insurance claim, been in an automobile accident, received a speeding ticket, or experienced any other incident that could account for the increase.

157. Due to the major insurance premium rate increase, Plaintiff Skyers subsequently sought auto insurances quotes from Allstate Insurance, GEICO and The General in early 2024. All three insurers denied coverage to him.

158. Upon information and belief, the increased premiums and insurance denials suffered by Plaintiff Skyers were a result of insurers being provided with the uncontextualized, misleading, and unconsented-to personal Driving Data on Plaintiff Skyers's Verisk Report.

159. If Plaintiff Skyers had known that GM would intercept and sell his Driving Data to Verisk, and other third parties without his knowledge or consent, he would not have purchased the 2019 Cadillac CTS-V.

160. Plaintiff Skyers' Driving Data has tangible value. Because of Defendants' conduct, Plaintiff Skyers has lost control over the use of his Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

161. Plaintiff Skyers had a reasonable expectation of privacy in his vehicle, including that detailed data about his location, routes, schedule, and driving behaviors would not be collected or shared without his express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing his Driving Data invaded Plaintiff Skyers' privacy rights.

## GEORGIA

### Plaintiff David Gaddis

162. Plaintiff David Gaddis is a resident and citizen of the state of Georgia. Plaintiff Gaddis has purchased a number of GM vehicles, including the following vehicles:

    a. On or around January 12, 2014, Plaintiff Gaddis purchased a 2013 Chevrolet Corvette from a GM dealer in Buford, Georgia.

GM equipped this vehicle with OnStar during the manufacturing process.

b. On or around August 10, 2019, Plaintiff Gaddis purchased a 2019 Chevrolet Corvette from a GM dealer in Atlanta, Georgia. GM equipped this vehicle with OnStar during the manufacturing process.

c. On or around September 14, 2024, Plaintiff Gaddis purchased a 2023 Chevrolet Camaro SS from a GM dealer in Decatur, Alabama. GM equipped this vehicle with OnStar during the manufacturing process.

163.   When Plaintiff Gaddis purchased each of his vehicles, including the 2023 Chevrolet Camaro SS, he was told by the GM dealer that OnStar was included in the vehicle's purchase and that the vehicles came with a "free trial" of OnStar; for each of his vehicles, the GM dealer activated OnStar at the dealership. Plaintiff Gaddis was never given a choice to activate, and never knowingly enrolled in, OnStar Smart Driver.

164.   Unbeknownst to Plaintiff Gaddis, GM intercepted Driving Data relating to his 2023 Chevrolet Camaro, and likely also his other GM vehicles, using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff Gaddis reasonably expected that his Driving Data would remain

private unless he gave GM his express authorization to collect, use, or share it. Plaintiff Gaddis did not know that GM was intercepting his Driving Data for its own financial and commercial use, and never authorized GM to do so.

165. Unbeknownst to Plaintiff Gaddis, GM also sold his Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and shared his Driving Data for their own financial and commercial benefit. Plaintiff Gaddis has never knowingly opted in to sharing his Driving Data relating to his vehicles with anyone, including LexisNexis or Verisk, nor would he have done so. Plaintiff Gaddis, who did not know that LexisNexis and Verisk had possession of his Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share his Driving Data with other third parties.

166. Plaintiff Gaddis received a copy of his Verisk Driving Behavior History Report, dated October 17, 2024, which confirmed that Driving Data from his 2023 Chevrolet Camaro SS was intercepted, accessed, recorded and disclosed by GM to Verisk without his consent. The Report omits important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

167. Plaintiff Gaddis maintained insurance coverage for his vehicles through Nationwide Insurance and Travelers Insurance. From around 2018, Plaintiff Gaddis

noticed that his vehicle insurance premiums were increasing significantly. His insurer did not explain the reason for the increase. Plaintiff Gaddis' insurance agents told him that insurance rates were increasing nationwide.

168.  Plaintiff Gaddis had not recently filed an insurance claim, been in an automobile accident, received a speeding ticket, or experienced any other incident that could account for the increase.

169.  Upon information and belief, the increased premiums suffered by Plaintiff Gaddis were a result of his insurer being provided with the uncontextualized, misleading, and unconsented-to personal Driving Data on Plaintiff Gaddis's LexisNexis/Verisk Reports.

170.  If Plaintiff Gaddis had known that GM would intercept and sell his Driving Data to LexisNexis, Verisk, and other third parties without his knowledge or consent, he would not have purchased his GM vehicles, including the 2023 Chevrolet Camaro SS.

171.  Plaintiff Gaddis's Driving Data has tangible value. Because of Defendants' conduct, Plaintiff Gaddis has lost control over the use of his Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

172.  Plaintiff Gaddis had a reasonable expectation of privacy in his vehicle, including that detailed data about his location, routes, schedule, and driving

behaviors would not be collected or shared without his express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing his Driving Data invaded Plaintiff Gaddis's privacy rights.

### Stephen Griner

173.   Plaintiff Stephen Griner is a resident and citizen of the state of Georgia. Over the years, Plaintiff Griner has owned a number of GM vehicles, which GM likely equipped with OnStar during the manufacturing process.

174.   On or about December 21, 2021, Plaintiff Griner purchased a 2021 GMC Sierra 1500 from a GM dealer in Lake City, Florida. GM equipped the 2021 GMC Sierra 1500 with OnStar during the manufacturing process.

175.   When Plaintiff Griner purchased the 2021 GMC Sierra 1500, he was told by the GM dealer that OnStar was included with the vehicle's purchase and that the vehicle came with a "free trial" of OnStar. Plaintiff Griner was not interested in OnStar and told the GM dealer that he did not want it, but the GM dealer was insistent, and the GM dealer activated OnStar at the dealership. Plaintiff Griner never knowingly enrolled in OnStar Smart Driver.

176.   Unbeknownst to Plaintiff Griner, GM intercepted Driving Data relating to Plaintiff Griner's 2021 GMC Sierra 1500 using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff Griner reasonably expected that his Driving Data would remain private unless he gave GM his express

authorization to collect, use, or share it. Plaintiff Griner did not know that GM was intercepting his Driving Data for its own financial and commercial use, and never authorized GM to do so.

177.    Unbeknownst to Plaintiff Griner, GM also sold his Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and shared Plaintiff Griner's Driving Data for their own financial and commercial benefit. Plaintiff Griner has never knowingly opted in to sharing his Driving Data relating to his 2021 GMC Sierra 1500 with anyone, including LexisNexis or Verisk, nor would he have done so. Plaintiff Griner, who did not know that LexisNexis and Verisk had possession of his Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share his Driving Data with other third parties.

178.    Plaintiff Griner received a copy of his LexisNexis Consumer Disclosure Report dated August 21, 2024, which confirmed that Driving Data from his 2021 GMC Sierra 1500 was intercepted, accessed, recorded, and disclosed by GM to LexisNexis without his consent. The Report included detailed Driving Data for 182 trips in February 2024 and March 2024, including, for each trip: the start and end date; the start and end time; the distance driven; acceleration events; high speed events; and hard brake events.

179. The Report confirmed that Plaintiff Griner's Driving Data was collected by LexisNexis even after Plaintiff Griner's "free trial" of OnStar had expired.

180. The LexisNexis Report omits important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

181. On information and belief, some of the Driving Data Defendants collected and shared is improperly and inaccurately associated with Plaintiff Griner because his wife and son also sometimes drove the vehicle.

182. Plaintiff Griner maintained insurance coverage for his 2021 GMC Sierra 1500, as well as for other vehicles he owned, through State Farm.

183. From 2022 onwards, Plaintiff Griner has experienced significant increases in the insurance premiums for many of his vehicles, including the 2021 GMC Sierra 1500. Plaintiff Griner's insurance premium for his 2021 GMC Sierra increased by approximately $208.36 between around January 19, 2022 and around October 16, 2024.

184. State Farm Insurance initially told Plaintiff Griner that the reasons for the insurance premium increases was because it becomes more expensive to obtain replacement parts for cars as they age. Subsequently, Plaintiff Griner was told by a

State Farm representative that State Farm had obtained information about him from LexisNexis.

185.   Plaintiff Griner's LexisNexis Report reveals that State Farm accessed his LexisNexis Report on or around November 20, 2023 and December 27, 2023, which, upon information and belief, included his Driving Data.

186.   In around late 2022, Plaintiff Griner also sought auto insurance quotes from other insurance companies, including Geico, Farmers Insurance and Auto-Owners Insurance. Plaintiff Griner was not quoted rates that were better or significantly better than the premiums he was paying to State Farm Insurance.

187.   Plaintiff Griner's LexisNexis Report reveals that Geico accessed his LexisNexis Report on or about November 27, 2023, which, upon information and belief, included his Driving Data.

188.   Upon information and belief, the increased premiums and inflated quotes suffered by Plaintiff Griner were a result of insurers being provided with the uncontextualized, misleading, and unconsented-to personal Driving Data on Plaintiff Griner's LexisNexis/Verisk Reports.

189.   If Plaintiff Griner had known that GM would collect and/or sell his Driving Data to LexisNexis, Verisk, and other third parties without his knowledge or consent, he would not have purchased the 2021 GMC Sierra 1500.

190. Plaintiff Griner's Driving Data has tangible value. Because of Defendants' conduct, Plaintiff Griner has lost control over the use of his Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

191. Plaintiff Griner had a reasonable expectation of privacy in his vehicle, including that detailed data about his location, routes, schedule, and driving behaviors would not be collected or shared without his express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing his Driving Data invaded Plaintiff Griner's privacy rights.

## IDAHO

### Pavel Gazhenko

192. Plaintiff Pavel Gazhenko is a resident and citizen of the state of Idaho. On or about May 2023 Plaintiff Gazhenko purchased a 2023 GMC Sierra 1500 from a GM dealer in Nampa, Idaho. GM equipped the GMC Sierra 1500 with OnStar during the manufacturing process.

193. When Plaintiff Gazhenko purchased the GMC Sierra 1500, he was told by the GM dealer that OnStar was included with the vehicle's purchase and the GM dealer activated OnStar before Plaintiff Gazhenko took possession of the vehicle. Plaintiff Gazhenko was never given a choice to activate, and never knowingly enrolled in, OnStar Smart Driver.

194. Unbeknownst to Plaintiff Gazhenko, GM intercepted Driving Data relating to his GMC Sierra 1500 using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff Gazhenko reasonably expected that his Driving Data would remain private unless he gave GM his express authorization to collect, use, or share it. Plaintiff Gazhenko did not know that GM was intercepting his Driving Data for its own financial and commercial use, and never authorized GM to do so.

195. Unbeknownst to Plaintiff Gazhenko GM also sold his Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and shared his Driving Data for their own financial and commercial benefit. Plaintiff Gazhenko has never knowingly opted in to sharing his Driving Data relating to his GMC Sierra 1500 with anyone, including LexisNexis or Verisk, nor would he have done so. Plaintiff Gazhenko, who did not know that LexisNexis and Verisk had possession of his Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share his Driving Data with other third parties.

196. On July 6, 2024, Plaintiff Gazhenko received a copy of his LexisNexis Consumer Disclosure Report, which confirmed that Driving Data from his GMC Sierra 1500 was intercepted, accessed, recorded, and disclosed by GM to LexisNexis without his consent. The Report included detailed Driving Data for 252 trips from January 2024 to March 2024, including, for each trip: the start and end date; the start

and end time; the distance driven; acceleration events; high speed events; and hard brake events.

197. The LexisNexis Report omits important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

198. On information and belief, much of the Driving Data Defendants collected and shared is improperly and inaccurately associated with Plaintiff Gazhenko because Olga Gazhenko was also a driver of the vehicle.

199. Plaintiff maintained insurance coverage for his GMC Sierra 1500 through Travelers Insurance. In June 2024, Travelers Insurance told Plaintiff that his insurance premium for the vehicle would increase by 20%. Travelers Insurance did not explain the decision. Plaintiff Gazhenko had not recently filed an insurance claim, been in an automobile accident, received a speeding ticket, or experienced any other incident that could account for the increase.

200. If Plaintiff Gazhenko had known that GM would intercept and sell his Driving Data to LexisNexis, Verisk, and other third parties without his knowledge or consent, he would not have purchased the GMC Sierra 1500.

201. Plaintiff Gazhenko's Driving Data has tangible value. Because of Defendants' conduct, Plaintiff has lost control over the use of his Driving Data,

which is in the possession of third parties who have used and will use it for their own financial advantage.

202.   Plaintiff Gazhenko had a reasonable expectation of privacy in his vehicle, including that detailed data about his location, routes, schedule, and driving behaviors would not be collected or shared without his express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing his Driving Data invaded Plaintiff Gazhenko's privacy rights.

## ILLINOIS

### Adam Dinitz

203.   Plaintiff Adam Dinitz is a resident and citizen of the state of Illinois. On or about October 1, 2020, Plaintiff Dinitz purchased a 2020 GMC Sierra HD Double Cab from a GM dealer in McHenry, Illinois. GM equipped the Sierra with OnStar during the manufacturing process.

204.   When Plaintiff Dinitz purchased the Sierra, he was told by the GM dealer that OnStar was mandatory, that OnStar was included with the vehicle's purchase, and that the vehicle came with a "free trial" of OnStar. The GM dealer activated OnStar before Plaintiff Dinitz took possession of the vehicle. Plaintiff Dinitz was never given a choice to activate, and never knowingly enrolled in, OnStar Smart Driver.

205.    Unbeknownst to Plaintiff Dinitz, GM intercepted Driving Data relating to Plaintiff Dinitz's Sierra using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff Dinitz reasonably expected that his Driving Data would remain private unless Plaintiff he gave GM his express authorization to collect, use, or share it. Plaintiff Dinitz did not know that GM was intercepting his Driving Data for its own financial and commercial use, and never authorized GM to do so.

206.    Unbeknownst to Plaintiff Dinitz, GM also sold his Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and shared Plaintiff's Driving Data for their own financial and commercial benefit. Plaintiff Dinitz has never knowingly opted in to sharing his Driving Data relating to his Sierra with anyone, including LexisNexis or Verisk, nor would he have done so. Plaintiff Dinitz, who did not know that LexisNexis and Verisk had possession of his Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share his Driving Data with other third parties.

207.    On October 1, 2024, Plaintiff Dinitz received a copy of his LexisNexis Consumer Disclosure Report, which confirmed that Driving Data from his Sierra was intercepted, accessed, recorded, and disclosed by GM to LexisNexis without his consent. The Report confirmed that Plaintiff's Driving Data was collected by LexisNexis even after Plaintiff's "free trial" of OnStar had expired.

208.   On September 20, 2024, Plaintiff Dinitz received a copy of his Verisk Driving Behavior History Report, which confirmed that Driving Data from his Sierra was intercepted, accessed, recorded and disclosed by GM to Verisk without his consent. The Report confirmed that Plaintiff's Driving Data was collected by Verisk even after Plaintiff's "free trial" of OnStar had expired.

209.   The LexisNexis and Verisk Reports omit important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

210.   Plaintiff Dinitz maintained insurance coverage for his Sierra through Erie Insurance. In March 2023, Erie Insurance told Plaintiff that his insurance premium for the vehicle would increase by $313 annually. Erie Insurance did not explain the decision. Plaintiff Dinitz had not recently filed an insurance claim, been in an automobile accident, received a speeding ticket, or experienced any other incident that could account for the increase.

211.   In March 2024, Plaintiff also sought auto insurances quotes from Progressive Insurance. In March 2024, Progressive Insurance told Plaintiff that he was not quoted at their best rate. Plaintiff's LexisNexis Report reveals that

Progressive accessed his LexisNexis Report on or about March 15, 2023, which, upon information and belief, included his Driving Data.

212.    If Plaintiff Dinitz had known that GM would intercept and sell his Driving Data to LexisNexis, Verisk, and other third parties without his knowledge or consent, he would not have purchased the Sierra.

213.    Plaintiff Dinitz's Driving Data has tangible value. Because of Defendants' conduct, Plaintiff has lost control over the use of his Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

214.    Plaintiff Dinitz had a reasonable expectation of privacy in his vehicle, including that detailed data about his location, routes, schedule, and driving behaviors would not be collected or shared without his express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing his Driving Data invaded Plaintiff Dinitz's privacy rights.

**Peter Gray**

215.    Plaintiff Peter Gray is a resident and citizen of the state of Illinois. On or about January 2024, Plaintiff Gray purchased a 2023 Chevrolet Bolt from a GM dealer in Villa Park, Illinois. GM equipped the Chevrolet with OnStar during the manufacturing process.

216.     When Plaintiff Gray purchased the Chevrolet, he was told by the GM dealer that OnStar was mandatory and that the vehicle came with a "free trial" of OnStar. The GM dealer activated OnStar before Plaintiff Gray took possession of the vehicle.

217.     Unbeknownst to Plaintiff Gray, GM intercepted non-anonymized, personal Driving Data relating to Plaintiff Gray's Chevrolet using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff Gray reasonably expected that his Driving Data would remain private unless he gave GM his express authorization to collect, use, or share it. Plaintiff Gray did not know that GM was intercepting his Driving Data for its own financial and commercial use, and never authorized GM to do so.

218.     Unbeknownst to Plaintiff Gray, GM also sold his Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and shared Plaintiff Gray's Driving Data for their own financial and commercial benefit. Plaintiff Gray has never knowingly opted in to sharing his Driving Data relating to his Chevrolet with anyone, including LexisNexis, Verisk, nor would he have done so. Plaintiff Gray, who did not know that LexisNexis and Verisk had possession of his Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share his Driving Data with other third parties.

219.  On April 25, 2024, Plaintiff Gray received a copy of his LexisNexis Consumer Disclosure Report, which confirmed that Driving Data from his Chevrolet was intercepted, accessed, recorded, and disclosed by GM to LexisNexis without his consent. The Report included detailed Driving Data for 171 trips from February 2024 to March 2024, including, for each trip: the start and end date; the start and end time; the distance driven; acceleration events; high speed events; and hard brake events.

220.  On October 24, 2024, Plaintiff Gray received a copy of his Verisk Driving Behavior History Report, which confirmed that Driving Data from his Chevrolet was intercepted, accessed, recorded and disclosed by GM to Verisk without his consent. The Report confirmed that Plaintiff Gray's Driving Data was collected by Verisk even after Plaintiff Gray's "free trial" of OnStar had expired.

221.  The LexisNexis and Verisk Reports omit important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

222.  On information and belief, much of the Driving Data Defendants collected and shared is improperly and inaccurately associated with Plaintiff Gray because Jennifer Gray was also a driver of the vehicle.

223. If Plaintiff Gray had known that GM would intercept and sell his Driving Data to LexisNexis, Verisk, and other third parties without his knowledge or consent, he would not have purchased the Chevrolet.

224. Plaintiff Gray's private Driving Data has tangible value. Because of Defendants' conduct, Plaintiff Gray has lost control over the use of his Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

225. Plaintiff Gray had a reasonable expectation of privacy in his vehicle, including that detailed data about his location, routes, schedule, and driving behaviors would not be collected or shared without his express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing his Driving Data invaded Plaintiff Gray's privacy rights.

## Jeffrey Horvath

226. Plaintiff Jeffrey Horvath is a resident and citizen of the state of Illinois. On or about May 2023, Plaintiff Horvath purchased a 2023 CT4 V Black Wing Cadillac from a GM dealer in Lansing, Michigan. GM equipped the Cadillac with OnStar during the manufacturing process.

227. When Plaintiff Horvath purchased the 2023 CT4 V Black Wing Cadillac he was told by the GM dealer that the vehicle came with a six-month "free trial" of OnStar. Plaintiff Horvath did not enroll in OnStar when his free trial ended

because he did not want to keep the service. Plaintiff Horvath never knowingly enrolled in OnStar Smart Driver.

228. Unbeknownst to Plaintiff Horvath, GM intercepted Driving Data relating to Plaintiff Horvath's Cadillac using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff reasonably expected that his Driving Data would remain private unless Plaintiff Horvath gave GM his express authorization to collect, use, or share it. Plaintiff Horvath did not know that GM was intercepting his Driving Data for its own financial and commercial use, and never authorized GM to do so.

229. Unbeknownst to Plaintiff Horvath, GM also sold his Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and shared Plaintiff's Driving Data for their own financial and commercial benefit. Plaintiff Horvath has never knowingly opted in to sharing his Driving Data relating to his Cadillac with anyone, including LexisNexis or Verisk, nor would he have done so. Plaintiff Horvath, who did not know that LexisNexis and Verisk had possession of his Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share his Driving Data with other third parties.

230. On approximately March 21, 2024, Plaintiff Horvath received a copy of his LexisNexis Consumer Disclosure Report, which confirmed that Driving Data from his Cadillac was intercepted, accessed, recorded, and disclosed by GM to

LexisNexis without his consent. The Report included detailed Driving Data for 130 trips from September 2023 to March 2024, including, for each trip: the start and end date; the start and end time; the distance driven; acceleration events; high speed events; and hard brake events.

231. The Report confirmed that Plaintiff's Driving Data was collected by LexisNexis even after Plaintiff's "free trial" of OnStar had expired.

232. On approximately May 14, 2024, Plaintiff Horvath received a copy of his Verisk Driving Behavior History Report, which confirmed that Driving Data from his Cadillac was intercepted, accessed, recorded and disclosed by GM to Verisk without his consent. The Report included detailed Driving Data for 65 trips from November 2023 to March 2024, including, for each date: the number of trips, speeding events, hard braking events, rapid acceleration events, daytime driving minutes, nighttime driving minutes, and miles driven.

233. The Report confirmed that Plaintiff's Driving Data was collected by Verisk even after Plaintiff's "free trial" of OnStar had expired.

234. The LexisNexis and Verisk Reports omit important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

235. On information and belief, the Driving Data Defendants collected and shared included Driving Data improperly and inaccurately associated with Plaintiff Horvath as the vehicle was also driven, during the relevant time period, by authorized third parties such as valets and service technicians.

236. Plaintiff maintained insurance coverage for his Cadillac through State Farm.

237. In April 2024, State Farm told Plaintiff that his insurance premium for the vehicle would increase by 24 dollars per month. State Farm did not explain the decision.

238. Plaintiff's LexisNexis Report reveals that State Farm accessed his LexisNexis Report on or about March 2023, January 2024, and February 2024 which, upon information and belief, included his Driving Data.

239. Plaintiff Horvath had not recently filed an insurance claim, been in an automobile accident, received a speeding ticket, or experienced any other incident that could account for the increase.

240. Plaintiff Horvath filed disputes with LexisNexis and Verisk regarding his Reports on or about May 15, 2024 and, as a result, Plaintiff is informed and believes that his Driving Data was removed from both Reports. In August 2024, after Plaintiff's Driving Data was removed from the Reports, Plaintiff Horvath's policy was re-underwritten by State Farm and his premium was reduced.

241. Upon information and belief, the increased premium suffered by Plaintiff was a result of State Farm being provided with the uncontextualized, misleading, and unconsented-to personal Driving Data on Plaintiff's LexisNexis Report.

242. If Plaintiff Horvath had known that GM would intercept and sell his Driving Data to LexisNexis, Verisk, and other third parties without his knowledge or consent, he would not have purchased the Cadillac.

243. Plaintiff Horvath's Driving Data has tangible value. Because of Defendants' conduct, Plaintiff has lost control over the use of his Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

244. Plaintiff Horvath had a reasonable expectation of privacy in his vehicle, including that detailed data about his location, routes, schedule, and driving behaviors would not be collected or shared without his express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing his Driving Data invaded Plaintiff Horvath's privacy rights.

## INDIANA

### David Lima

245. Plaintiff David Lima is a resident and citizen of the state of Indiana. On or about April 18, 2020, Plaintiff Lima purchased a 2019 Chevrolet Corvette Grand

Sport Convertible from a GM dealer in Cincinnati, Ohio. GM equipped the Corvette with OnStar during the manufacturing process.

246.  When Plaintiff Lima purchased the Corvette, he was told by the GM dealer that the vehicle came with a "free trial" of OnStar, and the GM dealer activated OnStar before Plaintiff Lima took possession of the vehicle. Plaintiff David Lima purchased certain OnStar services in relation to the Corvette after the initial "free trial" elapsed, because he believed that these services would be useful in case of an emergency and for purposes such as GPS and navigation. Plaintiff Lima never knowingly enrolled in OnStar Smart Driver.

247.  Unbeknownst to Plaintiff Lima, GM intercepted Driving Data relating to his Corvette using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff Lima reasonably expected that his Driving Data would remain private unless he gave GM his express authorization to collect, use, or share it. Plaintiff Lima did not know that GM was intercepting his Driving Data for its own financial and commercial use, and never authorized GM to do so.

248.  Unbeknownst to Plaintiff Lima, GM also sold his Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and shared his Driving Data for their own financial and commercial benefit. Plaintiff Lima has never knowingly opted in to sharing his Driving Data relating to his Corvette with anyone, including LexisNexis or Verisk, nor would he have done so.

Plaintiff Lima, who did not know that LexisNexis and Verisk had possession of his Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share his Driving Data with other third parties.

249. On or around March 20, 2024, Plaintiff Lima received a copy of his LexisNexis Consumer Disclosure Report, which confirmed that Driving Data from his Corvette was intercepted, accessed, recorded, and disclosed by GM to LexisNexis without his consent. The Report included detailed Driving Data for 43 trips from September 2023 to March 2024, including, for each trip: the start and end date; the start and end time; the distance driven; acceleration events; high speed events; and hard brake events.

250. On or around October 10, 2024, Plaintiff Lima received a copy of his Verisk Driving Behavior History Report, which confirmed that Driving Data from his Corvette was intercepted, accessed, recorded and disclosed by GM to Verisk without his consent.

251. The LexisNexis and Verisk Reports omit important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

252.   On information and belief, some of the Driving Data Defendants collected and shared is improperly and inaccurately associated with Plaintiff Lima because his spouse, Renee Lima, was also a driver of the vehicle.

253.   Plaintiff Lima maintained insurance coverage for his Corvette through Erie Insurance. Plaintiff's annual insurance premium for the vehicle increased by $118 from the annual policy period beginning in March 2023 to the annual policy period beginning in March 2024. Erie Insurance did not explain this increase.

254.   In or around February 2024, after receiving notice of the increase in his annual insurance premium, Plaintiff Lima sought auto insurances quotes from other auto insurance companies—including Progressive, Auto-Owners, Allstate, American Family Mutual, Liberty Mutual, and Geico—but none of those companies offered significantly better rates than Erie Insurance.

255.   Plaintiff Lima's LexisNexis Report reveals that Progressive, Auto-Owners, Allstate, American Family Mutual, Liberty Mutual, and Geico accessed his LexisNexis Report on or about February 15 or February 16, 2024, which, upon information and belief, included his Driving Data.

256.   Upon information and belief, the inflated quotes suffered by Plaintiff Lima were a result of insurers being provided with the uncontextualized, misleading, and unconsented-to personal Driving Data on Plaintiff's LexisNexis Report.

257. If Plaintiff Lima had known that GM would intercept and sell his Driving Data to LexisNexis, Verisk, and other third parties without his knowledge or consent, he would not have activated or enrolled in OnStar.

258. Plaintiff Lima's Driving Data has tangible value. Because of Defendants' conduct, Plaintiff has lost control over the use of his Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

259. Plaintiff Lima had a reasonable expectation of privacy in his vehicle, including that detailed data about his location, routes, schedule, and driving behaviors would not be collected or shared without his express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing his Driving Data invaded Plaintiff Lima's privacy rights.

## KANSAS

### Manuel Martinez Jr.

260. Plaintiff Manuel Martinez Jr. is a resident and citizen of the state of Kansas. On or about May 10, 2019, Plaintiff M. Martinez and his wife Kathleen Martinez purchased a 2019 GMC Yukon from a GM dealer in Kansas City, Missouri. GM equipped the 2019 Yukon with OnStar during the manufacturing process.

261. Plaintiff M. Martinez was never given a choice to activate, and never knowingly enrolled in, OnStar or Smart Driver for his 2019 GMC Yukon. At all relevant times, Plaintiff M. Martinez did not know that OnStar was even active in the vehicle.

262. On or about September 7, 2023, Plaintiff M. Martinez and his wife traded in their 2019 Yukon for a 2023 GMC Yukon at a GM dealer in Olathe, Kansas. GM equipped the 2023 Yukon with OnStar during the manufacturing process.

263. When Plaintiff M. Martinez purchased the 2023 Yukon, he was told by the GM dealer that OnStar was included with the vehicle's purchase and came with a "free" three-year On-Star services package, and the GM dealer activated OnStar before Plaintiff M. Martinez took possession of the vehicle. Plaintiff M. Martinez was never given a choice to activate, and never knowingly enrolled in, OnStar Smart Driver.

264. Unbeknownst to Plaintiff M. Martinez, GM intercepted Driving Data relating to his 2019 GMC Yukon and 2023 GMC Yukon using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff M. Martinez reasonably expected that his Driving Data would remain private unless he gave GM his express authorization to collect, use, or share it. Plaintiff M. Martinez

did not know that GM was intercepting his Driving Data for its own financial and commercial use, and never authorized GM to do so.

265. Unbeknownst to Plaintiff M. Martinez, GM also sold his Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and shared Plaintiff's Driving Data for their own financial and commercial benefit. Plaintiff M. Martinez has never knowingly opted in to sharing his Driving Data relating to his 2019 GMC Yukon or 2023 GMC Yukon with anyone, including LexisNexis or Verisk, nor would he have done so. Plaintiff M. Martinez, who did not know that LexisNexis and Verisk had possession of his Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share his Driving Data with other third parties.

266. On information and belief, much of the Driving Data Defendants collected and shared is improperly and inaccurately associated with Plaintiff M. Martinez because his wife, Kathleen Martinez, was also a driver of the vehicle.

267. Plaintiff M. Martinez maintained insurance coverage for his 2019 GMC Yukon and his 2023 GMC Yukon through USAA. Beginning in January 2024, Plaintiff M. Martinez's insurance premiums began to increase. USAA did not explain the decision. Plaintiff Manuel Martinez Jr. had not recently filed an insurance claim, been in an automobile accident, received a speeding ticket, or experienced any other incident that could account for the increase.

268. Upon information and belief, the increased premiums suffered by Plaintiff M. Martinez were a result of USAA being provided with the uncontextualized, misleading, and unconsented-to personal Driving Data on his wife, Plaintiff Kathleen Martinez's Verisk Report.

269. If Plaintiff M. Martinez had known that GM would intercept and sell his Driving Data to LexisNexis, Verisk, and other third parties without his knowledge or consent, he would not have purchased the 2019 GMC Yukon or the 2023 GMC Yukon.

270. Plaintiff M. Martinez's Driving Data has tangible value. Because of Defendants' conduct, Plaintiff has lost control over the use of his Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

271. Plaintiff M. Martinez had a reasonable expectation of privacy in his vehicle, including that detailed data about his location, routes, schedule, and driving behaviors would not be collected or shared without his express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing his Driving Data invaded Plaintiff M. Martinez's privacy rights.

### Kathleen Martinez

272. Plaintiff Kathleen Martinez is a resident and citizen of the state of Kansas. On or about May 10, 2019, Plaintiff K. Martinez and her husband Manuel

Martinez Jr. purchased a 2019 GMC Yukon from a GM dealer in Kansas City, Missouri. GM equipped the 2019 Yukon with OnStar during the manufacturing process.

273. Plaintiff K. Martinez was never given a choice to activate, and never knowingly enrolled in, OnStar or Smart Driver for her 2019 GMC Yukon. At all relevant times, Plaintiff K. Martinez did not know that OnStar was even active in the vehicle.

274. On or about September 7, 2023, Plaintiff K. Martinez and her husband traded in their 2019 Yukon for a 2023 GMC Yukon at a GM dealer in Olathe, Kansas. GM equipped the 2023 Yukon with OnStar during the manufacturing process.

275. When Plaintiff K. Martinez purchased the 2023 Yukon, she was told by the GM dealer that OnStar was included with the vehicle's purchase and came with a "free" three-year On-Star services package, and the GM dealer activated OnStar before Plaintiff K. Martinez took possession of the vehicle. Plaintiff K. Martinez was never given a choice to activate, and never knowingly enrolled in, OnStar Smart Driver.

276. Unbeknownst to Plaintiff K. Martinez, GM intercepted Driving Data relating to her 2019 GMC Yukon and 2023 GMC Yukon using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff K.

Martinez reasonably expected that her Driving Data would remain private unless she gave GM her express authorization to collect, use, or share it. Plaintiff K. Martinez did not know that GM was intercepting her Driving Data for its own financial and commercial use, and never authorized GM to do so.

277. Unbeknownst to Plaintiff K. Martinez, GM also sold her Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and shared Plaintiff's Driving Data for their own financial and commercial benefit. Plaintiff K. Martinez has never knowingly opted in to sharing her Driving Data relating to her 2019 Yukon or 2023 Yukon with anyone, including LexisNexis or Verisk, nor would she have done so. Plaintiff K. Martinez, who did not know that LexisNexis and Verisk had possession of her Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share her Driving Data with other third parties.

278. On May 9, 2024, Plaintiff K. Martinez received a copy of her Verisk Driving Behavior History Report, which confirmed that Driving Data from her 2023 GMC vehicle was intercepted, accessed, recorded and disclosed by GM to Verisk without her consent. The Report included detailed Driving Data for 816 trips from November 10, 2023, through April 9, 2024, including, for each date: the number of trips, speeding events, hard braking events, rapid acceleration events, daytime driving minutes, nighttime driving minutes, and miles driven. The Report omits

important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

279. On information and belief, much of the Driving Data Defendants collected and shared is improperly and inaccurately associated with Plaintiff K. Martinez because her husband, Plaintiff M. Martinez, was also a driver of the vehicle.

280. Plaintiff maintained insurance coverage for her 2019 GMC Yukon and 2023 GMC Yukon through USAA. Beginning in January 2024, Plaintiff K. Martinez's insurance premiums began to increase. USAA did not explain the decision. Plaintiff K. Martinez had not recently filed an insurance claim, been in an automobile accident, received a speeding ticket, or experienced any other incident that could account for the increase.

281. Upon information and belief, the increased premiums suffered by Plaintiff K. Martinez were a result of USAA being provided with the uncontextualized, misleading, and unconsented-to personal Driving Data on her Verisk Report.

282. If Plaintiff K. Martinez had known that GM would intercept and sell her Driving Data to LexisNexis, Verisk, and other third parties without her

knowledge or consent, she would not have purchased the 2019 GMC Yukon or the 2023 GMC Yukon.

283. Plaintiff K. Martinez's Driving Data has tangible value. Because of Defendants' conduct, Plaintiff has lost control over the use of her Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

284. Plaintiff K. Martinez had a reasonable expectation of privacy in her vehicle, including that detailed data about her location, routes, schedule, and driving behaviors would not be collected or shared without her express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing her Driving Data invaded Plaintiff K. Martinez's privacy rights.

## KENTUCKY

### Donnie Ray Foley

285. Plaintiff Donnie Ray Foley is a resident and citizen of the state of Kentucky. On or about June 2023, Plaintiff Foley purchased a 2019 Cadillac XT5 from a GM dealer in Corydon, Indiana equipped with OnStar during the manufacturing process.

286. When Plaintiff Foley purchased the 2019 Cadillac XT5, he was told by the GM dealer that OnStar was included with the vehicle's purchase and the vehicle came with a "free trial" of OnStar. The GM dealer activated OnStar before Plaintiff

Foley took possession of the vehicle. Plaintiff Foley never knowingly enrolled in OnStar Smart Driver.

287. Unbeknownst to Plaintiff Foley, GM intercepted Driving Data relating to Plaintiff Foley's Cadillac using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff Foley reasonably expected that his Driving Data would remain private unless he gave GM his express authorization to collect, use, or share it. Plaintiff Foley did not know that GM was intercepting his Driving Data for its own financial and commercial use, and never authorized GM to do so.

288. Unbeknownst to Plaintiff Foley, GM also sold his Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and shared Plaintiff's Driving Data for their own financial and commercial benefit. Plaintiff Foley has never knowingly opted in to sharing his Driving Data relating to his Cadillac with anyone, including LexisNexis or Verisk, nor would he have done so. Plaintiff Foley, who did not know that LexisNexis and Verisk had possession of his Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share his Driving Data with other third parties.

289. On or about April 2024, Plaintiff Foley received a copy of his LexisNexis Consumer Disclosure Report, which confirmed that Driving Data from

his Cadillac was intercepted, accessed, recorded, and disclosed by GM to LexisNexis without his consent.

290.   On November 17, 2024, Plaintiff Foley received a copy of his Verisk Driving Behavior History Report, which confirmed that Driving Data from his Cadillac was intercepted, accessed, recorded, and disclosed by GM to Verisk without his consent.

291.   The LexisNexis and Verisk Reports omit important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

292.   Plaintiff maintained insurance coverage for his Cadillac through Geico Insurance. In March 2024 Geico told Plaintiff Foley that his insurance premium for the vehicle would increase by more than $121. Geico did not explain the decision. Plaintiff Foley had not recently filed an insurance claim, been in an automobile accident, received a speeding ticket, or experienced any other incident that could account for the increase.

293.   In August 2024, Plaintiff Foley also sought auto insurances quotes from Progressive Insurance, who gave him an inflated quote that was higher in cost than his then-current Geico policy.

294. Upon information and belief, the increased premiums and inflated quote suffered by Plaintiff Foley were a result of insurers being provided with the uncontextualized, misleading, and unconsented-to personal Driving Data on Plaintiff's LexisNexis and Verisk Reports.

295. If Plaintiff Foley had known that GM would intercept and sell his Driving Data to LexisNexis, Verisk, and other third parties without his knowledge or consent, he would not have purchased the Cadillac.

296. Plaintiff Foley's Driving Data has tangible value. Because of Defendants' conduct, Plaintiff has lost control over the use of his Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

297. Plaintiff Foley had a reasonable expectation of privacy in his vehicle, including that detailed data about his location, routes, schedule, and driving behaviors would not be collected or shared without his express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing his Driving Data invaded Plaintiff Foley's privacy rights.

## MARYLAND

### Joseph McDaniels III

298. Plaintiff Joseph McDaniels III is a resident and citizen of the state of Maryland. On or about June 7, 2023, Plaintiff McDaniels purchased a 2023

Chevrolet Bolt from a GM dealer in Silver Spring Maryland. GM equipped the 2023 Chevrolet Bolt with OnStar during the manufacturing process.

299.   When Plaintiff McDaniels purchased the 2023 Chevrolet Bolt, he was told by the GM dealer that OnStar was included with the vehicle's purchase and the vehicle came with a "free trial" of OnStar.  The GM dealer activated OnStar before Plaintiff McDaniels took possession of the vehicle. Plaintiff McDaniels was never given a choice to activate, and never knowingly enrolled in, OnStar Smart Driver.

300.   Unbeknownst to Plaintiff McDaniels, GM intercepted Driving Data relating to Plaintiff McDaniels's 2023 Chevrolet Bolt using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff McDaniels reasonably expected that his Driving Data would remain private unless he gave GM his express authorization to collect, use, or share it. Plaintiff McDaniels did not know that GM was intercepting his Driving Data for its own financial and commercial use, and never authorized GM to do so.

301.   Unbeknownst to Plaintiff McDaniels, GM also sold his Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and shared Plaintiff's Driving Data for their own financial and commercial benefit. Plaintiff McDaniels has never knowingly opted in to sharing his Driving Data relating to his 2023 Chevrolet Bolt with anyone, including LexisNexis or Verisk, nor would he have done so. Plaintiff McDaniels, who did not know that LexisNexis

and Verisk had possession of his Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share his Driving Data with other third parties.

302. Plaintiff McDaniels received a copy of LexisNexis Consumer Disclosure Report dated April 16, 2024, which confirmed that Driving Data from his 2023 Chevrolet Bolt was intercepted, accessed, recorded, and disclosed by GM to LexisNexis without his consent. The Report included detailed Driving Data for 178 trips from October 2023 to March 2024 including, for each trip: the start and end date; the start and end time; the distance driven; acceleration events; high speed events; and hard brake events.

303. The Report confirmed that Plaintiff's Driving Data was collected by LexisNexis even after Plaintiff's "free trial" of OnStar had expired.

304. Upon investigation, Plaintiff McDaniels discovered errors in the Report, including improperly recorded and inaccurate acceleration events and hard brake events.

305. The LexisNexis Report omits important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

306.   On October 10, 2024, Plaintiff McDaniels received a copy of his Verisk Driving Behavior History Report, which confirmed that Driving Data from his 2023 Chevrolet Bolt was intercepted, accessed, recorded and disclosed by GM to Verisk without his consent.

307.   On information and belief, much of the Driving Data Defendants collected and shared is improperly and inaccurately associated with Plaintiff McDaniels because his wife, Shaina E. Rae, was also a driver of the vehicle.

308.   Plaintiff maintained insurance coverage for his 2023 Chevrolet Bolt through Farmers Insurance. In May 2024, Farmers Insurance told Plaintiff that his insurance premium for the vehicle would increase. Plaintiff McDaniels had not recently filed an insurance claim, been in an automobile accident, received a speeding ticket, or experienced any other incident that could account for the increase.

309.   Upon information and belief, the increased premiums suffered by Plaintiff McDaniels were a result of Farmers Insurance being provided with the uncontextualized, misleading, and unconsented-to personal Driving Data on Plaintiff's LexisNexis Report.

310.   If Plaintiff McDaniels had known that GM would intercept and sell his Driving Data to LexisNexis, Verisk, and other third parties without his knowledge or consent, he would have considered purchasing other electric vehicles.

311. Plaintiff McDaniels's Driving Data has tangible value. Because of Defendants' conduct, Plaintiff has lost control over the use of [his/her] Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

312. Plaintiff McDaniels had a reasonable expectation of privacy in his vehicle, including that detailed data about his location, routes, schedule, and driving behaviors would not be collected or shared without his express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing his Driving Data invaded Plaintiff McDaniels's privacy rights.

## MICHIGAN

### Kenneth Brockington

313. Plaintiff Kenneth Brockington is a resident and citizen of the state of Michigan. On or about May 8, 2021, Plaintiff Brockington purchased a 2021 Cadillac Escalade from a GM dealer in Plymouth, Michigan. GM equipped the 2021 Cadillac Escalade with OnStar during the manufacturing process.

314. When Plaintiff Brockington purchased the 2021 Cadillac Escalade, he was told by the GM dealer that OnStar was included with the vehicle's purchase and the vehicle came with a "free trial" of OnStar. The GM dealer activated OnStar before Plaintiff Brockington took possession of the vehicle.

315.    Plaintiff Brockington was enrolled in OnStar Smart Driver from approximately May 8, 2021, until October 20, 2022, so that he could privately learn about his own driving behavior.

316.    Unbeknownst to Plaintiff Brockington, GM intercepted Driving Data relating to Plaintiff Brockington's 2021 Cadillac Escalade using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff Brockington reasonably expected that his Driving Data would remain private unless he gave GM his express authorization to collect, use, or share it. Plaintiff Brockington did not know that GM was intercepting his Driving Data for its own financial and commercial use, and never authorized GM to do so.

317.    Unbeknownst to Plaintiff Brockington, GM also sold his Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and shared Plaintiff's Driving Data for their own financial and commercial benefit. Plaintiff Brockington has never knowingly opted in to sharing his Driving Data relating to his 2021 Cadillac Escalade with anyone, including LexisNexis or Verisk, nor would he have done so. Plaintiff Brockington, who did not know that LexisNexis and Verisk had possession of his Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share his Driving Data with other third parties.

318.    Plaintiff Brockington received a copy of his LexisNexis Consumer Disclosure Report dated October 20, 2022, which confirmed that Driving Data from his 2021 Cadillac Escalade was intercepted, accessed, recorded, and disclosed by GM to LexisNexis without his consent. The Report included detailed Driving Data for 418 trips from March 2022 to October 2022, including, for each trip: the start and end date; the start and end time; the distance driven; acceleration events; high speed events; and hard brake events.

319.    Upon investigation, Plaintiff discovered errors in the LexisNexis Report, including improperly recorded acceleration events, hard brake events and high-speed events.

320.    The LexisNexis Report omits important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

321.    On April 5, 2024, Plaintiff Brockington received a copy of his Verisk Driving Behavior History Report, which confirmed that Driving Data from his 2021 Cadillac Escalade was also intercepted, accessed, recorded and disclosed by GM to Verisk without his consent.

322.    Plaintiff Brockington's Driving Data has tangible value. Because of Defendants' conduct, Plaintiff has lost control over the use of his Driving Data,

which is in the possession of third parties who have used and will use it for their own financial advantage.

323.    Plaintiff Brockington had a reasonable expectation of privacy in his vehicle, including that detailed data about his location, routes, schedule, and driving behaviors would not be collected or shared without his express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing his Driving Data invaded Plaintiff Brockington's privacy rights.

### Melvin Drews and Karen Drews

324.    Plaintiffs Melvin Drews and Karen Drews are residents and citizens of the state of Michigan.  On or about May 6, 2020, the Drews purchased a 2019 Chevrolet Corvette from a GM dealer in Merrillville, Indiana.  On or about March 17, 2020, the Drews purchased a 2020 Buick Enclave from Jim Winter GMC Auto Group in Jackson, Michigan. GM equipped the 2019 Chevrolet Corvette and 2020 Buick Enclave with OnStar during the manufacturing process.

325.    The Drews were never given a choice to activate, and never knowingly enrolled in OnStar or Smart Driver for their 2019 Chevrolet Corvette.  The Drews did not know that OnStar was even active in the vehicle until they received a LexisNexis Consumer Disclosure Report detailing Driving Data as described below.

326.    When the Drews purchased the 2020 Buick Enclave, they were told by the GM dealer that OnStar was included with the vehicle's purchase and that the

vehicle came with a "free trial" of OnStar. The GM dealer activated OnStar before the Drews took possession of the vehicle. The Drews were never given a choice to activate, and never knowingly enrolled in, OnStar Smart Driver. Before the free trial period ended, the Drews contacted GM to cancel all OnStar services and were told that their cancellation was effective.

327. Unbeknownst to the Drews, GM intercepted non-anonymized, personal Driving Data relating to their Chevrolet Corvette and 2020 Buick Enclave using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. The Drews had no reason to believe their Driving Data would be tracked or stored by GM and if their car had any tracking measures, they reasonably expected that their Driving Data would remain private unless they gave GM their express authorization to collect, use, or share it. The Drews did not know that GM was intercepting their Driving Data for its own financial and commercial use, and never authorized GM to do so.

328. Unbeknownst to the Drews, GM also sold their Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and shared the Drews' Driving Data for their own financial and commercial benefit. The Drews have never knowingly opted in to sharing their Driving Data relating to their 2019 Chevrolet Corvette and 2020 Buick Enclave with anyone, including LexisNexis, Verisk, nor would they have done so. The Drews, who did not know

that LexisNexis and Verisk had possession of their Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share their Driving Data with other third parties.

329. The Drews received a copy of Melvin Drews' LexisNexis Consumer Disclosure Report dated January 8, 2024, which confirmed that Driving Data from their 2019 Chevrolet Corvette and 2020 Buick Enclave was intercepted, accessed, recorded, and disclosed by GM to LexisNexis without their consent. The Report included detailed Driving Data for 590 trips from 2023, including, for each trip: the start and end date; the start and end time; the distance driven; acceleration events; high speed events; and hard brake events.

330. The Report confirmed that the Drews' Driving Data for their Corvette was collected by LexisNexis and that the Drews' Driving Data for their Buick Enclave was collected even after their "free trial" of OnStar had expired and even after the Drews had canceled their OnStar subscription.

331. Upon investigation, the Drews discovered errors in the report, including unknown addresses and emails attributed to the Drews and a reported lien that was nonexistent.

332. On or about November 2, 2024, the Drews requested a copy of their Verisk Driving Behavior History Report. When the report is received, Plaintiffs may amend their allegations accordingly.

333.   The LexisNexis Report omits important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. For example, on more than one occasion, Karen Drews had to brake sharply to avoid hitting a deer that crossed over the roadway. This was not just a safe operation of the vehicle, but also a necessary one to avoid an accident. Nonetheless, this event was reported on the LexisNexis Report as an episode of unsafe driving. Reporting these events, by themselves, says nothing of the driving conditions and factors experienced during each trip, which may evidence that the event was, in fact, an episode of safe driving.

334.   On information and belief, much of the Driving Data Defendants collected and shared is improperly and inaccurately associated with Plaintiff Melvin Drews because Plaintiff Karen Drews was also a driver of the vehicles.

335.   The Drews maintained insurance coverage for their 2019 Chevrolet Corvette and 2020 Buick Enclave through Auto Owners Insurance. On or about January 2, 2024 Auto Owners Insurance told the Drews that their insurance premium for the vehicles would nearly double from approximately $1,940.87 per year to $3,741.03 per year. Auto Owners Insurance told the Drews that its decision was based on information received from LexisNexis.

336.   The Drews had not recently filed an insurance claim, been in an automobile accident, received a speeding ticket, or experienced any other incident that could account for the increase.

337.   In January 2024, the Drews also sought auto insurances quotes from two local insurance agents in Jackson, Michigan, the Walton Agency and the Richmond Agency. The Drews also contacted State Farm Insurance. In January 2024 all three agencies told the Drews that their rates would be similar to the rates quoted by Auto Owners.

338.   Plaintiff Melvin Drew's LexisNexis Report reveals that each of these insurers had accessed their LexisNexis Report on or about the dates that the Drews had sought insurance quotes, which, upon information and belief, included their Driving Data.

339.   Upon information and belief, the increased premiums from Auto Owners and inflated quotes from Walton, Richmond and State Farm suffered by the Drews were a result of these insurance agencies being provided with the uncontextualized, misleading, and unconsented-to personal Driving Data on the Drews' LexisNexis reports.

340.   If the Drews had known that GM would intercept and sell their Driving Data to LexisNexis, Verisk, and other third parties without their knowledge or

consent, they would not have purchased the 2019 Chevrolet Corvette and 2020 Buick Enclave.

341.  The Drews' private Driving Data has tangible value. Because of Defendants' conduct, the Drews have lost control over the use of their Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

342.  The Drews had a reasonable expectation of privacy in their vehicles, including that detailed data about their location, routes, schedule, and driving behaviors would not be collected or shared without their express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing their Driving Data invaded the Drews' privacy rights.

### Brian LaFalce

343.  Plaintiff Brian LaFalce is a resident and citizen of the state of Michigan. On or about December 29, 2022, Plaintiff LaFalce purchased a 2023 Chevrolet Equinox from a GM dealer in Grand Rapids, Michigan. GM equipped the 2023 Chevrolet Equinox with OnStar during the manufacturing process.

344.  When Plaintiff LaFalce purchased the 2023 Chevrolet Equinox, he was told by the GM dealer that OnStar was included with the vehicle's purchase and the vehicle came with a "free trial" of OnStar for 90 days and the GM dealer activated

OnStar before Plaintiff LaFalce took possession of the vehicle. Plaintiff LaFalce was never given a choice to activate, and never knowingly enrolled in, Smart Driver.

345.   Unbeknownst to Plaintiff LaFalce, GM intercepted Driving Data relating to Plaintiff LaFalce's 2023 Chevrolet Equinox using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff LaFalce reasonably expected that his Driving Data would remain private unless he gave GM his express authorization to collect, use, or share it. Plaintiff LaFalce did not know that GM was intercepting his Driving Data for its own financial and commercial use, and never authorized GM to do so.

346.   Unbeknownst to Plaintiff LaFalce, GM also sold his Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and shared Plaintiff LaFalce's Driving Data for their own financial and commercial benefit. Plaintiff LaFalce has never knowingly opted in to sharing his Driving Data relating to his 2023 Chevrolet Equinox with anyone, including LexisNexis or Verisk, nor would he have done so. Plaintiff LaFalce, who did not know that LexisNexis and Verisk had possession of his Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share his Driving Data with other third parties.

347.   Plaintiff LaFalce received a copy of his LexisNexis Consumer Disclosure Report dated April 2, 2024, which confirmed that Driving Data from his 2023 Chevrolet Equinox was intercepted, accessed, recorded, and disclosed by GM

to LexisNexis without his consent. The Report included detailed Driving Data for 331 trips from September 2023 to March 2024, including, for each trip: the start and end date; the start and end time; the distance driven; acceleration events; high speed events; and hard brake events.

348. The Report confirmed that Plaintiff's Driving Data was collected by LexisNexis even after Plaintiff LaFalce's "free trial" of OnStar had expired in late March 2023.

349. Plaintiff LaFalce received a copy of his Verisk Driving Behavior History Report dated April 4, 2024, which confirmed that Driving Data from his 2023 Chevrolet Equinox was intercepted, accessed, recorded and disclosed by GM to Verisk without his consent. The Report included detailed Driving Data for 302 trips from October 2023 to March 2024, including, for each date: the number of trips, speeding events, hard braking events, rapid acceleration events, daytime driving minutes, nighttime driving minutes, and miles driven.

350. The Report confirmed that Plaintiff LaFalce's Driving Data was collected by Verisk even after Plaintiff LaFalce's "free trial" of OnStar had expired in late March 2023.

351. The LexisNexis and Verisk Reports omit important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by

themselves, says nothing of the driving conditions and factors experienced during each trip.

352.  On information and belief, much of the Driving Data Defendants collected and shared is improperly and inaccurately associated with Plaintiff LaFalce because his wife was also a driver of the vehicle.

353.  Plaintiff LaFalce maintained insurance coverage for his 2023 Chevrolet Equinox through The Hartford.

354.  In September 2024, The Hartford told Plaintiff LaFalce that his insurance premium for the vehicle would increase by $222 per year. The Hartford did not explain the decision.

355.  Plaintiff LaFalce had not recently filed an insurance claim, been in an automobile accident, received a speeding ticket, or experienced any other incident that could account for the increase.

356.  Upon information and belief, the increased premiums suffered by Plaintiff LaFalce were a result of The Hartford being provided with the uncontextualized, misleading, and unconsented-to personal Driving Data on Plaintiff's LexisNexis and/or Verisk Reports.

357.  If Plaintiff LaFalce had known that GM would intercept and sell his Driving Data to LexisNexis, Verisk, and other third parties without his knowledge or consent, he would not have purchased the 2023 Chevrolet Equinox.

358.    Plaintiff LaFalce's Driving Data has tangible value. Because of Defendants' conduct, Plaintiff has lost control over the use of his Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

359.    Plaintiff LaFalce had a reasonable expectation of privacy in his vehicle, including that detailed data about his location, routes, schedule, and driving behaviors would not be collected or shared without his express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing his Driving Data invaded Plaintiff LaFalce's privacy rights.

## MISSISSIPPI

### Grace Gilmore

360.    Plaintiff Grace Gilmore is a resident and citizen of the state of Mississippi. On or about December 2019, Plaintiff Gilmore purchased a 2020 Chevrolet Spark from a GM dealer in Picayune, Mississippi. GM equipped the 2020 Chevrolet Spark with OnStar during the manufacturing process.

361.    Plaintiff Gilmore was never given a choice to activate, and never knowingly enrolled in, OnStar or Smart Driver for her 2020 Chevrolet Spark LS. Plaintiff Gilmore requested that she not be enrolled in OnStar because she understood that OnStar would require an additional fee. At all relevant times, Plaintiff Gilmore did not know that OnStar was active on her vehicle.

362. Unbeknownst to Plaintiff Gilmore, GM intercepted Driving Data relating to Plaintiff Gilmore's 2022 Chevrolet Spark LS using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff Gilmore reasonably expected that her Driving Data would remain private unless she gave GM her express authorization to collect, use, or share it. Plaintiff Gilmore did not know that GM was intercepting her Driving Data for its own financial and commercial use, and never authorized GM to do so.

363. Unbeknownst to Plaintiff Gilmore, GM also sold her Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and shared Plaintiff's Driving Data for their own financial and commercial benefit. Plaintiff Gilmore has never knowingly opted in to sharing her Driving Data relating to her 2020 Chevrolet Spark with anyone, including LexisNexis or Verisk, nor would she have done so. Plaintiff Gilmore, who did not know that LexisNexis and Verisk had possession of her Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share her Driving Data with other third parties.

364. Plaintiff Gilmore received a copy of her LexisNexis Consumer Disclosure Report dated April 22, 2024, which confirmed that Driving Data from her 2020 Chevrolet Spark was intercepted, accessed, recorded, and disclosed by GM to LexisNexis without her consent. The Report, which confirmed that Plaintiff Gilmore's Driving Data was collected by LexisNexis, included detailed Driving

Data for 357 trips, which, on information and belief, dated from September of 2023 to April of 2024. For each trip, the Report included the start and end date, the start and end time, the distance driven, acceleration events, high speed events, and hard brake events. Upon investigation, Plaintiff Gilmore also discovered errors in the Report, including incorrect date of birth, address, email addresses, and driver's license information. The Report also incorrectly included alleged "previous addresses" at which Plaintiff Gilmore never resided.

365. Plaintiff Gilmore received a copy of her Verisk Driving Behavior History Report dated September 13, 2024, which confirmed that Driving Data from her 2020 Chevrolet Spark was intercepted, accessed, recorded and disclosed by GM to Verisk without her consent. The Report included detailed Driving Data for 4 trips, based on a limited "Observation Period" of March 13, 2024 through April 9, 2024, including, for each date: the number of trips, speeding events, hard braking events, rapid acceleration events, daytime driving minutes, nighttime driving minutes, and miles driven.

366. The LexisNexis and Verisk Reports omit important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

367. Plaintiff Gilmore maintained insurance coverage for her 2020 Chevrolet Spark through Progressive. In June of 2024, Progressive raised the rate of Plaintiff Gilmore's monthly insurance payment by $35. Progressive did not explain its decision.

368. In April of 2024, after Plaintiff Gilmore had received an indication from her insurance carrier that her rates were going to go up, Plaintiff Gilmore sought an auto insurances quote from The Hartford. The Hartford quoted Plaintiff Gilmore a rate $30 higher than her current insurance rate and informed Plaintiff Gilmore in writing that its decision was based on information contained in her LexisNexis Consumer Report.

369. Upon information and belief, the increased insurance premiums suffered by Plaintiff Gilmore were a result of Progressive and The Hartford being provided with the uncontextualized, misleading, and unconsented-to personal Driving Data on Plaintiff Gilmore's LexisNexis or Verisk Report.

370. Plaintiff Gilmore's Driving Data has tangible value. Because of Defendants' conduct, Plaintiff has lost control over the use of her Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage and to her detriment.

371. Plaintiff Gilmore had a reasonable expectation of privacy in her vehicle, including that detailed data about her location, routes, schedule, and driving

behaviors would not be collected or shared without her express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing her Driving Data invaded Plaintiff Gilmore's privacy rights.

## NEVADA

### Jennifer Melberg

372. Plaintiff Jennifer Melberg is a resident and citizen of the state of Nevada. On about May 25, 2018, Plaintiff Melberg purchased a 2018 Chevrolet Camaro from a GM dealer in Las Vegas, Nevada. GM equipped the 2018 Chevrolet Camaro with OnStar during the manufacturing process.

373. When Plaintiff Melberg purchased the 2018 Chevrolet Camaro, she was told by the GM dealer that the version of OnStar (without Smart Driver) that she had was being transferred from her prior vehicle to her new vehicle, which was then activated at the direction of the GM dealer. Plaintiff Melberg was never given a choice to activate, and never knowingly enrolled in, OnStar Smart Driver.

374. Unbeknownst to Plaintiff Melberg, GM intercepted Driving Data relating to Plaintiff Melberg's 2018 Chevrolet Camaro using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff Melberg reasonably expected that her Driving Data would remain private unless she gave GM her express authorization to collect, use, or share it. Plaintiff Melberg did not know

that GM was intercepting her Driving Data for its own financial and commercial use, and never authorized GM to do so.

375. Unbeknownst to Plaintiff Melberg, GM also sold her Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and shared Plaintiff's Driving Data for their own financial and commercial benefit. Plaintiff Melberg has never knowingly opted in to sharing her Driving Data relating to her 2018 Chevrolet Camaro with anyone, including LexisNexis or Verisk, nor would she have done so. Plaintiff Melberg, who did not know that LexisNexis and Verisk had possession of her Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share her Driving Data with other third parties.

376. Plaintiff Melberg received a copy of her LexisNexis Consumer Disclosure Report dated April 5, 2024, which confirmed that Driving Data from her 2018 Chevrolet Camaro was intercepted, accessed, recorded, and disclosed by GM to LexisNexis without her consent. The Report included detailed Driving Data for 265 trips from September 2023 to March 2024, including, for each trip: the start and end date; the start and end time; the distance driven; acceleration events; high speed events; and hard brake events.

377. The LexisNexis Report omits important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by themselves, says

nothing of the driving conditions and factors experienced during each trip and in many cases makes little sense.

378.   Upon investigation, Plaintiff Melberg discovered errors and illogical information in the Report, including that many short trips of under one mile, have Plaintiff engaging in multiple acts of hard braking, and has Plaintiff engaging in multiple acceleration events, when driving barely over a mile, and for less than five minutes, and in some cases, even when driving less than one minute.

379.   Plaintiff Melberg requested her Verisk Report on about September 9, 2024.  In about mid- October 2024, Plaintiff Melberg received a copy of her Verisk Driving Behavior History Report, which according to Verisk, was created on September 21, 2024. The Report states that it had received Driving Data from GM, but that it was no longer receiving this data, and that it no longer provided this data to insurers.   It further stated that the availability of such data to the customer depended upon when Verisk stopped receiving this data from various automakers.

380.   That Report did not provide Plaintiff Melberg with the driving behavior that Verisk had collected because the Report only covered the period of March 24, 2024 to April 9, 2024, effectively after Verisk had ceased receiving such data from GM. Consequently, for the following categories of driving behavior the Report showed zeros: vehicle ignition on and off, vehicle speed greater than 80 mph, hard braking events, rapid acceleration events, daytime driving minutes, nighttime

driving minutes, and miles driven. Significantly, Verisk did not disclose the driving information that it had collected for earlier time periods although, upon information and belief, the fact that the Report contained these driving behavior categories, implies that Verisk had collected them for earlier periods. Moreover, in its cover letter, Verisk failed to check the alternative indicating that it did not possess such information, implying that it does have Plaintiff's driver behavior information for earlier periods.

381. Plaintiff Melberg maintained insurance coverage for her 2018 Chevrolet Camaro through Progressive. In December 2023, Progressive told Plaintiff that her insurance premium for the vehicle would increase by approximately $350. Progressive did not explain the decision.

382. In about October 2023, Plaintiff Melberg and/or her husband used Allstate's online quotation service to seek out an alternative insurance quote from Allstate. Allstate was not able to provide a more reasonable quote. Upon information and belief, this was because of the Driving Data that Allstate obtained from Plaintiff Melberg's LexisNexis and Verisk Reports.

383. Plaintiff's LexisNexis Report reveals that Allstate accessed her LexisNexis Report, on or about October 30, 2023, which, upon information and belief, included her Driving Data.

384. In November 2024, Progressive informed Plaintiff Melberg that it intended to raise her insurance rates. Plaintiff Melberg and/or her husband again sought an alternative quote from Allstate through its online quotation service. This time, and because it no longer had access to Plaintiff's misleading Driving Data, Allstate was able to provide Plaintiff with a more reasonable quote for car insurance.

385. Upon information and belief, the increased premiums and/or inflated quotes suffered by Plaintiff Melberg were a result of insurers being provided with the uncontextualized, misleading, and unconsented-to personal Driving Data on Plaintiff's LexisNexis Report, and potentially Plaintiff's Verisk Report.

386. Plaintiff Melberg's Driving Data has tangible value. Because of Defendants' conduct, Plaintiff has lost control over the use of her Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

387. Plaintiff Melberg had a reasonable expectation of privacy in her vehicle, including that detailed data about her location, routes, schedule, and driving behaviors would not be collected or shared without her express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing her Driving Data invaded Plaintiff Melberg's privacy rights.

**NEW JERSEY**

**Morris D. Gordin**

388. Plaintiff Morris D. Gordin is a resident and citizen of the state of New Jersey. On or about December 2022, Plaintiff Gordin purchased a new 2023 Chevrolet Bolt EUV LT from a GM dealer in Livingston, New Jersey. GM equipped the 2023 Chevrolet Bolt EUV LT with OnStar during the manufacturing process.

389. When Plaintiff Gordin purchased the 2023 Chevrolet Bolt EUV LT, he was told by the GM dealer that OnStar was included with the vehicle's purchase and that the vehicle came with a "free trial" of OnStar. The GM dealer activated OnStar at the dealership at the time of purchase. After the free trial expired, Plaintiff Gordin purchased certain OnStar services because he believed they would be helpful if, for example, he was in an accident, in an emergency situation, or got locked out of his car. The OnStar services purchased by Plaintiff Gordin included OnStar Smart Driver, although Plaintiff was unaware that OnStar Smart Driver was included in the OnStar services he purchased.

390. Unbeknownst to Plaintiff Gordin, GM intercepted Driving Data relating to his 2023 Chevrolet Bolt EUV LT using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff Gordin reasonably expected that his Driving Data would remain private unless he gave GM his express authorization to collect, use, or share it. Plaintiff Gordin did not know that GM was

intercepting his Driving Data for its own financial and commercial use, and never authorized GM to do so.

391. Unbeknownst to Plaintiff Gordin, GM also sold his Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and shared Plaintiff's Driving Data for their own financial and commercial benefit. Plaintiff Gordin has never knowingly opted in to sharing his Driving Data relating to his 2023 Chevrolet Bolt EUV LT with anyone or any entity, including LexisNexis or Verisk, nor would he have done so. Plaintiff Gordin, who did not know that LexisNexis and Verisk had possession of his Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share his Driving Data with other third parties.

392. Plaintiff Gordin received a copy of his LexisNexis Consumer Disclosure Report dated April 2, 2024, which confirmed that Driving Data from his 2023 Chevrolet Bolt EUV LT was intercepted, accessed, recorded, and disclosed by GM to LexisNexis without his consent. The Report included detailed Driving Data for 349 trips in 2023 and 2024, including, for each trip: the start and end date; the start and end time; the distance driven; acceleration events; high speed events; and hard brake events.

393. The LexisNexis Report omits important context relating to the driving events, including what these events mean, how they are calculated, or why someone

might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

394. On information and belief, some of the Driving Data Defendants collected and shared is improperly and inaccurately associated with Plaintiff Gordin because Plaintiff Gordin's son was also an intermittent driver of the vehicle during the period covered by Plaintiff's LexisNexis Report.

395. If Plaintiff Gordin had known that GM would intercept and sell his Driving Data to LexisNexis, Verisk, and other third parties without his knowledge or consent, he would not have purchased the OnStar services.

396. Plaintiff Gordin's Driving Data has tangible value. Because of Defendants' conduct, Plaintiff Gordin has lost control over the use of his Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

397. Plaintiff Gordin had a reasonable expectation of privacy in his vehicle, including that detailed data about his location, routes, schedule, and driving behaviors would not be collected or shared without his express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing his Driving Data invaded Plaintiff Gordin's privacy rights.

**John Matthews**

398.   Plaintiff John Matthews is a resident of the state of New Jersey. On or about September 2023, Plaintiff Matthews purchased a 2023 Chevrolet Bolt EUV from a GM dealer in Lakewood, New Jersey. GM equipped the 2023 Chevrolet Bolt EUV with OnStar during the manufacturing process.

399.   When Plaintiff Matthews purchased the 2023 Chevrolet Bolt EUV, he was told by the GM dealer that OnStar should be activated as part of the delivery process for the vehicle, that OnStar was included with the vehicle's purchase and that the vehicle came with a "free trial" of OnStar and the GM dealer activated OnStar at the dealership. Plaintiff Matthews was never given a choice to activate, and never knowingly enrolled in, OnStar Smart Driver.

400.   Unbeknownst to Plaintiff Matthews, GM intercepted Driving Data relating to Plaintiff Matthew's 2023 Chevrolet Bolt EUV using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff Matthews reasonably expected that his Driving Data would remain private unless he gave GM his express authorization to collect, use, or share it. Plaintiff Matthews did not know that GM was intercepting his Driving Data for its own financial and commercial use, and never authorized GM to do so.

401.   Unbeknownst to Plaintiff Matthews, GM also sold his Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and

shared Plaintiff's Driving Data for their own financial and commercial benefit. Plaintiff Matthews has never knowingly opted in to sharing his Driving Data relating to his 2023 Chevrolet Bolt EUV with anyone, including LexisNexis or Verisk, nor would he have done so. Plaintiff Matthews, who did not know that LexisNexis and Verisk had possession of his Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share his Driving Data with other third parties.

402. Plaintiff Matthews received a copy of his LexisNexis Consumer Disclosure Report dated March 21, 2024, which confirmed that Driving Data from his 2023 Chevrolet Bolt EUV was intercepted, accessed, recorded, and disclosed by GM to LexisNexis without his consent. The Report included detailed Driving Data for 311 trips in 2023 and 2024, including, for each trip: the start and end date; the start and end time; the distance driven; acceleration events; high speed events; and hard brake events.

403. The Report confirmed that, to the best of Plaintiffs' belief, Plaintiff's Driving Data was collected by LexisNexis even after Plaintiff's "free trial" of OnStar had expired.

404. The LexisNexis Report omits important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

405. On information and belief, much of the Driving Data Defendants collected and shared is improperly and inaccurately associated with Plaintiff Matthews, because John Matthew's son is the primary driver of the vehicle and Matthews' wife also drives the vehicle.

406. If Plaintiff Matthews had known that GM would intercept and sell his Driving Data to LexisNexis, Verisk, and other third parties without his knowledge or consent, he would not have purchased the 2023 Chevrolet Bolt EUV.

407. Plaintiff Matthews' Driving Data has tangible value. Because of Defendants' conduct, Plaintiff has lost control over the use of his Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

408. Plaintiff Matthews had a reasonable expectation of privacy in [his/her] vehicle, including that detailed data about his location, routes, schedule, and driving behaviors would not be collected or shared without his express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing his Driving Data invaded Plaintiff Matthews' privacy rights.

**Zachary Smith**

409. Plaintiff Zachary Smith is a resident and citizen of the state of New Jersey. On or about April 3, 2023, Plaintiff Z. Smith purchased a 2023 Chevrolet

Bolt EV 2LT from a GM dealer in Westville, New Jersey. GM equipped the 2023 Chevrolet Bolt EV 2LT with OnStar during the manufacturing process.

410. When Plaintiff Z. Smith purchased the 2023 Chevrolet Bolt EV 2LT, he was told by the GM dealer that OnStar was mandatory, that OnStar was included with the vehicle's purchase, and that the vehicle came with a "free trial" of OnStar. The GM dealer activated OnStar before Plaintiff Z. Smith took possession of the vehicle. Plaintiff Z. Smith was never given a choice to activate, and never knowingly enrolled in, OnStar Smart Driver.

411. Unbeknownst to Plaintiff Z. Smith, GM intercepted Driving Data relating to his 2023 Chevrolet Bolt EV 2LT using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff Z. Smith reasonably expected that his Driving Data would remain private unless he gave GM his express authorization to collect, use, or share it. Plaintiff Z. Smith did not know that GM was intercepting his Driving Data for its own financial and commercial use, and never authorized GM to do so.

412. Unbeknownst to Plaintiff Z. Smith, GM also sold his Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and shared Plaintiff's Driving Data for their own financial and commercial benefit. Plaintiff Z. Smith has never knowingly opted in to sharing his Driving Data relating to his 2023 Chevrolet Bolt EV 2LT with anyone, including LexisNexis or Verisk,

nor would he have done so. Plaintiff Z. Smith, who did not know that LexisNexis and Verisk had possession of his Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share his Driving Data with other third parties.

413. Plaintiff Z. Smith received a copy of his LexisNexis Consumer Disclosure Report dated April 25, 2024, which confirmed that Driving Data from his 2023 Chevrolet Bolt EV 2LT was intercepted, accessed, recorded, and disclosed by GM to LexisNexis without his consent. The Report included detailed Driving Data for 496 trips in 2023 and 2024, including, for each trip: the start and end date; the start and end time; the distance driven; acceleration events; high speed events; and hard brake events.

414. Plaintiff Z. Smith received a copy of his Verisk Driving Behavior History Report, which confirmed that Driving Data from his 2023 Chevrolet Bolt EV 2LT was intercepted, accessed, recorded and disclosed by GM to Verisk without his consent. The Report included detailed Driving Data for 86 trips from November 2023 to March 2024, including, for each date: the number of trips, speeding events, hard braking events, rapid acceleration events, daytime driving minutes, nighttime driving minutes, and miles driven.

415. The LexisNexis and Verisk Reports omit important context relating to the driving events, including what these events mean, how they are calculated, or

why someone might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

416.   On information and belief, some of the Driving Data Defendants collected and shared is improperly and inaccurately associated with Plaintiff Z. Smith because his wife also occasionally drove the 2023 Chevrolet Bolt EV 2LT.

417.   Plaintiff Z. Smith maintained insurance coverage for his 2023 Chevrolet Bolt EV 2LT through Plymouth Rock Assurance. In around November 2023, Plymouth Rock Assurance informed Plaintiff that his vehicle insurance premium would increase by approximately $406.00.

418.   Plaintiff Z. Smith's LexisNexis Report reveals that Liberty Insurance Associates, who was Plaintiff's insurance agent for Plymouth Rock Assurance, accessed his LexisNexis Report, on or about November 14, 2023, which, upon information and belief, included his Driving Data.

419.   Plaintiff Z. Smith had not recently filed an insurance claim, been in an automobile accident, received a speeding ticket, or experienced any other incident that could account for the increase.

420.   In or about November 2023, Plaintiff Z. Smith also sought auto insurance quotes from other automobile insurers, including State Farm and Geico.

State Farm and Geico quoted Plaintiff Z. Smith rates that were even higher than the rate he was already paying.

421. Plaintiff's LexisNexis Report reveals that State Farm accessed his LexisNexis Report on or about November 2023, which, upon information and belief, included his Driving Data.

422. Plaintiff's LexisNexis Report reveals that Geico accessed his LexisNexis Report on or about November 2023 which, upon information and belief, included his Driving Data.

423. Upon information and belief, the increased premiums and inflated insurance quotes suffered by Plaintiff Z. Smith were a result of Plymouth Rock Assurance, State Farm, and Geico being provided with the uncontextualized, misleading, and unconsented-to personal Driving Data on Plaintiff's LexisNexis and/or Verisk Reports.

424. If Plaintiff Z. Smith had known that GM would intercept and sell his Driving Data to LexisNexis, Verisk, and other third parties without his knowledge or consent, he would not have purchased the 2023 Chevrolet Bolt EV 2LT.

425. Plaintiff Z. Smith's Driving Data has tangible value. Because of Defendants' conduct, Plaintiff has lost control over the use of his Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

426. Plaintiff Z. Smith had a reasonable expectation of privacy in his vehicle, including that detailed data about his location, routes, schedule, and driving behaviors would not be collected or shared without his express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing his Driving Data invaded Plaintiff Z. Smith's privacy rights.

## NEW YORK

### Joseph Davids

427. Plaintiff Joseph Davids is a resident and citizen of the state of New York. On or about July 2021, Plaintiff Davids leased a 2021 Cadillac XT5 from a GM dealer in Farmingdale, New York. GM equipped the 2021 Cadillac XT5 with OnStar during the manufacturing process. Plaintiff Davids leased the 2021 Cadillac XT5 until around February 2024.

428. When Plaintiff Davids leased the 2021 Cadillac XT5, he was told by the GM dealer that OnStar was included with the vehicle's purchase and that the vehicle came with a "free trial" of OnStar, and the GM dealer activated OnStar at the dealership. Plaintiff Davids never knowingly enrolled in OnStar Smart Driver. Plaintiff Davids purchased certain OnStar services in relation to the 2021 Cadillac XT5 after the initial "free trial" elapsed because he believed that these services would be useful in case of an emergency and for purposes such as GPS and navigation.

429. On or about February 6, 2024, Plaintiff Davids purchased a 2024 Cadillac XT6 from a GM dealer in Farmingdale, New York. GM equipped the 2024 Cadillac XT6 with OnStar during the manufacturing process.

430. When Plaintiff Davids purchased the 2024 Cadillac XT6, he was told by the GM dealer that OnStar was included with the vehicle's purchase and that the vehicle came with a "free trial" of OnStar, and the GM dealer activated OnStar at the dealership. Plaintiff Davids was never given a choice to activate, and never knowingly enrolled in, OnStar Smart Driver.

431. Unbeknownst to Plaintiff Davids, GM intercepted Driving Data relating to his 2021 Cadillac XT5 and 2024 Cadillac XT6 using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff Davids reasonably expected that his Driving Data would remain private unless he gave GM his express authorization to collect, use, or share it. Plaintiff Davids did not know that GM was intercepting his Driving Data for its own financial and commercial use, and never authorized GM to do so.

432. Unbeknownst to Plaintiff Davids, GM also sold his Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and shared Plaintiff's Driving Data for their own financial and commercial benefit. Plaintiff Davids has never knowingly opted in to sharing his Driving Data relating to his 2021 Cadillac XT5 or his 2024 Cadillac XT6 with LexisNexis or Verisk, nor

would he have done so. Plaintiff Davids, who did not know that LexisNexis and Verisk had possession of his Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share his Driving Data with other third parties.

433. Plaintiff Davids received a copy of his LexisNexis Consumer Disclosure Report dated April 27, 2024, which confirmed that Driving Data from his 2021 Cadillac XT5 and 2024 Cadillac XT6 was intercepted, accessed, recorded, and disclosed by GM to LexisNexis without his consent. The Report included detailed Driving Data for 612 trips in 2023 and 2024, including, for each trip: the start and end date; the start and end time; the distance driven; acceleration events; high speed events; and hard brake events.

434. The Report confirmed that Plaintiff's Driving Data in relation to his 2021 Cadillac XT5 was collected by LexisNexis even after Plaintiff's enrollment in OnStar in relation to this vehicle had expired.

435. Plaintiff Davids received a copy of his Verisk Driving Behavior History Report, which confirmed that Driving Data from his 2021 Cadillac XT5 and his 2024 Cadillac XT6 was intercepted, accessed, recorded and disclosed by GM to Verisk without his consent. The Report included detailed Driving Data for 418 trips in relation to Plaintiff's 2021 Cadillac XT5 from November 2023 to February 2024 and 150 trips in relation to Plaintiff's 2024 Cadillac XT6 from February 2024 to March 2024, including, for each date: the number of trips, speeding events, hard braking

events, rapid acceleration events, daytime driving minutes, nighttime driving minutes, and miles driven.

436. The Report confirmed that Plaintiff's Driving Data in relation to his 2021 Cadillac XT5 was collected by Verisk even after Plaintiff's enrollment in OnStar in relation to this vehicle had expired.

437. The LexisNexis and Verisk Reports omit important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

438. On information and belief, some of the Driving Data Defendants collected and shared is improperly and inaccurately associated with Plaintiff Davids because his wife was also an occasional driver of both vehicles.

439. Plaintiff Davids maintained insurance coverage for his 2021 Cadillac XT5 and his 2024 Cadillac XT6 through Nationwide. If Plaintiff Davids had known that GM would intercept and sell his Driving Data to LexisNexis, Verisk, and other third parties without his knowledge or consent, he would not have leased the 2021 Cadillac XT5 and or purchased his 2024 Cadillac XT6.

440. Plaintiff Davids' Driving Data has tangible value. Because of Defendants' conduct, Plaintiff has lost control over the use of his Driving Data,

which is in the possession of third parties who have used and will use it for their own financial advantage.

441.   Plaintiff Davids had a reasonable expectation of privacy in his vehicle, including that detailed data about his location, routes, schedule, and driving behaviors would not be collected or shared without his express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing his Driving Data invaded Plaintiff Davids' privacy rights.

### Scott Smith

442.   Plaintiff Scott Smith is a resident and citizen of the state of New York. On or about June 2022, Plaintiff S. Smith leased a 2022 Buick Encore GX from a GM dealer in Malone, New York. GM equipped the 2022 Buick Encore GX with OnStar during the manufacturing process.

443.   When Plaintiff S. Smith leased the 2022 Buick Encore GX, he was told by the GM dealer that OnStar was included with the vehicle's purchase and that the vehicle came with a "free trial" of OnStar, and the GM dealer activated OnStar before at the dealership. Plaintiff S. Smith was never given a choice to activate, and never knowingly enrolled in, OnStar Smart Driver.

444.   Unbeknownst to Plaintiff S. Smith, GM intercepted Driving Data relating to his 2022 Buick Encore GX using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff S. Smith reasonably

expected that his Driving Data would remain private unless he gave GM his express authorization to collect, use, or share it. Plaintiff S. Smith did not know that GM was intercepting his Driving Data for its own financial and commercial use, and never authorized GM to do so.

445. Unbeknownst to Plaintiff S. Smith, GM also sold his Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and shared Plaintiff's Driving Data for their own financial and commercial benefit. Plaintiff S. Smith has never knowingly opted in to sharing his Driving Data relating to his 2022 Buick Encore GX with anyone, including LexisNexis or Verisk, nor would he have done so. Plaintiff S. Smith, who did not know that LexisNexis and Verisk had possession of his Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share his Driving Data with other third parties.

446. Plaintiff S. Smith received a copy of his LexisNexis Consumer Disclosure Report, which confirmed that Driving Data from his 2022 Buick Encore GX was intercepted, accessed, recorded, and disclosed by GM to LexisNexis without his consent. The Report included detailed Driving Data for 127 trips in February 2024 and March 2024, including, for each trip: the start and end date; the start and end time; the distance driven; acceleration events; high speed events; and hard brake events.

447. The Report confirmed that Plaintiff's Driving Data was collected by LexisNexis even after Plaintiff's "free trial" of OnStar had expired. Plaintiff believes that he had a 3-month "free trial" of OnStar which commenced in around June 2022.

448. Plaintiff S. Smith received a copy of his Verisk Driving Behavior History Report dated September 19, 2024, which confirmed that Driving Data from his 2022 Buick Encore GX was intercepted, accessed, recorded and disclosed by GM to Verisk without his consent. The Report included detailed Driving Data for 11 trips in March 2024, including, for each date: the number of trips, speeding events, hard braking events, rapid acceleration events, daytime driving minutes, nighttime driving minutes, and miles driven. The Report confirmed that Plaintiff's Driving Data was collected by Verisk even after Plaintiff's "free trial" of OnStar had expired.

449. The LexisNexis and Verisk Reports omit important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

450. Plaintiff S. Smith maintained insurance coverage for his 2022 Buick Encore GX through The Main Street America Group. In around January 2023, The Main Street America Group told Plaintiff that his vehicle insurance premium would

increase from approximately $584.00 per year to approximately $739.00 per year. In around January 2024, The Main Street America Group told Plaintiff that his vehicle insurance premium would further increase to approximately $841 per year. The Main Street America Group did not explain the decision to increase his insurance premium.

451.   Plaintiff S. Smith had not recently filed an insurance claim, been in an automobile accident, received a speeding ticket, or experienced any other incident that could account for the increase.

452.   Upon information and belief, the increased premiums suffered by Plaintiff S. Smith were a result of The Main Street America Group being provided with the uncontextualized, misleading, and unconsented-to personal Driving Data on Plaintiff's LexisNexis/Verisk Reports.

453.   If Plaintiff S. Smith had known that GM would intercept and sell his Driving Data to LexisNexis, Verisk, and other third parties without his knowledge or consent, he would not have purchased his 2022 Buick Encore GX.

454.   Plaintiff S. Smith's Driving Data has tangible value. Because of Defendants' conduct, Plaintiff has lost control over the use of his Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

455.    Plaintiff S. Smith had a reasonable expectation of privacy in his vehicle, including that detailed data about his location, routes, schedule, and driving behaviors would not be collected or shared without his express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing his Driving Data invaded Plaintiff S. Smith's privacy rights.

## NORTH CAROLINA

### Rickie Donovan Baker

456.    Plaintiff Rickie Donovan Baker is a resident and citizen of the state of North Carolina. On or about November 2023, Plaintiff Baker purchased a 2023 Chevrolet Corvette z51 from a GM dealer in Hickory, North Carolina. GM equipped the 2023 Chevrolet Corvette z51 with OnStar during the manufacturing process. Plaintiff Baker also previously purchased a 2017 Corvette Grand Sport which he purchased on or around June 2019 from a GM dealer in Greensboro, North Carolina. GM equipped the 2023 Chevrolet Corvette z51 with OnStar during the manufacturing process.

457.    When Plaintiff Baker purchased each of his GM vehicles, including the 2023 Chevrolet Corvette z51, he was told by the GM dealer that OnStar was included with the vehicle's purchase and the vehicle came with a "free trial" of OnStar. Plaintiff Baker activated OnStar in each of his GM vehicles, including the 2023 Chevrolet

Corvette z51, shortly after bringing the vehicles home from the dealership. Plaintiff Baker never knowingly enrolled in OnStar Smart Driver.

458.    Unbeknownst to Plaintiff Baker, GM intercepted Driving Data relating to Plaintiff Baker's 2023 Chevrolet Corvette z51, and possibly also other GM vehicles he owned, using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff Baker reasonably expected that his Driving Data would remain private unless he gave GM his express authorization to collect, use, or share it. Plaintiff Baker did not know that GM was intercepting his Driving Data for its own financial and commercial use, and never authorized GM to do so.

459.    Unbeknownst to Plaintiff Baker, GM also sold his Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and shared Plaintiff's Driving Data for their own financial and commercial benefit. Plaintiff Baker has never knowingly opted in to sharing his Driving Data relating to his GM vehicles, including his 2023 Chevrolet Corvette z51, with anyone, including LexisNexis or Verisk, nor would he have done so. Plaintiff Baker, who did not know that LexisNexis and Verisk had possession of his Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share his Driving Data with other third parties.

460.    Plaintiff Baker received a copy of his LexisNexis Consumer Disclosure Report dated March 31, 2024 which confirmed that Driving Data from his 2023

Chevrolet Corvette z51 was intercepted, accessed, recorded, and disclosed by GM to LexisNexis without his consent.

461. The LexisNexis Report omits important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

462. On information and belief, much of the Driving Data Defendants collected and shared is improperly and inaccurately associated with Plaintiff Baker because another individual was also a driver of the vehicle.

463. Plaintiff maintained insurance coverage for his 2023 Chevrolet Corvette z51 through Geico.

464. From around January 2024, Plaintiff's vehicle insurance premium increased, from approximately $128.00 per month to the current rate of approximately $234.00 per month. Geico did not explain the reason for this increase.

465. Plaintiff Baker had not recently filed an insurance claim, been in an automobile accident, received a speeding ticket, or experienced any other incident that could account for the increase.

466. In around January 2024, Plaintiff also sought auto insurances quotes from Progressive and Allstate. Progressive and Allstate gave Plaintiff quotes which

were not better and/or not substantially better than the premium Plaintiff was already paying.

467.    Upon information and belief, the increased premiums and inflated quotes suffered by Plaintiff were a result of Geico, Progressive and Allstate being provided with the uncontextualized, misleading, and unconsented-to personal Driving Data on Plaintiff's LexisNexis/Verisk Reports.

468.    Plaintiff Baker also received an updated version of his LexisNexis Report dated November 12, 2024. Driving Data obtained from GM was not on this Report.

469.    If Plaintiff Baker had known that GM would intercept and sell his Driving Data to LexisNexis, Verisk, and other third parties without his knowledge or consent, he would not have purchased the OnStar enabled GM vehicles he owned, including his 2023 Chevrolet Corvette z51.

470.    Plaintiff Baker's Driving Data has tangible value. Because of Defendants' conduct, Plaintiff has lost control over the use of his Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

471.    Plaintiff Baker had a reasonable expectation of privacy in his vehicle, including that detailed data about his location, routes, schedule, and driving behaviors would not be collected or shared without his express consent or authorization.

Defendants' actions of secretly intercepting, using, and disclosing his Driving Data invaded Plaintiff Baker's privacy rights.

## Thomas Fuhrer

472.   Plaintiff Thomas Fuhrer is a resident and citizen of the state of North Carolina. In 2019, Plaintiff Fuhrer purchased a 2019 Chevrolet Cruze from a GM dealer in Wilmington, North Carolina. GM equipped the 2019 Chevrolet Cruze with OnStar during the manufacturing process.

473.   When Plaintiff Fuhrer purchased the 2019 Chevrolet Cruze, he was told by the GM dealer that OnStar was included with the vehicle's purchase and that the vehicle came with a "free trial" of OnStar. Plaintiff cannot recall if OnStar was activated in the 2019 Chevrolet Cruze. If it was activated, it would have been activated by the GM dealer at the dealership at the time of purchase. Plaintiff Fuhrer was never given a choice to activate, and never knowingly enrolled in, OnStar Smart Driver.

474.   In 2022, Plaintiff Fuhrer purchased a 2022 Chevrolet Colorado from a GM dealer in Wilmington, North Carolina. GM equipped the 2022 Chevrolet Colorado with OnStar during the manufacturing process.

475.   When Plaintiff Fuhrer purchased the 2022 Chevrolet Colorado, he was told by the GM dealer that OnStar was included with the vehicle's purchase and that the vehicle came with a "free trial" of OnStar. Plaintiff cannot recall if OnStar was

activated in the 2022 Chevrolet Colorado. If it was activated, it would have been activated by the GM dealer at the dealership at the time of purchase. Plaintiff Fuhrer was never given a choice to activate, and never knowingly enrolled in, OnStar Smart Driver.

476. Unbeknownst to Plaintiff, GM intercepted Driving Data relating to Plaintiff Fuhrer's 2019 Chevrolet Cruze and 2022 Chevrolet Colorado using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff Fuhrer reasonably expected that his Driving Data would remain private unless he gave GM his express authorization to collect, use, or share it. Plaintiff Fuhrer did not know that GM was intercepting his Driving Data for its own financial and commercial use, and never authorized GM to do so.

477. Unbeknownst to Plaintiff Fuhrer, GM also sold his Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and shared Plaintiff's Driving Data for their own financial and commercial benefit. Plaintiff Fuhrer has never knowingly opted in to sharing his Driving Data relating to his 2019 Chevrolet Cruze or 2022 Chevrolet Colorado with anyone, including LexisNexis or Verisk, nor would he have done so. Plaintiff Fuhrer, who did not know that LexisNexis and Verisk had possession of his Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share his driving data with other third parties.

478. Plaintiff Fuhrer received a copy of his LexisNexis Consumer Disclosure Report dated April 5, 2024, which confirmed that Driving Data from his 2019 Chevrolet Cruze and 2022 Chevrolet Colorado was intercepted, accessed, recorded, and disclosed by GM to LexisNexis without his consent. The Report included detailed Driving Data for 622 trips from October 2023 to March 2024, including, for each trip: the start and end date; the start and end time; the distance driven; acceleration events; high speed events; and hard brake events.

479. The Report confirmed that Plaintiff's Driving Data was collected by LexisNexis even after Plaintiff's "free trial" of OnStar had expired.

480. Plaintiff Fuhrer received a copy of his Verisk Driving Behavior History Report dated May 10, 2024, which confirmed that Driving Data from his 2019 Chevrolet Cruze and 2022 Chevrolet Colorado was intercepted, accessed, recorded and disclosed by GM to Verisk without his consent. The Report included detailed Driving Data for 352 trips in relation to the 2019 Chevrolet Cruze, and 181 trips in relation to the 2022 Chevrolet Colorado, from November 2023 to March 2024, including, for each date: the number of trips, speeding events, hard braking events, rapid acceleration events, daytime driving minutes, nighttime driving minutes, and miles driven. The Report confirmed that Plaintiff's Driving Data was collected by Verisk even after Plaintiff's "free trial" of OnStar had expired.

481. The LexisNexis and Verisk Reports omit important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

482. On information and belief, some of the Driving Data Defendants collected and shared is improperly and inaccurately associated with Plaintiff Fuhrer because his wife occasionally drove the vehicles.

483. Plaintiff Fuhrer maintained insurance coverage for the 2019 Chevrolet Cruze and the 2022 Chevrolet Colorado through USAA. Plaintiff's annual insurance premium for the vehicle increased by approximately $169 from the annual policy period ending in February 2024 to the annual policy period ending in February 2025.

484. Plaintiff Fuhrer's LexisNexis Report reveals that USAA accessed his LexisNexis Report on or about June 20, 2023, July 24, 2023 and March 23, 2024, which, upon information and belief, included his Driving Data.

485. Plaintiff Fuhrer had not recently filed an insurance claim, been in an automobile accident, received a speeding ticket, or experienced any other incident that could account for the increase.

486. Upon information and belief, the increased premiums suffered by Plaintiff Fuhrer were a result of USAA being provided with the uncontextualized,

misleading, and unconsented-to personal Driving Data on Plaintiff's LexisNexis Report.

487.  If Plaintiff Fuhrer had known that GM would intercept and sell his Driving Data to LexisNexis, Verisk, and other third parties without his knowledge or consent, he would not have purchased the 2019 Chevrolet Cruze and 2022 Chevrolet Colorado.

488.  Plaintiff Fuhrer's Driving Data has tangible value. Because of Defendants' conduct, Plaintiff has lost control over the use of his Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

489.  Plaintiff Fuhrer had a reasonable expectation of privacy in his vehicle, including that detailed data about his location, routes, schedule, and driving behaviors would not be collected or shared without his express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing his Driving Data invaded Plaintiff Fuhrer's privacy rights.

## OHIO

### Peter Christie

490.  Plaintiff Peter Christie is a resident and citizen of the state of Ohio. In or around 2019, Plaintiff Christie purchased a 2019 Chevrolet Cruz from a GM dealer in Warren, Ohio. GM equipped the 2019 Chevrolet Cruz with OnStar during the

manufacturing process. Plaintiff Christie had also previously owned other GM vehicles, which GM equipped with OnStar during the manufacturing process.

491.    When Plaintiff Christie purchased the 2019 Chevrolet Cruz, he was told by the GM dealer that OnStar was included with the vehicle's purchase and that the vehicle came with a "free trial" of OnStar. The GM dealer activated OnStar at the dealership. The same is true in relation to other GM vehicles Plaintiff Christie owned prior to the 2019 Chevrolet Cruz. Plaintiff Christie was never given a choice to activate, and never knowingly enrolled in, OnStar Smart Driver, in relation to the 2019 Chevrolet Cruz or any other GM vehicle he has ever owned.

492.    Unbeknownst to Plaintiff Christie, GM intercepted non-anonymized, personal Driving Data relating to Plaintiff Christie's 2019 Chevrolet Cruz using OnStar and may also have done so in relation to other GM vehicles Plaintiff Christie has owned. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff Christie reasonably expected that the Driving Data relating to his vehicle would remain private unless he gave GM his express authorization to collect, use, or share it. Plaintiff Christie did not know that GM was intercepting the Driving Data for its own financial and commercial use, and never authorized GM to do so.

493.    Unbeknownst to Plaintiff Christie, GM also sold the Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and shared the Driving Data for their own financial and commercial benefit. Plaintiff

Christie has never knowingly opted in to sharing Driving Data relating to his 2019 Chevrolet Cruz (or any other GM vehicle he has owned) with anyone, including LexisNexis and Verisk, nor would he have done so. Plaintiff Christie, who did not know that LexisNexis and Verisk had possession of the Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share the Driving Data with other third parties.

494.    Plaintiff Christie received a copy of his LexisNexis Consumer Disclosure Report, dated July 7, 2024, which confirmed that Driving Data from his 2019 Chevrolet Cruz was intercepted, accessed, recorded, and disclosed by GM to LexisNexis without his consent. The Report included detailed Driving Data for 602 trips in 2023 and 2024, including, for each trip: the start and end date; the start and end time; the distance driven; acceleration events; high speed events; and hard brake events.

495.    The LexisNexis Report omits important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

496.    On information and belief, the Driving Data Defendants collected and shared is improperly and inaccurately associated with Plaintiff Christie because his son was the primary driver of the vehicle.

497.     Plaintiff Christie initially maintained insurance coverage for the 2019 Chevrolet Cruz through Safeco Insurance. Plaintiff Christie experienced increases in his vehicle insurance rates after purchasing the 2019 Chevrolet Cruz. Plaintiff Christie's LexisNexis Report reveals that Safeco accessed his LexisNexis Consumer Disclosure Report on or about July 9, 2023 and August 26, 2023, which, upon information and belief, included Driving Data.

498.     Plaintiff Christie had not recently filed an insurance claim, been in an automobile accident or received a speeding ticket that could account for the increase in premiums charged by Safeco.

499.     In around early 2024, Plaintiff Christie, though his insurance agent, looked to change insurers due to the premiums Safeco was charging. To the best of Plaintiff Christie's knowledge, the best rate he was offered was by Erie Insurance. In around early 2024, Plaintiff Christie change his insurance to Erie Insurance due to increases in his vehicle insurance premiums with Safeco Insurance.

500.     Plaintiff Christie's LexisNexis Report reveals that insurers Grange Insurance Company, Geico, Liberty Mutual Insurance Company, Cincinnati Insurance Company, Auto Owners Insurance Company, Valley Insurance Group, Orange Insurance Exchange, and Shepherd Insurance LLC accessed his LexisNexis Report in 2023 and 2024, which, upon information and belief, included Driving Data.

501. Upon information and belief, the increased premiums and/or inflated quotes suffered by Plaintiff Christie were a result of Safeco and other insurers being provided with the uncontextualized, misleading, and unconsented-to personal Driving Data on Plaintiff Christie's LexisNexis Report.

502. If Plaintiff Christie had known that GM would intercept and sell Driving Data from his vehicle to LexisNexis, Verisk, and other third parties without his knowledge or consent, he would not have purchased the 2019 Chevrolet Cruz.

503. The Driving Data from Plaintiff Christie's vehicle has tangible value. Because of Defendants' conduct, Plaintiff Christie has lost control over the use of the Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

504. Plaintiff Christie had a reasonable expectation of privacy in his vehicle, including that detailed data about the locations, routes, schedules, and driving behaviors associated with his vehicle would not be collected or shared without his express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing the Driving Data from Plaintiff Christie's vehicle invaded his privacy rights.

## Julianne Kovein

505.   Plaintiff Julianne Kovein is a resident and citizen of the state of Ohio. Plaintiff Kovein and her husband, Joshua Kovein, have owned and/or leased numerous GM vehicles over the years, including those set out below.

506.   On or about February 25, 2016, Plaintiff Kovein and her husband leased a 2016 GM Acadia from a GM dealer in Medina, Ohio. GM equipped the 2016 GM Acadia with OnStar during the manufacturing process.

507.   On or about June 18, 2022, Plaintiff Kovein's husband purchased a 2019 Chevrolet Traverse from a GM dealer in Akron, Ohio. GM equipped the 2019 Chevrolet Traverse with OnStar during the manufacturing process. Both Plaintiff Kovein and her husband's names are currently on the title to this vehicle.

508.   On or about March of 2023, Plaintiff Kovein and her husband purchased a 2023 Chevrolet Silverado from a GM dealer in Rittman, Ohio. GM equipped the 2023 Chevrolet Silverado with OnStar during the manufacturing process.

509.   In relation to all the GM vehicles Plaintiff Kovein and/or her husband purchased and/or leased, including the 2019 Chevrolet Traverse, they were told by the GM dealer that OnStar was included with the vehicle's purchase and the vehicle came with a "free trial" of OnStar, and the GM dealer activated OnStar and the

dealership. Plaintiff Kovein and her husband were never given a choice to activate, and never knowingly enrolled in, OnStar Smart Driver.

510.    Unbeknownst to Plaintiff Kovein, GM intercepted Driving Data relating to the 2019 Chevrolet Traverse using OnStar (and may have done so in relation to the other GM vehicles Plaintiff Kovein and/or her husband owned and/or leased). GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff Kovein reasonably expected that her Driving Data would remain private unless she gave GM her express authorization to collect, use, or share it. Plaintiff Kovein did not know that GM was intercepting her Driving Data for its own financial and commercial use, and never authorized GM to do so.

511.    Unbeknownst to Plaintiff Kovein, GM also sold her Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and shared Plaintiff's Driving Data for their own financial and commercial benefit. Plaintiff Kovein has never knowingly opted in to sharing her Driving Data relating to any of her GM vehicles, including the 2019 Chevrolet Traverse, with anyone, including LexisNexis or Verisk, nor would she have done so. Plaintiff Kovein, who did not know that LexisNexis and Verisk had possession of her Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share her Driving Data with other third parties.

512. Plaintiff Kovein received a copy of her Verisk Driving Behavior History Report dated October 25, 2024, which confirmed that Driving Data from the 2019 Chevrolet Traverse was intercepted, accessed, recorded and disclosed by GM to Verisk without her consent.

513. Any information collected by Verisk would have been collected without important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

514. On information and belief, some of the Driving Data Defendants collected and shared is improperly and inaccurately associated with Plaintiff Kovein because her husband was also a driver of the vehicle.

515. Plaintiff Kovein maintained insurance coverage for her vehicles, including the 2019 Chevrolet Traverse through State Farm until around August 2024. Beginning with Plaintiff's insurance renewal in 2020, Plaintiff Kovein's insurance rates with State Farm increased significantly at each 6-month renewal. Between 2020 and 2024, Plaintiff Kovein's insurance rates with State Farm nearly doubled. For example, while in 2019, Plaintiff Kovein paid approximately $50 per month in insurance rates, by mid-2024, Plaintiff Kovein was paying approximately

$90 per month in insurance rates. State Farm did not explain the decision to increase Plaintiff's insurance rates.

516. Plaintiff Kovein had not recently filed an insurance claim, received a speeding ticket, been in an automobile accident other than one, no-fault accident, or experienced any other incident that could account for the increase.

517. In 2024, Plaintiff Kovein also sought auto insurances quotes from Progressive and Allstate which were slightly lower than, but similar to, the State Farm rates.

518. Plaintiff Kovein's Verisk Report reveals that Grange Mutual Insurance, Liberty Mutual Insurance, and Farmers Insurance accessed her Verisk Driving Behavior Report which, upon information and belief, included her Driving Data.

519. Upon information and belief, the increased premiums and/or inflated quotes suffered by Plaintiff Kovein were a result of insurers being provided with the uncontextualized, misleading, and unconsented-to personal Driving Data on Plaintiff's Verisk Report.

520. In around August 2024, Plaintiff Kovein changed her automobile insurance to Seville Insurance due to the high rates being charged by State Farm. When she called Seville Insurance to look into changing her insurer, and explained that she was seeking to change her insurer because her vehicle insurance rates were

so high, a Seville Insurance representative told Plaintiff words to the effect that "OnStar was increasing insurance rates."

521.   If Plaintiff Kovein had known that GM would intercept and sell her Driving Data to LexisNexis, Verisk, and other third parties without her knowledge or consent, she would not have leased and/or purchased GM vehicles, including the 2019 Chevrolet Traverse.

522.   Plaintiff Kovein's Driving Data has tangible value. Because of Defendants' conduct, Plaintiff has lost control over the use of her Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

523.   Plaintiff Kovein had a reasonable expectation of privacy in her vehicle, including that detailed data about her location, routes, schedule, and driving behaviors would not be collected or shared without her express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing her Driving Data invaded Plaintiff Kovein's privacy rights.

**Samantha Horton and Christopher Horton**

524.   Plaintiffs Samantha Horton and Christopher Horton are residents and citizens of the state of Ohio. On or about May 6, 2023, the Hortons purchased a 2023 Chevrolet Silverado 1500 LT from a GM dealer in Massillon, Ohio. GM equipped

the 2023 Chevrolet Silverado 1500 LT with OnStar during the manufacturing process.

525. When the Horton purchased the 2023 Chevrolet Silverado 1500 LT, they were told by the GM dealer that OnStar was included with the vehicle's purchase and that the vehicle came with a "free trial" of OnStar, and the GM dealer activated OnStar at the dealership. The Horton subsequently purchased an OnStar subscription after the initial "free trial" expired, because they believed that OnStar was useful for crash detection, emergency services and GPS services.

526. Unbeknownst to the Hortons, GM intercepted Driving Data relating to their 2023 Chevrolet Silverado 1500 LT using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. The Hortons reasonably expected that their Driving Data would remain private unless they gave GM their express authorization to collect, use, or share it. The Hortons did not know that GM was intercepting their Driving Data for its own financial and commercial use, and never authorized GM to do so.

527. Unbeknownst to the Hortons, GM also sold their Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and shared Plaintiff's Driving Data for their own financial and commercial benefit. The Hortons have never knowingly opted in to sharing their Driving Data relating to their 2023 Chevrolet Silverado 1500 LT with anyone, including LexisNexis or Verisk,

nor would they have done so. The Hortons, who did not know that LexisNexis and Verisk had possession of their Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share their Driving Data with other third parties.

528. Plaintiff Christopher Horton received a copy of his LexisNexis Consumer Disclosure Report dated August 21, 2024, which confirmed that Driving Data from the 2023 Chevrolet Silverado 1500 LT he jointly owns with Plaintiff Samantha Horton was intercepted, accessed, recorded, and disclosed by GM to LexisNexis without Plaintiffs' consent. The Report included detailed Driving Data for 27 trips from February 2024 and March 2024, including, for each trip: the start and end date; the start and end time; the distance driven; acceleration events; high speed events; and hard brake events.

529. The LexisNexis Report omits important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

530. The Hortons maintained insurance coverage for the 2023 Chevrolet Silverado 1500 LT through Ohio Mutual.

531. In around May 2024, Ohio Mutual told the Hortons that their vehicle insurance premium would increase by approximately $450.00 for the next year. Ohio

Mutual did not explain the decision to increase Plaintiffs' insurance rates, other than to advise them that "everything was going up" in cost.

532. Plaintiffs had not recently filed a significant insurance claim, been in an automobile accident, received a speeding ticket, or experienced any other incident that could account for the increase.

533. Upon information and belief, the increased premium suffered by the Hortons was a result of Ohio Mutual being provided with the uncontextualized, misleading, and unconsented-to personal Driving Data on Plaintiff Christopher Horton's LexisNexis Report.

534. If the Hortons had known that GM would intercept and sell their Driving Data to LexisNexis, Verisk, and other third parties without their knowledge or consent, they would not have purchased the 2023 Chevrolet Silverado 1500 LT and/or purchased OnStar services.

535. Plaintiffs Samantha Horton and Christopher Horton's Driving Data has tangible value. Because of Defendants' conduct, Plaintiffs have lost control over the use of their Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

536. Plaintiffs Samantha Horton and Christopher Horton had a reasonable expectation of privacy in their vehicle, including that detailed data about their location, routes, schedule, and driving behaviors would not be collected or shared

without their express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing their Driving Data invaded Plaintiffs' privacy rights.

## **OKLAHOMA**

### **Gregory Brakefield**

537.   Plaintiff Gregory Brakefield is a resident and citizen of the state of Oklahoma. In or about February 2021, Plaintiff Brakefield leased a 2021 GM Suburban from a GM Chevrolet dealer in Tulsa, Oklahoma. He purchased the 2021 Suburban in or about March 2024. GM equipped the 2021 Suburban with OnStar during the manufacturing process.

538.   When Plaintiff Brakefield leased the 2021 Suburban, he was told by the GM dealer that the OnStar system was included with the vehicle's purchase. He understood that his OnStar subscription would carry over from a prior GM vehicle whose lease term had ended. The GM dealer activated OnStar before Plaintiff Brakefield took possession of the vehicle. Plaintiff Brakefield was never given a choice to activate, and never knowingly enrolled in, OnStar Smart Driver.

539.   Unbeknownst to Plaintiff Brakefield, GM intercepted Driving Data relating to Plaintiff Brakefield's 2021 Suburban using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff Brakefield reasonably expected that his Driving Data would remain private unless he gave GM

his express authorization to collect, use, or share it. Plaintiff Brakefield did not know that GM was intercepting his Driving Data for its own financial and commercial use, and never authorized GM to do so.

540.    Unbeknownst to Plaintiff Brakefield, GM also sold his Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and shared Plaintiff's Driving Data for their own financial and commercial benefit. Plaintiff Brakefield has never knowingly opted in to sharing his Driving Data relating to his 2021 Suburban vehicle with GM, including LexisNexis or Verisk. Plaintiff Brakefield, who did not know that LexisNexis and Verisk had possession of his Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share his Driving Data with other third parties.

541.    On or about April 11, 2024, Plaintiff Brakefield received a copy of his LexisNexis Consumer Disclosure Report, which confirmed that Driving Data from his 2021 Suburban was intercepted, accessed, recorded, and disclosed by GM to LexisNexis without his consent. The Report included detailed Driving Data for 216 trips from October 2023 to March 2024, including, for each trip: the start and end date; the start and end time; the distance driven; acceleration events; high speed events; and hard brake events.

542.    The LexisNexis Report omits important context relating to the driving events, including what these events mean, how they are calculated, or why someone

might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

543. On information and belief, much of the Driving Data Defendants collected and shared is improperly and inaccurately associated with Plaintiff Brakefield because his spouse was also a driver of the vehicle.

544. Plaintiff Brakefield's Driving Data has tangible value. Because of Defendants' conduct, Plaintiff has lost control over the use of his Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

545. Plaintiff Brakefield had a reasonable expectation of privacy in his vehicle, including that detailed data about his location, routes, schedule, and driving behaviors would not be collected or shared without his express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing his Driving Data invaded Plaintiff Brakefield's privacy rights.

## OREGON

### Michael Montgomery

546. Plaintiff Michael Montgomery is a resident and citizen of the state of Oregon. On or about February 22, 2019, Plaintiff Montgomery purchased a 2019 GMC Sierra 1500 AT4 from a GM Buick dealer in Salem, Oregon. GM equipped the 2019 GMC Sierra with OnStar during the manufacturing process.

547.    When Plaintiff Montgomery purchased the 2019 GMC Sierra, he was told by the GM dealer that OnStar was mandatory and that the vehicle came with a "free trial" of OnStar. The GM dealer activated OnStar before Plaintiff Montgomery took possession of the vehicle. Plaintiff Montgomery was never given a choice to activate, and never knowingly enrolled in, OnStar Smart Driver.

548.    Unbeknownst to Plaintiff Montgomery, GM intercepted Driving Data relating to Plaintiff Montgomery's 2019 GMC Sierra using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff Montgomery reasonably expected that his Driving Data would remain private unless he gave GM his express authorization to collect, use, or share it. Plaintiff Montgomery did not know that GM was intercepting his Driving Data for its own financial and commercial use, and never authorized GM to do so.

549.    Unbeknownst to Plaintiff Montgomery, GM also sold his Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and shared Plaintiff's Driving Data for their own financial and commercial benefit. Plaintiff Montgomery has never knowingly opted in to sharing his Driving Data relating to his 2019 GMC Sierra with anyone, including LexisNexis or Verisk, nor would he have done so. Plaintiff Montgomery, who did not know that LexisNexis or Verisk had possession of his Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share his Driving Data with other third parties.

550. On or about May 9, 2024, Plaintiff Montgomery received a copy of his LexisNexis Consumer Disclosure Report, which confirmed that Driving Data from his 2019 GMC Sierra was intercepted, accessed, recorded, and disclosed by GM to LexisNexis without his consent. The Report included detailed Driving Data for 345 trips from November 2023 to March 2024, including, for each trip: the start and end date; the start and end time; the distance driven; acceleration events; high speed events; and hard brake events.

551. The Report confirmed that Plaintiff's Driving Data was collected by LexisNexis even after Plaintiff's "free trial" of OnStar had expired.

552. Upon investigation, Plaintiff discovered errors in the Report, including, for example, that the Report included a social security number that was not his and names that he had never used.

553. Plaintiff Montgomery subsequently disputed the errors on his LexisNexis Report, including requesting that his Driving Data be removed. From about June 2024 through about September 2024, Plaintiff Montgomery requested and received additional copies of his LexisNexis Report which contained Driving Data despite his request for removal.

554. The LexisNexis Reports omit important context relating to the driving events, including what these events mean, how they are calculated, or why someone

might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

555. Plaintiff Montgomery previously maintained insurance coverage for his 2019 GMC Sierra through Pemco. During the coverage period from about June 2023 through June 2024, Pemco increased Plaintiff Montgomery's insurance premium by over $300 over the previous year. Pemco did not explain the increases.

556. Plaintiff Montgomery had not recently filed an insurance claim, been in an automobile accident, received a speeding ticket, or experienced any other incident that could account for the increase.

557. Plaintiff's LexisNexis Report reveals that Pemco accessed his LexisNexis Report on or about October 12, 2023, which, upon information and belief, included his Driving Data.

558. Upon information and belief, the increased premiums suffered by Plaintiff were a result of Pemco's being provided with the uncontextualized, misleading, and unconsented-to personal Driving Data on Plaintiff's LexisNexis Report.

559. In or about May 2024, Plaintiff Montgomery sought an insurance quote from USAA due to his increasing rates with Pemco.

560. Plaintiff Montgomery's LexisNexis Report reveals that USAA accessed his LexisNexis Report on or about May 7, 2024, which, upon information and belief, included his Driving Data.

561. On or about May 7, 2024, USAA informed Plaintiff Montgomery that he was not quoted at their best rate. USAA told Plaintiff that its decision was based on information received from LexisNexis. Nonetheless, Plaintiff accepted the quote and changed insurers.

562. Upon information and belief, the higher quote and higher premium suffered by Plaintiff was a result of USAA being provided with the uncontextualized, misleading, and unconsented-to personal Driving Data on Plaintiff's LexisNexis Report.

563. On or about October 8, 2024, Plaintiff Montgomery received a copy of his Verisk Driving Behavior History Report, which confirmed that Driving Data from his 2019 GMC Sierra was intercepted, accessed, recorded and disclosed by GM to Verisk without his consent.

564. If Plaintiff Montgomery had known that GM would intercept and sell his Driving Data to LexisNexis, Verisk, and other third parties without his knowledge or consent, he would not have purchased the 2019 GMC Sierra.

565. Plaintiff Montgomery's Driving Data has tangible value. Because of Defendants' conduct, Plaintiff has lost control over the use of his Driving Data,

which is in the possession of third parties who have used and will use it for their own financial advantage.

566. Plaintiff Montgomery had a reasonable expectation of privacy in his vehicle, including that detailed data about his location, routes, schedule, and driving behaviors would not be collected or shared without his express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing his Driving Data invaded Plaintiff Montgomery's privacy rights.

## PENNSYLVANIA

### Sean Willey

567. Plaintiff Sean Willey is a resident and citizen of the state of Pennsylvania. On or about January 9, 2024, Plaintiff Willey purchased a Cadillac CT4 2021 from a GM dealer in Lancaster, Pennsylvania. GM equipped the Cadillac with OnStar during the manufacturing process.

568. When Plaintiff Willey purchased the Cadillac, he was told by the GM dealer that OnStar was included with the vehicle's purchase and that the vehicle came with a "free trial" of OnStar. Plaintiff Willey was never given a choice to activate, and never knowingly enrolled in, OnStar Smart Driver.

569. Unbeknownst to Plaintiff Willey, GM intercepted Driving Data relating to Plaintiff Willey's Cadillac using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff Willey reasonably expected that his

Driving Data would remain private unless he gave GM his express authorization to collect, use, or share it. Plaintiff Willey did not know that GM was intercepting his Driving Data for its own financial and commercial use, and never authorized GM to do so.

570. Unbeknownst to Plaintiff Willey, GM also sold his Driving Data to LexisNexis and other third parties, who then stored, manipulated, used, and shared Plaintiff's Driving Data for their own financial and commercial benefit. Plaintiff Willey has never knowingly opted in to sharing his Driving Data relating to his Cadillac with anyone, including LexisNexis, nor would he have done so. Plaintiff Willey, who did not know that LexisNexis had possession of his Driving Data, never authorized LexisNexis to store, manipulate, use, sell, or share his Driving Data with other third parties.

571. On or about September 20, 2024, Plaintiff Willey received a copy of his LexisNexis Consumer Disclosure Report, which confirmed that Driving Data from his Cadillac was intercepted, accessed, recorded, and disclosed by GM to LexisNexis without his consent. The Report included detailed Driving Data for 3 trips in March 2024, including, for each trip: the start and end date; the start and end time; the distance driven; acceleration events; high speed events; and hard brake events.

572. The LexisNexis Report omits important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

573. Plaintiff Willey maintained insurance coverage for his Cadillac through State Farm Insurance. In March 2024 State Farm Insurance told Plaintiff that his insurance premium for the vehicle would increase by more than $30. State Farm Insurance did not explain the decision. On information and belief, Plaintiff's LexisNexis Report reveals that State Farm Insurance accessed his LexisNexis Report, which, upon information and belief, included his Driving Data.

574. Plaintiff Willey had not recently filed an insurance claim, been in an automobile accident, received a speeding ticket, or experienced any other incident that could account for the increase.

575. Upon information and belief, the increased premiums suffered by Plaintiff were a result of State Farm Insurance being provided with the uncontextualized, misleading, and unconsented-to personal Driving Data on Plaintiff's LexisNexis Report.

576. If Plaintiff Willey had known that GM would intercept and sell his Driving Data to LexisNexis and other third parties without his knowledge or consent, he would not have purchased the Cadillac.

577. Plaintiff Willey's Driving Data has tangible value. Because of Defendants' conduct, Plaintiff has lost control over the use of his Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

578. Plaintiff Willey had a reasonable expectation of privacy in his vehicle, including that detailed data about his location, routes, schedule, and driving behaviors would not be collected or shared without his express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing his Driving Data invaded Plaintiff Willey's privacy rights.

## Omar Guc

579. Plaintiff Omar Guc is a resident and citizen of the state of Pennsylvania. On or about October 2023, Plaintiff Guc purchased a Chevrolet, Corvette Z06, 2023 from a GM dealer in Nashua, New Hampshire. GM equipped the Corvette with OnStar during the manufacturing process.

580. When Plaintiff Guc purchased the Corvette, the GM dealer gave Plaintiff Guc the impression that OnStar was mandatory, the GM dealer told Plaintiff Guc that OnStar was included with the vehicle's purchase, and the GM dealer activated OnStar before Plaintiff Guc took possession of the vehicle. Plaintiff Guc was never given a choice to activate, and never knowingly enrolled in, OnStar Smart Driver.

581. Unbeknownst to Plaintiff Guc, GM intercepted Driving Data relating to Plaintiff Guc's Corvette using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff Guc reasonably expected that his Driving Data would remain private unless he gave GM his express authorization to collect, use, or share it. Plaintiff Guc did not know that GM was intercepting his Driving Data for its own financial and commercial use, and never authorized GM to do so.

582. Unbeknownst to Plaintiff Guc, GM also sold his Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and shared Plaintiff's Driving Data for their own financial and commercial benefit. Plaintiff Guc has never knowingly opted in to sharing his Driving Data relating to his Corvette with anyone, including LexisNexis or Verisk, nor would he have done so. Plaintiff Guc, who did not know that LexisNexis and Verisk had possession of his Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share his Driving Data with other third parties.

583. On March 4, 2024, Plaintiff Guc received a copy of his LexisNexis Consumer Disclosure Report, which confirmed that Driving Data from his Corvette was intercepted, accessed, recorded, and disclosed by GM to LexisNexis without his consent. The Report included detailed Driving Data for 8 trips in October 2023,

including, for each trip: the start and end date; the start and end time; the distance driven; acceleration events; high speed events; and hard brake events.

584.   On April 9, 2024, Plaintiff Guc received a copy of his Verisk Driving Behavior History Report, which confirmed that Driving Data from his Corvette was intercepted, accessed, recorded and disclosed by GM to Verisk without his consent. The Report included detailed Driving Data for 10 trips in October 2023, including, for each date: the number of trips, speeding events, hard braking events, rapid acceleration events, daytime driving minutes, nighttime driving minutes, and miles driven.

585.   The LexisNexis and Verisk Reports omit important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

586.   Plaintiff's Verisk Report also reveals that Root Insurance accessed his Verisk Driving Behavior Report between Oct. 10, 2023 and April 8, 2024, which, upon information and belief, included his Driving Data.

587.   If Plaintiff Guc had known that GM would intercept and sell his Driving Data to LexisNexis, Verisk, and other third parties without his knowledge or consent, he would not have purchased the Corvette.

588.  Plaintiff Guc's Driving Data has tangible value. Because of Defendants' conduct, Plaintiff has lost control over the use of his Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

589.  Plaintiff Guc had a reasonable expectation of privacy in his vehicle, including that detailed data about his location, routes, schedule, and driving behaviors would not be collected or shared without his express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing his Driving Data invaded Plaintiff Guc's privacy rights.

## SOUTH CAROLINA

### Wallace Bruce Mason

590.  Plaintiff Wallace Bruce Mason is a resident and citizen of the state of South Carolina. In or around November 2023, Plaintiff Mason purchased a 2024 Chevrolet Corvette Stingray and a 2024 Chevrolet Silverado from a GM dealer in Newton, North Carolina. GM equipped the Corvette and Silverado with OnStar during the manufacturing process.

591.  When Plaintiff Mason purchased the Corvette and Silverado, he was told by the GM dealer that OnStar was included with the vehicle's purchase and the GM dealer activated OnStar before Plaintiff Mason took possession of the vehicle.

Plaintiff Mason was never given a choice to activate, and never knowingly enrolled in, OnStar Smart Driver.

592. Unbeknownst to Plaintiff Mason, GM intercepted Driving Data relating to Plaintiff Mason's Corvette and Silverado using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff Mason reasonably expected that his Driving Data would remain private unless he gave GM his express authorization to collect, use, or share it. Plaintiff Mason did not know that GM was intercepting his Driving Data for its own financial and commercial use, and never authorized GM to do so.

593. Unbeknownst to Plaintiff Mason, GM also sold his Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and shared Plaintiff's Driving Data for their own financial and commercial benefit. Plaintiff Mason has never knowingly opted in to sharing the Driving Data that GM collected relating to his Corvette and Silverado with anyone, including LexisNexis or Verisk. Plaintiff Mason, who did not know that LexisNexis and Verisk had possession of his Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share his Driving Data with other third parties.

594. On March 28, 2024, Plaintiff Mason received a copy of his LexisNexis Consumer Disclosure Report, which confirmed that Driving Data from his Corvette and Silverado was intercepted, accessed, recorded, and disclosed by GM to

LexisNexis without his consent. The Report included detailed Driving Data for 150 trips from, on or about, September 23, 2023 to, on or about, March 14, 2024, including, for each trip: the start and end date; the start and end time; the distance driven; acceleration events; high speed events; and hard brake events.

595. The LexisNexis Report omits important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

596. On information and belief, much of the Driving Data Defendants collected and shared is improperly and inaccurately associated with Plaintiff Mason because Plaintiff Mason's wife was also a driver of the vehicle.

597. Plaintiff Mason maintained insurance coverage for his Corvette and Silverado through USAA and Progressive.

598. In February 2024, USAA told Plaintiff that his insurance premium for the two vehicles would substantially increase. USAA did not explain the decision.

599. Plaintiff's LexisNexis Report reveals that USAA accessed his LexisNexis Report on or about June 30, 2023, November 28, 2023, December 28, 2023, and February 7, 2024, which, upon information and belief, included his Driving Data.

600.   Plaintiff Mason had not recently filed an insurance claim, been in an automobile accident, received a speeding ticket, or experienced any other incident that could account for the increase.

601.   As a result of this increase in the cost of his USAA insurance, Plaintiff Mason decided to switch insurers—choosing to insure his Corvette and Silverado instead with Progressive in February 2024.

602.   In August 2024, Progressive told Plaintiff that his insurance premium for the vehicle would increase by $57 for the Corvette and $46 for the Silverado. Progressive told Plaintiff that its decision was based on information received from LexisNexis.

603.   Plaintiff's LexisNexis Report reveals that Progressive accessed his LexisNexis Report on or about August 12, 2023, August 22, 2023, October 3, 2023, November 28, 2023, February 3, 2024, and February 5, 2024, which, upon information and belief, included his Driving Data.

604.   Plaintiff Mason had not recently filed an insurance claim, been in an automobile accident, received a speeding ticket, or experienced any other incident that could account for the increase.

605.   Upon information and belief, the increased premiums suffered by Plaintiff Mason were a result of insurers being provided with the uncontextualized, misleading, and unconsented-to personal Driving Data on Plaintiff's LexisNexis.

606.   If Plaintiff Mason had known that GM would intercept and sell his Driving Data to LexisNexis, Verisk, and other third parties without his knowledge or consent, he would not have purchased the Corvette and Silverado, or at least not have purchased them at the price he did.

607.   Plaintiff Mason's Driving Data has tangible value. Because of Defendants' conduct, Plaintiff has lost control over the use of his Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

608.   Plaintiff Mason had a reasonable expectation of privacy in his vehicle, including that detailed data about his location, routes, schedule, and driving behaviors would not be collected or shared without his express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing his Driving Data invaded Plaintiff Mason's privacy rights.

## SOUTH DAKOTA

### Steven Angerhofer

609.   Plaintiff Steven Angerhofer is a resident and citizen of the state of South Dakota. On or about March 2023, Plaintiff Angerhofer purchased a Chevrolet Corvette 2023 from a GM dealer in Pipestone, Minnesota. GM equipped the Corvette with OnStar during the manufacturing process.

610.    Plaintiff Angerhofer never knowingly enrolled in, OnStar or Smart Driver for his Corvette. At all relevant times, Plaintiff Angerhofer did not know that OnStar was even active in the vehicle.

611.    Unbeknownst to Plaintiff Angerhofer, GM intercepted Driving Data relating to Plaintiff Angerhofer's Corvette using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff Angerhofer reasonably expected that his Driving Data would remain private unless he gave GM his express authorization to collect, use, or share it. Plaintiff Angerhofer did not know that GM was intercepting his Driving Data for its own financial and commercial use, and never authorized GM to do so.

612.    Unbeknownst to Plaintiff Angerhofer, GM also sold his Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and shared Plaintiff's Driving Data for their own financial and commercial benefit. Plaintiff Angerhofer has never knowingly opted in to sharing his Driving Data relating to his Corvette with anyone, including LexisNexis or Verisk, nor would he have done so. Plaintiff Angerhofer, who did not know that LexisNexis and Verisk had possession of his Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share his Driving Data with other third parties.

613.    On August 22, 2024, Plaintiff Angerhofer received a copy of his LexisNexis Consumer Disclosure Report, which confirmed that Driving Data from

his Corvette was intercepted, accessed, recorded, and disclosed by GM to LexisNexis without his consent. The Report included detailed Driving Data for 14 trips from February to March 2024, including, for each trip: the start and end date; the start and end time; the distance driven; acceleration events; high speed events; and hard brake events.

614. On September 12, 2024, Plaintiff Angerhofer received a copy of his Verisk Driving Behavior History Report, which confirmed that Driving Data from his Corvette was intercepted, accessed, recorded and disclosed by GM to Verisk without his consent. The Report included detailed Driving Data for 1 trip from March 2024, including, for that date, the number of trips, speeding events, hard braking events, rapid acceleration events, daytime driving minutes, nighttime driving minutes, and miles driven.

615. The LexisNexis and Verisk Reports omit important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

616. On information and belief, much of the Driving Data Defendants collected and shared is improperly and inaccurately associated with Plaintiff Angerhofer because his wife and three sons were also drivers of the vehicle.

617.  Plaintiff maintained insurance coverage for his Corvette through American Family Insurance and Progressive.

618.  In April 2024 American Family Insurance told Plaintiff that his insurance premium for the vehicle would increase by more than $334. American Family Insurance did not explain the decision.

619.  Plaintiff's LexisNexis Report reveals that American Family Insurance accessed his LexisNexis Report on or about December 18, 2023, which, upon information and belief, included his Driving Data.

620.  Plaintiff Angerhofer had not recently filed an insurance claim, been in an automobile accident, received a speeding ticket, or experienced any other incident that could account for the increase.

621.  On April 9, 2024, Plaintiff also sought an auto insurance quote from Progressive, which provided him an inflated quote that was more than double the cost of his policy with his then-insurer American Family Insurance.

622.  Plaintiff's LexisNexis Report reveals that Progressive accessed his LexisNexis Report on or about April 9, 2024, which, upon information and belief, included his Driving Data.

623.  Upon information and belief, the increased premium and inflated quotes suffered by Plaintiff Angerhofer were a result of American Family Insurance

and Progressive being provided with the uncontextualized, misleading, and unconsented-to personal Driving Data on Plaintiff's LexisNexis and Verisk Reports.

624. If Plaintiff Angerhofer had known that GM would intercept and sell his Driving Data to LexisNexis, Verisk, and other third parties without his knowledge or consent, he would not have purchased the Corvette.

625. Plaintiff Angerhofer's Driving Data has tangible value. Because of Defendants' conduct, Plaintiff has lost control over the use of his Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

626. Plaintiff Angerhofer had a reasonable expectation of privacy in his vehicle, including that detailed data about his location, routes, schedule, and driving behaviors would not be collected or shared without his express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing his Driving Data invaded Plaintiff Angerhofer's privacy rights.

## TEXAS

### Jace Parkhurst

627. Plaintiff Jace Parkhurst is a resident and citizen of the state of Texas. On or about February 10, 2024, Plaintiff Parkhurst purchased a 2024 GM Yukon Denali from a GM dealer in Carrolton, Texas. GM equipped the Yukon Denali with OnStar during the manufacturing process.

628. When Plaintiff Parkhurst purchased the Yukon Denali, he was told by the GM dealer that OnStar was mandatory and included with the vehicle's purchase, and the GM dealer activated OnStar before Plaintiff Parkhurst took possession of the vehicle. Plaintiff Parkhurst was never given a choice to activate, and never knowingly enrolled in, OnStar Smart Driver.

629. Unbeknownst to Plaintiff Parkhurst, GM intercepted Driving Data relating to Plaintiff Parkhurst's Yukon Denali using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff reasonably expected that his Driving Data would remain private unless Plaintiff Parkhurst gave GM his express authorization to collect, use, or share it. Plaintiff Parkhurst did not know that GM was intercepting his Driving Data for its own financial and commercial use, and never authorized GM to do so.

630. Unbeknownst to Plaintiff Parkhurst, GM also sold his Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and shared Plaintiff's Driving Data for their own financial and commercial benefit. Plaintiff Parkhurst has never knowingly opted in to sharing his Driving Data relating to his Yukon Denali with anyone, including LexisNexis or Verisk, nor would he have done so. Plaintiff Parkhurst, who did not know that LexisNexis and Verisk had possession of his Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share his Driving Data with other third parties.

631. In March 2024, Plaintiff Parkhurst received a copy of his LexisNexis Consumer Disclosure Report, which confirmed that Driving Data from his Yukon Denali was intercepted, accessed, recorded, and disclosed by GM to LexisNexis without his consent. The Report included detailed Driving Data for 64 trips from February, 2024 to March, 2024, including, for each trip: the start and end date; the start and end time; the distance driven; acceleration events; high speed events; and hard brake events.

632. In April 2024, Plaintiff Parkhurst received a copy of his Verisk Driving Behavior History Report, which confirmed that Driving Data from his Yukon Denali was intercepted, accessed, recorded and disclosed by GM to Verisk without his consent. The Report included detailed Driving Data for 83 trips from February, 2024 to March, 2024, including, for each date: the number of trips, speeding events, hard braking events, rapid acceleration events, daytime driving minutes, nighttime driving minutes, and miles driven. The Report also confirmed that Verisk had shared Plaintiff's Driving Data with Root Insurance Company.

633. The LexisNexis and Verisk Reports omit important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

634. On information and belief, some of the Driving Data Defendants collected and shared is improperly and inaccurately associated with Plaintiff Parkhurst because his friends were also drivers of the vehicle on occasion.

635. Plaintiff Parkhurst maintained insurance coverage for his Yukon Denali through Geico.

636. Plaintiff's Verisk Report reveals that Root Insurance Company accessed his Verisk Driving Behavior Report on or about April 5, 2024, which, upon information and belief, included his Driving Data.

637. If Plaintiff Parkhurst had known that GM would intercept and sell his Driving Data to LexisNexis, Verisk, and other third parties without his knowledge or consent, he would not have purchased the Yukon Denali.

638. Plaintiff Parkhurst's Driving Data has tangible value. Because of Defendants' conduct, Plaintiff has lost control over the use of his Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

639. Plaintiff Parkhurst had a reasonable expectation of privacy in his vehicle, including that detailed data about his location, routes, schedule, and driving behaviors would not be collected or shared without his express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing his Driving Data invaded Plaintiff Parkhurst's privacy rights.

## WASHINGTON

## Taylor DeVilbiss

640.     Plaintiff Taylor DeVilbiss is a resident and citizen of the state of Washington. On or about June 23, 2023, Plaintiff DeVilbiss purchased a Chevrolet Colorado 2023 from a GM dealer in Milwaukie, Oregon. GM equipped the Colorado with OnStar during the manufacturing process.

641.     When Plaintiff DeVilbiss purchased the Colorado, he was told by the GM dealer that OnStar was included with the vehicle's purchase and the vehicle came with a "free trial" of OnStar, and the GM dealer activated OnStar before Plaintiff DeVilbiss took possession of the vehicle. Plaintiff DeVilbiss was never given a choice to activate, and never knowingly enrolled in, OnStar Smart Driver.

642.     Unbeknownst to Plaintiff DeVilbiss, GM intercepted Driving Data relating to Plaintiff DeVilbiss's Colorado using OnStar. GM used the intercepted data for GM's own financial and commercial benefit. Plaintiff DeVilbiss reasonably expected that his Driving Data would remain private unless he gave GM his express authorization to collect, use, or share it. Plaintiff DeVilbiss did not know that GM was intercepting his Driving Data for its own financial and commercial use, and never authorized GM to do so.

643.     Unbeknownst to Plaintiff DeVilbiss, GM also sold his Driving Data to LexisNexis, Verisk, and other third parties, who then stored, manipulated, used, and

shared Plaintiff's Driving Data for their own financial and commercial benefit. Plaintiff DeVilbiss has never knowingly opted in to sharing his Driving Data relating to his Colorado with anyone, including LexisNexis or Verisk, nor would he have done so. Plaintiff DeVilbiss, who did not know that LexisNexis and Verisk had possession of his Driving Data, never authorized LexisNexis or Verisk to store, manipulate, use, sell, or share his Driving Data with other third parties.

644. On July 4, 2024, Plaintiff DeVilbiss received a copy of his LexisNexis Consumer Disclosure Report, which confirmed that Driving Data from his Colorado was intercepted, accessed, recorded, and disclosed by GM to LexisNexis without his consent. The Report included detailed Driving Data for 430 trips from on or about December 29, 2023 to March 2, 2024, including, for each trip: the start and end date; the start and end time; the distance driven; acceleration events; high speed events; and hard brake events.

645. On October 31, 2024, Plaintiff DeVilbiss received a copy of his Verisk Driving Behavior History Report, which confirmed that Driving Data from his Colorado was intercepted, accessed, recorded and disclosed by GM to Verisk without his consent. The Report included detailed Driving Data for 4 trips from March 2024, including, for each date: the number of trips, speeding events, hard braking events, rapid acceleration events, daytime driving minutes, nighttime driving minutes, and miles driven.

646.     The LexisNexis and Verisk Reports omit important context relating to the driving events, including what these events mean, how they are calculated, or why someone might have experienced these events. Stating these events, by themselves, says nothing of the driving conditions and factors experienced during each trip.

647.     Plaintiff maintained insurance coverage for his Colorado through State Farm.

648.     In April 2024 State Farm told Plaintiff that his insurance premium for his Colorado would increase by $18. In July 2024 State Farm told Plaintiff that his insurance premium for the Colorado would increase again, this time by $31. In total, Mr. DeVilbiss's insurance increased by $49. State Farm did not explain either decision.

649.     Plaintiff's LexisNexis Report reveals that State Farm accessed his LexisNexis Report on or about October 4, 2023 and October 9, 2023, which, upon information and belief, included his Driving Data.

650.     Plaintiff DeVilbiss had not recently filed an insurance claim, been in an automobile accident, received a speeding ticket, or experienced any other incident that could account for the increase.

651.     Upon information and belief, the increased premiums suffered by Plaintiff were a result of State Farm being provided with the uncontextualized,

misleading, and unconsented-to personal Driving Data on Plaintiff's LexisNexis Report.

652.    If Plaintiff DeVilbiss had known that GM would intercept and sell his Driving Data to LexisNexis, Verisk, and other third parties without his knowledge or consent, he would not have purchased the Colorado.

653.    Plaintiff DeVilbiss's Driving Data has tangible value. Because of Defendants' conduct, Plaintiff has lost control over the use of his Driving Data, which is in the possession of third parties who have used and will use it for their own financial advantage.

654.    Plaintiff DeVilbiss had a reasonable expectation of privacy in his vehicle, including that detailed data about his location, routes, schedule, and driving behaviors would not be collected or shared without his express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing his Driving Data invaded Plaintiff DeVilbiss's privacy rights.

## **DEFENDANTS**

655.    Defendant General Motors LLC ("GM") is a limited liability company organized under the laws of the state of Delaware, with its headquarters and principal place of business in Detroit, Michigan. GM is registered with the Georgia Secretary of State, conducts business in Georgia, and its registered agent is CSC Networks, Inc., 407 East Maple Street, Suite 204, Cumming, GA, 30040. GM manufactures

and sells vehicles in the United States and across the world, including Chevrolet, GMC, Cadillac, and Buick branded vehicles. GM has global manufacturing operations across six continents,[4] and manufactures vehicles and component parts in more than 37 countries.[5] Within the U.S., GM has manufacturing facilities in 27 states and the District of Columbia.[6]

656.  Defendant OnStar LLC ("OnStar") is a limited liability company organized under the laws of the state of Delaware, with its headquarters and principal place of business in Detroit, Michigan. OnStar is a subsidiary of GM. OnStar is registered with the Georgia Secretary of State, conducts business in Georgia, and its registered agent is CSC Networks, Inc., 407 East Maple Street, Suite 204, Cumming, GA, 30040. OnStar provides communications, security, emergency services, navigation, diagnostics, and information services to GM vehicles in the United States and around the world.

657.  Both GM and OnStar are wholly owned by General Motors Holdings, LLC. Defendants GM and OnStar are collectively referred to herein as "GM."

658.  Defendant LexisNexis Risk Solutions Inc. ("LexisNexis") is a Delaware corporation with its headquarters and principal place of business in

---

[4] *GM in the U.S.*, General Motors, https://www.gm.com/company/usa-operations (last accessed Dec. 3, 2024).
[5] *General Motors Statistics and Facts*, Market.us (July 14, 2022), https://market.us/statistics/automotive-companies/general-motors.
[6] *GM in the U.S., General Motors*, https://www.gm.com/company/usa-operations.

Alpharetta, Georgia. LexisNexis is a global data and analytics company that provides data and technology services, analytics, predictive insights, and fraud prevention for a wide range of industries, including the automotive industry. LexisNexis is registered with the Georgia Secretary of State and conducts business in Georgia.

659. Defendant Verisk Analytics, Inc. ("Verisk") is a Delaware corporation with its headquarters and principal place of business in Jersey City, New Jersey. Verisk traces its history to 1971, when Insurance Services Office, Inc. ("ISO") was formed as an association of insurance companies to gather statistical data and other information from insurers and Report to regulators.[7] On May 23, 2008, in contemplation of its initial public offering, ISO formed Verisk Analytics, Inc. as a wholly owned subsidiary to be the holding company for the business.[8] On October 6, 2009, in connection with the IPO, the company effected a reorganization whereby ISO became a wholly owned subsidiary of Verisk.[9] Insurance Services Office, Inc.[10]

---

[7] *Verisk Analytics, Inc. 2023 Annual Report*, at p.4, available at https://d18rn0p25nwr6d.cloudfront.net/CIK-0001442145/d75862d5-9f37-4064-ae16-68c5c71e87f4.pdf.

[8] *Id.* at 5.

[9] *Id.*

[10] *See* https://www.verisk.com/privacy-policies/client-privacy-notice/ (directing legal notices to Insurance Services Office, Inc.).

is registered to do business in Georgia, with a registered agent located at 2 Sun Court, Suite 400, Peachtree Corners, GA 30092.[11]

## STATEMENT OF FACTS

660. GM is one the largest multinational automotive manufacturing companies in the world. Since 2015, GM has sold or leased millions of vehicles under its four brands, Chevrolet, GMC, Cadillac, and Buick, through a network of over 4,000 GM dealers nationwide.[12] In 2023 alone, GM sold roughly 2.6 million vehicles across the United States[13] and offered services via OnStar, GM's in-vehicle telematics technology, to "more than 21 million connected vehicles globally[.]"[14]

661. GM essentially invented the term "telematics" when it launched OnStar in 1996 as the industry's first embedded telematics system. A combination of "telecommunication" and "informatics," telematics describes vehicle systems that combine Global Positioning System ("GPS") and cellular technologies with onboard electronics to generate and collect data.[15] As one LexisNexis data scientist explains:

---

[11] Insurance Services Office, Inc. Annual Registration, State of Georgia Secretary of State, filed Jan. 10, 2024.

[12] *Verisk Analytics, Inc. 2023 Annual Report*, at p.4, available at https://d18rn0p25nwr6d.cloudfront.net/CIK-0001442145/d75862d5-9f37-4064-ae16-68c5c71e87f4.pdf.

[13] Michael Wayland, *GM's 2023 U.S. Vehicle Sales Were Its Best Since 2019*, CNBC (Jan. 3, 2024), https://www.cnbc.com/2024/01/03/gm-2023-us-vehicle-sales.html.

[14] *General Motors Company 2021 Annual Report*.

[15] Shanna Freeman, *How OnStar Works*, HOWSTUFFWORKS, (Feb. 8, 2006), https://auto.howstuff works.com/onstar.htm.

"telematics is a collection of data from any device, such as a smart phone app or plug in, that **tells a story about a driver in their vehicle**."[16]

662.　When GM first launched OnStar, it was a "dealer-installed" device.[17] Since 2015 model year vehicles rolled off of assembly lines, OnStar hardware and software have come installed as original, standard equipment in all GM vehicles before they ever reach the dealership—"now everything you need," GM says, "is a button-push away."[18]

663.　OnStar began primarily to connect drivers to first responders after an accident.[19] OnStar's capabilities significantly expanded over time. For example, in 1997, GM introduced "Remote Diagnostics," allowing drivers to request an on-demand diagnostics check from an OnStar advisor "at the push of a button."[20] In 2005, GM introduced "Vehicle Diagnostics," allowing GM to run "hundreds of diagnostic and maintenance checks" on its vehicles' "key operating systems," which would be emailed to drivers in monthly diagnostic reports.[21] In 2006, GM began offering cloud-based "Turn-by-Turn Navigation," with voice recognition, integrated

---

[16] Lisa Greenberg, *Presentation: Driving Data Science for Automakers and Insurers*, LEXISNEXIS RISK SOLUTIONS (June 3, 2021), available at https://vimeo.com/558702815 (emphasis added).
[17] *The evolution of OnStar,* ONSTAR.COM, https://www.onstar.com/why-onstar/evolution-of-onstar-innovations (last accessed Nov. 23, 2024).
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.*

steering wheel controls, and Bluetooth.[22] In 2008, GM introduced "Stolen Vehicle Slowdown," which allowed GM, through an OnStar advisor, to remotely slow down a potentially stolen vehicle using satellites and vehicle sensors to determine the vehicle's location.[23]

664.    As OnStar's functionality has expanded over the years, GM has gained the ability to collect and transmit highly complex and granular and Driving Data from every consumer for every GM vehicle model year 2015 or newer. This Driving Data can (and has) been used to create invasive, detailed profiles on both the car and its drivers that are rich profit opportunities for GM and any third parties that are provided access to it: "If you doubt the way data can be turned into money," CNN warns, "just look at the success of Google (GOOG) and Facebook (FB). They offer free services to billions[] and make a fortune off the data they collect."[24]

665.    Since OnStar's creation, GM has fought back against fears that OnStar could be used to spy on consumers, while critics cautioned that OnStar's functionality could lead to "Big Brother"-type invasions of consumer privacy, especially if GM allowed access to third parties.[25] For years, GM has deflected these

---

[22] *Id.*
[23] *Id.*
[24] Matt McFarland, *Your car's data may soon be more valuable than the car itself*, CNN (Feb. 7, 20217) https://money.cnn.com/2017/02/07/technology/car-data-value/index.html.
[25] Shanna Freeman, *How OnStar Works*, HOWSTUFFWORKS, (Feb. 8, 2006), https://auto.howstuff works.com/onstar.htm.

criticisms, promising consumers that OnStar is an "in-vehicle safety and security system," not Big Brother, that it was "designed to help protect you and your family and provide peace of mind on the road,"[26] and that GM would not use OnStar to overstep into consumers' private lives without their consent.

666.   But as the auto industry has pivoted from selling cars to selling data, GM's bottom line has become more and more dependent on its ability to use consumers' cars as corporate surveillance machines.[27]

## I.   The importance of consumer privacy in the auto industry.

667.   Car ownership in America has long been associated with freedom—the freedom to go anywhere, at any time, and in private. "With the open road before you, you can go anywhere—from behind the wheel you really take control of your destiny. In this regard, cars are empowering. Ownership means that you have the means to be independently mobile, that you own not just a vehicle but choice as well."[28]

---

[26] *Help: Chevrolet*, ONSTAR.COM, https://www.onstar.com/support/faq/chevrolet (last accessed Nov. 25, 2024).
[27] *Wyden-Markey Auto Privacy Letter* (July 26, 2024), available at https://www.wyden.senate.gov/imo/media/doc/wyden-markey_auto_privacy_letter_to_ftc.pdf.
[28] Krystal D'Costa, *Choice, Control, Freedom and Car Ownership*, Scientific American (Apr. 22, 2013), https://www.scientificamerican.com/blog/anthropology-in-practice/choicecontrol-freedom-and-car-ownership/.

668. American automobile manufacturers, in particular, pushed the narrative of the "freedom" that cars provided to individuals. GM, in particular, has long told its customers that its cars provide them freedom—freedom to move anywhere they want to go, at any time. As GM Certified Service used to proudly proclaim in its commercials: "It's not just a car, it's your freedom."[29]

669. This "freedom" for consumers—to go anywhere, at any time, with the ability to control the means of how an individual gets to a particular location—has become intertwined with vehicle ownership. Unfortunately, modern vehicles—which have commonly become known as "connected cars"—do not afford consumers the same freedoms to which they have become accustomed because cars now have the ability to continually "spy" on their owners. Only recently have consumers been alerted to this issue through investigative reporting.

670. Consumer advocates and governmental agencies have long warned about the potential for abusive corporate intrusions into driver privacy.[30]

671. "[M]ost cars are wiretaps on wheels," said Albert Fox Cahn, a technology and human rights fellow at Harvard's Carr Center for Human Rights

---

[29] Mr. Goodwrench Commercial 1989, YouTube, https://www.youtube.com/watch?v=aXS6x3Gkt0U (last accessed Jun. 10, 2024). GM Certified Service was previously called Mr. Goodwrench.

[30] *Id.*; Ed Leefeldt, *The Witness Against You: Your Car*, FORBES (Feb. 17, 2021), available at https://www.nasdaq.com/articles/the-witness-against-you:-your-car-2021-02-17.

Policy. "The electronics that drivers pay more and more money to install are collecting more and more data on them and their passengers." "There is something uniquely invasive about transforming the privacy of one's car into a corporate surveillance space," he added.[31]

672. California Privacy Protection Agency (CPPA) Executive Director Ashkan Soltani calls modern cars "connected computers on wheels:" "They're able to collect a wealth of information via built-in apps, sensors, and cameras, which can monitor people both inside and near the vehicle[.]"[32] Protecting vehicle privacy is "critical," according to the CCPA: "these vehicles often automatically gather consumers' locations, personal preferences, and details about their daily lives."[33] Last year, California nonprofit Consumer Watchdog warned the state's regulator that "car data is the new gold rush of the auto industry. . . . Automakers and third-party companies know where we drive, what we buy, eat, our texts. A whole consumer profile is created with this information to essentially sell you things."[34]

---

[31] Frank Bajak, *'Wiretaps on wheels': How your car is collecting and selling your personal data*, LA TIMES (Sept. 6, 2023), https://www.latimes.com/business/story/2023-09-06/carmakers-privacy-data-collection-drivers.

[32] *CPPA to Review Privacy Practices of Connected Vehicles and Related Technologies* (July 31, 2023), available at https://cppa.ca.gov/announcements/2023/20230731.html.

[33] *Id.*

[34] https://www.reuters.com/business/autos-transportation/california-agency-probes-automakers-data- privacy-practices-2023-07-31/

673.    In a recent letter urging FTC action on GM's and other automakers' exploitative data sharing, Senators Edward Markey and Ron Wyden warned "[t]he auto industry cannot become yet another domain that tracks and targets consumers."[35]

674.    But corporate surveillance and exploitation of private consumer data already has American consumers on high alert. In 2020, a Pew Research Center reported that 52% of Americans said they had opted against using a product or service because they were worried above the amount of personal information it would collect about them.[36]

---

[35] Senator Markey, *Letter to FTC on Auto Privacy* (Feb. 27, 2024), *available at*: https://www.markey.senate.gov/news/press-releases/senator-markey-urges-ftc-to-investigate-invasive-data-privacy-practices-of-automakers.

[36] Andrew Perrin, *Half of Americans have Decided not to use a Product or Service Because of Privacy Concerns*, Pew Research Center (Apr. 14, 2020), https://www.pewresearch.org/short-reads/2020/04/14/half-of-americans-have-decided-not-to-use-a-product-or-service-because-of-privacy-concerns.



**Americans give up websites, electronics and social media to avoid sharing personal information**

*Among the 52% who say they recently decided NOT to use a product or service because they were worried about how much personal information would be collected about them, % who describe a recent situation where they ...*

**Decided not to use ___ over concerns about how much personal information would be collected**

| | |
|---|---|
| Websites | 21% |
| Electronics | 11 |
| Social media | 10 |
| DNA, financial, health care services | 10 |
| Contests/sweepstakes/surveys/quizzes | 3 |
| Games | 1 |
| Free downloads/trials/samples | 1 |

**Found that ___ was problematic**

| | |
|---|---|
| Having to share general personal information | 15% |
| The service being untrustworthy | 9 |
| Being surveilled | 8 |
| Access to device being needed | 6 |
| Payment information privacy/security | 4 |
| Third-party involvement | 4 |
| Receiving spam/robocalls | 3 |
| Allowing cookies on their device | <1 |
| *Other* | 9 |
| *Refused* | 32 |

Note: Verbatim responses have been coded into categories. Figures may add up to more than 100% because multiple responses were allowed. In open-ended answers, respondents answered with the product/service they decided not to use, what they found problematic, or both.
Source: Survey of U.S. adults conducted June 3-17, 2019.

675. Three years later, Pew reported that "roughly four-in-ten Americans say they are very worried about companies selling their information to others without them knowing (42%)" and "81% say they feel very or somewhat concerned with how companies use the data they collect about them.[37] "Most Americans see more risks than benefits" from allowing companies to collect their personal data, with

---

[37] Colleen McClain et al., *Report: How Americans View Data Privacy*, PEW RESEARCH CENTER (Oct. 18, 2023) available at https://www.pewresearch.org/internet/2023/10/18/how-americans-view-data-privacy.

"[a]bout eight-in-ten (81%) Americans say[ing] the potential risks outweigh the benefits[.]"[38] According to another report, "more than 9 out of 10 don't trust manufacturers with their data."[39]



**About 4 in 10 Americans are very worried about their information being sold or stolen, but this varies by race and ethnicity**

*% of U.S. adults who say they are **very worried** about the following*

| | Companies selling their information to others without them knowing | People stealing their identity or personal information | Law enforcement monitoring what they do online |
|---|---|---|---|
| U.S. adults | 42 | 38 | 15 |
| White | 38 | 33 | 10 |
| Black | 49 | 48 | 21 |
| Hispanic | 47 | 50 | 23 |
| Asian* | 43 | 47 | 20 |

\* Estimates for Asian adults are representative of English speakers only.
Note: White, Black and Asian adults include those who report being only one race and are not Hispanic. Hispanic adults are of any race. Those who did not give an answer or who gave other responses are not shown. For the item about law enforcement, those who do not use the internet are not shown.
Source: Survey of U.S. adults conducted May 15-21, 2023.
"How Americans View Data Privacy"

**PEW RESEARCH CENTER**

---

[38] Brooke Auxier et al., *Key takeaways on Americans' views about privacy, surveillance and data-sharing*, Pew Research Center (Nov. 14, 2019), https://www.pewresearch.org/short-reads/2019/11/15/key-takeaways-on-americans-views-about-privacy-surveillance-and-data-sharing/.
[39] Suzanne Smalley, *Senators to FTC: Car Companies' Data Privacy Practices Must be Investigated*, The Record (July 26, 2024), https://therecord.media/markey-wyden-ask-ftc-to-probe-car-company-data-practices.



**Americans are largely concerned and feel little control or understanding of how companies and the government collect, use data about them**

*% of U.S. adults who say they ...*

Are **concerned** about how ___ use(s) the data they collect about them

| | |
|---|---|
| Companies | 81 |
| The government | 71 |

Have **little to no control** over the data that ___ collect(s) about them

| | |
|---|---|
| Companies | 73 |
| The government | 79 |

Have **little to no understanding** about what ___ do(es) with the data they collect about them

| | |
|---|---|
| Companies | 67 |
| The government | 77 |

Note: "Very/somewhat concerned" are combined above. Respondents could also say they were not too or not at all concerned. Those who did not give an answer or who gave other responses are not shown.
Source: Survey of U.S. adults conducted May 15-21, 2023.
"How Americans View Data Privacy"

**PEW RESEARCH CENTER**

676.   In November 2022, the Electronic Privacy Information Center (EPIC) issued a report warning that the out-of-context use collection, sale, and use of personal data by business involved in targeted advertising, consumer profiling, and

other commercial surveillance practices "causes substantial injury to consumers," including economic harms, psychological harms, and autonomy harms.[40]

677. EPIC explained that "[w]hen a consumer expects that their data will be used in a specific context for a limited purpose, and companies instead use, retain, transfer, or sell that data for an unrelated purpose, that is a substantial injury to an individual's contextual integrity and autonomy."[41]

678. Autonomy harms involve "restricting, undermining, inhibiting, or unduly influencing people's choices. People are prevented from making choices that advance their preferences. People are either directly denied the freedom to decide or are tricked into thinking that they are freely making choices when they are not." When consumers are denied autonomy over their personal data, they are denied the ability to "determine and express [their] identities, by [them]selves and with others, but ultimately—and essentially—on [their] own terms." Harms to autonomy "cause substantial injury to consumers."[42]

679. For example, "**[o]ut-of-context secondary uses [] substantially injure consumers' autonomy by depriving them of control over their personal**

---

[40] Elec. Privacy Info. Ctr., *Disrupting Data Abuse: Protecting Consumers from Commercial Surveillance in the Online Ecosystem*, p. 41 (Nov. 2022), https://epic.org/wp-content/uploads/2022/12/EPIC-FTC-commercial-surveillance-ANPRM-comments-Nov2022.pdf.
[41] *Id.* at p. 42.
[42] *Id.* at p. 47-48.

**information**."[43] "'Lack of control involves the inability to make certain choices about one's personal data or to be able to curtail certain uses of the data.' This constitutes an injury because it diminishes a consumer's ability to manage risk to the security of their information and denies them the ability to limit its downstream uses." As EPIC explained, "The loss of control poses special concerns for sensitive data about individual consumers' finances, health, intimate relationships, and precise location. Consumers lack control over data that is collected without their knowledge. They also lack control over data that they knowingly provide to a company for a limited purpose because they have no practical ability to prevent the repurposing of that data by the company or other entities in the online ecosystem."[44]

680. Discussed herein, Defendants' collection, disclosure, and use of valuable consumers' sensitive, personal information, which provides a comprehensive picture of consumers' private lives, unacceptably invades consumers' privacy and causes substantial injury.

## II. GM transitions from automaker to data broker, amassing billions of miles of consumer Driving Data.

681. GM credits itself with "start[ing] the connected car revolution 20 years ago with the launch of OnStar[.]"[45] Over the years, GM has searched for ways to

---

[43] *Id.* at p. 45.

[44] *Id.* at p. 45-46.

[45] *GM Delivers Ultimate Personal Mobility Experiences*, NEWSPRESS USA (May 1, 2016), available at  https://newspressusa.com/publicReleaseView/50508.

monetize the data-generating capabilities of its cars. In 2005, GM launched a program in which GMAC Insurance, a former GM subsidiary, offered discounts to OnStar customers who shared their mileage information.[46]

682.   Then, in 2007, at the Auto Insurance Report National Conference, an OnStar executive reportedly "practically begged insurers to partner with them" to create a centralized exchange for sharing car data with insurers.[47] According to the conference hosts: "Nick Pudar, now vice president of planning and business development at OnStar, outlined for the conference attendees a scenario very similar to what has finally developed [with Verisk's Data Exchange]. But insurers were just getting started with UBI [usage-based insurance], and automakers were very wary of sharing information in a way that would upset customers. If an automaker was worried at the slightest that customers would be angry about data sharing, it wanted no part of the deal."[48]

---

[46] *GM Changes UBI Game, Sharing OnStar Data with Verisk Exchange*, Auto Insurance Report (Sept. 14, 2015), archived at https://web.archive.org/web/20171023185706/http://img.en25.com/Web/ISO/%7B145061fe-cd91-4316-903d-e1b84275f343%7D_GM_Changes_the_UBI_Game.pdf.
[47] *GM Changes UBI Game, Sharing OnStar Data with Verisk Exchange*, Auto Insurance Report (Sept. 14, 2015), archived at https://web.archive.org/web/20171023185706/http://img.en25.com/Web/ISO/%7B145061fe-cd91-4316-903d-e1b84275f343%7D_GM_Changes_the_UBI_Game.pdf.
[48] *GM Changes UBI Game, Sharing OnStar Data with Verisk Exchange*, Auto Insurance Report (Sept. 14, 2015), archived at

683. Unable to secure the exchange-like partnership it envisioned, GM instead partnered directly with several insurers to offer mileage discount plans, including State Farm, Liberty Mutual, National General, Plymouth Rock, and 21st Century.[49]

684. Since emerging from bankruptcy in 2010, GM has re-focused its efforts on executing its corporate vision for monetizing the data collected from consumers' cars on a wider scale.

685. Eventually, other automakers and insurance companies caught up to GM's vision. By the 2010s, auto manufacturers had "shifted their focus from selling cars to selling data,"[50] with automaker executives widely regarding car data as the "new gold rush" of the auto industry.[51]

---

https://web.archive.org/web/20171023185706/http://img.en25.com/Web/ISO/%7B145061fe-cd91-4316-903d-e1b84275f343%7D_GM_Changes_the_UBI_Game.pdf.

[49] *GM Changes UBI Game, Sharing OnStar Data with Verisk Exchange*, Auto Insurance Report (Sept. 14, 2015), archived at https://web.archive.org/web/20171023185706/http://img.en25.com/Web/ISO/%7B145061fe-cd91-4316-903d-e1b84275f343%7D_GM_Changes_the_UBI_Game.pdf.

[50] Jenn Caltrider, et al., *It's Official: Cars Are the Worst Product Category We Have Ever Reviewed for Privacy*, THE MOZILLA FOUNDATION (Sept. 6, 2023), https://foundation.mozilla.org/en/privacynotincluded/articles/its-official-cars-are-the-worst-product-category-we-have-ever-reviewed-for-privacy/.

[51] Matt McFarland, *Your car's data may soon be more valuable than the car itself*, CNN (Feb. 7, 20217), https://money.cnn.com/2017/02/07/technology/car-data-value/index.html; David Shepardson, *California agency probes automakers' data privacy practices*, REUTERS, July 31, 2023,

686. By 2017, KPMG reported that 84% of auto industry executives believe that "data is the fuel for the future business model of automotive companies" and that the "clear focus" for automakers is "on creating value out of upstream and downstream data."[52] More than three out of four auto executives surveyed believed that one connected car could generate higher revenues over the entire lifecycle than 10 non-connected cars,[53] with 85% agreeing that the digital ecosystem for connected cars would "generate higher revenues than the hardware of the car itself."[54] The conclusion: "data is gold."[55]

687. GM, which had been leading the auto industry in data acquisition for decades, was "seeing dollar signs."[56] In an interview with Reuters, GM Chief Executive Officer Mary Barra touted GM's plans to execute "new efforts to

---

https://www.reuters.com/business/autostransportation/california-agency-probes-automakers-data-privacy-practices-2023- 07-31/.

[52] *Global Automotive Executive Survey 2017*, KPMG (Jan. 2017), https://web.archive.org/web/20181226135924/https://assets.kpmg.com/content/dam/kpmg/xx/pdf/2017/01/global-automotive-executive-survey-2017.pdf.

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *GM Revamps OnStar: Take a Long Look in the Mirror*, GM INSIDE NEWS (Apr. 30, 2018), https://www.gminsidenews.com/threads/gm-revamps-onstar-take-a-long-look-in-the-mirror.301014/?post_id=7289036#post-7289036; Matt Posky, *Report: Connected Cars Already Know Everything About You*, GM INSIDE NEWS (Dec. 19, 2019), https://www.gminsidenews.com/threads/report-connected-cars-already-know-everything-about-you.301889/?post_id=7289911#post-7289911.

capitalize on the connectivity built into its cars,"[57] forecasting earnings in the hundreds of millions for "connectivity related services," noting the "value in connectivity will grow" if GM customers "provide data GM can use to tailor features and services[.]"[58] As one news sources warned: "those fed up with companies selling your data or paranoid about Orwellian Big Brother scenarios might be less enthusiastic about the long-term corporate vision. . . . GM is going to attempt to collect [your] data more effectively and monetize it for financial gain."[59] "Basically," another source reported, "GM has been turned into an information company, which happens to make cars."[60]

688.   In October 2017, Barra reiterated GM's vision at the Barclays Global Automotive Conference in New York. According to one article, "GM sees data acquisition as a huge financial opportunity," and "[b]y launching 13 million connected cars over the next several years, the company thinks it can accrue wealth through an in-car digital marketplace that sells apps and services. Afterward, it can

---

[57] *Exclusive: GM to tap into connectivity, expand car sharing services – CEO*, REUTERS (Sept. 29, 2015) https://www.reuters.com/article/2015/09/28/us-gm-ceo-idUSKCN0RS2K420150928/.
[58] *Id.*
[59] *GM Revamps OnStar: Take a Long Look in the Mirror*, GM INSIDE NEWS (Apr. 30, 2018), https://www.gminsidenews.com/threads/gm-revamps-onstar-take-a-long-look-in-the-mirror.301014/?post_id=7289036#post-7289036.
[60] Dr. Mark van Rijmenam, *Three Use Cases of How General Motors Applies Big Data to Become Profitable Again*, DATAFLOQ (Aug. 25, 2014), https://datafloq.com/read/three-use-cases-general-motors-applies-big-data-be/#google_vignette.

collect Driving Data (purchasing choices, driving habits, etc.), sell it off to whoever wants it…and potentially issues in-car advertisements[.]"[61] In 2018, Gerard Connell, Director of Sales and Marketing for GM's Global Connected Customer Experience, doubled-down on OnStar's long-term strategy of "focus[ing] on data."[62]

689.   As automakers have amassed more and more data from consumers, an entire "ecosystem" has formed around the money to be made from consumers' car data. As a 2021 report from McKinsey & Company explains, the connected car



Vehicle ecosystem, nonexhaustive

Source: McKinsey Center for Future Mobility

---

[61] *General Motors to Build Two Bolt-based Crossovers, Considers the Data-mining Business*, THE TRUTH ABOUT CARS (Nov. 15, 2017) https://www.thetruthaboutcars.com/2017/11/general-motors-building-two-bolt-based-crossovers/.

[62] *GM Revamps OnStar: Take a Long Look in the Mirror*, GM INSIDE NEWS (Apr. 30, 2018), https://www.gminsidenews.com/threads/gm-revamps-onstar-take-a-long-look-in-the-mirror.301014/?post_id=7289036#post-7289036.

ecosystem includes suppliers, dealers, insurers, fleets, tech players, and data brokers as reflected in the illustration below:[63]

690.    Companies "along the entire value chain" in the ecosystem have raced to partner with automakers, insurers, and other industry players to capitalize on the value of connected car data.[64] As KPMG explained in 2020, "***cross-industry cooperation***, connecting with complementary partners and services, ***is a key success factor for generating value on data in the automotive industry***…. the extensive car manufacturer and technology players ecosystem are enabling a large amount of openings for new revenue streams."[65]

691.    In 2021, McKinsey estimated that connected car-data monetization could deliver between $250 billion to $400 billion in annual incremental value across the connected car ecosystem, including through R&D optimization, mobility insurance, and sales efficiency.[66] On a "per-vehicle level," McKinsey estimated, "[i]n 2030, we expect annual revenue potential per vehicle to range from $130 to

---

[63] *Unlocking the full life-cycle value from connected car data,* MCKINSEY & COMPANY (Feb. 11, 2021) https://www.mckinsey.com/industries/automotive-and-assembly/our-insights/unlocking-the-full-life-cycle-value-from-connected-car-data.
[64] *Id.*
[65] *Global Automotive Executive Survey 2017*, KPMG (Jan. 2017), https://web.archive.org/web/20181226135924/https://assets.kpmg.com/content/dam/kpmg/xx/pdf/2017/01/global-automotive-executive-survey-2017.pdf.
[66] *Unlocking the full life-cycle value from connected car data,* MCKINSEY & COMPANY (Feb. 11, 2021) https://www.mckinsey.com/industries/automotive-and-assembly/our-insights/unlocking-the-full-life-cycle-value-from-connected-car-data.

$210 for basic connectivity . . . to $400 to $610 for advanced connectivity. . . . Annual cost savings would be in the range of $100 to $170 and $120 to $210 per vehicle, respectively."[67] McKinsey concluded by urging: "Car data can help mobility players along the entire value chain—but they need to act now."[68]

692.   The projected "$250 billion to $400 billion in annual potential value[] [are] revenues that no OEM can afford to ignore or be slow to exploit," explained Geotab, a telematics service provider, who urged that automakers need to "build symbiotic relationships within the greater connected car ecosystem" to "capitalize on the value that data can provide[.]"[69]

693.   In a presentation on "the Connected Car Ecosystem" in the mid-2010s, a GM Senior Manager explained that "space the business-to-business space has been very interesting in GM for the past couple of years, we've seen partners approach us and give us ideas that we've never played with before…. we want to partner with industry service providers. By that I mean we want to partner with the weather

[67] *Unlocking the full life-cycle value from connected car data,* MCKINSEY & COMPANY (Feb. 11, 2021) https://www.mckinsey.com/industries/automotive-and-assembly/our-insights/unlocking-the-full-life-cycle-value-from-connected-car-data.
[68] *Id.*
[69] *Mining value from connected vehicle data: How OEMs can lead the next-gen of data-enabled services*, GEOTAB (Nov. 11, 2021), *available at* https://www.geotab.com/white-paper/connected-vehicle-data/; *Unlocking the full life-cycle value from connected car data,* MCKINSEY & COMPANY (Feb. 11, 2021) https://www.mckinsey.com/industries/automotive-and-assembly/our-insights/unlocking-the-full-life-cycle-value-from-connected-car-data.

stations, we want to partner with traffic monitoring, we want to partner with again insurance companies, **we want to share this data…it's a win-win…for GM and for these industry service providers**[.]"[70]

694.   Data brokers specifically, including Verisk and LexisNexis, sought to carve out a role in "build[ing] an ecosystem that supports profitable growth."[71] Both companies vied for access to consumers' Driving Data, pitching the opportunity for automakers and insurers alike to use them as a "single point of contact" between "hundreds" of automakers and "hundreds of insurers wanting access to the data[.]"[72]

**A.     GM sells consumers' Driving Data to Verisk, which uses it to develop products and power its insurance business.**

695.   Verisk markets itself as "[a]s a strategic partner to the global insurance industry," that provides "help" to partners "along the path to profitable growth" through "advanced data analytics, software, scientific research, and deep industry

---

[70] *General Motors Drives Innovation With APIs to Perfect the Connected Car Ecosystem*, at 20:34, ValueOps by Broadcom (Dec. 28, 2016), *available at* https://www.youtube.com/watch?v=TGWB1hbHLMw.

[71] Mark Anquillare et al., *Accelerating competitiveness with a digital auto insurance ecosystem*, VERISK (Sept. 30, 2021), *available at* https://web.archive.org/web/20230208094606/https://www.verisk.com/insurance/visualize/accelerating-competitiveness-with-a-digital-auto-insurance-ecosystem/.

[72] *See, e.g., Verisk Teams with Driveway Software on Smartphone Telematics for Autos*, INSURANCE JOURNAL (Dec. 6, 2016), *available at* https://web.archive.org/web/20161209164944/http://www.insurancejournal.com/news/national/2016/12/06/434322.htm; *Cutting in the middleman for data handling*, AUTOMOTIVE TU (Feb. 19, 2016), *archived at* https://web.archive.org/web/20160518041846/http://analysis.tu-auto.com/insurance-legal/cutting-middleman-data-handling.

knowledge."[73] Since 2014, Verisk has operated a "Verisk Telematics," division, which promised to "innovate and provide solutions that help our customers retain their edge and improve their margins[.]"[74]

696. In October 2015, GM contracted with Verisk, "open[ing] the floodgates to shared driving information[.]"[75]

697. According to an article by Auto Insurance Report, "[s]everal prominent data vendors were vying for the GM contract once the automaker expressed its willingness to share, but Verisk won the prize, and along with it an undisclosed

---

[73] *Industry Leading Insurance Solutions*, VERISK, https://www.verisk.com/insurance/ (last accessed Nov. 26, 2024).
[74] *Press Release: New Verisk Telematics Division Offers Filed Driver Discount Program*, VERISK (Apr. 2, 2014), *archived at* https://web.archive.org/web/20140704005241/http://www.verisk.com/Press-Releases/2014/new-verisk-telematics-division-offers-filed-driver-discount-program.html.
[75] *GM Changes UBI Game, Sharing OnStar Data with Verisk Exchange*, Auto Insurance Report (Sept. 14, 2015), *archived at* https://web.archive.org/web/20171023185706/http://img.en25.com/Web/ISO/%7B145061fe-cd91-4316-903d-e1b84275f343%7D_GM_Changes_the_UBI_Game.pdf.

period of exclusivity."[76] The GM contract was a "major win for Verisk, which ha[d] been fighting for a foothold in the UBI marketplace."[77]

698.   At the time Verisk won the GM contract, it had been aggressively pushing the "need" for a telematics exchange for the insurance industry, explaining: "***The ultimate objective*** for usage-based insurance ***is the same for both the automobile and telecommunications industries***: ***the vehicle as a fully connected data center***."[78]

699.   Verisk and GM jointly presented their agreement at the 2016 Auto Insurance Report Conference, in a presentation titled "Shared Driving Data Has Arrived:"[79]

---

[76] *GM Changes UBI Game, Sharing OnStar Data with Verisk Exchange*, Auto Insurance Report (Sept. 14, 2015), *archived at* https://web.archive.org/web/20171023185706/http://img.en25.com/Web/ISO/%7B145061fe-cd91-4316-903d-e1b84275f343%7D_GM_Changes_the_UBI_Game.pdf.

[77] *GM Changes UBI Game, Sharing OnStar Data with Verisk Exchange*, Auto Insurance Report (Sept. 14, 2015), *archived at* https://web.archive.org/web/20171023185706/http://img.en25.com/Web/ISO/%7B145061fe-cd91-4316-903d-e1b84275f343%7D_GM_Changes_the_UBI_Game.pdf.

[78] Jim Levendusky, *Telematics data exchange needed for auto insurance industry*, VERISK .COM (July 1, 2015), *archived at* https://web.archive.org/web/20201030162018/https://www.verisk.com/insurance/visualize/telematics-data-exchange-needed-for-auto-insurance-industry/ (emphasis added).

[79] *Auto Insurance Report National Conference 2016 Agenda*, *available at* https://web.archive.org/web/20161019195519/http://riskinformation.com:80/wp-content/uploads/2010/12/AIRNC2016program.pdf.

**1:50 – 2:40 pm**   **Shared Driving Data Has Arrived**
*Neil Spector, President, Underwriting Solutions, Verisk;*
*Greg Ross, Director, Business Development and Alliances, Global Connected*
*Customer Experience, General Motors*

As usage-based-insurance started to take firm root in the auto insurance market just a few years ago, it did not seem likely that insurance companies would be able to keep their customers' driving data to themselves for very long. After all, driving behavior data is not dissimilar to credit behavior data, which is housed in central bureaus so it can be shared by all, and enables consumers to shop around for the best deal. We now know that the life of wholly owned driver data was about 18 years, which is how long it has been since the first public UBI pilot ("Autograph") by Progressive Insurance. In this session we'll learn about the launch of a new data clearinghouse that will mark the move to end proprietary driver data. General Motor's OnStar started this ball rolling as far back as 2007, when a senior executive came to our conference and all but begged insurers to help, and then made it a reality by signing on with Verisk last year to build a driving data clearinghouse that will launch this year. During the session Verisk's Neil Spector and GM's Greg Ross will outline the birth of this new data structure, and we will discuss how the idea is likely to evolve in the future.

700.    At the 2016 TU-Automotive Detroit Conference in Michigan, attended by Verisk, GM, and various connected car industry players like Ford, Toyota, Kia, Honda, Nissan, McKinsey, Wejo, and Inrix, the conference hosts headlined the "Next Wave of the Auto Industry" with a presentation by Verisk on "The Changing Landscape of the Telematics Insurance Ecosystem."[80]

---

[80] *Automotive Reinvented – Technology First*, TU-AUTOMOTIVE (version as of Dec. 10, 2015), *archived at*
https://web.archive.org/web/20151210132057/http://www.tu-auto.com/detroit/;
*The Crucial Debates Shaping Auto Tech*, TU-AUTOMOTIVE (version as of June 27, 2016), available at https://web.archive.org/web/20160627084201/http://www.tu-auto.com/detroit/conference-agenda.php.

## Topics To Guide The Next Wave Of The Auto Industry

✔ **Connected Car Data:** The hottest commodity in the world's hottest tech. industry – are you feeling its full power?

✔ **Safety, ADAS, Autonomous:** Integrate the big ethical, human and legal questions into your tech. roadmap to crack the autonomous code

✔ **Smart Mobility:** Automakers become mobility service providers. From car-sharing to sustainability - OEMs re-invent transportation for the 21st century

✔ **Legislation vs. Technology:** Distraction, liability and licencing. Get legislators on side to make the right decision for the future of auto tech.

✔ **Cyber Security:** Create an impenetrable connected car infrastructure to ensure hackers can't take control of the road

---

**2.10-2.30 The Changing Landscape of the Telematics Insurance Ecosystem: What Does it Mean for You** 

The tremendous market potential for UBI has caused the auto manufacturing, insurance, risk analytics, and Internet of Things (IoT) industries to converge. As a result, all parties involved have an active interest in sharing and capitalizing on telematics data.

- Examine the challenges of collecting, analyzing, and distributing telematics data from multiple sources (e.g. smartphone apps, connected cars) to multiple destinations (e.g. insurers, TSPs)
- Demonstrate how a first-of-its-kind telematics data exchange (essentially an IoT platform) can facilitate this complex data management and distribution process to benefit consumers ultimately
- Understand how connected homes and connected cars can leverage the telematics data exchange infrastructure, thus expanding growth opportunities within the ecosystem

 Jim Levendusky
Vice President, Telematics
**Verisk Insurance Solutions**

---

701.  In December 2016, Verisk's VP of Telematics contributed a piece to Risk Management Monitor about the use of telematics data, titled "Driving Data: Advances in Innovative Exchange," in which he wrote: "In recent years, ***telematics has brought auto manufacturers and insurers into alignment***, with both industries

recognizing the potential of telematics…. [which] gives auto-makers the potential ***to capitalize on vast amounts of data collected by the connected cars*** they sell."[81]

702. Pursuant to the October 2015 agreement, GM sold Verisk its customers' Driving Data and routinely funneled the data from consumers' vehicles to Verisk without consumers' knowledge or consent.[82] GM has admitted that it provided Verisk Driving Data from cars enrolled in OnStar Smart Driver from 2015 until 2024, when GM was forced to discontinue Smart Driver after the true nature of the program was exposed.[83]

703. The Driving Data GM sold Verisk included granular trip-level data on each vehicle's location, speed, trip mileage, hard braking and acceleration, unique trip identifiers, and other information on how each driver drove their car each time they drove it.[84] GM also sold Verisk data that permitted Verisk to personally identify each customer, such as each customer's ID, name, home address, VIN, vehicle year,

---

[81] James Levendusky, *Driver Data: Advances in Innovative Exchange*, Risk Management Monitor (Dec. 12, 2016) *archived at* https://web.archive.org/web/20161218035955/http://www.riskmanagementmonitor .com/driver-data-advances-in-innovative-exchange/ (emphasis added).
[82] Texas Att. Gen. Pet., p. 26; *see also* Press Release: *Verisk Insurance Solutions Announces GM as Inaugural Auto Manufacturer to Join Telematics Data Exchange*, (Sept. 2, 2015), https://www.verisk.com/company/newsroom/verisk-insurance-solutions-announces-gm-as-inaugural-auto-manufacturer-to-j.
[83] Texas Att. Gen. Pet., p. 29.
[84] Texas Att. Gen. Pet., p. 26.

vehicle make, vehicle model, OnStar Vehicle Diagnostics ("OVD") enrollment date, and OVD unenrollment date.[85]

704.    Under the terms of the agreement, Verisk developed a "Driving Score" for each of GM's customers using the customers' Driving Data.[86] Verisk also "mined [the data] to prepare Driving Behavior Data History Reports[,]" and then "sold these reports to auto insurance companies[.]"[87]

705.    Pursuant to the agreement, Verisk developed a database to store the Driving Data, which Verisk called the "Verisk Data Exchange," and marketed and sold licenses to insurance companies to access the exchange.[88] According to one source, "Verisk's Telematics Data Exchange works on a revenue sharing model. The insurance companies that want to see the Driving Data will pay Verisk for the privilege, and then Verisk will share part of that revenue with the data source (in the beginning, OnStar)."[89] In a blog post on Verisk's website, Verisk wrote: "The exchange…appeals to automakers because they will have an opportunity to

---

[85] Texas Att. Gen. Pet., p. 26.
[86] Texas Att. Gen. Pet., p. 26-27.
[87] *Wyden-Markey Auto Privacy Letter* (July 26, 2024), *available at* https://www.wyden.senate.gov/imo/media/doc/wyden-markey_auto_privacy_letter_to_ftc.pdf.
[88] Texas Att. Gen. Pet., p. 27.
[89] *GM Changes UBI Game, Sharing OnStar Data with Verisk Exchange*, Auto Insurance Report (Sept. 14, 2015), *archived at* https://web.archive.org/web/20171023185706/http://img.en25.com/Web/ISO/%7B145061fe-cd91-4316-903d-e1b84275f343%7D_GM_Changes_the_UBI_Game.pdf.

capitalize on their connected-car data."[90] Likewise, in a 2018 promotional video titled "Innovation in 60 Seconds: What's on the horizon for telematics insurance?" VP of Telematics, Jim Levendusky, previewed the insurer relationships Verisk hoped to achieve through its telematics exchange: *"Insurance companies are very excited about the idea of telematics."*[91]

706.    In another article promoting the exchange, Verisk wrote: "how can auto manufacturers, telematics service providers, mobile service providers, and hundreds of auto insurer connect to leverage driving data[?]… With the Verisk Data Exchange, you can maximize your data's reach across the insurance market, simplify data integration and infrastructure development, strengthen customer engagement, and streamline claims service."[92]

707.    In an article reporting on Verisk and GM's partnership, Automotive TU wrote that the exchange would give insurers "the ability to create innovative

[90] Paulina Yick, *Underwriting Solutions President Neil Spector on the Future of UBI and Telematics*, Verisk.com (April 18, 2016), archived at https://web.archive.org/web/20230326131915/https://www.verisk.com/blog/underwriting-solutions-president-neil-spector-on-the-future-of-ubi-and-telematics/.
[91] *Innovation in 60 Seconds: What's on the horizon for telematics insurance?* VERISK, available at https://www.youtube.com/watch?v=7v2-8phPC98.
[92] *Verisk Data Exchange: Unlocking the Value of Connected-Vehicle Data*, Verisk.com/insurance (as of Sept. 25, 2017) archived at https://web.archive.org/web/20170925110215/http:/www.verisk.com/insurance/products/telematics/data-exchange/unlocking-connected-vehicle-data.html.

products with that data."[93] "As the auto insurance marketplace becomes more competitive," Verisk warned, "[a]uto insurers who don't have telematics programs in place are at a greater risk for adverse selection. The companies that are implementing telematics successfully have significantly gained share from their competitors. Verisk Telematics can help carriers make sure they don't get left behind."[94]

708. An advertisement for the Verisk Data Exchange promoting insurers' ability to "capitalize" on Driving Data:[95]

---

[93] *Insurance Telematics USA 2015 Day II: Rummaging through the keys to UBI success*, Automotive TU (Sept. 4, 2015), *available at* https://web.archive.org/web/20171028113430/http://analysis.tu-auto.com/insurance-legal/insurance-telematics-usa-2015-day-ii-rummaging-through-keys-ubi-success.

[94] *Press Release: New Verisk Telematics Division Offers Filed Driver Discount Program*, VERISK (Apr. 2, 2014), *archived at* https://web.archive.org/web/20140704005241/http://www.verisk.com/Press-Releases/2014/new-verisk-telematics-division-offers-filed-driver-discount-program.html.

[95] *Auto Insurance Report National Conference 2016 Agenda*, *available at* https://web.archive.org/web/20161019195519/http://riskinformation.com:80/wp-content/uploads/2010/12/AIRNC2016program.pdf.



Connected cars, connected insurers

**The Verisk Telematics Data Exchange™**

Introducing the Verisk Telematics Data Exchange™—the first-of-its-kind data exchange for driving data at time of quote and renewal. Now you can capitalize on telematics information to implement usage-based insurance (UBI) without the challenges of logistics, technology, big data, and more.

Visit the Verisk Insurance Solutions table to learn more.

**verisk**
Insurance Solutions

709.   By 2021, Verisk announced that "*5 of the top 10 insurers* in North America currently utilizing the company's [Verisk's] telematics platform, along

with **numerous other midmarket, regional, and insurtech customers**."[96] Over the term of the agreement, Verisk sold licenses to nine insurers, including Root Insurance Company,[97] Nationwide Insurance Company,[98] and, upon information and belief, American Family Insurance, Bristol West Insurance Group, CSAA Insurance Services, Inc., Metlife Group, Inc., and Pekin Life Insurance, Inc., which accessed the Driving Scores and Driving Data of hundreds of thousands of GM's customers.[99] Upon purchasing a license, insurance companies could review the Driving Behavior Data History Reports and search for the Driving Scores of their insureds or potential insureds, and then use that information to financially harm GM customers, including by denying prospective insureds coverage, increasing current insureds' monthly premiums, or dropping their current insureds from coverage entirely.[100] In a recent Senate investigation into these practices, "Verisk officials confirmed to Senator

---

[96] *Verisk Analytics Recognized as the 2021 Company of the Year*, Frost & Sullivan, (Sept. 2021), *available at* https://www.frost.com/wp-content/uploads/2021/09/Verisk-Award-Write-Up.pdf (emphasis added).

[97] *Root Insurance Company Joins the Verisk Data Exchange*, VERISK (Aug. 15, 2019), *available at* https://www.verisk.com/company/newsroom/root-insurance-company-joins-the-verisk-data-exchange/.

[98] *Nationwide Joins the Verisk Data Exchange to Drive Usage-Based Insurance Solutions*, VERISK (July 7, 2020), *available at* https://www.verisk.com/company/newsroom/nationwide-joins-the-verisk-data-exchange-to-drive-usage-based-insurance-solutions/.

[99] Texas Att. Gen. Pet., p. 27.

[100] *Id.*

Wyden's office that the company's contracts with automakers and insurers did not require that driver telematics data only be used to provide discounts."[101]

710.    Verisk paid GM ongoing "royalty payments" based on revenue generated from those licenses.[102] GM also received an initial multi-million-dollar lump sum payment from Verisk in exchange for the Driving Data—a fact that contradicts a statement GM made on September 2, 2015, that it was "not being compensated" for sending Driving Data to Verisk.[103]

711.    GM also contractually required Verisk to solicit "other vehicle [manufacturers], telecom carriers, and other third parties possessing Driving Data and other relevant vehicle data" for inclusion in the Verisk Data Exchange. As a result, Verisk entered into similar agreements with both American Honda Motor Company (on December 7, 2017) and Hyundai Motor America (on March 1, 2018).[104] Between 2018 and 2024, Hyundai shared data from 1.7 million cars with

---

[101] *Wyden-Markey Auto Privacy Letter* (July 26, 2024), *available at* https://www.wyden.senate.gov/imo/media/doc/wyden-markey_auto_privacy_letter_to_ftc.pdf.

[102] Texas Att. Gen. Pet., p. 27.

[103] *Id.* at p. 26; John Huetter, *With eye toward usage-based insurance, GM to allow OnStar users to share data with Verisk*, REPAIRER DRIVEN NEWS (Sept. 4, 2015), https://www.repairerdrivennews.com/2015/09/04/with-eye-towards-usage-based-insurance-gm-to-allow-onstar-users-to-share-data-with-verisk/.

[104] Texas Att. Gen. Pet., p. 27.

Verisk, and between 2020 and 2024, Honda shared data from 97,000 cars with Verisk.[105]

712. Although Verisk represented that drivers had consented to this information collection, GM drivers never consented to their information being provided to Verisk, let alone added into a vast, widely-shared "data exchange" that was routinely accessed by "[n]umerous auto insurers."[106]

713. With consumers in the dark about GM and Verisk's data sharing, the Verisk Data Exchange grew quickly. By the end of 2016, Verisk reported that "85%" of GM's "new-car buyers" were "signing up for the program," and that Verisk had collected Driving Data from 900,000 vehicles covering more than 3 billion trip miles. Verisk anticipated a growth rate of 5,000 to 6,000 cars and 3 million miles a day.[107] By the end of 2017, Verisk had accumulated Driving Data from 3 million GM vehicles with more than 28 billion miles of Driving Data, with the exchange continuing to grow by more than 180,000 cars a month.[108]

---

[105] *Wyden-Markey Auto Privacy Letter* (July 26, 2024), *available at* https://www.wyden.senate.gov/imo/media/doc/wyden-markey_auto_privacy_letter_to_ftc.pdf.
[106] *Id.*
[107] *Verisk Analytics, Inc. 2016 Annual Report*, *available at* https://www.annualreports.com/HostedData/AnnualReportArchive/v/NASDAQ_VRSK_2016.pdf.
[108] *Id.*

714. By the end of 2018, Verisk had gathered Driving Data from 4.5 million vehicles, representing 32% of U.S. new car sales and 75 billion miles of Driving Data; Verisk continued to add approximately 150,000 cars a month.[109] By the end of 2019, Verisk had added 1.3 million cars and 72 billion miles of Driving Data to the exchange, and continued to add around 115,000 vehicles every month.[110]



715. By July 8, 2019, Verisk announced that it had collected 100 billion miles of Driving Data and was ingesting Driving Data from more than 5 million active vehicles generating more than 20 million trips per day.[111] In the announcement, a Senior Vice President and General Manager of Verisk stated: "There are subtle but important patterns that become visible only from the

---

[109] *Id.*

[110] *Id.*

[111] *Verisk Data Exchange Reaches Milestone: 100 Billion Miles of Driving Data*, VERISK.COM (July 8, 2019), https://www.verisk.com/company/newsroom/verisk-data-exchange-reaches-milestone-100-billion-miles-of-driving-data/.

application of advanced data science to extremely large data sets like ours."[112] That year, Verisk used Driving Data from the Verisk Exchange to identify seasonality patterns in driving behavior for use in insurance modeling.[113] Verisk boasted that the Driving Data was "helping allies shorten their path to market while successfully navigating security, regulatory, and privacy issues."[114]

716.   By the end of 2020, Verisk reported adding "more than 60 billion miles of new driving data" and over 1 million new cars to the exchange.



717.   In February 2021, Verisk boasted that the exchange had over 7.5 million cars and 230 billion miles of Driving Data.[115]

---

[112] *Verisk Data Exchange Reaches Milestone: 100 Billion Miles of Driving Data*, VERISK.COM (July 8, 2019), https://www.verisk.com/company/newsroom/verisk-data-exchange-reaches-milestone-100-billion-miles-of-driving-data/.
[113] *Id.*
[114] *Id.*
[115] *Press Release: Connected Cars Become an Innovative Lead Generation Channel for Usage-Based Insurance Through New Verisk Program*, VERISK (Feb.

718.   By 2023, Verisk boasted its "auto solutions are powered by a mix of third-party and proprietary data ranging from 2 billion traffic court records to ***500 billion miles of connected car telematics data and we have characteristics on more than 270 million insured drivers and 280 million registered vehicles with access to expansive industry databases on loss costs and claims***."[116]

719.   The rapid growth of Verisk's exchange was critical to Verisk's goal of using the Driving Data to build a portfolio of telematics products.

720.   In Verisk's 2015 Annual Report, it explained that "unique data sets" which are "constantly recalibrated by refreshed data of actual events… provides us significant competitive advantage over our competitors…as we develop our models[.]"

721.   In a 2019 article titled "More is more: Why 100 billion miles of driving data matter," Senior VP and General Manager of Verisk IoT/Telematics explained

16, 2021), https://investor.verisk.com/News--Events-/Press-Releases--Market-Info/news-details/2021/Connected-Cars-Become-an-Innovative-Lead-Generation-Channel-for-Usage-Based-Insurance-Through-New-Verisk-Program-02-16-2021/default.aspx.

[116] *Verisk Analytics, Inc. 2023 Annual Report*, *available at* https://www.annualreports.com/HostedData/AnnualReports/PDF/NASDAQ_VRSK_2023.pdf.

why the collection of large masses of Driving Data was critical to Verisk's end game:[117]

> When telematics data arrives in varying formats from multiple sources, it takes advanced analytics, such as artificial intelligence and machine learning, to unscramble the signals and reveal the underlying reality. But bringing that picture into high definition calls for even greater capability.

> Pivotal as data science is, there's more to making multisource telematics data operational. Extremely large data sets—such as the 100 billion miles of driving data in the Verisk Data Exchange—may be necessary for the science to discover subtle but important patterns that would otherwise be less apparent.

> Data on this scale—gathered into the exchange from consenting consumers through car manufacturers and telematics service providers over the past three years—allows Verisk to quickly and efficiently qualify and onboard automakers and other parties while running real-time quality checks on incoming data.

> The exchange currently has more than 5 million active vehicles generating more than 20 million trips per day, helping to bring new products and services to market while meeting complex security, regulatory, and privacy demands.

> The platform also generates proprietary analytics, such as granular, state-level insights on driving behavior, to support lead generation, usage-based insurance (UBI) programs, and claim applications for auto insurers.

> As an example, Verisk has recently identified seasonal patterns in driving behavior using exchange data. For example, in Montana, the average mileage per driver is 35 percent higher in the summer months

---

[117] Saurabh Khemka, *More is more: Why 100 billion miles of driving data matter*, VERISK (July 18, 2019, *archived at* https://web.archive.org/web/20200921104346/https://www.verisk.com/insurance/visualize/more-is-more-why-100-billion-miles-of-driving-data-matter/.

than in winter months. In states with warmer climates, such as Florida, the seasonal variation in mileage tends to be far less.

Such insights can help drive development of sophisticated insurance models, such as the Verisk Driving Score™, and the supporting filings where required by state insurance regulators. The Verisk Driving Score measures driving behavior risk through a scoring model that underlies ISO's telematics rating rule, which is filed and ready for use in 43 states....

722. With a critical mass of continually-refreshing Driving Data in hand, Verisk used consumers' Driving Data to create a "portfolio of point-of-sale solutions designed to aid insurers on their telematics journeys," called the "DrivingDNA Portfolio."[118]

723. Verisk marketed the DrivingDNA products as "solutions drawn from advanced analytics, extensive in-market experience, and hundreds of billions of miles in the industry-leading Verisk Data Exchange."[119] "Drawing from millions of connected vehicles enrolled in the Verisk Data Exchange, hundreds of billions of trip-miles from consenting drivers, and alliances with numerous leading automakers," Verisk promised that "these purpose-built solutions" reflected

---

[118] Anthony R. O'Donnell, *Verisk Launches Next-Generation DrivingDNA for UBI Innovation*, INSURANCE INNOVATION REPORTER (June 23, 2021), *archived at* https://web.archive.org/web/20230127213725/https://iireporter.com/verisk-launches-next-generation-drivingdna-for-ubi-innovation/.
[119] *The Verisk Data Exchange: Personal Auto Telematics*, VERISK (version as of Dec. 11, 2023), *archived at* https://web.archive.org/web/20231211162628/https://www.verisk.com/insurance/capabilities/telematics/personal-auto-solutions/.

"Verisk's unmatched data attributes, advanced data management and predictive analytics capabilities" and would "help[] insurers overcome product development and operational challenges…. [and] harness the power of these individualized telematics insights. Just as DNA forms the blueprint for organic life, DrivingDNA reveals distinct characteristics of driving risk through normalized telematics data and scores at point of sale."[120]

724.  "At the center," of the DrivingDNA portfolio was Verisk's product called the "**DrivingDNA Score**," an "advanced predictive model and rating rule for behavior-based segmentation and pricing sophistication."[121] Verisk stated that the DrivingDNA Score was "*[e]nabled by the growth of the Verisk Data Exchange* and its 260 billion miles of datdd"[122] and was "a significant update to its predecessor, *using 15 times more data for training and validation*"[123] that "[i]ncorporate[d]

---

[120] Joe Wodark, *High-performance analytics empower telematics point-of-sale rating*, VERISK (June 30, 2021), *archived at* https://web.archive.org/web/20211024071718/https://www.verisk.com/insurance/visualize/high-performance-analytics-for-telematics-point-of-sale-rating/.
[121] *Id.*
[122] *Verisk Launches Next-Generation DrivingDNA Score to Support Usage-Based Insurance Innovation*, VERISK.COM (July 23, 2021), https://investor.verisk.com/News--Events-/Press-Releases--Market-Info/news-details/2021/Verisk-Launches-Next-Generation-DrivingDNA-Score-to-Support-Usage-Based-Insurance-Innovation-06-23-2021/default.aspx.
[123] Joe Wodark, *High-performance analytics empower telematics point-of-sale rating*, VERISK (June 30, 2021), *archived at* https://web.archive.org/web/20211024071718/https://www.verisk.com/insurance/visualize/high-performance-analytics-for-telematics-point-of-sale-rating/.

advanced analytics to adjust for seasonality effects, and optionally, distracted driving."[124]

725. Verisk explained that the new score was "a powerful predictor of future claims and can improve risk segmentation up to 5.5 times above traditional rating variables alone" and "lays the foundation for expansive UBI programs[.]"[125]

726. Alongside the DrivingDNA Score, Verisk advertised a "new Verisk Distracted Driving Score" available as an optional feature for insurers with mobile-based programs, which could purportedly "adjust the DrivingDNA Score by measuring phone-handling events that have been contextualized by the speeds at which they occur[.]"[126]

727. The DrivingDNA portfolio also included "DrivingDNA Data," which Verisk marketed as the "normalized driving behavior data attributes and mileage information from drivers across multiple leading automakers[.]"[127]

---

[124] *Verisk Launches Next-Generation DrivingDNA Score to Support Usage-Based Insurance Innovation*, VERISK.COM (July 23, 2021), https://investor.verisk.com/News--Events-/Press-Releases--Market-Info/news-details/2021/Verisk-Launches-Next-Generation-DrivingDNA-Score-to-Support-Usage-Based-Insurance-Innovation-06-23-2021/default.aspx.

[125] Joe Wodark, *High-performance analytics empower telematics point-of-sale rating*, VERISK (June 30, 2021), *archived at* https://web.archive.org/web/20211024071718/https://www.verisk.com/insurance/visualize/high-performance-analytics-for-telematics-point-of-sale-rating/.

[126] *Id.*

[127] Anthony R. O'Donnell, *Verisk Launches Next-Generation DrivingDNA for UBI Innovation*, INSURANCE INNOVATION REPORTER (June 23, 2021), *archived at*

728. The DrivingDNA portfolio also included "DrivingDNA Lab," a "research and development environment where an insurer can study the lift and impact of Verisk's score and telematics data attributes with information from its existing portfolio." [128]

Driving DNA® Lab: Powered by the Verisk Data Exchange

The Verisk Data Exchange contains hundreds of billions of trip miles of normalized driving behavior data from multiple leading automakers. Using experience gained from operating this industry-leading telematics platform and backed by Verisk's insurance expertise, the DrivingDNA Lab offers a proven path-forward to uncover telematics insights, perform advanced modelling, and develop new products.

---

https://web.archive.org/web/20230127213725/https://iireporter.com/verisk-launches-next-generation-drivingdna-for-ubi-innovation/.

[128] Joe Wodark, *High-performance analytics empower telematics point-of-sale rating*, VERISK (June 30, 2021), *archived at* https://web.archive.org/web/20211024071718/https://www.verisk.com/insurance/visualize/high-performance-analytics-for-telematics-point-of-sale-rating/.

729. Verisk marketed this product as providing access to "[m]illions of vehicles available for research and product development in a secure environment."[129] On its webpage promoting this product, Verisk stated:[130]

    a. **"Accelerate product development with real-world driving data**. For insurers that are still developing their UBI strategies or considering adding connected cars to their programs, the journey begins with acquiring usable telemetry. Yet the process of accessing at scale can be costly and time consuming. Uncover behavior-based insights from real-world drivers already in your portfolio and avoid lengthy data acquisition pilots, costly hardware, or complex mobile apps."

    b. **"Learn from your own insured vehicles**. Verisk identifies real-world VINs from your portfolio that are already in the Verisk Data Exchange, then appends corresponding premium and loss information to the driving data, exposure categories, and features. The DrivingDNA Lab offers a secure way to validate the power of the DrivingDNA Score or test DrivingDNA Data with your proprietary algorithm."

    c. "**Use model-ready exposure categories and advanced data features.** Verisk's experts use advanced analytics to transform raw event data into normalized aggregations that align with UBI exposure categories. Verisk has also engineered thousands of data features with segmentation by geography, vehicle type, and more. Verisk puts this expansive, purpose-built telematics data in the DrivingDNA Lab to accelerate advanced insurance modeling—with no time lost to data preparation."

---

[129] *The Verisk Data Exchange: Personal Auto Telematics*, VERISK (version as of Dec. 11, 2023), *archived at* https://web.archive.org/web/20231211162628/https://www.verisk.com/insurance/capabilities/telematics/personal-auto-solutions/.

[130] *The Verisk Data Exchange: Driving DNA Lab*, VERISK (version as of Dec. 10, 2023), *archived at* https://web.archive.org/web/20231210043454/https://www.verisk.com/insurance/products/drivingdna-lab/.

d. "**Test and learn in a secure R&D; environment**. Large volumes of sensitive, proprietary data needed for telematics research and development demand meticulous safeguards. The DrivingDNA Lab resides in a secure cloud environment with rigorous security procedures and access controls. The DrivingDNA Lab also includes statistical analysis software to help your actuaries and data scientists test hypotheses, conduct research, and study specific use cases."

e. "**Make informed strategic decisions faster with Instant Analysis**. Verisk's experienced team of telematics experts can arm you with turnkey insights that reveal the lift on your book of business and the power of behavior-based rating. The analysis report uses data that you provide from your existing portfolio to inform strategic planning."

730. The DrivingDNA portfolio also included "DrivingDNA Mileage," a tool with "verified odometer readings from millions of connected cars:"[131]

**DrivingDNA Mileage: Powered by the Verisk Data Exchange**

The Verisk Data Exchange connects you with verified odometer readings from consenting drivers of millions of vehicles across multiple leading automakers. DrivingDNA Mileage harnesses the reporting capabilities of these connected cars to help you improve the accuracy and profitability of your mileage-based auto program.

---

[131] *The Verisk Data Exchange: Personal Auto Telematics*, VERISK (version as of Dec. 11, 2023), *archived at* https://web.archive.org/web/20231211162628/https://www.verisk.com/insurance/capabilities/telematics/personal-auto-solutions/.



**Gain unmatched access to connected car data**

Enhance your mileage-based auto insurance program with verified odometer readings from multiple leading automakers, representing nearly 50 percent of U.S. new vehicle sales.

Gm Honda

Hyundai Ford

731.   Consumers' Driving Data also allowed Verisk to offer a "Discount Alert" product alongside the Verisk Data Exchange:[132]

**Discount Alert: Powered by the Verisk Data Exchange**

The Verisk Data Exchange connects you with millions of consenting connected car drivers from leading automakers. Discount Alert harnesses connectivity to unlock new opportunities for your UBI program that can put you on the road to profitable growth.

Driver Feedback Powered

---

[132] *The Verisk Data Exchange: Discount Alert*, VERISK (version as of Dec. 11, 2023), *archived at* https://web.archive.org/web/20231211161135/https://www.verisk.com/insurance/products/discount-alert/.

## How can insurers use automakers' digital ecosystems to grow profitably?

Vehicle telematics and automakers' digital engagement channels have enormous but untapped potential to connect auto insurers with new prospective policyholders. Discount Alert can assist with your behavior-based marketing efforts and support UBI program growth.

### Make connected cars a powerful channel for UBI growth

Discount Alert

Many connected car drivers are already using their automakers' mobile apps and online owner portals to connect with a range of digital services. Discount Alert lets insurers tap these ecosystems to identify vehicles used in a safe and low-mileage manner and providing a channel to deliver notifications with potential marketing offers.

Plug into this powerful new engagement channel to support profitable growth for your usage-based insurance (UBI) program.

732. Verisk regarded each new batch of Driving Data as a profit opportunity. For example, as Verisk explained when Hyundai agreed to share its consumers' data with Verisk:[133]

      a. "U.S. auto insurers can now access detailed driving data from Hyundai vehicles for their usage- and mileage-based insurance programs…. Hyundai data features are available for modeling and analysis in a secure cloud environment. When combined with corresponding premium and loss data and then depersonalized, this cost-effective solution helps insurers

---

[133] Joe Wodark, *Hyundai telematics integration goes live on the Verisk Data Exchange*, VERISK (March 29, 2021), *archived at* https://web.archive.org/web/20211024071912/https://www.verisk.com/insurance/visualize/hyundai-telematics-integration-goes-live-on-the-verisk-data-exchange/.

to uncover telematics insights from existing policyholders at scale and supercharges their program development and enhancement initiatives."

b. "**Point-of-sale underwriting and rating:** Normalized driving behavior and mileage information from consenting Hyundai drivers allows insurers to calculate an applicant's personalized discount at point of sale. Using Verisk's driving score, filed and available in 43 states, insurers have a turnkey behavior-based insurance solution for market entry or expansion. Months of Hyundai telemetry can also be delivered upfront during the quoting process as a customizable data package, tailored for compatibility with insurers' proprietary scoring algorithms."

c. "**Pay-as-you-drive (PAYD) & UBI monitoring:** Insurers can also receive a continuous data feed of Hyundai driving behaviors or odometer readings for PAYD, UBI, and mileage-based programs. This post-bind information provides the accurate, ongoing insights needed for driver monitoring."

d. "**Insurance lead generation:** With Verisk, insurers can harness the power of connected Hyundai vehicles as a new marketing channel to support the profitable growth of their behavior- or mileage-based programs. Discount Alert allows insurers to deploy personalized marketing offers directly to drivers through Hyundai's online owner portal and contains robust tools to anonymously segment ideal risk targets—ensuring your offers are only sent to qualified leads."

733. Together with its collection of a vast treasure trove of driving information, Verisk was able to further monetize its investment by combining the Driving Data with information it purchased through company acquisitions. In November 2021, Verisk announced that it acquired Data Driven Safety, a leading public record data aggregation firm that "specializes in driver risk assessment in the

United States."[134] Data Driven Safety built its business through a "unique data collection and management platform," which gathered "information on traffic citations, vehicle accidents and driving records from public sources."[135] According to Verisk, "[a]dding billions of driver risk records improves the granularity of our innovative risk-indicator solutions and will help customers advance their digital transformation strategies,"—that is, Verisk could empower insurance companies to increase insurance rates for customers that it deemed to be high-risk.[136]

734.   Verisk also used consumers' Driving Data to "forge strategic alliances" in the connected car ecosystem. In 2016, Verisk "forged a strategic alliance with Driveway Software to offer a smartphone telematics solution for auto manufacturers, their customers, and participating insurers in the exchange. The mobile application will enable owners of older-model vehicles to have a connected-car experience and apply driver scoring to the resulting data for insurers to use in their UBI programs."[137] That year, Verisk also "expanded [its] relationship with Duck Creek Technologies—a leading provider of software and services for insurers worldwide— by providing access to the exchange. Duck Creek will receive driving data and risk

---

[134] *Verisk Acquires Data Driven Safety to Further Expand Auto Insurance Analytics*, VERISK (Nov. 2, 2021), https://www.verisk.com/company/newsroom/verisk-acquires-data-driven-safety-to-further-expand-auto-insurance-analytics/.
[135] *Id.*
[136] *Id.*
[137] Verisk, 2016 Annual Report, at p. 8.

scores from the exchange to support pricing models for the company's insurer customers."[138]

735.　In 2019, "Verisk teamed with TrueMotion to offer integrated telematics solutions that combine mobile data with Verisk driving-behavior analytics. The agreement helps insurers quickly deploy or enhance existing usage-based insurance programs."[139]

736.　In 2020, Verisk "launched new telematics data integrations with Honda and Geotab,"[140] boasting that Driving Data "will be available across Verisk's portfolio of telematics products, expanding the reach of the Verisk Data Exchange…. We are making more OEM data available to insurers, so they can reach more of the market[.]"[141]

---

[138] Verisk, 2016 Annual Report, at p. 8; *Verisk Insurance Solutions Expands Relationship with Duck Creek Technologies by Providing Access to Verisk Data Exchange*, Verisk.com (Dec. 21, 2016), *available at* https://www.verisk.com/company/newsroom/verisk-insurance-solutions-expands-relationship-with-duck-creek-technologies-by-providing-access-to-verisk-data-exchange/.

[139] Verisk, 2019 Annual Report, at p. 10.

[140] Verisk, 2020 Annual Report, at p. 15.

[141] *Verisk Telematics Data Integration with Honda Now Live, Providing New Opportunities for Usage-Based Insurance Innovation*, VERISK (Aug. 6, 2020), *available at* https://www.verisk.com/company/newsroom/verisk-telematics-data-integration-with-honda-now-live-providing-new-opportunities-for-usage-based-insurance-innovation/.

737. In 2022, Verisk partnered with "insuretech innovator Mile Auto" to connect Mile Auto to the Verisk Data Exchange and "its network of automakers."[142] Verisk announced that Mile Auto would be using at least two solutions—Discount Alert and DrivingDNA Mileage—to "target low-mileage drivers" and "access verified odometer readings." In the announcement, Joe Wodark, General Manager of Verisk's Telematics business, boasted: "Mileage information and odometer readings are highly predictive but have been notoriously difficult for insurers to access or trust…. The verified data we provide through DrivingDNA Mileage will help overcome those challenges[.]"[143]

**B.    GM sells consumers' Driving Data to LexisNexis, which uses it to build its telematics business and expand its market share.**

738. LexisNexis also competed for GM's and automakers' Driving Data. LexisNexis is a self-described "analytics provider for industries around the globe, including financial services, retail/ecommerce, logistics, and telecommunications."[144] LexisNexis's customers are "insurers and automakers" from whom it seeks out business to "streamline business processes, control costs,

---

[142] *Mile Auto Enhances Insurance Experience for Low-Mileage Drivers with Verisk Telematics*, VERISK (March 15, 2022), available at https://www.verisk.com/company/newsroom/mile-auto-enhances-insurance-experience-for-low-mileage-drivers-with-verisk-telematics/.
[143] *Id.*
[144] *LexisNexis Risk Solutions – Transform Your Risk Decision Making*, LexisNexis, Risk.lexisnexis.com (last accessed Dec. 5, 2024).

and improve customer experiences"[145] including by "turn[ing] connected car data into tangible driving behavior insights that can be leveraged within insurance carriers' existing workflows."[146]

739.  In 2017, LexisNexis reported that automakers like GM were "investing billions" in their connected vehicle programs and branding and needed "strong partnerships in building data monetization programs to continue the investments in connected services."[147] LexisNexis pitched that it was "committed to building the necessary inter-connectivity and communized platforms, working through the LexisNexis Telematics Exchange. . . . for example, building bridges between the different market participants." Citing usage-based insurance as a "key" benefit of connected cars, LexisNexis said it was "well positioned to work with [insurers and automakers] to build this marketplace[.]" LexisNexis reported that Barra stated, "We are in the midst of seeing more change in the next five years than we've seen in the last 50 years."[148]

---

[145] *Insurance Solutions for Risk Management*, LexisNexis Risk Solutions, https://risk.lexisnexis.com/global/en/insurance (last accessed Dec. 5, 2024).
[146] *Data Solutions for Automakers*, LEXISNEXIS, https://risk.lexisnexis.com/insurance/solutions-for-automakers (last accessed Dec. 5, 2024).
[147] Pavan Mathew, *Data-Derived Revenues for Auto Industry Rising and They Need Insurers Along for the Ride*, LEXISNEXIS (version as of Dec. 11, 2018) https://web.archive.org/web/20181211085430/http://blogs.lexisnexis.com/insuranc e-insights/2017/12/data-derived-revenues-for-auto-industry-rising-and-they-need-insurers-along-for-the-ride/.
[148] *Id.*

740. "**Many participants [are] converging on the connected vehicle ecosystem**" LexisNexis wrote in a blog post, "many different parties, including the Silicon Valley tech giants, car manufacturers, auto-parts producers, startups, computer engineers, lawyers, data scientists, insurance providers and the regulators themselves, are all converging on this common territory…. After all, the petabytes data coming out of connected vehicles, now and in the future, provide a rich source of opportunities and benefits for automotive OEMs, the insurance industry and vehicle owners…. everybody in the chain benefits, and it is about minimi[z]ing the data integration, data collection costs, leveraging the power of an equitable data platform, and bringing this transformation into the mainstream[.]"[149]

741. As David Lukens, director of Telematics at LexisNexis explained carmakers and insurers have a unique relationship: "They share a customer 100% of the time, everyone who has a car has insurance. The ability to team up and provide a sharing experience through the data is pretty powerful."[150]

---

[149] *Follow the Data: Mapping the Compliance and GDPR Implications for Connected Vehicles*, LexisNexis, available at https://risk.lexisnexis.com/insights-resources/blog-post/follow-the-data-mapping-the-compliance-and-gdpr-implications-for-connected-vehicles (last accessed Dec. 10, 2024) (emphasis in original).

[150] *Sharing behaviour information best for insurers and consumers*, AUTOMOTIVE TU (June 6, 2017), *archived at* https://web.archive.org/web/20170624145336/http://analysis.tu-auto.com/insurance-legal/sharing-behaviour-information-best-insures-and-consumers.

742.   In 2019, GM secretly, and without its consumers' consent, agreed to sell LexisNexis its consumers' Driving Data.[151]

743.   GM sold LexisNexis all the Driving Data that GM had previously collected from its customers in 2017, 2018, and 2019 in exchange for an initial multi-million-dollar payment. Customers whose Driving Data was collected from 2017-2019 did not, and could not, have consented to this exchange.

744.   GM also, without its customers' consent, secretly funneled its customers' Driving Data to LexisNexis on a routine basis from 2019 until 2024, when it was forced to discontinue Smart Driver after the true nature of the program was exposed.[152]

745.   The Driving Data GM sold to LexisNexis included granular trip-level data on each driver's location, speed, trip mileage, hard braking and acceleration, unique trip identifiers, and other information on how they drove their car each time they drove it, along with information that allowed LexisNexis to associate that Driving Data with individual customers, including customers' names, addresses, phone numbers, email addresses, and their vehicles' VIN, make, model, and year.[153]

---

[151] Texas Att. Gen. Pet., p. 29. Like GM's agreement with Verisk, GM and LexisNexis has kept the terms of this agreement confidential. This Complaint includes details revealed by the Texas Attorney General's Office August 2024 state court petition.

[152] *Id.*

[153] *Id.* at p. 30.

746.  Like Verisk, LexisNexis used the Driving Data to calculate a "driving score" for each of GM's customers based on a series of "driving events" that were supposedly indicative of "bad" driving behavior.

747.  Pursuant to the agreement, LexisNexis agreed to annually pay GM a guaranteed minimum payment if GM provided LexisNexis with the Driving Data of a certain percentage of the vehicles it sold that year.[154]

748.  GM required LexisNexis to create a database to house the Driving Data, which LexisNexis called the "LexisNexis Telematics Exchange." According to LexisNexis, the purpose of the Telematics Exchange was to "deliver driving behavior information to the insurance industry."[155]

749.  Like the Verisk agreement, LexisNexis charged insurance companies for access to the Driving Data in the exchange. For insurers that contracted to use the LexisNexis exchange, any time an individual made an inquiry about obtaining car insurance, the insurer receiving the inquiry could search the LexisNexis exchange to see if it contained Driving Data about the potential insured.[156] With the information gained in the exchange, insurance companies could increase their

---

[154] Texas Att. Gen. Pet., p. 30.

[155] John Chalfant, *OnDemand Access to Consumer-Driven Telematics*, LEXISNEXIS (Dec. 8, 2020), https://web.archive.org/web/20201218172231/https://blogs.lexisnexis.com/insurance-insights/2020/12/on-demand-access-to-consumer-driven-telematics-data/.

[156] Texas Att. Gen. Pet., p. 30.

insureds' monthly premiums, drop their insureds from coverage entirely or decline to provide coverage altogether.[157]

750. GM also sought to profit off its ability to "potentially influence" other vehicle manufacturers to sell their customers' Driving Data to LexisNexis. Specifically, LexisNexis agreed to pay GM additional royalty payments if LexisNexis successful contracted with any "target OEMs" which included America Honda Motor Corp., Inc., Hyundai USA, Toyota Motor North America, and Volkswagen Group of America.[158] LexisNexis entered into similar agreements with Mitsubishi Motors North America (Mar 31, 2018), Nissan North America, Inc. (February 28, 2019), Ford Motor Company (August 2, 2021), Subaru of America, Inc. (February 6, 2023), and Kia America, Inc. (October 16, 2023).

751. LexisNexis also used the Driving Data to "market and deliver FCRA and non-FCRA products and solutions to Insurers."[159]

752. Since announcing its partnership with GM, LexisNexis' platform has expanded dramatically, with 42% of the U.S. auto insurance market, including 5 of the top 10 insurers, "contracting to access our Exchange" as of 2022.[160] By 2022,

---

[157] Texas Att. Gen. Pet., p. 30.

[158] *Id.* at p. 29 ("Upon information and belief, none of the four target OEMs entered into agreements with LexisNexis").

[159] *Id.*

[160] *LexisNexis Telematics Exchange Celebrates 5-Year Anniversary*, LEXISNEXIS (June 28, 2022), https://risk.lexisnexis.com/about-us/press-room/press-release/20220628-telematics-exchange-5-year-anniversary.

the LexisNexis Exchange had "real-world driving behavior" collected "from over 10 million vehicles"—252 billion driving miles or the equivalent of "19.5 million years of vehicle logging."[161]

753. Like GM and Verisk, LexisNexis has propped up an entire segment of its business using Plaintiffs and other unsuspecting consumers' Driving Data. "The insights we've gained from 300 million US drivers," LexisNexis stated in 2019 promotional materials, "allows companies to view the big picture, easily spot trends and patterns, understand usage patterns of products, analyze millions of data points for predictive and prescriptive analytics"—"giving you 'inside information' on your own drivers."[162]

754. LexisNexis—as a data broker—collects far more information about American consumers than Driving Data.

> LexisNexis is a paid service used by government, law, and risk management professionals to access a vast public and legal records database. This data is gathered from public sources, including publicly accessible internet information.
>
> The database contains personal information like names, addresses, family details, and contact numbers. It also includes professional and financial data such as licenses, salary records, bankruptcy filings, and

---

[161] *Id.*

[162] *Payback on Connected Car Technology Investments: Reasons to Meet With Us at the CES and CTS Shows*, LEXISNEXIS (2019) *archived at* https://web.archive.org/web/20190115093110/http://blogs.lexisnexis.com/insuranc e-insights/2018/12/payback-on-connected-car-technology-investments-reasons-to-meet-with-us-at-the-ces-and-cts-shows.

business contacts. Additionally, it stores information like vehicle registrations and property records.

…

LexisNexis provides its subscribers access to billions of personal records, including full names, social security numbers, credit history, bankruptcy records, license plate images, and cellular subscriber information.[163]

755. The robustness of the information that LexisNexis gathers on consumers is a reason why some have dubbed it "the secret credit bureau."[164]

756. In September 2020, LexisNexis hosted a "Connected Car Forum" for global insurance providers and auto manufacturers "to discuss the role of connected car data" in consumer services.[165] In a webinar titled "Using the Connected Car's Digital Data in the Real World," LexisNexis spoke about the last twelve months using its telematics exchange, and emphasized the value of Driving Data to insurers and auto manufacturers, underscoring the benefit from "build[ing] a critical mass of data"[166]

---

[163] Conor Walsh, *How To Opt Out of LexisNexis—And Why You Should Do It*, ProPrivacy (Dec. 15, 2023), https://proprivacy.com/privacy-service/guides/lexisnexis-opt-out.
[164] *LexisNexis: The Secret Credit Bureau*, Credit Suite (July 20, 2022), https://www.youtube.com/watch?v=GeWnVgr194g&t=20s.
[165] *Daimler, Sara Assicurazioni and EU Commission to join LexisNexis Risk Solutions Connected Car Forum 2020 Using the Connected Car's Digital Data in the Real World*, LEXISNEXIS RISK SOLUTIONS PRESS ROOM (Sept. 24, 2020) https://risk.lexisnexis.com/global/en/about-us/press-room/press-release/20200924-sbd-automotive-webinar.
[166] *Using the Connected Car's Digital Data in the Real World*, LEXISNEXIS (Sept. 30, 2020), https://www.youtube.com/watch?v=HzIm8t8MHXM.

757. Screenshots from the presentation discuss data sharing, UBI, how LexisNexis's products can be used to improve an insurer's bottom line, and how Driving Data "may soon be more valuable than the car itself."



According to LexisNexis's presentation in 2020, "data aggregators" (like LexisNexis) had already "onboarded onto their platforms" information from 30 million vehicles.



758.  In the same presentation, LexisNexis touted its product because collecting and submitting Driving Data from each car manufacturer to each insurance company would "cost the industries $4 billion."



759.  LexisNexis also clearly understood the "obstacles" to sharing Driving Data—including "regulations" and "accuracy of the data" being collected from vehicles.



760. LexisNexis also represented in its presentation that a customer's "most valuable asset" is "vehicle data."



761. LexisNexis was also very mindful that obtaining this "valuable asset" could be difficult to do legally—under "challenges and barriers," it noted that creating "steps required to gain consent" could cause customer "friction"—meaning that a customer may not, ultimately, agree to share their Driving Data. Further, LexisNexis also acknowledged the problem of a "broken consent chain"—or that consumers may consent to data sharing for some purposes, but not for others.



762. Fully aware of these "challenges and barriers," LexisNexis accepted Driving Data from GM.

763. By June 2021, LexisNexis Connected Car data scientist Lisa Greenberg stated that LexisNexis was the operator of "one of the largest telematics exchanges, with insights into one in fifteen U.S. households and growing."[167]

764. In 2022, in its promotional video, "LexisNexis Telematics Exchange: Your Many-to-Many Solution," LexisNexis boasted: "There is currently an explosion in connectivity and data that is dramatically changing the way people live,

---

[167] Lisa Greenberg, *Presentation: Driving Data Science for Automakers and Insurers*, LEXISNEXIS RISK SOLUTIONS (June 3, 2021), *available at* https://vimeo.com/558702815.

work, and move. In the automotive and insurance markets, this change is rapid."[168] LexisNexis said, "[f]or automakers, we help them better maximize investments in connectivity, while offering a more seamless integration of driving and vehicle data into the auto insurance workflows. . . ultimately helping to transform the insurance and automotive markets as one connected ecosystem."

765. According to LexisNexis, "Telematics data ingested by the exchange is processed, normalized, and made available for usage-based insurance ***and related solutions***… Through the LexisNexis Telematics Exchange, LexisNexis Risk Solutions can create insurance solutions…. [and] Automakers and other telematics service providers can better maximize investments in connectivity[.]"[169]

766. LexisNexis indeed used Driving Data to "drive" its "Telematics OnDemand" product; explaining that Telematics OnDemand "delivers scores and attributes using the LexisNexis Drive Metrics telematics scoring model," and that the Exchange "powers the LexisNexis Vehicle History connected mileage solution, which delivers attributes for rating and underwriting to include mileage from connected vehicles." LexisNexis also claimed that its "LexisNexis Telematics

[168]*LexisNexis Telematics Exchange: Your Many-to-Many Solution*, LEXISNEXIS RISK SOLUTIONS, (July 7, 2022), *available at* https://www.youtube.com/watch?v=b8SejdQ7QjI.
[169] *Telematics Exchange*, LEXISNEXIS, *available at* https://risk.lexisnexis.com/products/telematics-exchange (last accessed Dec. 3, 2024) (emphasis added).

IntelliMatch" which it said "can help insurers connect with consumers who are interested in insurance offers" was "telematics-driven."[170]

767. In its 2022 Auto Insurance Trends Report, LexisNexis reported[171] that its partnership with automakers would represent over 30% of all connected vehicles in 2022:



768. In a 2022 report, LexisNexis concluded that telematics data was "core to future business success."[172] "Insurance carriers told us they believe they need to invest in telematics data now or run the risk of being left behind the competition

[170] *LexisNexis Telematics Exchange Celebrates 5-Year Anniversary*, LexisNexis (June 28, 2022), https://risk.lexisnexis.com/about-us/press-room/press-release/20220628-telematics-exchange-5-year-anniversary.
[171] *LexisNexis U.S. Auto Insurance Trends Report* (2022), https://web.archive.org/web/20230521074843/https://risk.lexisnexis.com/insights-resources/white-paper/auto-insurance-trends-report.
[172] *LexisNexis U.S. Auto Insurance Trends Report* (2022), https://web.archive.org/web/20230521074843/https://risk.lexisnexis.com/insights-resources/white-paper/auto-insurance-trends-report.

within three to four years' time, and a significant majority of those carriers believe that a telematics exchange can deliver scalability, providing real-time data that informs on driving behavior," said Adam Hudson, vice president and general manager of U.S. Connected Car at LexisNexis Risk Solutions.[173] "We won't stop here, as there are industry challenges to solve and a growing, evolving exchange data set can be used in a variety of telematics solutions beyond UBI, while also creating the opportunity to improve the overall vehicle ownership experience."[174]

**C.     GM secretly arranges to sell consumers' Driving Data to other third parties.**

769.   GM also sold billions of miles of Driving Data to other third parties, only some of whom have been identified to date.

770.   The Texas Attorney General recently revealed that in 2018, GM entered into an agreement with Wejo Limited ("Wejo"), a British connected car start-up. GM bought a 35% ownership interest in Wejo for $25 million and agreed to provide Wejo with the 2018 Driving Data of 2.6 million vehicles, valued at $70 million.[175]

[173] *LexisNexis Telematics Exchange Celebrates 5-Year Anniversary*, LexisNexis (June 28, 2022), https://risk.lexisnexis.com/about-us/press-room/press-release/20220628-telematics-exchange-5-year-anniversary.
[174] *Id.*
[175] Mark Kleinman, *General Motors revs up UK 'connected car' start-up Wejo*, Sky News (Feb. 12, 2019), https://news.sky.com/story/amp/general-motors-revs-up-uk-connected-car-start-up-wejo-11635625 ("GM's investment includes an 'in-kind' consideration worth more than $70m to supply data from millions of the car-maker's vehicles for wejo to manage for seven years…The value of this data to

771. GM also continuously sent Wejo newly collected Driving Data. The specific Driving Data varied over time, but generally included: trip start, trip end, hard braking and acceleration events, speed events over 80 miles per hour, and driver seatbelt status change. Over time, GM sold additional types of Driving Data to Wejo. For example, in December 2022, GM started providing Wejo with its customers' "Radio Listening Data" which included data such as: (1) ignition state and timestamp (start or end of the trip); (2) AM/FM frequency; (3) time zone identifiers; (4) radio station call sign; and (5) channel genre.

772. The data GM sold to Wejo included VINs and location data. In 2023, around the time that Wejo went bankrupt, a former Wejo employee told Prolific North:

> Wejo was processing 50 million car journeys per day, which was mostly all GM data. This data would include PII data such as VIN numbers and location data. The data of millions of GM customers has been left on a cloud environment that is not being managed or

---

industries like traffic and mapping, urban mobility, insurance, parking and geolocation is potentially enormous"); Christopher Marchant, *GM acquires 35% stake in UK connected car company*, MOTORFINANCE (Feb. 13, 2019), https://www.motorfinanceonline.com/news/gm-acquires-35-stake-in-uk-connected-car-company/?cf-view; Anthony Alaniz, *General Motors Invests $25M In Wejo, A Connected-Car Data Start-Up*, GM AUTHORITY (Feb. 13, 2019), https://gmauthority.com/blog/2019/02/general-motors-invests-25m-in-wejo-a-connected-car-data-start-up/ ("The deal with General Motors will also give wejo access to a tremendous amount of data from the Detroit automaker, further improving wejo's services").

maintained due to the administrator laying off all staff including key functions such as data science, privacy and security.[176]

773. GM sold Wejo its customers' Driving Data so that Wejo could sell licenses to other companies for access to the data. Under the agreement, GM authorized Wejo to pursue potential buyers for the Driving Data in other sectors, not just insurers.

774. In an archived version of Wejo's website, it marketed connected car data to various industries, stating: "Drilling into previously inaccessible sources of data, businesses around the world are now able to transform their business strategies and improve efficiency by leveraging rich and unique data from millions of connected vehicles. Underpin new propositions, improve competitiveness and drive innovation with connected vehicle data":[177]

---

[176] Chris Newbould, *'Millions' of GM customers' data potentially compromised as Wejo Group lays off all global employees. Meanwhile, P45s sent to the wrong people*, PROLIFIC NORTH (July 30, 2023), *available at* https://www.prolificnorth.co.uk/news/millions-of-gm-customers-data-potentially-compromised-as-wejo-group-lays-off-all-global-employees-meanwhile-p45s-sent-to-the-wrong-people/.

[177] *For Business*, WEJO (version as of Aug. 14, 2022), *archived at* https://web.archive.org/web/20220814175513/https://www.wejo.com/for-business.





**Media & Advertising**

Connected vehicle data gives you an accurate view of consumer behaviors based on trends in travel. Unlock new insights that can help you better create, deliver and measure impactful campaigns.

Find out more >

**Retail & Hospitality**

Use unique and reliable connected vehicle data to get to know your target audience better, understand consumer trends and determine the accessibility of site locations.

Find out more >

**Real Estate Investment**

Use easily accessible connected vehicle data to gain richer insights into consumer behavior and traffic trends around potential investment sites.

Find out more >

775. On May 20, 2021, Wejo announced that it would "make 8.6 trillion data points from more than 10.7 million vehicles available to users of Esri's ArcGIS, a system that connects people, locations and data using advanced mapping and analysis." "More than 350,000 organizations—including departments of transportation, engineering and construction firms, public safety organizations, and insurance providers, among others—rely on Esri for location services and accurate, informed maps developed by using Esri's ArcGIS technology."[178]

776. On August 10, 2021, Wejo announced it would "provide new and existing customers with real-time movement data from more than 11 million

---

[178] *Esri & Wejo partner to bring connected vehicle data to GIS*, WEJO (May 20, 2021), *archived at* https://web.archive.org/web/20210625040830/https://www.wejo.com/press/esri-and-wejo-partner-to-bring-live-connected-vehicle-data-to-gis.

connected vehicles in North America" and would "join Iteris' ecosystem of mobility intelligence providers, empowering…commercial enterprise customers in the transportation space nationwide with Wejo's connected vehicle data."[179]

777. One of Wejo's buyers was Inrix, a US-based mobility data and software provider. According to a former Wejo employee:[180]

> "INRIX was the company we were selling US data to: Fully bespoke, three separate data streams, for $600K a year," they explained. "That was costing us $400K a year to deliver, and we were sharing about 60 per cent of that revenue with GM. We were literally paying GM and AWS for INRIX to take the data."

778. In May 2022, when GM reportedly "lost faith in Wejo," GM signed a direct partnership with Inrix.[181]

779. Upon information and belief, GM received ongoing payments from Wejo based on Wejo's license sales. Specifically, under the Wejo Agreement, Wejo had a minimum monthly revenue licensing target of $3 million per month, and Wejo agreed to pay GM 70% of this revenue. Wejo also agreed to "reimburse" GM if it ever failed to meet its monthly revenue target.

---

[179] *Iteris and Wejo Partner to Deliver Enhanced Applications of Connected Vehicle Data for Safer and More Efficient Roadways*, WEJO (Aug. 10, 2021), *archived at* https://web.archive.org/web/20210921193722/https://www.wejo.com/press/iteris-and-wejo-partner.

[180] Chris Newbould, *"It was absolutely mental": Beleaguered Wejo sold GM vehicle data 'at a loss*, Prolific North (June 19, 2023) *available at* https://www.prolificnorth.co.uk/news/it-was-absolutely-mental-beleaguered-wejo-sold-gm-vehicle-data-loss/.

[181] *Id.*

780.   In June 2021, Wejo reportedly had "10.3 million cars in the US on its platform and receives an update from each driving vehicle every three seconds."[182]

781.   Upon information and belief, GM also has agreements to sell and make available consumers' Driving Data to Flespi,[183] Caruso,[184] and Otonomo.[185]

782.   In 2024, GM sold Driving Data to Jacobs Engineering Group, Inc. ("Jacobs") for use in Jacobs' own products and to license Driving Data to other parties approved by GM. According to the Texas Attorney General, GM authorized Jacobs to use "de-identified" data, although it is not known what data elements Jacob has, and whether such information can truly be de-identified.

783.   Upon information and belief, GM provided consumers' data to GM Maxis,[186] its predictive analytics platform that generates insights into core business strategies, including anticipating market demand for autonomous vehicles. Maxis—

---

[182] *Wejo announces Moonshadow as a Data Insight Partner*, WEJO (June 11, 2020), *archived at* https://web.archive.org/web/20210625043845/https://www.wejo.com/press/wejo-announces-moonshadow-as-a-data-insight-partner.

[183] *Blog*, FLESPI, *available at* https://flespi.com/blog?tag=usecases.

[184] Frederic Bruneteau, *Why do we need vehicle data hubs*, PTOLEMUS (Apr. 5, 2020), available at https://www.ptolemus.com/insight/why-do-we-need-vehicle-data-hubs/.

[185]  Egli Juliussen, *Connected Cars: Show Me The Money*, EE TIMES (Feb. 25, 2021), *available at* https://www.eetimes.com/connected-cars-show-me-the-money/.

[186] Clint Boulton, *At GM, self-service analytics drives business results*, CIO (July 17, 2018), *available at* https://www.cio.com/article/221940/at-gm-self-service-analytics-drives-business-results.html.

shorthand for maximizing insights—analyzes more than 30 billion records (1.5 petabytes) per day. The data comes from internal sources such as applications and internet of things (IoT) sensors from connected cars, as well as external sources from partners and other market forces that make up GM's supply chain. GM estimated the financial benefit from Maxis to be $100 million in 2017 and expected that to double or triple in 2018 and beyond.[187]

784. In oversight calls with Senator Wyden's staff in 2021 and 2024, discussed above, GM officials confirmed that it was also providing bulk, de-identified location data from GM cars to unnamed commercial partners, which GM officials would not identify, without consumers' informed consent, for years:[188]

> In addition to sharing data on drivers in its Smart Driver program to Verisk, GM also confirmed to Senator Wyden's staff that it shared location data on all drivers who activated the internet connection for their GM car, even if they did not enroll in Smart Driver. These disclosures of location data—to other, unnamed parties—have been going on for years.

> In a May 13, 2021 oversight call with Senator Wyden's staff which has not previously been made public, GM officials confirmed that the company was providing bulk, de-identified location data from GM cars to an unnamed commercial partner, which GM officials would not identify and referred to as 'Company A.' During that oversight call, GM confirmed it did not seek informed consent from consumers for

---

[187] Clint Bouton, *At GM, Self-Service Analytics Drives Business Results*, CIO (July 17, 2018) *available at* https://www.cio.com/article/221940/at-gm-self-service-analytics-drives-business-results.html.
[188] *Wyden-Markey Auto Privacy Letter* (July 26, 2024), *available at* https://www.wyden.senate.gov/imo/media/doc/wyden-markey_auto_privacy_letter_to_ftc.pdf.

sharing this data. Company officials told Senator Wyden's staff that the only way consumers could opt out of the data sharing was by disabling the car's internet connection entirely.

In a follow-up phone call three years later, on May 16, 2024, GM confirmed that it stopped sharing location data with Company A in May 2023. GM continues to refuse to identify this partner; however, Sky News reported in 2019 that GM provided an 'in kind' investment of driver data to a British data broker named Wejo, alongside a cash investment in the company. Wejo shut down operations in May 2023, the same month and year that GM told Senator Wyden's office that it stopped providing location data to its unnamed partner.

During that May 16, 2024, follow-up call, GM officials also revealed that the automaker is now sharing customer location data with a different company, which they also refused to identify.

785.   In short, as the *New York Times* reported, "[i]f you drive a car made by General Motors and it has an internet location, your car's movements and exact location are being collected and shared anonymously with a data broker."[189] This is an extreme violation of consumers' privacy. "[L]ocation data is extremely valuable and can reveal so many things about you, such as where you travel, including where you live, where you work, where you spend your nights. It can reveal your political affiliation, your religious affiliation, your sexual orientation, and so on."[190] This

---

[189] Kashmir Hill, *Automakers Sold Driver Data for Pennies, Senators Say*, THE NEW YORK TIMES (July 26, 2024).

[190] Staff Report, *Bringing Dark Patterns to Light*, FEDERAL TRADE COMMISSION (Sept. 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14.2022%20-%20FINAL.pdf; *see also* Jon Keegan & Alfred Ng, *There's a Multibillion-Dollar Market for Your Phone's Location Data*, THE MARKUP (Sept. 30, 2021), available at

violation of privacy is not cured by illusory claims that data is anonymized. As Senator Chris Coons explained in 2011, any claims that GM can "anonymize" location records "are undermined by a broad body of research showing that it is extraordinarily difficult to successfully anonymize highly personal data like location. . . . If a data set shows the exact location where a car starts every morning, the roads that car travels on its morning commute, the office where it is parked during business hours, and the schools where it stops on its way home, it is unnecessary for that data set to include a name or license plate for it to be connected to an individual and his or her family."[191]

### D.     GM uses consumers' Driving Data to build a lucrative insurance enterprise.

786.   In addition to secretly selling Driving Data without consent, GM used its customers' Driving Data for its own business ventures, including to build the billion-dollar insurance enterprise General Motors Insurance Company.

---

https://themarkup.org/privacy/2021/09/30/theres-a-multibillion-dollar-market-for-your-phones-location-data (explaining that a consumer's location data can be sold repeatedly in the location data marketplace, such as to aggregators that resell the data to multiple sources, to location intelligence firms that use the raw data to analyze foot traffic in retail locations and demographics of visitors, and to hedge funds looking for insights into the popularity of certain stores).

[191] Chris Coons, *Press Release: Senators Coons, Franken to OnStar: Tracking, sharing customers' location without consent is a serious violation of privacy* (Sept. 22, 2011) https://www.coons.senate.gov/news/press-releases/senators-coons-franken-to-onstar-tracking-sharing-customers-location-without-consent-is-a-serious-violation-of-privacy.

787. In November 2020, GM re-launched its auto insurance division under the OnStar brand.[192] Yet another way to "generate new revenue using data from its growing number of connected cars in the U.S.," OnStar's UBI offering was built around using the Driving Data collected through OnStar. GM marketed its insurance company as "created for General Motors Vehicles" that could directly access "the technology already working in your vehicle" to provide a UBI-related quote "in minutes."[193] In GM's Annual Report for 2021, GM previewed future ambitions to "integrate insurance products into the vehicle experience."[194]

788. In the announcement, GM's Vice President of Insurance Innovation, Andrew Rose, said: "We're not the only (carmaker) out there with connected vehicles, but we have more data than the rest of the industry combined[.]"[195] CNBC reported:

> GM previously offered its own auto insurance from 1925 to 2008. The operations generated billions in annual revenue and contributed $400

---

[192] *Video advertisement: GM Launches OnStar Insurance* (Nov. 18, 2020), available at https://www.youtube.com/watch?v=HllxgyXHwPE; *Video: General Motors to Offer Auto Insurance Through OnStar*, CBS DETROIT NEWS (Nov. 18, 2020), *available at* https://www.youtube.com/watch?v=iHoBWH3bBmk.

[193] *General Motors Insurance uses in-vehicle technology to reward safe driving*, GM INSURANCE, available at https://www.gminsurance.com/safe-driving-savings (last accessed Nov. 24, 2024).

[194] *2021 Annual Report*, GENERAL MOTORS COMPANY, https://investor.gm.com/static-files/6ac492ca-6a4f-462e-9de8-0e2a7d471327.

[195] Tina Bellon, *General Motors launches use-based auto insurance with OnStar vehicle data*, REUTERS (Nov. 18, 2020) https://www.reuters.com/article/business/general-motors-launches-use-based-auto-insurance-with-onstar-vehicle-data-idUSL1N2I32XL/.

million to $1.1 billion to GM's bottom line during their final years of operation. Andrew Rose, president of OnStar Insurance Services, declined to disclose earnings projections for the new insurance business but said the "opportunity is enormous."

"GM has been a material player in that market before. We hope that we can return to being a material player in that market again," said Rose, an auto insurance veteran who joined the company in January. "Auto insurance is a $250 billion marketplace."

…"Consumers have chosen, with their consent, to share their driving data with GM," Rose said. "With that information, we can let you know you can get savings because of your safe driving or not. And we can give you coaching as time goes by to become a better, safer driver."[196]

789.   In an interview following the announcement in March 2021, Rose said that Driving Data "offers us all kinds of opportunities how, when, where do you drive your vehicle--those are all very relevant information for pricing."[197]   Rose explained that GM launched the program in Arizona in late November, and that "this is a program that we want to uh have countrywide as quickly as possible."[198]

790.   Then, "[i]n just 10 months, OnStar Insurance became available in 38 states" making the effort one of the "fastest nationwide rollouts of an auto insurance

---

[196] Michael Wayland, *GM to offer auto insurance that uses data from connected vehicles to price rates*, CNBC (Nov. 18, 2020), https://www.cnbc.com/2020/11/18/gm-to-offer-auto-insurance-that-uses-data-from-connected-vehicles-to-price-rates.html.
[197] *Episode 204: Smart Driving Cars Podcast*, starting at time stamp 3:11 (March 16, 2021), *available at* https://www.youtube.com/watch?v=k5PZ2s_yZHI..
[198] *Id.* at 21:02.

product," according to Pam Fletcher, GM's Vice President of Global Innovation.[199] In an accompanying press release, GM stated: "OnStar Insurance [is] projected to have a potential revenue opportunity of more than $6 billion annually by the end of the decade."[200]

791.   By 2023, GM executive Andrew Rose proclaimed GM to be "in the midst of a telematics revolution[.]"[201] GM described 2023 as a "momentous year" for the insurance side of its business, "during which the company shifted strategies from an agency model to a full-stack carrier wholly owned by GM Financial." Thereafter, OnStar insurance rebranded as GM Insurance.[202]

---

[199] *GM's OnStar Insurance To Be Available In All 50 States By Early 2022*, GM AUTHORITY (Oct. 8, 2021), https://gmauthority.com/blog/2021/10/gms-onstar-insurance-to-be-available-in-all-50-states-by-early-2022/.

[200] *Newsroom: GM Details Plan to Double its Revenue, Drive Even Higher Margins*, NEWS.GM.COM (version as of Aug. 21, 2023), *archived at* https://media.gm.com/media/us/en/gm/home.detail.html/content/Pages/news/us/en/2021/oct/1006-investor.html;  Jamie L. LaReau, *GM calls $1,500 OnStar plan optional – but new car buyers are being forced into it*, DETROIT FREE PRESS (Aug. 9, 2022), https://www.freep.com/story/money/cars/general-motors/2022/08/09/gm-onstar-connected-services-plan-cost-option/10246244002/

[201] *OnStar Insurance—Insurance Evolved*, GUIDEWIRE CONNECTIONS, at 16:111-17:04 (Nov. 22, 2023), *available at* https://www.youtube.com/watch?v=j7d4BAvFH-s.

[202] Jake Stevens, *OnStar Insurance to Rebrand as General Motors*, GM FINANCIAL (Jan. 17, 2024) https://www.gmfinancial.com/en-us/company/newsroom/onstar-insurance-rebrands-gm-insurance.html.

## III. Defendants conceal their Driving Data scheme from impacted consumers while duplicitously claiming they have consent.

792. Defendants hid the above data sharing practices from consumers, intentionally, to avoid the type of consumer backlash GM had faced only a few years earlier.

793. In September 2011, GM announced that it planned to collect data from GM vehicles, like location data, even if a customer no longer subscribed to OnStar, unless a customer called GM and opted out. In a Forbes Magazine article titled "GM's Boneheaded Privacy Mistake With OnStar," Kashmir Hill reported that GM planned to add the following language to its Privacy Statement starting in December 2011:[203]

> **Unless the Data Connection to your Vehicle is deactivated, data about your Vehicle will continue to be collected even if you do not have a Plan.** It is important that you convey this to other drivers, occupants, or subsequent owners of your Vehicle. You may deactivate the Data Connection to your Vehicle at any time by contacting an OnStar Advisor.

794. The public was outraged. Senators Coons and Al Franken decried the change as violating "basic principles of privacy and fairness for OnStar's

---

[203] Kashmir Hill, *GM's Boneheaded Privacy Mistake With OnStar*, FORBES (Sept. 26, 2011) https://www.forbes.com/sites/kashmirhill/2011/09/26/gms-boneheaded-privacy-mistake-with-onstar/.

approximately six million customers;"[204] Senator Charles Schumer described OnStar's proposal as "one of the most brazen invasions of privacy in recent memory;" and others likened it to "Big Brother, the fictitious, all-seeing dictator in George Orwell's dystopian novel 1984."[205]

795.   GM reversed its decision within days, issuing a video statement:[206]



*Screenshot of video: "All of us at OnStar value your trust in us when it comes to the handling of your personal data. We've done so for the last fifteen years…. We*

---

[204] *Press Release: Senators Coons, Franken to OnStar: Tracking, sharing customers' location without consent is a serious violation of privacy*, (Sept. 22, 2011), *available at* https://www.coons.senate.gov/news/press-releases/senators-coons-franken-to-onstar-tracking-sharing-customers-location-without-consent-is-a-serious-violation-of-privacy.

[205] Paul A. Eisenstein, *GM's OnStar service raises privacy alarms*, NBC NEWS (Sept. 28, 2011), https://www.nbcnews.com/id/wbna44690140#.VLaLoSvF-So (Sept. 28, 2011) (emphasis added).

[206] *OnStar Reverses Decision to Change Terms and Conditions*, GM PRESSROOM, *available at* https://pressroom.gm.com/gmbx/us/en/pressroom/home/videos.html#query=onstar (last accessed Dec. 10, 2024).

*will continue to honor your trust in us moving forward."- Linda Marshall, On-Star President*

796.  GM posted a written press release on its website apologizing for its decision and promising: "If OnStar ever offers the option of a data connection after cancellation, it would only be when a customer opted-in, Marshall said. And then OnStar would honor customers' preferences about how data from that connection is treated. 'We regret any confusion or concern we may have caused,' Marshall said."[207]

797.  Senators Coons and Franken jointly called GM's reversal "the right thing to do." "Consumers have a right to know what data is being collected about them and have a right to decide whether they want to share that information and when," said Franken in a statement.[208]

798.  From then on, at all times, Defendants were emphatic, to the press, consumers, and regulators, that consumers would have "control" over their Driving

---

[207] *OnStar Reverses Decision to Change Terms and Conditions: will continue to protect customer and vehicle data privacy*, ONSTAR NEWS (Sept. 27, 2011), *archived at*
https://web.archive.org/web/20111019181912/http://media.gm.com/content/media/us/en/onstar/news.detail.html/content/Pages/news/us/en/2011/Sep/0927_onstar; Kashmir Hill, *OnStar Kills Its Terrible Plan to Monitor Non-Customers' Driving*, FORBES (Oct. 5, 2011)
https://www.forbes.com/sites/kashmirhill/2011/09/27/onstar-kills-its-terrible-plan-to-track-non-customers-driving-data/ (updated Oct. 5, 2011).
[208] *Id.*

Data, and that it would not collect or share their Driving Data with third parties without consumer consent.

799. In July 2015, the summer before announcing the GM/Verisk partnership, Jim Levendusky, Marketing Manager for Verisk wrote of GM: "A major American auto manufacturer has already committed to providing driving information from consenting customers from its connected cars to insurance companies through a data exchange. Such consumers consent to provide data both to an exchange and to individual insurers…. **Informed consent:** All UBI programs are voluntary. If car owners don't want their driving history available to insurers, they can simply opt out. ***Drivers have control of where, when, and with whom they share their data***."[209]

800. Then, in September 2015, GM and Verisk announced their partnership at the Insurance Telematics USA 2015 Conference in September 2015. In an interview following the announcement, Greg Ross, GM's Global Director of Business Development & Alliances, and Neil Spector, Verisk Insurance Solutions' President of Underwriting, explained the "concept" of the "data exchange, repeatedly emphasizing the importance of "consent" and "consumer control" and

---

[209] Jim Levendusky, *Telematics data exchange needed for auto insurance industry*, VERISK .COM (July 1, 2015), *archived at* https://web.archive.org/web/20201030162018/https://www.verisk.com/insurance/v isualize/telematics-data-exchange-needed-for-auto-insurance-industry/ (emphasis added).

insisting that the consumers' decision to receive  private feedback on his or her driving would be "very clearly separated" from any decision to share Driving Data with third parties:[210]

    a. Ross and Spector explained that they had made a joint announcement during a presentation earlier that day regarding "the concept of creating a data exchange" where "connected car data ***with consenting consumers*** can be accessed by insurers for use in [user-based insurance] programs" (1:26-139);

    b. Spector stated that data from GM customers would be the "first data that we're going to have in the exchange (1:42-1:48) and that GM and Verisk would be launching the exchange "in the middle of next year" (1:48-1:50). Spector described the exchange as "an opportunity for consumers" who were in safe driver programs with GM OnStar to "have their safe driving data ***with their consent*** collected and then be able to leverage that when they buy insurance . . . ***as long as they consented***" (1:55-2:11);

    c. Ross explained that the partnership would "***help customers maintain control of their data***" because "***customers create the data, it's theirs; they get feedback on how they're driving and they maintain control of it*** and then if they choose to share it with an insurance provide, they can do that" (2:30-2:43);

    d. Ross: "there's a lot more third parties interested in using the data" (6:58-7:02);

    e. Ross: "I would say the connected car offers an opportunity to collect a lot of really good data" (9:29-9:33);

---

[210] *Interview: Insurance Telematics USA 2015 – Verisk Insurance Solutions and General Motors*, TU-Automotive (Sept. 24, 2015), *available at* https://www.youtube.com/watch?v=ffusmY-QDG0.

f. Ross: "***it's not the manufacturers data, in our view it's the customer's data and we need to act as a custodian for it***" (11:04-11:11);

g. Ross: "I think the way that we've broken through this is to think about making sure we're providing the customer real value with a [] service that gives them feedback on their driving and ***separate that from*** that sharing the data with insurance companies. So, let the customer have the data, let them understand how they're performing, give them feedback, and give them control over whether to share that data with the insurance company. So, ***what I like about the arrangement*** that we've struck with Verisk, and Neil [Spector] and I talked about this earlier today, ***is keeping that decision very clearly separated.*** Let the customer create their data and put it in a place where they can make it usable [] when they want to, but if they won't want to***, let them continue to have the feedback that they value separately from sharing that data with an insurance company***." (11:11-11:58).

801. Likewise, when GM announced Smart Driver, Ross told the press: "The beauty of this program is that control is in the hands of the customer[.]" The press release stated:[211]

> The new connected vehicle service will allow OnStar customers a chance to enroll in a program that provides a detailed driving assessment at the end of a 90-day evaluation period. The assessment, provided only to OnStar customers who sign up for this service, will reveal how the customer performed in important driving metrics, comparing that customer against an aggregate of other anonymous

---

[211] *OnStar to Offer Driving Feedback; Customers can Seek Insurance Discounts*, OnStar News (Jan. 4, 2015), *archived at* https://web.archive.org/web/20150318183543/http://media.gm.com/media/us/en/onstar/news.detail.html/content/Pages/news/us/en/2015/Jan/0104-smart-driver.html (emphasis added).

enrolled customers. Driving tips will be provided by OnStar based on a customer's individual assessment characteristics.

After the assessment, some customers can choose to share their driving data and evaluation information with Progressive through its Snapshot® program, potentially leading to discounted insurance offers. ***This information sharing will be entirely voluntary following advanced consent from customers***.

. . . Progressive® Insurance is the first insurance company that will use OnStar data to evaluate actual driving behavior, ***subject to explicit customer consent***, to offer driving-based insurance discounts.

802.    Described below, in an article immediately following the Verisk/GM partnership announcement, GM spokesperson Deanna Alicea told Repairer Driven News that it would issue a "separate terms of use" to cover the Verisk/GM partnership: [212]

> **GM customers' privacy**. . . . GM will be clear with customers about what data is being released under the new partnership, Alicea said. OnStar customers will have to opt-in to a separate terms of use beyond the standard OnStar terms before GM will share anything with Verisk.
>
> "Our customers are first and foremost," she said.
>
> She said the Verisk terms of use will be specific, and not include generic concepts which could be interpreted as permission for insurers or Verisk to collect anything you did with OnStar or your vehicle.
>
> "You know exactly what you're opting in to," she said.

---

[212] *With eye toward usage-based insurance, GM to allow OnStar users to share data with Verisk*, Repairer Driven News (Sept. 4, 2015), https://www.repairerdrivennews.com/2015/09/04/with-eye-towards-usage-based-insurance-gm-to-allow-onstar-users-to-share-data-with-verisk/.

803. Likewise, in another article following the September 2015 announcement that was linked to Verisk's website, Verisk reportedly "confirm[ed] that it sees a need to provide a way for consumers to access their driving data and some method for them to challenge negative information. Verisk has a goal of having some form of consumer engagement ready to go next June."[213]

804. Following GM and Verisk's announcement on day one of the Insurance Telematics USA Conference,[214] Automotive TU reported that GM "wants to put users in control of UBI data." In the caption for a now-inaccessible video, TU Automotive writes "Let's make it possible for customers to get their UBI data before their preferred insurer and maintain control of their own data, says Greg Ross business development and partnerships at GM's Connected Vehicle Group and Neil Spector underwriting division and telematics strategy at Verisk."[215]

---

[213] *GM Changes UBI Game, Sharing OnStar Data with Verisk Exchange*, Auto Insurance Report (Sept. 14, 2015), *archived at* https://web.archive.org/web/20171023185706/http://img.en25.com/Web/ISO/%7B145061fe-cd91-4316-903d-e1b84275f343%7D_GM_Changes_the_UBI_Game.pdf.

[214] *Insurance Telematics USA 2015 Day 1: Still many ways to skin the UBI cat,* TU AUTOMOTIVE (Sept. 3, 2015), *archived at* https://web.archive.org/web/20160625221826/http://analysis.tu-auto.com/insurance-legal/insurance-telematics-usa-2015-day-i-still-many-ways-skin-ubi-cat.

[215] *Video: GM wants to put users in control of UBI Data*, TU AUTOMOTIVE (Nov. 27, 2015), *archived at* https://web.archive.org/web/20171028114229/http://analysis.tu-auto.com/insurance-legal/video-gm-wants-put-users-control-ubi-data.

805.  Similarly, in November 2015, Steve Schwinke, GM's Director of Advanced Development and Concepts, gave a speech at the 2015 Best Practices for Consumer Products Conference titled "Keeping Customers at the Center of Connected Car Development," when discussing the Smart Driver program stated:[216]

> OnStar Smart Driver [] I hope everyone wants this []. . . we're going to provide our customer some really valuable insight as to how they're driving[] a customer can opt in and we're going to collect data in real time [] about their driving event and how they've performed on that particular drive and then they can log into onstar.com to get a detailed assessment and get a score of how good of a driver they are. (18:58-19:28)
>
> *And then if they want to, and I got to keep saying if they want to, they can share that information* so they can compare themselves kind of anonymously to other drivers that are out there but they can also share that score and that information with insurance companies and, especially if you're a great driver, you're probably going to get some type of discount [] in terms of [] your driving you know because you're such a safe driver and you don't do as many hard brakes etc. you're going to be able to get a discount [] on your insurance from your you know from your providers. So we think this is really interesting space I think we're going to continue to evolve it and look uh forward to launching it here shortly. (19:28 – 20:06)
>
> **Q:** "Recently there was a discussion going on in a number of the radio programs, the topic was the proliferation of agreements, right, user agreements, that you sign, you mentioned a large population of people accepting these agreements but do you have any data to show whether [consumers] understand the agreements at all?"
>
> **A:** "So, uh, I think uh first of all I don't want to go too far on that. . . . *we take privacy very seriously* we work very closely with the legal staff in terms of making sure what we do is correct. . . . I can tell you that

---

[216] *Keeping Customers at the Center of Connected Car Development*, 2015 Best Practices for Consumer Products Conference (Nov. 2, 2015), *available at* https://www.youtube.com/watch?v=NhthFtsjFes.

when we collect data out of the vehicle everything that we do goes through our Chief Privacy Officer before we do it. . . *you need to make sure you put the right diligence in place to make sure you're not violating any you know privacy laws. . . . So we take that commitment very seriously* and everything that we do is run through the appropriate channels." (35:35)

806.    In July 2016, Verisk Vice President of Telematics James Levendusky

gave an interview at the TU Automotive conference during which he discussed the

importance of "transparency" and "consent" both in Driving Data collection, *and* in

Driving Data sharing when asked about usage-based insurance:[217]

> I think what will likely happen is more and more customers will adopt UBI *because the collection of their data done with their consent* you know will be much more easy there'll be more easier for them to opt into a UBI program and they will be able to manage their data. *One of the things with the exchange that's very important to us is making sure that there's transparency consumers you know understand what data is being collected and how it might be used and always to do with their consent so to make sure that we get their consent to collect their data and then when they approach an insurer of their choice the insurer has to ask for their consent to access the data so the consumer is in control so our feeling is between the transparency and giving the consumer control of his or her data* basically that that answers addresses a lot of the questions around you know whether or not consumers want to opt in well they have that choice *it's not mandatory it's a choice.* (4:58)

807.    In a 2017 presentation on the connected car ecosystem, a GM manager

was asked "How are you sharing that information you know with insurance agencies

---

[217] *Interview with James Levendusky, Vice President, Telematics, Verisk Insurance Solutions*, TU-AUTOMOTIVE (July 4, 2016), *available at* https://www.youtube.com/watch?v=Gzt7LEEqmQ4.

and in other industries you know collectively all this data and all this information

without you know violating that you know the customer privacy?" In response, he

stated: "….let me raise my hand up and say we're not collecting all data unless a

subscriber or customer is actually consented for it… if you have a GM vehicle and

you haven't consented we have no record of what your driving behaviors, so that's

the balance that we play with[.]"[218]

808.　In 2017, LexisNexis published a study admitting that "[p]rivacy

regarding driving information shared through . . . connected car features" was a

"universal concern across all respondents" with "[s]even-in-ten respondents" citing

personal privacy concerns as the main reason they are less interested in [connected

car features like OnStar] if it enables UBI."[219]

809.　Also that year, LexisNexis Director of Telematics David Lukens told

Automotive TU that Driving Data suppliers would have to be meticulous about how

they approach the customer to get permission to analyze their Driving Data: "The

---

[218] *General Motors Drives Innovation With APIs to Perfect the Connected Car Ecosystem*, at 20:34, VALUEOPS BY BROADCOM (Dec. 28, 2016), *available at* https://www.youtube.com/watch?v=TGWB1hbHLMw.

[219] References to this study have been removed from online sources. The study was previously available through LexisNexis's website via a "download" button. *See 2017 Usage-Based Insurance (UBI) Research Results – OEM Edition*, LEXISNEXIS, *archived at* https://web.archive.org/web/20180203013511/http://solutions.lexisnexis.com/2017 ubistudy#form (last accessed Dec. 13, 2024). The "download" button is not operational on the archived version of the website.

consumer is always going to have to consent to their data being used this way," Lukens cautions. "I don't see a world in which I could pull your data without you knowing about it, use it to price your insurance and then present you with a quote. Ultimately, the consumer has to drive what the data can be used for."[220]

810.   In March 2017, Verisk gave a presentation at the Casual Actuarial Society's 2017 Ratemaking and Product Management Seminar titled "Navigating

---

[220] *Sharing behaviour information best for insurers and consumers*, TU AUTOMOTIVE (June 16, 2017), *archived at* https://web.archive.org/web/20170624145336/http://analysis.tu-auto.com/insurance-legal/sharing-behaviour-information-best-insures-and-consumers.

the Regulatory Environment Around Usage-Based Insurance," in which it identified "key issues" including "data privacy" and "drivers who choose not to opt in":[221]



811. In a January 2018 interview posted on Verisk's website, Avner Freiberger, general manager of the Verisk Innovation Center tasked with developing Verisk's telematics programs, responded to the question "**How does Verisk plan to handle privacy issues?**" by stating: "Privacy is critical. Everyone is concerned with Big Brother monitoring every move. Verisk requires two consents from consumers before sharing driving data: the first consent is to actually participate in the program

---

[221] *Presentation: Navigating the Regulatory Environment Around Usage-Based Insurance*, VERISK INSURANCE SOLUTIONS (March 29, 2017), *available at* https://www.casact.org/sites/default/files/presentation/rpm_2017_presentations_re g-1.pdf.

and to allow collection of data; the second consent is for sharing data or a score with insurers. This way, the consumer approves his or her data at the point of sale just before it exits our exchange."[222]

812.   In September 2019, on a panel of "thought leaders" in the automotive industry discussing the "future of automotive technology," Levendusky (Verisk) discussed the importance of informed consent from consumers, stating "I think there are a number of important themes here, one being trust . . . a component of that being transparency, and what Verisk is seeing with our OEM partners is it's really important for there to be informed consent coming from the consumer and transparency—they know what they are being asked to do and you know you're getting their permission. . . . I think that's the important part the trust and the transparency," (26:40) and stated "***we treat the data as if the consumer owns it, period***. And this is why we have very stringent practices around opt in, opt out, you know, consumer consent, the transparency of the consent, and we also manage the data as if its subject to all federal and state privacy rules and regulation. . . and we treat it all the time as if the consumer owns his or her data[.]" (31:11).[223]

---

[222] Avner Freiberger, *The Verisk Telematics Innovation Center: Advancing telematics*, VERISK.COM/INSURANCE (Jan. 2, 2018), *archived at* https://web.archive.org/web/20210618080502/https://www.verisk.com/insurance/visualize/the-verisk-innovation-center-advancing-telematics/.
[223] *SCRS Presents; The Future of Telematics, Technology, and Transportation and the Collision Industry*, SCRS COLLISION (Sept. 12, 2019), *available at* https://www.youtube.com/watch?v=eVetWkI4HWg.

813.  On Verisk's "Verisk Data Exchange" webpage as of at least November 2021, Verisk promised to "**Put trust, privacy, and compliance front and center**," stating "Customer driving data demands rigorous, purposeful, and transparent protections. This is core to Verisk's operations. We only provide data to authorized insurers with affirmative customer consent and employ industry best practices around data privacy and governance as well as regulatory compliance."[224]

814.  At the 2019 Annual Auto Insurance Report National Conference, sponsored by both LexisNexis and Verisk, Adam Hudson, Senior Director & General Manager, U.S. Connected Car for LexisNexis gave a presentation titled "Preparing for the Regulatory Challenge of Driving Data," the synopsis for which admitted that "any minute now, a new challenge will arise, as regulators, politicians, and the public start asking questions. Who owns the data? Is it safely stored? How can consumers access their data? How can they challenge its contents, or question its use?"[225]

---

[224] *The Verisk Data Exchange: Automakers and IoT Solution Provides*, VERISK.COM/INSURANCE (version as of Nov. 14, 2021), *available at* https://web.archive.org/web/20211114205436/https://www.verisk.com/insurance/capabilities/telematics/automakers-and-iot-solution-providers/.
[225] *2019 Program*, AUTO INSURANCE REPORT, *available at* https://web.archive.org/web/20210817134442/https://df9fd9b6ab64495ad759-f14ba961ae89374e6d5a8ee602c09059.ssl.cf5.rackcdn.com/1056.pdf.

**1:30 – 2:15 pm**     **Preparing for the Regulatory Challenge of Driving Data**

Adam Hudson, Senior Director & GM, US Connected Car, LexisNexis Risk Solutions

In the rush toward usage-based insurance and connected cars, an unprecedented amount of data is being collected, with far more to come. The most immediate challenges have been managing the data flow and figuring out how best to mine it for insights. But any minute now, a new challenge will arise, as regulators, politicians and the public start asking questions. Who owns the data? Is it safely stored? How can consumers access their data? How can they challenge its contents, or question its use? In this session, Adam Hudson of LexisNexis will discuss the nature of this evolving data set and place it in the context of similar data, such as credit, to assess how regulations might evolve. He will suggest what insurers can do to ensure that they responsibly manage this data, a job that is quickly becoming a major challenge.

## CONFERENCE SPEAKERS 2019

### Adam Hudson

Senior Director and General Manager, U.S. Connected Car,
LexisNexis Risk Solutions

Adam Hudson leads the U.S. Connected Car Team at LexisNexis Risk Solutions. The team is dedicated to developing and driving adoption of insurance telematics and OEM data and analytics solutions for the U.S. and automotive OEM market. In his prior role, Adam was the strategy and merger and acquisitions lead for the insurance data services business overseeing European expansion and expansion into the Chinese market.



Adam is a former management consulting and investment banking professional with more than a decade of experience in corporate strategy, finance and performance improvement gained at Alvarez & Marsal, Macquarie, Capgemini and Siemens. Adam has an MBA from Columbia Business School and a Bachelor of Science in industrial and systems engineering from Georgia Tech.

815.   In the program advertisements for the conference, LexisNexis ran an advertisement that stated, "More connected driving data exists today than ever before. *Let's get going.* New telematics and driving behavior data are steering the

insurance industry in a new direction. We're here to help…. ***It's time to steer the***

***conversation toward providing a clearer understanding of the consumer consent***



***management process***…."[226]

[226] *Id.*

816. And in a 2022 article, LexisNexis wrote, "[c]early customer trust and education must be front and cent[er] when it comes to when and how connected car data is shared with insurance providers. . . . LexisNexis Risk Solutions will focus on consumer consent for UBI derived from connected car data[.]"[227]

817. Indeed, three years after the original OnStar debacle, GM and other major automakers made a commitment to the Federal Trade Commission to provide "clear, meaningful and prominent" notice about the collection of driver behavior information, including why it is collected and "the types of entities with which the information may be shared." The automakers, including GM, adopted a set of principles governing the collection, use and dissemination of private driver information (the "Principles").

818. The Principles, articulated in a report entitled "Consumer Privacy Protection Principles: Privacy Principles for Vehicle Technologies and Services" issued on November 12, 2014 (and reviewed in 2018 and 2022),[228] set forth the

---

[227] *Data On and From the Car Set to Underpin Motor Insurance*, LEXISNEXIS (as of Nov. 20, 2022), *archived at* https://web.archive.org/web/20221120194334/https://insights.lexisnexis.com/auto motive/auto-insurance/data-on-and-from-the-car-set-to-underpin-motor-insurance/.
[228] *Available via* The Alliance for Automotive Innovation, Inc. *at* https://www.autosinnovate.org/innovation/Automotive%20Privacy/Consumer_Priv acy_Principlesfor_VehicleTechnologies_Services-03-21-19.pdf.

defining standards for the automotive industry's collection and use of private driver information in recognition of the importance of privacy to consumers.

819.   In the Principles, GM and other manufacturers acknowledged personal driving behavior as one of the categories of Covered Information;[229] that is, data whose handling and dissemination required especially stringent guardrails, precautions, and consents.

820.   The Principles also acknowledge the need to present the context in which Covered Information such as driving behavior, was presented and shared, and that impact that disclosing it would have on the consumer.

821.   The Principles include the following:

(1) Transparency: Requiring automobile manufacturers to provide owners and users with ready access to clear and meaningful notices about the manufacturer's collection, use and sharing of Covered Information;

(2) Choice: Providing owners and users with certain choices regarding the collection, use and sharing of their Covered Information;

(3) Respect for Context: Requiring members to commit to using and sharing the Covered Information in ways that are consistent with the context in which the information was collected, taking into account the likely impact on owners and users;

(4) Data Minimization, De-Identification and Retention: Committing members to collect Covered Information only as

---

[229] Covered Information included identifiable information that vehicles collect, generate, record or store, which is retrieved by the automaker, as well as personal subscription information including geolocation information, biometrics, and driver behavior information.

needed for legitimate business purposes, and not retaining this data that is no longer necessary;

(5) Data Security: Requiring members to implement reasonable measures to protect Covered Information against loss and unauthorized use;

(6) Integrity and Access: Requiring members to implement reasonable measures to maintain the accuracy of the Covered Information and to provide users and owners with reasonable means to review and correct personal subscription information; and

(7) Accountability: Requiring members to commit to taking reasonable steps to ensure that they and other entities that receive Covered Information adhere to the Principles.

822. It is now clear that those statements were merely lip service to assuage consumer and regulator concern. Instead of conforming its Driving Data sharing practices to its consumers' expectations or meaningfully disclosing those practices by applying the Principles described above, Defendants hid them because they knew consumers would disapprove. Instead, GM continued to deceptively design and market On-Star to ensure it could perpetuate its surreptitious scheme to collect and sell Driving Data.

IV. **To maximize the amount and quality of Driving Data collected from its consumers, GM upgraded its technology and launched Smart Driver.**

823. To maximize its ability to harvest Driving Data from its customers and their vehicles in line with its new business model, GM launched a series of coordinated changes to its vehicles and OnStar offerings, ultimately leading to its launch of the Smart Driver program in 2016.

824.    In 2010, GM became one of the first companies to connect the internet to the vehicle's navigation system. With GM's introduction of in-vehicle internet connectivity, GM gained the ability to instantly transmit Driving Data from vehicles to GM's data centers.

825.    From 2014 to 2015, GM rolled out 4G LTE connectivity for all vehicle models 2015 or newer.[230] The 4G rollout made GM the first full-line automaker to implement the feature across its entire vehicle portfolio and representing the "broadest and quickest deployment of the technology in history."[231] GM expected a "hefty profit"[232] and "rocket ship" growth as a result of these efforts,[233] which Chief Operating Officer Terry Inch called "a differentiator for GM with customers. . . . Going forward with 4G, the voice and data will be 10 times faster. We can do more,

---

[230] Sean Szymkowski, *GM's 'Adjacent Businesses' Represent $1.5 Billion Opportunity,* GM AUTHORITY (July 15, 2018) https://gmauthority.com/blog/2015/04/general-motors-expects-onstar-4g-lte-to-drive-profits-increase-innovation/; *Exclusive: GM to tap into connectivity, expand car sharing services – CEO*, REUTERS (Sept. 29, 2015) https://www.reuters.com/article/2015/09/28/us-gm-ceo-idUSKCN0RS2K420150928/.

[231] *Id.*

[232] Sean Szymkowski, *GM's 'Adjacent Businesses' Represent $1.5 Billion Opportunity,* GM AUTHORITY (July 15, 2018) https://gmauthority.com/blog/2015/04/general-motors-expects-onstar-4g-lte-to-drive-profits-increase-innovation/.

[233] Mark Phelan, *Automakers hit the gas on telematics*, LANSING STATE JOURNAL, (Apr. 13, 2014).

faster."[234] Although OnStar was already valued as high as $9 billion, one Citi analyst noted "an under-appreciation of what OnStar is morphing into with 4G LTE[.]"[235]

826.   Around that same time, to ensure that customers subscribed to OnStar, and maintained that subscription and data connection, GM introduced an "OnStar Basic Plan" for GM drivers. Although GM typically required drivers to pay for OnStar subscriptions, GM began offering the new OnStar Basic Plan as a free, "complementary" service that was "included" with the vehicle purchase. The OnStar Basic Plan, which allowed drivers to access vehicle diagnostic reports, dealer maintenance notifications, and remote start/control, enabled GM to maintain a data connection with the vehicle for a minimum of five years.[236] This free, five-year version of OnStar ensured that vehicles model year 2015 or newer would continually transmit data to GM during this five-year term. As Sid Madamanchi, Senior Manager at GM stated in a 2017 presentation on the connected car ecosystem: "With every vehicle now coming out of the lot… you're able to talk to it, whether you have an OnStar subscription or not… two-three years ago, [] this feature was only available

---

[234] *Id.*
[235] Sean Szymkowski, *General Motors Expects OnStar 4g LTE to Drive Profits, Increase Innovation*, GM AUTHORITY (Apr. 19, 2015) https://gmauthority.com/blog/2015/04/general-motors-expects-onstar-4g-lte-to-drive-profits-increase-innovation/.
[236] *OnStar Basic Plan Info & Price*, GM AUTHORITY, https://gmauthority.com/blog/gm/general-motors-technology/onstar/onstar-plans-pricing/onstar-basic-plan-info-price/ (last accessed Nov. 24, 2024).

if you were a paid subscriber, now this is actually available free of cost to everyone because ***we want you to connect with us more than ever***…. Because of the constant data pipe that we have with these vehicles, our vehicles are constantly sending data to the back-office."[237]   As Gerard Connell, Director of Sales and Marketing for Global Connected Customer Experienced told Automotive News in 2018: "Really, the primary purpose of that basic plan is to make sure we know what's going on with the car."[238]

827.   Then, with a framework in place to maximize mass Driving Data collection, GM launched "OnStar Smart Driver."

828.   As part of the new, free "OnStar Basic Plan," GM promoted "OnStar Smart Driver" as a new service that "provided customers with information about their driving behavior[.]"

> What is OnStar Smart Driver? OnStar Smart Driver provides you insights on your driving behavior and can help you recognize driving improvement opportunities. You'll earn achievements, get valuable feedback with each trip, and access your driving data. OnStar Smart

---

[237] *General Motors Drives Innovation With APIs to Perfect the Connected Car Ecosystem*, at 10:30, ValueOps by Broadcom (Dec. 28, 2016), available at https://www.youtube.com/watch?v=TGWB1hbHLMw.
[238] Matt Posky, *GM Revamps OnStar: Take a Long Look in the Mirror*, GM Inside News (Apr. 30, 2018), available at https://www.gminsidenews.com/threads/gm-revamps-onstar-take-a-long-look-in-the-mirror.301014/?post_id=7289036#post-7289036.

Driver also gives you the opportunity to use Connected Teen Driver, which helps promote safe driving habits. . . .[239]

829.   GM framed Smart Driver as a "gamified" way for drivers to improve their driving and reduce depreciation of their vehicles, and promised to provide participants with a driving score to understand how their driving behavior compares to other drivers, monthly summaries, and opportunities to complete specific challenges and earn "achievements" or "badges."[240]

830.   Knowing its customers would reject the program outright if they knew GM's true plans for the Driving Data, GM concealed that OnStar Smart Driver was a core part of GM's strategic plan to collect, share and monetize a steady stream of Driving Data from consumers' cars.

831.   Indeed, GM has experience with customers rejecting such programs based upon the very same concerns customers raise now.  In 2011, GM opted not to begin a program that has many of the same features as the Smart Driver program[241] given the backlash it was already facing from consumers over GM spyware.

---

[239] *See Wyden-Markey Auto Privacy Letter* (July 26, 2024), available at https://www.wyden.senate.gov/imo/media/doc/wyden-markey_auto_privacy_letter_to_ftc.pdf.

[240] *See, e.g., Reading Into Your Chevrolet, Buick, GMC and Cadillac Smart Driver Score*, OnStar (Jan. 28, 2020), https://www.onstar.ca/en/tips/reading-into-your-smart- driver-score (addressing OnStar Smart Driver's operation in Canada, which largely mirrors its operation in U.S. vehicles).

[241] Kashmir Hill, *GM's Boneheaded Privacy Mistake With OnStar*, FORBES (Sept. 26, 2011) https://www.forbes.com/sites/kashmirhill/2011/09/26/gms-boneheaded-privacy-mistake-with-onstar/.

832. After some time passed from GM's botched attempt to previously collect and monetize driving, GM surreptitiously began to monetize Driving Data using Smart Driver.

833. Using GM's pre-installed, in-vehicle telematics equipment, GM used Smart Driver as a means to intercept extensive, highly private Driving Data reflecting consumers' driving behavior and their location from a vehicle's many sensors and on-board computer, including, for each trip, every instance of "hard braking," "hard acceleration," driving without a seatbelt, driving over 80mph, and "late night driving" (defined as driving between 12 a.m. and 4 a.m.).

834. GM collected this Driving Data at every ignition cycle and transmitted it from vehicles to GM's servers, much of it in "in real time," using the car's cellular network.[242]

835. GM intentionally marketed and described Smart Driver always in terms that suggested it was a tool purely for the consumers' benefit. For example, in an archived webpage explaining "How It Works," GM told consumers that OnStar would "provide you with information on driving events" to allow "you to learn to drive smarter and get more out of your vehicle":[243]

---

[242] *GM's Letter Response to Senate Inquiry* (Dec. 21, 2023), available at https://interactive.wthr.com/pdfs/automakers-response-to-markey.pdf.

[243] *Explore the advantages of OnStar Smart Driver*, ONSTAR.COM, (as of Sept. 9, 2016), https://web.archive.org/web/20160909120843/https://www.onstar.com/us/en/services/vehiclemanager/smart-driver.html.

**How It Works**

**1** **Enroll**
Begin your OnStar Smart Driver experience today.

**2** **Drive**
OnStar will then begin to provide you with information on driving events, including.

    Hard Braking instances and where they took place
    Hard Acceleration instances and where they took place
    Distance Driven
    Late Night Driving (driving between 12am and 4am)

Plus, average miles per gallon, miles per hour, speed over 80 MPH (on select vehicles) and total idle time

**3** **Enjoy**
Use what you learn to drive smarter and get more out of your vehicle. Your driving information will also be compiled into your monthly OnStar Smart Driver Report.

836.   In an archived version of Smart Driver's "Help & Support" page, GM told consumers that Smart Driver would provide them information about their driving behavior "to help maximize their vehicles' overall performance, reduce vehicle wear and tear, enhance fuel efficiency and help customers become better drivers."[244]

837.   Unless customers "separately" activated an "insurance discounts eligibility" feature, GM also never disclosed to customers that their Smart Driver Driving Data was being disclosed to third parties, including insurers. Even then, GM promised that their information would only be shared *anonymously*, and *only* by GM:

---

[244] *Reading Into Your OnStar Smart Driver Score*, ONSTAR (Nov. 30, 2016) archived at
https://web.archive.org/web/20170328075702/http:/www.experienceonstar.com:80
/view/reading-into-your-smart-driver-score.

The Insurance Discounts Eligibility Feature helps you find financial rewards for driving smart. Without sharing your personal information or vehicle location, we send your OnStar Smart Driver data to participating insurance companies to see if you are eligible for a discount off of their standard insurance rates. If eligible, you can then choose to take advantage of discounted insurance rate offers made available to you, giving you a simple, discrete way to reward yourself for driving smart. As part of OnStar Smart Driver, this feature comes at no cost to you!

Here's How it Works…

We will build a 90-day sample of your driving behavior, remove all personal information from it, and then send it to participating insurance companies. Participating insurance companies will tell us whether the de-identified data qualifies for a discount off their standard rate, and we will communicate that message to you. Select the offers that interest you and you will be taken to the insurance company's website where you can identify yourself to claim the offer. After your first 90-day assessment, we will check again for new offers twice a year and relay those to you.

838. Now difficult to find publicly, archived versions of GM's marketing and webpages for Smart Driver emphasized that the program allowed customers to check for insurance discounts "without sharing your personal information" and only

if they "separately enroll[ed] in the Insurance Discount Eligibility potion of the program:"[245]



839.    GM repeatedly described the Driving Data-sharing component of Smart Driver as an "optional feature" that would nonetheless keep drivers' information "anonymous."[246] "Once you enroll, you can separately decide if you would like to anonymously check for insurance discounts," GM promised in one webpage

---

[245] *OnStar Help & Support: OnStar Smart Driver*, ONSTAR.COM, (as of Dec. 23, 2016), https://web.archive.org/web/20161223204856/https://www.onstar.com/us/en/help-support/onstar-smart-driver.html; *see also MyBuick App Helps Enhance Your Driving Skills*, WRIGHT CHEVROLET BUICK GMC, https://www.wrightchevroletbuickgmc.com/mybuick-app-helps-enhance-driving-skills-blog (last accessed Nov. 25, 2024) ("you can also take advantage of the Insurance Discounts Eligibility program").
[246] *10 Things Every Smart Driver Does*, ONSTAR.COM (June 16, 2016), archived at https://web.archive.org/web/20160906121028/http://www.experienceonstar.com/view/tips-for-every-smart-driver.

discussing the "advantages" of Smart Driver, "giving you a private, risk-free option to find rewards for driving smart."[247] "OnStar has an optional feature that helps you find . . . saving opportunities without revealing your identity. . . . To enroll in this optional Insurance Discounts Eligibility feature, look for the link on your OnStar Smart Driver activity page online." GM wrote in a webpage titled Reading Into Your OnStar Smart Driver Score: "*You're in control*."[248]

840. GM misrepresented that any Driving Data collected would be kept completely private and sent "only" to the customer. For example, in a January 5, 2015, article titled "OnStar-equipped Cars Can Track Your Driving, Should We Panic About Big Brother?" a MotorTrend reporter explained:[249]

> OnStar's most recent press release announces the option to have the programming track your driving habits, and then send you an assessment which you can then forward on to your insurance company (currently only Progressive Insurance), in return for an insurance discount, assuming that your driving report is a positive one.

---

[247] *Explore the advantages of Smart Driver*, ONSTAR.COM (version as of Sept. 9, 2016), archived at https://web.archive.org/web/20160909120843/https:/www.onstar.com/us/en/servic es/vehiclemanager/smart-driver.html.

[248] *Reading Into Your OnStar Smart Driver Score*, ONSTAR (Nov. 30, 2016) archived at https://web.archive.org/web/20170328075702/http:/www.experienceonstar.com:80 /view/reading-into-your-smart-driver-score (emphasis added).

[249] Elana Scherr, *OnStar-equipped Cars Can Track Your Driving, Should We Panic About Big Brother?*, HOT ROD MAGAZINE (Jan. 5, 2015) https://www.hotrod.com/news/onstar-equipped-cars-can-track-your-driving-should-we-panic-about-big-brother/.

On first glance, it's like finding out that your best friend has agreed to give daily reports about your activities to your mom, but the OnStar rep we spoke with assured us that driver privacy is incredibly important, and that nothing gets recorded or shared without explicit permission from the OnStar subscriber. "**All the information is kept anonymously by OnStar, and the driving assessment is sent automatically only to the subscriber, who can then choose to share it with the insurance company**," he told us.

841. In various promotional pieces and blogs, GM likewise pushed the narrative that anonymous Driving Data sharing for insurer use required active participation in a separate program.[250]

842. GM disseminated video ads with that same message reflecting maximum consumer access, transparency, and—most importantly—control.[251]

---

[250] *Blog: MyBuick App Helps Enhance Your Driving Skills*, WRIGHT CHEVROLET BUICK GMC, available at https://www.wrightchevroletbuickgmc.com/mybuick-app-helps-enhance-driving-skills-blog (last accessed Nov. 27, 2024) ("Along with enrolling in this service, you can also take advantage of the Insurance Discounts Eligibility program. This is a risk-free way to see if your positive driving behaviors can help you get discounts on your insurance."); Sean Szymkowski, *Buick Rolls Out OnStar Smart Driver Program*, GM AUTHORITY (Dec. 13, 2016), available at https://gmauthority.com/blog/2016/12/buick-rolls-out-onstar-smart-driver-program/ ("Customers can also enroll in Insurance Discounts Eligibility, which can help reveal discounts due to driving behavior. It does not share personal details with insurance companies, though.").

[251] *See Buick Smart Driver Ad*, CAR NEWS (Dec. 13, 2016), available at https://www.youtube.com/watch?v=8YSoiztRfKI.



843.   Unbeknownst to consumers, GM collected and sold consumers'
Driving Data to Verisk and LexisNexis for, among other things, the development of
usage-based insurance "data exchanges." Together, Defendants amassed millions of
consumers' highly private, personal information, generated substantial profit, and
then licensed that information to an unknown number of unknown third parties.

**V.    GM used Smart Driver to surreptitiously and continuously collect
consumers' Driving Data.**

844.   GM used vehicle components to harvest granular Driving Data by
equipping vehicles with components that detect and record substantial amounts of
data concerning vehicle operation and driver behavior, and then transmitting that
information—both while the vehicle is in operation and after a vehicle trip is
completed.

845. GM touts the data processing and transmission capacity of its vehicles. GM boasts that its "Vehicle Intelligence Platform," launched in 2020, "powers an electronic system capable of managing up to 4.5 *terabytes* of data processing power per hour," enabling "more rapid communications within the vehicle itself and to outside sources . . . ."[252]

846. "The proliferation of sensors on automobiles . . . has made them prodigious data-collection hubs."[253] GM vehicles are equipped with a "swarm of sensors" throughout. These sensors detect and transmit a host of data related to the vehicle use, performance, and driving conditions including vehicle speed, vehicle acceleration and deceleration, collision detection, seatbelt usage, road conditions, information from vehicle cameras, and more.[254]

---

[252] GM's Vehicle Intelligence Platform Enables Adoption of Future Technologies, *available at* https://www.gm.com/stories/digital-vehicle-platform (emphasis added).

[253] Frank Bajak, '*Wiretaps on wheels': How your car is collecting and selling your personal data*, Los Angeles Times (Sept. 6, 2023), https://www.latimes.com/business/story/2023-09-06/carmakers-privacy-data-collection-drivers.

[254] Cisco, "The Smart and Connected Vehicle and he Internet of Things," *available at* chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://tf.nist.gov/seminars/WSTS/PDFs/1-0_Cisco_FBonomi_ConnectedVehicles.pdf.



*Conceptual illustration of vehicle sensors (not specific to GM vehicles)*

847.   As many as 200-plus sensors are connected to internal processing units in the vehicle (essentially mini-computers referred to as "electronic control units" or ECUs).[255]   ECUs are in turn connected to a central processing unit or central gateway.

848.   Gateways allow different systems to "speak" to each other. As illustrated below, they "connect different [electronic control units], translating data from one protocol to another before forwarding it on" to another ECU. As depicted

---

[255] IEEE.org, "5 Ways Your Car Has Become A Computer on Wheels," (Feb. 28, 2024) *available at* https://transmitter.ieee.org/5-ways-your-car-has-become-a-computer-on-wheels/

below, gateways send data to a vehicle's telematics control unit.[256] The telematics control unit ("TCU") sends Driving Data out of the vehicle.



*Conceptual illustration of vehicle gateway connections (not specific to GM vehicles)*

849. In GM vehicles equipped with OnStar, raw data detected by vehicle sensors is processed by vehicle electronic control units and transmitted through gateways to the TCU.

850. The following image depicts the TCU (labeled "OnStar") installed in a GM vehicle's internal electronic communications network, allowing the TCU to receive Driving Data from various vehicle control systems and to transmit Driving Data out of the vehicle.[257]

---

[256] Texas Instruments, "Automotive Gateways: the Bridge between Communication Domains," *available at* https://www.ti.com/document-viewer/lit/html/SSZT949.
[257] Automatic Transmission Rebuilders Association, "A Closer Look at Vehicle Data Communications," *available at*



*Depiction of OnStar Unit's Placement in GM Vehicles' Electronic*

*Communications Network*

851.  GM uses the TCU to transmit detailed driving behavior and geolocation information to itself both during routine vehicle operation and upon the completion of vehicle trips, all unbeknownst to drivers.

852.  Specifically, the TCU transmits the detailed driving behavior and geolocation data received from GPS satellites to GM/OnStar through the vehicle's cellular network connection.

---

https://atracom.blob.core.windows.net/gears/2010/2010-04/2010_4_22.pdf. Note that, at the time this image was prepared (2010), only some GM vehicles were equipped with a TCU.

853.  As explained by GM, the OnStar "service" works by "leverag[ing] cellular networks for connectivity"[258] and GM "partners with multiple wireless carriers to provide coverage across the nation."[259]

854.  Upon information and belief, GM, through the TCU, transmits certain Driving Data to itself in real time—for example, data regarding vehicle location and speed.

855.  Upon information and belief, GM, through the TCU, accesses stored Driving Data and transmits it to itself after each trip or on other periodic bases—for example, average speed during a trip, or number of miles driven during a trip.

856.  Some or all of the Driving Data harvested by GM from vehicle components through the TCU, whether harvested in real-time or by accessing temporarily stored information, is tied to individual drivers and vehicles, and is not anonymized.

857.  Even Driving Data that would appear to be anonymized is still connected to GPS geolocation data and/or to the vehicle and is thus easily linked to individuals.

---

[258] *3G Network Sunset FAQ*, https://www.onstar.com/support/faq/3g-network-sunset (last accessed on Dec. 3, 2024).

[259] *Help: OnStar Coverage*, https://www.onstar.com/support/faq/coverage (last accessed Dec. 3, 2024).

**VI. Plaintiffs did not consent to Defendants' interception, sale, or use of their Driving Data.**

858. GM shared consumers' Driving Data with Verisk and LexisNexis without consumers' consent, a practice that Senators Wyden and Markey condemned as a "flagrant abuse of[] customers' privacy" for which both GM and senior company officials responsible should be held responsible.[260]

859. GM contends that it "expressly disclosed" and consumers consented to Defendants' collection and sale of their Driving Data to Verisk and LexisNexis pursuant to the OnStar Terms. However, a document titled "OnStar Terms" does not exist. Instead, the terms GM cites are an amalgamation of two documents on two different websites, neither of which have OnStar in the title—specifically, the "User Terms for Connected Vehicle Services" (the "User Terms") and the "U.S. Connected Services Privacy Statement" (the "Privacy Statement").

860. These byzantine, multi-platform, cross-referential set of agreements are virtually impossible for a reasonable consumer to comprehend. At all relevant times, GM knew that these documents rendered its data privacy controls difficult to find and even more difficult to understand. Because of this, starting in mid-2024, GM "rework[ed] its privacy practices and controls to make them easier to find and

---

[260] *Wyden-Markey Auto Privacy Letter* (July 26, 2024), available at https://www.wyden.senate.gov/imo/media/doc/wyden-markey_auto_privacy_letter_to_ftc.pdf.

understand"[261] Specifically, led by its new Chief Trust and Privacy Officer, Alisa Bergman, GM announced it had consolidated its web of statements in order to increase transparency and provide easier access to privacy controls.[262] Ms. Bergman stated that GM was committed to "make its practices more accessible," and that GM had reorganized its privacy statement to "make the sections on connected data easier to find" and provide "clear explanations" on how it handles data like "geolocation, driving behavior, and camera information," and that it had "rewritten" parts of the statement "with simpler, more consistent language."[263] GM further announced it had added new sections explaining tools for customers to "limit access" or delete their data.[264] GM, working with the Future of Privacy Forum, represented that these changes were intended to help drivers make thoughtful decisions about uses of their

---

[261] *An update on our Privacy Statement*, GM News (Sept. 25, 2024),.

[262] *GM Simplifies Privacy Practices to Enhance Transparency and Customer Control*, EMobility+ (Sept. 26, 2024), https://emobilityplus.com/2024/09/26/gm-simplifies-privacy-practices-to-enhance-transparency-and-customer-control/.

[263] *As GM responds to outcry, federal regulator looking at car data privacy*, The Detroit News (May 23, 2024), https://www.detroitnews.com/search/?q=After+GM+scandal%2C+FTC+looking+at+car+data+privacy; *see also* William Gavin, *GM's 'crappy' privacy statement is getting some changes after backlash and a lawsuit*, Quartz (Sept. 29, 2024), https://qz.com/gm-privacy-concern-sale-consumer-data-insurance-broker-1851657340.

[264] Jonathan Lopez, *How to Opt Out of GM Sharing Your Driving Data With Insurance Companies*, GM Authority (Mar. 20, 2024), https://gmauthority.com/blog/2024/03/how-to-opt-out-of-gm-sharing-your-driving-data-with-insurance-companies/.

personal information.[265] As these re-writes underscore, GM knew it did not reasonably inform consumers such that that they could provide consent before sharing customers' Driving Data.

## A. GM's OnStar Terms do not ask for consumers' consent.

861. At all relevant times, neither document that comprises the OnStar Terms addressed, disclosed, or authorized GM's surreptitious collection and sale of consumers' Driving Data. Nowhere, in either document does GM disclose to drivers that their Driving Data will be sold to LexisNexis, Verisk, or third-party risk assessors or data aggregation companies. Nowhere, in either document, does GM disclose that Verisk and LexisNexis would then manipulate the Driving Data to create profiles and "scores" for drivers. Nowhere, in either document, does GM disclose that Verisk and LexisNexis would sell consumers' Driving Data and driving scores to other third parties.

862. First, the User Terms do not cover or purport to address GM and third parties' surreptitious collection and sale of Driving Data. According to the User Terms, "[t]hey apply to *your use* of the connected vehicle services we make available to You[.]"[266] Nothing in the User Terms refers to GM's use of connected vehicle

---

[265] *An update on our Privacy Statement*, GM News (Sept. 25, 2024), https://news.gm.com/home.detail.html/Pages/news/us/en/2024/sep/0925-privacy.html.

[266] User Terms for Connected Vehicle Services, May 1, 2018 (emphasis added).

services. Indeed, the User Terms do not address GM's data sharing practices, other than to reference the "Privacy Statement."

863.    But the Privacy Statement also does not disclose GM's collection and sale of Driving Data to Verisk, LexisNexis, or any other third parties. In one section, titled "How we may share your information," GM states that it "may share" information with certain "**Third-Party Business Relationships**" "where you have elected to receive a service from them and/or authorized them to request data from GM." In 2018, GM quietly amended this Privacy Statement to add the "/or," without explanation, suggesting an attempt to further conceal the nature of GM's Driving Data-sharing practices. Regardless, consumers did not consent to have GM collect their Driving Data for purposes of providing it to Verisk and LexisNexis, and never elected to receive a service from Verisk and LexisNexis (let alone a service whereby LexisNexis or Verisk compiled their Driving Data for resale) nor did consumers authorize them to request Driving Data from GM.

864.    Thus, even if GM drivers consented to the User Terms and Privacy Statement, they unequivocally did *not* consent to the collection of their Driving Data. GM knows this and has repeatedly admitted it. For example, in its Smart Driver FAQ page, as of September 25, 2023, GM includes the follow Q&A, which is a concession

that the OnStar Terms were *not* sufficient to get consumers' "express consent" to "collect driving behavior data":[267]

**What information does Smart Driver capture?**

Upon the Member's consent and enrollment in Smart Driver, depending on vehicle capability, the vehicle will collect specific driving behavior data, including hard braking events, hard acceleration events, time spent idle, speeds over 80 miles per hour, when a trip occurs and the number of miles driven.

**Why do Members have to enroll separately in Smart Driver from their basic OnStar services?**

We do not collect driving behavior data on our Members unless they consent to us doing so.

**How does OnStar protect Members' personally identifiable information from being shared?**

OnStar takes the security of its Members' data very seriously. We use technical, administrative and physical safeguards designed to help protect Members' information from loss, misuse and unauthorized access, disclosure, alteration, destruction or theft. OnStar doesn't share personally identifiable information with an insurance company without your express consent.

---

[267] *Help: Smart Driver*, OnStar, *made available via* https://web.archive.org/web/20230925021817/https://www.onstar.com/support/faq/smart-driver (archived Sept. 25, 2023).

865.     After *the New York Times* reported that GM was in fact sharing customer data without their express consent, GM removed the statement that "OnStar doesn't share personally identifiable information with an insurance company without your express consent" from its website.

866.     In other words, GM expressly represented that it would not collect Driving Data at all unless consumers enrolled separately in Smart Driver. Even if a consumer enrolled in Smart Driver, GM also represented that it would use technical, administrative, and physical safeguards to protect consumers' Driving Data and *specifically* represented that it would not share personally identifiable information without consumers' express consent.

867.     GM also knows that a driver's consent to the OnStar Terms did *not* constitute consent to the sharing of their Driving Data with Verisk and LexisNexis.

868.     In 2015, back when GM first announced its "first-of-its-kind" partnership with Verisk,[268] GM was clear that the OnStar Terms did not cover, and did not seek its customers' informed consent for GM's sharing of Driving Data with

---

[268] *Verisk Insurance Solutions Announces GM as Inaugural Auto Manufacturer to Join Telematics Data Exchange*, VERISK ANALYTICS (Sept. 2, 2015), https://web.archive.org/web/20160803203730/http://www.verisk.com/press-releases-verisk/2015/september-2015/verisk-insurance-solutions-announces-gm-as-inaugural-auto-manufacturer-to-join-telematics-data-exchange.html.

Verisk and insurers. According to a report by Repairer Driven News, GM stated that it would issue a "separate terms of use" to address that offering:[269]

> General Motors will let OnStar users opt-in to share driving data with insurance risk data provider Verisk Analytics . . . according to Deana Alicea, GM connected customer experience spokeswoman. . . .

> **GM customers' privacy**. . . . GM will be clear with customers about what data is being released under the new partnership, Alicea said. OnStar customers will have to opt-in to a separate terms of use beyond the standard OnStar terms before GM will share anything with Verisk.

> "Our customers are first and foremost," she said.

> *She said the Verisk terms of use will be specific, and not include generic concepts which could be interpreted as permission for insurers or Verisk to collect anything you did with OnStar or your vehicle.*

> "You know exactly what you're opting in to," she said.

869. But contrary to GM's representations, GM never issued a "Verisk terms of use" nor did GM issue terms specific to LexisNexis. And while GM's disclosures have varied over time, at no point have they materially diverged from those discussed above. In short, GM knew from its initial roll out of On-Star that its Driving Data collection and sharing arrangements with Verisk and LexisNexis did not implicate, arise out of, or relate to the OnStar Terms.

---

[269] *With eye toward usage-based insurance, GM to allow OnStar users to share data with Verisk*, REPAIRER DRIVEN NEWS (Sept. 4, 2015), https://www.repairerdrivennews.com/2015/09/04/with-eye-towards-usage-based-insurance-gm-to-allow-onstar-users-to-share-data-with-verisk/.

870. Acknowledging this, GM points to "an additional Smart Drive and Notifications Opt-In," which, according to GM, "generally explained the Smart Driver program and the type of information that is collected from the vehicle."[270] But even if consumers ever saw this "Opt-In," (explained below), GM never disclosed, and never asked for consumer consent, for GM to share customers' Driving Data with Verisk and LexisNexis or any other third party.

**B.      GM's Smart Driver Terms do not authorize the interception or sale of Plaintiffs' Driving Data to third parties.**

871. According to GM, drivers of GM vehicles could "sign up" for Smart Driver at the dealership, through their Mobile App, or online. Although GM discontinued Smart Driver earlier this year, rendering the "sign up" process no longer easily accessible, GM provided Senators Markey and Wyden with a copy of a "Smart Driver and Notifications Opt-In" that GM apparently contends would have been presented to consumers as part of the car buying process. But like the User Terms and Privacy Policy, the language in the "Opt In" does not seek consumers' consent for GM to collect and share their Driving Data with third parties like Verisk and LexisNexis:

---

[270] Joint Preliminary Report and Discovery Plan, Doc. 84 at 7.

**One-click Enroll into OnStar Smart Driver and Notifications**

<u>OnStar Smart Driver†</u>

Improve your ownership experience with access to OnStar Smart Driver.

What is OnStar Smart Driver? OnStar Smart Driver provides you insights on your driving behavior and can help you recognize driving improvement opportunities. You'll earn achievements, get valuable feedback with each trip, and access your driving data. OnStar Smart Driver also gives you the opportunity to use Connected Teen Driver, which helps promote safe driving habits.

We'll use information we collect about where and how you operate your vehicle, such as your vehicle's location, routes driven, driving schedule, fuel or charging levels, fuel economy, battery status, overall vehicle health, and driving behavior, such as hard braking, hard acceleration, tailgating, vehicle speed, late night driving, driver and passenger seatbelt status, and driver attention. Smart Driver "hard braking" and "hard acceleration" events are identified when measured vehicle speed changes rapidly, regardless of the cause of the rapid speed change. We may also use alerts from your vehicle, such as forward collision and traction control.

After enrollment, you can opt out of OnStar Smart Driver at any time by clicking "unenroll" in OnStar Smart Driver in your myGMC mobile app.

**Notifications**

*Excerpt; full screenshots below in Section VII(C)(2).*

What is OnStar Smart Driver? OnStar Smart Driver provides you insights on your driving behavior and can help you recognize driving improvement opportunities. You'll earn achievements, get valuable feedback with each trip, and access your driving data. OnStar Smart Driver also gives you the opportunity to use Connected Teen Driver, which helps promote safe driving habits. . . .

We'll use information we collect about where and how you operate your vehicle, such as your vehicle's location, routes driven, driving schedule, fuel or charging levels, fuel economy, battery status, overall vehicle health, and driving behavior, such as hard braking, hard acceleration, tailgating, vehicle speed, late night driving, driver and passenger seatbelt status, and driver attention. Smart Driver "hard braking" and "hard acceleration" events are identified when measured vehicle speed changes rapidly, regardless of the cause of the rapid speed change. We may also use alerts from your vehicle, such as forward collision and traction control.

## VII. GM structured OnStar and Smart Driver to force consumer participation.

872.   In a July 2024 letter urging the FTC to investigate GM, Senators Wyden and Markey exposed that GM not only "failed to obtain informed consent from consumers before sharing their data," but also "used manipulative design techniques, known as dark patterns, to coerce consumers into enrolling in its Smart Driver program."[271]

873.   "Dark patterns," is a term "used to describe design practices that trick or manipulate users into making choices they would not otherwise have made and that may cause harm."[272]

874.   "Tricking consumers into sharing data" is, according to the FTC, a "common dark pattern tactic."[273] As a 2022 FTC Staff Report explained: "These dark patterns are often presented as giving consumers choices about privacy settings or sharing data but are designed to intentionally steer consumers toward the option

---

[271] *Wyden-Markey Auto Privacy Letter* (July 26, 2024), available at https://www.wyden.senate.gov/imo/media/doc/wyden-markey_auto_privacy_letter_to_ftc.pdf.

[272] Staff Report, *Bringing Dark Patterns to Light*, FEDERAL TRADE COMMISSION (Sept. 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14.2022%20-%20FINAL.pdf.

[273] *FTC Report Shows Rise in Sophisticated Dark Patterns Designed to Trick and Trap Consumers*, FEDERAL TRADE COMMISSION (Sept. 15, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/09/ftc-report-shows-rise-sophisticated-dark-patterns-designed-trick-trap-consumers.

that gives away the most personal information."[274]  Common examples of "tricking consumers into sharing data" include:

> a. "asking users to give consent but not informing them in a clear, understandable way what they are agreeing to share,"
>
> b. "telling users the site is collecting their information for one purpose but then sharing it with others or using it for other purposes," and
>
> c. "including default settings that maximize data collection and making it difficult for users to find and change them[.]"[275]

875. As the FTC explained: "[u]nfair commercial practices" like dark patterns "are rarely presented in isolation. . . .The combination of several dark patterns is even more effective at influencing consumers' choices, and complicates enforcement, which is often based on a practice-by-practice investigation."[276]

---

[274] *Id.*

[275] *FTC Report Shows Rise in Sophisticated Dark Patterns Designed to Trick and Trap Consumers*, FEDERAL TRADE COMMISSION (Sept. 15, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/09/ftc-report-shows-rise-sophisticated-dark-patterns-designed-trick-trap-consumers.

[276] *See, e.g.,* European Commission, Directorate-General for Justice and Consumers, Lupiáñez-Villanueva, F., Boluda, A., Bogliacino, F., et al., *Behavioural study on unfair commercial practices in the digital environment: dark patterns and manipulative personalisation: final report* (May 2022), at 19, available at https://data.europa.eu/doi/10.2838/ 859030.

876. Described below, GM employed each of these dark patterns, combined with others, to coerce customer enrollment in Smart Driver.

**A.  GM told customers that OnStar was included with their purchase or made them pay for it.**

877. GM markets OnStar as a subscription-based service that is "provided as part of the sale or lease of certain vehicles."[277] During the sales process, using various abusive subscription practices, GM induces consumers to activate OnStar in their vehicles by convincing them that OnStar "comes with" their purchase of the vehicle Starting in 2015 GM instituted a "free" Basic Plan for all OnStar vehicles model year 2014 or newer that lasted five years.

878. In 2018, GM rebranded the free OnStar Basic Plan as the "Connected Access" plan, available for vehicles model year 2018 or newer. As part of the rebrand, GM added "Smart Driver" to the plan and doubled the lifespan of the free plan—and GM's data connection to the vehicle—from five years to ten years.[278]

---

[277] *General Motors Company 2010 Annual Report*, available at https://investors.gm.com/static-files/9f84c5ad-d270-4658-94b1-01ae8261173d.
[278] *OnStar Basic Plan Info & Price*, GM AUTHORITY, https://gmauthority.com/blog/gm/general-motors-technology/onstar/onstar-plans-pricing/onstar-basic-plan-info-price/ (last accessed Nov. 24, 2024).

879.   A GM plan comparison brochure, found in an archived version of GM's OnStar website from January 2023, shows that GM told consumers that "OnStar Smart Drive" was "included within vehicle purchase:"[279]



880.   GM confused consumers by *also* offering, at the time of purchase, "free trials" of the premium, paid plains. Once these free trials (commonly 1 month, 3 months, or 6 months) expired, and unbeknownst to consumers, GM would then automatically enroll those consumers in the "free" Basic Plan or Connected Access

---

[279]*Plans Pricing Modernized* , ONSTAR.COM, archived at https://web.archive.org/web/20230104180930mp_/https://www.onstar.com/content/dam/onstar/na/us/en/index/pricing/02-pdfs/planspricing-modernized-v8.pdf (last accessed Nov. 24, 2024).

Plan, and thus continue to collect their Driving Data for the remainder of the five or ten year period without their knowledge or consent.[280]

881. Then, starting in 2022, GM forced consumers to purchase OnStar. For example, in June of 2022, GM began including three-year pre-paid OnStar services as standard mandatory "options" in Buicks, Cadillacs, and GMCs for $1,500, which was included in the Manufacturer's Suggested Retail Price (MSRP); drivers did not have a choice as to whether their vehicle would have OnStar services.[281] By way of example, a sticker for a 2022 GMC lists the OnStar service:[282]

---

[280] *See, e.g.,* https://web.archive.org/web/20181110051236/https://www.chevrolet.com/electric/volt-plug-in-hybrid.

[281] As the Detroit Free Press reported in August 2022, the automaker tacked $1,500 onto many new vehicles' prices to cover the connectivity package. Although listed under "options", GM confirmed the package was not optional, but was actually standard equipment. "Providing this connectivity standard is more convenient for our customers and provides a more seamless onboarding experience," said GM spokesman Patrick Sullivan in an email to the Free Press in 2022. "The package has been offered as optional in the past, but going forward, it is standard on all Buick and GMCs." *See* Jamie L. LaReau, *GM calls $1,500 Onstar plan optional— but new car buyers are being forced into it*, DETROIT FREE PRESS (Aug. 9, 2022), *available at*: https://web.archive.org/web/20240402004133/https://www.freep.com/story/money/cars/general-motors/2022/08/09/gm-onstar-connected-services-plan-cost-option/10246244002/; *see also* Jamie L. LaReau, *GM faces 2nd lawsuit over driver data collection without consent*, DETROIT FREE PRESS (March 29, 2024), *available at*: https://web.archive.org/web/20240416034400. /https://www.freep.com/story/money/cars/general-motors/2024/03/29/gm-lawsuit-driver-data-collection-without-consent/73143189007/.

[282] *Available at* https://monroneylabels.com/cars/12536884-2022-gmc-sierra-1500.



882. Likewise, in July 2022, GM announced that a 3-year OnStar & Connected Services Plan was mandatory for purchases of new Buick, GMC, and Cadillac models, and $1,500 would be built into the price of the car "whether the customer activates OnStar" or not.[283] GM spokesperson Kelly Cusinato told the Detroit Free Press that the OnStar upgrade "is not removable as it is delivered from the factory with it included" and if the customer declined the activate OnStar, they would still be charged $1,500.[284] A dealership owner told the Detroit Free Press:

---

[283] Jamie L. LaReau, *GM calls $1,500 Onstar plan optional—but new car buyers are being forced into it*, DETROIT FREE PRESS (Aug. 9, 2022), *available at*: https://web.archive.org/web/20240402004133/https://www.freep.com/story/money/cars/general-motors/2022/08/09/gm-onstar-connected-services-plan-cost-option/10246244002/.

[284] *Id.*

"We've had a couple people say, 'I don't want this.' But it's a forced option."[285]

Another dealership noted: "We've had people very confused about it asking why they have to pay $1,500 for something that says it's an option," Lynn Thompson, president of Thompson Buick GMC Cadillac in Springfield, Missouri, told the Free Press. "We say, 'We're sorry, but we don't price the cars.' We wish they would put it as part of the car, having an option being standard is a problem for us. Don't put something as an option that's not an option." Likewise, in September 2022, GM announced that all 2023-model-year Chevy vehicles would come with a "Remote Access Plan" and that GM had baked the cost, $300, into the MSRP.[286]

883.    These deceptive marketing tactics were intended to induce drivers to permit GM to maintain a data connection with their vehicle so that GM could collect and harvest consumers' private information.

**B.    GM penalized dealership employees who failed to enroll consumers in OnStar.**

884.    GM mandated that its dealers activate OnStar for buyers and lessees of cars model year 2015 or newer. To ensure compliance with this mandate, GM imposed penalties for dealer employees that failed to activate OnStar via the

---

[285] *Id.*
[286] Jonathan Lopez, C*hevy Vehicles Get Standard Remote Access Plan, $300 Price Increase*, GM AUTHORITY (Sept. 2, 2022), https://gmauthority.com/blog/2022/09/chevy-vehicles-get-standard-remote-access-plan-300-price-increase/.

"onboarding process" at point of sale—and financial rewards for dealers that complied. As one news article reported, "[m]onetizing data is something many automakers are looking into and GM is right at the front of the pack. But that only works if a lot of people sign up for OnStar, so the company is sharing revenue with dealers who encourage customers to sign up."[287]

885. Likewise, dealership employees' pay was contingent on completing the onboarding process with the customer and convincing the customer to activate OnStar (and, as a result, the data connection between GM and the vehicle). As a result, dealership employees were incentivized to sign up as many customers as possible, clicking through screens and agreements without obtaining customer consent, and rushing through the process so that consumers were unable to review any terms that might be applicable to the program.[288] As a result, consumers nationwide were enrolled in OnStar, and Smart Driver, without their knowledge or consent.

---

[287] Matt Posky, *General Motors to Build Two Bolt-based Crossovers, Considers the Data-mining Business*, THE TRUTH ABOUT CARS (Nov. 15, 2017), https://www.thetruthaboutcars.com/2017/11/general-motors-building-two-bolt-based-crossovers/.

[288] *See* Kashmir Hill, *How G.M. Tricked Millions of Drivers Into Being Spied On (Including Me)*, NEW YORK TIMES (Apr. 23, 2024), https://www.nytimes.com/2024/04/23/technology/general-motors-spying-driver-data-consent.html ("At no point had these drivers been explicitly informed that this would happen, not even in the fine print, they said. New reporting reveals the cause: a misleading screen that these people would have briefly seen when they bought their cars—if their salesperson showed it to them.").

886.   As the *New York Times* first exposed in April, for many consumers, the

dealers never took consumers through the online enrollment process (where

consumers would have been presented with the OnStar Terms, discussed above) and

instead filled out the online enrollment for the customers, without their knowledge

or consent, because of the financial implications for dealers if customers "declined"

those services:

> According to G.M., our car was enrolled in Smart Driver when we
> bought it at a Chevrolet dealership in New York. . . . To find out how it
> happened, I called our dealership, a franchise of General Motors, and
> talked to the salesman who had sold us the car. He confirmed that he
> had enrolled us for OnStar, noting that his pay is docked if he fails to
> do so. He said that was a mandate from G.M., which sends the
> dealership a report card each month tracking the percentage of sign-
> ups. G.M. doesn't just want dealers selling cars; it wants them selling
> connected cars. . . .
>
> Our salesman described the enrollment as a three-stage process that he
> does every day. He selects yes to enroll a customer in OnStar, then yes
> for the customer to receive text messages, and then no to an insurance
> product that G.M. offers and that monitors how you drive your car.
> (This sounds similar to Smart Driver, but it is different.) He does this
> so often, he said, that it has become automatic—yes, yes, no—and that
> he always chooses no for the last one because that monitoring would be
> a nuisance for customers. . . .
>
> At my request [GM] provided the series of screens that dealers are
> instructed to show customers during the enrollment for OnStar and
> Smart Driver. . . . The flow of screens was almost exactly as my
> salesman described, except for the second one about receiving
> messages, which he said he always hits "yes" on. That screen wasn't
> just about accepting messages from G.M.: it also opted us into OnStar
> Smart Driver. It's a screen that my husband and I do not recall seeing—

presumably because our salesman filled it out for us as part of his standard procedure.[289]

887.  As a result, GM car buyers across the nation have reported that their Driving Data was collected by GM, LexisNexis, and Verisk even though they had never even heard of Smart Driver in the first place. "Many G.M. owners have reached out with similar accounts," Ms. Hill reported. For example: "Jenn Archer of Illinois bought a Chevy Trailblazer in April 2022. She didn't subscribe to OnStar and had never heard of Smart Driver, but last month discovered that LexisNexis had her Driving Data. 'I was furious,' she said." [290]

888.  Investigative reporting by GM-Trucks.com also found that "many GM vehicle owners have opted into Smart Driver without their consent."[291] In fact, one editor explained that his personal vehicles had the "Allow OnStar Smart Driver" toggled "on" "despite never opting to the feature."[292] According to the editor:

> When I opened the myGMC and myChevrolet app this week, I found not only was I enrolled in Smart Driver under my business account, which has active OnStar subscriptions in place, but also in my personal account, which does not have an OnStar Subscription active. All three

---

[289] *Id.*

[290] Kashmir Hill, *How G.M. Tricked Millions of Drivers Into Being Spied On (Including Me)*, NYTIMES.COM (Apr. 25, 2024).

[291] Zane Merva, *In Stunning Reversal, GM Stops Sharing Vehicle Driving Data With Brokers*, GM-TRUCKS.COM (Mar. 22, 2024), https://www.gm-trucks.com/in-stunning-reversal-gm-stops-sharing-vehicle-driving-data-with-brokers/.

[292] Zane Merva, *Not So Smart Driver—Our Chevrolet, Buick, and GMC Vehicles Are Snitching To Our Insurance and Yours Is Too*, GM-TRUCKS.COM (Mar. 22, 2024), https://www.gm-trucks.com/onstar-smart-driver-chevrolet-buick-gmc-insurance/.

of my vehicles, which I've never enrolled into OnStar Smart Driver, had the feature enabled. What the heck? Turns out I'm not alone. A quick look online shows we're not the only GM vehicle owner that's found the feature randomly enabled. There's even discussion on if vehicles are transmitting data when Smart Driver is not enabled. Your vehicle may be sending driving information when Smart Driver is turned off or even when you don't have an active OnStar Account subscription.[293]

889.   In a follow-up article instructing readers how to "Opt-Out of OnStar Smart Driver," GM-Trucks warned: "**It's important to note- even if you don't have an active OnStar Subscription or Account—Smart Driver may still be enabled!**"[294] Similar accounts can be found online:

    a. "GM auto enrolled me in Smart Driver program. . . ."[295]

    b. "I just found out yesterday by wife's ct6 was enrolled. Never agreed to that. We signed up over onstar call after getting vehicle and I would remember if they wanted to track driving habits."[296]

    c. "Verisk obtained Driving Behavior Data History information without legal consent from any owner of my vehicle. I also expressly forbade XXXX and the XXXX dealer in writing from sharing my information with 3rd parties other than for vehicle

---

[293] Zane Merva, *Not So Smart Driver—Our Chevrolet, Buick, and GMC Vehicles Are Snitching To Our Insurance and Yours Is Too*, GM-TRUCKS.COM (Mar. 22, 2024), https://www.gm-trucks.com/onstar-smart-driver-chevrolet-buick-gmc-insurance/.

[294] *Id.*

[295] *GM auto enrolled me in Smart Driver program*, REDDIT.COM, https://www.reddit.com/r/Cadillac/comments/1bdde80/gm_auto_enrolled_me_in_s mart_driver_program/ (last accessed Nov. 24, 2024).

[296] *Id.*

registration and tax reporting purpose on a cash vehicle purchase."[297]

d. "Was surprised to find that my 2023 EV 2LT is enrolled in Smart Driver and that LexisNexis has a few hundred pages of my driving. I haven't touched the app since I left the dealer with the car in April of last year, and I certainly didn't sign up for it back then. I called Onstar, gave them an earful, had them unenroll me, and then pulled the fuse F02. I can confirm that on the 2023 EV, the microphone for calls still works. This is the first GM car I've owned, and it's looking to be the last as well."[298]

e. "After reading this post, I also discovered that On Star Smart Driver had been automatically activated. I turned that option off."[299]

f. "Thanks. Bottom of the page. No stats displayed but I was still opted in. Screw them, I refused to use them for my vehicle WiFi, went with my cell provider. Kiss my @ss OnStar"[300]

g. "Thanks for this info OP. I'm a "spirited" driver, to say it nicely. Opted out."

h. "Thank you for this information. I just went and deactivated mine. I had no idea I was enrolled."[301]

i. "Thank you for the heads up. I have a 2023 Z71. Found OnStar Smart Driver bullsh*t in the Chevy app pretty quick. Mine was

[297] CONSUMER FINANCIAL PROTECTION BUREAU, Complaint No. 8794494 (Apr. 18, 2024), https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/8794494.

[298] *My experience disabling onstar in my 2023 Bolt EUV*, REDDIT.COM, https://www.reddit.com/r/BoltEV/comments/1bhsqx0/my_experience_disabling_onstar_in_my_2023_bolt_euv/ (last accessed Nov. 24, 2024).

[299] *Opt out of OnStar Smart Driver*, REDDIT.COM, https://www.reddit.com/r/chevycolorado/comments/1bdtksd/opt_out_of_onstar_smart_driver/ (last accessed Nov. 24, 2024).

[300] *Id.*

[301] *Id.*

turned on as well. Apparently since I purchased last September"[302]

890. Upon information and belief, GM was at all times aware that its onboarding process and incentive structure would lead to this result. Seemingly acknowledging this, GM issued a press release in September 2024 that it had "made enhancements to the OnStar enrollment process" and "we've reminded dealers of the important role they play in helping to ensure customers are aware of the privacy statement, the user terms, and the choices they can make about vehicle connectivity and communication preferences."[303]

## C. GM designed a deceptive "onboarding process" to establish OnStar's uninterrupted data connection.

891. GM created a confusing web of automatic activation of OnStar services after free trials were over and incentivized dealership employees to sign up customers for paid OnStar services. On top of that, GM added yet another layer of deception. To ensure that it could collect Driving Data from vehicles model 2015 or newer, GM integrated a deceptively-designed OnStar "onboarding process" into the sales process for its vehicles. Both GM and the dealers held out the onboarding

---

[302] *Id.*

[303] *An update on our Privacy Statement*, NEWS.GM.COM (Sept. 25, 2024), https://news.gm.com/home.detail.html/Pages/news/us/en/2024/sep/0925-privacy.html.

process as a mandatory pre-requisite to new buyers or lessees taking possession of their vehicles.

892.  The aim of the "onboarding process" was to get an acknowledged version of the OnStar Terms and Smart Driver Opt-In (called the "OnStar Online Enrollment"), so that GM could have legal cover to start collecting a wealth of Driving Data from the vehicle.

893.  The "onboarding process" had two steps: first, the dealer had to submit a completed "OnStar Online Enrollment" for each customer through the dealer portal; second, the dealer had to initiate a "Blue Button Welcome Call" with the customer and an OnStar advisor inside the vehicle.

894.  To conduct step one, a dealership employee would log into GM's onboarding system, enter the customers' VIN, create an OnStar account for the customer or locate the customer's pre-existing account, and then walk the customer through a multi-step "onboarding" displayed on the dealership employee's computer (described in detail below).[304] It was during this "OnStar Online Enrollment" step that GM contends consumers consented to the OnStar Terms and Smart Driver Opt-In.

---

[304] Texas Att. Gen. Pet., at ¶ 42.

### 1. GM's online enrollment at the dealership forced customers to have OnStar even if they did not consent to the terms.

895. Discussed herein, many GM customers were never taken through the online onboarding process. For any customers that were taken through the process, GM induced customers to believe that the online onboarding process was mandatory before taking possession of their vehicle. For example, the computer screen shown to customers (if it was even shown to customers) displayed a message instructing the reader to "complete the next few steps" "before tak[ing] ownership of [their] vehicle," and coerced the customer to select a "Get started" button.

896. After selecting the "Get started" button, GM showed the individual viewing the screen a difficult-to-read (by design) document containing over 50 pages, including: the OnStar Terms (the aforementioned 36-page User Terms, and 18-page Privacy Statement); a link to AT&T's terms and conditions, a link to AT&T's network management practices; a vehicle ownership acknowledgment statement; and, finally, an "I accept" and an "I decline" checkbox option, with both options including even more information:[305]

---

[305] Texas Att. Gen. Pet., at ¶ 44.



CONFIDENTIAL TREATMENT REQUESTED: ALL RIGHTS RESERVED.

897.     Customers were only shown the first paragraph of the User Terms, and the first paragraph of the Privacy Statement. These paragraphs were displayed in nonsensically disproportionate and ill-fitted text boxes. If a customer desired to actually read the 50-pages of terms, the customer had to scroll both horizontally and vertically to review the content:



898. GM had no legitimate business purpose for restricting the size of the "box" in which the terms would appear; instead, the size of the boxes, the substantial information on the screen, and the cryptic nature of the terms themselves served to prevent and deter customers from reviewing GM's disclosures constituting more "dark patterns" to prevent consumers from understanding GM's terms.

899. But even if a customer closely read every word on the screen, the disclosures, and the other linked policies, they still would have no knowledge of

GM's actual conduct—, [because] nowhere did the disclosures explain that by selecting "I accept," customers were "agreeing" to GM's collection and sale of their Driving Data.

900.   GM also designed the onboarding process to repeatedly display messages meant to deter customers from declining OnStar. Specifically, any customer that selected the "I decline" option received a "warning" message that misleadingly claimed that declining would "cancel your trial or pre-paid plan" and "result in deactivation of all services" even though, at this point in the onboarding process, customers had not yet enrolled in OnStar or agreed to a free trial.[306]



*You are about to disable your OnStar and Connected Services and* ***cancel your trial or pre-paid plan.*** *To keep OnStar and Connected Services active, select "Go back" below and then "I accept" before*

---

[306] Texas Att. Gen. Pet., at ¶ 46.

*clicking "Continue." Declining the User Terms for Connected Vehicle Services and Privacy Statement **will result in deactivation of all services, including the Automatic Crash Response, Emergency Services and Vehicle Diagnostics**. Any OnStar and Connected Services plans ordered will be removed. If you have any questions, please call **1-888-466-7827**. You may activate OnStar and Connected Services later by pressing the blue button in your vehicle and following the prompts.*

901.    The warning message further attempted to dissuade customers from declining OnStar by emphasizing that safety features, such as "Automatic Crash Response" and "Emergency Services," would be "de-activated" if they declined.

902.    If GM's first safety warning did not successfully deter a customer, GM took the customer to another screen warning that declining OnStar meant that "All services on your vehicle have been deactivated" and telling the customer to "go back and accept OnStar terms:"



*You have declined OnStar and Connected Services. All services on your vehicle have been deactivated, including **Automatic Crash Response, Emergency Services** and Vehicle Diagnostics. Any multi-year OnStar or connected services plan selected has been removed. If you still want a plan or your trial or pre-paid services, please talk to your sales associate.*

903.   If a customer managed to leave the dealership without enrolling in OnStar, GM would repeatedly email them to sign up for a "trial" period.[307]

904.   As explained by the Texas Attorney General, this onboarding screen was a "deceptively designed sales flow to ensure that customers would sign up for the connected vehicle services and unwittingly be enrolled in GM's Driving Data collection scheme."[308]

### 2.   GM threatened to take away services included with OnStar if the customer did not "opt in" to Smart Driver.

905.   If a customer accepted the OnStar Terms and then clicked "Continue," they were directed to a second, even lengthier screen titled "Enrollment Preferences."

---

[307] Texas Att. Gen. Pet., at ¶ 49.
[308] Texas Att. Gen. Pet., at ¶ 41.



906. The "Enrollment Preferences" screen listed three separate boxes in a vertical line; the first was titled "One-click Enroll into OnStar Smart Driver and Notifications," the second was titled "Text Messages," and the first was titled "OnStar Insurance Driving Program:"

## One-click Enroll into OnStar Smart Driver and Notifications

### OnStar Smart Driver†

Improve your ownership experience with access to OnStar Smart Driver.

What is OnStar Smart Driver? OnStar Smart Driver provides you insights on your driving behavior and can help you recognize driving improvement opportunities. You'll earn achievements, get valuable feedback with each trip, and access your driving data. OnStar Smart Driver also gives you the opportunity to use Connected Teen Driver, which helps promote safe driving habits.

We'll use information we collect about where and how you operate your vehicle, such as your vehicle's location, routes driven, driving schedule, fuel or charging levels, fuel economy, battery status, overall vehicle health, and driving behavior, such as hard braking, hard acceleration, tailgating, vehicle speed, late night driving, driver and passenger seatbelt status, and driver attention. Smart Driver "hard braking" and "hard acceleration" events are identified when measured vehicle speed changes rapidly, regardless of the cause of the rapid speed change. We may also use alerts from your vehicle, such as forward collision and traction control.

After enrollment, you can opt out of OnStar Smart Driver at any time by clicking "unenroll" in OnStar Smart Driver in your myGMC mobile app.

### Notifications

Get more connected and more protected.
Simplify your ownership experience by opting into notifications that will keep you informed on services that need your attention. But first, we need your permission to send them.

We'll keep you informed about the following:

- Up-to-date information about your driving skills
- Low tire pressure or oil change needed
- Potential maintenance or performance issues
- Service notifications from your dealer
- Theft Alarm Notifications if your alarm is triggered
- Wi-Fi® data running out

### Details

By providing an email and opting into notifications, we can keep you informed on the following services and features, based on your vehicle's capability/eligibility.

Diagnostics Report† – reports each month showing you the status of your vehicle's key operating systems.

Diagnostic Alerts† – alerts regarding issues with your vehicle's key operating systems.

Proactive Alerts† – predicts potential upcoming issues with your vehicle's systems and notifies you.
(Note: You will receive an email and in-vehicle message for this alert)

Dealer Maintenance Notifications† – notifies your preferred dealer, who may contact you to set up an appointment should maintenance be needed.

Theft Alarm Notifications† – notifies you if your vehicle's alarm is sounding. Theft Alarm Notifications are sent only to you. OnStar does not notify police of a Theft Alarm Notification; that is up to your discretion. The Theft Alarm Notification service may alert you to a theft in progress. Always use caution and good judgment. Do not approach the vehicle unless you are certain the situation is safe.

Data Usage Notifications – alerts you when your data plan is low or about to end.

Your email address will also be used to provide you with information about your account and offers related to the features or services in your vehicle.

Please visit my.gmc.com for more information about your OnStar and GMC Connected Services. You can also change your communication preferences or un-enroll from any of these services at any time on my.gmc.com or through an Advisor. Messaging and data rates may apply.

By checking "Accept", you will be enrolled in OnStar Smart Driver and we may also send you notifications related to all of the above services.

- ● I Accept: I agree to enroll in OnStar Smart Driver and the notification services listed above.

- ○ I Decline: I do not agree to enroll in OnStar Smart Driver and the notification services listed above.

### Text messages

Would you like to receive text messages? This includes a welcome message inviting you to set up your connected vehicle, as well as text alerts regarding the services above if you accepted notifications. Don't worry, you can change this preference later.

Enrolling allows General Motors, OnStar and those acting on our behalf to send text messages for informational purposes using a manual or automatic telephone system to your telephone number shown below. This is not required as a condition to conduct business with us. Messaging and data rates may apply.

Mobile (313) 313-3331

- ● I Accept: I agree to enroll to receive text messages.

- ○ I Decline: I do not agree to enroll to receive text messages for the services listed above.

### OnStar Insurance Driving Program

OnStar Insurance ("OSI"), a subsidiary of General Motors Holdings LLC ("GM"), is serious about smart driving and looks for ways to reward smart driving behaviors by offering programs you can choose to participate in that use driving data to reward smart driving and price auto insurance. This literally puts you in the driver seat to "drive your insurance rate."

To participate in these programs, find out about eligible savings based on your driving data, and receive information on OSI offerings, we need your consent. To get started all you need to do is click "I Accept" below to provide permission for GM to send OSI your data while you are participating in these programs, including your account information, vehicle location, driving behavior, and other data about your vehicle such as diagnostic data. OSI will use this data to conduct research to develop and improve its insurance offerings, to evaluate offers and rates that may apply to you based on your driving behavior, and to present you with offers and related marketing for programs, services, and discounts you may be eligible for. This data will only be shared from GM to OSI and OSI's operations partner/s. Opting into this program will have no impact on your current insurance. Additional program details and terms can be found here onstarinsurance.com/driving-program-terms and you can cancel your participation and stop this data sharing at any time by contacting us at onstarinsurance.com/driver-unenroll.

Take advantage of OnStar Insurance's driving program for your vehicle with 3 simple steps:

- **Enroll Now** – Just click "I Accept" below. We'll take care of the rest.
- **Drive Smart** – All you need to do is drive. No gadgets necessary to show us that you are a smart driver. The data we will receive and use includes account, location, and driving behavior data such as where you drive, how much you drive, how you drive, when you drive, and whether vehicle safety features, such as seatbelts and advanced driver assistance features, are used or are active.
- **Enjoy Rewards** – based on your driving behaviors, a smart driving score is calculated. While we can't guarantee that your will qualify for rewards, discounts or savings, we will send you offers that are available for you. If eligible, you can choose to take advantage of these offers.

- ● I Accept: I agree to participate in the OnStar Insurance driving program

- ○ I Decline: I do not agree to participate in the OnStar Insurance driving program

**Continue**

907. In the "One-click Enroll into OnStar Smart Driver and Notifications," GM intentionally and deceptively combined the opt-in for Smart Driver with consent to receive important emails notifying the driver when their car's theft alarm goes off, and to receive safety reports identifying vehicle problems and necessary repairs.[309] Disguised as an efficient way to enroll customers in multiple options at once, the "One-click Enroll" was a deceptive design choice, intended to force customers to enroll in Smart Driver without disclosing GM's scheme to collect and sell customers' Driving Data.

908. Specifically, GM forced customers to technically "opt in" to Smart Driver, an unrelated program, or else GM would not allow them to receive notifications about low tire pressure, oil change needs, potential maintenance and performance issues, service notifications from their dealer, theft alarm notifications if their alarm is triggered, or notifications that their WiFi data was running out. Given its length, this "One-click Enroll" is split into four screens below.

    a. "One-Click Enroll" screen part 1:

---

[309] *Id.* at p. 2 (added emphasis).

**One-click Enroll into OnStar Smart Driver and Notifications**

**OnStar Smart Driver†**

Improve your ownership experience with access to OnStar Smart Driver.

What is OnStar Smart Driver? OnStar Smart Driver provides you insights on your driving behavior and can help you recognize driving improvement opportunities. You'll earn achievements, get valuable feedback with each trip, and access your driving data. OnStar Smart Driver also gives you the opportunity to use Connected Teen Driver, which helps promote safe driving habits.

We'll use information we collect about where and how you operate your vehicle, such as your vehicle's location, routes driven, driving schedule, fuel or charging levels, fuel economy, battery status, overall vehicle health, and driving behavior, such as hard braking, hard acceleration, tailgating, vehicle speed, late night driving, driver and passenger seatbelt status, and driver attention. Smart Driver "hard braking" and "hard acceleration" events are identified when measured vehicle speed changes rapidly, regardless of the cause of the rapid speed change. We may also use alerts from your vehicle, such as forward collision and traction control.

After enrollment, you can opt out of OnStar Smart Driver at any time by clicking "unenroll" in OnStar Smart Driver in your myGMC mobile app.

**Notifications**

*Described in Section VI above; does not seek consent for sharing of Driving Data.*

b. "One-Click Enroll" screen part 2:

**Notifications**

Get more connected and more protected.
Simplify your ownership experience by opting into notifications that will keep you informed on services that need your attention. But first, we need your permission to send them.

We'll keep you informed about the following:

- Up-to-date information about your driving skills
- Low tire pressure or oil change needed
- Potential maintenance or performance issues
- Service notifications from your dealer
- Theft Alarm Notifications if your alarm is triggered
- Wi-Fi® data running out

*Notifications. Get more connected and more protected. Simplify your ownership experience by opting into notifications that will keep you informed on services that need your attention. But first, we need your permission to send them. We'll keep you informed about the following:*

- *Up-to-date information about your driving skills*
- *Low tire pressure or oil change needed*

- *Potential maintenance or performance issues*
- *Services notifications from your dealer*
- *Theft Alarm Notifications if your alarm is triggered*
- *Wi-Fi data running out*

c. "One-Click Enroll" screen part 3:

## Details

By providing an email and opting into notifications, we can keep you informed on the following services and features, based on your vehicle's capability/eligibility:

**Diagnostics Report†** – reports each month showing you the status of your vehicle's key operating systems.

**Diagnostic Alerts†** – alerts regarding issues with your vehicle's key operating systems.

**Proactive Alerts†** – predicts potential upcoming issues with your vehicle's systems and notifies you.
*(Note: You will receive an email and in-vehicle message for this alert)*

**Dealer Maintenance Notifications†** – notifies your preferred dealer, who may contact you to set up an appointment should maintenance be needed.

**Theft Alarm Notifications†** – notifies you if your vehicle's alarm is sounding. Theft Alarm Notifications are sent only to you. OnStar does not notify police of a Theft Alarm Notification; that is up to your discretion. The Theft Alarm Notification service may alert you to a theft in progress. Always use caution and good judgment. Do not approach the vehicle unless you are certain the situation is safe.

**Data Usage Notifications** – alerts you when your data plan is low or about to end.

d. "One-Click Enroll" screen part 4:

*By checking "Accept" you will be enrolled in OnStar Smart Driver and we may also send you notifications related to all of the above services.*

909. Upon information and belief, diagnostics reports, alerts, dealer maintenance notifications, and similar functions were already standard features of OnStar for which customers did not need to "opt in"—GM included them in the opt-in as a false choice to coerce consumers to also opt-in to Smart Driver.

910. Illustrating this point, screen shots obtained from GM promotional and online materials demonstrate that the Mobile App enrollment process for Smart Driver did *not* require or ask customers to opt-in to notifications at the same time as Smart Driver. This demonstrates that GM grouped "Smart Driver" and "Notifications" together during the Online Enrollment process in a deceptive attempt to force Smart Driver enrollment.

911. Further, this "Smart Driver" opt-in provides no detail or explanation regarding the types of notifications consumers should expect to receive about Smart Driver. Even though the "Notifications" section promises that GM will send drivers "up-to-date information on your driving skills," the "Details" section noticeably omits any mention of what those notifications will be, despite providing "Details" for every other item listed in the "Notifications" section. In any event, this opt in does not ask for consumers' consent to share Driving Data with third parties, nor does it even raise third-party sharing as a possibility.

**D.** **GM made it difficult for consumers to learn that they were enrolled in OnStar or Smart Driver without their consent.**

912. Making matters worse, GM failed to provide appropriate notice to consumers that they were actually enrolled in OnStar or Smart Driver. Acknowledging this, GM issued a statement in September 2024 that, as part of the "enhancements made to the OnStar enrollment process," GM had "added more information to the emails customers receive when they enroll, including links to the privacy statement and user terms as well as instructions on where they can manage their account's communication preferences, services, and settings."[310]

---

[310] *An update on our Privacy Statement*, NEWS.GM.COM (Sept. 25, 2024), https://news.gm.com/home.detail.html/Pages/news/us/en/2024/sep/0925-privacy.html.

**E.    GM instituted deceptive cancellation requirements.**

913.    In the above online onboarding process, GM represented that consumers could "opt out" of OnStar Smart Driver "at any time by clicking 'unenroll' in OnStar Smart Driver" in their Mobile App. GM did not disclose, however, that consumers could also "opt out" via the website—another deceptive dark pattern to further complicate opting out by encouraging customers to use a different method than they used to enroll in order to cancel.

914.    Opting out of Smart Driver did *not* cancel a customers' OnStar subscription, however, nor did it turn off OnStar's software processes for recording and transmitting Driving Data. Because GM contends that consumers "consented" to the collection and sale of their Driving Data through the OnStar Terms, it does not seem that "opting-out" of Smart Driver resulted in GM terminating Driving Data collection for that driver.

915.    Further, while GM permitted customers to enroll in OnStar using a variety of methods, including online, GM only allowed customers to cancel OnStar by calling: "You cannot cancel your service online."[311] This is a common "obstruction" dark pattern variant referred to as "Roadblocks to Cancellation," meaning "making it easy to sign up but hard to cancel" like "letting people sign up

---

[311] *Help: Become an OnStar Member or transfer an account*, ONSTAR.COM, https://www.onstar.com/support/faq/subscribe (last accessed Nov. 23, 2024).

online but making them use another means to cancel" or requiring that people cancel by phone but then concealing the phone number, short-staffing the cancellation line, opening the line during limited hours, or requiring people to listen to a sales pitch or upsell while trying to cancel."[312] "There's no excuse for not allowing users to leave a service in the same location they signed up for it."[313]

## VIII. The information collected by GM and shared with LexisNexis and Verisk is inaccurate, flawed, and materially misleading.

916. Beyond the serious and fundamental privacy concerns and lack of consent for the collection, sharing and use of Driving Data, the data itself presents a number of problems and the programs designed to collect and disclose the data are fundamentally flawed.

917. First, Defendants knew or should have known that the consumer reports prepared from consumers' Driving Data were inaccurate. For example, some LexisNexis Reports reflect a "negative" number of events.

918. Further, the Driving Data Defendants collected was and is decontextualized from the ways that vehicle owners can and must safely operate their vehicles. For example, instances of "late night driving" are indicated red flags

---

[312] Staff Report, *Bringing Dark Patterns to Light*, FEDERAL TRADE COMMISSION (Sept. 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14.2022%20-%20FINAL.pdf.
[313]*Id.*

to insurers, and factor into a driver's assigned risk score. Despite the fact that 80 mph is the standard speed limit on large portions of the interstate highways in western United States,[314] consumers driving at those speeds would be penalized by Defendants' metrics for "high speed driving."

919. Additionally, when a driver encounters a child or animal suddenly entering the roadway, sudden braking is the appropriate defensive driving response, but that driver would be penalized by Smart Driver for "hard braking."

920. Further, as Plaintiffs' experiences illustrate, multiple drivers' Driving Data would be captured in the same report, with no way to determine the accuracy. "The fact that they cannot reconcile who gave consent and whose data it is . . . is very problematic," according to Andrea Amico, founder of Privacy4Cars.[315]

921. Exemplifying the problematic nature of breaking down raw individual Driving Data into decontextualized metrics is the fact that the Driving Data, and the resulting metrics, are not measured or reflected in a consistent manner between LexisNexis and Verisk Reports.

922. First, the LexisNexis and Verisk Reports reflect different compilations of data. A driver's Verisk Report will include a summary setting out the number of

---

[314] *State Speed Limit Chart*, NATIONAL MOTORIST ASSOCIATION, *available at* https://ww2.motorists.org/issues/speed-limits/state-chart/ (last accessed May 11, 2024).

[315] *See* Kashmir Hill, *How G.M. Tricked Millions of Drivers Into Being Spied On (Including Me)*, NYTIMES.COM (Apr. 25, 2024).

trips within the reporting period, and for every trip taken in the vehicle, will include the date, speeding events (greater than 80 mph), hard braking events, rapid acceleration events, daytime driving minutes, nighttime driving minutes,[316] and mileage. In contrast, a LexisNexis Report will include, for every trip taken in the vehicle within the reporting period, the start and end date, start and end time, acceleration events, hard brake events, high speed events, and distance.

923. Even within the same category of data, LexisNexis and Verisk Reports vary—both in how the category of data is defined, and by how it is transmitted, collected, or reported by LexisNexis and Verisk.

924. First, the definition of a particular category of data may be different as between Verisk and LexisNexis. For example, Smart Driver has defined late night driving as between 12 a.m. and 4 a.m.[317] But certain Verisk Reports define late night driving as between 11 p.m. to 5 a.m. A similar problem exists in the inconsistent

---

[316] Critics have suggested that insurer reliance on particular metrics (such as late night driving) "punishes people who work the third shift, typically blue-collar or service occupations." Because those jobs are disproportionately held by people of color, use of the factor can "reinforce rather than diminish discrimination," says Douglas Heller, an insurance expert at the Consumer Federation of America. Kaveh Waddell, *How Car Insurance Telematics Really Work*, CONSUMER REPORTS (October 7, 2021), available at https://www.consumerreports.org/money/car-insurance/how-car-insurance-telematics-discounts-really-work-a1549580662/.

[317] *See Explore the advantages of OnStar Smart Driver*, ONSTAR.COM, (as of Sept. 9, 2016), https://web.archive.org/web/20160909120843/https://www.onstar.com/us/en/services/vehiclemanager/smart-driver.html.

definitions of what constitutes a "hard brake event" or a "rapid acceleration event." A "hard brake event" might be defined as dropping 10 mph or more in one second, or it might be defined as dropping 5 mph per second. Verisk defines braking and acceleration events as a change in speed of greater than 9.5kph/s (5.9 mph/s).

925. Second, the Driving Data on a Verisk Report from a particular car on a particular day may look wildly different than the LexisNexis Report for the same car on the same day. For one Plaintiff, Verisk reported 9 trips, 5 speeding events, 60 hard brakes, 26 rapid accelerations on a specific day for his vehicle. On the same day, for the same Plaintiff, LexisNexis reported 8 trips, 2 speeding events, 10 hard brakes, and 7 rapid accelerations. Reports contain numerous examples of similar irreconcilable differences, where the daily Verisk Reports do not match the LexisNexis Reports for the same time period.

926. Compounding the sometimes extreme and irreconcilable inconsistencies within Driving Data metrics and as between LexisNexis/Verisk reporting it is the seemingly arbitrary nature of how these metrics are used by insurers. This graphic shows the range of metrics that particular insurers had been using to evaluate risk and set premiums.[318]

---

[318] Kaveh Waddell, *How Car Insurance Telematics Really Work*, CONSUMER REPORTS (October 7, 2021), *available at* https://www.consumerreports.org/money/car-insurance/how-car-insurance-telematics-discounts-really-work-a1549580662/.



927. Further, Defendants continued to collect, retain, or share Driving Data on consumer reports even after consumers opted out of the program.[319]

928. Indeed, despite the real-world consequences of Driving Data from Smart Driver and similar programs being shared with third parties and insurers, the

---

[319] *See My experience disabling onstar in my 2023 Bolt EUV*, REDDIT.COM, https://www.reddit.com/r/BoltEV/comments/1bhsqx0/my_experience_disabling_o nstar_in_my_2023_bolt_euv/ (last accessed Nov. 24, 2024) ("FYI: I opted out of Chevy Smart driver nearly a year ago. I reviewed my LexisNexis report and they still have all the trips I made after that[.]").

underlying Driving Data is fundamentally flawed, and in some cases is simply wrong about consumers' driving behavior; the resulting reports are inconsistent as between LexisNexis and Verisk even as to the same data, often in irreconcilable ways; and these deeply flawed and irreconcilably inconsistent reports are purchased and used in an arbitrary fashion by various insurers.[320]

929.   These flaws are and should have been obvious to all of the Defendants, yet they continued to collect, disclose, and profit from flawed Driving Data without regard to inaccuracy of the information.

930.   Without any context, Driving Data that Defendants sell to third parties is misleading, inaccurate, and bears little relationship to a user's actual safe driving abilities. Driver reports do not offer consumers the ability to provide context to any of the reported events, and drivers are not alerted when negative events are reported so as to enable them to provide any explanation or context for the reported events.

931.   Smart Driver is a fundamentally flawed system, and LexisNexis and Verisk fully understand, or were reckless in not understanding, the flaws within the system.  In spite of those flaws, LexisNexis and Verisk continued to collect, disclose, and monetize Driving Data collected from Smart Driver willfully and recklessly.

---

[320] Jason Torchinsky, *Carmakers Are Sneakily Sharing Your Driving Data with Insurance Companies but What's Worse Is That the Data Is Crap*, AUTOPIAN (Mar. 19, 2024), https://www.theautopian.com/carmakers-are-sneakily-sharing- your-driving-data-with-insurance-companies-but-whats-worse-is-that-the-data-is- crap/.

## IX. Consumer advocates and regulators expose Defendants' surreptitious Driving Data practices.

### A. *The Mozilla Foundation* sparks a congressional investigation and call for FTC action.

932. On September 6, 2023, Mozilla Foundation published the results of its in-depth investigation entitled "After Researching Cars and Privacy, Here's What Keeps Us up At Night," which concluded that "[m]odern cars are surveillance-machines on wheels souped-up with sensors, radars, cameras, telematics, and apps that can detect everything we do inside—even where and when we do it."[321]

933. The article explained that vehicles and automakers were collecting what it termed a "WTF-level" of data, giving rise to numerous privacy red flags, and noting car companies "have so much information about you that they can (and do) use it to invent even more, through 'inferences.' . . . Then, a lot of the car companies share and sell that information—to service providers, data brokers, the government, and other businesses we know little or nothing about. . . . But there's more: the intimacy of the data. . . . There is some personal information, such as genetic

---

[321] Jen Caltrider, Misha Rykov, and Zoe McDonald, *After Researching Cars and Privacy, Here's what Keeps Us up at Night*, MOZILLA FOUNDATION (Sept. 6, 2023), *available at*: https://foundation.mozilla.org/en/privacynotincluded/articles/after- researching-cars-and-privacy-heres-what-keeps-us-up-at-night/; *see also* Jenn Caltrider, Misha Rykov, and Zoe McDonald, *What Data Does My Car Collect About Me and Where Does It Go?*, MOZILLA FOUNDATION (Sept. 6, 2023), *available at*: https://foundation.mozilla.org/en/privacynotincluded/articles/what-data-does-my-car-collect-about-me-and-where-does-it-go/.

information, that corporations just should not be allowed to collect about you, especially when there is no imaginable good reason for them to do it. GM's Cadillac, GMC, Buick, and Chevrolet say in their California Privacy Statement that they can collect (among so many other things) your 'Genetic, physiological, behavioral, and biological characteristics.'"[322]

934. The article concluded that despite collecting this private information, vehicle manufacturers lacked sufficient data protection, and that their connectivity was being "weaponized."[323]

935. Mozilla's investigative report sparked an immediate Senate investigation and call by Senator Markey to the FTC to investigate the data privacy practices of automakers.

936. On November 30, 2023, as part of the Senate investigation, Senator Markey sent letters to thirteen automakers, including GM, concerning their data collection use and disclosure practices. These letters asked several pointed questions concerning the data these manufacturers collect about drivers and the extent to which they secure that data and transmit it to third parties. In GM's case, this included

_____

[322] Jen Caltrider, Misha Rykov, and Zoe McDonald, *After Researching Cars and Privacy, Here's what Keeps Us up at Night*, MOZILLA FOUNDATION (Sept. 6, 2023), *available at*:
https://foundation.mozilla.org/en/privacynotincluded/articles/after-researching-cars-and-privacy-heres-what-keeps-us-up-at-night/.
[323] *Id*.

whether GM collected personal information from any owner and user of its vehicles, and whether it provides the driver with notice and the opportunity to exercise consent to such data collection. Senator Markey referred to the Mozilla Foundation article's conclusion that automobile manufacturers were engaged in "unfettered data collection", exclaiming that these practices "must end" and explaining:

> These practices are unacceptable. Although certain data collection and sharing practices may have real benefits, consumers should not be subject to a massive data collection apparatus, with any disclosures hidden in pages-long privacy policies filled with legalese. Cars should not—and cannot—become yet another venue where privacy takes a backseat. As more and more cars become computers on wheels, automakers must implement strong privacy policies to protect users.[324]

937. On December 21, 2023, GM sent a response letter to Senator Markey that was both evasive and misleading.

938. In response to the question of "Does your company collect user data from its vehicles, including but not limited to the actions, behaviors, or personal information of any owner or user?" GM responded: "If a customer opts in to Connected Services, then yes, GM collects vehicle data."[325]

939. GM's response failed to disclose GM's commoditization of Driving Data, ignoring Senator Markey's question on that issue. For example, when asked

---

[324] *Id*. at page 4.
[325] *GM's Letter Response to Senate Inquiry* (Dec. 21, 2023), available at https://interactive.wthr.com/pdfs/automakers-response-to-markey.pdf.

whether it sold, transferred, shared, or otherwise derived a commercial benefit from

the Driving Data it collected, GM responded:

> If an owner opts in to Connected Services, GM has the ability to share data collected from Vehicles with third parties, as outlined in our US Connected Services Privacy Statement. For example, data might be shared to help emergency responders respond more quickly and accurately, to support in-vehicle services utilized by the owner, and where the owner directs GM to do so (such as helping owners optimize their charging patterns). For those limited data shares where there is a commercial benefit attributable directly to the data sharing, the impact to GM's overall 2022 revenue was de minimis.[326]

940. GM likewise failed to disclose to Senator Markey that it was selling

Driving Data to Defendants LexisNexis and Verisk, which were selling that Driving

Data to insurance companies.

---

[326] *Senator Markey Letter to FTC on Auto Privacy* (Feb. 28, 2024), available at https://www.markey.senate.gov/download/senator-markey-letter-to-ftc-on-auto-privacy_022824pdf.

941.    Question 3 focuses on consent(s) with respect to data collection, and GM's response specifies that separate consents are required for services such as Smart Driver:

**3.    Does your company provide owners or users an opportunity to exercise consent with respect to data collection in its vehicles?**

Yes, central to GM's approach is keeping customers in control of their connectivity, maintaining transparency in our data practices, and safeguarding personal information. Owners must opt-in to Connected Services. In a set of rare cases where safety is concerned, we also currently have the ability to collect limited data from Vehicles whose owners have not opted-in to Connected Services to respond 1) if a user initiated an OnStar button press and 2) for safety-related alerts in specific models.

**a.    If so, please describe the process by which a user is able to exercise consent with respect to such data collection. If not, why not?**

GM collects user data from Vehicles through the use of Connected Services. At the point of new vehicle sale or lease, the owner is presented with information about Connected Services and prompted to accept or decline the US Connected Services Privacy Statement. Owners who elect not to complete this process at the dealership or through other GM provided channels then have 30 days to accept the US Connected Services Privacy Statement or cellular connectivity is disabled. In order to connect a disabled vehicle, the owner must contact GM to re-activate the vehicle by double pressing the OnStar blue button from inside the vehicle and speaking with an advisor, who will send the consumer the US Connected Services Privacy Statement for review and acceptance as part of Connected Services being activated.

GM also provides separate consents for specific service offerings that may collect additional vehicle data, such as Smart Driver.

942.    In response to Question 3.b., regarding users who consent to services, GM notes that only "a small percentage of new vehicle owners do not opt-in to receive Connected Services."

943.    On February 27, 2024, Senator Markey, dissatisfied with the evasive and incomplete responses that he received from the auto manufacturers, urged the FTC to investigate their data privacy practices. Senator Markey noted the large and

invasive amounts of data that manufacturers such as GM stockpile, which can be

exploited for a variety of detrimental and even dangerous purposes, warning:

> The answers [of the car manufacturers] gave me little comfort. In general, the automakers sidestepped my questions or focused on the beneficial uses of this data—all while ignoring the real privacy risks their data practices created. . . . Based on public reporting and responses to my own inquiries into these practices, automakers face few, if any limitations on the collection, use, and disclosure of this data. Consumers are often left in the dark. . . [as] most automakers [including GM] refused to disclose whether they transfer data for commercial benefit.[327]

**B.** *The New York Times* **investigates and reveals Defendants' data collection scheme.**

944. On March 11, 2024, *New York Times* reporter Kashmir Hill exposed

GM's Driving Data collection in an article titled "Automakers Are Sharing

Consumers' Driving Behavior With Insurance Companies." Hill confirmed the

rampant privacy violations by the automobile industry generally, and GM

specifically. Hill reported: "drivers of General Motors cars. . . may not realize that

their Driving Data is being shared with insurance companies" and that "LexisNexis,

which generates consumer risk profiles for the insurers, knew about every trip G.M.

---

[327] Senator Markey, *Letter to FTC on Auto Privacy* (Feb. 27, 2024), *available at*: https://www.markey.senate.gov/imo/media/doc/senator_markey_letter_to_ftc_on_ auto_privacy__022824pdf.pdf; *see GM's Letter Response to Senate Inquiry* (Dec. 21, 2023), available at https://interactive.wthr.com/pdfs/automakers-response-to-markey.pdf.

drivers had taken on their cars, including when they sped, braked too hard or accelerated rapidly."[328]

945. Indeed, as detailed in the *New York Times* on March 11, 2024, insurance companies admit they have relied on Driving Data to raise the cost of car insurance or deny coverage altogether.[329] Further, at least some of the Driving Data that insurers use to offer and price their products came from data brokers who received the Driving Data from GM.[330]

946. The article includes instructions for "How to Find Out What Your Car is Doing," which encourages drivers to: (1) see what data their car is capable of collecting at https://vehicleprivacyreport.com; (2) check their enrollment status on their connected car app; (3) search "privacy request form" alongside the name of their vehicle's manufacturer for instructions on how to request information; (4) request their LexisNexis report at https://consumer.risk.lexisnexis.com/consumer; and (5) request their Verisk report at https://fcra.verisk.com/#/.[331]

---

[328] Kasmir Hill, *Automakers Are Sharing Consumers' Driving Behavior With Insurance Companies*, NEW YORK TIMES (Mar. 11, 2024), *available at*: https://www.nytimes.com/2024/03/11/technology/carmakers-driver-tracking-insurance.html (hereinafter, NYT article, March 2024).
[329] *Id.*
[330] *Id.*
[331] *Id.*

947. In response to questions from the *New York Times*, GM admitted that it shares with LexisNexis and Verisk "select insights" about consumers' hard braking, hard accelerating, speeding over 80 miles an hour and drive time.

948. On April 23, 2024, Ms. Hill published a follow-up article detailing her own journey in discovering that, unbeknownst to her or her husband, their GM car had generated hundreds of pages of reports detailing their trips and driving behavior and shared that with LexisNexis and Verisk.[332] And these reports were terribly flawed and contained inconsistent Driving Data. The *New York Times* piece revealed that although both of the Hills drove their car, the reported data was associated with only one of the drivers (Mr. Hill) because the GM dealership had listed him as the primary owner.

## X. Public outcry and litigation prompt some Defendants to stop some of their illegal sharing practices.

### A. Within days of the litigation commencing, GM stops sharing Driving Data with LexisNexis and Verisk.

949. Like in 2011, public backlash and outrage over the public disclosure of GM's stealth Driving Data collection and sharing practices was swift. "The revelations about OnStar Smart Driver and data sharing have resonated deeply

---

[332] Kashmir Hill, *How G.M. Tricked Millions of Drivers Into Being Spied on (Including Me)*, NEW YORK TIMES (Apr. 23, 2024), *available at*: https://www.nytimes.com/2024/04/23/technology/general-motors-spying-driver-data-consent.html (hereinafter, NYT Article, April 2024).

within the []community and beyond, highlighting a spectrum of concerns" one article reported. Specifically, the article emphasized the importance of "[t]he Right to Control Personal Data," stating "[a]mid growing calls for the ability to disable or opt out of data collection systems, there is a clear desire among vehicle owners for more autonomy over their personal information and the technology embedded in their vehicles. . . . The lesson here for GM and the broader automotive industry is the paramount importance of upholding transparency, securing informed consent, and honoring privacy."[333]

950.   Accounts of consumer outrage over Defendants' sharing practices are rampant across public forums and message boards:

   a. I'm still in shock about this staggering betrayal of trust by GM."[334]

   b. I logged into the myChevrolet app, and as Boomer detailed I was enrolled too even though I've never paid for OnStar. Thank you 2020Colorado for bringing this to our attention! There was definitely driving information there that nobody else should see![335]

---

[333] *Not So Smart Driver – Our Chevrolet, Buick, and GMC Vehicles Are Snitching To Our Insurance and Yours Is Too*, GM-TRUCKS.COM (Mar. 22, 2024) https://www.gm-trucks.com/onstar-smart-driver-chevrolet-buick-gmc-insurance/.
[334] *Disable or Opt Out of OnStar Tracking*, CHEVYBOLT.ORG https://www.chevybolt.org/threads/disable-or-opt-out-of-onstar-tracking.45751/page-4 (last accessed Nov. 21, 2024).
[335] *Heads Up-Beware of the "Smart Driver" feature of OnStar*, CORVETTE FORUM, available at https://www.corvetteforum.com/forums/c8-general-discussion/4680651-heads-up-beware-of-the-smart-driver-feature-of-onstar.html (last accessed Apr. 24, 2024).

c. Thanks 2020Colorado for posting this. I had never installed the My Chevrolet app until 5 minutes ago and lo and behold I was enrolled in this invasive plan; but not anymore.[336]

d. I received a letter from LexisNexis that my records showed a negative report on my file (required by Colorado Law). I had never heard of them and asked for a report to be sent to me. I got a 98 page report that is similar to a credit report with all my former addresses and credit cards listed along with my property and business info. It also had a "Telemetrics" category that had several pages of my Smart driver events listed. LexisNexis is a company that aggregates info from various sources and resells it to several industries including insurance companies….[337]

e. I know this is an older post but did you find any resolution? I just received my lexis nexis report and had the same thing happen. It just randomly started June 1st of this year and has now reported every single trip I have ever taken to them. I called GM privacy to opt out and the privacy rep had never even heard of lexisnexis and told me to reach out to onstar. The onstar rep in India had also never heard of lexisnexis and was no help. I called the 1 800 # that was on the report but it is actually the number to lexisnexis and NOT GM holdings where they say they obtained this information. There is no point challenging it and having it removed until I can actually get them to stop reporting my movements in the first place. I disabled location services in the settings of the vehicle but I don't know that it will do anything. I'm extremely creeped out by this and it infuriates me to have this data shared without my consent and without any way to opt-out and no recourse for GM for this slimy practice. I could have all my information removed from lexisnexis in general but I worry that it would hurt my insurance scores just like having a "0" does for a credit score.[338]

---

[336] *Id.*

[337] *Id.*

[338] Online Forum, *OnStar / GM Tracking and reporting of 3rd Gen Colorado*, COLORADO FANS.COM, available at https://www.coloradofans.com/threads/onstar-

f. This HAS to be some sort of an infringement of our privacy if this is happening. How is that legal for GM to collect and REPORT that info without our knowledge? This whole idea is wrong and truly disturbing.[339]

g. I just turned off my 'Smart Driver'. Had no idea I was being tracked and my driving habits/data being sold to a 3rd party. . . .[340]

h. From this data, which includes location data, they could tell things like: How often you go to the liquor store; Do you go to bars and then drive? How late do you stay out. Do you stay out late at bars and then drive home? Do you frequent gay bars? Strip clubs? Are you having an affair? What is your favorite grocery store? Where your kids go to school; How often you break the speed limit. What's your average highway speed; If you have cancer (visiting oncologists offices); If you're pregnant (visiting obstetricians); If you or your kids play sports, and what sport; If you've changed jobs or lost your job; Where you work; Or really ANYTHING in your life. It's like having someone in the passenger seat writing down everything you do and then selling that information to anyone So what can you do? You HAVE to disable Onstar data collection. This involves cancelling your Onstar subscription BUT YOU MUST ALSO CALL ONSTAR AND REQUEST TO STOP COLLECTING DATA. Even if you cancel your Onstar subscription they will still collect all of this

gm-tracking-and-reporting-of-3rd-gen-colorado.435098/ (last accessed Nov. 24, 2024).

[339] Online Forum, *Big Brother is Watching*, CAMARO 6, available at https://www.camaro6.com/forums/showthread.php?t=610488 (last accessed Nov. 24, 2025).

[340] Online Forum, *OnStar / GM Tracking and reporting of 3rd Gen Colorado*, COLORADO FANS.COM, available at https://www.coloradofans.com/threads/onstar-gm-tracking-and-reporting-of-3rd-gen-colorado.435098/ (last accessed Nov. 24, 2024).

data unless you call and specifically opt-out. Really, there needs to be some privacy legislation enacted to stop this.[341]

951.   Less than one week after its scheme was exposed, on March 20, 2024, GM announced it was ending its relationship with LexisNexis and Verisk.[342] GM spokesperson Kevin Kelly sent the *Detroit Free Press* the following statement: "As of March 20th, OnStar Smart Driver customer data is no longer being shared with LexisNexis or Verisk. Customer trust is a priority for us, and we are actively evaluating our privacy processes and policies." Kelly declined to provide any further information, and did not explain what would happen to the Driving Data that GM already transmitted to LexisNexis or Verisk.

952.   Also in March 2024, GM updated the "Smart Driver" FAQ webpage to disclose, for the first time, that GM had been sharing Driving Data with LexisNexis and Verisk:

> **Do you share the data with LexisNexis or Verisk, or other third-party telematics exchange companies**. As of March 20, 2024, OnStar Smart Driver customer data is no longer being shared with LexisNexis

---

[341] Online Forum, *GM selling your data to insurance carriers*, REDDIT.COM, *available at* https://www.reddit.com/r/chevycolorado/comments/1bfg19l/gm_selling_your_data _to_insurance_carriers/ (last accessed Nov. 24, 2024).

[342] Jamie L. LaReau, *GM cuts ties with 2 data firms amid heated lawsuits over driver data*, DETROIT FREE PRESS (Mar. 22, 2024), https://www.freep.com/story/money/cars/general-motors/2024/03/22/gm-data-firms-lexis-nexis/73057931007/.

or Verisk. Customer trust is a priority for us, and we are actively evaluating our privacy processes and policies.[343]

953.   A month later, on April 24, 2024, GM issued a press release, stating:[344]

At GM, we believe that vehicles are not just modes of transportation—they're also technology platforms that can enrich our customers' lives. Vehicles have become increasingly connected, intelligent, and personalized with features that improve the overall driving experience and safety on every journey. As our technology progresses, we are committed to being transparent in our privacy practices and empowering customers with control of their data.

Over the last several weeks, we have heard feedback from many customers about the OnStar Smart Driver product. Customer trust is a priority for us, which is why we have taken several decisive actions and are continuing to review our processes:

- **Discontinuing OnStar Smart Driver:** We established the Smart Driver product to promote safer driving behavior for the benefit of customers who chose to participate. However, we've decided to discontinue Smart Driver across all GM vehicles and unenroll all customers. This process will begin over the next few months.

- **Terminating partnerships with LexisNexis and Verisk:** We terminated our relationships with third-party telematics companies, LexisNexis and Verisk. Any data sharing with these companies ended on March 20, 2024.

- **Enhancing privacy controls:** We are working on enhanced privacy controls aimed at greater transparency. At the same time, we are focused on providing customers with the ability to manage vehicle performance, diagnostics and, most

---

[343] https://www.onstar.com/services/smart-driver (last accessed Apr. 25, 2024)

[344] *Based on customer feedback, GM is discontinuing Smart Driver*, NEWS.GM.COM (Apr. 24, 2024), https://news.gm.com/home.detail.html/Pages/news/us/en/2024/apr/0424-driver.html.

importantly, what is needed to keep them and their vehicles safe.

- **New leadership:** Alisa Bergman will join General Motors as our new Chief Trust and Privacy Officer on April 29, 2024. She comes to GM from Fanatics, where she served as Chief Privacy Officer (CPO), and before that held the roles of CPO at Adobe and Warner Bros. She was a Board member for the International Association of Privacy Professionals (IAPP) and is currently on the Advisory Boards of the IAPP AI Governance Center and The Future of Privacy Forum.

We appreciate hearing from customers and will continue to share updates on our progress.

954. On April 30, 2024, GM emailed consumers that it was discontinuing Smart Driver:





*Screenshot of April 30, 2024, Email to Plaintiff Melvin Drews.*

955.   On September 25, 2024, GM updated its Privacy Statement,[345] adding, among other things, the following:

**Driving Behavior information**
We may disclose Driver Behavior Information collected from connected vehicles to our affiliates and categories of third parties for

---

[345] *General Motors U.S. Consumer Privacy Statement* (Sept. 25, 2024), available at https://www.gm.com/privacy-statement.

the following limited purposes: ... Where you have given your affirmative consent to disclose Driver Behavior Information with General Motors Insurance for usage-based insurance offers or to help determine your rate for an insurance quote or policy. . . .

**Sharing or transferring your connected vehicle**
The nature of our connected vehicles means that there may be circumstances where you might let someone else use a product or service that we provide to you (*for example, you enrolled your vehicle in OnStar and then let someone else drive the vehicle*). It is important that if you do let someone else use one of our products or services that you inform them of this Privacy Statement and of the privacy choices that you have made.

If you sell or otherwise transfer your vehicle, we strongly encourage you to delete all Personal Information (such as contacts, address searches, saved map addresses, or preferences) from the vehicle and contact us to transfer or cancel your account. If you do not delete this Personal Information, it may remain in the vehicle and may be accessible to future users of the vehicle. For instructions on how to delete Personal Information from your vehicle, please refer to your owner's manual. . . .

956.   On October 7, 2024: GM sent an email to customers titled "An Update on our Privacy Statement." In the email, GM stated (emphasis added):

Every day, we at GM continue to evolve the driving experience, with the intention of making our cars safer and offering you more features and functionality. We value the trust you place in us and are working hard to continue raising the bar on our privacy practices. With this in mind, **we have updated and consolidated many of our privacy statements to make the information easier to find, read, and navigate**. You can review the full statement from the link below. Here are some highlights:

**We consolidated our key statements** across our websites, OnStar connected services, and vehicle mobile apps into a single statement **to make our practices more accessible**.

We reorganized sections of our privacy statement for improved clarity.

**We created new sections that highlight connected vehicle data, including privacy controls we offer.**

Our full consolidated privacy statement is available at www.gm.com/privacy. Thank you for being a valued GM customer.[346]

B.   **Verisk discontinues its telematics exchange shortly after the litigation is commenced.**

957.   Shortly after litigation commenced, at Verisk's Spring Insurance Conference (VIC), in April/May 2024, Verisk announced the discontinuation of its telematics program. CEO Lee Shavel explained the decision: "The simple answer is that the entities that were providing that data to us decided to discontinue collecting that data. And so there was really not sufficient analytical value in that without the data that was being provided. And I think it's fair to assume that it's a function of some of the media attention to collect connected car data. So that really was the simple reason."[347]

958.   Around the same time, Verisk also made changes to its Verisk Reports. For example, upon information and belief, Verisk removed the "Data Requested By"

[346] *An update on our Privacy Statement*, NEWS.GM.COM (Sept. 25, 2024), https://news.gm.com/home.detail.html/Pages/news/us/en/2024/sep/0925-privacy.html.
[347] Shefi Ben-Hutta, *Verisk discontinues telematics offerings and more*, COVERAGER (Mar 2, 2024), https://coverager.com/verisk-discontinues-telematics-offering-and-more/.

field in its Verisk Report as of April 9, 2024. By removing this field, which purported to show the insurers that received access to consumers' Verisk Reports, Verisk has prevented Plaintiffs and Class Members from accessing this information.[348]

**C.     LexisNexis continues to market its telematics exchange: "shrouded in secrecy."**

959.   In its March 20, 2024, Article, the *Detroit Free Press* reported that LexisNexis did not respond to a request for comment on the lawsuit.[349] According to Recorded Future News, "[m]uch of LexisNexis Risk Solutions' work remains shrouded in secrecy."[350]

960.   Unlike Verisk, LexisNexis "continues to prominently promote" its driving behavior data report for insurers.[351]

---

[348] *See* Plaintiff Parkhurst's Apr. 5, 2024 Verisk Report ("Any insurers that have requested access to these records are shown in the report area captioned as 'Data Requested By.'"; Jonathan Lopez, *Comment section:   GM Denies Illegal Data Sharing In OnStar Lawsuit*, GM Authority (April 24, 2024), *available at* https://gmauthority.com/blog/2024/04/gm-denies-illegal-data-sharing-in-onstar-lawsuit/ ("I called Verisk and they said GM had told them to delete all the data on April 10, so I didn't need to request a deletion of data. They also said the VDE-IRD-Root means that they transferred my data to Root Insurance (before GM cancelled it). Who knows what happened to the data after Root Insurance got it.").

[349] Jamie L. LaReau, *GM cuts ties with 2 data firms amid heated lawsuits over driver data*, DETROIT FREE PRESS (Mar. 22, 2024), https://www.freep.com/story/money/cars/general-motors/2024/03/22/gm-data-firms-lexis-nexis/73057931007/.

[350] Suzanne Smalley, *Data broker shuts down product related to driver behavior patterns*, THE RECORD (June 24, 2024), https://therecord.media/data-broker-shuts-product-driver-patterns.

[351] *Id.*

961.   At an industry conference in May 2024, LexisNexis's Global Data Protection Officer Rick Gardner "refused to tell Recorded Future News how many automakers the company works with."[352] Recorded Future News reported that "[d]espite declining to say how many automakers [LexisNexis] works with, Gardner was more direct about the company's relationship with insurers. 'We do a lot with insurance companies[.]'"[353]

## **TOLLING**

962.   All applicable statute(s) of limitations have been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein. Plaintiffs and Class Members' causes of action could not have accrued and did not accrue until shortly before the filing of this action, because Plaintiffs and Class Members could not have reasonably discovered Defendants' practice of covertly collecting, recording, using, sharing, and profiting from Driving Data until shortly before this class action litigation began.  Given Defendants' surreptitious collection of Driving Data without providing adequate notice or obtaining consent, Defendants should be equitably estopped from asserting any statute of limitations defense, as consumers

---

[352] *Id.*

[353] Suzanne Smalley, *Data broker shuts down product related to driver behavior patterns*, THE RECORD (June 24, 2024), https://therecord.media/data-broker-shuts-product-driver-patterns.

did not know, and would have no reason to know, that they were impacted by Defendants' practices.

## CLASS ACTION ALLEGATIONS

963. Plaintiffs bring this action individually and on behalf of all other similarly situated individuals pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), (b)(3). Plaintiffs seek certification of the following classes:

**Nationwide Class**: All persons residing in the United States and its territories whose GM-branded vehicle Driving Data was collected, stored, distributed, and/or sold by Defendants.

**FCRA Subclass**: All persons residing in the United States and its territories whose GM-branded vehicle Driving Data was collected, stored, distributed, and/or sold by Defendants, and for which a report was created, which was then disclosed to a third party.

**State Subclass**: All persons residing in [state] whose GM-branded vehicle Driving Data was collected, stored, distributed, and/or sold by Defendants.

964. Excluded from the Classes are Defendants, any entity in which Defendants have a controlling interest, any of the officers or directors of Defendants, the legal representatives, heirs, successors, and assigns of Defendants, and any Judge to whom this case is assigned, the court's staff, and their immediate family.

965. The Class Period extends from the date that Defendants began implementing the practices described in this Complaint to the date of entry of judgment.

966. Plaintiffs' claims described in detail below satisfy the numerosity, commonality, typicality, adequacy, and superiority requirements for class certification under Fed. R. Civ. P. 23.

967. <u>Numerosity</u>: The class numbers in the millions of persons. As a result, joinder of all class members in a single action is impracticable.

968. <u>Ascertainability</u>: All members of the Class are ascertainable by reference to objective criteria, as Defendants have access to names, addresses, and other contact information for all Class members that can be used for notice purposes. Class members may be informed of the pendency of this action through regular mail, e-mail, text, and/or posting of an approved notice. To the extent Defendants have not maintained complete records sufficient to identify class members, engaged in practices resulting in the destruction of data that would have been sufficient to identify class members, or have otherwise maintained their records in a way that makes it difficult to identify class members, they should be equitably estopped from raising any defense related to class member identification.

969. <u>Common Questions of Law and Fact Predominate</u>: There are common questions of fact and law to the classes that predominate over any questions affecting only individual class members. The questions of law and fact common to the classes arising from Defendants' acts and omissions include, without limitation, the following:

a. Whether GM collected Plaintiffs' and Class Members' Driving Data;

b. Whether Plaintiffs and Class Members consented to such collection;

c. Whether Plaintiffs and Class Members consented to have their Driving Data shared with LexisNexis, Verisk, and other third parties;

d. Whether LexisNexis or Verisk knew, or should have known, that GM did not have consent to transmit Class Members' Driving Data to them;

e. Whether LexisNexis or Verisk obtained Plaintiffs' and Class Members' Driving Data without consent;

f. Whether LexisNexis or Verisk sold Plaintiffs' and Class Members' Driving Data to third parties without consent;

g. Whether the Driving Data reported is "inaccurate" within the meaning of § 1681e(b);

h. Whether Defendants followed reasonable procedures to assure maximum possible accuracy of the Driving Data as required by § 1681e(b);

i. Whether Defendants' conduct constitutes violations of the Fair Credit Reporting Act;

j. Whether Defendants' conduct constitutes violations of the Federal Wiretap Act;

k. Whether Defendants' conduct constitutes violations of the Stored Communications Act;

l. Whether Defendants' conduct constitutes violations of the Computer Fraud and Abuse Act;

m. Whether Defendants were unjustly enriched;

n. Whether Defendants' conduct constitutes an invasion of privacy;

o. Whether Defendants' conduct was knowing and willful;

p. Whether Defendants are liable for damages, and the amount of such damages; and

q. Whether Defendants should be enjoined from such conduct in the future.

970. _Typicality_: Plaintiffs' claims are typical of those of the class in that all were subject to the same data collection, use, and sharing practices of Defendants.

971. _Superiority_: Class treatment is superior to individual treatment, as it will permit a large number of similarly situated persons to prosecute their respective class claims in a single forum, simultaneously, efficiently, and without unnecessary

duplication of evidence, effort, and expense that numerous individual actions would produce. Defendants have acted or refused to act on grounds generally applicable to the class. Absent a class action, most of the members of the Class would find the cost of litigating their claims to be prohibitive and would have no effective remedy. Separate actions by individual class members would unnecessarily burden the courts, could create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for Defendants, and/or substantially impair or impede the ability of class members to protect their interests. Additionally, Defendants have thus far enjoyed the benefits of consolidated litigation through the creation of this multidistrict litigation in order to avoid inconsistent judgments in courts across the country, and have asked the Judicial Panel on Multidistrict Litigation to consolidate dozens of actions before one court so that they benefit from collective litigation, including consolidated discovery, decisions on the merits that could potentially dispose of dozens of actions, and dismissals of any actions not brought on behalf of Plaintiffs referenced in this consolidated, representative complaint. Defendants' actions have demonstrated the superiority of class treatment by virtue of their participation in collective action in order to preserve resources and obtain consistent rulings.

972. <u>Adequacy</u>: Plaintiffs are adequate representatives because they are members of the classes they seek to represent, and their interests do not conflict with

the interests of the members of those classes. The interests of the members of the classes will be fairly and adequately protected by Plaintiffs and their undersigned counsel, who are experienced prosecuting complex consumer class actions, including in multi-district litigation involving privacy.

973. To the extent not all issues or claims, including the amount of damages, can be resolved on a class-wide basis, Plaintiffs invoke Federal Rule of Civil Procedure 23(c)(4), reserving the right to seek certification of a class action with respect to particular issues, and Federal Rule of Civil Procedure 23(c)(5), reserving the right to divide the class into additional subclasses. To the extent Plaintiffs seek declaratory or injunctive relief, Defendants have acted or refused to act on grounds that apply generally to the class, rendering certification under Rule 23(b)(2) appropriate.

## CLAIMS ON BEHALF OF THE NATIONWIDE CLASS

## COUNT 1

### VIOLATION OF THE FEDERAL WIRETAP ACT, 18 U.S.C. §§ 2510, *et seq.*

*On Behalf of Plaintiffs and the Nationwide Class Against GM*

974. Plaintiffs repeat and reallege Paragraphs 1-973, as if fully alleged herein.

975.   The Federal Wiretap Act ("FWA"), as amended by the Electronic Communications Privacy Act of 1986 ("ECPA"), prohibits the intentional interception, use, or disclosure of any wire, oral, or electronic communication.

976.   In relevant part, the FWA prohibits any person from intentionally intercepting, endeavoring to intercept, or procuring "any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a).

977.   The FWA also makes it unlawful for any person to intentionally disclose, or endeavor to disclose, to any other person or to intentionally use, or endeavor to use, the "contents of any wire, oral, or electronic communication, knowing or having reason to know that" the communication was obtained in violation of the FWA. 18 U.S.C. § 2511(1)(c) & (d).

978.   The FWA provides a private right of action to any person whose wire, oral, or electronic communication is intercepted, used, or disclosed. 18 U.S.C. § 2520(a).

979.   The FWA defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

980.   The FWA defines "electronic communication" as "any transfer of signs, signals, . . . data, or intelligence of any nature transmitted in whole or in part

by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

981.   The FWA defines "electronic, mechanical, or other device" as "any device or apparatus which can be used to intercept a wire, oral, or electronic communication." 18 U.S.C. § 2510(5).

982.   The FWA defines "contents," with respect to any covered communication, to include "any information concerning the substance, purport, or meaning of that communication[.]" 18 U.S.C. § 2510(8).

983.   The FWA defines "person" to include "any individual, partnership, association, joint stock company, trust, or corporation[.]" 18 U.S.C. § 2510(6).

984.   GM, a corporation, is a person as defined by 18 U.S.C. § 2510(6).

985.   The data and transmissions within, to, and from Plaintiffs' and Class Members' vehicles constitute "electronic communications," as defined by 18 U.S.C. § 2510(12), as they are transfers of signals, data, and intelligence transmitted by electromagnetic, photoelectronic or photooptical systems that affect interstate commerce.

986.   As alleged herein, GM has intercepted, in real time and as it was transmitted, the contents of electronic communications transmitted within, to, and from Plaintiffs' vehicles, and has diverted those communications to itself without consent.

987. GM intercepted these electronic communications in real time separately from and in addition to accessing data stored in Plaintiffs' and Class Members' vehicle components.

988. GM intercepted these data transmissions by diverting them, during flight to a TCU or similar device, and to its own servers, unbeknownst to Plaintiffs and Class Members.

989. As detailed herein, the electronic communications detailed above that GM has intercepted are tied to individual drivers and vehicles, and not anonymized.

990. Plaintiffs and Class Members have a reasonable expectation of privacy within their vehicles, and Plaintiffs and Class Members reasonably expected privacy while driving their vehicles. Further, there is a reasonable expectation that the interactions between a driver and their vehicle, *i.e.,* their personal driving behaviors and data related thereto, are private.

991. Common understanding and experience of how automotive vehicles work create a reasonable expectation that a vehicle manufacturer and service provider like GM would not surreptitiously intercept and divert the detailed and personal electronic communications described above.

992. In further violation of the FWA, GM has intentionally disclosed or endeavored to disclose to third parties the contents of the electronic communications described above while knowing or having reason to know that the information was

obtained through the interception of the communications in violation of 18 U.S.C. § 2511(1)(a). 18 U.S.C. § 2511(1)(c).

993.   In further violation of the FWA, GM has intentionally used or endeavored to use the contents of the electronic communications described above knowing or having reason to know that the information was obtained through interception in violation of 18 U.S.C. § 2511(1)(a). 18 U.S.C. § 2511(1)(d).

994.   Specifically, GM has disclosed and used the contents of the electronic communications described above by selling Plaintiffs' and Class Members' Driving Data to LexisNexis, Verisk, and other third parties for their own financial and commercial benefit, obtaining substantial profit.

995.   As a result, Plaintiffs and Class Members have suffered harm and injury due to the interception, disclosure, and/or use of electronic communications containing their private and personal information.

996.   Pursuant to 18 U.S.C. § 2520, Plaintiffs and Class Members have been damaged by GM's interception, disclosure, and/or use of their communications in violation of the Wiretap Act and are entitled to: (1) appropriate equitable or declaratory relief; (2) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiffs and the Class and any profits made by GM as a result of the violation or (b) statutory damages for each Class Member of whichever is the greater of $100 per day per violation or

$10,000; and (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

## COUNT 2

### VIOLATION OF THE FEDERAL WIRETAP ACT, 18 U.S.C. §§ 2510, *et seq.*

*On Behalf of Plaintiffs and the Nationwide Class Against Verisk and LexisNexis*

997. Plaintiffs repeat and reallege Paragraphs 1- Paragraphs 1-973, as if fully alleged herein.

998. Plaintiffs specifically restate the allegations of Paragraphs 974-996, relating to the elements and definitions under the FWA.

999. LexisNexis, a corporation, is a person as defined under 18 U.S.C. § 2510(6).

1000. Verisk, a corporation, is a person as defined under 18 U.S.C. § 2510(6).

1001. In violation of 18 U.S.C. § 2511(1)(c), LexisNexis and Verisk intentionally disclosed or endeavored to disclose to third parties the contents of the electronic communications sent within, to, and from Plaintiffs' and Class Members' vehicles that were intercepted by GM, as described above, while knowing or having reason to know that the information was obtained through the interception of the communications in violation of 18 U.S.C. § 2511(1)(a).

1002. In violation of 18 U.S.C. § 2511(1)(d), LexisNexis and Verisk intentionally used or endeavored to use the contents of the electronic

communications sent within, to, and from Plaintiffs' and Class Members' vehicles that were intercepted by GM, as described above, while knowing or having reason to know that the information was obtained through the interception of the communications in violation of 18 U.S.C. § 2511(1)(a).

1003. Specifically, LexisNexis and Verisk intentionally disclosed or endeavored to disclose Plaintiffs' and Class Members' Driving Data to various entities including auto insurance companies.

1004. LexisNexis and Verisk have used or have endeavored to use Plaintiffs' and Class Members' Driving Data because they used the information derived from the electronic communications described above to create products they market, license, and sell, including so-called driving scores, risk ratings, and access to databases containing Plaintiffs' and Class Members' Driving Data.

1005. LexisNexis and Verisk have used and disclosed the information derived from the electronic communications described above in aggregate fashion to create their telematics exchange, develop risk models, and other products they market and sell.

1006. LexisNexis and Verisk have used and disclosed the contents of the communications described above for their own financial and commercial benefit, obtaining substantial profit.

1007. LexisNexis and Verisk knew or had reason to know that the information they obtained from GM was obtained through the unlawful interception of communications in violation of 18 U.S.C. § 2511(1)(a).

1008. Specifically, LexisNexis and Verisk knew or should have known that the detailed driving information they used and sold was captured in secret in violation of 18 U.S.C. § 2511(1)(a) for the following reasons, among others that will become known through discovery:

    a.  the numerous, obvious consent and privacy challenges to the collection of Driving Data that both LexisNexis and Verisk acknowledged in writing and in presentations;

    b.  the opaque disclosures in GM's various terms and policies, which did not operate as a reasonable basis for inferring consumer consent to share the information with LexisNexis and Verisk, and both LexisNexis and Verisk understood that consumer consent for the collection of the information could be an issue if the "chain of consent" were broken;

    c.  the sheer volume of data LexisNexis and Verisk were receiving from GM versus from other manufacturers gave LexisNexis and Verisk reason to know that GM was harvesting data without consumer consent;

d. the lack of public knowledge about GM's collection and sharing practices until at least 2024;

e. that fact that LexisNexis continued to collect after it was publicized that collection was secret/happening without consent or knowledge; and

f. the nature of the data as such that it had to be obtained via an interception of electronic communications within, to, and from consumers' vehicles.

1009. Upon information and belief, GM and LexisNexis continue to disclose and use unlawfully obtained Driving Data for their own financial gain to this day.

1010. As a result, Plaintiffs and Class Members have suffered harm and injury due to the interception, disclosure, and/or use of their private and personal information.

1011. Pursuant to 18 U.S.C. § 2520, Plaintiffs and Class Members have been damaged by the disclosure, and/or use of the electronic communications described above in violation of the Wiretap Act and are entitled to: (1) appropriate equitable or declaratory relief; (2) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiffs and the Class and any profits made by LexisNexis and Verisk as a result of the violation or (b) statutory damages for each Class Member of whichever is the greater of $100

per day per violation or $10,000; and (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

## COUNT 3

### VIOLATION OF THE STORED COMMUNICATIONS ACT, 18 U.S.C. §§ 2701, *et seq.*

*On Behalf of Plaintiffs and the Nationwide Class Against GM*

1012. Plaintiffs and Class Members repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1013. Plaintiffs and Class Members specifically restate the allegations relating to the elements and definitions under the FWA/ECPA set forth above.

1014. The Federal Stored Communications Act ("SCA"), enacted in 1986 as part of the ECPA, creates a civil remedy for those whose stored electronic communications have been obtained by one who "intentionally accesses without authorization" or "intentionally exceeds an authorization to access" a facility through which an electronic communication service ("ECS") is provided. 18 U.S.C. §§ 2701, 2707.

1015. The Act reflects Congress's judgment that users have a legitimate interest in the confidentiality and privacy of communications in electronic storage.

1016. "Electronic communication" is defined as "any transfer of signs, signals, . . . data, or intelligence of any nature transmitted in whole or in part by a

wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

1017. "Electronic communication service" means "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15) (incorporated by reference in 18 U.S.C. § 2711(1)).

1018. "Electronic storage" is defined as "(A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and (B) any storage of such communication by an electronic communication service for purposes of backup protection of such communication . . . ." 18 U.S.C. §§ 2510(17) (incorporated by reference in 18 U.S.C. § 2711(1)).

1019. Plaintiffs, as individuals, and GM, as a corporation or legal entity, are "persons" within the meaning of 18 U.S.C. § 2510(6), and for purposes of 18 U.S.C. § 2707.

1020. As alleged herein, the electronic communications transmitted within, to, and from Plaintiffs' and Class Members' vehicles are stored in electronic components of those vehicles, including ECUs and the TCU.

1021. In-vehicle units with storage function, such as ECUs and TCUs, are facilities through which electronic communication services are provided because

they provide users, such as Plaintiffs and Class Members, the ability to send and receive electronic communications including related to their Driving Data.

1022. As alleged herein, there is a reasonable expectation of privacy within a person's vehicle, and Plaintiffs and Class Members reasonably expected privacy while driving their vehicles. Further, there is a reasonable expectation that the interactions and communications between driver and vehicle, *i.e.*, personal driving behaviors and data related thereto, are private.

1023. Common understanding and experience regarding how automotive vehicles work create a reasonable expectation that GM would not access the electronic communications described above that are stored in Plaintiffs' and Class Members' vehicles.

1024. GM, without the consent or authorization of Plaintiffs or Class Members, accessed certain data stored in the vehicle and transmitted it to GM's servers via cellular network from storage after the completion of a trip or at the end of the day or on some other periodic basis.

1025. GM accessed these temporarily stored electronic communications in addition to and separately from intercepting other electronic communications transmitted in real time.

1026. As detailed herein, the data contained in the electronic communications detailed above that GM has accessed are tied to individual drivers and vehicles, and not anonymized.

1027. Plaintiffs and Class Members did not consent to GM accessing the Driving Data communications stored in the vehicle.

1028. GM intentionally accessed each of these facilities without authorization.

1029. GM intentionally exceeded its authority to access these facilities.

1030. In accessing these facilities without authorization and obtaining access to the electronic communications stored there, GM violated the SCA, 18 U.S.C. § 2701.

1031. GM's conduct was willful and intentional, and invaded Plaintiffs' and Class Members' expectations of privacy within their vehicle and privacy of the personal interactions and communications between driver and vehicle, *i.e.*, their Driving Data.

1032. The communications accessed by GM in violation of the SCA have significant value, evidenced by (1) the profits that GM has obtained from, among other things, selling the improperly accessed communications to Verisk and LexisNexis for marketing and licensing out to numerous third parties; and (2) the significant value of the aggregated data for various applications.

1033. Because of GM's conduct, Plaintiffs and Class Members have forever lost the value of their Driving Data, their privacy interest in their Driving Data, and their control over its use.

1034. Pursuant to 18 U.S.C. § 2707, Plaintiffs and Class Members have been damaged and aggrieved by GM's intentional acts in violation of the SCA and are entitled to bring this civil action to recover: (1) declaratory and equitable relief; (2) damages in an amount to be determined at trial, assessed as actual damages and any profits made by GM as a result of the violation, but in no case less than $1,000; (3) reasonable attorneys' fees and other litigation costs reasonably incurred; and, because Defendants' conduct was intentional, (4) punitive damages as determined by the Court.

## COUNT 4

### VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT
### 18 U.S.C. § 1030 *et seq.*

*On Behalf of Plaintiffs and the Nationwide Class Against GM*

1035. Plaintiffs and Class Members repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1036. The Computer Fraud and Abuse Act ("CFAA"), enacted in 1986 as part of the ECPA, prohibits the intentional accessing, without authorization or in excess of authorization, of a computer under certain circumstances. 18 U.S.C. § 1030(a).

1037. The Act reflects Congress's judgment that users have a legitimate interest in the confidentiality and privacy of information within their computers.

1038. The CFAA specifically provides that it is unlawful to "intentionally access a computer without authorization or exceed[] authorized access, and thereby obtain[]…information from any protected computer." 18 U.S.C. § 1030(a)(2)(c).

1039. Plaintiffs, as individuals, and GM, as a corporation or legal entity, are "persons" within the meaning of the CFAA. 18 U.S.C. § 1030(e)(12).

1040. A "computer" is defined as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device." 18 U.S.C. § 1030(e)(10).

1041. "Exceeds authorized access" is defined as "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain." 18 U.S.C. § 1030(e)(6).

1042. A "protected computer" is defined as "a computer . . . which is used in or affecting interstate or foreign commerce or communication…, [or that] has moved in or otherwise affects interstate or foreign commerce." 18 U.S.C. § 1030(e)(2)(B).

1043. Plaintiffs' and Class Members' in-vehicle control units, including the ECUs and TCU, and the systems of which they are a part, are electronic high-speed

data-processing devices performing logical, arithmetic, and storage functions and thus constitute a "computer" within the meaning of the CFAA. 18 U.S.C. § 1030(e)(1).

1044. These computers are created in facilities across the world, installed in vehicles designed for transportation, and they utilize GPS, cellular, and WiFi networks in addition to internal wires to send and receive information and electronic communications across state lines and internationally. Thus, they constitute "protected computers" within the meaning of the CFAA. 18 U.S.C. § 1030(e)(2)(B).

1045. GM intentionally accessed the protected computers in Plaintiffs' and Class Members' vehicles without Plaintiffs' or Class Members' authorization, or in a manner that exceeded Plaintiffs' and Class Members' authorization, and obtained information therefrom in violation of the CFAA. 18 U.S.C. § 1030(a)(2)(C).

1046. Plaintiffs and Class Members have suffered harm and injury due to GM's unauthorized access to the communications containing their private and personal information.

1047. A civil action for violation of the CFAA is proper if the conduct involves "loss to 1 or more persons during any 1-year period … aggregating at least $5,000 in value." Because the loss to Plaintiffs and Class Members during any one-year period within the relevant timeframe, including the loss of their privacy interest in and control over their Driving Data, exceeded $5,000 in aggregate, Plaintiffs and

the Class are entitled to bring this civil action and are entitled to economic damages, compensatory damages, injunctive, equitable, and all available statutory relief, as well as their reasonable attorney's fees and costs and other relief as permitted by the CFAA. 18 U.S.C. § 1030(g).

**COUNT 5**

**INVASION OF PRIVACY**

*Against All Defendants on Behalf of Plaintiffs and the Nationwide Class, or Alternatively, on Behalf of Plaintiffs and the Statewide Subclasses*

1048. Plaintiffs repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1049. Plaintiffs and Class Members have a common law, legally-or constitutionally-protected privacy interest in their Driving Data and are entitled to the protection of their Driving Data against unauthorized access.

1050. Plaintiffs and Class Members have a reasonable expectation of privacy in their driving abilities, habits, patterns, and behavior engaged in while they are in their own vehicles, and in any compilation of highly personalized driving behavior profile resulting from the collection of such data.

1051. As Plaintiffs and Class Members drive their GM cars to work, visit family, or simply go about their days, they have unknowingly created troves of highly sensitive data mapping their respective personal lives which is then collected,

captured, transmitted, accessed, compiled, stored, analyzed, and sold—all without their knowledge or informed consent.

1052. The continued nonconsensual surveillance of an individual in their private capacity, as Defendants have done and continue to do, represents a fundamental violation of personal privacy, freedom, and autonomy. It is not simply an intentional intrusion but a profound and egregious infringement upon the most personal and sacred aspects of one's life. Plaintiffs and Class Members have unknowingly been subjected to constant observation while they go about their days, which destabilizes the very essence of personal liberty.

1053. As a result of Defendants' intentionally intrusive conduct, Plaintiffs and Class Members have been and still remain today under pervasive surveillance compromising their privacy, autonomy, and basic human dignity that our society relies upon and expects.

1054. Plaintiffs and Class Members have a reasonable expectation that data regarding their locations, driving abilities, patterns, decisions, and habits engaged in while they are in their own vehicles would not be collected by GM without their express consent, and that such data would not be shared with or used by third parties without their express consent.

1055. Without the consent or knowledge of Plaintiffs and Class Members, GM collected comprehensive Driving Data that Plaintiffs and Class Members reasonably expected to remain private.

1056. GM then disclosed this highly personal and sensitive information to LexisNexis, Verisk, and other third parties, who used the information and further disseminated it to third parties for commercial gain.

1057. Defendants intentionally invaded Plaintiffs' and Class Members' privacy interests by deliberately designing devices and programs that surreptitiously obtain, improperly gain knowledge of, review, retain, package, and sell their confidential driving history.

1058. Defendants' conduct is highly offensive to a reasonable person and constitutes an egregious breach of social norms underlying the right to privacy, as evidenced by substantial research, literature, and governmental enforcement and investigative efforts to protect consumer privacy against surreptitious technological intrusions.

1059. By tracking, collecting, storing, distributing and selling Plaintiffs' and Class Members' Driving Data without authorization or consent to do so, Defendants intentionally intruded upon Plaintiffs' and Class Members' seclusion, solitude, and private life engaged in within the confines of their respective vehicles, without their knowledge or permission.

1060. Defendants' conduct infringed Plaintiffs' and Class Members' privacy interests by, among other things: (1) allowing the dissemination and/or misuse of their Driving Data; (2) preventing Plaintiffs and Class Members from maintaining control over the type of information that GM track and/or record; and (3) preventing Plaintiffs and Class Members from making personal decisions and/or conducting personal activities without observation, intrusion, or interference, including being able to drive without their Driving Data being intercepted and made publicly available without Plaintiffs' and Class Members' knowledge or consent.

1061. In sharing Plaintiffs' and Class Members' Driving Data in inherently and contextually misleading fashions that inaccurately report Plaintiffs' driving events and abilities, Defendants acted in reckless disregard of Plaintiffs' and Class Members' privacy rights, intentionally and unlawfully intruded into their seclusion, and publicly disclosed their private data that was false or inaccurate.

1062. Defendants' intentional intrusions unlawfully allowed access to Plaintiffs' and Class Members' Driving Data as a service to third parties without consent. Plaintiffs and Class Members did not receive any compensation in return for the improper use of their Driving Data. Defendants deprived Plaintiffs and Class Members of the right to control how their Driving Data is collected, used, or disseminated and by whom.

1063. Defendants have improperly profited from their invasion of Plaintiffs' and Class Members' privacy and their use of Plaintiffs' and Class Members' Driving Data for their economic value and their own commercial gain.

1064. As a direct and proximate result of Defendants' unlawful invasions of privacy, Plaintiffs' and Class Members' reasonable expectations of privacy were frustrated, exploited, compromised, and defeated.

1065. Plaintiffs and Class Members were harmed by Defendants' wrongful conduct causing their loss of privacy and the confidentiality of their own private conduct within the confines of their own vehicle. Defendants have needlessly harmed Plaintiffs by capturing their Driving Data through their connected services. This intrusion, disclosure of information, and loss of privacy and confidentiality has caused Plaintiffs to suffer mental anguish, actual damages, lost value in their personal data, and an invasion of their privacy in an amount to be determined at trial.

1066. Unless and until enjoined, and restrained by order of this Court, Defendants' wrongful conduct will cause irreparable injury to Plaintiffs and Class Members in that their Driving Data maintained by Defendants may be viewed, distributed, and used by unauthorized third parties for years to come.

1067. Plaintiffs and Class Members seek nominal, compensatory, and punitive damages as a result of Defendants' actions. Plaintiffs seek actual damages suffered, plus any profits attributable to Defendants' use of Plaintiffs' and Class

Members' Driving Data. Punitive damages are warranted because Defendants' malicious, oppressive, and willful actions were done in conscious disregard of their rights. Punitive damages are also warranted to deter Defendants from engaging in future misconduct.

## COUNT 6

## CIVIL CONSPIRACY TO COMMIT INVASION OF PRIVACY

*Against All Defendants on Behalf of Plaintiffs and the Nationwide Class, or Alternatively, on Behalf of Plaintiffs and the Statewide Subclasses*

1068. Plaintiffs repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1069. All Defendants knowingly and willfully conspired and agreed among themselves to invade Plaintiffs' and Class Members' privacy and committed acts in furtherance of the conspiracy resulting in the interference with Plaintiffs' and Class Members' possessory rights in their personal property and the unlawful extraction and exploitation of Plaintiffs' and Class Members' highly sensitive Driving Data.

1070. Defendants entered into an agreement to unlawfully record, collect, capture, transmit, compile, intercept, evaluate, and sell Plaintiffs' and Class Members' Driving Data encompassing driving abilities, patterns, decisions, and habits engaged in while they were in their own vehicles conducting private matters without Plaintiffs' knowledge or informed consent.

1071. Defendants knowingly participated in the conspiracy, with intent to deprive Plaintiffs and Class Members of their possessory rights, privacy, and economic benefit in their highly sensitive driving behavior and driving history, and to use the data for Defendants' unlawful financial gain.

1072. Defendants maliciously conspired and acted with the intent of depriving Plaintiffs and Class Members of their right to privacy, intending to cause emotional distress and damage to their reputation to achieve greater industry market share and obtain profits at the Plaintiffs' and Class Members' expense.

1073. The purpose of Defendants' agreement was to engage in acts that constitute an invasion of Plaintiffs' and Class Members' privacy, including but not limited to: (1) establishing systems for extracting Driving Data from Plaintiffs' and Class Members' vehicles and processing it into marketable formats; (2) the unauthorized collection and evaluation of Plaintiffs' and Class Members' Driving Data, including highly sensitive information such as vehicle location, speed, and personal driving habits; (3) entering into contracts with third parties for the sale or licensing of Plaintiffs' and Class Members' Driving Data; and (4) the dissemination and sale of Plaintiffs' and Class Members' Driving Data to third parties for profit without Plaintiffs' consent or awareness.

1074. In furtherance of their conspiracy, Defendants performed substantial acts, including but not limited to: (1) utilizing tracking technologies, devices, and

software embedded in vehicles and/or mobile applications to surreptitiously extract, obtain, improperly gain knowledge of, review, retain, package, and sell Plaintiffs' and Class Members' Driving Data; (2) analyzing and compiling Plaintiffs' Driving Data into evaluative reports that personally identified Plaintiffs and Class Members in contextually misleading fashions that misreport their driving abilities; and (3) selling or licensing the data to third parties, including insurers and data brokers, and making available to essentially all participants in the public marketplace, knowing that Plaintiffs and Class Members did not consent to such collection or use. Defendants' conduct constituted and continues to constitute an invasion of Plaintiffs' and Class Members' privacy by:

a. *Intrusion Upon Seclusion*: Defendants intentionally intruded upon Plaintiffs' and Class Members' private driving habits and location without consent, in a manner that would be highly offensive to a reasonable person.

b. *Misappropriation of Personal Information*: Defendants misappropriated Plaintiffs' and Class Members' Driving Data for their own commercial benefit without authorization or compensation.

1075. Defendants knowingly and intentionally participated in the conspiracy with the understanding and common goal for their conduct to result in an invasion of Plaintiffs' and Class Members' privacy and seclusion.

1076. As a direct and proximate result of Defendants' conspiracy and wrongful acts, Plaintiffs and Class Members' have suffered harm, including but not limited to: loss of privacy; emotional distress and mental anguish; diminution of control over Plaintiffs' and Class Members' Driving Data; and economic harm from the exploitation of Plaintiffs' and Class Members' Driving Data without compensation.

1077. Plaintiffs and Class Members are entitled to just compensation including appropriate monetary damages in an amount to be determined by a jury at trial.

## COUNT 7

### UNJUST ENRICHMENT

*Against All Defendants on Behalf of Plaintiffs and the Nationwide Class, or Alternatively, on Behalf of Plaintiffs and the Statewide Subclasses*

1078. Plaintiffs repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1079. GM manufactured vehicles with embedded technology designed to collect significant amounts of Driving Data from Plaintiffs and Class Members and surreptitiously transmit this Driving Data to GM for its own use and disclosure; by

driving their vehicles, Plaintiffs and Class Members unknowingly conferred the benefit of their Driving Data on GM, LexisNexis, and Verisk.

1080. GM, LexisNexis, and Verisk knew and appreciated that benefit: GM collected and sold Plaintiffs' and Class Members' Driving Data, without Plaintiffs' and Class Members' consent, to LexisNexis and Verisk, and LexisNexis and Verisk in turn sold Plaintiffs' and Class Members' Driving Data to other third parties and also used it to build products and services.

1081. Plaintiffs and Class Members received no benefit from this use and sale of their Driving Data. Indeed, because Plaintiffs and Class Members did not consent to Defendants' collection and sale of Plaintiffs' and Class Members' Driving Data, they could not and do not benefit from such practices. It is therefore inequitable for Defendants to retain any profit from such collection and sale without payment to Plaintiffs and Class Members for the value of their Driving Data.

1082. GM is therefore liable to Plaintiffs and Class Members for restitution in the amount of the benefit conferred on GM as a result of its wrongful conduct, including specifically the value to GM of the Driving Data that GM wrongfully intercepted, collected, used, and sold to third parties, and the profits GM received or is currently receiving from the use and sale of that Driving Data.

## COUNT 8

## BREACH OF CONTRACT

*Against GM on Behalf of Plaintiffs and the Nationwide Class, or Alternatively, on Behalf of Plaintiffs and the Statewide Subclasses*

1083. Plaintiffs repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1084. Pursuant to Fed. R. Civ. P. 8(d)(2) and (3), Plaintiffs plead this claim in the alternative to Plaintiffs' unjust enrichment claim against GM. Plaintiffs allege that no contract was formed between Plaintiffs and GM that permitted GM to collect and sell Plaintiffs' and Class Members' Driving Data to third parties, including LexisNexis and Verisk.

1085. In the alternative, to the extent there exists any contract or contracts between Plaintiffs and GM regarding Plaintiffs' Driving Data, no contract provision therein permitted GM to collect Plaintiffs' Driving Data and sell that data to third parties, including LexisNexis and Verisk.

1086. Further, to the extent there exists any contract between Plaintiffs and GM regarding Plaintiffs' Driving Data, the implied covenant of good faith and fair dealing prohibits GM from doing anything which has the effect of injuring Plaintiffs' rights to receive the benefits of any such contract. By collecting and selling Plaintiffs' Driving Data to third parties without Plaintiffs' consent, GM has injured Plaintiffs' rights to receive the benefits of Plaintiffs' contract to purchase, lease, and enjoy the use of GM vehicles and related services.

1087. As such, GM breached any such contract by collecting Plaintiffs' Driving Data and selling it to third parties, including LexisNexis and Verisk.

1088. As a direct and proximate result of GM's breach of contract, Plaintiffs and Class members sustained actual losses and damages as described in detail above and are also entitled to recover nominal damages.

## COUNT 9

## TRESPASS TO CHATTELS

*Against all Defendants on Behalf of Plaintiffs and the Nationwide Class, or Alternatively, on Behalf of Plaintiffs and the Statewide Subclasses*

1089. Plaintiffs repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1090. Plaintiffs own, possess, and otherwise have a legally protected right of privacy and possession of their personal property, including their vehicle. Plaintiffs' right of privacy and possession also extends to the Driving Data collected while they are in the confines of their own vehicles and conducting private matters, and in any compilation of highly personalized driving behavior profiles resulting from the nonconsensual intrusive collection and disclosures of such data from their personal vehicles.

1091. Plaintiffs did not provide informed consent to Defendants' unauthorized and intrusive use, access, and interference with their vehicle and the hardware/systems contained therein.

1092. Defendants intentionally interfered with Plaintiffs' possessory interest in their private property by: (1) accessing and utilizing Driving Data generated by Plaintiffs' vehicle and associated systems/hardware without Plaintiffs' informed consent and authorization, and (2) embedding, enabling, and activating software/hardware to extract Driving Data from Plaintiffs' vehicle without informed consent to do so.

1093. As a direct and proximate result of Defendants' unauthorized and intrusive use, access, and interference, Plaintiffs' chattel was harmed and diminished in value. The harm Plaintiffs have suffered includes but is not limited to: loss of privacy; unauthorized use of Plaintiffs' vehicle systems for Defendants' commercial gain, the loss of control over their Driving Data and its associated economic value.

1094. Defendants' interference caused Plaintiffs to suffer damages, including economic harm related to the unauthorized exploitation of Plaintiffs' Driving Data.

1095. Plaintiffs are entitled to just compensation including appropriate monetary damages in an amount to be determined by a jury at trial.

## CLAIMS ON BEHALF OF THE FCRA SUBCLASS

## COUNT 10

## WILLFUL VIOLATION OF THE FAIR CREDIT REPORTING ACT
## 15 U.S.C. § 1681, *et seq.* ("FCRA")

*On Behalf of Plaintiffs and the FCRA Subclass Against Verisk and LexisNexis*

1096. Plaintiffs repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1097. Plaintiffs bring this cause of action on their own behalf and on behalf of the FCRA Subclass against Verisk and LexisNexis.

1098. Plaintiffs and FCRA Subclass Members are consumers entitled to the protections of the FCRA. 15 U.S.C. § 1681a(c).

1099. Under the FCRA, a "consumer reporting agency" includes any person which, for monetary fees or on a cooperative nonprofit basis, regularly engages, in whole or in part, in the practice of assembling or evaluating consumer credit information or other consumer information for the purpose of furnishing "consumer reports" to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports. At all relevant times, LexisNexis and Verisk were consumer reporting agencies. 15 U.S.C. § 1681a(f).

1100. Under the FCRA, a "consumer report" is any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living, which is used, expected to be used, or collected, in whole or in part, for the purpose of serving as a factor in establishing the consumer's eligibility for (i) credit or insurance to be used primarily for personal, family, or household purposes, (ii) employment purposes, or (iii) any

other purpose authorized by 15 U.S.C. § 1681b. At all relevant times, LexisNexis and Verisk had compiled and maintained "consumer reports" on Plaintiffs and FCRA Subclass Members. 15 U.S.C. § 1681a(d)(1).

1101. As consumer reporting agencies, LexisNexis and Verisk are and were required to identify, implement, maintain, and monitor systems to ensure the accuracy of consumer information in its possession, custody, and control, including Plaintiffs' and FCRA Subclass Members' Driving Data.

1102. LexisNexis and Verisk obtain driver behavior data from GM and OnStar and furnishes it to third parties, including automobile insurers, without Plaintiff' and other class Members' full knowledge and consent.

1103. LexisNexis's and Verisk's provision of credit information that includes driver behavior data to third parties, including automobile insurance companies, constitutes the furnishing of consumer reports under the FCRA and an impermissible purpose and use of data under the FCRA.

1104. The FCRA requires credit reporting agencies to adopt reasonable procedures to ensure the "maximum possible accuracy" of the consumer credit information it furnishes. 15 U.S.C. § 1681e(b).

1105. LexisNexis and Verisk, acting as consumer reporting agencies, as defined by 15 U.S.C. §1681c(1), have failed to implement procedures to maintain

"maximum possible accuracy" regarding Plaintiff' and Class Members' Driving Data.

1106. LexisNexis and Verisk have knowingly and willfully engaged in the collection and production of inaccurate data metrics regarding Plaintiff and class Members' driving abilities. Those actions have included, among other things as alleged herein:

a. Adopting and implementing systems which misreport Driver Data and PII as being associated with one individual, when that information should be associated with other individuals;

b. Continuing to misreport Driver Data and PII even when LexisNexis and Verisk know that the systems developed to collect and report such that information is prone to errors, does not correctly report Driver Data, provides no context for certain Driver Data, and is not subject to review to ensure that the Driver Data is correct;

c. Preparing reports which LexisNexis and Verisk knew, or were reckless in not knowing, that the Driver Data included therein was inaccurate.

1107. As a result of LexisNexis and Verisk's conduct, insurance carriers and others who view these consumer reports receive and in turn rely on an inaccurate representation of Plaintiff' and FCRA Subclass Members' driving abilities.

1108. The foregoing deceptive acts and practices constitute reckless and/or negligent violations of the FCRA, including, but not limited to, 15 U.S.C. §1681e(b).

1109. As a result of each and every willful violation of the FCRA, Plaintiff are entitled to actual damages as the Court may allow pursuant to 15 U.S.C.

§1681n(a)(1); statutory damages pursuant to 15 U.S.C. §1681n(a)(1); punitive damages as the Court may allow pursuant to 15 U.S.C. §1681n(a)(2); and reasonable attorneys' fees and costs pursuant to 15 U.S.C. §1681n(a)(3) from LexisNexis and Verisk.

1110. As a result of each and every negligent noncompliance of the FCRA, Plaintiff and Class Members are entitled to actual damages as the Court may allow pursuant to 15 U.S.C. §1681o(a)(1); and reasonable attorneys' fees and costs pursuant to 15 U.S.C. §1681o(a)(2) from Defendants.

## CLAIMS ON BEHALF OF THE ALABAMA SUBCLASS

## COUNT 11

### ALABAMA DECEPTIVE TRADE PRACTICES ACT
### Ala. Code §§ 8-19-1, *et seq.*

*Against All Defendants*

1111. The Alabama Plaintiff identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Alabama Subclass, repeats and realleges Paragraphs 1-973, as if fully alleged herein.

1112. Plaintiff and the Alabama Subclass Members are each a "consumer" as defined in Ala. Code § 8-19-3.

1113. GM, LexisNexis, and Verisk are each a "person" as defined by Ala. Code § 8-19-3.

1114. Plaintiff sent pre-suit notice pursuant to Ala. Code § 8-19-10(e) on November 22, 2024.

1115. GM, LexisNexis, and Verisk each engaged in "trade or commerce" affecting the people of Alabama by advertising, offering for sale, selling, or distributing goods and services in the State of Alabama. *See* Ala. Code § 8-19-3.

1116. GM engaged in unfair, unconscionable, unlawful, and/or deceptive acts and practices in conducting trade and commerce in violation of Ala. Code § 8-19-5, including:

   a. Intercepting, collecting, using, and selling Plaintiff's and Alabama Subclass Members' Driving Data without obtaining their consent;

   b. Omitting, suppressing, and concealing the material fact that GM was intercepting, collecting, using, and selling Plaintiff's and Alabama Subclass Members' Driving Data to LexisNexis, Verisk, and other third parties for GM's own financial and commercial benefit;

   c. Omitting, suppressing, and concealing the material fact that LexisNexis, Verisk, and other third parties collected, manipulated, used, and sold Plaintiff's and Alabama Subclass

Members' Driving Data for their own financial and commercial benefit;

d. Omitting, suppressing, and concealing material facts regarding the functionality of OnStar with respect to the privacy of consumers in their own vehicles;

e. Misrepresenting the purpose of OnStar and that it would protect the privacy of Plaintiff's and the Alabama Subclass Members' Driving Data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f. Failing to comply with common law and/or statutory duties pertaining to the privacy of Plaintiff's and Alabama Subclass Members' Driving Data.

1117. These statements, misrepresentations, omissions, and concealments constitute violations of Ala. Code § 8-19-5 (5), (7), (9) and (27).

1118. GM acted intentionally, knowingly, and maliciously to violate the Act, and recklessly disregarded Plaintiff's and Alabama Subclass Members' rights, because GM intentionally intercepted, collected, used, and sold Plaintiff's and Subclass Members' Driving Data without obtaining their consent.

1119. The fact that GM intercepted, collected, used, and sold Plaintiff's and Alabama Subclass Members' Driving Data was material to Plaintiff and Alabama

Subclass Members. This is a fact that reasonable consumers would consider important when choosing to purchase or lease a vehicle.

1120. Plaintiff and Alabama Subclass Members were deceived and/or could reasonably be expected to be deceived by GM's material misrepresentations and omissions regarding the functionality of OnStar, the security and privacy of their Driving Data, and their privacy in their own vehicles to their detriment.

1121. LexisNexis and Verisk engaged in unfair and unconscionable conduct in violation of the Act by engaging in the conduct alleged herein, including by soliciting and accepting Plaintiff and Alabama Subclass Members' Driving Data from GM with knowledge that such data was obtained without Plaintiff's and Subclass Members' consent, and further using, selling and disseminating Plaintiff's and Alabama Subclass Members' information without their consent.

1122. LexisNexis and Verisk also violated the Act by knowingly taking advantage of Plaintiffs' and Alabama Subclass Members' inability to reasonably protect their interests, due to their lack of knowledge regarding GM's practices, of which LexisNexis and Verisk were aware.

1123. As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive acts and practices, Plaintiff and Alabama Subclass Members have suffered and will continue to suffer injury, including, but not limited to, the loss of

privacy, the unauthorized dissemination of their valuable Driving Data, and economic harm stemming from GM's exploitation of their Driving Data.

1124. Defendants' unconscionable and unfair acts and practices caused substantial injury to Plaintiff and Alabama Subclass Members, which they could not reasonably avoid, and which outweighed any benefits to consumers or to competition.

1125. Plaintiff and the Alabama Subclass seek all monetary and non-monetary relief allowed by law, including the greater of (a) actual damages or (b) statutory damages of $100; treble damages; injunctive relief; attorneys' fees, costs, and any other relief that is just and proper.

## CLAIMS ON BEHALF OF THE ARIZONA SUBCLASS

## COUNT 12

## ARIZONA CONSUMER FRAUD ACT
### Ariz. Rev. Stat. §§ 44-1521, *et seq.*

*Against all Defendants*

1126. The Arizona Plaintiffs identified above ("Plaintiffs" for purposes of this Count), individually and on behalf of the Arizona Subclass, repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1127. Plaintiffs and members of the Arizona Subclass are each a "person" as defined by Ariz. Rev. Stat. § 44-1521.

1128. GM, LexisNexis, and Verisk are each a "person" as defined by Ariz. Rev. Stat. § 44-1521.

1129. GM, LexisNexis, and Verisk each engaged in trade directly or indirectly affecting the people of Arizona by advertising, offering for sale, selling or distributing goods and services in the State of Arizona. See Ariz. Rev. Stat. § 44-1521.

1130. GM engaged in unfair, unconscionable, unlawful, and/or deceptive acts and practices in conducting trade and commerce in violation of Arizona Revised Statute § 44-1522(A), including:

    a. Intercepting, collecting, using, and selling Plaintiffs' and Arizona Subclass Members' Driving Data without obtaining their consent;

    b. Omitting, suppressing, and concealing the material fact that GM was intercepting, collecting, using, and selling Plaintiffs' and Arizona Subclass Members' Driving Data to LexisNexis, Verisk, and other third parties for GM's own financial and commercial benefit;

    c. Omitting, suppressing, and concealing the material fact that LexisNexis, Verisk, and other third parties collected, manipulated, used, and sold Plaintiffs' and Arizona Subclass

Members' Driving Data for their own financial and commercial benefit;

d. Omitting, suppressing, and concealing material facts regarding the functionality of OnStar with respect to the privacy of consumers in their own vehicles;

e. Misrepresenting the purpose of OnStar and that it would protect the privacy of Plaintiffs' and the Arizona Subclass Members' Driving Data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f. Failing to comply with common law and/or statutory duties pertaining to the privacy of Plaintiffs' and Subclass Members' Driving Data.

1131. GM acted intentionally, knowingly, and maliciously to violate the Act, and recklessly disregarded Plaintiffs' and Arizona Subclass Members' rights, because GM intentionally intercepted, collected, used, and sold Plaintiffs' and Arizona Subclass Members' Driving Data without obtaining their consent.

1132. The fact that GM intercepted, collected, used, and sold Plaintiffs' and Arizona Subclass Members' Driving Data was material to Plaintiffs and Arizona Subclass Members. This is a fact that reasonable consumers would consider important when choosing to purchase or lease a vehicle.

1133.   Plaintiffs and Arizona Subclass Members were deceived and/or could reasonably be expected to be deceived by GM's material misrepresentations and omissions regarding the functionality of OnStar, the security and privacy of their Driving Data, and their privacy in their own vehicles to their detriment.

1134.   Plaintiffs' and the Arizona Subclass' Driving Data has tangible value. As a direct and proximate result of GM's unfair and deceptive acts and practices, Plaintiffs' and Arizona Subclass Members' Driving Data is in the possession of third parties—including LexisNexis and Verisk—who have used and will use such data for their commercial benefit.

1135.   As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive acts and practices, Plaintiffs and Arizona Subclass Members have suffered and will continue to suffer injury, including, but not limited to, the loss of privacy, the unauthorized dissemination of their valuable Driving Data, and economic harm stemming from GM's exploitation of their Driving Data.

1136.   LexisNexis and Verisk engaged in unfair and unconscionable conduct in violation of Arizona Revised Statute § 44-1522(A) by engaging in the conduct alleged herein, including by soliciting and accepting Plaintiffs' and Arizona Subclass Members' Driving Data from GM with knowledge that such data was obtained without Plaintiffs' and Arizona Subclass Members' consent, and further using, selling

and disseminating Plaintiffs' and Arizona Subclass Members' information without their consent.

1137.   LexisNexis and Verisk also violated Arizona Revised Statute § 44-1522(A) by knowingly taking advantage of Plaintiffs' and Arizona Subclass Members' inability to reasonably protect their interests, due to their lack of knowledge regarding GM's practices, of which LexisNexis and Verisk were aware.

1138. Plaintiffs and Arizona Subclass Members seek all monetary and non-monetary relief allowed by law, including compensatory damages; disgorgement; punitive damages; injunctive relief; and reasonable attorneys' fees and costs.

## CLAIMS ON BEHALF OF THE CALIFORNIA SUBCLASS

## COUNT 13

### CALIFORNIA CONSTITUTIONAL INVASION OF PRIVACY
### California Constitution, Article I, Section 1

*Against All Defendants*

1139. The California Plaintiffs identified above ("Plaintiffs," for purposes of this Count), individually and on behalf of the California Subclass, repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1140. The California Constitution recognizes the right to privacy inherent in all residents of the State and creates a private right of action against private entities that invade that right.

1141. Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const. art. I, § 1.

1. The right to privacy was added to the California Constitution in 1972, through Proposition 11 (called the "Right to Privacy Initiative"). Proposition 11 was designed to codify the right to privacy, protecting individuals from invasions of privacy from both the government and private entities alike: "The right of privacy is the right to be left alone. It is a fundamental and compelling interest. . . . It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of personal information." Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), argument in favor of Prop. 11, p. 27.

1142. Plaintiffs and California Subclass Members have legally protected privacy interests, as recognized by the California Constitution.

1143. Plaintiffs and California Subclass Members have an interest in precluding Defendants' interception, collection, dissemination and use of their Driving Data.

1144. Plaintiffs and California Subclass Members had a reasonable expectation of privacy under the circumstances, as they could not have reasonably expected that Defendants would violate state and federal privacy laws and collect, disseminate and use their Driving Data. Plaintiffs and California Subclass Members were not aware and could not have reasonably expected that Defendants would use devices attached to their vehicles that would track and transmit their Driving Data to third parties without authorization.

1145. Defendants' conduct in secretly intercepting, collecting, disseminating, and using Plaintiffs' and California Subclass Members' Driving Data is an egregious breach of societal norms and is highly offensive to a reasonable person.

1146. Defendants' conduct was intentional and intruded on Plaintiffs' and California Subclass Members' seclusion and use of their personal property.

1147. Plaintiffs and California Subclass Members had no knowledge and did not consent or otherwise authorize Defendants to track, collect, obtain, disseminate, or otherwise use their Driving Data.

1148. Defendants were unjustly enriched as a result of their invasion of Plaintiffs' and California Subclass Members' privacy.

1149. As a direct and proximate result of Defendants' invasion of their privacy, Plaintiffs and California Subclass Members were injured and suffered damages, including, but not limited to, the loss of privacy, the unauthorized dissemination of their valuable Driving Data, and economic harm stemming from GM's exploitation of their Driving Data.

1150. Plaintiffs and California Subclass Members are entitled to equitable relief and just compensation in an amount to be determined at trial. Plaintiffs and California Subclass Members seek all relief available for the invasion of privacy under the California Constitution, including nominal damages and general privacy damages.

## COUNT 14

## CALIFORNIA INVASION OF PRIVACY ACT — WIRETAPPING LAW
## Cal. Pen. Code §§ 631

### *Against All Defendants*

1151. The California Plaintiffs identified above ("Plaintiffs," for purposes of this Count), individually and on behalf of the California Subclass, repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1152. California Penal Code Section 630 recognizes that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and

techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."

1153. At all relevant times, there was in full force and effect the California Wiretapping Act, Cal. Penal Code § 631.

1154. The California Wiretapping Act prohibits:

> any person . . . who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section[.]

1155. GM, LexisNexis, and Verisk are each a "person" within the scope of the California Wiretapping Act.

1156. The data and transmissions within, to, and from Plaintiffs' and California Subclass Members' vehicles constitute messages, reports, and/or communications, within the scope of Cal. Penal Code § 631(a), as they are transfers of signals, data, and intelligence transmitted by a wire, line, or cable system.

1157. As alleged herein, GM intercepted, in real time and as they were transmitted, the contents of communications, and have diverted those communications to itself without consent.

1158. GM intercepted these data transmissions by diverting them, during flight via a TCU or similar device, to its own servers, unbeknownst to Plaintiffs and California Subclass Members.

1159. As detailed herein, the electronic communications detailed above that GM intercepted are tied to individual drivers and vehicles, and not anonymized.

1160. The OnStar TCU equipped in Plaintiffs' and California Subclass Members' vehicles constitutes a machine, instrument, or contrivance that taps or makes unauthorized connection to Plaintiffs' and California Subclass Members' vehicles' communication systems.

1161. Plaintiffs and California Subclass Members have a reasonable expectation of privacy within their vehicles, and Plaintiffs and California Subclass Members reasonably expected privacy while driving their vehicles. Further, there is a reasonable expectation that the interactions between a driver and their vehicle, *i.e.*, their personal driving behaviors and data related thereto, are private.

1162. In further violation of the California Wiretapping Act, GM intentionally disclosed or endeavored to disclose to third parties the contents of the communications described above while knowing or having reason to know that the information was obtained through the interception of the communications.

1163. In further violation of the California Wiretapping Act, GM has intentionally used or endeavored to use the contents of the communications

described above knowing or having reason to know that the information was obtained through unlawful interception.

1164. Specifically, GM has disclosed and used the contents of the communications described above by selling Plaintiffs' and Class Members' personal Driving Data to LexisNexis, Verisk, and other third parties for its own financial and commercial benefit, obtaining substantial profit.

1165. LexisNexis and Verisk have also violated Cal. Penal Code § 631, by disclosing or endeavoring to disclose to third parties the contents of the communications intercepted by GM described above while knowing or having reason to know that the information was obtained through the interception of the communications in violation of Cal. Penal Code § 631.

1166. Specifically, LexisNexis and Verisk intentionally disclosed Plaintiffs' and California Subclass Members' detailed Driving Data to various auto insurance companies.

1167. In further violation of Cal. Penal Code § 631, LexisNexis and Verisk willfully used or endeavored to use the contents of the communications described above while knowing or having reason to know that the information was obtained through the interception of the communications in violation of Cal. Penal Code § 631.

1168. Specifically, LexisNexis and Verisk have used the information derived from the communications described above to create products they market, license, and sell, including so-called driving scores, risk ratings, and access to databases containing Plaintiffs' and the California Subclass Members' Driving Data.

1169. Further, LexisNexis and Verisk have used the information derived from the communications described above in aggregate fashion to create their telematics exchange, develop risk models, and other products they market and sell.

1170. LexisNexis and Verisk have used and disclosed the contents of the communications described above for their own financial and commercial benefit, obtaining substantial profit.

1171. LexisNexis and Verisk knew or had reason to know that the information they obtained from GM was obtained through the unlawful interception of communications in violation of the California Wiretapping Act.

1172. Specifically, LexisNexis and Verisk knew or should have known that the detailed driving information they used and sold was captured in secret in violation of the Act for the following reasons, among others that will become known through discovery:

> a. the numerous, obvious consent and privacy challenges to the collection of Driving Data that both LexisNexis and Verisk acknowledged in writing and in presentations;

b. the opaque disclosures in GM's various terms and policies, which did not operate as a reasonable basis for inferring consumer consent to share the information with LexisNexis and Verisk;

c. the sheer volume of data LexisNexis and Verisk were receiving from GM versus from other manufacturers;

d. the lack of public knowledge about GM's collection and sharing practices until at least 2024;

e. that fact that LexisNexis continued to collect after it was publicized that collection was secret/happening without consent or knowledge; and

f. the nature of the data as such that it had to be obtained via a wiretap.

1173. Upon information and belief, GM and LexisNexis continue to disclose and use unlawfully obtained Driving Data for their own financial gain to this day.

1174. Defendants, collectively, agreed, employed and conspired with one another to intercept, collect, disseminate and use data concerning Plaintiffs' and California Subclass members' vehicles.

1175. At all relevant times, Plaintiffs and California Subclass Members were not aware that Defendants were intercepting and recording their data, and therefore

could not provide consent to have any part of their communications intercepted and recorded, transmitted or used.

1176. Neither Defendants nor any other person informed Plaintiffs and California Subclass Members that Defendants were intercepting and transmitting their data. Plaintiffs and California Subclass Members did not know Defendants were intercepting and recording their data, as such they could not and did not consent for their data to be intercepted and/or used by Defendants.

1177. As a direct and proximate result of Defendants' violations of the Wiretapping Act, Plaintiffs and California Subclass Members were injured and suffered damages, a loss of privacy, and loss of the value of their personal information in an amount to be determined at trial.

1178. Defendants were unjustly enriched by their violations of the Wiretapping Act.

1179. Pursuant to California Penal Code Section 637.2, Plaintiffs and California Subclass Members have been injured by Defendants' violations of the Wiretapping Act, and seek damages for the greater of $5,000 or three times the amount of actual damages, and injunctive relief, plus reasonable attorneys' fees and costs.

## COUNT 15

### CALIFORNIA INVASION OF PRIVACY ACT — ELECTRONIC TRACKING DEVICE
### Cal. Pen. Code § 637.7

*Against GM*

1180. The California Plaintiffs identified above ("Plaintiffs," for purposes of this Count), individually and on behalf of the California Subclass, repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1181. California Penal Code Section 637.7 prohibits any person from using an electronic tracking device to determine the location or movements of any person.

1182. GM is a "person" within the scope of CIPA.

1183. The TCU attached to Plaintiffs' and California Subclass Members' vehicles is an "electronic tracking device" as defined by CIPA as it is a device that is attached to the vehicle and which reveals the vehicles' location or movement by the transmission of electronic signals through the intercept, collection, and dissemination of Plaintiffs' and California Subclass Members' location information.

1184. GM violated Cal. Penal Code § 637.7 by attaching the TCU/an electronic tracking device to Plaintiffs' and California Subclass Members' vehicles and thereby intercepting, collecting, taking, storing, using, and disseminating Plaintiffs' and California Subclass Members' Driving Data.

1185. Neither GM nor any other person informed Plaintiffs and California Subclass Members or meaningfully disclosed that GM had attached an electronic tracking device to their vehicles.

1186. The collection of Plaintiffs' and California Subclass Members' Driving Data without full and informed consent violated and continues to violate Cal. Penal Code § 637.7.

1187. As a direct and proximate result of GM's violations, Plaintiffs and California Subclass Members were injured and suffered damages, a loss of privacy, and loss of the value of their personal information in an amount to be determined at trial.

1188. Pursuant to Calif. Penal Code Section 637.2, Plaintiffs and California Subclass Members have been injured by Defendants' violations of the CIPA and seek damages for the greater of $5,000 or three times the amount of actual damages, and injunctive relief, plus reasonable attorneys' fees and costs.

## COUNT 16

### CALIFORNIA COMPUTER DATA ACCESS AND FRAUD ACT
### Cal. Pen. Code §§ 502, *et seq.*

*Against GM*

1189. The California Plaintiffs identified above ("Plaintiffs," for purposes of this Count), individually and on behalf of the California Subclass, repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1190. The California legislature enacted the Computer Data Access and Fraud Act ("CDAFA") to "expand the degree of protection afforded to individuals . . . from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a). The enactment of CDAFA was motivated by the finding that "the proliferation of computer technology has resulted in a concomitant proliferation of . . . unauthorized access to computers, computer systems, and computer data." *Id.*

1191. The CDAFA provides a private right of action to the "owner or lessee of the computer, computer system, computer network, computer program, or data who suffers damage or loss by reason of a violation of any of the provisions of subsection (c)." Cal. Penal Code § 502(e).

1192. The component parts of the electronic system on Plaintiffs' and California Subclass Members' vehicles including ECUs and the TCU constitute "computers" within the scope of the CDAFA. Plaintiffs and California Subclass Members are owners and/or lessees of the computers or computer systems in their vehicles.

1193. GM violated the following sections of the CDAFA:

    a. Section 502(c)(1), which makes it unlawful to "knowingly access[] and without permission . . . use[] any data, computer, computer system, or computer network in order to either (A)

devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data;"

b. Section 502(c)(2), which makes it unlawful to "knowingly access[] and without permission take[], cop[y], or make[] use of any data from a computer, computer system, or computer network, or take[] or cop[y] any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network;"

c. Section 502(c)(6), which makes it unlawful to "knowingly and without permission provide[] or assist[] in providing a means of accessing a computer, computer system, or computer network in violation of this section;"

d. Section 502(c)(7), which makes it unlawful to "knowingly and without permission access[] or cause[] to be accessed any computer, computer system, or computer network."

1194. As alleged herein, the electronic communications transmitted within, to, and from Plaintiffs' and California Subclass Members' vehicles are stored in electronic components of those vehicles, including ECUs and the TCU.

1195. In-vehicle units with storage function, such as ECUs and TCUs, are facilities through which electronic communication services are provided because they provide users, such as Plaintiffs and California Subclass Members, the ability to send and receive electronic communications including related to their personal Driving Data.

1196. As alleged herein, there is a reasonable expectation of privacy within a person's vehicle, and Plaintiffs and California Subclass Members reasonably expected privacy while driving their vehicles. Further, there is a reasonable expectation that the interactions and communications between driver and vehicle, *i.e.*, personal Driving Data, are private.

1197. Common understanding and experience regarding how automotive vehicles work create a reasonable expectation that GM would not access the electronic communications described above that are stored in Plaintiffs' and California Subclass Members' vehicles.

1198. GM knowingly accessed the computers and/or computer systems attached to Plaintiffs' and California Subclass Members' vehicles without their permission, and thereby intercepted, took, copied and made use of the Driving Data concerning Plaintiffs and California Subclass Members.

1199. GM intercepted, collected, disseminated and used Plaintiffs' and California Subclass Members' Driving Data as part of a scheme to deceive and

defraud Plaintiffs and California Subclass Members, and to wrongfully and unjustly enrich itself at the expense of Plaintiffs and California Subclass Members.

1200. GM knowingly accessed or caused to be computers and/or computer systems in the vehicles without Plaintiffs' and California Subclass Members' informed consent.

1201. GM accessed these temporarily stored electronic communications in addition to and separately from intercepting other electronic communications transmitted in real time.

1202. As detailed herein, the data contained in the electronic communications detailed above that GM accessed are tied to individual drivers and vehicles, and not anonymized.

1203. GM's conduct was willful and intentional, and invaded Plaintiffs' and California Subclass Members' expectations of privacy within their vehicle and privacy of the personal interactions and communications between driver and vehicle, *i.e.*, their personal Driving Data.

1204. GM was unjustly enriched by intercepting, acquiring, taking, or using Plaintiffs' and California Subclass Members' Driving Data without their permission, and using it for financial benefit. GM has been unjustly enriched in an amount to be determined at trial.

1205. The communications accessed by GM in violation of Cal. Penal Code § 502 have significant value, evidenced by the profits that GM has obtained from, among other things, selling the improperly accessed communications to Verisk and LexisNexis for marketing and licensing out to numerous third parties, and as evidenced by the significant value of the aggregated data for various applications.

1206. Because of GM's conduct, Plaintiffs and California Subclass Members have forever lost the value of their data, their privacy interest in the data, and their control over its use.

1207. As a direct and proximate result of GM's violations of the CDAFA, Plaintiffs and California Subclass Members suffered damages. Plaintiffs and California Subclass Members suffered actual injuries, including but not limited to (a) damage to and diminution of the value of their personal information; (b) violation of their privacy rights; (c) the likelihood of future misuse of their private information; and (d) overpaying for their vehicles as a result of the failure to inform Plaintiffs and California Subclass Members that the vehicle would intercept, take, copy, collect, and use their Driving Data.

1208. Pursuant to CDAFA Section 502(e)(1), Plaintiffs and California Subclass Members seek compensatory, injunctive and equitable relief in an amount to be determined at trial.

1209. Pursuant to CDAFA Section 502(e)(2), Plaintiffs and California Subclass Members seek an award of reasonable attorneys' fees and costs.

1210. Pursuant to CDAFA Section 502(e)(4), Plaintiffs and California Subclass Members seek punitive or exemplary damages for GM's willful violations of the CDAFA.

## COUNT 17

### CALIFORNIA CONSUMER PRIVACY ACT
### Cal. Civ. Code §§ 1798.100, *et seq.*

*Against All Defendants*

1211. The California Plaintiffs identified above ("Plaintiffs," for purposes of this Count), individually and on behalf of the California Subclass, repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1212. The California Consumer Privacy Act ("CCPA"), Cal. Civ. Code § 1798.100, *et seq.*, was enacted to protect consumers' personal information from collection and use by businesses without appropriate notice and consent.

1213. GM, LexisNexis, and Verisk are each businesses that control the collection of consumers' personal information within the scope of the CCPA.

1214. Plaintiffs and California Subclass Members are consumers within the scope of the CCPA.

1215. The Driving Data that Defendants intercepted, collected, and obtained from Plaintiffs' and California Subclass Members' vehicles constitutes personal information within the scope of the CCPA.

1216. Pursuant to Civil code § 1798.150, Defendants owed a duty to implement and maintain reasonable security procedures and practices to maintain the security of the information that it obtained concerning Plaintiffs and California Subclass Members.

1217. GM violated its duty to implement and maintain reasonable security procedures and practices by disclosing Plaintiffs' and California Subclass Members' Driving Data without their authorization or consent.

1218. LexisNexis and Verisk violated their duty to implement and maintain reasonable security procedures and practices by accepting, using, and disclosing Plaintiffs' and California Subclass Members' Driving Data without their authorization and knowing that it was obtained without their consent.

1219. In accordance with Civil Code §1798.150(b), prior to the filing of this complaint, Plaintiffs served Defendants with notice of these CCPA violations.

1220. Plaintiffs need not notify Defendants of their violations of Section 1798.110 of the CCCPA because notice would be futile. Notwithstanding, Plaintiffs provided notice to GM on November 22, 2024

1221. On behalf of the California Subclass, Plaintiffs seek injunctive relief in the form of an order enjoining Defendants from continuing to violate the CCPA, as well as actual, punitive, and statutory damages; restitution; attorneys' fees and costs; and any other relief the Court deems proper as a result of Defendants' violations of the CCPA.

**COUNT 18**

**CALIFORNIA UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***

*Against All Defendants*

1222. The California Plaintiffs identified above ("Plaintiffs," for purposes of this Count), individually and on behalf of the California Subclass, repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1223. The California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §17200, *et seq.*, prohibits, *inter alia*, "any unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code §17200.

1224. GM, LexisNexis, and Verisk are each a "person" as defined by Cal. Bus. & Prof. Code § 17201.

1225. Defendants violated the UCL by engaging in business acts and practices which are unlawful, unconscionable, and unfair under the UCL.

1226. Defendants' acts and practices are unlawful because Defendants violated and continue to violate California common law, constitutional, and statutory

rights to privacy, including but not limited to the California Constitution Article I, Section 1, CIPA, CCPA, CDAFA, CLRA, and FAL.

1227. GM engaged in unfair, unconscionable, unlawful, and/or deceptive acts and practices in conducting trade and commerce in violation of the UCL by:

a. Intercepting, collecting, using, and selling Plaintiffs' and California Subclass Members' Driving Data without obtaining their consent;

b. Omitting, suppressing, and concealing the material fact that GM was intercepting, collecting, using, and selling Plaintiffs' and California Subclass Members' Driving Data to LexisNexis, Verisk, and other third parties for GM's own financial and commercial benefit;

c. Omitting, suppressing, and concealing the material fact that LexisNexis, Verisk, and other third parties collected, manipulated, used, and sold Plaintiffs' and California Subclass Members' Driving Data for their own financial and commercial benefit;

d. Omitting, suppressing, and concealing material facts regarding the functionality of OnStar with respect to the privacy of consumers in their own vehicles;

e. Misrepresenting the purpose of OnStar and that it would protect the privacy of Plaintiffs' and the California Subclass Members' Driving Data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f. Failing to comply with common law and/or statutory duties pertaining to the privacy of Plaintiffs' and California Subclass Members' Driving Data.

1228.   GM acted intentionally, knowingly, and maliciously to violate the Act, and recklessly disregarded Plaintiffs' and California Subclass Members' rights, because GM intentionally intercepted, collected, used, and sold Plaintiffs' and Subclass Members' Driving Data without obtaining their consent.

1229.   The fact that GM intercepted, collected, used, and sold Plaintiffs' and Subclass Members' Driving Data was material to Plaintiffs and California Subclass Members. This is a fact that reasonable consumers would consider important when choosing to purchase or lease a vehicle.

1230.   Plaintiffs and California Subclass Members were deceived and/or could reasonably be expected to be deceived by GM's material misrepresentations and omissions regarding the functionality of OnStar, the security and privacy of their Driving Data, and their privacy in their own vehicles to their detriment.

1231. LexisNexis and Verisk engaged in unfair and unconscionable conduct in violation of the UCL by engaging in the conduct alleged herein, including by soliciting and accepting Plaintiffs' and California Subclass Members' Driving Data from GM with knowledge that such data was obtained without Plaintiffs' and California Subclass Members' consent, and further using, selling and disseminating Plaintiffs' and California Subclass Members' information without their consent.

1232. LexisNexis and Verisk also violated the UCL by knowingly taking advantage of Plaintiffs' and California Subclass Members' inability to reasonably protect their interests, due to their lack of knowledge regarding GM's practices, of which LexisNexis and Verisk were aware.

1233. In the course of their business, Defendants repeatedly and regularly engaged in the unlawful, unconscionable, and unfair acts or practices, which caused serious harm to consumers, including Plaintiffs and California Subclass Members.

1234. Plaintiffs' and the California Subclass' Driving Data has tangible value. As a direct and proximate result of GM's unfair and deceptive acts and practices, Plaintiffs' and California Subclass Members' Driving Data is in the possession of third parties—including LexisNexis and Verisk—who have used and will use such data for their commercial benefit.

1235. As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive acts and practices, Plaintiffs and California Subclass Members have

suffered and will continue to suffer injury, including, but not limited to: loss of privacy; unauthorized dissemination of their valuable Driving Data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their Driving Data; and economic harm stemming from the exploitation of their Driving Data.

1236. Plaintiffs and California Subclass Members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendants' unlawful, unfair, and unconscionable practices or use of their Driving Data; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

## COUNT 19

**CALIFORNIA CONSUMERS LEGAL REMEDIES ACT**
**Cal. Civ. Code §§ 1750, *et seq.***

*Against GM*

1237. The California Plaintiffs identified above ("Plaintiffs," for purposes of this Count), individually and on behalf of the California Subclass, repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1238. The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.* ("CLRA") is a comprehensive statutory scheme that is to be liberally construed to protect consumers against unfair and deceptive business practices in connection with

the conduct of businesses providing goods, property or services to consumers primarily for personal, family, or household use.

1239. GM is a "person" under Cal Civ. Code §§ 1761(c) and 1770, and has provided "services" as defined by Cal. Civ. Code §§ 1761(b) and 1770.

1240. Plaintiffs and California Class Members are "consumers" as defined by Cal. Civ. Code §§ 1761(d) and 1770 and have engaged in a "transaction" as defined by Cal Civ. Code §§ 1761(e) and 1770.

1241. GM's conduct, as described herein, in misrepresenting the characteristics, qualities, benefits and capabilities of the vehicles and OnStar, and omitting material information concerning the vehicles and OnStar, violates the CLRA. Specifically, GM violated the CLRA by omitting, suppressing, and concealing the material fact that Plaintiffs' and California Subclass Members' Driving Data was being intercepted, collected, used and/or disseminated, which violates the following practices proscribed by Cal. Civ. Code § 1770(a):

> a. Representing that the goods or services have approval, characteristics, ingredients, uses, benefits, or quantities that they do not have;
>
> b. Representing that the goods or services are of a particular standard, quality, or grade if they are of another;

c. Advertising the goods or services with the intent not to sell them as advertised; and

d. Representing that subject of a transaction has been supplied in accordance with previous representations when they have not.

1242. GM violated the CLRA by selling and leasing vehicles that it knew intercepted, collected, and transmitted Plaintiffs' and California Subclass Members' Driving Data. The fact that GM intercepted, collected, and transmitted Plaintiffs' and California Subclass Members' Driving Data was material to Plaintiffs and California Subclass Members. This is a fact that reasonable consumers would consider important when choosing to purchase or lease a vehicle.

1243. GM knew and failed to disclose at the time of the sale or lease of the vehicles to Plaintiffs and California Subclass Members that its vehicles intercepted, collected, and transmitted Driving Data.

1244. As a direct and proximate result of GM's misconduct, Plaintiffs and California Subclass Members have suffered and will continue to suffer injury, including, but not limited to: loss of privacy; unauthorized dissemination of their valuable Driving Data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their Driving Data; and economic harm stemming from the exploitation of their Driving Data.

2.      Plaintiffs need not notify GM of its violations of Section 1770 of the CLRA because notice would be futile. Notwithstanding, Plaintiffs provided notice to GM on November 22, 2024.

3.      Plaintiffs and the California Subclass seek all monetary and non-monetary relief allowed by law, including damages, an order enjoining the acts and practices described above, and reasonable attorneys' fees and costs under the CLRA.

## COUNT 20

### CALIFORNIA FALSE ADVERTISING LAW
### Cal. Bus. & Prof. Code §§ 17500, *et seq.*

*Against GM*

1245. The California Plaintiffs identified above ("Plaintiffs," for purposes of this Count), individually and on behalf of the California Subclass, repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1246. The California False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq.*, prohibits making any statement that is "untrue or misleading" and made "with the intent directly or indirectly to dispose of" property or services. Cal. Bus. & Prof. Code 17500.

1247. GM is a person, firm, corporation, and/or association within the scope of the FAL.

1248. GM's advertising was highly misleading. GM failed to disclose or did not meaningfully disclose that its vehicles intercepted, collected, used, and

disseminated Plaintiffs' and California Subclass Members' Driving Data, or that GM profited from the dissemination, sale, and use of such data.

1249. GM's representations and omissions were material because they were likely to deceive reasonable consumers about the true function and purposes of GM's products and services. Reasonable consumers lack the means to verify GM's representations and omissions concerning the vehicles' data collection practices, or to understand the fact or significance of GM's practices concerning the collection, dissemination and use of Plaintiffs' and California Subclass Members' Driving Data.

1250. Plaintiffs and California Subclass Members have been harmed and have suffered economic injuries as a result of Defendants' misrepresentations and omissions, including but not limited to (a) damage to and diminution of the value of their personal information; (b) violation of their privacy rights; (c) the likelihood of future misuse of their private information; and (d) overpaying for their vehicles.

1251. As a result of its misrepresentations and omissions, GM has been able to reap unjust profits and revenues from both the sale of the vehicles, and the sale, dissemination, and use of Plaintiffs' and California Subclass Members' Driving Data.

1252. Unless restrained and enjoined, GM will continue to misrepresent its data collection and sales practices and will not recall or destroy the data collected

concerning Plaintiffs and California Subclass Members. Accordingly, injunctive relief is appropriate.

## CLAIMS ON BEHALF OF THE CONNECTICUT SUBCLASS

## COUNT 21

### CONNECTICUT UNFAIR TRADE PRACTICES ACT
### Conn. Gen. Stat. §§ 42-110a, *et seq.*

*Against All Defendants*

1253. The Connecticut Plaintiff identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Connecticut Subclass, repeats and realleges Paragraphs 1-973, as if fully alleged herein.

1254. The Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 41-110a, *et seq.*, prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 41-110b(a).

1255. Plaintiff, Connecticut Subclass Members, and Defendants are each a "person" as defined by as defined in Conn. Gen. Stat. Ann. § 42-110a.

1256. Defendants are each engaged in "trade or commerce" affecting the people of Connecticut by advertising, offering for sale, selling or distributing goods and services in the State of Connecticut. Conn. Gen. Stat. Ann. § 42-110a.

1257.  GM engaged in unfair, unconscionable, unlawful, and/or deceptive acts and practices in conducting trade and commerce in violation of the CUTPA by:

a. Intercepting, collecting, using, and selling Plaintiff's and Connecticut Subclass Members' Driving Data without obtaining their consent;

b. Omitting, suppressing, and concealing the material fact that GM was intercepting, collecting, using, and selling Plaintiff's and Connecticut Subclass Members' Driving Data to LexisNexis, Verisk, and other third parties for GM's own financial and commercial benefit;

c. Omitting, suppressing, and concealing the material fact that LexisNexis, Verisk, and other third parties collected, manipulated, used, and sold Plaintiff's and Connecticut Subclass Members' Driving Data for their own financial and commercial benefit;

d. Omitting, suppressing, and concealing material facts regarding the functionality of OnStar with respect to the privacy of consumers in their own vehicles;

e. Misrepresenting the purpose of OnStar and that it would protect the privacy of Plaintiff's and the Connecticut Subclass Members' Driving Data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f. Failing to comply with common law and/or statutory duties pertaining to the privacy of Plaintiff's and Connecticut Subclass Members' Driving Data.

1258. GM acted intentionally, knowingly, and maliciously to violate the Act, and recklessly disregarded Plaintiff's and Connecticut Subclass Members' rights, because GM intentionally intercepted, collected, used, and sold Plaintiff's and Connecticut Subclass Members' Driving Data without obtaining their consent.

1259. The fact that GM intercepted, collected, used, and sold Plaintiff's and Connecticut Subclass Members' Driving Data was material to Plaintiff and Connecticut Subclass Members. This is a fact that reasonable consumers would consider important when choosing to purchase or lease a vehicle.

1260. Plaintiff and Connecticut Subclass Members were deceived and/or could reasonably be expected to be deceived by GM's material misrepresentations and omissions regarding the functionality of OnStar, the security and privacy of their Driving Data, and their privacy in their own vehicles to their detriment.

1261. LexisNexis and Verisk engaged in unfair and unconscionable conduct in violation of the CUTPA by engaging in the conduct alleged herein, including by soliciting and accepting Plaintiff's and Connecticut Subclass Members' Driving Data from GM with knowledge that such data was obtained without Plaintiff's and

Connecticut Subclass Members' consent, and further using, selling and disseminating Plaintiff's and Connecticut Subclass Members' Driving Data without their consent.

1262.   LexisNexis and Verisk also violated the CUTPA by knowingly taking advantage of Plaintiff's and Connecticut Subclass Members' inability to reasonably protect their interests, due to their lack of knowledge regarding GM's practices, of which LexisNexis and Verisk were aware.

1263. Defendants' trade practices were unconscionable and unfair because they offend public policy as it has been established by statutes, the common law, or otherwise; are immoral, unethical, oppressive or unscrupulous; or cause substantial injury to consumers.

1264.   Plaintiff's and the Connecticut Subclass' Driving Data has tangible value. As a direct and proximate result of GM's unfair and deceptive acts and practices, Plaintiff's and Connecticut Subclass Members' Driving Data is in the possession of third parties—including LexisNexis and Verisk—who have used and will use such data for their commercial benefit.

1265.   As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive acts and practices, Plaintiff and Connecticut Subclass Members have suffered and will continue to suffer injury, including, but not limited to: loss of privacy; unauthorized dissemination of their valuable Driving Data; damage to and diminution of the value of their personal information; the likelihood of future misuse

of their Driving Data; and economic harm stemming from the exploitation of their Driving Data.

1266.   Plaintiff and Connecticut Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages, injunctive relief, and reasonable attorneys' fees and costs.

## CLAIMS ON BEHALF OF THE DELAWARE SUBCLASS

## COUNT 22

### DELAWARE CONSUMER FRAUD ACT
### 6 Del. Code §§ 2511, *et seq.*

*Against GM*

1267. The Delaware Plaintiff identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Delaware Subclass, repeats and realleges Paragraphs 1-973, as if fully alleged herein.

1268.  The Delaware Consumer Fraud Act ("DCFA"), 6 Del. Code § 2511, et seq. prohibits "[t]he act, use, or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale, lease, receipt, or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby[.]"  6 Del. Code § 2513(a).

1269. Plaintiff, members of the Delaware Subclass, and GM are each a "person" as defined by as defined by 6 Del. Code § 2511.

1270. GM engaged in the "advertisement" or "sale" of "merchandise" indirectly or directly affecting the people of Delaware by advertising, offering for sale, selling or distributing goods and services in the State of Delaware. 6 Del. Code § 2511.

1271. GM used and employed misrepresentation and the concealment, suppression, and omission of material facts with intent that others rely upon such concealment, suppression, and omission, in connection with the sale and advertisement of merchandise in violation of the DCFA, including by:

    a. Intercepting, collecting, using, and selling Plaintiff's and Delaware Subclass Members' Driving Data without obtaining their consent;

    b. Omitting, suppressing, and concealing the material fact that GM was intercepting, collecting, using, and selling Plaintiff's and Delaware Subclass Members' Driving Data to LexisNexis, Verisk, and other third parties for GM's own financial and commercial benefit;

    c. Omitting, suppressing, and concealing the material fact that LexisNexis, Verisk, and other third parties collected,

manipulated, used, and sold Plaintiff's and Delaware Subclass Members' Driving Data for their own financial and commercial benefit;

d. Omitting, suppressing, and concealing material facts regarding the functionality of OnStar with respect to the privacy of consumers in their own vehicles;

e. Misrepresenting the purpose of OnStar and that it would protect the privacy of Plaintiff's and the Delaware Subclass Members' Driving Data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f. Failing to comply with common law and/or statutory duties pertaining to the privacy of Plaintiff's and Delaware Subclass Members' Driving Data.

1272. GM acted intentionally, knowingly, and maliciously to violate the Act, and recklessly disregarded Plaintiff's and Delaware Subclass Members' rights, because GM intentionally intercepted, collected, used, and sold Plaintiff's and Delaware Subclass Members' Driving Data without obtaining their consent.

1273. The fact that GM intercepted, collected, used, and sold Plaintiff's and Delaware Subclass Members' Driving Data was material to Plaintiff and Delaware

Subclass Members. This is a fact that reasonable consumers would consider important when choosing to purchase or lease a vehicle.

1274.   Plaintiff and Delaware Subclass Members were deceived and/or could reasonably be expected to be deceived by GM's material misrepresentations and omissions regarding the functionality of OnStar, the security and privacy of their Driving Data, and their privacy in their own vehicles to their detriment.

1275. GM's unlawful trade practices were gross, oppressive, and aggravated, and GM breached the trust of Plaintiff and the Delaware Subclass Members.

1276.   Plaintiff's and the Delaware Subclass' Driving Data has tangible value. As a direct and proximate result of GM's unfair and deceptive acts and practices, Plaintiff's and Delaware Subclass Members' Driving Data is in the possession of third parties—including LexisNexis and Verisk—who have used and will use such data for their commercial benefit.

1277.   As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive acts and practices, Plaintiff and Delaware Subclass Members have suffered and will continue to suffer injury, including, but not limited to: loss of privacy; unauthorized dissemination of their valuable Driving Data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their Driving Data; and economic harm stemming from the exploitation of their Driving Data.

1278. Plaintiff and Delaware Subclass Members seek all monetary and non-monetary relief allowed by law, including damages under 6 Del. Code § 2525 for injury resulting from the direct and natural consequences of GM's unlawful conduct; injunctive relief; and reasonable attorneys' fees and costs.

## COUNT 23

### DELAWARE WIRETAPING, ELECTRONIC SUVEILLANCE AND INTERCEPTION OF COMMUNICATIONS LAW
### Del. Stat. Tit. 11 §§ 24011, *et seq.*

*Against All Defendants*

1279. The Delaware Plaintiff identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Delaware Subclass, repeats and realleges Paragraphs 1-973, as if fully alleged herein.

1280.  The Delaware Wiretapping, Electronic Surveillance and Interception of Communications law ("DWES"), 11 Del. Stat. § 2401, *et seq.*, declares it unlawful for a person to "intentionally intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept any wire, oral or electronic communication." 11 Del. Stat. § 2402(a)(1).

1281.  The DWES also makes unlawful for a person to "intentionally disclose or endeavor to disclose" or to "intentionally use or endeavor to use" the "contents of any wire, oral or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral or electronic communication" in violation of the Act. 11 Del. Stat. § 2402(a)(2), (3).

1282. The DWES defines an "electronic communication" to include "any transfer of signs, signals, writing, images, sounds, data or intelligence of any electromagnetic, photoelectronic or photooptical system." 11 Del. Stat. § 2401(5).

1283. The DWES defines "intercept" as "the aural or other acquisition of the contents of any wire, oral or electronic communication through the use of any electronic, mechanical or other device." 11 Del. Stat. § 2401(10).

1284. GM, LexisNexis, and Verisk are each a "person" as defined by 11 Del. Stat. §2401(15).

1285. The data transmissions from Plaintiff's and Delaware Subclass Members' vehicles constitute "electronic communications" within the scope of the DWES as they are transfers of data, signals and intelligence transmitted by electromagnetic, photoelectronic, or photooptical system in Plaintiff's and Delaware Subclass Members vehicles.

1286. As alleged herein, GM intercepted, in real time and as they were transmitted, the contents of electronic communications, and diverted those communications to itself without consent.

1287. Plaintiff and Delaware Subclass Members have a reasonable expectation of privacy within their vehicles, and Plaintiff and Delaware Subclass Members reasonably expected privacy while driving their vehicles. Further, there is

a reasonable expectation that the interactions between a driver and their vehicle, *i.e.*, their personal Driving Data, are private.

1288. Common understanding and human experience of how automotive vehicles work create a reasonable expectation that a vehicle manufacturer and service provider like GM would not surreptitiously intercept and divert the detailed and personal electronic communications described above.

1289. GM intercepted these electronic communications in real time separately from and in addition to accessing data stored in Plaintiff's and Delaware Subclass Members' vehicle components.

1290. GM intercepted these data transmissions by diverting them, during flight via a TCU or similar device, to their own servers, unbeknownst to Plaintiff and Delaware Subclass Members.

1291. As detailed herein, the electronic communications detailed above that GM intercepted are tied to individual drivers and vehicles, and not anonymized.

1292. In further violation of the DWES, GM has disclosed or attempted to disclose to third parties the contents of the communications described above while knowing or having reason to know that the information was obtained through interception in violation of the DWES.

1293. In further violation of the DWES, GM has used or attempted to use the contents of the communications described above while knowing or having reason to

know that the information was obtained through interception in violation of the DWES.

1294. Specifically, GM has disclosed and used the contents of the communications described above by selling Plaintiff's and Delaware Subclass Members' Driving Data to LexisNexis and Verisk for its own financial and commercial benefit, obtaining substantial profit.

1295. LexisNexis and Verisk have also violated the DWES by disclosed or endeavoring to disclose to third parties the contents of the communications intercepted by GM described above while knowing or having reason to know that the information was obtained through the interception of the communications in violation of the DWES.

1296. Specifically, LexisNexis and Verisk intentionally disclosed Plaintiff's and Delaware Subclass Members' detailed Driving Data to various auto insurance companies.

1297. In further violation of the DWES, LexisNexis and Verisk willfully used or endeavored to use the contents of the communications described above while knowing or having reason to know that the information was obtained through the interception of the communications in violation of the DWES.

1298. Specifically, LexisNexis and Verisk have used the information derived from the communications described above to create products they market, license,

and sell, including so-called driving scores, risk ratings, and access to databases containing Plaintiff's and the Delaware Subclass Members' Driving Data.

1299. Further, LexisNexis and Verisk have used the information derived from the communications described above in aggregate fashion to create their telematics exchanges, develop risk models, and other products they market and sell.

1300. LexisNexis and Verisk have used and disclosed the contents of the communications described above for their own financial and commercial benefit, obtaining substantial profit.

1301. LexisNexis and Verisk knew or had reason to know that the information they obtained from GM was obtained through the unlawful interception of communications in violation of the DWES.

1302. Specifically, LexisNexis and Verisk knew or should have known that the detailed driving information they used and sold was captured in secret in violation of DWES for the following reasons, among others that will become known through discovery:

> a. the numerous, obvious consent and privacy challenges to the collection of Driving Data that both LexisNexis and Verisk acknowledged in writing and in presentations;
>
> b. the opaque disclosures in GM's various terms and policies, which did not operate as a reasonable basis for inferring

consumer consent to share the information with LexisNexis and
Verisk;

   c.  the sheer volume of data LexisNexis and Verisk were receiving
from GM versus from other manufacturers;

   d.  the lack of public knowledge about GM's collection and sharing
practices until at least 2024;

   e.  that fact that LexisNexis continued to collect after it was
publicized that collection was secret/happening without consent
or knowledge; and

   f.  the nature of the data as such that it had to be obtained via a
wiretap.

1303. Upon information and belief, GM and LexisNexis continue to disclose
and use unlawfully obtained Driving Data for their own financial gain to this day.

1304. Plaintiff and Delaware Subclass Members did not consent or otherwise
authorize Defendants to intercept, disclose, or use their communications.

1305. As a result, Plaintiff and Delaware Subclass Members have suffered
harm and injury due to the interception, disclosure, and/or use of communications
containing their private and personal information.

1306. Pursuant to 11 Del. Stat. § 2409(a), Plaintiff and Delaware Subclass
Members have been damaged by the interception, disclosure, and/or use of their

communications in violation of the DWES and are entitled to: (1) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiff and the Delaware Subclass or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; and (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

## CLAIMS ON BEHALF OF THE FLORIDA SUBCLASS

## COUNT 24

### FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT
### Fla. Stat. §§ 501.201, *et seq.*

*Against All Defendants*

1307. The Florida Plaintiffs identified above ("Plaintiffs" for purposes of this Count), individually and on behalf of the Florida Subclass, repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1308. The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201, *et seq.*, prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" Fla. Stat. § 501.204.

1309. Plaintiffs and the members of the Florida Subclass are each a "consumer" as defined in Fla. Stat. Ann. § 501.203.

1310. GM, LexisNexis, and Verisk are each a "person" as defined in Fla. Stat. Ann. § 504.203.

1311. GM, LexisNexis, and Verisk each engaged in "trade or commerce" affecting the people of Florida by advertising, offering for sale, selling or distributing goods and services in the State of Florida. Fla. Stat. Ann. § 501.203.

1312. GM engaged in unfair, unconscionable, unlawful, and/or deceptive acts and practices in conducting trade and commerce in violation of the FDUTPA by:

    a. Intercepting, collecting, using, and selling Plaintiffs' and Florida Subclass Members' Driving Data without obtaining their consent;

    b. Omitting, suppressing, and concealing the material fact that GM was intercepting, collecting, using, and selling Plaintiffs' and Florida Subclass Members' Driving Data to LexisNexis, Verisk, and other third parties for GM's own financial and commercial benefit;

    c. Omitting, suppressing, and concealing the material fact that LexisNexis, Verisk, and other third parties collected, manipulated, used, and sold Plaintiffs' and Florida Subclass Members' Driving Data for their own financial and commercial benefit;

d.  Omitting, suppressing, and concealing material facts regarding the functionality of OnStar with respect to the privacy of consumers in their own vehicles;

e.  Misrepresenting the purpose of OnStar and that it would protect the privacy of Plaintiffs' and the Florida Subclass Members' Driving Data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f.  Failing to comply with common law and/or statutory duties pertaining to the privacy of Plaintiffs' and Florida Subclass Members' Driving Data.

1313. These deceptive statements, misrepresentations, omissions, concealments and acts constitute violations of Fla. Stat. § 501.204(1).

1314. GM acted intentionally, knowingly, and maliciously to violate FDUTPA, and recklessly disregarded Plaintiffs' and Florida Subclass Members' rights, because GM intentionally intercepted, collected, used, and sold Plaintiff's and Florida Subclass Members' Driving Data without obtaining their consent.

1315. The fact that GM intercepted, collected, used, and sold Plaintiffs' and Florida Subclass Members' Driving Data was material to Plaintiffs and Florida Subclass Members. This is a fact that reasonable consumers would consider important when choosing to purchase or lease a vehicle.

1316.   Plaintiffs and Florida Subclass Members were deceived and/or could reasonably be expected to be deceived by GM's material misrepresentations and omissions regarding the functionality of OnStar, the security and privacy of their Driving Data, and their privacy in their own vehicles to their detriment.

1317.   LexisNexis and Verisk engaged in unfair and unconscionable conduct in violation of the FDUTPA by engaging in the conduct alleged herein, including by soliciting and accepting Plaintiffs' and Florida Subclass Members' Driving Data from GM with knowledge that such data was obtained without Plaintiffs' and Florida Subclass Members' consent, and further using, selling and disseminating Plaintiffs' and Florida Subclass Members' Driving Data without their consent.

1318.   LexisNexis and Verisk also violated the FDUTPA by knowingly taking advantage of Plaintiffs' and Florida Subclass Members' inability to reasonably protect their interests, due to their lack of knowledge regarding GM's practices, of which LexisNexis and Verisk were aware.

1319.   Plaintiffs' and the Florida Subclass' Driving Data has tangible value. As a direct and proximate result of GM's unfair and deceptive acts and practices, Plaintiffs' and Florida Subclass Members' Driving Data is in the possession of third parties—including LexisNexis and Verisk—who have used and will use such data for their commercial benefit.

1320.    As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive acts and practices, Plaintiffs and Florida Subclass Members have suffered and will continue to suffer injury, including, but not limited to: loss of privacy; unauthorized dissemination of their valuable Driving Data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their Driving Data; and economic harm stemming from the exploitation of their Driving Data.

1321.    Plaintiffs and Florida Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages, injunctive relief, and reasonable attorneys' fees and costs.

## COUNT 25

## FLORIDA SECURITY OF COMMUNICATIONS ACT
## Fla. Stat. §§ 934.01, *et seq.*

*Against All Defendants*

1322.    The Florida Plaintiffs identified above ("Plaintiffs," for purposes of this Count), individually and on behalf of the Florida Subclass, repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1323.    The Florida Security of Communications Act ("FSCA"), Fla. Stat. § 934.01, *et seq.*, states that any person who "[i]ntentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any wire, oral, or electronic communication" is subject to liability.  Fla. Stat. § 934.03(1)(a).

1324. Plaintiffs, members of the Florida Subclass, GM, LexisNexis, and Verisk each constitute a "person" as defined in Fla. Stat. § 934.02.

1325. The data and transmissions within, to, and from Plaintiffs' and Class Members' vehicles constitute "electronic communications," as defined by Fla. Stat. § 934.02, as they are transfers of signals, data, and intelligence transmitted by electromagnetic, photoelectronic or photooptical systems that affect intrastate, interstate or foreign commerce.

1326. The FSCA prohibits any person from intentionally disclosing, or endeavoring to disclose, to any other person "the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of [the FSCA]." Fla. Stat. Ann. § 934.03(c).

1327. The FSCA prohibits any person from intentionally using, or endeavoring to use, "the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of [the FSCA.]" Fla. Stat. Ann. § 934.03(d).

1328. As alleged herein, GM intercepted, in real time and as they were transmitted, the contents of electronic communications, and diverted those communications to itself without consent.

1329. As detailed herein, the electronic communications detailed above that GM has intercepted are tied to individual drivers and vehicles, and not anonymized.

1330. Plaintiffs and Florida Subclass Members have a reasonable expectation of privacy within their vehicles, and Plaintiffs and Florida Subclass Members reasonably expected privacy while driving their vehicles. Further, there is a reasonable expectation that the interactions between a driver and their vehicle, *i.e.*, their personal Driving Data, are private.

1331. Common understanding and human experience of how automotive vehicles work create a reasonable expectation that a vehicle manufacturer and service provider like GM would not surreptitiously intercept and divert the detailed and personal electronic communications described above.

1332. GM intercepted these electronic communications in real time separately from and in addition to accessing data stored in Plaintiffs' and Florida Subclass Members' vehicle components.

1333. GM intercepted these data transmissions by diverting them, during flight via a TCU or similar device, to their own servers, unbeknownst to Plaintiffs and Florida Subclass Members.

1334. As detailed herein, the electronic communications detailed above that GM intercepted are tied to individual drivers and vehicles, and not anonymized.

1335. In further violation of the FSCA, GM has disclosed or attempted to disclose to third parties the contents of the communications described above while knowing or having reason to know that the information was obtained through interception in violation of the FSCA.

1336. In further violation of the FSCA, GM has used or attempted to use the contents of the communications described above while knowing or having reason to know that the information was obtained through interception in violation of the FSCA.

1337. Specifically, GM has disclosed and used the contents of the communications described above by selling Plaintiffs' and Florida Subclass Members' personal Driving Data to LexisNexis and Verisk for its own financial and commercial benefit, obtaining substantial profit.

1338. LexisNexis and Verisk have also violated the FSCA by disclosed or endeavoring to disclose to third parties the contents of the communications intercepted by GM described above while knowing or having reason to know that the information was obtained through the interception of the communications in violation of the FSCA.

1339. Specifically, LexisNexis and Verisk intentionally disclosed Plaintiffs' and Florida Subclass Members' detailed Driving Data to various auto insurance companies.

1340. In further violation of the FSCA, LexisNexis and Verisk willfully used or endeavored to use the contents of the communications described above while knowing or having reason to know that the information was obtained through the interception of the communications in violation of the FSCA.

1341. Specifically, LexisNexis and Verisk have used the information derived from the communications described above to create products they market, license, and sell, including so-called driving scores, risk ratings, and access to databases containing Plaintiffs' and the Florida Subclass Members' Driving Data.

1342. Further, LexisNexis and Verisk have used the information derived from the communications described above in aggregate fashion to create their telematics exchanges, develop risk models, and other products they market and sell.

1343. LexisNexis and Verisk have used and disclosed the contents of the communications described above for their own financial and commercial benefit, obtaining substantial profit.

1344. LexisNexis and Verisk knew or had reason to know that the information they obtained from GM was obtained through the unlawful interception of communications in violation of the FSCA.

1345. Specifically, LexisNexis and Verisk knew or should have known that the Driving Data they used and sold was captured in secret in violation of FSCA for the following reasons, among others that will become known through discovery:

a. the numerous, obvious consent and privacy challenges to the collection of Driving Data that both LexisNexis and Verisk acknowledged in writing and in presentations;

b. the opaque disclosures in GM's various terms and policies, which did not operate as a reasonable basis for inferring consumer consent to share the information with LexisNexis and Verisk;

c. the sheer volume of data LexisNexis and Verisk were receiving from GM versus from other manufacturers;

d. the lack of public knowledge about GM's collection and sharing practices until at least 2024;

e. that fact that LexisNexis continued to collect after it was publicized that collection was secret/happening without consent or knowledge; and

f. the nature of the data as such that it had to be obtained via a wiretap.

1346. Upon information and belief, GM and LexisNexis continue to disclose and use unlawfully obtained Driving Data for their own financial gain.

1347. Plaintiffs and Florida Subclass Members did not consent or otherwise authorize Defendants to intercept, disclose, or use their communications.

1348. As a result, Plaintiffs and Florida Subclass Members have suffered harm and injury due to the interception, disclosure, and/or use of communications containing their private and personal information.

1349. Defendants' violations of the FSCA have directly and proximately caused Plaintiffs and the Florida Subclass to suffer harm and injury due to the interception, disclosure, and/or use of their private and personal information in an amount to be ascertained at trial.

1350. Pursuant to Fla. Stat. § 934.10(1), Plaintiffs and Florida Subclass Members have been damaged by the interception, disclosure, and/or use of their communications in violation of the FSCA and are entitled to: (1) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiffs and the Florida Subclass or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; and (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs reasonably incurred

## CLAIMS ON BEHALF OF THE GEORGIA SUBCLASS

## COUNT 26

## VIOLATION OF THE GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT,
### Ga. Code Ann. §§ 10-1-370, *et seq.*

*Against GM*

1351. The Georgia Plaintiffs identified above ("Plaintiffs" for purposes of this Count) repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1352. GM, Plaintiffs, and Georgia Subclass Members are "persons" within the meaning of § 10-1-371(5) of the Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA").

1353. GM engaged in deceptive trade practices in the conduct of its business in violation of Ga. Code § 10-1-372(a), including:

   a. Representing that goods or services have characteristics that they do not have;

   b. Representing that goods or services are of a particular standard, quality, or grade if they are of another;

   c. Advertising goods or services with intent not to sell them as advertised;

   d. Engaging in other conduct that creates a likelihood of confusion or misunderstanding.

1354. GM engaged in unfair, unconscionable, unlawful, and/or deceptive acts and practices in conducting trade and commerce in violation of the Georgia UDTPA by:

a. Intercepting, collecting, using, and selling Plaintiffs' and Georgia Subclass Members' Driving Data without obtaining their consent;

b. Omitting, suppressing, and concealing the material fact that GM was intercepting, collecting, using, and selling Plaintiffs' and Georgia Subclass Members' Driving Data to LexisNexis, Verisk, and other third parties for GM's own financial and commercial benefit;

c. Omitting, suppressing, and concealing the material fact that LexisNexis, Verisk, and other third parties collected, manipulated, used, and sold Plaintiffs' and Georgia Subclass Members' Driving Data for their own financial and commercial benefit;

d. Omitting, suppressing, and concealing material facts regarding the functionality of OnStar with respect to the privacy of consumers in their own vehicles;

e. Misrepresenting the purpose of OnStar and that it would protect the privacy of Plaintiffs' and the Georgia Subclass Members' Driving Data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f. Failing to comply with common law and/or statutory duties pertaining to the privacy of Plaintiffs' and Georgia Subclass Members' Driving Data.

1355. GM acted intentionally, knowingly, and maliciously to violate the Georgia UDTPA, and recklessly disregarded Plaintiffs' and Georgia Subclass Members' rights, because GM intentionally intercepted, collected, used, and sold Plaintiff's and Georgia Subclass Members' Driving Data without obtaining their consent.

1356. The fact that GM intercepted, collected, used, and sold Plaintiffs' and Georgia Subclass Members' Driving Data was material to Plaintiffs and Georgia Subclass Members. This is a fact that reasonable consumers would consider important when choosing to purchase or lease a vehicle.

1357. Plaintiffs and Georgia Subclass Members were deceived and/or could reasonably be expected to be deceived by GM's material misrepresentations and omissions regarding the functionality of OnStar, the security and privacy of their Driving Data, and their privacy in their own vehicles to their detriment.

1358. In the course of its business, GM engaged in activities with a tendency or capacity to deceive. GM's prior attempts to create similar programs, and the backlash that such proposed programs created demonstrating consumer disapproval with such programs, put it on notice that consumers would not consent to the

collection and disclosure of Driving Data, thus necessitating Defendants' omissions and misrepresentations regarding their programs.

1359. Plaintiffs' and the Georgia Subclass' Driving Data has tangible value. As a direct and proximate result of GM's unfair and deceptive acts and practices, Plaintiffs' and Georgia Subclass Members' Driving Data is in the possession of third parties—including LexisNexis and Verisk—who have used and will use such data for their commercial benefit.

1360. As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive acts and practices, Plaintiffs and Georgia Subclass Members have suffered and will continue to suffer injury, including, but not limited to: loss of privacy; unauthorized dissemination of their valuable Driving Data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their Driving Data; and economic harm stemming from the exploitation of their Driving Data.

1361. Plaintiffs and Georgia Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages, injunctive relief, and reasonable attorneys' fees and costs under O.C.G.A. § 10-1-373.

## COUNT 27

### RECOVERY OF EXPENSES OF LITIGATION
### O.C.G.A. §§ 13-6-11, *et seq.*

*Against GM*

1362. The Georgia Plaintiffs identified above, individually and on behalf of the Georgia Subclass, repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1363. Pursuant to O.C.G.A. § 13-6-11, the jury may allow the expenses of litigation and attorneys' fees as part of the damages where a defendant "has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense."

1364. GM, through its actions alleged and described herein, acted in bad faith, was stubbornly litigious, or caused the Georgia Subclass unnecessary trouble and expense with respect to the transaction or events underlying this litigation.

1365. The Georgia Subclass therefore requests that their claim for recovery of expenses of litigation and attorneys' fees be submitted to the jury, and that the Court enter a Judgment awarding their expenses of litigation and attorneys' fees pursuant to O.C.G.A. § 13-6-11.

## CLAIMS ON BEHALF OF THE IDAHO SUBCLASS

## COUNT 28

## IDAHO CONSUMER PROTECTION ACT,
### Idaho Code §§ 48-601, *et seq*.

*Against All Defendants*

1366. The Idaho Plaintiff identified above ("Plaintiff" for purposes of this Count) repeats and realleges Paragraphs 1-973, as if fully alleged herein.

1367. GM, LexisNexis, and Verisk are each a "person" as defined by Idaho Code § 48-602(1).

1368. GM's conduct as alleged herein pertained to "goods" and "services" as defined by Idaho Code § 48-602(6) and (7).

1369. GM, LexisNexis, and Verisk each engaged in "trade or commerce" affecting the people of Idaho by advertising, offering for sale, selling or distributing goods and services in the State of Idaho.

1370. GM engaged in unfair, unconscionable, and deceptive acts or practices in the conduct of trade and commerce with respect to the sale and advertisement of goods and services, in violation of Idaho Code §§ 48-603 and 48-603(C), including:

   a.  Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have;

   b.  Representing that goods are of a particular standard, quality, or grade when they are of another;

   c.  Advertising goods or services with intent not to sell them as advertised;

   d.  Engaging in other acts and practices that are otherwise misleading, false, or deceptive to consumers;

e. Engaging in unconscionable methods, acts or practices in the conduct of trade or commerce.

1371. Specifically, GM's unfair, deceptive, and unconscionable acts and practices include:

a. Intercepting, collecting, using, and selling Plaintiff's and Idaho Subclass Members' Driving Data without obtaining their consent;

b. Omitting, suppressing, and concealing the material fact that GM was intercepting, collecting, using, and selling Plaintiff's and Idaho Subclass Members' Driving Data to LexisNexis, Verisk, and other third parties for GM's own financial and commercial benefit;

c. Omitting, suppressing, and concealing the material fact that LexisNexis, Verisk, and other third parties collected, manipulated, used, and sold Plaintiff's and Idaho Subclass Members' Driving Data for their own financial and commercial benefit;

d. Omitting, suppressing, and concealing material facts regarding the functionality of OnStar with respect to the privacy of consumers in their own vehicles;

e. Misrepresenting the purpose of OnStar and that it would protect the privacy of Plaintiff's and the Idaho Subclass Members' Driving Data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f. Failing to comply with common law and/or statutory duties pertaining to the privacy of Plaintiff's and Idaho Subclass Members' Driving Data.

1372. GM acted intentionally, knowingly, and maliciously to violate the Act, and recklessly disregarded Plaintiff's and Idaho Subclass Members' rights, because GM intentionally intercepted, collected, used, and sold Plaintiff's and Idaho Subclass Members' Driving Data without obtaining their consent.

1373. The fact that GM intercepted, collected, used, and sold Plaintiff's and Idaho Subclass Members' Driving Data was material to Plaintiff and Idaho Subclass Members. This is a fact that reasonable consumers would consider important when choosing to purchase or lease a vehicle.

1374. Plaintiff and Idaho Subclass Members were deceived and/or could reasonably be expected to be deceived by GM's material misrepresentations and omissions regarding the functionality of OnStar, the security and privacy of their Driving Data, and their privacy in their own vehicles to their detriment.

1375. In the course of its business, GM engaged in activities with a tendency or capacity to deceive. GM's prior attempts to create similar programs, and the backlash that such proposed programs created demonstrating consumer disapproval with such programs, put it on notice that consumers would not consent to the collection and disclosure of Driving Data and telematics, thus necessitating Defendants' omissions and misrepresentations regarding their programs.

1376. Had GM disclosed to the Idaho Plaintiff and Subclass Members that it was collecting and disclosing Driving Data, they would have been unable to enroll so many individuals in its programs. Instead, in order to drastically increase the numbers of consumers enrolled in its programs, GM did not disclose material terms or obtain actual, written consent for them. Instead, GM omitted material facts from consumers and misrepresented the actual purpose of its programs. Accordingly, Plaintiff and the Idaho Subclass Members acted reasonably in relying on GM's misrepresentations and omissions, the truth of which they could not have discovered.

1377. LexisNexis and Verisk engaged in unfair and unconscionable conduct in violation of the Act by engaging in the conduct alleged herein, including by soliciting and accepting Plaintiff's and Idaho Subclass Members' Driving Data from GM with knowledge that such data was obtained without Plaintiff's and Idaho Subclass Members' consent, and further using, selling and disseminating Plaintiff's and Idaho Subclass Members' Driving Data without their consent.

1378. LexisNexis and Verisk also violated the Act by knowingly taking advantage of Plaintiff's and Idaho Subclass Members' inability to reasonably protect their interests, due to their lack of knowledge regarding GM's practices, of which LexisNexis and Verisk were aware.

1379. Plaintiff's and the Idaho Subclass' Driving Data has tangible value. As a direct and proximate result of GM's unfair and deceptive acts and practices, Plaintiff's and Idaho Subclass Members' Driving Data is in the possession of third parties—including LexisNexis and Verisk—who have used and will use such data for their commercial benefit.

1380. As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive acts and practices, Plaintiff and Idaho Subclass Members have suffered and will continue to suffer injury, including, but not limited to: loss of privacy; unauthorized dissemination of their valuable Driving Data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their Driving Data; and economic harm stemming from the exploitation of their Driving Data.

1381. Plaintiff and Idaho Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages, injunctive relief, and reasonable attorneys' fees and costs.

## COUNT 29

### ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT,
### 815 Ill. Comp. Stat. §§ 505, *et seq.*

*Against All Defendants*

1382. The Illinois Plaintiffs identified above ("Plaintiffs," for purposes of this Count), individually and on behalf of the Illinois Subclass, repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1383. GM, LexisNexis, and Verisk are each a "person" as defined by 815 Ill. Comp. Stat. §§ 505/1(c).

1384. Plaintiffs and Illinois Subclass Members are "consumers" as defined by 815 Ill. Comp. Stat. §§ 505/1(e).

1385. GM's conduct as described herein was in the conduct of "trade" or "commerce" as defined by 815 Ill. Comp. Stat. § 505/1(f).

1386. GM's deceptive, unfair, and unlawful trade acts or practices, in violation of 815 Ill. Comp. Stat. § 505/2, include:

    a. Intercepting, collecting, using, and selling Plaintiffs' and Illinois Subclass Members' Driving Data without obtaining their consent;

    b. Omitting, suppressing, and concealing the material fact that GM was intercepting, collecting, using, and selling Plaintiffs' and

Illinois Subclass Members' Driving Data to LexisNexis, Verisk, and other third parties for GM's own financial and commercial benefit;

c. Omitting, suppressing, and concealing the material fact that LexisNexis, Verisk, and other third parties collected, manipulated, used, and sold Plaintiffs' and Illinois Subclass Members' Driving Data for their own financial and commercial benefit;

d. Omitting, suppressing, and concealing material facts regarding the functionality of OnStar with respect to the privacy of consumers in their own vehicles;

e. Misrepresenting the purpose of OnStar and that it would protect the privacy of Plaintiffs' and the Illinois Subclass Members' Driving Data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f. Failing to comply with common law and/or statutory duties pertaining to the privacy of Plaintiffs' and Illinois Subclass Members' Driving Data.

1387. GM acted intentionally, knowingly, and maliciously to violate the Act, and recklessly disregarded Plaintiffs' and Illinois Subclass Members' rights, because

GM intentionally intercepted, collected, used, and sold Plaintiff's and Illinois Subclass Members' Driving Data without obtaining their consent.

1388. The fact that GM intercepted, collected, used, and sold Plaintiffs' and Illinois Subclass Members' Driving Data was material to Plaintiffs and Illinois Subclass Members. This is a fact that reasonable consumers would consider important when choosing to purchase or lease a vehicle.

1389. Plaintiffs and Illinois Subclass Members were deceived and/or could reasonably be expected to be deceived by GM's material misrepresentations and omissions regarding the functionality of OnStar, the security and privacy of their Driving Data, and their privacy in their own vehicles to their detriment.

1390. GM intended to mislead Plaintiffs and Illinois Subclass Members and induce them to rely on their misrepresentations and omissions.

1391. In the course of its business, GM engaged in activities with a tendency or capacity to deceive.

1392. Had GM disclosed to Plaintiffs and Illinois Subclass Members that it was collecting and disclosing Driving Data, it would have been unable to enroll so many individuals in its programs. Instead, in order to drastically increase the numbers of consumers enrolled in its programs, GM did not disclose material terms or obtain actual, written consent for them. Instead, GM omitted material facts from consumers and misrepresented the actual purpose of its programs. Accordingly,

Plaintiffs and the Illinois Subclass Members acted reasonably in relying on GM's misrepresentations and omissions, the truth of which they could not have discovered.

1393.  LexisNexis and Verisk engaged in unfair and unconscionable conduct in violation of the Act by engaging in the conduct alleged herein, including by soliciting and accepting Plaintiffs' and Illinois Subclass Members' Driving Data from GM with knowledge that such data was obtained without Plaintiffs' and Illinois Subclass Members' consent, and further using, selling and disseminating Plaintiffs' and Illinois Subclass Members' Driving Data without their consent.

1394.  LexisNexis and Verisk also violated the Act by knowingly taking advantage of Plaintiffs' and Illinois Subclass Members' inability to reasonably protect their interests, due to their lack of knowledge regarding GM's practices, of which LexisNexis and Verisk were aware.

1395.  Plaintiffs' and the Illinois Subclass' Driving Data has tangible value. As a direct and proximate result of GM's unfair and deceptive acts and practices, Plaintiffs' and Illinois Subclass Members' Driving Data is in the possession of third parties—including LexisNexis and Verisk—who have used and will use such data for their commercial benefit.

1396.  As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive acts and practices, Plaintiffs and Illinois Subclass Members have suffered and will continue to suffer injury, including, but not limited to: loss of

privacy; unauthorized dissemination of their valuable Driving Data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their Driving Data; and economic harm stemming from the exploitation of their Driving Data.

1397. Plaintiffs and Illinois Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages, injunctive relief, and reasonable attorneys' fees and costs.

## COUNT 30

### ILLINOIS WIRETAPING, ELECTRONIC SUVEILLANCE AND INTERCEPTION OF COMMUNICATIONS LAW
### 720 ILCS 5/14-1, *et seq.*

*Against All Defendants*

1398. The Illinois Plaintiffs identified above ("Plaintiffs" for purposes of this Count), individually and on behalf of the Illinois Subclass, repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1399. The Illinois Eavesdropping law, 720 ILCS 5/14-1, et seq., prohibits, *inter alia*, any person from knowingly or intentionally "intercept[ing], record[ing], or transcrib[ing], in a surreptitious manner, any private electronic communication" without the consent of all parties. 720 ILCS 5/14-2(a)(3).

1400. The Illinois Eavesdropping law also prohibits any person from using or disclosing "any information which he or she knows or reasonably should know was

obtained" in violation of the Act, unless such use or disclosure is done "with the consent of all of the parties." 720 ILCS 5/14-2(a)(5).

1401. GM, LexisNexis, and Verisk are each a "person" within the scope of the Illinois Eavesdropping law.

1402. The data and transmissions within, to, and from Plaintiffs' and Illinois Subclass Members' vehicles constitute "private electronic communications" as defined by 720 ILCS 5/14-1(e), as they are transfers of signals, data, and intelligence transmitted by electromagnetic, photoelectronic or photooptical systems.

1403. Plaintiffs and Illinois Subclass Members have a reasonable expectation of privacy within their vehicles, and Plaintiffs and Illinois Subclass Members reasonably expected privacy while driving their vehicles. Further, there is a reasonable expectation that the interactions between a driver and their vehicle, *i.e.*, their personal Driving Data, are private.

1404. As alleged herein, GM has intercepted, in real time and as they were transmitted, the contents of private electronic communications, and diverted those communications to itself without consent.

1405. GM intercepted these data transmissions by diverting them, during flight through a TCU or similar device, to their own servers, unbeknownst to Plaintiffs and Illinois Subclass Members.

1406. As detailed herein, the electronic communications detailed above that GM intercepted are tied to individual drivers and vehicles, and not anonymized.

1407. In further violation of the Illinois Eavesdropping law, GM intentionally disclosed or endeavored to disclose to third parties the contents of the private electronic communications described above while knowing or having reason to know that the information was obtained through the interception of the private electronic communications.

1408. In further violation of the Illinois Eavesdropping law, GM intentionally used or endeavored to use the contents of the communications described above knowing or having reason to know that the information was obtained through interception in violation of the Act.

1409. GM has disclosed and used the contents of the communications described above by selling consumers' personal Driving Data to the third parties, including LexisNexis and Verisk, for its own financial and commercial benefit, obtaining substantial profit.

1410. In violation of the Illinois Eavesdropping law, LexisNexis and Verisk intentionally disclosed, used, or endeavored to use disclose to third parties the contents of Plaintiffs' and Illinois Subclass Members' private electronic communications intercepted by GM while knowing or having reason to know that

the information was obtained through the interception of the communications in violation of the Illinois Eavesdropping law.

1411. Specifically, LexisNexis and Verisk intentionally disclosed or endeavored to disclose Plaintiffs' and Illinois Subclass Members' detailed Driving Data to various auto insurance companies.

1412. LexisNexis and Verisk further used the information derived from Plaintiffs' and Illinois Subclass Members' private electronic communications to create products they market, license, and sell, including so-called driving scores, risk ratings, and access to databases containing Plaintiffs' and Illinois Subclass Members' Driving Data. LexisNexis and Verisk also used the information derived from the communications described above in aggregate fashion to create their telematics exchange, develop risk models, and other products they market and sell.

1413. LexisNexis and Verisk knew or should have known that the detailed driving information they used and sold was captured in violation of the Illinois Eavesdropping law for the following reasons, among others that will become known through discovery:

    a. the numerous, obvious consent and privacy challenges to the collection of Driving Data that both LexisNexis and Verisk acknowledged in writing and in presentations;

b. the opaque disclosures in GM's various terms and policies, which did not operate as a reasonable basis for inferring consumer consent to share the information with LexisNexis and Verisk;

c. the sheer volume of data LexisNexis and Verisk were receiving from GM versus from other manufacturers;

d. the lack of public knowledge about GM's collection and sharing practices until at least 2024;

e. that fact that LexisNexis continued to collect after it was publicized that collection was secret/happening without consent or knowledge; and

f. the nature of the data as such that it had to be obtained via a wiretap.

1414. Plaintiffs and Illinois Subclass Members did not consent or otherwise authorize Defendants to intercept, disclose, or use their communications.

1415. As a result, Plaintiffs and Illinois Subclass Members have suffered harm and injury due to the interception, disclosure, and/or use of communications containing their private and personal information.

1416. Pursuant to 720 ILCS 14-6, Plaintiffs and Illinois Subclass Members have been damaged by the interception, disclosure, and/or use of their

communications in violation of the Eavesdropping law and are entitled to: (1) damages, in an amount to be determined at trial; (2) punitive damages; (3) injunctive relief prohibiting Defendants from further eavesdropping; and (4) reasonable attorneys' fees and other litigation costs reasonably incurred.

## CLAIMS ON BEHALF OF THE INDIANA SUBCLASS

## COUNT 31

### INDIANA DECEPTIVE CONSUMER SALES ACT,
### Ind. Code §§ 24-5-0.5-1, *et seq.*

*Against All Defendants*

1417. The Indiana Plaintiff identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Indiana Subclass, repeats and realleges Paragraphs 1-973, as if fully alleged herein.

1418. GM, LexisNexis, and Verisk are each a "person" as defined by Ind. Code § 24-5-0.5-2(a)(2).

1419. Defendants are each a "supplier" as defined by § 24-5-0.5-2(a)(1), because they regularly engages in or solicits "consumer transactions," within the meaning of Ind. Code § 24-5-0.5-2(a)(3)(A).

1420. Defendants engaged in unfair, abusive, and deceptive acts, omissions, and practices in connection with consumer transactions by advertising, offering for sale, selling or distributing goods and services in the State of Indiana. Ind. Code § 24-5-0.5-3(a).

1421. GM's representations and omissions include both implicit and explicit representations.

1422. GM engaged in unconscionable, unfair, and deceptive acts and practices in the conduct of trade or commerce in violation of Ind. Code § 24-5-0.5-3 by:

a. Intercepting, collecting, using, and selling Plaintiff's and Indiana Subclass Members' Driving Data without obtaining their consent;

b. Omitting, suppressing, and concealing the material fact that GM was intercepting, collecting, using, and selling Plaintiff's and Indiana Subclass Members' Driving Data to LexisNexis, Verisk, and other third parties for GM's own financial and commercial benefit;

c. Omitting, suppressing, and concealing the material fact that LexisNexis, Verisk, and other third parties collected, manipulated, used, and sold Plaintiff's and Indiana Subclass Members' Driving Data for their own financial and commercial benefit;

d. Omitting, suppressing, and concealing material facts regarding the functionality of OnStar with respect to the privacy of consumers in their own vehicles;

e. Misrepresenting the purpose of OnStar and that it would protect the privacy of Plaintiff's and the Indiana Subclass Members' Driving Data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f. Failing to comply with common law and/or statutory duties pertaining to the privacy of Plaintiff's and Indiana Subclass Members' Driving Data.

1423. GM acted intentionally, knowingly, and maliciously to violate the Act, and recklessly disregarded Plaintiff's and Indiana Subclass Members' rights, because GM intentionally intercepted, collected, used, and sold Plaintiff's and Indiana Subclass Members' Driving Data without obtaining their consent.

1424. The fact that GM intercepted, collected, used, and sold Plaintiff's and Indiana Subclass Members' Driving Data was material to Plaintiff and Indiana Subclass Members. This is a fact that reasonable consumers would consider important when choosing to purchase or lease a vehicle.

1425. Plaintiff and Indiana Subclass Members were deceived and/or could reasonably be expected to be deceived by GM's material misrepresentations and

omissions regarding the functionality of OnStar, the security and privacy of their Driving Data, and their privacy in their own vehicles to their detriment.

1426. GM intended to mislead the Indiana Plaintiff and Indiana Subclass Members and induce them to rely on their misrepresentations and omissions.

1427. In the course of its business, GM engaged in activities with a tendency or capacity to deceive. GM's prior attempts to create similar programs, and the backlash that such proposed programs created demonstrating consumer disapproval with such programs, put it on notice that consumers would not consent to the collection and disclosure of Driving Data, thus necessitating Defendants' omissions and misrepresentations regarding their programs.

1428. Had GM disclosed to Plaintiff and Indiana Subclass Members that it was collecting and disclosing their Driving Data, it would have been unable to enroll so many individuals in its programs. Instead, in order to drastically increase the numbers of consumers enrolled in its programs, GM did not disclose material terms or obtain actual, written consent for them. Instead, GM omitted material facts from consumers, and misrepresented the actual purpose of its programs. Accordingly, Plaintiff and the Indiana Subclass Members acted reasonably in relying on GM's misrepresentations and omissions, the truth of which they could not have discovered.

1429. LexisNexis and Verisk engaged in unfair and unconscionable conduct in violation of the Act by engaging in the conduct alleged herein, including by

soliciting and accepting Plaintiff's and Indiana Subclass Members' Driving Data from GM with knowledge that such data was obtained without Plaintiff's and Indiana Subclass Members' consent, and further using, selling and disseminating Plaintiff's and Indiana Subclass Members' Driving Data without their consent.

1430.   LexisNexis and Verisk also violated the Act by knowingly taking advantage of Plaintiff's and Indiana Subclass Members' inability to reasonably protect their interests, due to their lack of knowledge regarding GM's practices, of which LexisNexis and Verisk were aware.

1431.   As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive acts and practices, Plaintiff and Indiana Subclass Members have suffered and will continue to suffer injury, including, but not limited to: loss of privacy; unauthorized dissemination of their valuable Driving Data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their Driving Data; and economic harm stemming from the exploitation of their Driving Data.

1432. Plaintiff sent a demand for relief on behalf of the Indiana Subclass pursuant to Ind. Code § 24-5-0.5-5. Defendants have not cured their unfair, abusive, and deceptive acts and practices, or their violations of Indiana Deceptive Consumer Sales Act were incurable. Defendants' conduct was incurable because Plaintiff's and

Indiana Subclass Members' Driving Data has already been used and shared with third parties.

1433. Defendants' violations present a continuing risk to Plaintiff and Indiana Subclass Members as well as to the general public if injunctive relief does not prevent them from continuing their deceptive acts and practices in the future.

1434. Plaintiff and Indiana Subclass Members seek all monetary and non-monetary relief allowed by law, including the greater of actual damages or $500 for each non-willful violation; the greater of treble damages or $1,000 for each willful violation; restitution; reasonable attorneys' fees and costs; injunctive relief; and punitive damages.

## CLAIMS ON BEHALF OF THE KANSAS SUBCLASS

## COUNT 32

## KANSAS CONSUMER PROTECTION ACT,
### Kan. Stat. Ann. §§ 50-623, *et seq.*

*Against All Defendants*

1435. The Kansas Plaintiffs identified above ("Plaintiffs," for purposes of this Count), individually and on behalf of the Kansas Subclass, repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1436. K.S.A. §§ 50-623, *et seq.*, is to be liberally construed to protect consumers from suppliers who commit deceptive and unconscionable practices.

1437. Plaintiffs and Kansas Subclass Members are "consumers" as defined by K.S.A. § 50-624(b).

1438. The acts and practices described herein are "consumer transactions," as defined by K.S.A. § 50-624(c).

1439. GM, LexisNexis, and Verisk are "supplier[s]" as defined by K.S.A. § 50-624(l).

1440. GM advertised, offered, or sold goods or services in Kansas and engaged in trade or commerce directly or indirectly affecting the people of Kansas.

1441. GM engaged in unfair, unconscionable, unlawful, and/or deceptive acts and practices in conducting trade and commerce in violation of the Act by:

    a. Intercepting, collecting, using, and selling Plaintiffs' and Kansas Subclass Members' Driving Data without obtaining their consent;

    b. Omitting, suppressing, and concealing the material fact that GM was intercepting, collecting, using, and selling Plaintiffs' and Kansas Subclass Members' Driving Data to LexisNexis, Verisk, and other third parties for GM's own financial and commercial benefit;

    c. Omitting, suppressing, and concealing the material fact that LexisNexis, Verisk, and other third parties collected,

manipulated, used, and sold Plaintiffs' and Kansas Subclass Members' Driving Data for their own financial and commercial benefit;

d. Omitting, suppressing, and concealing material facts regarding the functionality of OnStar with respect to the privacy of consumers in their own vehicles;

e. Misrepresenting the purpose of OnStar and that it would protect the privacy of Plaintiffs' and the Kansas Subclass Members' Driving Data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f. Failing to comply with common law and/or statutory duties pertaining to the privacy of Plaintiffs' and Kansas Subclass Members' Driving Data.

1442. GM's representations and omissions include both implicit and explicit representations.

1443. GM acted intentionally, knowingly, and maliciously to violate the Act, and recklessly disregarded Plaintiffs' and Kansas Subclass Members' rights, because GM intentionally intercepted, collected, used, and sold Plaintiff's and Kansas Subclass Members' Driving Data without obtaining their consent.

1444. The fact that GM intercepted, collected, used, and sold Plaintiffs' and Kansas Subclass Members' Driving Data was material to Plaintiffs and Kansas Subclass Members. This is a fact that reasonable consumers would consider important when choosing to purchase or lease a vehicle.

1445. Plaintiffs and Kansas Subclass Members were deceived and/or could reasonably be expected to be deceived by GM's material misrepresentations and omissions regarding the functionality of OnStar, the security and privacy of their Driving Data, and their privacy in their own vehicles to their detriment.

1446. GM intended to mislead Plaintiffs and Kansas Subclass Members and induce them to rely on their misrepresentations and omissions.

1447. In the course of its business, GM engaged in activities with a tendency or capacity to deceive. GM's prior attempts to create similar programs, and the backlash that such proposed programs created demonstrating consumer disapproval with such programs, put it on notice that consumers would not consent to the collection and disclosure of Driving Data, thus necessitating Defendants' omissions and misrepresentations regarding their programs.

1448. Had GM disclosed to Plaintiffs and Kansas Subclass Members that it was collecting and disclosing their Driving Data, it would have been unable to enroll so many individuals in its programs. Instead, in order to drastically increase the numbers of consumers enrolled in its programs, GM did not disclose material terms

or obtain actual, written consent for them. Instead, GM omitted material facts from consumers and misrepresented the actual purpose of its programs. Accordingly, Plaintiffs and the Kansas Subclass Members acted reasonably in relying on GM's misrepresentations and omissions, the truth of which they could not have discovered.

1449. Plaintiffs' and the Kansas Subclass' Driving Data has tangible value. As a direct and proximate result of GM's unfair and deceptive acts and practices, Plaintiffs' and Kansas Subclass Members' Driving Data is in the possession of third parties—including LexisNexis and Verisk—who have used and will use such data for their commercial benefit.

1450. As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive acts and practices, Plaintiffs and Kansas Subclass Members have suffered and will continue to suffer injury, including, but not limited to: loss of privacy; unauthorized dissemination of their valuable Driving Data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their Driving Data; and economic harm stemming from the exploitation of their Driving Data.

1451. GM's violations present a continuing risk to Plaintiffs and Kansas Subclass Members as well as to the general public if injunctive relief does not prevent them from continuing their deceptive acts and practices in the future.

1452. GM also engaged in unconscionable acts and practices in connection with a consumer transaction, in violation of K.S.A. § 50-627, including:

a. Knowingly taking advantage of the inability of Plaintiffs and the Kansas Subclass to reasonably protect their interests, due to their lack of knowledge (see K.S.A. § 50-627(b)(1)); and

b. Requiring Plaintiffs and the Kansas Subclass to enter into a consumer transaction on terms that GM knew were substantially one-sided in favor of GM (see K.S.A. § 50-627(b)(5)).

1453. LexisNexis and Verisk engaged in unfair and unconscionable conduct in violation of the Act by engaging in the conduct alleged herein, including by soliciting and accepting Plaintiffs' and Kansas Subclass Members' Driving Data from GM with knowledge that such data was obtained without Plaintiffs' and Kansas Subclass Members' consent, and further using, selling and disseminating Plaintiffs' and Kansas Subclass Members' Driving Data without their consent.

1454. LexisNexis and Verisk also violated the Act by knowingly taking advantage of Plaintiffs' and Kansas Subclass Members' inability to reasonably protect their interests, due to their lack of knowledge (see K.S.A. § 50-627(b)(1)) regarding GM's practices, of which LexisNexis and Verisk were aware.

1455. Plaintiffs and the Kansas Subclass had unequal bargaining power with respect to their ability to control the security and confidentiality of Driving Data.

1456. The above unfair, deceptive, and unconscionable practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiffs and Kansas Subclass Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

1457. Defendants acted intentionally, knowingly, and maliciously to violate Kansas's Consumer Protection Act, and recklessly disregarded Plaintiffs and Kansas Subclass Members' rights.

1458. Plaintiffs and Kansas Subclass Members seek all monetary and non-monetary relief allowed by law, including civil penalties or actual damages (whichever is greater), under K.S.A. §§ 50-634 and 50-636; injunctive relief; restitution; and reasonable attorneys' fees and costs.

## CLAIMS ON BEHALF OF THE KENTUCKY SUBCLASS

### COUNT 33

### KENTUCKY CONSUMER PROTECTION ACT,
### Ky. Rev. Stat. §§ 367.110, *et seq.*

*Against all Defendants*

1459. The Kentucky Plaintiff identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Kentucky Subclass, repeats and realleges Paragraphs 1-973, as if fully alleged herein.

1460. GM, LexisNexis, and Verisk are each a "person" as defined by Ky. Rev. Stat. § 367.110(1).

1461. GM, LexisNexis, and Verisk advertised, offered, or sold goods or services in Kentucky and engaged in trade or commerce directly or indirectly affecting the people of Kentucky, as defined by Ky. Rev. Stat. 367.110(2).

1462. GM engaged in unfair, false, misleading, deceptive, and unconscionable acts or practices, in violation of Ky. Rev. Stat. § 367.170, including:

a. Intercepting, collecting, using, and selling Plaintiff's and Kentucky Subclass Members' Driving Data without obtaining their consent;

b. Omitting, suppressing, and concealing the material fact that GM was intercepting, collecting, using, and selling Plaintiff's and Kentucky Subclass Members' Driving Data to LexisNexis, Verisk, and other third parties for GM's own financial and commercial benefit;

c. Omitting, suppressing, and concealing the material fact that LexisNexis, Verisk, and other third parties collected, manipulated, used, and sold Plaintiff's and Kentucky Subclass Members' Driving Data for their own financial and commercial benefit;

d. Omitting, suppressing, and concealing material facts regarding the functionality of OnStar with respect to the privacy of consumers in their own vehicles;

e. Misrepresenting the purpose of OnStar and that it would protect the privacy of Plaintiff's and the Kentucky Subclass Members' Driving Data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f. Failing to comply with common law and/or statutory duties pertaining to the privacy of Plaintiff's and Kentucky Subclass Members' Driving Data.

1463. GM's representations and omissions include both implicit and explicit representations.

1464. GM acted intentionally, knowingly, and maliciously to violate the Act, and recklessly disregarded Plaintiff's and Kentucky Subclass Members' rights, because GM intentionally intercepted, collected, used, and sold Plaintiff's and Kentucky Subclass Members' Driving Data without obtaining their consent.

1465. The fact that GM intercepted, collected, used, and sold Plaintiff's and Kentucky Subclass Members' Driving Data was material to Plaintiff and Kentucky Subclass Members. This is a fact that reasonable consumers would consider important when choosing to purchase or lease a vehicle.

1466.   Plaintiff and Kentucky Subclass Members were deceived and/or could reasonably be expected to be deceived by GM's material misrepresentations and omissions regarding the functionality of OnStar, the security and privacy of their Driving Data, and their privacy in their own vehicles to their detriment.

1467. In the course of its business, GM engaged in activities with a tendency or capacity to deceive. GM's prior attempts to create similar programs, and the backlash that such proposed programs created demonstrating consumer disapproval with such programs, put it on notice that consumers would not consent to the collection and disclosure of Driving Data, thus necessitating Defendants' omissions and misrepresentations regarding their programs.

1468. Had GM disclosed to Plaintiff and Kentucky Subclass Members that it was collecting and disclosing Driving Data, it would have been unable to enroll so many individuals in its programs. Instead, in order to drastically increase the numbers of consumers enrolled in its programs, GM did not disclose material terms or obtain actual, written consent for them. Instead, GM omitted material facts from consumers and misrepresented the actual purpose of its programs. Accordingly, Plaintiff and the Kentucky Subclass Members acted reasonably in relying on GM's misrepresentations and omissions, the truth of which they could not have discovered.

1469.   LexisNexis and Verisk engaged in unfair and unconscionable conduct in violation of the Act by engaging in the conduct alleged herein, including by

soliciting and accepting Plaintiff's and Kentucky Subclass Members' Driving Data from GM with knowledge that such data was obtained without Plaintiff's and Kentucky Subclass Members' consent, and further using, selling and disseminating Plaintiff's and Kentucky Subclass Members' Driving Data without their consent.

1470.   LexisNexis and Verisk also violated the Act by knowingly taking advantage of Plaintiff's and Kentucky Subclass Members' inability to reasonably protect their interests, due to their lack of knowledge regarding GM's practices, of which LexisNexis and Verisk were aware.

1471. The above unfair, deceptive, and unconscionable practices and acts by GM a were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff and Kentucky Subclass members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

1472. GM acted intentionally, knowingly, and maliciously to violate Kentucky's Consumer Protection Act, and recklessly disregarded Plaintiff's and Kentucky Subclass Members' rights.

1473.   Plaintiff's and the Kentucky Subclass' Driving Data has tangible value. As a direct and proximate result of GM's unfair and deceptive acts and practices, Plaintiff's and Kentucky Subclass Members' Driving Data is in the possession of third

parties—including LexisNexis and Verisk—who have used and will use such data for their commercial benefit.

1474. As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive acts and practices, Plaintiff and Kentucky Subclass Members have suffered and will continue to suffer injury, including, but not limited to: loss of privacy; unauthorized dissemination of their valuable Driving Data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their Driving Data; and economic harm stemming from the exploitation of their Driving Data.

1475. Plaintiff and Kentucky Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages, injunctive relief, and reasonable attorneys' fees and costs. GM's violations present a continuing risk to Plaintiff and Kentucky Subclass Members as well as to the general public if injunctive relief does not prevent them from continuing their deceptive acts and practices in the future.

## CLAIMS ON BEHALF OF THE MARYLAND SUBCLASS

## COUNT 34

### VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT
### Md. Comm. Code §§ 13-301, *et seq*.

*Against GM*

1476. The Maryland Plaintiff identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Maryland Subclass, repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1477. GM is a "person[s]" as defined by Md. Comm. Code § 13-101(h).

1478. GM's conduct as alleged herein related to "sales," "offers for sale," "leases," "rentals," "loans" or "bailment" as defined by Md. Comm. Code § 13-101(i) and § 13-303.

1479. Plaintiff and Maryland Subclass Members are "consumers," as defined by Md. Comm. Code § 13-101(c).

1480. GM advertises, offers, leases and/or sells "consumer goods" and/or "consumer services" as defined by Md. Comm. Code § 13-101(d).

1481. GM advertises, offers, leases and/or sells goods and/or services in Maryland and engages in trade or commerce directly or indirectly affecting the people of Maryland.

1482. GM engaged in unfair and deceptive trade practices in the sale, lease, rental, loan, or bailment of consumer goods and/or consumer services and/or in the offer for sale, lease, rental, loan, or bailment of consumer goods and/or consumer services, in violation of Md. Comm. Code § 13-303, including under the following provisions:

a. Making false or misleading oral or written statements, visual descriptions, or other representations which had the capacity, tendency, or effect of deceiving or misleading consumers. Md. Comm. Code § 13-301(1);

b. Representing that consumer goods and/or consumer services have characteristics that they do not have. Md. Comm. Code § 13-301(2)(i);

c. Representing that consumer goods and/or consumer services are of a particular standard or quality that they are not. Md. Comm. Code § 13-301(2)(iv);

d. Failing to state a material fact where the failure deceives or tends to deceive. Md. Comm. Code § 13-301(3);

e. Advertising and/or offering consumer goods and/or consumer services without intent to sell, lease or rent them as advertised or offered. Md. Comm. Code § 13-301(5)(i);

f. Making false or misleading representations of fact which concern the reason for a price reduction and/or a price in comparison to GM's own price at a past or future time. Md. Comm. Code § 13-301(6);

g. Making a false statement which concerns the reason for offering or supplying consumer goods and/or consumer services at sale or discount prices. Md. Comm. Code § 13-301(8); and

h. Deception, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with: (1) the promotion or sale of any consumer goods and/or or consumer service and/or (2) the subsequent performance of a merchant with respect to an agreement of sale, lease, or rental. Md. Comm. Code § 13-301(9)(i) and § 13-301(9)(ii).

1483. GM's unfair and deceptive trade practices included the following conduct:

a. Intercepting, collecting, using, and selling Plaintiff's and Maryland Subclass Members' Driving Data without obtaining their consent;

b. Omitting, suppressing, and concealing the material fact that GM was intercepting, collecting, using, and selling Plaintiff's and Maryland Subclass Members' Driving Data to LexisNexis, Verisk, and other third parties for GM's own financial and commercial benefit;

c. Omitting, suppressing, and concealing the material fact that LexisNexis, Verisk, and other third parties collected, manipulated, used, and sold Plaintiff's and Maryland Subclass Members' Driving Data for their own financial and commercial benefit;

d. Omitting, suppressing, and concealing material facts regarding the functionality of OnStar with respect to the privacy of consumers in their own vehicles;

e. Misrepresenting the purpose of OnStar and that it would protect the privacy of Plaintiff's and the Maryland Subclass Members' Driving Data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f. Failing to comply with common law and/or statutory duties pertaining to the privacy of Plaintiff's and Maryland Subclass Members' Driving Data.

1484. GM acted intentionally, knowingly, and maliciously to violate the Act, and recklessly disregarded Plaintiff's and Maryland Subclass Members' rights, because GM intentionally intercepted, collected, used, and sold Plaintiff's and Maryland Subclass Members' Driving Data without obtaining their consent.

1485.     The fact that GM intercepted, collected, used, and sold Plaintiff's and Maryland Subclass Members' Driving Data was material to Plaintiff and Maryland Subclass Members. This is a fact that reasonable consumers would consider important when choosing to purchase or lease a vehicle.

1486.     Plaintiff and Maryland Subclass Members were deceived and/or could reasonably be expected to be deceived by GM's material misrepresentations and omissions regarding the functionality of OnStar, the security and privacy of their Driving Data, and their privacy in their own vehicles to their detriment.

1487.     Plaintiff's and the Maryland Subclass' Driving Data has tangible value. As a direct and proximate result of GM's unfair and deceptive acts and practices, Plaintiff's and Maryland Subclass Members' Driving Data is in the possession of third parties—including LexisNexis and Verisk—who have used and will use such data for their commercial benefit.

1488.     As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive acts and practices, Plaintiff and Maryland Subclass Members have suffered and will continue to suffer injury, including, but not limited to: loss of privacy; unauthorized dissemination of their valuable Driving Data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their Driving Data; and economic harm stemming from the exploitation of their Driving Data.

1489. Plaintiff's and the Maryland Subclass' Driving Data was exploited without informed consent. Accordingly, Plaintiff and the Maryland Subclass are entitled to part of GM's profits that were generated by their Driving Data without informed consent.

1490. Plaintiff and the Maryland Subclass seek all monetary and non-monetary relief allowed by law, including damages, disgorgement, injunctive relief, attorneys' fees and costs, and any other relief that is just and proper.

## COUNT 35

### MARYLAND WIRETAPING AND ELECTRONIC SURVEILLANCE ACT, Md. Code. Ann., Cts. & Jud. Proc. §§ 10-401 *et seq.*

*Against All Defendants*

1491. The Maryland Plaintiff identified above ("Plaintiff" for purposes of this Count), individually and on behalf of the Maryland Subclass, repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1492. The Maryland Wiretapping and Electronic Surveillance Act ("MWESA"), Md. Code, Cts. & Jud. Proc. § 10-410 *et seq.*, makes it unlawful for a person to "willfully intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept any wire, oral, or electronic communication." Md. Code Ann., Cts. & Jud. Proc. § 10-402(a)(1).

1493. The Act also makes unlawful for a person to "willfully disclose" or "willfully use" the "contents of any wire, oral, or electronic communication,

knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication" in violation of the Act. Md. Code Ann., Cts. & Jud. Proc. § 10-402(a)(2), (3).

1494. The MWESA prohibits "willful"—*i.e.*, intentional—interception, disclosure, or use of such communications. Md. Code, Cts. & Jud. Proc. § 10-402(a); *see Holmes v. State*, 236 Md. App. 636, 649 (2018).

1495. Defendants are each a "person" under the MWESA, which is defined to include "any individual, partnership, association, joint stock company, trust, or corporation." Md. Code, Cts. & Jud. Proc. § 10-401(14).

1496. The MWESA defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system." Md. Code, Cts. & Jud. Proc. § 10-410(5)(i).

1497. The MWESA defines "contents" of a covered communication as "any information concerning the identity of the parties to the communication or the existence, substance, purport, or meaning of that communication." Md. Code, Cts. & Jud. Proc. § 10-401(4).

1498. The MWESA defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." Md. Code, Cts. & Jud. Proc. § 10-401(10).

1499. The MWESA provides a private right of action for any person "whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of [the Act]." Md. Code, Cts. & Jud. Proc. § 10-410(a).

1500. The data and transmissions within, to, and from Plaintiff's and Maryland Subclass Members' vehicles constitute "electronic communications," as defined by the MWESA, as they are transfers of signals, data, and intelligence transmitted by electromagnetic, photoelectronic, or photooptical system.

1501. As alleged herein, GM has intercepted, in real time and as they were transmitted, the contents of electronic communications, and has diverted those communications to itself without consent

1502. GM intercepted these data transmissions by diverting them, during flight via a TCU or similar device, to their own servers, unbeknownst to Plaintiff and Maryland Subclass Members.

1503. As detailed herein, the electronic communications detailed above that GM has intercepted are tied to individual drivers and vehicles, and not anonymized.

1504. Plaintiff and Maryland Subclass Members have a reasonable expectation of privacy within their vehicles, and Plaintiffs and Maryland Subclass Members reasonably expected privacy while driving their vehicles. Further, there is a reasonable expectation that the interactions between a driver and their vehicle, *i.e.*, their personal Driving Data, are private.

1505. Common understanding and human experience of how automotive vehicles work create a reasonable expectation that a vehicle manufacturer and service provider like GM would not surreptitiously intercept and divert the detailed and personal electronic communications described above.

1506. In further violation of the MWESA, GM has disclosed or attempted to disclose to third parties the contents of the communications described above while knowing or having reason to know that the information was obtained through interception in violation of the MWESA. Md. Code, Cts. & Jud. Proc. § 10-402(a)(2).

1507. In further violation of the MWESA, GM has used or attempted to use the contents of the communications described above while knowing or having reason to know that the information was obtained through interception in violation of the MWESA. Md. Code, Cts. & Jud. Proc. § 10-402(a)(3).

1508. Specifically, GM has disclosed and used the contents of the communications described above by selling Plaintiff's and Maryland Subclass Members' personal Driving Data to LexisNexis and Verisk for its own financial and commercial benefit, obtaining substantial profit.

1509. LexisNexis and Verisk have also violated the MWESA by disclosed or endeavoring to disclose to third parties the contents of the communications intercepted by GM described above while knowing or having reason to know that

489

the information was obtained through the interception of the communications in violation of the MWESA. Md. Code, Cts. & Jud. Proc. § 10-402(a)(2).

1510. Specifically, LexisNexis and Verisk intentionally disclosed Plaintiff's and Maryland Subclass Members' detailed Driving Data to various auto insurance companies.

1511. In further violation of the MWESA, LexisNexis and Verisk willfully used or endeavored to use the contents of the communications described above while knowing or having reason to know that the information was obtained through the interception of the communications in violation of the MWESA. Md. Code, Cts. & Jud. Proc. § 10-402(a)(3).

1512. Specifically, LexisNexis and Verisk have used the information derived from the communications described above to create products they market, license, and sell, including so-called driving scores, risk ratings, and access to databases containing Plaintiff's and the Maryland Subclass Members' Driving Data.

1513. Further, LexisNexis and Verisk have used the information derived from the communications described above in aggregate fashion to create their telematics exchanges, develop risk models, and other products they market and sell.

1514. LexisNexis and Verisk have used and disclosed the contents of the communications described above for their own financial and commercial benefit, obtaining substantial profit.

1515. LexisNexis and Verisk knew or had reason to know that the information they obtained from GM was obtained through the unlawful interception of communications in violation of the MWESA.

1516. Specifically, LexisNexis and Verisk knew or should have known that the detailed driving information they use and sell was captured in secret in violation of the Act for the following reasons, among others that will become known through discovery:

    a.  the numerous, obvious consent and privacy challenges to the collection of Driving Data that both LexisNexis and Verisk acknowledged in writing and in presentations;

    b.  the opaque disclosures in GM's various terms and policies, which did not operate as a reasonable basis for inferring consumer consent to share the information with LexisNexis and Verisk;

    c.  the sheer volume of data LexisNexis and Verisk were receiving from GM versus from other manufacturers;

    d.  the lack of public knowledge about GM's collection and sharing practices until at least 2024;

e. that fact that LexisNexis continued to collect after it was publicized that collection was secret/happening without consent or knowledge; and

f. the nature of the data as such that it had to be obtained via a wiretap.

1517. LexisNexis and Verisk further knew or had reason to know that GM captured Driving Data in violation of the MWESA because the disclosures in GM's various terms and policies did not operate as a basis for consumer consent to share the information with LexisNexis and Verisk, and both LexisNexis and Verisk understood that consumer consent for the collection of the information could be an issue if the "chain of consent" were broken. Nonetheless, Verisk continued to disclose and use Driving Data until the surreptitious collection of data became public, and consumer outcry reached a fever pitch.

1518. Upon information and belief, GM and LexisNexis continue to disclose and use unlawfully obtained Driving Data for their own financial gain to this day.

1519. As a result, Plaintiff and Maryland Subclass Members have suffered harm and injury due to the interception, disclosure, and/or use of their private and personal information

1520. Plaintiff and Maryland Subclass Members have suffered harm and injury as a direct and proximate result of Defendants' unlawful interception, disclosure, and/or use of their private and personal information.

1521. Plaintiff and Maryland Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages, liquidated damages, punitive damages, reasonable attorney's fees and costs.

## COUNT 36

### MARYLAND STORED WIRE AND ELECTRONIC COMMUNICATIONS AND TRANSACTIONAL RECORDS ACCESS ACT
### Md. Cts. & Jud. Pro. §§ 10-4A-01 *et seq.*

*Against GM*

1522. The Maryland Plaintiff identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Maryland Subclass, repeats and alleges Paragraphs 1-973, as if fully alleged herein.

1523. The Maryland Stored Wire and Electronic Communications and Transactional Records Access Act ("MSCA"), Md. Cts. & Jud. Pro. § 10-4A-01, *et seq.*, makes it unlawful for a person to obtain, alter, or prevent access to a wire or electronic communication while it is in electronic storage in an electronic communications system by intentionally accessing without authorization, or intentionally exceeding authorization to access, a facility through which an electronic communication service is provided. § 10-4A-02(a).

1524. GM is a "person" as defined by § 10-4A-01(b)(14) (incorporating by reference § 10-401(14)).

1525. The data transmissions within, to, and from Plaintiff's and Maryland Subclass Members' vehicles constitute "electronic communications" within the meaning of the MSCA as they are "transfer[s] of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system." § 10-4A-01(b)(5) (incorporating by reference § 10-401(5)(i)).

1526. The systems through which the electronic communications described above are transmitted constitute "electronic communications system[s]" within the meaning of the MWSCA as they include "facilities for the transmission of wire or electronic communications" and "computer facilities or related electronic equipment for the electronic storage of electronic communications." § 10-4A-01(b)(7) (incorporating by reference § 10-401(5)(i)).

1527. The MSCA defines "electronic storage" as "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission of the communication" and "any storage of a wire or electronic communication by an electronic communication service for purposes of backup protection of the communication." § 10-4A-01(b)(9) (incorporating by reference § 10-401(9)).

1528. As alleged herein, the electronic communications transmitted within, to, and from Plaintiff's and Maryland Subclass Members' vehicles are stored in electronic components of those vehicles, including ECUs and the TCU, which constitute "electronic storage" as defined under the MSCA.

1529. In-vehicle units with storage function, such as ECUs and TCUs, are facilities through which electronic communication services are provided because they provide users, such as Plaintiff and Maryland Subclass Members, the ability to send and receive electronic communications including related to their Driving Data.

1530. GM accessed certain data stored in the vehicle and transmitted it to GM's servers via cellular network from storage after the completion of a trip or at the end of the day or on some other periodic basis.

1531. GM knowingly and intentionally accessed without the authorization, and knowingly and intentionally exceeded authorization to access, the facilities in Plaintiff's and Maryland Subclass Members' vehicles and thereby obtained access to wire or electronic communications while in electronic storage, in violation of MWSCA § 10-4A-02(a).

1532. Plaintiff and Maryland Subclass Members did not consent or otherwise authorize GM to access, disclose, and use their communications.

1533. As detailed herein, the electronic communications that GM accessed are tied to individual drivers and vehicles, and not anonymized.

1534. The MWSCA provides a private right of action for knowing and intentional violations. § 10-4A-08(a).

1535. Plaintiff and Maryland Subclass Members have suffered harm and injury due to GM's access, use, and disclosure of communications containing their private and personal information.

1536. Plaintiff and Maryland Subclass Members seek all relief allowed by law, including injunctive relief, disgorgement of profits, damages of no less than $1,000 pursuant, and reasonable attorneys' fees and costs. § 10-4A-08(b), (c).

## CLAIMS ON BEHALF OF THE MASSACHUSETTS SUBCLASS

### COUNT 37

### MASSACHUSETTS CONSUMER PROTECTION ACT
Mass. Gen. Laws Ann. Ch. 93A, §§ 1, *et seq.*

*Against All Defendants*

1537. Plaintiffs repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1538. Plaintiffs and Massachusetts Subclass members are "persons" as defined by Mass. Gen. Laws Ann. Ch. 93A, § 1(a).

1539. GM, LexisNexis, and Verisk engaged in "trade or commerce" as defined by Mass. Gen. Laws Ann. Ch. 93A, § 1(b), by offering goods and services and engaging in business practices that directly or indirectly affect the people of Massachusetts.

1540.    GM, LexisNexis, and Verisk engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce in violation of Mass. Gen. Laws Ann. Ch. 93A, § 2(a).

1541.    GM's unfair and deceptive acts or practices include:

    a.    Intercepting, collecting, using, and selling Plaintiffs' and Massachusetts Subclass Members' Driving Data without obtaining their consent;

    b.    Omitting, suppressing, and concealing the material fact that GM was intercepting, collecting, using, and selling Plaintiffs' and Massachusetts Subclass Members' Driving Data to LexisNexis, Verisk, and other third parties for GM's own financial and commercial benefit;

    c.    Omitting, suppressing, and concealing the material fact that LexisNexis, Verisk, and other third parties collected, manipulated, used, and sold Plaintiffs' and Massachusetts Subclass Members' Driving Data for their own financial and commercial benefit;

    d.    Omitting, suppressing, and concealing material facts regarding the functionality of OnStar with respect to the privacy of consumers in their own vehicles;

e. Misrepresenting the purpose of OnStar and that it would protect the privacy of Plaintiffs' and the Massachusetts Subclass Members' Driving Data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f. Failing to comply with common law and/or statutory duties pertaining to the privacy of Plaintiffs' and Massachusetts Subclass Members' Driving Data.

1542. LexisNexis and Verisk engaged in unfair and unconscionable conduct in violation of the Act by engaging in the conduct alleged herein, including by soliciting and accepting Plaintiffs' and Massachusetts Subclass Members' Driving Data from GM with knowledge that such data was obtained without Plaintiffs' and Massachusetts Subclass Members' consent, and further using, selling and disseminating Plaintiffs' and Massachusetts Subclass Members' Driving Data without their consent.

1543. LexisNexis and Verisk also violated the Act by knowingly taking advantage of Plaintiffs' and Massachusetts Subclass Members' inability to reasonably protect their interests, due to their lack of knowledge regarding GM's practices, of which LexisNexis and Verisk were aware.

1544. GM acted intentionally, knowingly, and maliciously to violate the Act, and recklessly disregarded Plaintiffs' and Massachusetts Subclass Members' rights, because GM intentionally intercepted, collected, used, and sold Plaintiff's and Massachusetts Subclass Members' Driving Data without obtaining their consent.

1545. The fact that GM intercepted, collected, used, and sold Plaintiffs' and Massachusetts Subclass Members' Driving Data was material to Plaintiffs and Massachusetts Subclass Members. This is a fact that reasonable consumers would consider important when choosing to purchase or lease a vehicle.

1546. Plaintiffs and Massachusetts Subclass Members were deceived and/or could reasonably be expected to be deceived by GM's material misrepresentations and omissions regarding the functionality of OnStar, the security and privacy of their Driving Data, and their privacy in their own vehicles to their detriment.

1547. Plaintiffs' and the Massachusetts Subclass' Driving Data has tangible value. As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiffs' and Massachusetts Subclass Members' Driving Data is in the possession of third parties—including LexisNexis and Verisk—who have used and will use such data for their commercial benefit.

1548. As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive acts and practices, Plaintiffs and Massachusetts Subclass Members have suffered and will continue to suffer injury, including, but not limited to: loss of

privacy; unauthorized dissemination of their valuable Driving Data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their Driving Data; and economic harm stemming from the exploitation of their Driving Data.

1549.   Plaintiffs and the Massachusetts Subclass seek all monetary and non-monetary relief allowed by law, including actual damages, double or treble damages, injunctive or other equitable relief, and attorneys' fees and costs.

## COUNT 38

### MASSACHUSETTS WIRETAP ACT
### Mass. Gen. Stat. 272 §§ 99, *et seq.*

*Against All Defendants*

1550.   Plaintiffs repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1551. The Massachusetts Wiretap Act ("MWA"), Mass. Gen. Stat. 272 § 99, in relevant part, makes it unlawful for any person to "willfully commit[] an interception, attempt[] to commit an interception, or procure[] any other person to commit an interception or to attempt to commit an interception of any wire or oral communication." Mass. Gen. Stat. 272 § 99(C)(1).

1552.   The MWA also makes it unlawful to "willfully disclose[] or attempt[] to disclose" or "willfully use[] or attempt[] to use" the "contents of any wire or oral

communication, knowing that the information was obtained through interception." Mass. Gen. Stat. 272 § 99(C)(3)(a), (b).

1553. Defendants are each a "person" as defined by the MWA, which includes "any individual, partnership, association, joint stock company, trust, or corporation . . . ." Mass. Gen. Stat. 272 § 99(B)(13).

1554. The MWA defines "wire communication" as "any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception." Mass. Gen. Stat. 272 § 99(B)(1).

1555. The MWA defines "contents" as any information concerning the existence, contents, substance, purport, meaning, or identity of parties to a communication. Mass. Gen. Stat. 272 § 99(B)(5).

1556. The MWA defines "interception" as "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication[.]" Mass. Gen. Stat. 272 § 99(B)(4).

1557. The MWA defines "intercepting device" as "any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire or oral communication . . . ." Mass. Gen. Stat. 272 § 99(B)(3).

1558. The data and transmissions within, to, and from Plaintiffs' and Massachusetts Subclass Members' vehicles constitute "wire communications," under the MWA as they are communications "made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection . . . ." Mass. Gen. Stat. 272 § 99(B)(1).

1559. As alleged herein, GM has intercepted, in real time and as they were transmitted, the contents of electronic communications, and have diverted those communications to itself without consent.

1560. As detailed herein, the electronic communications detailed above that GM has intercepted are tied to individual drivers and vehicles, and not anonymized.

1561. GM intercepted these data transmissions by diverting them, during flight via a TCU or similar device, to their own servers, unbeknownst to Plaintiffs and Massachusetts Subclass Members.

1562. In violation of the MWA, GM intercepted the communications by diverting them, during flight, to their own servers, unbeknownst to drivers.

1563. Plaintiffs and Massachusetts Class Members have a reasonable expectation of privacy within their vehicles, and Plaintiffs and Class Members reasonably expected privacy while driving their vehicles. Further, there is a reasonable expectation that the interactions between a driver and their vehicle, *i.e.*, their personal Driving Data, are private.

1564. Common understanding and human experience of how automotive vehicles work create a reasonable expectation that a vehicle manufacturer like GM and a service provider like OnStar would not surreptitiously intercept and divert the detailed and personal electronic communications described above.

1565. In further violation of the MWA, GM has disclosed or attempted to disclose to third parties the contents of the communications described above while knowing that the information was obtained through interception in violation of the MWA. Mass. Gen. Stat. 272 § 99(Q).

1566. In further violation of the MWA, GM has used or attempted to use the contents of the communications described above while knowing that the information was obtained through interception in violation of the MWA. Mass. Gen. Stat. 272 § 99(Q); *see Pine v. Rust*, 404 Mass. 411, 413–414, 535 N.E.2d 1247 (1989).

1567. Specifically, GM has disclosed and used the contents of the communications described above by selling Plaintiffs' and Massachusetts Subclass Members' personal Driving Data to LexisNexis and Verisk for its own financial and commercial benefit, obtaining substantial profit.

1568. LexisNexis and Verisk also violated the MWA by disclosing or attempting to disclose to third parties the contents of the communications intercepted by GM described above while knowing that the information was obtained through

the interception of the communications in violation of the MWA. Mass. Gen. Stat. 272 § 99(Q); *see Pine v. Rust*, 404 Mass. 411, 413–414, 535 N.E.2d 1247 (1989).

1569. Specifically, LexisNexis and Verisk intentionally disclosed Plaintiffs' and Massachusetts Subclass Members' detailed Driving Data to various auto insurance companies.

1570. In further violation of the MWA, LexisNexis and Verisk willfully used or attempted to use the contents of the communications described above while knowing that the information was obtained through the interception of the communications in violation of the MWA. Mass. Gen. Stat. 272 § 99(Q); *see Pine v. Rust*, 404 Mass. 411, 413–414, 535 N.E.2d 1247 (1989).

1571. Specifically, LexisNexis and Verisk have used the information derived from the communications described above to create products they market, license, and sell, including so-called driving scores, risk ratings, and access to databases containing Plaintiffs' and the Massachusetts Subclass Members' Driving Data.

1572. Further, LexisNexis and Verisk have used the information derived from the communications described above in aggregate fashion to create their telematics exchange, develop risk models, and other products they market and sell.

1573. LexisNexis and Verisk have used and disclosed the contents of the communications described above for their own financial and commercial benefit, obtaining substantial profit.

1574. LexisNexis and Verisk knew that the information they obtained from GM was obtained through the unlawful interception of communications in violation of the MWA.

1575. Specifically, LexisNexis and Verisk knew or should have known that the detailed driving information they use and sell was captured in secret in violation of the Act for the following reasons, among others that will become known through discovery: LexisNexis and Verisk further knew that GM collected Driving Data in violation of the MWA because the disclosures in GM's various terms and policies did not operate as a basis for consumer consent to share the information with LexisNexis and Verisk, and both LexisNexis and Verisk understood that consumer consent for the collection of the information could be an issue if the "chain of consent" were broken. Nonetheless, Verisk continued to disclose and use Driving Data until the surreptitious collection of data became public, and consumer outcry reached a fever pitch.

1576. Upon information and belief, GM and LexisNexis continue to disclose and use unlawfully obtained Driving Data for their own financial gain to this day.

1577. Plaintiffs and Massachusetts Subclass Members have suffered harm and injury as a direct and proximate result of Defendants' interception, disclosure, and/or use of their private and personal information.

1578. The MWA grants a civil remedy to aggrieved persons. § 99(Q).

1579. Plaintiffs and Massachusetts Subclass Members are each an "aggrieved person" within the meaning of the MWA as they are each "a party to an intercepted wire or oral communication . . . who would otherwise have standing to complain that [their] personal or property interest or privacy was invaded in the course of an interception." Mass. Gen. Stat. 272 § 99(B)(6).

1580. Plaintiffs and Massachusetts Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages, liquidated damages, punitive damages, reasonable attorney's fees and costs.

## CLAIMS ON BEHALF OF THE MICHIGAN SUBCLASS

## COUNT 39

## VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT
### Mich. Comp. Laws Ann. §§ 445.901, *et seq.*

*Against GM*

1581. The Michigan Plaintiffs identified above ("Plaintiffs," for purposes of his Count), individually and on behalf of the Michigan Subclass, repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1582. GM and Plaintiffs are "person[s]" as defined by Mich. Comp. Laws Ann. § 445.902(1)(d).

1583. GM engaged in "trade or commerce" as defined by Mich. Comp. Laws Ann. § 445.902(1)(g).

1584. GM engaged in trade or commerce in Michigan and/or directly or indirectly affecting the people of Michigan.

1585. GM engaged in unfair, unconscionable, and deceptive practices in the conduct of trade and commerce, in violation of Mich. Comp. Laws Ann. § 445.903(1), including under the following provisions:

    a.  Representing that their goods and/or services had characteristics that they did not have. Mich. Comp. Laws Ann. § 445.903(1)(c);

    b.  Representing that their goods and/or services were of a particular standard or quality when they were of a different standard or quality. Mich. Comp. Laws Ann. § 445.903(1)(e);

    c.  Representing that a consumer will receive their goods or services free or without charge, or using words of similar import in the representation, without clearly and conspicuously disclosing with equal prominence in immediate conjunction with the use of those words the conditions, terms, or prerequisites to the use or retention of the goods or services advertised. Mich. Comp. Laws Ann. § 445.903(1)(r);

    d.  Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not

reasonably be known by the consumer. Mich. Comp. Laws Ann. § 445.903(1)(s);

e.  Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is. Mich. Comp. Laws Ann. § 445.903(1)(bb); and

f.  Failing to reveal facts that were material to a transaction in light of representations of fact made in a positive manner. Mich. Comp. Laws Ann. § 445.903(1)(cc).

1586. GM's unfair, unconscionable, and deceptive practices included the following conduct:

a.  Intercepting, collecting, using, and selling Plaintiffs' and Michigan Subclass Members' Driving Data without obtaining their consent;

b.  Omitting, suppressing, and concealing the material fact that GM was intercepting, collecting, using, and selling Plaintiffs' and Michigan Subclass Members' Driving Data to LexisNexis, Verisk, and other third parties for GM's own financial and commercial benefit;

c. Omitting, suppressing, and concealing the material fact that LexisNexis, Verisk, and other third parties collected, manipulated, used, and sold Plaintiffs' and Michigan Subclass Members' Driving Data for their own financial and commercial benefit;

d. Omitting, suppressing, and concealing material facts regarding the functionality of OnStar with respect to the privacy of consumers in their own vehicles;

e. Misrepresenting the purpose of OnStar and that it would protect the privacy of Plaintiffs' and the Michigan Subclass Members' Driving Data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f. Failing to comply with common law and/or statutory duties pertaining to the privacy of Plaintiffs' and Michigan Subclass Members' Driving Data.

1587. GM acted intentionally, knowingly, and maliciously to violate the Act, and recklessly disregarded Plaintiffs' and Michigan Subclass Members' rights, because GM intentionally intercepted, collected, used, and sold Plaintiff's and Michigan Subclass Members' Driving Data without obtaining their consent.

1588. The fact that GM intercepted, collected, used, and sold Plaintiffs' and Michigan Subclass Members' Driving Data was material to Plaintiffs and Michigan Subclass Members. This is a fact that reasonable consumers would consider important when choosing to purchase or lease a vehicle.

1589. Plaintiffs and Michigan Subclass Members were deceived and/or could reasonably be expected to be deceived by GM's material misrepresentations and omissions regarding the functionality of OnStar, the security and privacy of their Driving Data, and their privacy in their own vehicles to their detriment.

1590. The material facts GM misrepresented and/or failed to disclose to Plaintiffs could not reasonably be known by reasonable consumers like Plaintiffs.

1591. GM intended to mislead Plaintiffs and induce them to rely on their misrepresentations and omissions.

1592. GM's unfair, unconscionable, and deceptive practices in the conduct of trade and commerce included entering into a consumer transaction in which the consumer waives or purports to waive a right, benefit, or immunity provided by law, where the waiver was not clearly stated and the consumer did not specifically consent to it. Mich. Comp. Laws Ann. § 445.903(1)(t).

1593. Plaintiffs' and the Michigan Subclass' Driving Data has tangible value. As a direct and proximate result of GM's unfair and deceptive acts and practices, Plaintiffs' and Michigan Subclass Members' Driving Data is in the possession of third

parties—including LexisNexis and Verisk—who have used and will use such data for their commercial benefit.

1594. As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive acts and practices, Plaintiffs and Michigan Subclass Members have suffered and will continue to suffer injury, including, but not limited to: loss of privacy; unauthorized dissemination of their valuable Driving Data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their Driving Data; and economic harm stemming from the exploitation of their Driving Data.

1595. Plaintiffs' and the Michigan Subclass' Driving Data was exploited without informed consent. Accordingly, Plaintiffs and the Michigan Subclass are entitled to part of GM's profits that were generated by their Driving Data without informed consent.

1596. Plaintiffs and the Michigan Subclass seek all monetary and non-monetary relief allowed by law, including the greater of actual damages or $250 per Plaintiff and Michigan Subclass member, disgorgement, injunctive relief, attorneys' fees and costs, and any other relief that is just and proper.

## CLAIMS ON BEHALF OF THE MISSISSIPPI SUBCLASS

## COUNT 40

### VIOLATION OF THE MISSISSIPPI CONSUMER PROTECTION ACT
Miss. Code. §§ 75-24-1, *et seq.*

*Against All Defendants*

1597. The Mississippi Plaintiff identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Mississippi Subclass, repeats and realleges Paragraphs 1-973, as if fully alleged herein.

1598. Plaintiff and Defendants are each "persons" as defined by Miss. Code. § 75-24-1(a).

1599. Defendants engaged in "trade" and "commerce" as defined by Miss. Code. § 75-24-1(b).

1600. Defendants engaged in trade and commerce in Mississippi and/or directly or indirectly affecting the people of Mississippi.

1601. GM engaged in unfair or deceptive trade practices in or affecting commerce, in violation of Miss. Code. § 75-24-5, including by:

  a. Intercepting, collecting, using, and selling Plaintiff's and Mississippi Subclass Members' Driving Data without obtaining their consent;

  b. Omitting, suppressing, and concealing the material fact that GM was intercepting, collecting, using, and selling Plaintiff's and Mississippi Subclass Members' Driving Data to LexisNexis, Verisk, and other third parties for GM's own financial and commercial benefit;

c. Omitting, suppressing, and concealing the material fact that LexisNexis, Verisk, and other third parties collected, manipulated, used, and sold Plaintiff's and Mississippi Subclass Members' Driving Data for their own financial and commercial benefit;

d. Omitting, suppressing, and concealing material facts regarding the functionality of OnStar with respect to the privacy of consumers in their own vehicles;

e. Misrepresenting the purpose of OnStar and that it would protect the privacy of Plaintiff's and the Mississippi Subclass Members' Driving Data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f. Failing to comply with common law and/or statutory duties pertaining to the privacy of Plaintiff's and Mississippi Subclass Members' Driving Data.

1602. GM intended to mislead Plaintiff and induce Mississippi Subclass Members to rely on its misrepresentations and omissions.

1603. GM acted intentionally, knowingly, and maliciously to violate the Act, and recklessly disregarded Plaintiff's and Mississippi Subclass Members' rights,

because GM intentionally intercepted, collected, used, and sold Plaintiff's and Mississippi Subclass Members' Driving Data without obtaining their consent.

1604. The fact that GM intercepted, collected, used, and sold Plaintiff's and Mississippi Subclass Members' Driving Data was material to Plaintiff and Mississippi Subclass Members. This is a fact that reasonable consumers would consider important when choosing to purchase or lease a vehicle.

1605. Plaintiff and Mississippi Subclass Members were deceived and/or could reasonably be expected to be deceived by GM's material misrepresentations and omissions regarding the functionality of OnStar, the security and privacy of their Driving Data, and their privacy in their own vehicles to their detriment.

1. LexisNexis and Verisk engaged in unfair and deceptive trade practices in or affecting commerce, in violation of Miss. Code. § 75-24-5, by engaging in the conduct alleged herein, including by soliciting and accepting Plaintiff's and Mississippi Subclass Members' Driving Data from GM with knowledge that such data was obtained without Plaintiff's and Mississippi Subclass Members' consent, and further using, selling and disseminating Plaintiff's and Mississippi Subclass Members' Driving Data without their consent.

2. LexisNexis and Verisk also violated the Act by knowingly taking advantage of Plaintiff's and Mississippi Subclass Members' inability to reasonably

protect their interests, due to their lack of knowledge regarding GM's practices, of which LexisNexis and Verisk were aware.

1606. Defendants acted intentionally, knowingly, and maliciously to violate Mississippi's Consumer Protection Act, and recklessly disregarded Plaintiff's and the Mississippi Subclass' rights.

1607. Plaintiff's and the Mississippi Subclass' Driving Data has tangible value. As a direct and proximate result of GM's unfair and deceptive acts and practices, Plaintiff's and Mississippi Subclass Members' Driving Data is in the possession of third parties—including LexisNexis and Verisk—who have used and will use such data for their commercial benefit.

1608. As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive acts and practices, Plaintiff and Mississippi Subclass Members have suffered and will continue to suffer injury ascertainable losses of money or property, and monetary and non-monetary damages, including, but not limited to: loss of privacy; unauthorized dissemination of their valuable Driving Data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their Driving Data; and economic harm stemming from the exploitation of their Driving Data.

1609. Plaintiff's and the Mississippi Subclass' Driving Data was exploited without informed consent. Accordingly, Plaintiff and the Mississippi Subclass are

entitled to part of Defendants' profits that were generated by their Driving Data without informed consent.

1610. Plaintiff and the Mississippi Subclass seek all monetary and non-monetary relief allowed by law, including damages, disgorgement, injunctive relief, attorneys' fees and costs, and any other relief that is just and proper. Miss. Code. § 75-24-15.

## CLAIMS ON BEHALF OF THE NEBRASKA SUBCLASS

## COUNT 41

### NEBRASKA WIRETAP LAW
### Neb. Rev. Stat. §§ 86-271 *et seq.*

*Against All Defendants*

1611. Plaintiffs repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1612. The Nebraska Telecommunication Consumer Protection Act contains a wiretap law that makes it unlawful for a person to "intentionally intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept any wire, electronic, or oral communication." Neb. Rev. Stat. § 86-290.

1613. The Act also makes unlawful for a person to "intentionally use" or "intentionally disclose" the "contents of any wire, electronic, or oral communication, knowing or having reason to know that the information was obtained through the

interception of a wire, electronic, or oral communication" in violation of the Act. Neb. Rev. Stat. § 86-290.

1614. Defendants are each a "person" within the scope of the Nebraska Wiretapping Act.

1615. Plaintiffs and Nebraska Subclass Members specifically restate the allegations relating to the elements and definitions under the FWA/ECPA, set forth above.

1616. The data transmissions from Plaintiffs' and Nebraska Subclass Members' vehicles constitute a "transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system" within the scope of Neb. Rev. Stat. § 86-276 (defining "electronic communication").

1617. As alleged herein, GM intercepted, in real time and as they were transmitted, the contents of electronic communications, and diverted those communications to itself without consent.

1618. GM intercepted these electronic communications in real time separately from and in addition to accessing data stored in Plaintiffs' and Nebraska Subclass Members' vehicle components.

1619. Plaintiffs and Nebraska Subclass Members have a reasonable expectation of privacy within their vehicles, and Plaintiffs and Nebraska Subclass

Members reasonably expected privacy while driving their vehicles. Further, there is a reasonable expectation that the interactions between a driver and their vehicle, i.e., their personal Driving Data, are private.

1620. Common understanding and human experience of how automotive vehicles work create a reasonable expectation that a vehicle manufacturer and service provider like GM would not surreptitiously intercept and divert the detailed and personal electronic communications described above.

1621. GM intercepted these data transmissions by diverting them, during flight via a TCU or similar device, to their own servers, unbeknownst to Plaintiffs and Nebraska Subclass Members.

1622. As detailed herein, the electronic communications detailed above that GM has intercepted are tied to individual drivers and vehicles, and not anonymized.

1623. In further violation of the Act, GM disclosed or attempted to disclose to third parties the contents of the communications described above while knowing or having reason to know that the information was obtained through interception in violation of the Act.

1624. In further violation of the Act, GM used or attempted to use the contents of the communications described above while knowing or having reason to know that the information was obtained through interception in violation of the Act.

1625. Specifically, GM disclosed and used the contents of the communications described above by selling Plaintiffs' and Nebraska Subclass Members' Driving Data to LexisNexis and Verisk for its own financial and commercial benefit, obtaining substantial profit.

1626. LexisNexis and Verisk have also violated the Act by disclosing or endeavoring to disclose to third parties the contents of the communications intercepted by GM described above while knowing or having reason to know that the information was obtained through the interception of the communications in violation of the Act.

1627. Specifically, LexisNexis and Verisk intentionally disclosed Plaintiffs' and Nebraska Subclass Members' detailed Driving Data to various auto insurance companies.

1628. In further violation of the Act, LexisNexis and Verisk willfully used or endeavored to use the contents of the communications described above while knowing or having reason to know that the information was obtained through the interception of the communications in violation of the Act.

1629. Specifically, LexisNexis and Verisk have used the information derived from the communications described above to create products they market, license, and sell, including driving scores, risk ratings, and access to databases containing Plaintiffs' and the Nebraska Subclass Members' Driving Data.

1630. Further, LexisNexis and Verisk have used the information derived from the communications described above in aggregate fashion to create their telematics exchange, develop risk models, and other products they market and sell.

1631. LexisNexis and Verisk have used and disclosed the contents of the communications described above for their own financial and commercial benefit, obtaining substantial profit.

1632. LexisNexis and Verisk knew or had reason to know that the information they obtained from GM was obtained through the unlawful interception of communications in violation of the Act.

1633. Specifically, LexisNexis and Verisk knew or should have known that the detailed driving information they use and sell was captured in secret in violation of the Act for the following reasons, among others that will become known through discovery:

a. the numerous, obvious consent and privacy challenges to the collection of Driving Data that both LexisNexis and Verisk acknowledged in writing and in presentations;

b. the opaque disclosures in GM's various terms and policies, which did not operate as a reasonable basis for inferring consumer consent to share the information with LexisNexis and Verisk;

c. the sheer volume of data LexisNexis and Verisk were receiving from GM versus from other manufacturers;

d. the lack of public knowledge about GM's collection and sharing practices until at least 2024;

e. the fact that LexisNexis continued to collect after it was publicized that collection was secret/happening without consent or knowledge; and

f. the nature of the data as such that it had to be obtained via a wiretap.

1634. Upon information and belief, GM and LexisNexis continue to disclose and use unlawfully obtained Driving Data for their own financial gain to this day.

1635. At all relevant times, Plaintiffs and Nebraska Subclass Members were not aware that Defendants were intercepting and recording their data, and therefore could not provide consent to have any part of their communications intercepted and recorded, transmitted, disclosed, or used.

1636. Defendants' installation and use of the TCU, as well as interception, tracking, disclosure and use of Plaintiffs' and New Hampshire Subclass Members' communications, was intentional, willful, and wanton.

1637. Plaintiffs and the Nebraska Subclass Members are "aggrieved persons" within the meaning of the statute. Neb. Rev. Stat. § 86-297.

1638. As a direct and proximate result of Defendants' violations of the Nebraska wiretap statute, Plaintiffs and Nebraska Subclass Members were injured and suffered damages including, but not limited to: loss of privacy; unauthorized dissemination of their valuable Driving Data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their Driving Data; and economic harm stemming from the exploitation of their Driving Data.

1639. Pursuant to Neb. Rev. Stat. § 86-297, Plaintiffs and Nebraska Subclass Members have been injured by the interception, disclosure, and/or use of their communications in violation of the Act and are entitled to: (1) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiffs and the Nebraska Subclass or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; and (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs.

## COUNT 42

### NEBRASKA STORED COMMUNICATIONS LAW
### Neb. Rev. Stat. §§ 86-271 *et seq.*

*Against GM*

1640. Plaintiffs repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1641. The Nebraska Telecommunication Consumer Protection Act contains a stored communications law that makes it unlawful for a person to "(a) intentionally

access[] without authorization a facility through which an electronic communication service is provided or (b) intentionally exceed[] an authorization to access the facility and thereby obtain[] … access to a wire or electronic communication while it is in electronic storage." Neb. Rev. Stat. § 86-2,104.

1642. GM, as a corporation or legal entity, is a "persons" within the meaning of Neb. Rev. Stat. § 86-2,104.

1643. "Electronic communication" is defined as "any transfer of signs, signals, . . . data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system." Neb. Rev. Stat. § 86-276.

1644. "Electronic communication service" means "any service which provides to users thereof the ability to send or receive wire or electronic communication." Neb. Rev. Stat. § 86-277.

1645. "Electronic communication system" means "any wire, radio, electromagnetic, photooptical, or photoelectronic facilities for the transmission of electronic communications and any computer facilities or related electronic equipment for the electronic storage of such communication." Neb. Rev. Stat. Ann. § 86-278.

1646. "Electronic storage" is defined as "(A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic

transmission thereof; and (B) any storage of such communication by an electronic communication service for purposes of backup protection of such communication . . . ." Neb. Rev. Stat. § 86-279.

1647. Plaintiffs and Nebraska Subclass Members specifically restate the allegations relating to the Federal Stored Communications Act, set forth above.

1648. As alleged herein, GM, without the consent or authorization of Plaintiffs or Nebraska Subclass Members, accessed the data stored in the modules of Plaintiffs' vehicles and transmitted it to GM's servers.

1649. Each of these modules with storage function are facilities through which electronic communication services are provided, because they provide users, such as Plaintiffs and Nebraska Subclass Members, the ability to send and receive electronic communications including related to their personal Driving Data.

1650. As detailed herein, the data contained in the electronic communications detailed above that GM has accessed are tied to individual drivers and vehicles, and not anonymized.

1651. GM intentionally accessed each of these facilities without Plaintiffs or the Nebraska Subclass Members' authorization.

1652. GM intentionally exceeded its authority to access these facilities.

1653. In accessing these facilities without authorization and obtaining access to the electronic communications stored there, GM and OnStar violated the Nebraska stored communications law, Neb. Rev. Stat. § 86-2,104.

1654. GM's conduct was willful and intentional, and invaded Plaintiffs' and Nebraska Subclass Members' expectations of privacy within their vehicle and privacy of the personal interactions and communications between driver and vehicle, i.e., their Driving Data.

1655. GM has profited from their violation of the Nebraska law, by, among other things, selling the improperly-accessed communications or access to them to LexisNexis and Verisk.

1656. The communications unlawfully accessed by GM have significant value, evidenced by the profits that GM, LexisNexis, and Verisk have obtained from selling, marketing, licensing this data to each other and third parties, including insurance companies.

1657. Because of GM's conduct, Plaintiffs and Class Members have forever lost the value of their data, their privacy interest in the data, and their control over its use.

1658. Plaintiffs and the Nebraska Subclass members are persons aggrieved by Defendants' knowing and intentional violation of the Nebraska stored

communications law, and are thus entitled to bring this civil action for relief and damages. Neb. Rev. Stat. Ann. § 86-2,110.

1659. As a result of Defendants' conduct, Plaintiffs and Nebraska Subclass Members are entitled to all damages set forth in Neb. Rev. Stat. Ann. § 86-2,110, including declaratory and equitable relief, compensatory damages measured by actual damages and Defendants' profits but not less than $1,000 per person, reasonable attorneys' fees and costs, all available statutory relief, and punitive damages as determined by the Court.

## CLAIMS ON BEHALF OF THE NEW HAMPSHIRE SUBCLASS

## COUNT 43

### NEW HAMPSHIRE WIRETAPPING AND EAVESDROPPING ACT
### N.H. Rev. Stat. Ann. §§ 570-A:1 *et seq.*

1660. Plaintiffs repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1661. The New Hampshire Wiretapping and Eavesdropping Act makes it unlawful to "[w]ilfully intercept[ ] … any telecommunication," or to "[w]ilully use[]" or "[wilfully disclose[]. . .the contents of any telecommunication" knowing or having reason to know that the information was obtained in violation of the Act, "without the consent of all parties to the communication." N.H. Rev. Stat. Ann. 570-A:2, I(a), (c), (d).

1662. "Intercept" is defined, in pertinent part, as "the recording of . . . the contents of any telecommunication . . . through the use of any electronic, mechanical, or other device." N.H. Rev. Stat. Ann. 570-A:1(III).

1663. "Telecommunication" means the "transfer of any form of information in whole or in part through the facilities of a communications common carrier." N.H. Rev. Stat. Ann. § 570-A:1(I).

1664. "Contents", when used with respect to any telecommunication or oral communication, "includes any information concerning the identity of the parties to such communication or the existence, substance, purport, or meaning of that communication." N.H. Rev. Stat. Ann. § 570-A:1(VII).

1665. "Communications common carrier" means "a person engaged in providing communications services to the general public through transmission of any form of information between subscribers by means of wire, cable, radio or electromagnetic transmission, optical or fiber-optic transmission, or other means which transfers information without physical transfer of medium, whether by switched or dedicated facilities. … 'Communications common carrier' shall include any wireless technology that uses a wireless entry or access point to transmit or receive any form of information." N.H. Rev. Stat. Ann. § 570-A:1(IX).

1666. Plaintiffs, as individuals, and Defendants, as corporations, are "persons" within the meaning of the Act. N.H. Rev. Stat. Ann. § 570-A:1(V).

1667. Plaintiffs and New Hampshire Subclass Members specifically restate the allegations relating to the FWA/ECPA, set forth above.

1668. The data transmitted by the TCU in Plaintiffs' and New Hampshire Subclass Members' vehicles constitutes a ""transfer of any form of information in whole or in part through the facilities of a communications common carrier" within the scope of N.H. Rev. Stat. Ann. § 570-A:1(I) (defining "telecommunication").

1669. The unlawful interceptions occurred within the State of New Hampshire.

1670. The data transmissions from Plaintiffs' and New Hampshire Subclass Members' vehicles constitute a "transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system" within the scope of Neb. Rev. Stat. § 86-276 (defining "electronic communication").

1671. As alleged herein, GM intercepted, in real time and as they were transmitted, the contents of electronic communications, and diverted those communications to itself without consent.

1672. GM intercepted these electronic communications in real time separately from and in addition to accessing data stored in Plaintiffs' and New Hampshire Subclass Members' vehicle components.

1673. Plaintiffs and New Hampshire Subclass Members have a reasonable expectation of privacy within their vehicles, and Plaintiffs and New Hampshire Subclass Members reasonably expected privacy while driving their vehicles. Further, there is a reasonable expectation that the interactions between a driver and their vehicle, i.e., their personal Driving Data, are private.

1674. Common understanding and human experience of how automotive vehicles work create a reasonable expectation that a vehicle manufacturer and service provider like GM would not surreptitiously intercept and divert the detailed and personal electronic communications described above.

1675. GM intercepted these data transmissions by diverting them, during flight via a TCU or similar device, to their own servers, unbeknownst to Plaintiffs and New Hampshire Subclass Members.

1676. As detailed herein, the electronic communications detailed above that GM has intercepted are tied to individual drivers and vehicles, and not anonymized.

1677. In further violation of the Act, GM disclosed or attempted to disclose to third parties the contents of the communications described above while knowing or having reason to know that the information was obtained through interception in violation of the Act.

1678. In further violation of the Act, GM used or attempted to use the contents of the communications described above while knowing or having reason to know that the information was obtained through interception in violation of the Act.

1679. Specifically, GM disclosed and used the contents of the communications described above by selling Plaintiffs' and New Hampshire Subclass Members' Driving Data to LexisNexis and Verisk for its own financial and commercial benefit, obtaining substantial profit.

1680. LexisNexis and Verisk have also violated the Act by disclosing or endeavoring to disclose to third parties the contents of the communications intercepted by GM described above while knowing or having reason to know that the information was obtained through the interception of the communications in violation of the Act.

1681. Specifically, LexisNexis and Verisk intentionally disclosed Plaintiffs' and New Hampshire Subclass Members' detailed Driving Data to various auto insurance companies.

1682. In further violation of the Act, LexisNexis and Verisk willfully used or endeavored to use the contents of the communications described above while knowing or having reason to know that the information was obtained through the interception of the communications in violation of the Act.

1683. Specifically, LexisNexis and Verisk have used the information derived from the communications described above to create products they market, license, and sell, including driving scores, risk ratings, and access to databases containing Plaintiffs' and New Hampshire Subclass Members' Driving Data.

1684. Further, LexisNexis and Verisk have used the information derived from the communications described above in aggregate fashion to create their telematics exchange, develop risk models, and other products they market and sell.

1685. LexisNexis and Verisk have used and disclosed the contents of the communications described above for their own financial and commercial benefit, obtaining substantial profit.

1686. LexisNexis and Verisk knew or had reason to know that the information they obtained from GM was obtained through the unlawful interception of communications in violation of the Act.

1687. Specifically, LexisNexis and Verisk knew or should have known that the detailed driving information they use and sell was captured in secret in violation of the Act for the following reasons, among others that will become known through discovery:

> a. the numerous, obvious consent and privacy challenges to the collection of Driving Data that both LexisNexis and Verisk acknowledged in writing and in presentations;

b. the opaque disclosures in GM's various terms and policies, which did not operate as a reasonable basis for inferring consumer consent to share the information with LexisNexis and Verisk;

c. the sheer volume of data LexisNexis and Verisk were receiving from GM versus from other manufacturers;

d. the lack of public knowledge about GM's collection and sharing practices until at least 2024;

e. the fact that LexisNexis continued to collect after it was publicized that collection was secret/happening without consent or knowledge; and

f. the nature of the data as such that it had to be obtained via a wiretap.

1688. Upon information and belief, GM and LexisNexis continue to disclose and use unlawfully obtained Driving Data for their own financial gain to this day.

1689. At all relevant times, Plaintiffs and New Hampshire Subclass Members were not aware that Defendants were intercepting and recording their data, and therefore could not provide consent to have any part of their communications intercepted and recorded, transmitted, disclosed, or used.

1690. Defendants' installation and use of the TCU, as well as interception, tracking, disclosure and use of Plaintiffs' and New Hampshire Subclass Members' communications, was intentional, willful, and wanton.

1691. Plaintiffs and the New Hampshire Subclass Members are "aggrieved persons" within the meaning of the statute. N.H. Rev. Stat. Ann. § 570-A:1(X).

1692. As a direct and proximate result of Defendants' violations of the New Hampshire wiretap statute, Plaintiffs and New Hampshire Subclass Members were injured and suffered damages, including, but not limited to: loss of privacy; unauthorized dissemination of their valuable Driving Data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their Driving Data; and economic harm stemming from the exploitation of their Driving Data.

1693. Pursuant to N.H. Rev. Stat. Ann. § 570- A:11, Plaintiffs and New Hampshire Subclass members have been injured by the interception, disclosure, and/or use of their telecommunications in violation of the Act and are entitled to: (1) actual damages in an amount to be determined at trial, but not less than liquidated damages computed at the rate of $100 a day for each day of the violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs.

## CLAIMS ON BEHALF OF THE NEVADA SUBCLASS

## COUNT 44

## NEVADA DECEPTIVE TRADE PRACTICES ACT
### Nev. Rev. Stat. §§ 598.0903 *et seq.*

*Against All Defendants*

1694. The Nevada Plaintiff identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Nevada Subclass, repeats and realleges Paragraphs 1-973, as if fully alleged herein.

1695. GM, LexisNexis, and Verisk are "persons," as defined by Nev. Rev. Stat. § 598.0923(1).

1696. GM advertised, offered, or sold, goods or services in Nevada and engaged in trade or commerce directly or indirectly affecting the people of Nevada.

1697. GM engaged in "deceptive trade practices" as defined by Nev. Rev. Stat. §§ 598.0915 through 598.0925, including but not limited to:

    a. Failing to disclose material facts in connection with the sale of goods or services in violation of Nev. Rev. Stat. § 598.0923(2);

    b. Knowingly making false representations as to the characteristics, uses, or benefits of goods or services in violation of Nev. Rev. Stat. § 598.0915(5);

    c. Representing that goods or services for sale are of a particular standard, quality, or grade when Defendants knew or should have

known that they are of another standard, quality, or grade in violation of Nev. Rev. Stat. § 598.0915(7);

d. Advertising goods or services with intent not to sell them as advertised in violation of Nev. Rev. Stat § 598.0915(9); and

e. Violating state and federal statutes or regulations relating to the sale of goods or services in violation of Nev. Rev. Stat. §598.0923(A)(3).

1698. Plaintiff and the Nevada Subclass Members purchased or leased goods or services primarily for personal, family, or household purposes.

1699. GM's deceptive trade practices in the course of its business or occupation include:

a. Intercepting, collecting, using, and selling Plaintiff's and Nevada Subclass Members' Driving Data without obtaining their consent;

b. Omitting, suppressing, and concealing the material fact that GM was intercepting, collecting, using, and selling Plaintiff's and Nevada Subclass Members' Driving Data to LexisNexis, Verisk, and other third parties for GM's own financial and commercial benefit;

c. Omitting, suppressing, and concealing the material fact that LexisNexis, Verisk, and other third parties collected, manipulated, used, and sold Plaintiff's and Nevada Subclass Members' Driving Data for their own financial and commercial benefit;

d. Omitting, suppressing, and concealing material facts regarding the functionality of OnStar with respect to the privacy of consumers in their own vehicles;

e. Misrepresenting the purpose of OnStar and that it would protect the privacy of Plaintiff's and the Nevada Subclass Members' Driving Data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f. Failing to comply with common law and/or statutory duties pertaining to the privacy of Plaintiff's and Nevada Subclass Members' Driving Data.

1700. GM acted intentionally, knowingly, and maliciously to violate the Act, and recklessly disregarded Plaintiff's and Nevada Subclass Members' rights, because GM intentionally intercepted, collected, used, and sold Plaintiff's and Nevada Subclass Members' Driving Data without obtaining their consent.

1701.   The fact that GM intercepted, collected, used, and sold Plaintiff's and Nevada Subclass Members' Driving Data was material to Plaintiff and Nevada Subclass Members. This is a fact that reasonable consumers would consider important when choosing to purchase or lease a vehicle.

1702.   Plaintiff and Nevada Subclass Members were deceived and/or could reasonably be expected to be deceived by GM's material misrepresentations and omissions regarding the functionality of OnStar, the security and privacy of their Driving Data, and their privacy in their own vehicles to their detriment.

1703. GM intended to mislead Plaintiff and Nevada Subclass members and induce reliance on their misrepresentations, concealments, suppressions, and omissions of material facts.

1704. As a direct and proximate result of GM's deceptive and unfair practices, Plaintiff and Nevada Subclass members suffered ascertainable losses, including, but not limited to: loss of privacy; unauthorized dissemination of their valuable Driving Data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their Driving Data; and economic harm stemming from the exploitation of their Driving Data.

1705.   LexisNexis and Verisk engaged in unfair and unconscionable conduct in violation of the Act by engaging in the conduct alleged herein, including by soliciting and accepting Plaintiff's and Nevada Subclass Members' Driving Data from

GM with knowledge that such data was obtained without Plaintiff's and Nevada Subclass Members' consent, and further using, selling and disseminating Plaintiff's and Nevada Subclass Members' Driving Data without their consent.

1706. LexisNexis and Verisk also violated the Act by knowingly taking advantage of Plaintiff's and Nevada Subclass Members' inability to reasonably protect their interests, due to their lack of knowledge regarding GM's practices, of which LexisNexis and Verisk were aware.

1707. Plaintiff's and the Nevada Subclass' Driving Data has tangible value. As a direct and proximate result of GM's unfair and deceptive acts and practices, Plaintiff's and Nevada Subclass Members' Driving Data is in the possession of third parties—including LexisNexis and Verisk—who have used and will use such data for their commercial benefit.

1708. As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive acts and practices, Plaintiff and Nevada Subclass Members have suffered and will continue to suffer injury, including, but not limited to: loss of privacy; unauthorized dissemination of their valuable Driving Data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their Driving Data; and economic harm stemming from the exploitation of their Driving Data.

1709. Plaintiff and Nevada Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief, restitution, punitive damages, attorneys' fees, filing fees, and costs.

## CLAIMS ON BEHALF OF THE NEW JERSEY SUBCLASS

## COUNT 45

### NEW JERSEY CONSUMER FRAUD ACT,
### N.J. Stat. Ann. §§ 56:8-1, *et seq*.

*Against GM*

1710. The New Jersey Plaintiffs identified above ("Plaintiffs," for purposes of this Count), individually and on behalf of the New Jersey Subclass, repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1711. GM, LexisNexis, and Verisk are "person(s)," as defined by N.J. Stat. Ann. § 56:8-1(d).

1712. GM sells "merchandise," as defined by N.J. Stat. Ann. § 56:8-1(c) and (e).

1713. The New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1*, et seq.*, prohibits unconscionable commercial practices, deception, fraud, false pretense, false promise, misrepresentation, as well as the knowing concealment, suppression, or omission of any material fact with the intent that others rely on the concealment, omission, or fact, in connection with the sale or advertisement of any merchandise.

1714. GM's unconscionable and deceptive practices include:

a. Intercepting, collecting, using, and selling Plaintiffs' and New Jersey Subclass Members' Driving Data without obtaining their consent;

b. Omitting, suppressing, and concealing the material fact that GM was intercepting, collecting, using, and selling Plaintiffs' and New Jersey Subclass Members' Driving Data to LexisNexis, Verisk, and other third parties for GM's own financial and commercial benefit;

c. Omitting, suppressing, and concealing the material fact that LexisNexis, Verisk, and other third parties collected, manipulated, used, and sold Plaintiffs' and New Jersey Subclass Members' Driving Data for their own financial and commercial benefit;

d. Omitting, suppressing, and concealing material facts regarding the functionality of OnStar with respect to the privacy of consumers in their own vehicles;

e. Misrepresenting the purpose of OnStar and that it would protect the privacy of Plaintiffs' and the New Jersey Subclass Members' Driving Data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f. Failing to comply with common law and/or statutory duties pertaining to the privacy of Plaintiffs' and New Jersey Subclass Members' Driving Data.

1715. GM intended to mislead Plaintiffs and New Jersey Subclass members and induce reliance on their misrepresentations and omissions.

1716. GM acted intentionally, knowingly, and maliciously to violate the Act, and recklessly disregarded Plaintiffs' and New Jersey Subclass Members' rights, because GM intentionally intercepted, collected, used, and sold Plaintiff's and New Jersey Subclass Members' Driving Data without obtaining their consent.

1717. The fact that GM intercepted, collected, used, and sold Plaintiffs' and New Jersey Subclass Members' Driving Data was material to Plaintiffs and New Jersey Subclass Members. This is a fact that reasonable consumers would consider important when choosing to purchase or lease a vehicle.

1718. Plaintiffs and New Jersey Subclass Members were deceived and/or could reasonably be expected to be deceived by GM's material misrepresentations and omissions regarding the functionality of OnStar, the security and privacy of their Driving Data, and their privacy in their own vehicles to their detriment.

1719. Plaintiffs' and the New Jersey Subclass' Driving Data has tangible value. As a direct and proximate result of GM's unfair and deceptive acts and practices, Plaintiffs' and New Jersey Subclass Members' Driving Data is in the

possession of third parties—including LexisNexis and Verisk—who have used and will use such data for their commercial benefit.

1720.   As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive acts and practices, Plaintiffs and New Jersey Subclass Members have suffered and will continue to suffer injury, including, but not limited to: loss of privacy; unauthorized dissemination of their valuable Driving Data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their Driving Data; and economic harm stemming from the exploitation of their Driving Data.

1721. Plaintiffs and New Jersey Subclass Members have suffered injuries in fact and ascertainable losses of money or property as a result of GM's deceptive acts and practices. Plaintiffs' Driving Data has tangible economic value, which was wrongfully appropriated by Defendants for financial gain.

1722. Plaintiffs and New Jersey Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief, restitution, treble damages under N.J. Stat. Ann. § 56:8-19, attorneys' fees, filing fees, and costs.

## CLAIMS ON BEHALF OF THE NEW YORK SUBCLASS

## COUNT 46

### VIOLATION OF NEW YORK GENERAL BUSINESS LAW, N.Y. Gen. Bus. Law §§ 349

*Against All Defendants*

1723. The New York Plaintiffs identified above ("Plaintiffs," for purposes of this Count), individually and on behalf of the New York Subclass, repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1724. Defendants engaged in deceptive acts or practices in the conduct of their business, trade, and commerce, in violation of N.Y. Gen. Bus. Law § 349. GM engaged in deceptive acts and practices by:

a. Intercepting, collecting, using, and selling Plaintiffs' and New York Subclass Members' Driving Data without obtaining their consent;

b. Soliciting and accepting Plaintiffs' and New York Subclass Members' Driving Data from GM with knowledge that such data was obtained without Plaintiffs' and New York Subclass Members' consent, and further using, selling and disseminating Plaintiffs' and New York Subclass Members' Driving Data without their consent.

c. Omitting, suppressing, and concealing the material fact that GM was intercepting, collecting, using, and selling Plaintiffs' and New York Subclass Members' Driving Data to LexisNexis, Verisk, and other third parties for GM's own financial and commercial benefit;

d. Omitting, suppressing, and concealing the material fact that LexisNexis, Verisk, and other third parties collected, manipulated, used, and sold Plaintiffs' and New York Subclass Members' Driving Data for their own financial and commercial benefit;

e. Omitting, suppressing, and concealing material facts regarding the functionality of OnStar with respect to the privacy of consumers in their own vehicles;

f. Misrepresenting the purpose of OnStar and that it would protect the privacy of Plaintiffs' and the New York Subclass Members' Driving Data, including that it would not intercept, collect, use, or sell such data without consumers' express consent;

g. Knowingly taking advantage of Plaintiffs' and New York Subclass Members' inability to reasonably protect their interests, due to their lack of knowledge regarding GM's practices; and

h. Failing to comply with common law and/or statutory duties pertaining to the privacy of Plaintiffs' and New York Subclass Members' Driving Data.

1725. Defendants' omissions and misrepresentations were material because they were likely to deceive reasonable consumers into believing that their Driving Data would not be sold or used for financial gain without their knowledge or consent.

1726. Defendants acted intentionally, knowingly, and maliciously to violate N.Y. Gen. Bus. Law § 349, or acted with reckless disregard for the rights of Plaintiffs and New York Subclass Members.

1727. As a direct and proximate result of Defendants' deceptive and unlawful acts and practices, Plaintiffs and New York Subclass Members have suffered and will continue to suffer injury, but not limited to: loss of privacy; unauthorized dissemination of their valuable Driving Data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their Driving Data; and economic harm stemming from the exploitation of their Driving Data.

1728. Plaintiffs and New York Subclass Members have suffered injuries in fact and ascertainable losses of money or property as a result of Defendants' deceptive acts and practices. Plaintiffs' and New York Subclass Members' Driving Data has tangible economic value, which was wrongfully appropriated by Defendants for financial gain.

1729. The public interest and consumers at large were harmed by Defendants' deceptive and unlawful acts, which affected thousands of New York residents.

1730. Plaintiffs and New York Subclass Members seek all monetary and non-monetary relief available under N.Y. Gen. Bus. Law § 349, including actual damages or statutory damages of $50 (whichever is greater), treble damages, injunctive relief, attorneys' fees, and costs.

## COUNT 47

### VIOLATION OF NEW YORK GENERAL BUSINESS LAW
### N.Y. Gen. Bus. Law §§ 350

*Against GM*

1731. The New York Plaintiffs identified above ("Plaintiffs," for purposes of this Count) individually and on behalf of the New York Subclass, repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1732. GM engaged in advertising, including labeling, of goods and services that was misleading in a material respect in violation of New York General Business Law § 350-a(1).

1733. GM's advertising was misleading in a material respect because it falsely implied that their goods and services included privacy protections for consumers' Driving Data and failed to disclose material facts regarding the collection and sale of such data. Specifically, GM failed to disclose that it was surreptitiously collecting Plaintiffs' and New York Subclass Members' Driving Data and subsequently selling that data to third parties for profit, including but not limited to LexisNexis and Verisk.

1734. The omission of these material facts rendered GM's representations misleading in light of the advertised nature of their goods and services. Plaintiffs and New York Subclass Members reasonably believed, based on GM's advertising, that their Driving Data would not be collected or sold without their knowledge and consent.

1735. GM knowingly and intentionally engaged in false advertising with the intent to induce Plaintiffs and New York Subclass Members to purchase their goods and services, relying on the misleading representations and omissions regarding privacy protections for Driving Data.

1736. As a direct and proximate result of GM's false advertising, Plaintiffs and New York Subclass Members were injured in that they paid for goods and services under false pretenses and suffered a loss of privacy and control over their Driving Data, which has tangible value. Plaintiffs and New York Subclass Members would not have purchased GM's goods and services, or would have paid less for them, had the true facts been disclosed.

1737. Plaintiffs seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of five hundred dollars per violation, whichever is greater, treble damages for willful or knowing violations, injunctive relief, reasonable attorneys' fees, costs, pre-judgment interest, and any other relief the Court deems just and proper.

## COUNT 48

## VIOLATION OF NEW YORK GENERAL BUSINESS LAW
## N.Y. Gen. Bus. Law §§ 899-aa; 899-bb (SHIELD Act)

### *Against All Defendants*

1738. The New York Plaintiffs identified above ("Plaintiffs," for purposes of this Count) individually and on behalf of the New York Subclass, repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1739. GM, LexisNexis, and Verisk are businesses that own, license, or maintain computerized data that includes private information as defined by N.Y. Gen. Bus. Law § 899-aa(1)(a). Accordingly, Defendants are subject to the requirements of N.Y. Gen. Bus. Law §§ 899-aa(2) and (3).

1740. Plaintiffs' and Class Members' Driving Data includes private information covered by N.Y. Gen. Bus. Law § 899-aa(1)(b), as it contains sensitive, identifiable information, including records of their driving events.

1741. GM collected and maintained Driving Data from Plaintiffs and New York Subclass Members without informing them of the scope of the data collection or obtaining their consent for its subsequent use and sale to LexisNexis and Verisk.

1742. Defendants LexisNexis and Verisk knowingly obtained this data and used or sold it for financial gain without the consent of Plaintiffs and New York Subclass Members.

1743. Pursuant to N.Y. Gen. Bus. Law § 899-bb(2), Defendants were required to implement and maintain reasonable administrative, technical, and physical safeguards to protect Plaintiffs' and New York Subclass Members' Driving Data against unauthorized access, acquisition, or misuse.

1744. Defendants failed to implement such reasonable safeguards, as they failed to disclose the sale of Plaintiffs' and New York Subclass Members' Driving Data and enabled unauthorized access and transfer of this private information.

1745. Defendants violated N.Y. Gen. Bus. Law §§ 899-aa(2) and (3) by failing to provide timely, accurate, and sufficient notice to Plaintiffs and New Subclass Members of the unauthorized collection, use, and sale of their Driving Data.

1746. Defendants' failure to adhere to the administrative and security requirements of the SHIELD Act (N.Y. Gen. Bus. Law § 899-bb(2)) further compromised the security and confidentiality of Plaintiffs' and New York Subclass Members' private information.

1747. As a direct and proximate result of Defendants' violations of N.Y. Gen. Bus. Law §§ 899-aa and 899-bb, Plaintiffs and New York Subclass Members suffered damages, including, but not limited to: loss of privacy; unauthorized dissemination of their valuable Driving Data; damage to and diminution of the value

of their personal information; the likelihood of future misuse of their Driving Data; and economic harm stemming from the exploitation of their Driving Data.

1748. Plaintiffs and New York Subclass Members seek all remedies available under N.Y. Gen. Bus. Law § 899-aa(6)(b) and § 899-bb(2), including actual damages, injunctive relief, and any other relief deemed just and proper by the Court.

## COUNT 49

### VIOLATION OF NEW YORK CIVIL RIGHTS LAW
### §§ 50 AND 51

*Against All Defendants*

1749. The New York Plaintiffs identified above ("Plaintiffs," for purposes of this Count) individually and on behalf of the New York Subclass, repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1750. Defendants used Plaintiffs' and New York Subclass' driving and vehicle-related information for purposes of trade and advertising without first obtaining their written consent, in violation of New York Civil Rights Law § 50.

1751. Specifically, GM used Plaintiffs' and New York Subclass' Driving Data by collecting Plaintiffs' and New York Subclass Members' driving and vehicle-related data and selling it to Defendants LexisNexis and Verisk, who in turn sold or used that data to benefit insurance companies and other third parties.

1752. Plaintiffs' driving and vehicle-related data were used in connection with Defendants' trade and advertising without their knowledge or written consent.

Such use was intended to further Defendants' commercial interests and to generate profits from the unauthorized sale and exploitation of Plaintiffs' data.

1753. Plaintiffs and the New York Subclass were injured as a result of this unauthorized use, suffering harm to their privacy interests. Plaintiffs' and New York Subclass Members' data has tangible value, and Defendants profited from its use to the detriment of Plaintiffs and New York Subclass Members.

1754. Defendants acted knowingly, willfully, and maliciously in using Plaintiffs' names, portraits, pictures, and likenesses for trade and advertising purposes, without Plaintiffs' consent, to further Defendants' commercial gain.

1755. As a direct and proximate result of Defendants' conduct, Plaintiffs and New York Subclass Members have suffered damages and are entitled to recover the greater of their actual damages or statutory damages, including exemplary damages, as well as injunctive relief to prevent further unauthorized use of their names, portraits, pictures, and likenesses.

1756. Plaintiffs and New York Subclass Members seek all monetary and non-monetary relief allowed by law, including compensatory damages, statutory damages, exemplary damages for knowing violations, injunctive relief, reasonable attorneys' fees, costs, pre-judgment interest, and any other relief the Court deems just and proper.

## CLAIMS ON BEHALF OF THE NORTH CAROLINA SUBCLASS

## COUNT 50

## VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT
### N.C. Gen. Stat. §§ 75-1.1, *et seq.*

*Against All Defendants*

1757. The North Carolina Plaintiffs identified above ("Plaintiff," for purposes of this Count) individually and on behalf of the North Carolina Subclass, repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1758. GM, LexisNexis, and Verisk, and Plaintiffs are "persons" as defined by N.C. Gen. Stat. § 75-1.1(d).

1759. GM advertised, offered, or sold goods and services in North Carolina and engaged in trade or commerce directly or indirectly affecting the people of North Carolina, as defined by N.C. Gen. Stat. § 75-1.1(b).

1760. GM engaged in unfair, unconscionable, and deceptive practices in violation of N.C. Gen. Stat. § 75-1.1(a). These practices include:

  a. Intercepting, collecting, using, and selling Plaintiffs' and North Carolina Subclass Members' Driving Data without obtaining their consent;

  b. Omitting, suppressing, and concealing the material fact that GM was intercepting, collecting, using, and selling Plaintiffs' and North Carolina Subclass Members' Driving Data to LexisNexis,

Verisk, and other third parties for GM's own financial and commercial benefit;

c. Omitting, suppressing, and concealing the material fact that LexisNexis, Verisk, and other third parties collected, manipulated, used, and sold Plaintiffs' and North Carolina Subclass Members' Driving Data for their own financial and commercial benefit;

d. Omitting, suppressing, and concealing material facts regarding the functionality of OnStar with respect to the privacy of consumers in their own vehicles;

e. Misrepresenting the purpose of OnStar and that it would protect the privacy of Plaintiffs' and the North Carolina Subclass Members' Driving Data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f. Failing to comply with common law and/or statutory duties pertaining to the privacy of Plaintiffs' and North Carolina Subclass Members' Driving Data.

1761. LexisNexis and Verisk engaged in unfair and unconscionable conduct in violation of the Act by engaging in the conduct alleged herein, including by

soliciting and accepting Plaintiffs' and North Carolina Subclass Members' Driving Data from GM with knowledge that such data was obtained without Plaintiffs' and North Carolina Subclass Members' consent, and further using, selling and disseminating Plaintiffs' and North Carolina Subclass Members' Driving Data without their consent.

1762. LexisNexis and Verisk also violated the Act by knowingly taking advantage of Plaintiffs' and North Carolina Subclass Members' inability to reasonably protect their interests, due to their lack of knowledge regarding GM's practices, of which LexisNexis and Verisk were aware.

1763. GM acted intentionally, knowingly, and maliciously to violate the Act, and recklessly disregarded Plaintiffs' and North Carolina Subclass Members' rights, because GM intentionally intercepted, collected, used, and sold Plaintiff's and North Carolina Subclass Members' Driving Data without obtaining their consent. GM intended to mislead Plaintiffs and North Carolina Subclass members and induce them to rely on the omissions to their detriment.

1764. The fact that GM intercepted, collected, used, and sold Plaintiffs' and North Carolina Subclass Members' Driving Data was material to Plaintiffs and North Carolina Subclass Members. This is a fact that reasonable consumers would consider important when choosing to purchase or lease a vehicle.

1765.   Plaintiffs and North Carolina Subclass Members were deceived and/or could reasonably be expected to be deceived by GM's material misrepresentations and omissions regarding the functionality of OnStar, the security and privacy of their Driving Data, and their privacy in their own vehicles to their detriment.

1766.   Plaintiffs' and the North Carolina Subclass' Driving Data has tangible value. As a direct and proximate result of GM's unfair and deceptive acts and practices, Plaintiffs' and North Carolina Subclass Members' Driving Data is in the possession of third parties—including LexisNexis and Verisk—who have used and will use such data for their commercial benefit.

1767.   As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive acts and practices, Plaintiffs and North Carolina Subclass Members have suffered and will continue to suffer injury, including, but not limited to: loss of privacy; unauthorized dissemination of their valuable Driving Data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their Driving Data; and economic harm stemming from the exploitation of their Driving Data.

1768.   Plaintiffs and the North Carolina Subclass seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $500 per violation, whichever is greater, treble damages pursuant to N.C. Gen. Stat.

§ 75-16, injunctive relief, attorneys' fees under N.C. Gen. Stat. § 75-16.1, pre-judgment interest, costs, and any other relief the Court deems just and proper.

## CLAIMS ON BEHALF OF THE OHIO SUBCLASS

## COUNT 51

### VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT
### Ohio Rev. Code §§ 1345.01, *et seq.*

*Against GM*

1769. The Ohio Plaintiffs identified above ("Plaintiffs," for purposes of this Count) individually and on behalf of the Ohio Subclass, repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1770. Plaintiffs and Ohio Subclass Members are "persons" as defined by Ohio Rev. Code § 1345.01(B).

1771. GM is a "supplier" engaged in "consumer transactions," as defined by Ohio Rev. Code §§ 1345.01(A) and (C), by offering goods and services to consumers in Ohio.

1772. GM engaged in unfair and deceptive acts and practices in connection with consumer transactions, in violation of Ohio Rev. Code §§ 1345.02 and 1345.03.

1773. GM violated Ohio Rev. Code § 1345.02(B)(1) by representing that its goods and services had characteristics, uses, and benefits that they did not have, including misleading Plaintiffs and Ohio Subclass Members into believing their

Driving Data would remain private and secure, while surreptitiously collecting and selling such data to LexisNexis and Verisk.

1774. GM further violated Ohio Rev. Code § 1345.02(B)(2) by representing that its goods and services were of a particular standard or quality when they were not, misleading Plaintiffs and Ohio Subclass Members into believing that their Driving Data would not be misused for GM's profit.

1775. GM engaged in unconscionable acts in connection with consumer transactions, in violation of Ohio Rev. Code § 1345.03, by surreptitiously collecting and monetizing Plaintiffs' and Ohio Subclass Members' Driving Data without their knowledge or consent and by exploiting the inability of consumers to reasonably protect their interests in the face of GM's concealed practices.

1776. GM failed to disclose material facts about its Driving Data collection and monetization practices, despite a duty to do so, and concealed its sale of Driving Data to LexisNexis and Verisk, acts that violated Ohio Rev. Code §§ 1345.02 and 1345.03.

1777. GM acted knowingly, intentionally, and maliciously to violate the Ohio Consumer Sales Practices Act by surreptitiously monetizing Plaintiffs' and Ohio Subclass Members' Driving Data without consent and in reckless disregard of Plaintiffs' and Ohio Subclass Members' rights.

1778. As a direct and proximate result of GM's unfair, deceptive, and unconscionable acts and practices, Plaintiffs and Ohio Subclass Members have suffered ascertainable losses of money or property, including, but not limited to: loss of privacy; unauthorized dissemination of their valuable Driving Data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their Driving Data; and economic harm stemming from the exploitation of their Driving Data.

1779. Plaintiffs and Ohio Subclass Members seek all monetary and non-monetary relief allowed by law, including the greater of actual damages or statutory damages, treble damages, injunctive relief, attorneys' fees and costs, and any other relief the Court deems just and proper.

## CLAIMS ON BEHALF OF THE OKLAHOMA SUBCLASS

## COUNT 52

## OKLAHOMA CONSUMER PROTECTION ACT,
## 15 Okla. Stat. §§ 751, *et seq.*

*Against all Defendants*

1780. The Oklahoma Plaintiff identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Oklahoma Subclass, repeats and realleges Paragraphs 1-973, as if fully alleged herein.

1781. The Oklahoma Consumer Protection Act ("Oklahoma CPA") prohibits unfair and deceptive practices in the course of a person's business. 15 Okla. Stat. § 753.

1782. Defendants are each a "person" as defined by 15 Okla. Stat. § 752(1), which means "a natural person, corporation, trust, partnership, incorporated or unincorporated association, or any other legal entity[.]"

1783. Defendants have each engaged in "consumer transactions" as defined by 15 Okla. Stat. § 752(2), which means "the advertising, offering for sale or purchase, sale, purchase, or distribution of any services or any property, tangible or intangible, . . . or any other . . . thing of value wherever located, for purposes that are personal, household, or business oriented."

1784. "Unfair trade practice" means "any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." § 752(14) (definition); § 753(21) (declaring unfair trade practices illegal).

1785. By surreptitiously collecting private Driving Data from drivers while in their vehicles, and exploiting that Driving Data for their own commercial gain, Defendants have engaged in unfair practices.

1786. Plaintiff and Oklahoma Subclass Members could not have reasonably avoided Defendants' practices as described herein because Defendants concealed their practices and because they need to travel in their vehicles.

1787. Plaintiff and Oklahoma Subclass Members have derived no benefit from Defendants' surreptitious collection and exploitation of their private information.

1788. Plaintiff and Oklahoma Subclass Members have been substantially injured by the practices described herein because their rights to privacy have been violated, and because they have experienced economic loss.

1789. As a direct and proximate result of Defendants' unfair practices, Plaintiff and Oklahoma Subclass Members have suffered and will continue to suffer injury, losses, and damages, including, but not limited to: loss of privacy; unauthorized dissemination of their valuable Driving Data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their Driving Data; and economic harm stemming from the exploitation of their Driving Data.

1790. In violating Plaintiff's and Oklahoma Subclass Members' rights under the Oklahoma CPA as described herein, Defendants acted intentionally, knowingly, and/or with reckless disregard of the rights of Plaintiff and Oklahoma Subclass Members.

1791. Defendants' unlawful practices as described herein are unconscionable.

1792. Plaintiff and Oklahoma Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages, civil penalties, reasonable attorneys' fees and costs.

## CLAIMS ON BEHALF OF THE OREGON SUBCLASS

## COUNT 53

**OREGON UNLAWFUL TRADE PRACTICES ACT,**
**Or. Rev. Stat. §§ 646.605, *et seq.***

*Against GM*

1793. The Oregon Plaintiff identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Oregon Subclass, repeats and realleges Paragraphs 1-973, as if fully alleged herein.

1794. The Oregon Unlawful Trade Practices Act ("Oregon UTPA") prohibits unlawful practices in the course of a person's business, vocation, or occupation. Or. Rev. Stat. § 646.608(1).

1795. GM is a "person" as defined by Or. Rev. Stat. § 646.605(4), which includes "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations and any other legal entity[.]"

1796. GM has sold "goods or services" within the meaning of the Act, which mean "those that are or may be obtained primarily for personal, family or household purposes[.]" Or. Rev. Stat. § 646.605(6)(a).

1797. It is an unlawful trade practice under the Oregon UTPA for a person to represent that goods or services have characteristics, uses, benefits, quantities or qualities that they do not have. Or. Rev. Stat. § 646.605(1)(e).

1798. It is also an unlawful trade practice under the Oregon UTPA for a person to represent that goods or services are of a particular standard, quality, or grade if they are of another. Or. Rev. Stat. § 646.605(1)(g).

1799. It is also an unlawful trade practice under the Oregon UTPA for a person to advertise goods or services with intent not to provide them as advertised. Or. Rev. Stat. § 646.605(1)(i).

1800. A violative representation "may be made by any assertion by words or conduct, including, but not limited to, a failure to disclose a fact." Or. Rev. Stat. § 646.608(2). GM engaged in unlawful trade practices by:

    a. Intercepting, collecting, using, and selling Plaintiff's and Oregon Subclass Members' Driving Data without obtaining their consent;

    b. Omitting, suppressing, and concealing the material fact that GM was intercepting, collecting, using, and selling Plaintiff's and Oregon Subclass Members' Driving Data to LexisNexis, Verisk, and other third parties for GM's own financial and commercial benefit;

c. Omitting, suppressing, and concealing the material fact that LexisNexis, Verisk, and other third parties collected, manipulated, used, and sold Plaintiff's and Oregon Subclass Members' Driving Data for their own financial and commercial benefit;

d. Omitting, suppressing, and concealing material facts regarding the functionality of OnStar with respect to the privacy of consumers in their own vehicles;

e. Misrepresenting the purpose of OnStar and that it would protect the privacy of Plaintiff's and the Oregon Subclass Members' Driving Data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f. Failing to comply with common law and/or statutory duties pertaining to the privacy of Plaintiff's and Oregon Subclass Members' Driving Data.

1801. These misrepresentations and omissions concern the characteristics, uses, benefits, qualities and standards of GM's goods and services, in violation of Or. Rev. Stat. § 646.605(1)(e) and (1)(g).

1802. By misrepresenting and omitting crucial information regarding the functionality of OnStar with respect to the privacy of drivers in their own vehicles,

GM advertised its goods and services with intent not to provide them as advertised, in violation of Or. Rev. Stat. § 646.605(1)(i).

1803. Plaintiff and Oregon Subclass Members reasonably relied on GM's and material misrepresentations and omissions regarding the functionality of OnStar, the security and privacy of their Driving Data, and their privacy in their own vehicles to their detriment.

1804. As a direct and proximate result of GM's unlawful practices, Plaintiff and Oregon Subclass Members have suffered and will continue to suffer injury, losses, and damages, including, but not limited to: loss of privacy; unauthorized dissemination of their valuable Driving Data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their Driving Data; and economic harm stemming from the exploitation of their Driving Data.

1805. In violating Plaintiff's and Oregon Subclass Members' rights under the Oregon UPTA as described herein, GM acted intentionally, knowingly, and/or with reckless disregard of the rights of Plaintiff and Oregon Subclass Members.

1806. Plaintiff and Oregon Subclass Members seek all monetary and non-monetary relief allowed by law, including equitable relief, actual damages or statutory damages of $200 violation (whichever is greater), punitive damages, and reasonable attorneys' fees and costs.

## CLAIMS ON BEHALF OF THE PENNSYLVANNIA SUBCLASS

## COUNT 54

## UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### 73 Pa. Stat. §§ 201-1 *et seq.*

*Against All Defendants*

1807. The Pennsylvania Plaintiffs identified above ("Plaintiffs," for purposes of this Count), individually and on behalf of the Pennsylvania Subclass, repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1808. The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania UTPCP") makes unlawful unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. S.C. Code § 39-5-10(a).

1809. GM, LexisNexis, and Verisk are each a "person" as defined by 73 Pa. Stat. § 201-2(2), which includes corporations, trusts, partnerships, incorporated or unincorporated associations and any other legal entity.

1810. GM, LexisNexis, and Verisk each engage in "trade" or "commerce" as defined by 73 Pa. Stat. § 201-2(3), which includes advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and includes any trade or commerce directly or indirectly affecting the people of Pennsylvania.

1811. GM engaged in unfair trade practices by representing to Plaintiffs and Pennsylvania Subclass Members that their data would be kept secure and that data would not be shared, when in fact GM collected Driving Data from their vehicles.

1812. GM further engaged in unfair trade practices by failing to disclose to and concealing from Plaintiffs and Pennsylvania Subclass Members that their Driving Data was being collected and sold to LexisNexis and Verisk, who then used the Driving Data to develop products and make profits.

1813. These unfair statements, misrepresentations, omissions, and concealments constitute violations of 73 Pa. Stat. § 201-2(4).

1814. By misrepresenting, omitting, and concealing crucial information regarding the functionality of OnStar with respect to the privacy of drivers in their own vehicles, GM violated 73 Pa. Stat. § 201-2(4)(v), (vii) and (ix).

1815. GM violated 73 Pa. Stat. § 201-2(4)(xiv) by representing to Plaintiffs and Pennsylvania Subclass Members that their data would be kept secure and that data would not be shared, when in fact GM regularly collected detailed Driving Data regarding their use of their vehicles.

1816. Plaintiffs and Pennsylvania Subclass Members were deceived and/or could reasonably be expected to be deceived by GM's material misrepresentations and omissions regarding the functionality of OnStar, the security and privacy of their Driving Data, and their privacy in their own vehicles to their detriment.

1817. GM, LexisNexis, and Verisk violated 73 Pa. Stat. § 201-2(4)(ii) and (iii) by causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval, certification, affiliation, connection, or association with Plaintiffs' and Pennsylvania Subclass Members' Driving Data, namely that the collection and sale of such data was not authorized or consented-to by them, and therefore unlawfully obtained.

1818. As a direct and proximate result of Defendants' unfair practices, Plaintiffs and Pennsylvania Subclass Members have suffered and will continue to suffer injury, losses, and damages, including, but not limited to: loss of privacy; unauthorized dissemination of their valuable Driving Data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their Driving Data; and economic harm stemming from the exploitation of their Driving Data.

1819. In violating Plaintiffs' and Pennsylvania Subclass Members' rights under the Pennsylvania UTPCP as described herein, Defendants acted intentionally, knowingly, and/or with reckless disregard of the rights of Plaintiffs and Pennsylvania Subclass Members.

1820. Plaintiffs and Pennsylvania Subclass Members seek all monetary and non-monetary relief allowed by law, including equitable relief, actual damages or

one hundred dollars ($100), whichever is greater, treble damages, punitive damages, and reasonable attorneys' fees and costs.

## COUNT 55

### PENNSYLVANIA WIRETAPPING AND ELECTRONIC SURVEILLANCE CONTROL ACT (WESCA)
### 18 Pa. Const. Stat. §§ 5701 *et seq.*

*Against All Defendants*

1821. The Pennsylvania Plaintiffs identified above ("Plaintiffs," for purposes of this Count), individually and on behalf of the Pennsylvania Subclass, repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1822. The Pennsylvania Wiretapping and Electronic Surveillance Control Act (WESCA), 18 Pa. Cons. Stat. § 5701, *et seq.*, prohibits anyone from, among other things, "intentionally intercept[ing], endeavor[ing] to intercept, or procur[ing] any other person to intercept or endeavor to intercept any wire, electronic or oral communication." 18 Pa. Cons. Stat. § 5703(1).

1823. WESCA also makes it unlawful for any person to "intentionally disclose[] or endeavor to disclose[] to any other person" or to "intentionally use[], or endeavor to use[]," the "contents of any wire, oral, or electronic communication, or evidence derived therefrom, knowing or having reason to know that" the communication was obtained in violation of WESCA. 18 Pa. Cons. Stat. § 5703(1), (2), (3).

1824. WESCA provides a private right of action to "[a]ny person whose wire, electronic or oral communication is intercepted, disclosed or used in violation of [WESCA]." *Id.* at § 5725(a).

1825. WESCA defines "intercept" in relevant part as the "acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 Pa. Cons. Stat. § 5702.

1826. WESCA defines "electronic communication" as "[a]ny transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system. 18 Pa. C.S.A. § 5702.

1827. GM, LexisNexis, and Verisk are corporations, and Plaintiffs, as individuals, are each a person within the meaning of WESCA.

1828. The data transmissions from Plaintiffs' and Pennsylvania Subclass Members' vehicles constitute "electronic communications" within the scope of the WESCA as they are transfers of data, signals and intelligence transmitted by electromagnetic, photoelectronic, or photooptical system in Plaintiff's and Pennsylvania Subclass Members' vehicles within the scope of 18 Pa. C.S.A. § 5702 (defining "electronic communication").

1829. As alleged herein, GM intercepted, in real time and as they were transmitted, the contents of electronic communications, and diverted those communications to itself without consent.

1830. GM intercepted these electronic communications in real time separately from and in addition to accessing data stored in Plaintiffs' and Pennsylvania Subclass Members' vehicle components.

1831. Plaintiffs and Pennsylvania Subclass Members have a reasonable expectation of privacy within their vehicles, and Plaintiffs and Pennsylvania Subclass Members reasonably expected privacy while driving their vehicles. Further, there is a reasonable expectation that the interactions between a driver and their vehicle, i.e., their personal Driving Data, are private.

1832. Common understanding and human experience of how automotive vehicles work create a reasonable expectation that a vehicle manufacturer and service provider like GM would not surreptitiously intercept and divert the detailed and personal electronic communications described above.

1833. GM intercepted these data transmissions by diverting them, during flight to a TCU or similar device, and to their own servers, unbeknownst to Plaintiffs and Pennsylvania Subclass Members.

1834. As detailed herein, the electronic communications detailed above that GM has intercepted are tied to individual drivers and vehicles, and not anonymized.

1835. In further violation of the WESCA, GM disclosed or attempted to disclose to third parties the contents of the communications described above while knowing or having reason to know that the information was obtained through interception in violation of the WESCA.

1836. In further violation of the WESCA, GM used or attempted to use the contents of the communications described above while knowing or having reason to know that the information was obtained through interception in violation of the WESCA.

1837. Specifically, GM disclosed and used the contents of the communications described above by selling Plaintiffs' and Pennsylvania Subclass Members' personal Driving Data to LexisNexis and Verisk for its own financial and commercial benefit, obtaining substantial profit.

1838. LexisNexis and Verisk have also violated the WESCA by disclosing or endeavoring to disclose to third parties the contents of the communications intercepted by GM described above while knowing or having reason to know that the information was obtained through the interception of the communications in violation of the WESCA.

1839. Specifically, LexisNexis and Verisk intentionally disclosed Plaintiffs' and Pennsylvania Subclass Members' detailed Driving Data to various auto insurance companies.

1840. In further violation of the WESCA, LexisNexis and Verisk willfully used or endeavored to use the contents of the communications described above while knowing or having reason to know that the information was obtained through the interception of the communications in violation of the WESCA.

1841. Specifically, LexisNexis and Verisk have used the information derived from the communications described above to create products they market, license, and sell, including driving scores, risk ratings, and access to databases containing Plaintiffs' and the Pennsylvania Subclass Members' Driving Data.

1842. Further, LexisNexis and Verisk have used the information derived from the communications described above in aggregate fashion to create their telematics exchange, develop risk models, and other products they market and sell.

1843. LexisNexis and Verisk have used and disclosed the contents of the communications described above for their own financial and commercial benefit, obtaining substantial profit.

1844. LexisNexis and Verisk knew or had reason to know that the information they obtained from GM was obtained through the unlawful interception of communications in violation of the WESCA.

1845. Specifically, LexisNexis and Verisk knew or should have known that the detailed driving information they use and sell was captured in secret in violation

of WESCA for the following reasons, among others that will become known through discovery:

    a.  the numerous, obvious consent and privacy challenges to the collection of Driving Data that both LexisNexis and Verisk acknowledged in writing and in presentations;

    b.  the opaque disclosures in GM's various terms and policies, which did not operate as a reasonable basis for inferring consumer consent to share the information with LexisNexis and Verisk;

    c.  the sheer volume of data LexisNexis and Verisk were receiving from GM versus from other manufacturers;

    d.  the lack of public knowledge about GM's collection and sharing practices until at least 2024;

    e.  the fact that LexisNexis continued to collect after it was publicized that collection was secret/happening without consent or knowledge; and

    f.  the nature of the data as such that it had to be obtained via a wiretap.

1846. Upon information and belief, GM and LexisNexis continue to disclose and use unlawfully obtained Driving Data for their own financial gain to this day.

1847. At all relevant times, Plaintiffs and Pennsylvania Subclass Members were not aware that Defendants were intercepting and recording their data, and therefore could not provide consent to have any part of their communications intercepted and recorded, transmitted, disclosed, or used.

1848. Plaintiffs and the Pennsylvania Subclass Members are "aggrieved persons" within the meaning of the statute. 18 Pa. C.S.A. § 5702.

1849. As a direct and proximate result of Defendants' violations of WESCA, Plaintiffs and Pennsylvania Subclass Members were injured and suffered damages, including, but not limited to: loss of privacy; unauthorized dissemination of their valuable Driving Data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their Driving Data; and economic harm stemming from the exploitation of their Driving Data.

1850. Pursuant to 18 Pa. C.S.A. § 5725, Plaintiffs and Pennsylvania Subclass Members have been injured by the interception, disclosure, and/or use of their communications in violation of the Act and are entitled to: (1) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiffs and the Pennsylvania Subclass or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; and (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs.

# COUNT 56

## PENNSYLVANIA UNLAWFUL ACCESS TO STORED COMMUNICATIONS ACT
## 18 Pa. C.S. §§ 5741

*Against GM*

1851. The Pennsylvania Plaintiffs identified above ("Plaintiffs," for purposes of this Count), individually and on behalf of the Pennsylvania Subclass, repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1852. The Pennsylvania WESCA, 18 Pa. Cons. Stat. § 5701, et seq., also makes it unlawful for a person to "(a) intentionally access[] without authorization a facility through which an electronic communication service is provided or (b) intentionally exceed[] an authorization to access the facility and thereby obtain[] . . . access to a wire or electronic communication while it is in electronic storage." 18 Pa. C.S. § 5741.

1853. GM, as a corporation or legal entity, and Plaintiffs, as individuals, are "persons" within the meaning of 18 Pa. C.S.A. § 5702.

1854. "Electronic communication" is defined in relevant part as "[a]ny transfer of signs, signals, . . . data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system." 18 Pa. C.S.A. § 5702.

1855. "Communication system" means "[a]ny wire, radio, electromagnetic, photo-optical, or photoelectronic facilities for the transmission of communications

and any computer facilities or related electronic equipment for the electronic storage of such communications." 18 Pa. C.S.A. § 5702.

1856. "Electronic storage" is defined as "(1) [a]ny temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof"; and "(2) [a]ny storage of such a communication by an electronic communication service for purpose of backup protection of the communication[.]" 18 Pa. C.S.A. § 5702.

1857. As alleged herein, the electronic communications transmitted within, to, and from Plaintiffs' and Pennsylvania Subclass Members' vehicles are stored in electronic components of those vehicles, including ECUs and the TCU.

1858. In-vehicle units with storage function, such as ECUs and TCUs, are facilities through which electronic communication services are provided because they provide users, such as Plaintiffs and Pennsylvania Subclass Members, the ability to send and receive electronic communications including related to their personal Driving Data.

1859. As alleged herein, there is a reasonable expectation of privacy within a person's vehicle, and Plaintiffs and Pennsylvania Subclass Members reasonably expected privacy while driving their vehicles. Further, there is a reasonable expectation that the interactions and communications between driver and vehicle, i.e., personal Driving Data, are private.

1860. Common understanding and experience regarding how automotive vehicles work create a reasonable expectation that GM would not access the electronic communications described above that are stored in Plaintiffs' and Pennsylvania Subclass Members' vehicles.

1861. As alleged herein, GM, without the consent or authorization of Plaintiffs or Pennsylvania Subclass Members, accessed certain data stored in vehicles and transmitted it to GM's servers via cellular network from storage after the completion of a trip or at the end of the day or on some other periodic basis.

1862. GM accessed these temporarily stored electronic communications in addition to and separately from intercepting other electronic communications transmitted in real time.

1863. As detailed herein, the data contained in the electronic communications detailed above that GM accessed are tied to individual drivers and vehicles, and not anonymized.

1864. GM intentionally accessed each of these facilities without Plaintiffs' and the Pennsylvania Subclass Members' authorization.

1865. GM intentionally exceeded its authority to access these facilities.

1866. In accessing these facilities without authorization and obtaining access to the electronic communications stored there, GM violated the WESCA's Unlawful Access to Communications Act, 18 Pa. C.S.A. § 5741 et seq.

1867. GM's conduct was willful and intentional, and invaded Plaintiffs' and Pennsylvania Subclass Members' expectations of privacy within their vehicle and privacy of the personal interactions and communications between driver and vehicle, i.e., their personal Driving Data.

1868. GM profited from its violation of WESCA, by, among other things, using the improperly accessed communications or selling them to LexisNexis and Verisk for marketing and licensing out to numerous third parties.

1869. The communications accessed by GM in violation of the WESCA have significant value, evidenced by the profits that Defendants obtained from them.

1870. Because of GM's conduct, Plaintiffs and Pennsylvania Subclass Members have forever lost the value of their data, their privacy interest in the data, and their control over its use.

1871. Because of Defendants' knowing and intentional violation of the WESCA, Plaintiffs and the Pennsylvania Subclass Members are "aggrieved persons" within the meaning of 18 Pa. C.S.A. § 5702, and are thus entitled to bring this civil action for relief and damages. 18 Pa. C.S.A. § 5747.

1872. Pursuant to 18 Pa. C.S.A. § 5747, Plaintiffs and Pennsylvania Subclass Members have been damaged and aggrieved by GM's intentional acts in violation of the WESCA and are entitled to bring this civil action to recover: (1) declaratory and equitable relief; (2) damages in an amount to be determined at trial, assessed as

actual damages and any profits made by GM as a result of the violation, but in no case less than $1,000; (3) reasonable attorneys' fees and other litigation costs reasonably incurred; and, because Defendants' conduct was intentional, (4) punitive damages as determined by the Court.

## CLAIMS ON BEHALF OF THE RHODE ISLAND SUBCLASS

## COUNT 57

### RHODE ISLAND DECEPTIVE TRADE PRACTICES ACT
### R.I. Gen. Laws §§ 6-13.1-1, *et seq.*

*Against All Defendants*

1873.   Plaintiffs repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1874.   The Rhode Island Deceptive Trade Practices Act prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. R.I. Gen. Laws § 6-13.1-2.

1875.   Defendants are "[p]erson[s]," as defined by R.I. Gen. Laws § 6-13.1-1(3).

1876.   Defendants have engaged in "[t]rade and commerce," as defined by R.I. Gen. Laws § 6-13.1-1(5).

1877.   GM, LexisNexis, and Verisk engaged in unfair or deceptive acts or practices, misrepresentations, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of the goods and services

purchased by Plaintiffs and the Rhode Island Subclass Members in violation of R.I. Gen. Laws § 6-13.1-1(6)(i), (ii), (iii), (v), (vii), (ix), (xii), (xiii), (xiv), (xvii), including:

a. Intercepting, collecting, using, and selling Plaintiffs' and Rhode Island Subclass Members' Driving Data without obtaining their consent;

b. Omitting, suppressing, and concealing the material fact that GM was intercepting, collecting, using, and selling Plaintiffs' and Rhode Island Subclass Members' Driving Data to LexisNexis, Verisk, and other third parties for GM's own financial and commercial benefit;

c. Omitting, suppressing, and concealing the material fact that LexisNexis, Verisk, and other third parties collected, manipulated, used, and sold Plaintiffs' and Rhode Island Subclass Members' Driving Data for their own financial and commercial benefit;

d. Omitting, suppressing, and concealing material facts regarding the functionality of OnStar with respect to the privacy of consumers in their own vehicles;

e. Misrepresenting the purpose of OnStar and that it would protect the privacy of Plaintiffs' and the Rhode Island Subclass Members' Driving Data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f. Failing to comply with common law and/or statutory duties pertaining to the privacy of Plaintiffs' and Rhode Island Subclass Members' Driving Data.

1878. GM acted intentionally, knowingly, and maliciously to violate the Act, and recklessly disregarded Plaintiffs' and Rhode Island Subclass Members' rights, because GM intentionally intercepted, collected, used, and sold Plaintiff's and Rhode Island Subclass Members' Driving Data without obtaining their consent.

1879. The fact that GM intercepted, collected, used, and sold Plaintiffs' and Rhode Island Subclass Members' Driving Data was material to Plaintiffs and Rhode Island Subclass Members. This is a fact that reasonable consumers would consider important when choosing to purchase or lease a vehicle.

1880. Plaintiffs and Rhode Island Subclass Members were deceived and/or could reasonably be expected to be deceived by GM's material misrepresentations and omissions regarding the functionality of OnStar, the security and privacy of their Driving Data, and their privacy in their own vehicles to their detriment.

1881. GM intended to mislead Plaintiffs and Rhode Island Subclass Members and induce them to rely on their misrepresentations and omissions.

1882. GM benefited from misleading Plaintiffs and Rhode Island Subclass members as it obtained a profit from the collection of Driving Data.

1883. The foregoing unlawful and deceptive acts and practices were immoral, unethical, oppressive, and unscrupulous.

1884. Defendants' unfair or deceptive acts directly and proximately caused Plaintiffs and Rhode Island Subclass Members to suffer damages including, but not limited to: loss of privacy; unauthorized dissemination of their valuable Driving Data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their Driving Data; and economic harm stemming from the exploitation of their Driving Data.

1885. Plaintiffs and Rhode Island Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages or five hundred dollars ($500), whichever is greater, restitution, injunctive relief, and attorneys' fees and costs.

## CLAIMS ON BEHALF OF THE SOUTH CAROLINA SUBCLASS

## COUNT 58

### UNFAIR TRADE PRACTICES ACT
### S.C. Code §§ 39-5-10, *et seq*.

*Against all Defendants*

1886. The South Carolina Plaintiff identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the South Carolina Subclass, repeats and realleges Paragraphs 1-973, as if fully alleged herein.

1887. The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") makes unlawful unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. S.C. Code § 39-5-10(a).

1888. GM, LexisNexis, and Verisk are each a "person" as defined by S.C. Code § 39-5-10(a), which includes corporations, trusts, partnerships, incorporated or unincorporated associations and any other legal entity.

1889. GM, LexisNexis, and Verisk each engage in "trade" or "commerce" as defined by S.C. Code § 39-5-10(b), which includes the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of South Carolina.

1890. The South Carolina UTPA is guided by the interpretations given by the Federal Trade Commission and the Federal Courts to Section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)).

1891. Pursuant to 15 U.S.C. 45(n), an act or practice is "unfair" if it "causes or is likely to cause substantial injury to consumers which is not reasonably

avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. Sec. 45(n).

1892. By surreptitiously collecting Plaintiff's and South Carolina Subclass Members' Driving Data, and exploiting that data for their own commercial gain, Defendants have engaged in unfair practices.

1893. Plaintiff and South Carolina Subclass Members could not have reasonably avoided Defendants' practices as described herein because Defendants concealed their practices and because they need to travel in their vehicles.

1894. Plaintiff and South Carolina Subclass Members have derived no benefit from Defendants' surreptitious collection and exploitation of their private information, and there are no countervailing benefits to consumers or to competition in engaging in the unauthorized tracking and sale of consumer data.

1895. Plaintiff and South Carolina Subclass Members have been substantially injured by the practices described herein because their rights to privacy have been violated, and because they have experienced economic loss.

1896. As a direct and proximate result of Defendants' unfair practices, Plaintiff and South Carolina Subclass Members have suffered and will continue to suffer injury, losses, and damages, including, but not limited to: loss of privacy; unauthorized dissemination of their valuable Driving Data; damage to and diminution of the value of their personal information; the likelihood of future misuse

of their Driving Data; and economic harm stemming from the exploitation of their Driving Data.

1897. In violating Plaintiff's and South Carolina Subclass Members' rights under the South Carolina UTPA as described herein, Defendants acted intentionally, knowingly, and/or with reckless disregard of the rights of Plaintiff and South Carolina Subclass Members.

1898. Plaintiff and South Carolina Subclass Members seek all monetary and non-monetary relief allowed by law, including equitable relief, actual damages, treble damages, punitive damages, and reasonable attorneys' fees and costs.

## CLAIMS ON BEHALF OF THE SOUTH DAKOTA SUBCLASS

## COUNT 59

## DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION LAW
### S.D. Codified Laws §§ 37-24-1 *et seq.*

*Against GM*

1899. The South Dakota Plaintiff identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the South Dakota Subclass, repeats and realleges Paragraphs 1-973, as if fully alleged herein.

1900. GM is a "person" as defined by S.D. Codified L. § 37-24-1(8), which includes corporations, trusts, partnerships, incorporated or unincorporated associations and any other legal entity.

1901. GM engaged in "trade" or "commerce" as defined by 37-24-1(13), which includes the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of South Dakota.

1902. Under the South Dakota Deceptive Trade Practices and Consumer Protection Law ("South Dakota DCTPC"), it is a deceptive act or practice to "[k]nowingly act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby. S.D. Codified L. §§ 37-24-6(1).

1903. GM engaged in deceptive trade practices in violation of S.D. Codified L. §§ 37-24-6(1) by:

> a. Intercepting, collecting, using, and selling Plaintiff's and South Dakota Subclass Members' Driving Data without obtaining their consent;

> b. Omitting, suppressing, and concealing the material fact that GM was intercepting, collecting, using, and selling Plaintiff's and South Dakota Subclass Members' Driving Data to LexisNexis,

Verisk, and other third parties for GM's own financial and commercial benefit;

c. Omitting, suppressing, and concealing the material fact that LexisNexis, Verisk, and other third parties collected, manipulated, used, and sold Plaintiff's and South Dakota Subclass Members' Driving Data for their own financial and commercial benefit;

d. Omitting, suppressing, and concealing material facts regarding the functionality of OnStar with respect to the privacy of consumers in their own vehicles;

e. Misrepresenting the purpose of OnStar and that it would protect the privacy of Plaintiff's and the South Dakota Subclass Members' Driving Data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f. Failing to comply with common law and/or statutory duties pertaining to the privacy of Plaintiff's and South Dakota Subclass Members' Driving Data.

1904. GM acted intentionally, knowingly, and maliciously to violate the Act, and recklessly disregarded Plaintiff's and South Dakota Subclass Members' rights,

because GM intentionally intercepted, collected, used, and sold Plaintiff's and South Dakota Subclass Members' Driving Data without obtaining their consent.

1905. The fact that GM intercepted, collected, used, and sold Plaintiff's and South Dakota Subclass Members' Driving Data was material to Plaintiff and South Dakota Subclass Members. This is a fact that reasonable consumers would consider important when choosing to purchase or lease a vehicle.

1906. Plaintiff and South Dakota Subclass Members were deceived and/or could reasonably be expected to be deceived by GM's material misrepresentations and omissions regarding the functionality of OnStar, the security and privacy of their Driving Data, and their privacy in their own vehicles to their detriment.

1907. Plaintiff and South Dakota Subclass Members could not have reasonably avoided GM's practices as described herein because GM concealed their practices and because they need to travel in their vehicles.

1908. Plaintiff and South Dakota Subclass Members have derived no benefit from GM's surreptitious collection and exploitation of their private information, and there are no countervailing benefits to consumers or to competition in engaging in the unauthorized tracking and sale of consumer data.

1909. Plaintiff and South Dakota Subclass Members have been substantially injured by the practices described herein because their rights to privacy have been

violated, and because substantial numbers of consumers have experienced economic loss.

1910. As a direct and proximate result of GM's deceptive practices, Plaintiff and South Dakota Subclass Members have suffered and will continue to suffer injury, losses, and damages, including, but not limited to: loss of privacy; unauthorized dissemination of their valuable Driving Data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their Driving Data; and economic harm stemming from the exploitation of their Driving Data.

1911. In violating Plaintiff's and South Dakota Subclass Members' rights under the South Dakota DTPC as described herein, GM acted intentionally, knowingly, and/or with reckless disregard of the rights of Plaintiff and South Dakota Subclass Members.

1912. Plaintiff and South Dakota Subclass Members seek all monetary and non-monetary relief allowed by law, including equitable relief, actual damages pursuant to S.D. Codified L. § 37-24-31, treble damages, punitive damages, and reasonable attorneys' fees and costs.

## CLAIMS ON BEHALF OF THE TEXAS SUBCLASS
## COUNT 60

# TEXAS DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT
## Tex. Bus. & Com. Code §§ 17.41

*Against GM*

1913. The Texas Plaintiff identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Texas Subclass, repeats and realleges Paragraphs 1-973, as if fully alleged herein.

1914. The Texas Trade Practices-Consumer Protection Act ("Texas TPCPA") "shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty and to provide efficient and economical procedures to secure such protection." Tex. Bus. & Com. Code § 17.44(a).

1915. GM is a "person" as defined by 73 Pa. Stat. § 201-2(2), which includes partnership, corporation, association, or other group, however organized.

1916. GM engages in "trade" or "commerce" as defined by Tex. Bus. & Com. Code § 17.45(6), which includes advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and includes any trade or commerce directly or indirectly affecting the people of Texas.

1917. GM engaged in unfair and deceptive trade practices by representing to Plaintiff and Texas Subclass Members that their data would be kept secure and that data would not shared, when in fact GM regularly and collected detailed Driving Data regarding their use of the vehicle.

1918. GM further engaged in deceptive and unfair trade practices by failing to disclose to and concealing from Plaintiff and Texas Subclass Members that their detailed Driving Data was being collected and sold to LexisNexis and Verisk, who then used the data to make products and profit.

1919. These deceptive statements, misrepresentations, and omissions, and concealments constitute violations of Tex. Bus. & Com. Code § 17.46(b).

1920. GM violated Tex. Bus. & Com. Code § 17.46(b)(5), (9), and (20) and (24) by:

a. Omitting, suppressing, and concealing the material fact that GM was intercepting, collecting, using, and selling Plaintiff's and Texas Subclass Members' Driving Data to LexisNexis, Verisk, and other third parties for GM's own financial and commercial benefit;

b. Omitting, suppressing, and concealing the material fact that LexisNexis, Verisk, and other third parties collected, manipulated, used, and sold Plaintiff's and Texas Subclass

Members' Driving Data for their own financial and commercial benefit;

c. Omitting, suppressing, and concealing material facts regarding the functionality of OnStar with respect to the privacy of consumers in their own vehicles; and

d. Misrepresenting the purpose of OnStar and that it would protect the privacy of Plaintiff's and Texas Subclass Members' Driving Data, including that it would not intercept, collect, use, or sell such data without consumers' express consent.

1921. Plaintiff and Texas Subclass Members were deceived and/or could reasonably be expected to be deceived by GM's material misrepresentations and omissions regarding the functionality of OnStar, the security and privacy of their Driving Data, and their privacy in their own vehicles to their detriment.

1922. Further, GM violated Tex. Bus. & Com. Code § 17.46(b)(2) and (3) by causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval, certification, affiliation, connection, or association with Plaintiff's and Texas Subclass Members' Driving Data, namely that the collection and sale of such data was not authorized or consented-to by them, and therefore unlawfully obtained.

1923. In engaging in the above-described practices, GM acted intentionally and with flagrant disregard of prudent and fair business practices to the extent that

GM should be treated as having acted intentionally. Tex. Bus. & Com. Code § 17.45(13).

1924. Plaintiff and Texas Subclass Members have been substantially injured by the practices described herein because their rights to privacy have been violated, and because substantial numbers of them have experienced economic loss.

1925. As a direct and proximate result of GM's deceptive practices, Plaintiff and Texas Subclass Members have suffered and will continue to suffer injury, losses, and damages, including but not limited to: loss of privacy; unauthorized dissemination of their valuable Driving Data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their Driving Data; and economic harm stemming from the exploitation of their Driving Data.

1926. Plaintiff and Texas Subclass Members seek all monetary and non-monetary relief allowed by law, including equitable relief, actual damages, punitive damages, and reasonable attorneys' fees and costs.

## CLAIMS ON BEHALF OF THE UTAH SUBCLASS

## COUNT 61

### UTAH TRUTH IN ADVERTISING ACT
### Utah Code Ann. §§ 13.11a-1, *et seq.*

*Against GM*

1927. Plaintiffs repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1928. The Utah Truth in Advertising Act prohibits "deceptive, misleading, and false advertising practices and forms in Utah." Utah Code Ann. § 13.11a-1.

1929. GM is a "person" as defined by Utah Code Ann. § 13.11a-2(7).

1930. GM engaged in the complained-of conduct in connection with "sales transaction[s]," as defined by Utah Code Ann. § 13.11a-2(15).

1931. GM engaged in deceptive acts or practices, misrepresentations, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of the goods and services purchased by Plaintiffs and the Utah Subclass Members in violation of Utah Code Ann. § 13.11a-2(e), (g), and (i), including by:

    a. Intercepting, collecting, using, and selling Plaintiffs' and Utah Subclass Members' Driving Data without obtaining their consent;

    b. Omitting, suppressing, and concealing the material fact that GM was intercepting, collecting, using, and selling Plaintiffs' and Utah Subclass Members' Driving Data to LexisNexis, Verisk, and other third parties for GM's own financial and commercial benefit;

    c. Omitting, suppressing, and concealing the material fact that LexisNexis, Verisk, and other third parties collected,

manipulated, used, and sold Plaintiffs' and Utah Subclass Members' Driving Data for their own financial and commercial benefit;

d. Omitting, suppressing, and concealing material facts regarding the functionality of OnStar with respect to the privacy of consumers in their own vehicles;

e. Misrepresenting the purpose of OnStar and that it would protect the privacy of Plaintiffs' and the Utah Subclass Members' Driving Data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f. Failing to comply with common law and/or statutory duties pertaining to the privacy of Plaintiffs' and Utah Subclass Members' Driving Data.

1932. GM acted intentionally, knowingly, and maliciously to violate the Act, and recklessly disregarded Plaintiffs' and Utah Subclass Members' rights, because GM intentionally intercepted, collected, used, and sold Plaintiff's and Utah Subclass Members' Driving Data without obtaining their consent.

1933. The fact that GM intercepted, collected, used, and sold Plaintiffs' and Utah Subclass Members' Driving Data was material to Plaintiffs and Utah Subclass

Members. This is a fact that reasonable consumers would consider important when choosing to purchase or lease a vehicle.

1934. Plaintiffs and Utah Subclass Members were deceived and/or could reasonably be expected to be deceived by GM's material misrepresentations and omissions regarding the functionality of OnStar, the security and privacy of their Driving Data, and their privacy in their own vehicles to their detriment.

1935. GM intended to mislead Plaintiffs and Utah Subclass Members and induce them to rely on their misrepresentations and omissions.

1936. GM benefited from misleading Plaintiff and Utah Subclass Members as it obtained a profit from the collection of Driving Data.

1937. The foregoing unlawful and deceptive acts and practices were immoral, unethical, oppressive, and unscrupulous.

1938. GM's deceptive acts directly and proximately caused Plaintiffs and Utah Subclass Members to suffer damages including, but not limited to: loss of privacy; unauthorized dissemination of their valuable Driving Data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their Driving Data; and economic harm stemming from the exploitation of their Driving Data.

1939. Plaintiffs and Utah Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages sustained or $2,000, whichever is greater, restitution, injunctive relief, and attorneys' fees and costs.

## CLAIMS ON BEHALF OF THE VERMONT SUBCLASS

## COUNT 62

### VERMONT CONSUMER PROTECTION ACT
### Vt. Stat. Ann. Tit. 9 §§ 2451, *et seq.*

*Against GM*

1940. Plaintiffs repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1941. The purpose of the Vermont Consumer Protection Act is to "to complement the enforcement of federal statutes and decisions governing unfair methods of competition, unfair or deceptive acts or practices, and anti-competitive practices in order to protect the public and to encourage fair and honest competition." Vt. Stat. Ann. tit. 9, §§ 2451.

1942. Plaintiffs and Vermont Subclass Members are "[c]onsumer[s]," as defined by Vt. Stat. Ann. tit. 9, § 2451a(1).

1943. GM is a "seller" as defined by Vt. Stat. Ann. tit. 9, § 2451a(3).

1944. GM has advertised, offered, or sold goods or services in Vermont and engaged in trade or commerce directly or indirectly affecting the people of Vermont, as defined by Vt. Stat. Ann. tit. 9, § 2451a(3).

1945.	GM engaged in unfair or deceptive acts or practices, misrepresentations, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of the goods and services purchased by Plaintiffs and the Vermont Subclass Members in violation of Vt. Stat. Ann. tit. 9, § 2453, including:

a.	Intercepting, collecting, using, and selling Plaintiffs' and Vermont Subclass Members' Driving Data without obtaining their consent;

b.	Omitting, suppressing, and concealing the material fact that GM was intercepting, collecting, using, and selling Plaintiffs' and Vermont Subclass Members' Driving Data to LexisNexis, Verisk, and other third parties for GM's own financial and commercial benefit;

c.	Omitting, suppressing, and concealing the material fact that LexisNexis, Verisk, and other third parties collected, manipulated, used, and sold Plaintiffs' and Vermont Subclass Members' Driving Data for their own financial and commercial benefit;

d. Omitting, suppressing, and concealing material facts regarding the functionality of OnStar with respect to the privacy of consumers in their own vehicles;

e. Misrepresenting the purpose of OnStar and that it would protect the privacy of Plaintiffs' and the Vermont Subclass Members' Driving Data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f. Failing to comply with common law and/or statutory duties pertaining to the privacy of Plaintiffs' and Vermont Subclass Members' Driving Data.

1946. GM acted intentionally, knowingly, and maliciously to violate the Act, and recklessly disregarded Plaintiffs' and Vermont Subclass Members' rights, because GM intentionally intercepted, collected, used, and sold Plaintiff's and Vermont Subclass Members' Driving Data without obtaining their consent.

1947. The fact that GM intercepted, collected, used, and sold Plaintiffs' and Vermont Subclass Members' Driving Data was material to Plaintiffs and Vermont Subclass Members. This is a fact that reasonable consumers would consider important when choosing to purchase or lease a vehicle.

1948. Plaintiffs and Vermont Subclass Members were deceived and/or could reasonably be expected to be deceived by GM's material misrepresentations and

omissions regarding the functionality of OnStar, the security and privacy of their Driving Data, and their privacy in their own vehicles to their detriment.

1949. GM intended to mislead Plaintiffs and Vermont Subclass Members and induce them to rely on their misrepresentations and omissions.

1950. GM benefited from misleading Plaintiffs and Vermont Subclass Members as it obtained a profit from the collection of Driving Data.

1951. The foregoing unlawful and deceptive acts and practices were immoral, unethical, oppressive, and unscrupulous.

1952. GM's unfair or deceptive acts directly and proximately caused Plaintiffs and Vermont Subclass Members to suffer damages including, but not limited to: loss of privacy; unauthorized dissemination of their valuable Driving Data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their Driving Data; and economic harm stemming from the exploitation of their Driving Data.

1953. Plaintiffs and Vermont Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages or the consideration or the value of the consideration given, exemplary damages of up to three times the value of the consideration given, restitution, injunctive relief, and attorneys' fees and costs.

# CLAIMS ON BEHALF OF THE VIRGINIA SUBCLASS

## COUNT 63

### VIRGINIA CONSUMER PROTECTION ACT
### Va. Code Ann. §§ 59.1-196, *et seq.*

*Against GM*

1954. Plaintiffs repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1955. The Virginia Consumer Protection Act prohibits "[u]sing any . . . deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction." Va. Code Ann. § 59.1-200(14).

1956. GM is a "person" as defined by Va. Code Ann. § 59.1-198.

1957. GM is a "supplier," as defined by Va. Code Ann. § 59.1-198.

1958. GM engaged in the complained-of conduct in connection with "consumer transactions" with regard to "goods" and "services," as defined by Va. Code Ann. § 59.1-198. GM and OnStar advertised, offered, or sold goods or services used primarily for personal, family or household purposes.

1959. GM engaged in unfair or deceptive acts or practices, misrepresentations, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of the goods and services purchased by Plaintiffs and the Virginia Subclass Members in violation of the Virginia Consumer

Protection Act, including Va. Code Ann. §§ 59.1-200(5), (6), (8), and (14), including by:

a. Intercepting, collecting, using, and selling Plaintiffs' and Virginia Subclass Members' Driving Data without obtaining their consent;

b. Omitting, suppressing, and concealing the material fact that GM was intercepting, collecting, using, and selling Plaintiffs' and Virginia Subclass Members' Driving Data to LexisNexis, Verisk, and other third parties for GM's own financial and commercial benefit;

c. Omitting, suppressing, and concealing the material fact that LexisNexis, Verisk, and other third parties collected, manipulated, used, and sold Plaintiffs' and Virginia Subclass Members' Driving Data for their own financial and commercial benefit;

d. Omitting, suppressing, and concealing material facts regarding the functionality of OnStar with respect to the privacy of consumers in their own vehicles;

e. Misrepresenting the purpose of OnStar and that it would protect the privacy of Plaintiffs' and the Virginia Subclass Members'

Driving Data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f. Failing to comply with common law and/or statutory duties pertaining to the privacy of Plaintiffs' and Virginia Subclass Members' Driving Data.

1960. GM acted intentionally, knowingly, and maliciously to violate the Act, and recklessly disregarded Plaintiffs' and Virginia Subclass Members' rights, because GM intentionally intercepted, collected, used, and sold Plaintiff's and Virginia Subclass Members' Driving Data without obtaining their consent.

1961. The fact that GM intercepted, collected, used, and sold Plaintiffs' and Virginia Subclass Members' Driving Data was material to Plaintiffs and Virginia Subclass Members. This is a fact that reasonable consumers would consider important when choosing to purchase or lease a vehicle.

1962. Plaintiffs and Virginia Subclass Members were deceived and/or could reasonably be expected to be deceived by GM's material misrepresentations and omissions regarding the functionality of OnStar, the security and privacy of their Driving Data, and their privacy in their own vehicles to their detriment.

1963. GM intended to mislead Plaintiffs and Virginia Subclass Members and induce them to rely on their misrepresentations and omissions.

1964. GM benefited from misleading Plaintiffs and Virginia Subclass Members as it obtained a profit from the collection of Driving Data.

1965. The foregoing unlawful and deceptive acts and practices were immoral, unethical, oppressive, and unscrupulous.

1966. GM's unfair or deceptive acts directly and proximately caused Plaintiffs and Virginia Subclass Members to suffer damages including, but not limited to: loss of privacy; unauthorized dissemination of their valuable Driving Data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their Driving Data; and economic harm stemming from the exploitation of their Driving Data.

1967. Plaintiffs and Virginia Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages in the amount of $1,000 per violation if the conduct is found to be willful (or in the alternative, $500 per violation), restitution, injunctive relief, punitive damages, and attorneys' fees and costs.

## CLAIMS ON BEHALF OF THE WASHINGTON SUBCLASS

## COUNT 64

### WASHINGTON CONSUMER PROTECTION ACT
### Wash. Rev. Code §§ 19.86.010, *et seq.*

*Against GM*

1968. The Washington Plaintiff identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Washington Subclass, repeats and realleges Paragraphs 1-973, as if fully alleged herein.

1969. The Washington Consumer Protection Act ("Washington CPA") declares that unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful. Wash. Rev. Code § 19.86.020.

1970. GM is each a "person" as defined by Wash. Rev. Code § 19.86.010(1), which includes corporations, trusts, unincorporated associations and partnerships.

1971. GM engages in "trade" or "commerce" as defined by Wash. Rev. Code § 19.86.010(2), which includes the sale of assets or services, and any commerce directly or indirectly affecting the people of the state of Washington. GM has engaged in unfair practices by:

    a. Intercepting, collecting, using, and selling Plaintiff's and Washington Subclass Members' Driving Data without obtaining their consent;

    b. Omitting, suppressing, and concealing the material fact that GM was intercepting, collecting, using, and selling Plaintiff's and Washington Subclass Members' Driving Data to LexisNexis, Verisk, and other third parties for GM's own financial and commercial benefit;

c.  Omitting, suppressing, and concealing the material fact that LexisNexis, Verisk, and other third parties collected, manipulated, used, and sold Plaintiff's and Washington Subclass Members' Driving Data for their own financial and commercial benefit;

d.  Omitting, suppressing, and concealing material facts regarding the functionality of OnStar with respect to the privacy of consumers in their own vehicles;

e.  Misrepresenting the purpose of OnStar and that it would protect the privacy of Plaintiff's and the Washington Subclass Members' Driving Data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f.  Failing to comply with common law and/or statutory duties pertaining to the privacy of Plaintiff's and Washington Subclass Members' Driving Data.

1972.  GM acted intentionally, knowingly, and maliciously to violate the Act, and recklessly disregarded Plaintiff's and Washington Subclass Members' rights, because GM intentionally intercepted, collected, used, and sold Plaintiff's and Washington Subclass Members' Driving Data without obtaining their consent.

1973. The fact that GM intercepted, collected, used, and sold Plaintiff's and Washington Subclass Members' Driving Data was material to Plaintiff and Washington Subclass Members. This is a fact that reasonable consumers would consider important when choosing to purchase or lease a vehicle.

1974. Plaintiff and Washington Subclass Members were deceived and/or could reasonably be expected to be deceived by GM's material misrepresentations and omissions regarding the functionality of OnStar, the security and privacy of their Driving Data, and their privacy in their own vehicles to their detriment.

1975. Plaintiff and Washington Subclass Members could not have reasonably avoided GM's practices as described herein because GM concealed their practices and because they need to travel in their vehicles.

1976. Plaintiff and Washington Subclass Members have derived no benefit from GM's surreptitious collection and exploitation of their private information, and there are no countervailing benefits to them or to competition in engaging in the unauthorized tracking and sale of consumer data.

1977. Plaintiff and Washington Subclass Members have been substantially injured by the practices described herein because their rights to privacy have been violated, and because substantial numbers of them have experienced economic loss. As such, GM's deceptive and unfair acts and practices affect the public interest as they have had the capacity to injure and have injured other persons.

1978. As a direct and proximate result of GM's unfair practices, Plaintiff and Washington Subclass Members have suffered and will continue to suffer injury, losses, and damages, but not limited to: loss of privacy; unauthorized dissemination of their valuable Driving Data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their Driving Data; and economic harm stemming from the exploitation of their Driving Data.

1979. Plaintiff and Washington Subclass Members seek all monetary and non-monetary relief allowed by law, including equitable relief, actual damages, treble damages, civil penalties of up to $7,500 for each violation pursuant to Wash. Rev. Code § 19.86.140, punitive damages, and reasonable attorneys' fees and costs.

## CLAIMS ON BEHALF OF THE WEST VIRGINIA SUBCLASS

## COUNT 65

### WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT
### W. Va. Code Ann. §§ 46A-6-101, *et seq.*

*Against GM*

1980. Plaintiffs repeat and reallege Paragraphs 1-973, as if fully alleged herein.

1981. The West Virginia Consumer Credit and Protection Act prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. W. Va. Code. Ann. §46-A-104.

1982. Plaintiffs and West Virginia Subclass Members are "consumers" as defined by W. Va. Code Ann. § 46A-6-102(2).

1983. GM has engaged in "consumer transactions," as defined by W. Va. Code Ann. § 46A-6-102(2).

1984. GM has advertised, offered, or sold goods or services in West Virginia and engaged in trade or commerce directly or indirectly affecting the people of West Virginia, as defined by W. Va. Code Ann. § 46A-6-102(6).

1985. GM engaged in unfair or deceptive acts or practices, misrepresentations, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of the goods and services purchased by Plaintiffs and the West Virginia Subclass Members in violation of W. Va. Code Ann. § 46-A-104 and § 46-A-102(7)(E), (G), (I), (L), and (M), including:

a. Intercepting, collecting, using, and selling Plaintiffs' and West Virginia Subclass Members' Driving Data without obtaining their consent;

b. Omitting, suppressing, and concealing the material fact that GM was intercepting, collecting, using, and selling Plaintiffs' and West Virginia Subclass Members' Driving Data to LexisNexis, Verisk, and other third parties for GM's own financial and commercial benefit;

c. Omitting, suppressing, and concealing the material fact that LexisNexis, Verisk, and other third parties collected, manipulated, used, and sold Plaintiffs' and West Virginia Subclass Members' Driving Data for their own financial and commercial benefit;

d. Omitting, suppressing, and concealing material facts regarding the functionality of OnStar with respect to the privacy of consumers in their own vehicles;

e. Misrepresenting the purpose of OnStar and that it would protect the privacy of Plaintiffs' and the West Virginia Subclass Members' Driving Data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f. Failing to comply with common law and/or statutory duties pertaining to the privacy of Plaintiffs' and West Virginia Subclass Members' Driving Data.

1986. GM acted intentionally, knowingly, and maliciously to violate the Act, and recklessly disregarded Plaintiffs' and West Virginia Subclass Members' rights, because GM intentionally intercepted, collected, used, and sold Plaintiff's and West Virginia Subclass Members' Driving Data without obtaining their consent.

1987. The fact that GM intercepted, collected, used, and sold Plaintiffs' and West Virginia Subclass Members' Driving Data was material to Plaintiffs and West Virginia Subclass Members. This is a fact that reasonable consumers would consider important when choosing to purchase or lease a vehicle.

1988. Plaintiffs and West Virginia Subclass Members were deceived and/or could reasonably be expected to be deceived by GM's material misrepresentations and omissions regarding the functionality of OnStar, the security and privacy of their Driving Data, and their privacy in their own vehicles to their detriment.

1989. GM intended to mislead Plaintiffs and West Virginia Subclass Members and induce them to rely on their misrepresentations and omissions.

1990. GM benefited from misleading Plaintiffs and West Virginia Subclass Members as it obtained a profit from the collection of Driving Data.

1991. The foregoing unlawful and deceptive acts and practices were immoral, unethical, oppressive, and unscrupulous.

1992. GM's unfair or deceptive acts directly and proximately caused Plaintiffs and West Virginia Subclass Members to suffer damages including, but not limited to: loss of privacy; unauthorized dissemination of their valuable Driving Data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their Driving Data; and economic harm stemming from the exploitation of their Driving Data.

1993. Plaintiffs and West Virginia Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages in the amount of $200 per violation, restitution, injunctive relief, punitive damages, and attorneys' fees and costs.

## REQUEST FOR RELIEF

Plaintiffs, individually and on behalf of members of the Class and Subclasses, as applicable, respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

1.     That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiffs are proper class representatives; and appoint Plaintiffs' Counsel as Class Counsel;

2.     That the Court grant permanent injunctive relief to prohibit Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein;

3.     That the Court award Plaintiffs and Class and Subclass Members compensatory, consequential, and general damages in an amount to be determined at trial;

4.     That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of their unlawful acts, omissions, and practices;

5.     That the Court award statutory damages, trebled, and punitive or exemplary damages, to the extent permitted by law;

6.     That Plaintiffs be granted the declaratory relief sought herein;

7.     That the Court award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

8.     That the Court allow as part of damages and award to Plaintiffs their expenses of litigation and attorneys' fees pursuant to O.C.G.A. § 13-6-11;

9.     That the Court award pre- and post-judgment interest at the maximum legal rate; and

10.    That the Court grant all such other relief as it deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial on all claims so triable.

Date: December 13, 2024                    Respectfully submitted,

/s/ John R. Bevis
John R. Bevis
**THE BARNES LAW GROUP, LLC**
31 Atlanta Street
Marietta, Georgia 30060
Tel: (770) 227-6375
bevis@barneslawgroup.com

/s/ Norman E. Siegel
Norman E. Siegel, MO Bar No. 44378
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Tel: (816) 714-7100
siegel@stuevesiegel.com

### *MDL Co-Lead Counsel*

Bryan L. Clobes
**CAFFERTY CLOBES
MERIWETHER & SPRENGEL
LLP**
135 S. LaSalle St., Suite 3210
Chicago, Illinois 60603
Tel: (312) 782-4880
bclobes@caffertyclobes.com

Amy Keller
**DICELLO LEVITT LLP**
Ten North Dearborn Street
Sixth Floor
Chicago, Illinois 60602
Tel: (312) 214-7900
akeller@dicellolevitt.com

### *OnStar Track Co-Lead Counsel*

Joseph P. Guglielmo
**SCOTT+SCOTT ATTORNEYS AT
LAW LLP**
230 Park Avenue, 17th Floor
New York, New York 10169
Tel: (212) 223-4478
jguglielmo@scott-scott.com

Sabita J. Soneji
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, California 94612
Tel: (510) 254-6808
ssoneji@tzlegal.com

### *LexisNexis/Verisk Track Co-Lead Counsel*

Kiley L. Grombacher
**BRADLEY/GROMBACHER LLP**
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Tel: (805) 270-7100
Kgrombacher@bradleygrombacher.com

Emily E. Hughes
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Suite 300
Rochester, Michigan 48307
Tel: (248) 841-2200
eeh@millerlawpc.com

P. Graham Maiden
**MOTLEY RICE LLC**
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9670
gmaiden@motleyrice.com

Thomas E. Loeser
**COTCHETT, PITRE &
MCCARTHY LLP**
999 N. Northlake Way, Suite 215
Seattle, WA 98103
Tel: (206) 802-1272
tloeser@cpmlegal.com

Adam E. Polk
**GIRARD SHARP LLP**
601 California St., Suite 1400
San Francisco, California 94108
Tel: (415) 981-4800
apolk@girardsharp.com

John A. Yanchunis
**MORGAN & MORGAN
COMPLEX LITIGATION GROUP**
201 North Franklin Street, 7th Floor
Tampa, Florida 33602
Tel: (813) 223-5505
jyanchunis@forthepeople.com

*OnStar Track Steering Committee*

Gayle M. Blatt
**CASEY GERRY SCHENK
FRANCAVILLA BLATT &
PENFIELD, LLP**
110 Laurel Street
San Diego, California 92101
Tel: (619) 238-1811
gmb@cglaw.com

Stuart A. Davidson
**ROBBINS GELLER RUDMAN &
DOWD LLP**
225 NE Mizner Blvd., Suite 720
Boca Raton, Florida 33432
Tel: (561) 750-3000
sdavidson@rgrdlaw.com

Jennifer M. French
**LYNCH CARPENTER, LLP**
1234 Camino Del Mar
Del Mar, California 92014
Tel: (619) 762-1903
jennf@lcllp.com

Gary S. Graifman
**KANTROWITZ, GOLDHAMER &
GRAIFMAN, P.C.**
135 Chestnut Ridge Rd., Suite 200
Montvale, New Jersey 07645
Tel: (201) 391-7000
ggraifman@kgglaw.com

Jeffrey M. Ostrow
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Blvd., Suite 500

Chris Springer
**KELLER ROHRBACK LLP**
801 Garden Street, Suite 301

Fort Lauderdale, Florida 33301
Tel: (954) 332-4200
ostrow@kolawyers.com

Santa Barbara, California 93101
Tel: (805) 456-1496
cspringer@kellerrohrback.com

### *LexisNexis/Verisk Track Steering Committee*

M. Brandon Smith
**CHILDERS, SCHLUETER & SMITH LLC**
1932 N. Druid Hills Road, Suite 100
Atlanta, Georgia 30319
Tel: (404) 419-9500
bsmith@cssfirm.com

### *Plaintiffs' Liaison Counsel*

## LOCAL RULE 7.1 CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing pleading filed with the Clerk of Court has been prepared in 14-point Times New Roman font in accordance with Local Rule 5.1(C).

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was filed with this Court via its CM/ECF service, which will send email notification of such filing to all counsel of record this 13th day of December, 2024.

*/s/ John R. Bevis*
John R. Bevis
Georgia Bar No. 056110
**THE BARNES LAW GROUP, LLC**
31 Atlanta Street
Marietta, Georgia 30060
Tel: (770) 227-6375
bevis@barneslawgroup.com