# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| In re: Consumer Vehicle Driving Data Tracking Collection | No.:  1:24-md-3115-TWT |

## DEFENDANTS GENERAL MOTORS LLC AND ONSTAR, LLC'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS THE <u>MASTER CONSOLIDATED CLASS ACTION COMPLAINT</u>

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT.................................................................1

FACTUAL BACKGROUND .................................................................3

I.      The Parties .................................................................................3

II.     GM's Provision of OnStar and Smart Driver ............................5

III.    GM's Alleged Collection and Sale of Data ...............................9

IV.     The Master Consolidated Complaint........................................11

LEGAL STANDARD & CHOICE OF LAW .........................................12

I.      Pleading Requirements ............................................................12

II.     Choice of Law..........................................................................13

ARGUMENT ..........................................................................................14

I.      Plaintiffs' Federal Statutory Claims Must Be Dismissed............14

        A.     Plaintiffs Fail to State Wiretap Act Claims. ...............14

               1.     Operating a Vehicle Does Not Create an "Electronic
                      Communication" with "Content."...............................15

                      (a)     Plaintiffs fail to allege an "electronic communication."
                              ............................................................................15

                      (b)     Driving Data lacks "content." .......................17

               2.     Plaintiffs Have Not Identified a Contemporaneous
                      "Interception."..............................................................19

               3.     The FWA's "Party Exception" Applies Because Driving Data
                      Was Sent Directly to GM. .......................................23

               4.     Plaintiffs Fail to Allege the Intent Required to State a Claim
                      Under Sections 2511(1)(c) and (d).............................25

               5.     Plaintiffs' State Analog Claims Should Also Be Dismissed. ....26

        B.     Plaintiffs' Federal and State Stored Communications Act Claims
               Must Be Dismissed.................................................................29

               1.     TCUs and ECUs Are Not "Facilities" Under the SCA.............29

               2.     Driving Data Is Not in "Electronic Storage." .........................31

i

3.    The SCA's Exceptions Apply to GM's Alleged Conduct. ........33

4.    Plaintiffs' Claims Under Analogous State Statutes Fail. ..........35

C.    Plaintiffs' CFAA Claim Must Be Dismissed. ......................................36

1.    GM's Access Was Authorized, or, Alternatively, Was Not Intentionally Unauthorized. ......................................................36

2.    Plaintiffs Do Not Plead Loss Under the CFAA. .....................41

D.    California Plaintiffs' Claim Under the California Computer Data Access and Fraud Act ("CDAFA") Fails for Similar Reasons...........44

II.    Plaintiffs' State Law Claims Must Be Dismissed.........................................44

A.    Plaintiffs' Common Law and State Statutory Claims Are Preempted by the Fair Credit Reporting Act.......................................44

1.    Plaintiffs' Claims Are Expressly Preempted by Section 1681t(b)(1)(F). ...................................................46

2.    Plaintiffs' Claims Are Impliedly Preempted. ...........................49

B.    Plaintiffs Allege Injuries that Are Neither Cognizable nor Caused by GM...........................................................................................51

1.    Plaintiffs Base Claims on Non-Cognizable Injuries. ................52

2.    Plaintiffs Have Not Alleged That GM Proximately Caused Their Economic Injuries. ........................................................55

C.    Plaintiffs' Invasion of Privacy Claim Must Be Dismissed.................57

1.    Choice of Law....................................................................57

2.    Plaintiffs Fail to Allege an Invasion of a Privacy Interest Because Driving Behavior Is Public. ........................................59

3.    Plaintiffs Fail to Allege "Publication" of Private Facts. ..........61

4.    GM's Alleged Conduct Was not "Highly Offensive." .............62

5.    Plaintiffs' Misappropriation of Likeness Claim Fails..............64

6.    Plaintiffs Fail to State a Claim for False Light. ......................65

D.    Plaintiffs' Trespass to Chattels Claim Must Be Dismissed...............66

1.    Plaintiffs Fail to Allege Any Damage to Their "Property." ......67

2.      Plaintiffs' Fail to Allege that GM "interfered" with Their Physical Property Through Dispossession or Intermeddling....68

E.      Plaintiffs' Breach of Contract Claim Must Be Dismissed. .................70

F.      The Unjust Enrichment Claim Must Be Dismissed. ...........................72

III.    Plaintiffs' State Consumer Statute Claims Must Be Dismissed. ...................75

A.      No Private Right of Action Exists As To Certain Claims. .................75

B.      Claims Lacking a Representative Plaintiff Must Be Dismissed. ........75

C.      Plaintiffs Failed to Comply with the Pre-Suit Notice Requirements of Eight State Statutes. ..................................................76

D.      Plaintiffs Fail to Satisfy Federal Rule of Civil Procedure 9(b)...........77

1.      Rule 9(b) Applies to the UDAP Statute Claims.......................77

2.      Plaintiffs Failed to Allege Misstatements, Omissions, Causation, or Reliance with Sufficient Specificity. .................79

E.      Plaintiffs Cannot Maintain Omissions-Based UDAP Claims............82

F.      Plaintiffs Fail to Allege Scienter............................................................84

G.      Plaintiffs' CCPA Claim Must Be Dismissed. ......................................85

CONCLUSION ....................................................................................................85

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abu v. Dickson*,
   107 F.4th 508 (6th Cir. 2024) ..................................................................38, 40

*Ace Tree Surgery, Inc. v. Terex Corp.*,
   2017 WL 1836307 (N.D. Ga. Feb. 21, 2017) ....................................................78

*Acosta v. Scott Lab, LLC*
   377 F. Supp. 2d 647 (N.D. Ill. 2005).................................................................64

*Adams v. Nissan N. Am., Inc.*,
   395 F. Supp. 3d 838 (S.D. Tex. 2018).................................................................84

*Allbright v. Teva Pharms. USA, Inc.*,
   290 F. Supp. 3d 1321 (S.D. Fla. 2017).................................................................12

*Allen v. Brown*,
   320 F. Supp. 3d 16 (D.D.C. 2018).................................................................18

*Allison v. Vintage Sports Plaques*,
   136 F.3d 1443 (11th Cir. 1998) .................................................................64

*Allstate Inc. v. Ginsberg*,
   863 So.2d 156 (Fla. 2003) .................................................................60

*Am. Biomedical Grp., Inc. v. Techtrol, Inc.*,
   374 P.3d 820 (Okla. 2016).................................................................64

*Amerair Indus. of Delaware, LLC v. Indus. Accessories Co.*,
   2022 WL 1399535 (N.D. Ga. Mar. 30, 2022) ....................................................43

*Andrews v. Sirius XM Radio Inc.*,
   932 F.3d 1253 (9th Cir. 2019) ...................................................41, 42, 43, 44

*In re App. for Pen Register & Trap/Trace Device with Cell Site
   Location Auth.*,
   396 F. Supp. 2d 747 (S.D. Tex. 2005)...........................................................16, 24

*In re App. of U.S. for an Order Authorizing Disclosure of Location*
    *Info. of a Specified Wireless Tel.*,
    849 F. Supp. 2d 526 (D. Md. 2011) .................................................................16

*Armijo v. Yakima HMA, LLC*,
    2012 WL 2576624 (E.D. Wash. Jul. 3, 2012) ...................................................63

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).........................................................................................12

*Ass'n Servs., Inc. v. Smith*,
    549 S.E.2d 454 (Ga. App. 2001) ......................................................................63

*Auto. Assurance Grp. v. Giddens*,
    2022 WL 18460629 (N.D. Ga. Sept. 20, 2022).................................................37

*Baatz v. Mohawk ESV, Inc.*,
    2021 WL 2449856 (N.D. Ga. Apr. 22, 2021).....................................................62

*Baker v. Akumin Corp.*,
    2024 WL 1931480 (S.D. Fla. Apr. 16, 2024).....................................................53

*Baldwin v. First Nat'l Bank of Black Hills*,
    362 N.W.2d 85 (S.D. 1985) ..............................................................................*63*

*Banks v. Sec'y, Dep't of Health & Hum. Servs.*,
    38 F.4th 86 (11th Cir. 2022) ............................................................................52

*Beeney v. FCA US LLC*,
    2023 WL 6962116 (D. Del. Oct. 20, 2023)........................................................80

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).........................................................................................26

*Bell v. Bank of Am. NA*,
    2017 WL 380930 (M.D. Ga. Jan. 26, 2017).......................................................64

*Bell v. Blizzard Ent., Inc.*,
    2013 WL 12132044 (C.D. Cal. July 11, 2013)....................................................68

*Belle Isle Grill Corp. v. City of Detroit*,
    666 N.W.2d 271 (Mich. App. 2003)...................................................................73

*Benessere Inv. Group, LLC v. Swider*,
   2024 WL 4652090 (S.D. Fla. Oct. 31, 2024) ......................................................23

*Bey v. Shapiro Brown & Alt, LLP*,
   997 F. Supp. 2d 310 (D. Md. 2014) ...................................................................81

*BIOMILQ, Inc. v. Guiliano*,
   2023 WL 1879466 (N.C. Super. Feb. 10, 2023) ................................................69

*Bland v. Urology of Greater Atlanta, LLC*,
   2024 WL 3313348 (N.D. Ga. Mar. 14, 2024) ....................................................53

*Blanton v. Deloach*,
   2015 WL 6758230 (S.D. Ga. Nov. 5, 2015)........................................................61

*Boring v. Google Inc.*,
   362 F. App'x 273 (3d Cir. 2010) ........................................................................63

*In re BPS Direct, LLC*,
   705 F. Supp. 3d 333 (E.D. Pa. 2023)...........................................................53, 63

*Brodsky v. Apple, Inc.*,
   445 F. Supp. 3d 110 (N.D. Cal. Apr. 7, 2020)...................................................27

*Brooks v. Blue Cross & Blue Shield of Fla., Inc.*,
   116 F.3d 1364 (11th Cir. 1997) .........................................................................78

*Brown Jordan Int'l, Inc. v. Carmicle*,
   846 F.3d 1167 (11th Cir. 2017) ...................................................................41, 44

*Bruce v. Homeward Residential, Inc.*,
   2015 WL 5797846 (N.D. Ga. Aug. 31, 2015) ...................................................47

*Bruce v. McDonald*,
   2014 WL 931522 (M.D. Ala. Mar. 10, 2014) ....................................................23

*Bueno v. Univ. of Miami*,
   2023 WL 3093614 (S.D. Fla. Apr. 26, 2023)....................................................46

*Bui-Ford v. Tesla, Inc.*,
   2024 WL 694485 (N.D. Cal. Feb. 20, 2024)......................................................39

*Callen v. Daimler AG*,
  2021 WL 4523436 (N.D. Ga. Oct. 4, 2021) ......................................................76

*Cheadle v. Experian*,
  2021 WL 3144843 (D.N.J. July 26, 2021) ........................................................47

*Church v. City of Huntsville*,
  30 F.3d 1332 (11th Cir. 1994) ..........................................................................76

*Cipollone v. Liggett Group, Inc.*,
  505 U.S. 504 (1992)..........................................................................................45

*Clemons v. Waller*,
  82 F. App'x 436 (6th Cir. 2003) ........................................................................25

*Cline v. Reetz-Laiolo*,
  329 F. Supp. 3d 1000 (N.D. Cal. 2018).............................................................32

*Cohen v. Casper Sleep Inc.*,
  2018 WL 3392877 (S.D.N.Y. July 12, 2018).....................................................32

*Commonwealth of P.R. v. Franklin Cal. Tax-free Tr.*,
  579 U.S. 115 (2016)..........................................................................................44

*In re Conagra Peanut Butter Prod. Liab. Litig.*,
  251 F.R.D. 689 (N.D. Ga. 2008) ................................................................13, 73

*Conti v. Am. Honda Motor Co.*,
  2019 WL 10371067 (C.D. Cal. Oct. 17, 2019) ......................................56, 79, 82

*Cook v. GameStop, Inc.*,
  689 F. Supp. 3d 58 (W.D. Pa. 2023)..................................................................61

*Covington v. Gifted Nurses, LLC*,
  2023 WL 5167366 (N.D. Ga. July 19, 2023) .....................................................63

*Crosby v. Nat'l Foreign Trade Council*,
  530 U.S. 363 (2000)..........................................................................................45

*Crowley v. CyberSource Corp.*,
  166 F. Supp. 2d 1263 (N.D. Cal. 2001).............................................................20

*Damian for PFGBI, LLC v. Nelson Mullins Riley & Scarbrough, LLP*,
   317 F. Supp. 3d 1228 (N.D. Ga. 2017) ................................................................55

*Day v. Taylor*,
   400 F.3d 1272 (11th Cir. 2005) ......................................................................5, 6

*Dep't of Lab. v. McConnell*,
   828 S.E.2d 352 (Ga. 2019) ...................................................................................62

*Dial HD, Inc. v. Clearone Commc'ns, Inc.*,
   2010 WL 3732115 (S.D. Ga. Sept. 7, 2010) ...............................................68, 69

*Diamond Power Int'l, Inc. v. Davidson*,
   540 F. Supp. 2d 1322 (N.D. Ga. 2007) ...............................................................37

*Discovery Educ., Inc. v. SchoolsPLP, LLC*,
   2021 WL 2292223 (D. Del. June 4, 2021) ...........................................................67

*Divis v. Gen. Motors LLC*,
   2019 WL 4735405 (E.D. Mich. Sept. 27, 2019) .............................................79, 80

*Dixon v. Nat'l Hot Rod Ass'n*,
   2021 WL 1175198 (S.D. Ind. Mar. 29, 2021) .....................................................70

*In re DoubleClick, Inc. Privacy Litig.*,
   154 F. Supp. 2d 497 (S.D.N.Y. 2001) .................................................................34

*Dowis v. Mud Slingers, Inc.*,
   621 S.E.2d 413 (Ga. 2005) ...................................................................................13

*Egilman v. Keller & Heckman, LLP*,
   401 F. Supp. 2d 105 (D.D.C. 2005) .....................................................................36

*In re Equifax*,
   362 F. Supp. 3d 1295 (N.D. Ga. 2019) ...........................................................74, 83

*Ethicon Physiomesh Flexible Composite Hernia Mesh Prod. Liab.
   Litig. v. Ethicon, Inc.*,
   2020 WL 9887565 (N.D. Ga. Nov. 25, 2020) .....................................................13

*Euroboor B.V. v. Grafova*,
   2021 WL 4325694 (N.D. Ala. Sept. 23, 2021) ....................................................69

*Exeter Twp. v. Gardecki*,
2018 WL 6616930 (E.D. Pa. Dec. 17, 2018).........................................................35

*In re Facebook Internet Tracking Litig.*,
263 F. Supp. 3d 836 (N.D. Cal. 2017)................................................................30

*In re Facebook Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) ..............................................................31, 32, 66

*Faircloth v. AR Res., Inc.*,
2020 WL 2747781 (N.D. Cal. May 27, 2020)....................................................49

*Farrow v. Allstate Ins. Co.*,
862 N.Y.S.2d 92 (App. Div. 2008).......................................................................61

*Feldman v. BRP US, Inc.*,
2018 WL 8300534 (S.D. Fla. Mar. 28, 2018) ...................................................76

*Fish v. Tesla*,
2022 WL 1552137 (C.D. Cal. May 12, 2022)....................................................39

*Fisher v. Commc'n Workers of Am.*,
2008 WL 4754850 (N.C. Super. Oct. 30, 2008).................................................61

*Fitzgerald v. Trans Union, LLC*,
2018 WL 334530 (E.D. Pa. Jan. 8, 2018)..........................................................50

*Fleites v. MindGeek S.A.R.L.*,
2022 WL 1314035 (C.D. Cal. Feb. 10, 2022) ...................................................59

*Fox v. Loews Corp.*,
309 F. Supp. 3d 1241 (S.D. Fla. 2018)...............................................................83

*Frazier v. Synovus Fin. Corp.*,
2023 WL 6323084 (E.D. Pa. Sept. 28, 2023).................................................47, 49

*Frazier v. TransUnion*,
2023 WL 6323088 (E.D. Pa. Sept. 28, 2023)....................................................51

*Freedom Banc Mortg. Servs., Inc. v. O'Harra*,
2012 WL 3862209 (S.D. Ohio Sept. 5, 2012)....................................................31

*Geier v. Am. Honda Motor Co., Inc.*,
  529 U.S. 861 (2000).............................................................................45

*Gladue v. Cummins*,
  1999 WL 793783 (Super. Conn. 1999) ..............................................84

*Global Policy Partners, LLC v. Yesin*,
  686 F. Supp. 2d 631 (E.D. Va. 2009) ..................................................20

*Gonzales v. Mazda Motor Corp.*,
  2017 WL 3283957 (N.D. Cal. Aug. 1, 2017) ......................................84

*Gonzales v. Uber Techs., Inc.*,
  305 F. Supp. 3d 1078 (N.D. Cal. 2018)...............................................18

*In re Google Assistant Privacy Litig.*,
  457 F. Supp. 3d 797 (N.D. Cal. 2020).....................................30, 31, 34

*In re Google Inc. Cookie Placement Consumer Priv. Litig.* ("*In re Google*"),
  806 F.3d 125 (3d Cir. 2015) ........................................................*passim*

*In re Google, Inc. Privacy Policy Litig.*,
  2013 WL 6248499 (N.D. Cal. Dec. 3, 2013)................................33, 35

*Griffin v. Dugger*,
  823 F.2d 1476 (11th Cir. 1987) ...........................................................76

*Ground Zero Museum Workshop v. Wilson*,
  813 F. Supp. 2d 678 (D. Md. 2011).....................................................69

*Hammerling v. Google LLC*,
  615 F. Supp. 3d 1069 (N.D. Cal. 2022)...............................................63

*Hart v. TWC Prod. & Tech. LLC*,
  526 F. Supp. 3d 592 (N.D. Cal. 2021).................................................54

*Hayward v. Sw. Credit Sys.*,
  2024 WL 169570 (E.D. Pa. Jan. 16, 2024).....................................47, 49

*Heinisch v. Bernardini*,
  211 F. Supp. 3d 1294 (S.D. Ga. 2016) ................................................60

*Heiting v. Taro Pharms. USA, Inc.*,
   709 F. Supp. 3d 1007 (C.D. Cal. 2023) .............................................................44

*Herhold v. Green Tree Servicing, LLC*,
   2014 WL 806848 (E.D. Mich. Feb. 28, 2014).....................................................72

*Hilderman v. Enea Teksci, Inc.*,
   551 F. Supp. 2d 1183 (S.D. Cal. 2008) ..............................................................32

*hiQ Labs, Inc. v. LinkedIn Corp.*,
   31 F.4th 1180 (9th Cir. 2022) ............................................................................37

*Hix v. Acrisure Holdings, Inc.*,
   2022 WL 2803633 (N.D. Ga. July 18, 2022) ...............................................74, 75

*HSG, LLC v. Edge-Works Mfg. Co.*,
   2015 WL 5824453 (N.C. Super. Oct. 5, 2015)...................................................61

*Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*,
   48 F.4th 1236 (11th Cir. 2022) ..........................................................................53

*Ideal Aerosmith, Inc. v. Acutronic USA, Inc.*,
   2007 WL 4394447 (E.D. Pa. Dec. 13, 2007).....................................................36

*In re Info. Mgmt. Servs., Inc. Derivative Litig.*,
   81 A.3d 278 (Del. Ch. 2013) .............................................................................35

*Intel Corp. v. Hamidi*,
   30 Cal. 4th 1342 (2003) ..............................................................................67, 70

*In re iPhone Application Litig.*,
   844 F. Supp. 2d 1040 (N.D. Cal. 2012).....................................................*passim*

*Jacobson v. BH Assocs. Ltd. P'ship*,
   2001 WL 738408 (Mich. App. June 29, 2001)...................................................72

*Messenger ex rel. Messenger v. Gruner + Jahr Printing & Pub.*,
   727 N.E.2d 549 (N.Y. 2000)..............................................................................64

*Jaramillo v. Experian Info. Sols., Inc.*,
   155 F. Supp. 2d 356 (E.D. Pa. 2001).................................................................49

*In re Jetblue Airways Corp. Privacy Litig.*,
     379 F. Supp. 2d 299 (E.D.N.Y. 2005) ...................................................... 68

*Jurgens v. Build.com, Inc.*,
     2017 WL 5277679 (E.D. Mo. Nov. 13, 2017) ...................................... 15, 23

*Kaswell v. Wells Fargo Bank, N.A.*,
     2014 WL 3889183 (D. Md. Aug. 6, 2014) ............................................... 83

*Katz-Lacabe v. Oracle Am., Inc.*,
     668 F. Supp. 3d 928 (N.D. Cal. 2023) .................................................... 74

*Kesling v. Hubler Nissan, Inc.*,
     997 N.E.2d 327 (Ind. 2013) .................................................................. 83

*Koepnick v. Sears Roebuck Co.*,
     762 P.2d 609 (Ariz. App. 1988) ............................................................ 69

*Kurimski v. Shell Oil Co.*,
     2022 WL 2913742 (S.D. Fla. June 30, 2022) ......................................... 82

*Kurowski v. Rush Sys. for Health*,
     683 F. Supp. 3d 836 (N.D. Ill. 2023) .................................................... 67

*Larson v. Liberty Mut. Fire Ins. Co.*,
     2012 WL 93181 (D. Haw. Jan. 10, 2012) .............................................. 23

*Lee v. Panera Bread Co.*,
     2023 WL 2606611 (E.D. Mich. Mar. 6, 2023) ...................................... 71

*Leviston v. Jackson*,
     980 N.Y.S.2d 716 (NY. Super. 2013) ................................................... 64

*Lofton-Taylor v. Verizon Wireless*,
     262 F. App'x 999 (11th Cir. 2008) ....................................................... 51

*Lopez v. Apple, Inc.*,
     519 F. Supp. 3d 672 (N.D. Cal. 2021) .................................................. 33

*Lynn v. Fort McClellan Credit Union*,
     2013 WL 5707372 (N.D. Ala. Oct. 21, 2013) .................................. 54, 85

*M-I LLC v. Stelly*,
  733 F. Supp. 2d 759 (S.D. Tex. 2010)...................................................41

*Mack v. USAA Cas. Ins. Co.*,
  994 F.3d 1353 (11th Cir. 2021) ..........................................................52

*Marques v. JP Morgan Chase N.A.*,
  2017 WL 11358416 (N.D. Ga. Jan. 17, 2017).....................................62

*Marshall v. Swift River Acad., LLC*,
  327 F. App'x 13 (9th Cir. 2009) .........................................................50

*Martin v. State*,
  96 A.3d 765 (Md. App. 2014) .............................................................35

*Mastel v. Miniclip SA*,
  549 F. Supp. 3d 1129 (E.D. Cal. 2021) ..............................................32

*Maynard v. Melton*,
  2021 WL 6845008 (D.D.C. Apr. 7, 2021)...........................................58

*McBride v. Shipley*,
  2018 WL 4101524 (W.D. Okla. Aug. 28, 2018)..................................16

*McCann v. Iroquois Memorial Hosp.*,
  622 F.3d 745 (7th Cir. 2010) ..............................................................26

*McCoy v. Alphabet, Inc.*,
  2021 WL 405816 (N.D. Cal. Feb. 2, 2021) .........................................85

*Melzer v. Johnson & Johnson Consumer Inc.*,
  2023 WL 3098633 (D.N.J. Apr. 26, 2023)...........................................74

*Meta Platforms, Inc. v. BrandTotal Ltd.*,
  605 F. Supp. 3d 1218 (N.D. Cal. 2022)...............................................44

*Meyer v. Cnty. of San Diego*,
  2025 WL 449747 (S.D. Cal. Feb. 10, 2025)........................................75

*Meyers v. PNC Fin. Servs. Grp., Inc.*,
  2022 WL 4536829 (D. Conn. Sept. 28, 2022)......................................49

*In re Michaels Stores Pin Pad Litig.*,
  830 F. Supp. 2d 518 (N.D. Ill. 2011) ..................................................... 54

*Milgram v. Chase Bank USA, N.A.*,
  2020 WL 409546 (S.D. Fla. Jan. 25, 2020) ......................................... 49

*Mirkin v. Wasserman*,
  858 P.2d 568 (Cal. 1993) ..................................................................... 80

*Mitchell v. Litton Loan Servicing*,
  2011 WL 13319002 (N.D. Ga. Mar. 3, 2011) ...................................... 78

*Mollaei v. Otonomo Inc.*,
  651 F. Supp. 3d 1135 (N.D. Cal. 2023) ............................................... 28

*Moonlight Mountain Recovery, Inc. v. McCoy*,
  2024 WL 4027972 (D. Idaho Sept. 3, 2024) ....................................... 42

*Moore v. Rodriguez*,
  2021 WL 2222590 (S.D. Cal. June 2, 2021) ........................................ 75

*Morris v. BMW of North Am., LLC*,
  2014 WL 793550 (D.N.J. 2014) ........................................................... 84

*Mount v. PulsePoint, Inc.*,
  2016 WL 5080131 (S.D.N.Y. Aug. 17, 2016), *aff'd*, 684 F. App'x
  32 (2d Cir. 2017) .................................................................................. 67

*Murphy v. Capella Educ. Co.*,
  589 F. App'x 646 (4th Cir. 2014) ........................................................ 80

*Nelson v. Sci. Applications Int'l Corp.*,
  2013 WL 764664 (D.S.C. Feb. 7, 2013) .............................................. 63

*In re Nickelodeon Consumer Privacy Lit.*,
  827 F.3d 262 (3d Cir. 2016) ........................................................... 24, 30

*Nix v. O'Malley*,
  160 F.3d 343 (6th Cir. 1998) ............................................................... 26

*Oconee Fed. Sav. & Loan Ass'n v. Brown*,
  831 S.E.2d 222 (Ga. App. 2019) ......................................................... 66

*Oganyan v. Square Two Fin.*,
    2012 WL 3656355 (C.D. Cal. Aug. 24, 2012) ...................................................49

*Olivera v. Amoco Oil Co.*,
    776 N.E.2d 151 (Ill. 2002) .......................................................................84

*Ollodart v. Intel Corp.*,
    2021 WL 4165387 (D. Or. Sept. 11, 2021) .........................................................69

*Orbit One Commc'ns, Inc. v. Numerex Corp.*,
    692 F. Supp. 2d 373 (S.D.N.Y. 2010) ...............................................................38

*Orhan v. Nihem*,
    2014 WL 1721797 (Mich. App. Apr. 29, 2014).....................................................60

*Parker v. Perdue Foods, LLC*,
    2024 WL 3993855 (M.D. Ga. Aug. 29, 2024) ......................................................73

*Pearson v. Philip Morris, Inc.*,
    361 P.3d 3 (Or. 2015) ..........................................................................54

*People v. Ledesma*,
    795 N.E.2d 253 (Ill. 2003) ......................................................................27

*Perkins v. LinkedIn Corp.*,
    53 F. Supp. 3d 1190 (N.D. Cal. 2014)..............................................................44

*Perrin v. City of Elberton, GA*,
    2005 WL 1563530 (M.D. Ga. July 1, 2005)..........................................................67

*Peterson v. Aaron's, Inc.*,
    2017 WL 364094 (N.D. Ga. Jan. 25, 2017).............................................13, 58, 59

*In re Pharmatrak, Inc.*,
    329 F.3d 9 (1st Cir. 2003).......................................................................14

*Pica v. Delta Air Lines, Inc.*,
    2019 WL 1598761 (C.D. Cal. Feb. 14, 2019) .......................................................34

*Popa v. Harriet Carter Gifts, Inc.*,
    52 F.4th 121 (3d Cir. 2022) .....................................................................27

*Provost v. Aptos, Inc.*,
  2018 WL 1465766 (N.D. Ga. Mar. 12, 2018) ....................................53

*Rabelo v. Equifax Info. Servs., LLC*,
  2020 WL 1159372 (M.D. Fla. Mar. 10, 2020) ..................................49

*Ramirez v. LexisNexis Risk Sols.*,
  729 F. Supp. 3d 838 (N.D. Ill. 2024)..........................................54, 63

*Ramos v. Delphi Behav. Health Grp., LLC*,
  2022 WL 1415856 (11th Cir. May 4, 2022)......................................27

*Rayle Tech, Inc. v. DeKalb Swine Breeders, Inc.*,
  133 F.3d 1405 (11th Cir. 1998) .........................................................70

*Rene v. G.F. Fishers, Inc.*,
  817 F. Supp. 2d 1090 (S.D. Ind. 2011)..............................................22

*In re Rezulin Prods. Liab. Litig.*,
  210 F.R.D. 61 (S.D.N.Y. 2002) ........................................................55

*Riley v. Gen. Motors, LLC*,
  664 F. Supp. 3d 1336 (M.D. Fla. 2023).............................................76

*Risdon Enters, Inc. v. Colemill Enters, Inc.*,
  324 S.E.2d 738 (Ga. App. 1984) ......................................................58

*Roberts v. Sea-Land Servs., Inc.*,
  566 U.S. 93 (2012).............................................................................15

*Robinson v. Akal Sec., Inc.*,
  2020 WL 13746174 (N.D. Ga. Feb. 4, 2020)....................................65

*Rogers v. Staton*,
  2024 WL 4543192 (N.D. Ga. Feb. 15, 2024)....................................39

*Ross v. FDIC*,
  625 F.3d 808 (4th Cir. 2010) ............................................................50

*Roybal v. Equifax*,
  405 F. Supp. 2d 1177 (E.D. Cal. 2005) ............................................49

*Roznowski v. Bozyk*,
    251 N.W.2d 606 (Mich. App. 1977)......................................................74

*Safeco Ins. Co. of Am. v. Burr*,
    551 U.S. 47 (2007)...........................................................................50

*Salinas v. Cornwell Quality Tools Co.*,
    2022 WL 3130875 (C.D. Cal. June 10, 2022).............................37, 40

*Sanders v. State*,
    57 Md. App. 156 (1984) ...................................................................27

*Savidge v. Pharm-Save, Inc.*,
    2020 WL 265206 (W.D. Ky. Jan. 17, 2020) ....................................68

*Schechner v. Whirlpool Corp.*,
    237 F. Supp. 3d 601 (E.D. Mich. 2017) ..........................................74

*Serrano v. Cablevision Sys. Corp.*,
    863 F. Supp. 2d 157 (E.D.N.Y. 2012) .............................................82

*Sheffler v. Americold Realty Tr.*,
    2022 WL 1815505 (N.D. Ga. Jan. 19, 2022), *rev'd on other
    grounds*, 2023 WL 3918491 (11th Cir. June 9, 2023).....................53

*Shenkman v. Ocwen Loan Servicing, LLC*,
    2014 WL 5791060 (S.D. Ga. Nov. 6, 2014)......................................47

*Smith v. Stewart*,
    660 S.E.2d 822 (Ga. App. 2008) ......................................................65

*Soc'y of St. Vincent De Paul in the Arch. of Detroit v. Am. Textile
    Recycling Servs.*,
    2014 WL 65230 (E.D. Mich. Jan. 8, 2014) ......................................69

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)..........................................................................51

*Stanton v. Dachille*,
    463 N.W.2d 479 (Mich. App. 1990)..................................................70

*State St. Bank & Tr. Co. v. Canal Ins. Co.*,
    2015 WL 11256569 (N.D. Ga. Sept. 8, 2015)...................................59

*State v. Brinkley*,
132 A.3d 839 (Del. Super. 2016)........................................................................27

*Stires v. Carnival Corp.*,
243 F. Supp. 2d 1313 (M.D. Fla. 2002).............................................................78

*In re Subaru Battery Drain Prods. Liab. Litig.*,
2021 WL 1207791 (D.N.J. March 31, 2021).......................................................83

*Summers v. Bailey*,
55 F.3d 1564 (11th Cir. 1995) ...................................................................60, 61

*Sunbelt Rentals, Inc. v. Victor*,
43 F. Supp. 3d 1026 (N.D. Cal. 2014)................................................................21

*Svenson v. Google Inc.*,
65 F. Supp. 3d 717 (N.D. Cal. 2014).................................................................34

*T.D. v. Piedmont Healthcare, Inc.*,
2024 WL 3972984 (N.D. Ga. Aug. 28, 2024).....................................................25

*In re Takata Airbag Prods. Liab. Lit.*,
2016 WL 1266609 (S.D. Fla. Mar. 11, 2016) ....................................................76

*Tariq v. Tenet Healthcare Corp.*,
2022 WL 880629 (Mich. App. Mar. 24, 2022) ...................................................70

*In re Terazosin Hydrochloride Antitrust Litig.*,
160 F. Supp. 2d 1365 (S.D. Fla. 2001) ..............................................................76

*Terrill v. Electrolux Home Prods., Inc.*,
753 F. Supp. 2d 1272 (S.D. Ga. 2010) ..............................................................73

*Texas Ed Tech Sols., LLC v. Authentica Sols., LLC*,
2020 WL 5774015 (N.D. Ga. Sept. 28, 2020)...............................................72, 73

*Thompson v. Ross*,
2010 WL 3896533 (W.D. Pa. Sept. 30, 2010)....................................................36

*Toffoloni v. LFP Publ'g Grp., LLC*,
572 F.3d 1201 (11th Cir. 2009) ........................................................................64

*In re Toyota RAV4 Hybrid Fuel Tank Litig.*,
534 F. Supp. 3d 1067 (N.D. Cal. 2021) ............................................................80

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......................................................................................52

*In re Tri-State Crematory Litig.*,
215 F.R.D. 660 (N.D. Ga. 2003) ..................................................................58

*Triplett v. JPMorgan Chase Bank*,
2014 WL 4351429 (N.D. Fla. July 9, 2014) ...............................................46

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Associates, Ltd.*,
484 U.S. 365 (1988) .......................................................................................17

*United States v. Barrington*,
648 F.3d 1178 (11th Cir. 2011) .....................................................................22

*United States v. Booker*,
2013 WL 2903562 (N.D. Ga. June 13, 2013) ...............................................17

*United States v. Campagnuolo*,
592 F.2d 852 (5th Cir. 1979) .........................................................................25

*United States v. Koyomejian*,
970 F.2d 536 (9th Cir. 1992) .........................................................................19

*United States v. Reed*,
575 F.3d 900 (9th Cir. 2009) .........................................................................17

*United States v. Ropp*,
347 F. Supp. 2d 831 (C.D. Cal. 2004) ..........................................................22

*United States v. Steiger*,
318 F.3d 1039 (11th Cir. 2003) ..............................................................*passim*

*In re USAA Data Sec. Litig.*,
621 F. Supp. 3d 454 (S.D.N.Y. 2022) ..........................................................75

*Van Buren v. United States*,
593 U.S. 374 (2021)................................................................................*passim*

*Vita v. New England Baptist Hosp.*,
243 N.E.3d 1185 (Mass. 2024) ............................................................28

*Washington Cnty. Bd. of Educ. v. Mallinckrodt ARD, Inc.*,
431 F. Supp. 3d 698 (D. Md. 2020) ....................................................81

*Webb v. Fid. Brokerage Servs.*,
2021 WL 3234362 (Mich. Ct. App. July 29, 2021) ............................71

*Wells v. Enhanced Recovery Co., LLC*,
2011 WL 13319655 (N.D. Ga. May 12, 2011) ....................................62

*White v. Alcon Film Fund, LLC*,
2013 WL 12067479 (N.D. Ga. Aug. 13, 2013) ..................................73

*Williams v. Cobb Cnty. Farm Bureau, Inc.*,
718 S.E.2d 540 (Ga. App. 2011) .........................................................62

*Williams v. Raynor Rensch & Pfieffer*,
2015 WL 2127095 (D. Neb. May 6, 2015) ..........................................27

*Williams v. Rosenblatt Sec. Inc.*,
136 F. Supp. 3d 593 (S.D.N.Y. 2015) .................................................32

*Williamson v. Mazda Motor of Am.*,
562 U.S. 323 (2011)......................................................................45, 50

*Woodward v. ViroPharma Inc.*,
2013 WL 1485110 (Pa. Super. Apr. 3, 2013) ....................................62

*Wynn's Extended Care, Inc. v. Bradley*,
619 F. App'x 216 (4th Cir. 2015) .......................................................80

*In re Yahoo Mail Lit.*,
7 F. Supp. 3d 1016 (N.D. Cal. 2014) ..................................................66

*Young v. Grand Canyon Univ., Inc.*,
57 F.4th 861 (11th Cir. 2023) ......................................................78, 80

*In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*,
601 F. Supp. 3d 625 (C.D. Cal. 2022) ......................................54, 81, 82

*In re Zynga Privacy Litig.*,
   750 F.3d 1098 (9th Cir. 2015) ..........................................................................17

**Statutes**

11 Del. C. § 2402 .................................................................................................27

18 Pa. C.S.A. § 5703 ............................................................................................27

18 Pa. C.S.A. § 5741 ............................................................................................35

15 U.S.C. §1681b .................................................................................................50

15 U.S.C. § 1681 ..................................................................................................50

15 U.S.C. § 1681s-2 .........................................................................................47, 49

15 U.S.C. § 1681t .........................................................................................*passim*

18 U.S.C. § 1030 ...........................................................................................36, 41

18 U.S.C. § 2510 ......................................................................................... *passin*

18 U.S.C. § 2511 ...........................................................................................15, 23

18 U.S.C. § 2701 ...............................................................................29, 31, 33, 35

18 U.S.C. § 3117(b) ............................................................................................16

Ala. Code § 8-19-10(e) .......................................................................................77

Ala. Code § 8-19-13 ............................................................................................84

Cal. Civ. Code § 1782(a) ....................................................................................77

Cal. Pen. Code § 502 ..........................................................................................44

Cal. Penal Code § 631(a) ....................................................................................27

Cal. Penal Code § 637.7 ......................................................................................28

Fla. Stat. § 934.03(2)(d) ......................................................................................27

Ill. Comp. Stat. Ann. 5/14-2(a)(1)-(5) ...............................................................27

Ind. Code § 24-5-0.5-5 ..................................................................................77

Mass. Gen. Laws Ann. ch. 272, § 99B.4 .....................................................27

Mass. Gen. Laws Ann. ch. 93A, § 9(3) .......................................................77

Md. Code Ann., Cts. & Jud. Proc. § 10-402(c)(3)........................................27

Miss. Code § 75-24-15(2) ............................................................................77

N.H. Rev. Stat. Ann. § 570-A ................................................................27, 28

N.Y. Gen. Bus. Law §§ 899-aa ....................................................................75

Neb. Rev. Stat. Ann. § 86-290 .....................................................................27

Neb. Rev. Stat. Ann. § 86–2, 104 ................................................................35

O.C.G.A. § 44-1-3........................................................................................68

O.C.G.A. § 51-10-1 ......................................................................................66

O.C.G.A. § 51-10-3..................................................................................66, 67

Tex. Bus. & Com. Code § 17.505 .................................................................77

Utah Code Ann. § 13-11a-4(a)......................................................................77

W. Va. Code § 46A-6-106(b) ........................................................................77

**Other Authorities**

Restatement (Second) of Torts § 652 ...........................................................57

## PRELIMINARY STATEMENT

Like most modern cars, GM[1] vehicles are equipped with telematics systems that enable a variety of services which enhance driver safety and provide modern conveniences (e.g., crash response and emergency services, navigation, and Wi-Fi). GM's longstanding telematics business, OnStar, in recent years offered a program called Smart Driver, designed to encourage safe driving skills by collecting certain driving data, such as hard braking. Ignoring the benefits of OnStar services in general and Smart Driver in particular, Plaintiffs claim GM used OnStar and Smart Driver to convert GM vehicles into "corporate surveillance machines" that invaded customer privacy. These allegations fail to state viable claims because, among other reasons, GM's collection of driving data was disclosed and consented to, and because driving a vehicle—which necessarily involves conduct that takes place on public roads—cannot form the basis for any privacy-based claim.

Plaintiffs' scattershot Master Complaint (the "MC") consists of 627 pages and 1,993 paragraphs; it asserts 65 separate counts; and it is brought by 47 Plaintiffs on behalf of numerous putative classes. Despite the MC's length, Plaintiffs' claims and theories are unclear or lack merit. The MC should be dismissed for several reasons.

*First*, Plaintiffs' Wiretap Act claims are defective because operating a vehicle

---

[1] As used herein, the term "GM" refers to both Defendant General Motors LLC and Defendant OnStar, LLC ("OnStar") unless otherwise specified.

does not result in a "communication" with "contents," and GM did not "intercept" any such (non-existent) communications in any event. Moreover, GM was a party to these electronic transmissions—no other party is identified—and a party cannot "intercept" a communication to itself. Plaintiffs' claims under the Stored Communications Act and Computer Fraud and Abuse Act are similarly flawed, as Plaintiffs plead none of the requisite elements.

*Second*, Plaintiffs assert numerous common-law and state consumer statute claims, but these claims are barred by the Fair Credit Reporting Act ("FCRA"), which broadly preempts state-imposed "requirements" relating to the conduct of "furnishers." There is no question GM was a "furnisher" with respect to the alleged conduct; in fact, Plaintiffs assert FCRA claims against other Defendants (Count 10).

*Third*, even if Plaintiffs' common-law claims were not preempted, they would fail for other reasons. The invasion of privacy claim must be dismissed because (1) Plaintiffs are not "in seclusion" while they are driving in public, (2) collection of customer data is not a "highly offensive" intrusion, and (3) GM's disclosure of Plaintiffs' driving data was not made to the public at large. Plaintiffs' trespass to chattels claim fails for similar reasons, including that there is no allegation of damage to Plaintiffs' vehicles or information, and Plaintiffs suffered no deprivation of property. Finally, no claim for unjust enrichment lies because Plaintiffs do not allege they expected remuneration for any benefit they allegedly conferred.

*Fourth*, Plaintiffs' state statutory claims must be dismissed for numerous reasons. Initially, the Court should reject Plaintiffs' attempts to assert claims under (1) the laws of states in which no named Plaintiff resides and (2) statutes that do not provide a right of action. More fundamentally, Plaintiffs have failed to plead their state consumer fraud claims with the requisite particularity. Plaintiffs do not plead any particular pre-purchase communications they had with GM during which GM made misrepresentations. Instead, they rely on the allegedly deceptive conduct of independent dealers, which cannot be attributed to GM.

*Finally*, Plaintiffs' injury theories are insufficient. Some claimed injuries— like the risk of "future misuse of their Driving Data" and "diminution" in that data's value—are foreclosed by binding precedent. Others, including "loss of privacy" and "unauthorized dissemination" of data, are not actionable for the claims for which they are alleged. The only economic injury Plaintiffs point to—increased insurance premiums or denials—lacks a sufficient causal connection to GM's alleged conduct.

## FACTUAL BACKGROUND

### I.    The Parties

GM, a Delaware LLC headquartered in Michigan, is one of the world's leading automotive manufacturers. ¶ 655.[2] OnStar, a GM affiliate, provides various connected services for GM vehicles—e.g., "communications, security, and

---

[2] Citations to "¶" are to paragraphs of the MC.

3

emergency services." ¶ 656. LexisNexis Risk Solutions Inc. ("LNRS"), a Delaware corporation headquartered in Georgia, is a data and analytics company that provides services to a range of industries, including the automotive industry. ¶ 658. Verisk Analytics, Inc. ("Verisk") is a Delaware corporation headquartered in New Jersey that offers services to the insurance industry. ¶ 659. LNRS and Verisk are consumer reporting agencies, ¶ 1101, and are referred to collectively as "CRA Defendants."

Plaintiffs are forty-seven individuals from twenty-seven states who allege that they purchased or leased GM vehicles between 2014-2024 and were enrolled in OnStar and/or Smart Driver. *See generally* ¶¶ 10–654. Although Plaintiffs' circumstances vary considerably, they generally allege that GM collected and sold their "Driving Data"[3] to Verisk and LNRS so as to "materially invade [Plaintiffs'] privacy and harm them financially" while serving Defendants' commercial interests. ¶¶ 1–2. All Plaintiffs allege that their "Driving Data has tangible value"; that Defendants caused Plaintiffs to "los[e] control over the use of [their] Driving Data"; and that Defendants' "actions of secretly intercepting, using, and disclosing [Plaintiffs'] Driving Data invaded [their] privacy rights." *See, e.g.*, ¶¶ 24–25, 70–71, 137–38, 258–59, 322–23.

---

[3] The MC defines "Driving Data" to include "geolocation, route history, driving schedule, fuel or charging levels, hard braking events, hard acceleration events, tailgating, time spent idle, speeds over 80 miles per hour, vehicle speed, average speed, late night driving, [and] driver attention." ¶ 1.

## II.     GM's Provision of OnStar and Smart Driver

Like most major carmakers, GM has sold vehicles equipped with telematics[4] systems for years. ¶¶ 660–61. GM customers can choose to enroll in OnStar telematics services, which provide communication, entertainment, diagnostic, and safety features, such as stolen vehicle assistance and navigation. ¶¶ 656, 663. In 2016, GM launched "the Smart Driver program." ¶ 823. Smart Driver was one of an "array of [OnStar] Connected Services"[5] that provided enrolling customers with "insights on [their] driving behavior" and pursuant to which GM "use[d] information [it] collect[ed] about where and how [customers] operate[d] [their] vehicle[s]."[6] OnStar customers could separately enroll in Smart Driver; if they did, GM disclosed to those customers that "information on driving events" would be collected, including "Hard Braking," "Hard Acceleration," "Distance Driven, [and] Late Night Driving." *See* ¶ 835 (quoting webpage); *see also* ¶ 864 (explaining that customers "have to enroll separately in Smart Driver from their basic OnStar services").

---

[4] The term "telematics" refers to in-vehicle systems that "combine [GPS] and cellular technologies with onboard electronics." ¶ 661.

[5] *See GM's Response to Senate Inquiry*, available at https://interactive.wthr.com /pdfs/automakers-response-to-markey.pdf at 9 (cited in ¶ 834) ("GM Senate Response"). The Court may consider this document, and others cited in the MC, because they are incorporated by reference. *See Day v. Taylor,* 400 F.3d 1272, 1276 (11th Cir. 2005) (holding that incorporation by reference is proper "when the contents of a document are at issue in the case" and authenticity not disputed).

[6] ¶ 828; *see also Wyden-Markey Letter*, available at https://www.wyden.senate. gov/imo/media/doc/wyden-markey_auto_privacy_letter_to_ftc.pdf at 8 (cited in ¶ 828). This document is also incorporated by reference in the MC. *See supra* n.5.

### A.    Enrollment in OnStar and Smart Driver

Purchasers of GM vehicles had the option to enroll in OnStar Connected Services at the dealership or by contacting an OnStar advisor. ¶¶ 871, 893; *see also* GM Senate Response at 9. As part of the enrollment process, customers agreed to be bound by the "User Terms for Connected Vehicle Services" (the "User Terms") and the "U.S. Connected Services Privacy Statement" (the "Privacy Statement"). ¶ 859.[7] The User Terms disclosed that: "GM collects, uses, and shares information from and about You and your Vehicle." Ex. 1, User Terms § 26. The User Terms also incorporated and required consent to the Privacy Statement, *id.*, which further disclosed that (1) GM "may collect . . . ***Information about the use of your vehicle, including operational and safety related information***"; and (2) GM "may also share data with third parties . . . where you have elected to receive a service," for example, "usage based insurance providers." Ex. 2, Privacy Statement at 2, 4 (emphasis original). Customers who enrolled in OnStar could then enroll in Smart Driver at the dealership, online, or in a mobile application, where they were presented with additional terms regarding the Smart Driver program. ¶ 871.

Plaintiffs allege that car dealerships "never took consumers through the online enrollment process (where consumers would have been presented with the OnStar

---

[7] The Court may consider the User Terms and Privacy Statement as documents incorporated by reference in the MC. *See Taylor*, 400 F.3d at 1276.

Terms)" and instead accepted the agreements "without [consumers'] knowledge or consent." ¶ 886. If true, that violated GM's express instruction, stated on the OnStar enrollment page, that the "customer must personally review and accept (or decline) the terms" which "cannot be done by dealer personnel," ¶¶ 896–97:



Plaintiffs allege the User Terms and Privacy Statement were "impossible for a reasonable consumer to comprehend" and were deficient for not expressly stating that "Driving Data will be sold to LexisNexis [and] Verisk." ¶¶ 860–61. They also allege GM used "dark patterns" to "coerce consumers into enrolling" in OnStar and Smart Driver. *Id.* ¶¶ 872–76. For example, Plaintiffs allege that GM provided basic features for free, offered "free trials" of paid plans, and "built the cost of OnStar into the price of the car[.]" ¶¶ 877–82. Plaintiffs do not allege that GM's promotional statements were false or that GM failed to offer these services for free. Another "dark pattern" cited by Plaintiffs is that during the OnStar onboarding process, customers who "selected the 'I decline' option received a 'warning' message" "emphasizing that safety features such as 'Automatic Crash Response' and 'Emergency Services'" would be unavailable if they declined. ¶¶ 900–01. Plaintiffs do not allege these warnings were false. ¶ 901. With respect to onboarding at the dealership, Plaintiffs allege that "GM imposed penalties for dealer employees that failed to activate

OnStar" at the time of sale and offered "rewards for dealers that complied." ¶ 884.

### B.    Plaintiffs' Onboarding Experiences

Thirty-two of the 47 Plaintiffs allege that their dealer activated OnStar at the time of purchase, contrary to GM's instructions. Ex. 3, Plaintiff Chart.[8] Most of these Plaintiffs allege, without elaboration, that the "dealer activated OnStar before Plaintiff [ ] took possession of the vehicle." *E.g.*, ¶¶ 27, 43, 111, 193. Ten Plaintiffs admit they voluntarily enrolled in or activated OnStar themselves.[9] Several of these—including D. Smith, Brunet, and Brockington—also admit that they enrolled in Smart Driver so they could "privately learn about [their] own driving behavior." ¶¶ 73, 101, 315. Other Plaintiffs allege they enrolled in OnStar to use services that would be helpful if they were "in an accident" or "emergency situation." ¶ 389; *see also, e.g.*, ¶ 525.

A subset of Plaintiffs do not include any details as to how OnStar was allegedly activated in their vehicles—only that their cars were "equipped" with OnStar "during the manufacturing process" and that they were "never given a choice

---

[8] Many Plaintiffs' allegations are unclear—e.g., Fuhrer cannot recall when OnStar was activated; Chicco alleges only that the dealer "recommended activation of OnStar," leaving open the possibility that he himself activated it; and the Drews Plaintiffs, who had two cars, allege dealer activation only as to the second. ¶¶ 124, 473, 324–26, 568.

[9] *See* Ex. 3. Plaintiff Davids is unique in that he had two GM vehicles and alleges that he purchased OnStar services only for the first. ¶¶ 428–430. Plaintiff Lima alleges the dealer activated OnStar before he took possession of the vehicle, but he then purchased OnStar services after his "free trial" elapsed. ¶ 246.

to activate" or never "knowingly enrolled in" OnStar or Smart Driver.[10]

### III.    GM's Alleged Collection and Sale of Data

#### A.    GM Vehicle Technology

Like many modern cars, GM vehicles use technology to enhance safety and performance. *See* ¶¶ 844–45. Plaintiffs allege GM vehicles use a "swarm of sensors" to "detect and transmit data" about "vehicle use, performance, and driving conditions[.]" ¶¶ 846–47. These sensors are connected to "electronic control units" ("ECUs")—internal processing units within the vehicle, ¶¶ 846–47—and the ECUs are connected to "gateways," which process and "translat[e]" data from the ECUs, ¶¶ 848–49. Plaintiffs allege that each GM vehicle is equipped with a telematics control unit ("TCU"), which transmits data from the gateway out of the vehicle. ¶¶ 849–52. Plaintiffs allege upon information and belief that GM accesses and transmits consumers' Driving Data to itself in real time and periodically. ¶¶ 854–57.

#### B.    GM's Sharing of Data With Third Parties

Plaintiffs allege GM sold certain Driving Data to certain third parties. ¶¶ 695–785. They focus primarily on the alleged sale of Driving Data to Verisk and LNRS.

*Verisk.* Plaintiffs allege GM and Verisk entered into an agreement in 2015

---

[10] This includes Plaintiffs Chicco, Block, Horvath, Gilmore, Fuhrer, Willey, Melberg, and Angerhofer. ¶¶ 124, 139–40, 227, 361, 373, 473, 578, 610. Plaintiffs Melberg and Brakefield allege that when they purchased vehicles, they were told their existing subscriptions would be transferred to their new vehicles. ¶¶ 373, 578. They do not specify whether they voluntarily enrolled in OnStar in the first instance.

under which GM sold Verisk Driving Data collected from vehicles enrolled in Smart Driver. ¶¶ 695–702. This arrangement was not unique to GM; Plaintiffs allege that other automakers, including Honda and Hyundai, also shared data with Verisk. ¶¶ 711, 736. Plaintiffs allege GM provided Driving Data to Verisk from 2015 to 2024, including vehicle "location, speed, trip mileage, hard braking and acceleration, [and] unique trip identifiers." ¶ 703. Plaintiffs allege Verisk used this data to (1) generate "Driving Scores" for GM consumers and (2) create a telematics exchange to house Driving Data (from GM and others), which insurers could pay to access. ¶¶ 704–09. Plaintiffs allege nine insurers used Verisk's telematics exchange. ¶ 709.

*LNRS*. Plaintiffs allege GM entered into an agreement in 2019 to sell LNRS Driving Data collected from vehicles enrolled in Smart Driver. ¶¶ 742–44. This arrangement, again, was not unique to GM—other automakers, including Honda, Hyundai, Toyota, and Volkswagen, had similar arrangements with LNRS. ¶ 750. LNRS allegedly used this data to generate "driving scores" for consumers, create the "LexisNexis Telematics Exchange," which insurers could pay to access, and offer other products to insurers. ¶¶ 746–47, 751–53, 766–67. Plaintiffs also allege that LNRS's and Verisk's policies provided that insurers could only access Driving Data maintained by both LNRS and Verisk with the consent of the insureds. ¶¶ 811, 816.

***Other Third Parties***. Plaintiffs allege that GM sold Driving Data to other third parties, including Wejo Limited ("Wejo"), Inrix, Jacobs Engineering Group

("Jacobs"), and GM Maxis. ¶¶ 769–85. Plaintiffs allege few details concerning these third parties. Plaintiffs do not explain, for instance, how Jacobs and GM Maxis allegedly used the Driving Data and concede that much of the Data provided was "de-identified," meaning the personally identifiable information was removed. ¶¶ 782–83. Plaintiffs allege that Wejo—which is now defunct—planned to use the Data for transportation, engineering, construction, and public safety projects. ¶¶ 770–76.

Importantly, Plaintiffs do not allege they suffered economic harm due to any alleged data-sharing with these third parties. ¶¶ 769–85. Rather, the MC alleges that certain Plaintiffs suffered economic injuries caused only by Verisk's and LNRS' sharing of Driving Data with insurers. *See, e.g.*, ¶¶ 131, 335, 417–17. Specifically, 38 of the 47 Plaintiffs allege they suffered some form of adverse action from their insurers or prospective insurers. *See* Ex. 3, Pl. Chart. No Plaintiff alleges economic harm caused by data-sharing with any third party other than LNRS or Verisk.

## IV.    The Master Consolidated Complaint

The MC asserts 65 separate counts on behalf of numerous state subclasses and a putative nationwide class defined as "[a]ll persons residing in the United States … whose GM-branded vehicle Driving Data was collected, stored, distributed, and/or sold by Defendants." ¶ 963. As to GM, Plaintiffs assert the following claims:

- Federal statutory claims under the Federal Wiretap Act, the Stored Communications Act, and the Computer Fraud and Abuse Act;

- Common-law claims for invasion of privacy, trespass to chattels,

unjust enrichment, breach of contract, and civil conspiracy; and

- A myriad of state statutory claims—55 in all—most of which are asserted under state deceptive trade practices acts, among others.

Plaintiffs allege various theories of injury, but their most prominent injury theories concern (1) loss of the "value of their Driving Data" and "their control over its use," (2) loss of privacy, (3) "diminution of the value of their personal information," (4) "emotional distress and mental anguish," (5) a "likelihood of future misuse of their Driving Data," (6) "unauthorized dissemination of their valuable Driving Data," and (7) "economic harm stemming from GM's exploitation of their Driving Data." *E.g.*, ¶¶ 1033, 1065, 1076, 1135, 1244, 1380, 1708.[11]

## LEGAL STANDARD & CHOICE OF LAW

### I.    Pleading Requirements

To survive dismissal under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"; mere "conclusions" or a "formulaic recitation" of the elements of a claim "will not do." *Id.* A court need not accept conclusory allegations—"legal conclusions must be supported by factual allegations." *Allbright v. Teva Pharms. USA, Inc.*, 290 F. Supp.

---

[11] GM joins and incorporates by reference the CRA Defendants' argument that the MC is an improper shotgun pleading. *See* CRA Defs.' Br. (Dkt. 141-1) § I.

3d 1321, 1326 (S.D. Fla. 2017). For claims sounding in fraud, the circumstances constituting fraud must be pled "with particularity." Fed. R. Civ. P. 9(b).

## II.    Choice of Law

In the MDL context, the transferee court applies the state law that the transferor court would have applied. *In re Conagra Peanut Butter Prod. Liab. Litig.*, 251 F.R.D. 689, 693 (N.D. Ga. 2008). This Court is the transferor court for most Plaintiffs' claims against GM, and while Georgia's choice-of-law rules dictate that Georgia common law usually applies to common-law claims where no foreign statute is identified, courts will not apply Georgia law where it would be inconsistent with due process. *See Peterson v. Aaron's, Inc.*, 2017 WL 364094, at *6 (N.D. Ga. Jan. 25, 2017). In such cases, the *lex loci delicti* rule applies to tort claims. *Dowis v. Mud Slingers, Inc.*, 621 S.E.2d 413, 419 (Ga. 2005).[12]

Here, Plaintiffs identify no foreign statutes that govern their common-law claims. In fact, they fail to identify *any* source of law for their common-law claims whatsoever. That alone is grounds for dismissal. *See* CRA Defs.' Br. (Dkt. 141-1) § IV. Alternatively, for purposes of this Motion, each common-law claim requires its own inquiry to determine if application of Georgia law comports with due process.

---

[12] The Court should presume that the law of this Circuit applies to Plaintiffs' federal claims. *See Ethicon Physiomesh Flexible Composite Hernia Mesh Prod. Liab. Litig. v. Ethicon, Inc.*, 2020 WL 9887565, at *2 (N.D. Ga. Nov. 25, 2020). For Plaintiffs' state statutory claims, the law of the state supplying the relevant statute should apply. *See Peterson*, 2017 WL 364094, at *6.

## ARGUMENT

### I.    Plaintiffs' Federal Statutory Claims Must Be Dismissed.

Plaintiffs try mightily to fit the alleged facts above into the rigid framework of federal criminal statutes—namely, the Federal Wiretap Act ("FWA"), Stored Communications Act ("SCA"), and Computer Fraud and Abuse Act ("CFAA"). But GM's collection of Driving Data does not amount to wiretapping, illicit access to stored communications, or computer hacking.

### A.    Plaintiffs Fail to State Wiretap Act Claims.

The Federal Wiretap Act imposes criminal penalties for illegal wiretaps and electronic eavesdropping. The operative statute was passed in 1986, before the dawn of the Internet, making it "ill-suited to address modern forms of communication." *United States v. Steiger*, 318 F.3d 1039, 1047 (11th Cir. 2003). Here, Plaintiffs' novel claim would stretch the FWA far beyond its textual limits—and contrary to all applicable case law—to try to encompass GM's collection of Driving Data.

To state an FWA claim, Plaintiffs must allege that GM: (1) intentionally (2) intercepted, (3) the contents of (4) an electronic communication (5) using a device. *In re Pharmatrak, Inc.*, 329 F.3d 9, 18 (1st Cir. 2003). Plaintiffs' claims are foreclosed by the plain meaning of these terms and applicable precedent. Plaintiffs fail to identify an electronic communication, much less one with communicative "contents"; they fail to allege a contemporaneous interception; they fail to overcome the FWA's party exception; and they fail to allege the requisite intent.

14

1. **Operating a Vehicle Does Not Create an "Electronic Communication" with "Content."**

Plaintiffs fail to identify any "electronic communication" with "contents." The FWA defines "electronic communication" to mean "any transfer of signs, signals, writing, images, sounds, data, or intelligence," and it protects only the "contents" of a communication: "information concerning the [communication's] substance, purport, or meaning." 18 U.S.C. § 2510(8), (12).

*(a)    Plaintiffs fail to allege an "electronic communication."*

There is no "electronic communication" at issue here because there is no communication from the vehicle driver to an intended recipient. "Tautologically, a communication [under the FWA] will always consist of at least two parties: the speaker and/or sender, and at least one intended recipient." *In re Google Inc. Cookie Placement Consumer Priv. Litig.* ("*In re Google*"), 806 F.3d 125, 143 (3d Cir. 2015). Indeed, § 2511(2)(d) of the statute sets forth a "party exception" that presumes every communication has at least two parties capable of providing consent. *See Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 100 (2012) ("[The Court's] task is to fit, if possible, all parts [of a statute] into a[ ] harmonious whole.").

Plaintiffs do not allege they communicated with any other party. In fact, it's not even clear what Plaintiffs' theory is. To the extent Plaintiffs allege they were communicating with their vehicles or vehicle components, *see* ¶ 986, that theory fails for lack of a recipient, *see Jurgens v. Build.com, Inc.*, 2017 WL 5277679, at *6

15

(E.D. Mo. Nov. 13, 2017) (rejecting claim that "the intended recipient of [plaintiff's] 'electronic communications' was the DOM on her own computer" because "Plaintiff's interactions with her own computer were not 'communications' at all."). If Plaintiffs' theory is that GM intercepted communications occurring "within" their vehicles, *see* ¶ 986, then that theory fails for want of both a sender *and* a recipient.

That the FWA specifically excludes "any communication from a tracking device (as defined in section 3117[13] of this title)" from the definition of "electronic communication" bolsters this conclusion. 18 U.S.C. § 2510(12)(c). "[N]o communication from a tracking device can be an electronic communication." *In re App. for Pen Register & Trap/Trace Device with Cell Site Location Auth.*, 396 F. Supp. 2d 747, 759 (S.D. Tex. 2005). But Plaintiffs expressly allege that the TCU is a "tracking device." ¶ 1183.[14] The geolocation data on which Plaintiffs' claim rests plainly falls within the exception, *see McBride v. Shipley*, 2018 WL 4101524, at *3 (W.D. Okla. Aug. 28, 2018), and other elements of Driving Data—like route, speed,

---

[13] 18 U.S.C. § 3117(b) defines "tracking device" to mean "an electronic or mechanical device which permits the tracking of the movement of a person or object." "[T]he broad definition of tracking devices adopted by Congress was intended to encompass not only the limited beeper-type device that existed at the time, but also future technological permutations of tracking devices." *In re App. of U.S. for an Order Authorizing Disclosure of Location Info. of a Specified Wireless Tel.*, 849 F. Supp. 2d 526, 576 (D. Md. 2011).
[14] Plaintiffs make this allegation in the context of their California Invasion of Privacy Act claim, ¶¶ 1183–84, which is discussed below.

braking, and acceleration, *see* ¶ 1—also fall within the exception because they relate to the "movement" of Plaintiffs' vehicles (which are "objects") through space.

Congress's decision to exclude the monitoring of personal movements from the scope of the FWA confirms that Plaintiffs' Driving Data—which is analogous to that covered by the exception, if not squarely covered—is not an "electronic communication" under the FWA. That is the only interpretation that "produces a substantive effect that is compatible with the rest of the law." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Associates, Ltd*., 484 U.S. 365, 371 (1988).

### (b)    *Driving Data lacks "content."*

Even if Plaintiffs' Driving Data were an electronic communication under the FWA, it would have no statutory "content," i.e., information the user intended to communicate, such as the spoken words of a telephone call. *See United States v. Reed*, 575 F.3d 900, 916 (9th Cir. 2009). "Congress intended the word 'contents' to mean a person's intended message to another, (i.e., the 'essential part' of the communication, the 'meaning conveyed,' and the 'thing one intends to convey')." *In re Zynga Privacy Litig*., 750 F.3d 1098, 1106 (9th Cir. 2015); *see also United States v. Booker*, 2013 WL 2903562, at *6 (N.D. Ga. June 13, 2013) (Thrash, J.) (adopting R&R that "cellular site location information is not content information" because it "discloses nothing about the substance of the call itself").

Here, Plaintiffs' Driving Data was not an "intended message to another," *In re*

*Zynga Privacy Litig.*, 750 F.3d at 1106, because there is no intended communication and no "other" person to receive it. The Driving Data Plaintiffs identify is a record of the operation of a vehicle, not a content-laden communication. *See* ¶ 1 (defining "Driving Data"). Plaintiffs' allegations confirm this. They allege that Driving Data is gathered by various "components" that "detect and record . . . data concerning vehicle operation and driver behavior." ¶¶ 844–45. Courts have consistently held that, when data is "automatically generated," it is not content for purposes of the FWA—but is instead "record" information. *See In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1061 (N.D. Cal. 2012) ("[G]eolocation data . . . is generated automatically, rather than through the intent of the user, and therefore does not constitute 'content' susceptible to interception."); *see also, e.g.*, *Gonzales v. Uber Techs., Inc.*, 305 F. Supp. 3d 1078, 1085 (N.D. Cal. 2018) (dismissing FWA claim and collecting cases). Because Plaintiffs do not allege that they intended to communicate anything while operating their vehicles, Driving Data does not contain any "substance, purport, or meaning," and thus, no content that can be intercepted.

Proving the point, it is well established that video surveillance unaccompanied by sound is *not covered* by the FWA. *See, e.g.*, *Allen v. Brown*, 320 F. Supp. 3d 16, 38 (D.D.C. 2018) (observing that "*every* federal appeals or district court to have considered the question has concluded that silent video surveillance is not covered by the federal wiretapping statute"). That is because silent video surveillance only

captures conduct and does not capture the content of any communication. *See, e.g.*, *United States v. Koyomejian*, 970 F.2d 536, 538 (9th Cir. 1992). If a video recording of Plaintiffs' driving behavior would not violate the FWA, then acquiring similar information through a vehicle telematics system also does not.

### 2. Plaintiffs Have Not Identified a Contemporaneous "Interception."

Plaintiffs also do not state an FWA claim because they have not alleged GM "intercepted" a communication and did so contemporaneously, or during "flight." *Steiger*, 318 F.3d at 1048–49. Plaintiffs allege that GM intercepted computerized records of their driving habits. But under the Eleventh Circuit's "narrow reading of [the FWA]," "very few seizures of electronic communications from computers will constitute 'interceptions.'" *Id.* at 1050. That is because any interception must occur in "the seconds or mili-seconds before which a newly composed message is saved to any temporary location following a send command." *Id.*

Here, Plaintiffs allege that their vehicles use sensors to detect data, which was transferred sequentially to an ECU, then to a Gateway, then to a TCU, and finally to GM. *See* MC ¶¶ 844–57. Plaintiffs' allegations do not make clear where along this chain any purported interception occurred. On one hand, Plaintiffs allege that "GM uses the TCU to transmit detailed driving behavior . . . to itself both during routine vehicle operation and upon the completion of vehicle trips[.]" ¶ 851; *see also* ¶ 848 ("The [TCU] sends Driving Data out of the vehicle."). On the other, Plaintiffs plead

19

the conclusion that GM "intercepted . . . the contents of electronic communications transmitted *within, to, and from* Plaintiffs' vehicles." *Id*. ¶ 986 (emphasis added). Plaintiffs cannot state a claim under any of these interception theories.[15]

The former theory—that "GM uses the TCU to transmit" data "to itself" during vehicle operation, ¶¶ 849, 851—fails on multiple levels. First, GM cannot intercept a transmission to itself (as the intended recipient), *see, e.g.*, *Crowley v. CyberSource Corp*., 166 F. Supp. 2d 1263, 1268–69 (N.D. Cal. 2001), and in any event, the party exception would apply, *infra* § I.A.3. Second, interceptions that occur *after* the transmission was completed are not contemporaneous because no further "movement" of the message was necessary. *See Steiger*, 318 F.3d at 1048–49; *Global Policy Partners, LLC v. Yesin,* 686 F. Supp. 2d 631, 638 (E.D. Va. 2009) (holding that interception can only occur "when an e-mail communication is accessed at some point between the time the communication is sent and the time it is received by the destination server"). Plaintiffs' allegations confirm that "detect[ion] and record[ing]" of data occurs *prior to* any alleged transmission or interception. ¶ 844 (alleging GM "equipp[ed] vehicles with components that detect and record substantial amounts of data. . . *and then* transmit[ed] that information")

---

[15] Plaintiffs' FWA claim must be dismissed to the extent it relies on concededly non-contemporaneous data transfers—e.g., data transmitted "after a vehicle trip is completed," ¶ 844, or at periodic intervals after data has been stored, however briefly, ¶ 855; *see, e.g., Steiger*, 318 F.3d at 1050.

(emphasis added); *see also* ¶¶ 848, 854–55 (alleging the TCU "sends Driving Data out of the vehicle" directly to GM after the data is generated). Thus, these transmissions were no longer "in flight" when GM allegedly "intercepted" them. *Steiger*, 318 F.3d at 1048–49; *see also Sunbelt Rentals, Inc. v. Victor*, 43 F. Supp. 3d 1026, 1031 (N.D. Cal. 2014) (dismissing FWA claim because "[i]f anything, the pleadings suggest that [defendant] read [the] text messages *after* they were sent and received").

Nor have Plaintiffs alleged the contemporaneous interception of any "communications transmitted within" or "to" their vehicles. ¶ 986. Any transmission a driver sent *to* her vehicle must have reached its intended destination before any interception occurred. *See Steiger*, 318 F.3d at 1048 (noting the "ordinary meaning" of "intercept" is "to stop, seize, or interrupt . . . before arrival"). Thus, if Plaintiffs were somehow "communicating" with their vehicles (by operating them), then the endpoint of those transmissions must logically be the vehicle. To the extent Plaintiffs rely on *intra*-vehicle transmissions, then no interception is alleged whatsoever. The MC describes a linear chain of transmissions—from sensors to ECUs, ECUs to Gateways, and from Gateways to TCU. *See* ¶¶ 844–57. Even if such intra-component transmissions could be considered "communications" with "contents," there is no allegation GM intercepted them before they reached their destination.

Moreover, any alleged interception did not occur *while* these transmissions

were being sent through a system that affects interstate commerce. To be an "electronic communication" under the FWA, a transmission must occur through a "system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12). For this reason, internal computer signals, like those occurring within Plaintiffs' vehicles, cannot be intercepted. For example, "use of a keylogger will not violate the [FWA] if the signal or information captured from the keystrokes is *not at that time* being transmitted beyond the computer on which the keylogger is installed." *United States v. Barrington*, 648 F.3d 1178, 1201–03, n.25 (11th Cir. 2011); *Rene v. G.F. Fishers, Inc.*, 817 F. Supp. 2d 1090, 1094 (S.D. Ind. 2011) ("[C]ontemporaneous interception must occur *while* the transmission is traveling through a system that affects interstate or foreign commerce.") (emphasis added); *United States v. Ropp*, 347 F. Supp. 2d 831, 831 (C.D. Cal. 2004). Here, any transmission sent from Plaintiffs to their vehicles, or within them, did not utilize a connection to an external network; rather, it "exists internally" on the vehicle. *Rene*, 817 F. Supp. 2d at 1094. If Plaintiffs' alleged interception occurred while those transmissions were travelling through a self-contained system of components within their vehicles, then, "[a]s in *Barrington* and *Ropp* . . . the system through which these signals traveled did not affect interstate or foreign commerce." *Id*.

Instead of alleging an actionable interception, Plaintiffs' claim takes aim at GM's purportedly unauthorized access to Driving Data. That is insufficient. "[I]n a

consistent string of cases courts have held time and again that unauthorized access to an email account, standing alone, does not constitute interception." *Bruce v. McDonald*, 2014 WL 931522, at *5 (M.D. Ala. Mar. 10, 2014) (collecting cases). The same rationale applies here because unauthorized access "almost always happens *after* the transmission." *Id*. at *6 (emphasis original). Unauthorized access simply "does not constitute an interception of electronic communications in violation of the Wiretap Act." *Steiger*, 318 F.3d at 1050; *see also, e.g.*, *Larson v. Liberty Mut. Fire Ins. Co*., 2012 WL 93181, at *8 (D. Haw. Jan. 10, 2012); *Benessere Inv. Group, LLC v. Swider*, 2024 WL 4652090, at *4–5 (S.D. Fla. Oct. 31, 2024).

### 3. The FWA's "Party Exception" Applies Because Driving Data Was Sent Directly to GM.

Plaintiffs' FWA claims fail for the independent reason that GM is a party to the communications at issue, and the FWA does not impose liability on one who is "a party to the communication or where one of the parties to the communication has given prior consent to such interception." 18 U.S.C. § 2511(2)(d).

Here, Plaintiffs allege that GM, by design, was the intended recipient of the TCU's transmissions via the "cellular network connection" that GM installed in all cars. *See, e.g.*, ¶ 849, 851–52, 854. No other intended recipient is identified. The party exception applies when a communication is sent directly to a defendant or using a defendant's platform. *See In re Google*, 806 F.3d at 143–44; *Jurgens*, 2017 WL 5277679, at *5. Thus, Plaintiffs' FWA claim must be dismissed if it is premised

on transmissions *from* their vehicles—because such communications occurred directly *with* GM. Alternatively, if Plaintiffs allege GM intercepted transmissions *to* or *within* their vehicles, ¶¶ 985–86, the party exception still applies because these transmissions were, in fact, sent to GM, *see, e.g.* ¶ 854 (alleging GM "transmits" data "to itself"). That Plaintiffs were unaware of those circumstances, or allegedly did not consent to them, is irrelevant. *In re Google*, 806 F.3d at 143 (3d Cir. 2015).

*In re Google* involved claims that Google placed "tracking cookies" on consumers' web browsers, allowing Google to track users' behavior by associating their browsers' "GET requests" (sent to host websites) with particular users. *Id.* at 130–31. While plaintiffs only ever intended to visit the host website, Google automatically sent a separate GET request, enabling it to track future internet use. *Id.* at 131–32. The Third Circuit held that those "direct transmissions between the plaintiffs and the defendants" meant that Google was the "intended recipient." *Id.* at 141–42; *see also In re Nickelodeon Consumer Privacy Lit.*, 827 F.3d 262, 275–76 (3d Cir. 2016) (applying *In re Google* to similar facts). In so holding, the Court rejected plaintiffs' argument that the party exception did not apply because they were "induced to [send the GET requests] by deceit." *In re Google*, 806 F.3d at 143. The court reasoned that there "is no statutory language indicating" that the exception "excludes intended recipients who procured their entrance to a conversation through a fraud in the inducement" or by "deceiving" the plaintiffs. *Id.* Indeed, when

24

Congress enacted the FWA in 1968, it stated the term "party" meant "the person *actually participating* in the communication," regardless of whether that person was who they purported to be. *See id.* at 144–45 (cleaned up); *see also T.D. v. Piedmont Healthcare, Inc.*, 2024 WL 3972984, at *4 (N.D. Ga. Aug. 28, 2024) (Thrash, J.) (applying *In re Google* to hold that a defendant, alleged to have intercepted information with a pixel embedded on its own website without the plaintiffs' consent, was entitled to party exception).[16]

### 4.    Plaintiffs Fail to Allege the Intent Required to State a Claim Under Sections 2511(1)(c) and (d).

Plaintiffs also assert that GM violated §§ 2511(1)(c) and (d) of the FWA, which prohibit the "use" and "disclosure" of electronic communications that GM knew or had "reason to know" were intercepted in violation of the FWA. ¶¶ 992–93. Because these sections require a primary violation of the FWA, Plaintiffs' claims fail for all the same reasons set forth above. But these claims also fail because Plaintiffs do not allege GM *knew* that any purported interception violated the FWA.

Sections 2511(1)(c) and (d) "establish[ ] two preconditions to a finding of

---

[16] The Fifth and Sixth Circuits have also held that the party exception applies even where the communication was procured through alleged fraud or deceit. *See Clemons v. Waller*, 82 F. App'x 436, 441–42 (6th Cir. 2003) (applying party exception to an investigator, hired by defendant, who impersonated individual in order to obtain wife's coworker's cell-phone records); *United States v. Campagnuolo*, 592 F.2d 852, 861–63 (5th Cir. 1979) (applying party exception to FBI agent who, during search of suspected bookmaker's residence, reconnected bookmaker's telephone and answered calls from alleged gamblers).

liability: the interception must have violated the law, and the defendant must have known or had reason to know this when he disclosed the contents of the intercepted communication." *Nix v. O'Malley*, 160 F.3d 343, 348 (6th Cir. 1998). So, "[t]o be liable under § 2511(1)(c) or § 2511(1)(d), a defendant must know or have reason to know sufficient facts concerning the circumstances of the interception such that the defendant could . . . determine that the interception was prohibited [by] the Wiretap Act." *McCann v. Iroquois Memorial Hosp.*, 622 F.3d 745, 753 (7th Cir. 2010). And "[i]t is not enough to know that the conversation was intercepted; the defendant must also be able to tell that none of the statutory exceptions apply." *Id*. at 753.

The MC does not plausibly allege that GM knew it was violating the FWA. Instead, Plaintiffs simply parrot the language in §§ 2511(1)(c)-(d), *see* ¶¶ 992–33, which is not enough to state a claim, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Nor could GM have been on notice of any purported violation—as no court has ever applied the FWA so expansively. In any event, Plaintiffs allege the TCU sends data directly to GM, ¶¶ 850–57, so, at a minimum, GM had no reason to expect that the party exception would not apply. *See McCann*, 622 F.3d at 754 (no FWA liability where defendant knew he did not "intercept[] the conversation").

### 5.     Plaintiffs' State Analog Claims Should Also Be Dismissed.

The MC also includes nine claims asserted under state wiretapping statutes that are analogous to the FWA, including statutes in California, Delaware, Florida,

Illinois, Maryland, Massachusetts, Nebraska, New Hampshire, and Pennsylvania (Counts 14, 23, 25, 30, 35, 38, 41, 43, and 55).[17] The relevant provisions of these state statutes are virtually (and in many instances, exactly) identical to the relevant provisions of the FWA: At their core, these statutes all prohibit the "interception" of "communications."[18] Courts analyze the FWA and these state analogs together,[19] although some of the state statutes provide even narrower prohibitions. For example, the Massachusetts and New Hampshire statutes do not apply to electronic

---

[17] As discussed below, Plaintiffs also lack standing to assert claims under the Massachusetts Wiretap Act (Count 38), the Nebraska Wiretap Law (Count 41), and the New Hampshire Wiretapping and Eavesdropping Act (Count 43) because no Plaintiff resides in those states.

[18] *See* Cal. Penal Code § 631(a) (Count 14); 11 Del. C. § 2402 (Count 23); Fla. Stat. § 934.03(2)(d) (Count 25); 720 Ill. Comp. Stat. Ann. 5/14-2(a)(1)-(5); Md. Code Ann., Cts. & Jud. Proc. § 10-402(c)(3) (Count 35); Mass. Gen. Laws Ann. ch. 272, § 99B.4. (Count 38); Neb. Rev. Stat. Ann. § 86-290 (Count 41); N.H. Rev. Stat. Ann. § 570-A:2 (Count 43); 18 Pa. C.S.A § 5703 (Count 55).

[19] *See Brodsky v. Apple, Inc.*, 445 F. Supp. 3d 110, 127 (N.D. Cal. Apr. 7, 2020) ("The analysis for a violation of CIPA is the same as that under the federal Wiretap Act."); *State v. Brinkley*, 132 A.3d 839, 843 (Del. Super. 2016) ("[T]he federal wiretap statute and Delaware's wiretap statute [are] in all material respects virtually identical."); *People v. Ledesma*, 795 N.E.2d 253, 258–60 (Ill. 2003) (same for Illinois); *Ramos v. Delphi Behav. Health Grp., LLC*, 2022 WL 1415856, at *1 (11th Cir. May 4, 2022) (similar for Florida); *Sanders v. State*, 57 Md. App. 156, 164 (1984) (similar for Maryland); *Williams v. Raynor Rensch & Pfieffer*, 2015 WL 2127095, at *13 (D. Neb. May 6, 2015) (same for Nebraska); *Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121, 125 (3d Cir. 2022) (explaining that Pennsylvania's wiretap law "operates in conjunction with and as a supplement to the Federal Wiretap Act").

communications at all.[20] Plaintiffs' state statutory claims therefore fail for the same reasons as their FWA claim.

The only relevant difference between the FWA and the state statutes at issue here is that five of the statutes—those in Florida, Maryland, Massachusetts, New Hampshire, and Pennsylvania—do not recognize the party exception like the FWA, meaning that a party to a communication still can be liable for secretly recording it without the consent of all other parties to the communication. No matter; these claims still fail for the reasons above—because Plaintiffs do not allege that GM contemporaneously intercepted the contents of any communication.

Finally, Plaintiffs also claim that GM violated California Penal Code § 637.7, which prohibits "us[ing] an electronic tracking device to determine the location or movement of a person." Cal. Penal Code § 637.7(d). Under California law, a "tracking device" must be "attached to a vehicle." *Id.* § 637.7(a). A "TCU falls short" of that definition because it is a "component of Plaintiff's vehicle and not a device that was attached" to it. *Mollaei v. Otonomo Inc*., 651 F. Supp. 3d 1135, 1141 (N.D. Cal. 2023). GM additionally joins in the CRA Defendants' arguments on the state wiretapping claims. CRA Defs.' Br. (Dkt. 141-1) § III.

---

[20] *See Vita v. New England Baptist Hosp.,* 243 N.E.3d 1185, 1203–04 (Mass. 2024) (holding that definition of "communication" under Massachusetts wiretapping law was narrower than the FWA); N.H. Rev. Stat. Ann. § 570-A:1–2 (narrowly proscribing unlawful interception of oral communications and telecommunications).

### B.    Plaintiffs' Federal and State Stored Communications Act Claims Must Be Dismissed.

Plaintiffs' claim that GM violated the Stored Communications Act ("SCA") fares no better than their FWA claim. Enacted as part of the same legislation, the FWA regulates the contemporaneous interception of a communication while the SCA covers access to electronic information while it is "in electronic storage." Specifically, the SCA prohibits "(1) intentionally access[ing] without authorization a facility through which an electronic communication service is provided," or "(2) intentionally exceed[ing] an authorization to access that facility," and (3) "thereby obtain[ing], alter[ing], or prevent[ing] authorized access to a wire or electronic communication while it is in electronic storage." 18 U.S.C. § 2701(a). To state a claim under § 2701, Plaintiffs must identify a "facility through which an electronic communication service is provided," describe the electronic communications that were in "electronic storage," and plead facts showing unauthorized "access" to those communications. *Id.* Plaintiffs meet none of these requirements: (1) ECUs and TCUs are not "facilities" under the SCA, (2) the alleged communications were not in "electronic storage," and (3) GM and OnStar's alleged conduct was authorized under § 2701(c)'s exceptions.

### 1.    <u>TCUs and ECUs Are Not "Facilities" Under the SCA.</u>

To violate § 2701, a defendant must access a "facility through which an electronic communication service is provided." *Id.* An "electronic communication

service" is "any service [that] provides to users thereof the ability to send and receive wire or electronic communications." *Id.* § 2510(15). The statute does not define the term "facility," but the Eleventh Circuit has held that "the SCA clearly applies . . . to information stored with a phone company, Internet Service Provider (ISP), or electronic bulletin board system[.]" *Steiger*, 318 F.3d at 1049. By contrast, an individual's computer or device—which provide *only* their owners, *not* third parties, the ability to send or receive messages—are not "facilit[ies]." *See id.* (holding computer was not a "facility"); *In re Nickelodeon*, 827 F.3d at 277 (holding "personal computing devices" were not "facilities").[21]

Here, Plaintiffs' SCA claim hinges on the allegation that "[i]n-vehicle units . . . such as ECUs and TCUs" are "facilities" under the SCA. ¶ 1021. They are not. The "sensors" and "processing units" described in the MC, ¶ 847, are nothing like the "phone compan[ies]" or "ISP[s]" the SCA was designed to protect, *Steiger*, 318 F.3d at 1049. Even if the ECUs and TCUs in Plaintiffs' vehicles "enable the use of an electronic communication service," they are not "facilities that are operated by electronic communication service providers and used . . . [for] electronic storage,"

---

[21] *See also In re Google*, 806 F.3d at 146–48 (similar); *In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 821 (N.D. Cal. 2020) (holding "personal device" was not a "facility"); *In re Facebook Internet Tracking Litig.*, 263 F. Supp. 3d 836, 845 (N.D. Cal. 2017) (similar), *aff'd*, 956 F.3d 589 (9th Cir. 2020); *In re iPhone App.*, 844 F. Supp. 2d at 1058 (holding iPhones and iPads were not "facilit[ies]").

as required by the statute. *Freedom Banc Mortg. Servs., Inc. v. O'Harra*, 2012 WL 3862209, at *9 (S.D. Ohio Sept. 5, 2012). ECUs and TCUs are no different from the laptops, iPads, and mobile phones that courts hold are not "facilit[ies]" under the statute. That alone mandates dismissal of the SCA claim. *See In re Google Assistant*, 457 F. Supp. 3d at 822; *In re iPhone App.*, 844 F. Supp. 2d at 1058–59.

## 2. Driving Data Is Not in "Electronic Storage."

To violate § 2701, a defendant must also access an electronic communication while it is in "electronic storage." 18 U.S.C. § 2701(a). "Electronic storage" is defined as "(A) any temporary, intermediate storage of a[n] . . . electronic communication *incidental to the electronic transmission thereof*; and (B) any storage of such communication by an electronic communication service for *purposes of backup protection*[.]" *Id.* § 2510(17) (emphasis added). Courts thus construe the term "electronic storage" to encompass "*only* that information that has been stored by an electronic communication service provider," such as information an "internet or email provider stores to its servers" or "information stored with a telephone company." *Freedom Banc*, 2012 WL 3862209, at *8 (citing *Steiger*, 318 F.3d at 1049). Conversely, "[i]nformation that an individual stores to his or her hard drive . . . is not in electronic storage [under] the statute." *Id.* at *9; *see also In re Facebook*, 956 F.3d at 609 (explaining "the SCA has typically only been found to apply in cases involving a centralized data-management entity," such as "servers").

Here, the communications were never in "electronic storage." Plaintiffs do not allege GM ever stored the communications "for purposes of backup protection." 18 U.S.C. § 2510(17)(B). Rather, Plaintiffs allege their vehicles' ECUs and TCUs "temporarily stored" the communications. ¶ 1025. But these devices are "sensors" and "mini-computers" in individual vehicles, ¶ 847, not a "centralized data-management entity"—like an ISP or phone company—that temporarily stores communications while transmitting them, *In re Facebook*, 956 F.3d at 609.

Plaintiffs' allegations thus fail for three related reasons. *First*, the data at issue is not a "communication" under the SCA because there is no intended counterparty. *Supra* § I.A.1. *Second*, the information stored in individual vehicles' components is not akin to communications stored on email servers—rather, it is akin to information stored on other personal devices and cannot be in "electronic storage" under the SCA. *See Cohen v. Casper Sleep Inc.*, 2018 WL 3392877, at *5 (S.D.N.Y. July 12, 2018) (dismissing SCA claim where communications were stored on plaintiff's personal device); *Williams v. Rosenblatt Sec. Inc.*, 136 F. Supp. 3d 593, 607 (S.D.N.Y. 2015) (similar, personal computer); *Hilderman v. Enea Teksci, Inc.*, 551 F. Supp. 2d 1183, 1205 (S.D. Cal. 2008). *Third*, the communications are not stored during "transmission" to an "intended recipient." *See, e.g.*, *Mastel v. Miniclip SA*, 549 F. Supp. 3d 1129, 1142–43 (E.D. Cal. 2021) (dismissing claim where plaintiff failed to allege text stored on app was "in transit . . . to an intended recipient"); *Cline*

*v. Reetz-Laiolo*, 329 F. Supp. 3d 1000, 1044 (N.D. Cal. 2018) (holding defendant must have "accessed plaintiffs' emails *pending delivery* to their intended recipient" to violate SCA). According to Plaintiffs, TCUs and ECUs do not serve as storage for the transmission of communications from Plaintiffs' vehicles to an intended recipient—they are the devices that *initiate* the transmissions to the intended recipient (GM). *See* ¶¶ 851–52 (alleging "TCU[s]" "transmit" data from GM cars).

### 3.     The SCA's Exceptions Apply to GM's Alleged Conduct.

Even if Plaintiffs had adequately alleged GM and OnStar accessed communications in "electronic storage" in a "facility," the claim would still fail because GM and OnStar's alleged conduct falls within the SCA's exceptions for "conduct authorized: (1) by the person or entity *providing a wire or electronic communications service*; [or] (2) by a *user of that service* with respect to a communication *of or intended for that user*." 18 U.S.C. § 2701(c) (emphasis added).

In light of this statutory language, courts reject as "frivolous" SCA claims where the *defendant itself* is alleged to provide the electronic communication service. *In re Google, Inc. Privacy Policy Litig.*, 2013 WL 6248499, at *12 (N.D. Cal. Dec. 3, 2013) ("[Google] plainly authorized actions that it took itself."); *see also Lopez v. Apple, Inc.*, 519 F. Supp. 3d 672, 686 (N.D. Cal. 2021) ("Apple is the

service provider here and presumably authorized its own conduct.").[22] Courts likewise dismiss SCA claims where the *defendant itself* was the recipient of the allegedly accessed communications. *See, e.g.*, *In re iPhone*, 844 F. Supp. 2d at 1060 (dismissing SCA claim where communications were "directed at [mobile application] providers" and thus "the [mobile application] providers were authorized" to access and disclose the communications); *In re DoubleClick, Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 508–09 (S.D.N.Y. 2001) (holding websites were "users" where communications at issue were intended for them).

Plaintiffs' SCA claim fails for the same reasons. *First*, according to Plaintiffs, *OnStar itself* provides the "electronic communication service" at issue. Plaintiffs allege that "ECUs and TCUs" provide "electronic communication services," ¶ 1021, and do so through OnStar, *see* ¶ 656 (OnStar "provides communications . . . and information services to GM vehicles"); ¶ 661 (OnStar provides "telecommunication[s]" and "cellular technologies" using "onboard electronics"); ¶ 834 (GM transmitted data using "the car's cellular network"). Plaintiffs'

---

[22] *Pica v. Delta Air Lines, Inc.*, 2019 WL 1598761, at *6 (C.D. Cal. Feb. 14, 2019) ("The Court would have to accept the conclusion that Delta, in unlawfully accessing its own servers, did not have Delta's own authorization. But this conclusion would defy logic."), *aff'd*, 812 F. App'x 591 (9th Cir. 2020); *In re Google Assistant*, 457 F. Supp. 3d at 822 ("Defendants have authorization to access their own servers."); *Svenson v. Google Inc.*, 65 F. Supp. 3d 717, 726 (N.D. Cal. 2014) (plaintiff did not demonstrate that "Defendants were not authorized to access their own servers.").

"frivolous" SCA claim therefore fails. *In re Google*, 2013 WL 6248499, at *12.

*Second*, the Complaint shows the alleged communications were "intended for" GM and OnStar. 18 U.S.C. § 2701(c)(2). Plaintiffs allege that "nearly all GM-manufactured cars" utilize "OnStar technology," including TCUs, ¶¶ 1, 850, and that "GM uses . . . TCU[s] to transmit detailed driving behavior and geolocation information *to itself*," ¶ 851 (emphasis added). Moreover, as with their FWA claim, Plaintiffs do not allege anyone *other* than GM or OnStar were the intended recipients of these communications. *In re iPhone*, 844 F. Supp. 2d at 1060.[23]

### 4.    Plaintiffs' Claims Under Analogous State Statutes Fail.

Plaintiffs' claims under the analogous statutes of Maryland, Nebraska, and Pennsylvania fail for the same reasons as their federal SCA claim.[24] *See* ¶¶ 1522–36, 1640–59, 1851–72. The operative provisions of the state statutes are virtually identical to the federal SCA. *See* Md. Cts. & Jud. Pro. § 10-4A-02; Neb. Rev. Stat. § 86–2,104; 18 Pa. C.S. § 5741; *In re Info. Mgmt. Servs., Inc. Derivative Litig.*, 81 A.3d 278, 295 (Del. Ch. 2013) ("The Maryland act generally parallels the federal act."); *Exeter Twp. v. Gardecki*, 2018 WL 6616930, at *3 (E.D. Pa. Dec. 17, 2018) (same for Pennsylvania statute). The same arguments therefore apply. *E.g.*, *Martin*

---

[23] Plaintiffs' assertion that they are entitled to recover the "lost . . . value" of their data under the SCA is likewise meritless. ¶¶ 1032–33. *See infra* § II.B.1

[24] Plaintiffs also lack standing to assert a claim under the Nebraska statute because no Plaintiff resides in Nebraska. *See infra* § III.B.

*v. State*, 96 A.3d 765, 777 (Md. App. 2014) (holding cell phone was not a "facility" under Maryland statute); *Thompson v. Ross*, 2010 WL 3896533, at *4 (W.D. Pa. Sept. 30, 2010) (dismissing statutory claim where emails were not in "temporary" storage "incidental" to transmission); *Ideal Aerosmith, Inc. v. Acutronic USA, Inc.*, 2007 WL 4394447, at *6–7 (E.D. Pa. Dec. 13, 2007) (holding defendant, as a provider of an electronic communication service, had authority to access the communications).

### C.    Plaintiffs' CFAA Claim Must Be Dismissed.

Plaintiffs similarly overreach in trying to assert a claim under the CFAA, another federal criminal statute. The CFAA is "aimed at preventing the typical consequences of hacking," *Van Buren v. United States*, 593 U.S. 374, 392 (2021), and a private plaintiff may maintain a CFAA claim "only when certain prerequisites [a]re met." *Egilman v. Keller & Heckman, LLP*, 401 F. Supp. 2d 105, 110 (D.D.C. 2005). Relevant here, the CFAA applies to one who "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer." 18 U.S.C. § 1030(a)(2)(C). Plaintiffs' CFAA claim fails because (1) GM's access to Plaintiffs' in-vehicle computers was authorized; (2) GM did not intend for its access to be unauthorized; and (3) Plaintiffs do not plead "loss."

### 1.    GM's Access Was Authorized, or, Alternatively, Was Not Intentionally Unauthorized.

The Supreme Court has held that the CFAA's "without authorization" clause

"protects computers themselves by targeting so-called outside hackers—those who access a computer without any permission at all"—while the "exceeds authorized access" clause provides "complementary protection . . . by targeting so-called inside hackers—those who access a computer with permission, but then 'exceed' the parameters of authorized access by entering [a forbidden] area of the computer." *Van Buren*, 593 U.S. at 389, 390. Importantly, the CFAA "does not cover those who . . . have improper motives for obtaining information that is otherwise available to them." *Id.* at 378. Whether access is "authorized" instead depends on a "gates-up-or-down inquiry—one either can or cannot access a computer system, and one either can or cannot access certain areas within the system." *Id*. at 390.

"[A] violation for accessing 'without authorization' occurs only where initial access is not permitted," *Diamond Power Int'l, Inc. v. Davidson*, 540 F. Supp. 2d 1322, 1343 (N.D. Ga. 2007), and requires "circumvent[ing] a computer's . . . rules regarding access permissions, such as username and password requirements," *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1201 (9th Cir. 2022); *see also Salinas v. Cornwell Quality Tools Co.*, 2022 WL 3130875, at *5 (C.D. Cal. June 10, 2022) (information must be "delineated as private through use of a permission requirement . . . such as a password gate."); *Auto. Assurance Grp. v. Giddens*, 2022 WL 18460629, at *7 (N.D. Ga. Sept. 20, 2022) (no violation where former employee gained access using old credentials employer "failed to rescind").

37

Under this standard, GM did not access the computers in Plaintiffs' vehicles "without authorization." Far from it. Plaintiffs' theory is that GM "pre-installed" "OnStar technology" in all vehicles since 2015 specifically because it *could* access that technology to collect data. ¶¶ 1, 662. And they allege that OnStar is used to "connect drivers to first responders," provide "hundreds of diagnostics" checks, and for navigation, ¶ 663—all services that require access and connectivity. Indeed, Plaintiffs allege GM sends *itself* Driving Data through vehicles' TCUs, ¶ 854.

Thus, Plaintiffs' quarrel is with the substance of the data GM collected, not the fact that GM had access to Plaintiffs' vehicle computers. GM and OnStar, as the entities that manufacture and provide OnStar connected services, clearly have access to Plaintiffs' TCUs, and Plaintiffs do not allege that GM had to circumvent any passwords or security obstacles. When "computer code allows a user to take a certain action, it's usually fair to say that the system authorizes the access." *Abu v. Dickson*, 107 F.4th 508, 515 (6th Cir. 2024). GM did not hack into Plaintiffs' vehicles; Plaintiffs purchased vehicles "equipped with OnStar" that GM itself manufactured. ¶ 849. From GM's perspective, the "gates" were "up." *See Orbit One Commc'ns, Inc. v. Numerex Corp.*, 692 F. Supp. 2d 373, 386 (S.D.N.Y. 2010) (no CFAA violation where defendants had "unfettered access" to computer system).

Plaintiffs' real theory is not that GM lacked access to their in-vehicle computers, but instead that GM *exceeded* authorization by deceiving them, failing

to obtain consent, or using its access for improper purposes (data collection).[25] This case is thus akin to *Fish v. Tesla*, 2022 WL 1552137, at *9 (C.D. Cal. May 12, 2022), in which plaintiffs alleged Tesla "exceeded authorized access" by accessing their cars' "media control unit ('MCU')" to make "damaging" software updates without their consent. The court rejected that argument. Because plaintiffs did not "plausibly allege[] that Defendant did not have unfettered access to their MCUs," the fact that Tesla "damaged these systems without [their] consent is irrelevant." *Id.; see also Bui-Ford v. Tesla, Inc.*, 2024 WL 694485, at *4 (N.D. Cal. Feb. 20, 2024) (rejecting argument that Tesla accessed "without authorization because [it] concealed the true nature of the updates through misleading omissions in statements to consumers").

Nor may Plaintiffs rely on allegedly improper motives—i.e., that GM was authorized to provide "emergency" and "GPS services" but had no "authorization to collect" data. *E.g.*, ¶¶ 525–26. *Van Buren* held that a defendant "does not violate the CFAA" by obtaining information it has "access" to—"regardless of whether [the defendant] pulled the information for a prohibited purpose." 593 U.S. at 382–83; *see also Rogers v. Staton*, 2024 WL 4543192, at *9 (N.D. Ga. Feb. 15, 2024) (dismissing

---

[25] *See* ¶ 1045 (alleging GM accessed Plaintiffs' vehicles without authorization "or in a manner that exceeded [their] authorization"); ¶¶ 665–66 (alleging GM falsely told consumers "OnStar is an 'in-vehicle safety and security system'"); ¶¶ 877–911 (describing GM's "deceptive" marketing and onboarding tactics to "harvest" data); ¶¶ 858–70 (alleging GM failed to obtain informed consent).

CFAA claim where "it was not the access to information by Defendant that was unauthorized, it was the purpose for which he used the information").

Plaintiffs' claim also fails because they do not plead GM's intent. Because the CFAA is a criminal statute, the "wrongdoing must be conscious to be criminal." *Abu*, 107 F.4th at 516–17. The CFAA "prohibits only 'intentionally' exceeding authorized access," so a violator must "purposefully access an area of a computer *and know that it is forbidden*." *Id.* (emphasis added). Consequently, Plaintiffs cannot state a claim without alleging this "mens rea requirement of intentionality." *Salinas*, 2022 WL 3130875, at *5–6 (holding that defendant did not intend to exceed its authorization).

Here, 10 of the 47 Plaintiffs allege that they *affirmatively* enrolled in OnStar themselves, and most remaining Plaintiffs allege that an independent car dealer—not GM—activated OnStar at the time of purchase. *See supra* at 8. Plaintiffs do not allege facts suggesting GM knew (or could have known) whether a given enrollment was effectuated by a dealer rather than the purchaser. In fact, they allege that individual "dealership employees" would "click[ ] through screens and agreements without obtaining customer consent." ¶¶ 885–86. Thus, even accepting the premise that insufficient customer consent renders access "unauthorized," Plaintiffs do not plead that GM *knew* its access was unauthorized as to any single Plaintiff.[26]

---

[26] At minimum, the claims of the 10 Plaintiffs who affirmatively enrolled in OnStar must be dismissed.

### 2.     **Plaintiffs Do Not Plead Loss Under the CFAA.**

Plaintiffs' CFAA claim must also be dismissed for the independent reason that they do not plead "loss" under the statute. The CFAA's private right of action is available only if the "conduct involves 'loss to 1 or more persons . . . aggregating at least $5,000 in value.'" ¶ 1047 (quoting 18 U.S.C. §§ 1030(g), 1030(c)(4)(A)(i)(I)). And the term "loss" is defined narrowly—to include "the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense," or "consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11).

The "statutory definitions of 'damage' and 'loss' thus focus on technological harms—such as the corruption of files—of the type unauthorized users cause to computer systems and data." *Van Buren*, 593 U.S. at 392. This "makes sense in a scheme aimed at preventing the typical consequences of hacking." *Id.*; *see also Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1263 (9th Cir. 2019) ("The statute's 'loss' definition . . . clearly limits its focus to harms caused by computer intrusions, not general injuries unrelated to the hacking itself."); *Brown Jordan Int'l, Inc. v. Carmicle*, 846 F.3d 1167, 1174 (11th Cir. 2017) (recognizing only two "types of loss: (1) reasonable costs incurred in connection with . . . responding to a violation" and "(2) any revenue lost . . . or other consequential damages incurred because of interruption of service."); *M-I LLC v. Stelly*, 733 F. Supp. 2d 759, 780 (S.D. Tex.

2010) ("[C]ase law has consistently interpreted the loss provision to encompass only the costs incurred as a result of investigating or remedying damage to a computer, or costs incurred because the computer's service was interrupted.").

Here, Plaintiffs do not allege any technological harm to their vehicles or interruption of service. Rather, Plaintiffs generically allege that they "suffered harm and injury due to GM's unauthorized access," including the "loss of their privacy interest in and control over their Driving Data[.]" ¶¶ 1046–47. The MC elsewhere alleges that certain Plaintiffs were charged higher insurance premiums or suffered insurance coverage denials due to Defendants' data-sharing. *E.g.*, ¶¶ 20, 35. But these alleged injuries plainly are not "technological harms" of the type caused by "hacking," and they do not suffice under the CFAA. *Van Buren*, 593 U.S. at 392.

Indeed, courts reject precisely the "loss" Plaintiffs allege here. In *Andrews*, the Ninth Circuit held that taking "personal information without compensat[ion]" or losing "the value of [personal] information" do not qualify as "loss" under the CFAA. 932 F.3d at 1262–63. The Third Circuit has likewise concluded that collecting personal data from consumers without their consent does not constitute "loss." *In re Google*, 806 F.3d at 148–49 (3d Cir. 2015) (rejecting loss premised on nonconsensual collection of consumers' Internet browsing histories).[27]

---

[27] *Accord Moonlight Mountain Recovery, Inc. v. McCoy*, 2024 WL 4027972, at *5 (D. Idaho Sept. 3, 2024) ("costs incurred investigating the [CFAA] violation" were

The Ninth Circuit's *Andrews* decision, which concerned data sharing in the automotive industry, is instructive. The plaintiff purchased a used vehicle equipped with Sirius XM radio; in the process, he provided the car dealer with personal information. 932 F.3d at 1255–56.  Unbeknownst to plaintiff, the dealer allowed Sirius XM to access the database containing his personal information, which Sirius XM used to contact plaintiff to encourage him to renew his "trial subscription." *Id.* Plaintiff argued that he suffered a "loss" because Sirius XM "stole the personal information" without compensation and he "lost the value of that information." *Id.* at 1262. The Ninth Circuit rejected that argument: the "CFAA is an anti-hacking statute, not an expansive misappropriation statute," such that "loss" only encompasses "harms caused by computer intrusions." *Id.* at 1263; *see also Amerair Indus. of Delaware, LLC v. Indus. Accessories Co*., 2022 WL 1399535, at *6 (N.D. Ga. Mar. 30, 2022) ("Put plainly, 'loss' includes the direct costs of responding to the violation, and consequential damages resulting from any interruption of service.").

Plaintiffs categorically do not allege that GM's "unauthorized access" to their vehicles' computer systems damaged those systems or caused an "interruption of service." Nor do they allege they incurred expenses in remediating damage to their

---

cognizable whereas the "misappropriation of information" was "not considered compensable loss"); *In re iPhone App.*, 844 F. Supp. 2d at 1068 ("Courts have tended to reject the contention that [collecting] personal information . . . constitutes economic damages under the CFAA.") (collecting cases).

vehicles caused by such access. Plaintiffs thus fail to plead "loss." *See Van Buren*, 593 U.S. at 392; *Brown Jordan*, 846 F.3d at 1174; *Andrews*, 932 F.3d at 1263.

### D. California Plaintiffs' Claim Under the California Computer Data Access and Fraud Act ("CDAFA") Fails for Similar Reasons.

As a "state law counterpart to the CFAA," CDAFA claims generally "rise or fall with CFAA claims." *See Meta Platforms, Inc. v. BrandTotal Ltd*., 605 F. Supp. 3d 1218, 1260 (N.D. Cal. 2022); Cal. Pen. Code § 502. Here, GM's access was not unauthorized under CDAFA because Plaintiffs do not allege GM had to "circumvent technical or code based barriers," *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1217 (N.D. Cal. 2014), and there is no "injury" because CDAFA only allows recovery for "damage to the computer system"—not for "alleged privacy invasions," *Heiting v. Taro Pharms. USA, Inc.*, 709 F. Supp. 3d 1007, 1021 (C.D. Cal. 2023).

## II. Plaintiffs' State Law Claims Must Be Dismissed.

### A. Plaintiffs' Common Law and State Statutory Claims Are Preempted by the Fair Credit Reporting Act.

Many of Plaintiffs' common law and statutory claims fail as a threshold matter because they are both expressly and impliedly preempted by the FCRA.

Express preemption applies when a statute "contains an express pre-emption clause," which "contains the best evidence of Congress' pre-emptive intent." *Commonwealth of P.R. v. Franklin Cal. Tax-free Tr*., 579 U.S. 115, 125 (2016). The express preemption inquiry focuses on "whether the legal duty that is the predicate" of a plaintiff's claims falls within the preemptive scope of a statute's express

preemption clause. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 524 (1992). State law may also be impliedly preempted. The principle of "conflict preemption," a form of implied preemption, displaces a state law that "stands as an obstacle" to the "full purposes and objectives of a federal law." *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 873 (2000) (citation omitted); *see also Williamson v. Mazda Motor of Am.*, 562 U.S. 323, 330 (2011) (similar). To determine whether an "obstacle" exists, courts "examin[e] the federal statute as a whole and identify[ ] its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).

The FCRA contains two broad preemption provisions. First, § 1681t(b) expressly preempts certain obligations imposed by state law irrespective of whether there is any actual conflict with the FCRA. It provides:

> No requirement or prohibition may be imposed under the laws of any State (1) with respect to any subject matter regulated under . . . (F) section 1681s-2 of this title, relating to the responsibilities of persons who furnish information to [CRAs], except that this paragraph shall not apply—[to Massachusetts and California laws not at issue].

15 U.S.C. § 1681t(b)*. Second, § 1681t(a) of the FCRA preempts "the laws of any State with respect to the collection, distribution, or use of any information on consumers . . . to the extent that those laws are inconsistent with any provision of this subchapter [i.e., the FCRA]." *Id.* Both provisions are triggered here because Plaintiffs' invasion of privacy, unjust enrichment, trespass to chattels, state consumer statute, and state wiretap statute claims would all require GM to provide notice and

obtain consumers' consent before furnishing information to CRAs.[28] Thus, those claims are (1) expressly preempted because they impose requirements on GM with respect to the same subject matter regulated by the FCRA and (2) impliedly preempted because they undermine the Congressional goals of the FCRA.

### 1. Plaintiffs' Claims Are Expressly Preempted by Section 1681t(b)(1)(F).

As noted, the FCRA expressly preempts any state-imposed "requirement or prohibition . . . with respect to any subject matter regulated under . . . section 1681s-2 of this title." 15 U.S.C. § 1681t(b)(1)(F). And § 1681s-2 regulates the responsibilities of furnishers—i.e., entities that furnish information to CRAs. There is no question GM acted as a furnisher in providing information to Verisk and LNRS. Plaintiffs allege (1) that "LexisNexis and Verisk were [CRAs]," ¶¶ 1099, 1101, and (2) that GM furnished consumer data to Verisk and LNRS, ¶ 1102; *see also Bueno v. Univ. of Miami*, 2023 WL 3093614, at *4 (S.D. Fla. Apr. 26, 2023) (defining a "furnisher of information" as "any entity that 'reports' or otherwise submits information to a CRA"). GM's responsibilities as a furnisher are therefore governed by § 1681s-2, and this Court should follow a long line of cases applying § 1681t(b)(1)(F) to dismiss Plaintiffs' common law and state statutory claims.[29]

---

[28] *See* MC Counts 5–7, 9, 11–14, 17–24, 26, 28–35, 37–41, 43–55, 57–65.

[29] *See, e.g., Triplett v. JPMorgan Chase Bank*, 2014 WL 4351429, at *4 (N.D. Fla. July 9, 2014) (dismissing negligence, privacy, defamation, and misrepresentation

Section 1681s-2 broadly regulates the "subject matter" of the legal responsibilities of furnishers. Under § 1681s-2, furnishers are authorized to provide information to CRAs, subject to some exceptions. For example, a furnisher may "not furnish any information" if the furnisher knows the information is "inaccurate" or if the consumer has disputed information that is inaccurate. 15 U.S.C. § 1681s-2(a)(1)(A)–(B). Section 1681s-2 also requires furnishers to correct or update previously furnished information if it is incomplete or inaccurate, *id.* § 1681s-2(a)(2), and to notify consumers about information reported to CRAs in certain situations, *id.* § 1681s-2(a)(7). Critically, however, the FCRA "does not require furnishers . . . to obtain consent from the consumer prior to sharing information with [CRAs]." *Hayward v. Sw. Credit Sys.*, 2024 WL 169570, at *3 (E.D. Pa. Jan. 16, 2024); *see also Frazier v. Synovus Fin. Corp.*, 2023 WL 6323084, at *6 (E.D. Pa. Sept. 28, 2023) (dismissing state-law claim that required consumer consent because it was "based on [First Progress's] responsibilities as a furnisher"); *Cheadle v. Experian*, 2021 WL 3144843, at *3–4 (D.N.J. July 26, 2021) (FCRA preempted claim that furnisher "defam[ed] [the plaintiff's] name . . . without [his] consent"). In short, these and other rules laid out in § 1681s-2 govern whether, and under what

---

claims as "completely preempted by FCRA"); *Shenkman v. Ocwen Loan Servicing, LLC*, 2014 WL 5791060, at *4 (S.D. Ga. Nov. 6, 2014) (similar); *Bruce v. Homeward Residential, Inc.*, 2015 WL 5797846, at *14 (N.D. Ga. Aug. 31, 2015) (holding § 1681t(b)(1)(F) "encompass[es] both state statutory and common law claims").

circumstances, a furnisher may report information to a CRA, as well as the circumstances in which a furnisher is required to provide notice to consumers.

Plaintiffs' claims, however, would improperly impose *additional* "requirement[s] or prohibition[s]" on GM and OnStar "with respect to" the "subject matter" of § 1681s-2. 15 U.S.C. § 1681t(b)(1)(F). Plaintiffs' claims are based on allegations that GM and OnStar failed to provide notice to Plaintiffs and obtain their consent before sharing their information with Verisk and LNRS.[30] For instance, Plaintiffs assert an invasion of privacy claim based on allegations that GM "sold" their Driving Data "without their knowledge or informed consent." ¶ 1051. And most of their consumer statute claims are premised on GM "concealing" that it was "collecting, using, and selling" Plaintiffs' Driving Data to LNRS and Verisk "without obtaining their consent." ¶ 1312 (FDUTPA claim); *see also* ¶¶ 1386, 1392 (same under Illinois' consumer statute; also alleging "GM did not disclose" its practices or obtain "consent for them"); ¶ 1355 (alleging as to Georgia UDAP claim that GM "sold Plaintiffs' . . . Driving Data without obtaining their consent").

As explained below, *see infra* § II.E, GM disclosed and obtained consent for its collection of Driving Data. But even assuming that consent was ineffective, the FCRA "*does not* require furnishers of information to obtain consent" before

---

[30] *See, e.g.*, ¶ 861 (alleging GM did not "disclose to drivers that their Driving Data w[ould] be sold" to LNRS or Verisk); ¶¶ 10–654 (Plaintiffs alleging they were "never given a choice to activate, and never knowingly enrolled in, OnStar Smart Driver").

furnishing information to CRAs. *Hayward*, 2024 WL 169570, at *3; *see also Frazier*, 2023 WL 6323084, at *6. Nor does the FCRA require furnishers to provide notice to consumers in such circumstances. *See* 15 U.S.C. § 1681s-2(a)(7); *Oganyan v. Square Two Fin.*, 2012 WL 3656355, at *4 (C.D. Cal. Aug. 24, 2012) (holding California notice and demand provisions were preempted because they would "impose[ ] a requirement on furnishers of information to CRAs"); *see also Faircloth v. AR Res., Inc.*, 2020 WL 2747781, at *6 (N.D. Cal. May 27, 2020) (similar).

Plaintiffs' claims seek to enforce alleged notice and consent requirements (under state law), which fall squarely within the ambit of the FCRA's regulation of furnishers' responsibilities. Because doing so would impose additional "requirement[s] or prohibition[s]" on GM when it furnished information to Verisk and LNRS, Plaintiffs' claims are expressly preempted.[31] 15 U.S.C. § 1681t(b)(1)(F).

### 2.    Plaintiffs' Claims Are Impliedly Preempted.

Plaintiffs' claims are also impliedly preempted because they "stand[ ] as an

---

[31] Other courts have reached similar conclusions, holding that § 1681s-2 broadly "preempt[s] claims based on furnishing of information to [CRAs]." *Rabelo v. Equifax Info. Servs., LLC*, 2020 WL 1159372, at *2 (M.D. Fla. Mar. 10, 2020); *see also Milgram v. Chase Bank USA, N.A.*, 2020 WL 409546, at *6 (S.D. Fla. Jan. 25, 2020) (claim was preempted "to the extent it [wa]s based on furnishing . . . information to [CRAs]"); *Roybal v. Equifax*, 405 F. Supp. 2d 1177, 1181 (E.D. Cal. 2005) (holding state-law claims "based on . . . the reporting of credit information by a furnisher" were "completely preempted"); *Jaramillo v. Experian Info. Sols., Inc.*, 155 F. Supp. 2d 356, 361–62 (E.D. Pa. 2001) ("Congress wanted to eliminate all state causes of action relating to the responsibilities of [furnishers].""); *Meyers v. PNC Fin. Servs. Grp., Inc.*, 2022 WL 4536829, at *8 (D. Conn. Sept. 28, 2022) (similar).

obstacle to the accomplishment and execution of the full purposes and objectives of a federal law." *Williamson*, 562 U.S. at 330 (quotation omitted).

The FCRA's purpose is clear: "[T]o ensure fair and accurate credit reporting." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007). And GM's conduct here— furnishing information to be used in "the underwriting of insurance"—is one of the FCRA's "permissible purposes." 15 U.S.C. 1681b(a)(3)(C). Congress found that "[t]he banking system is dependent upon fair and accurate credit reporting" and that "[i]naccurate credit reports directly impair" the banking system. 15 U.S.C. § 1681(a)(1); *see also Marshall v. Swift River Acad., LLC*, 327 F. App'x 13, 14 (9th Cir. 2009) (explaining § 1681s-2(a)'s duties on furnishers "encourage[s] accurate reporting"). Thus, Congress enacted an "elaborate mechanism . . . for investigating and evaluating the credit worthiness . . . character, and general reputation of consumers." 15 U.S.C. § 1681(a)(2). In doing so, "Congress intended to avoid a patchwork framework of regulations . . . that could be expanded or contracted by state law actions." *Fitzgerald v. Trans Union, LLC*, 2018 WL 334530, at *4 n.3 (E.D. Pa. Jan. 8, 2018); *see also Ross v. FDIC*, 625 F.3d 808, 813 (4th Cir. 2010) (similar).

Here, Plaintiffs' allegations that GM violated state laws and statutes by furnishing information to Verisk and LNRS without consumers' consent cannot be squared with the purpose of the FCRA. There is a reason the FCRA does not require a furnisher to provide notice or obtain consumer consent before furnishing

information to a CRA: if consumers could prevent furnishers from reporting accurate, though negative, information, that would undermine Congress's goal of ensuring accurate credit reporting. "The FCRA simply does not have a consumer 'opt-out' provision." *Frazier v. TransUnion*, 2023 WL 6323088, at *4 (E.D. Pa. Sept. 28, 2023). Plaintiffs' claims premised on notice and consent would undermine Congress's goals; they are therefore preempted.[32]

## B.  Plaintiffs Allege Injuries that Are Neither Cognizable nor Caused by GM.

All of Plaintiffs' tort and state consumer statute claims require them to plead a cognizable injury caused by GM. Likewise, to establish the "irreducible constitutional minimum" of standing, a plaintiff must show "an injury in fact" that "is fairly traceable to the challenged conduct." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Many of Plaintiffs' claimed injuries do not meet even this "irreducible constitutional minimum," let alone the additional requirements imposed by state law.

---

[32] Bolstering this conclusion, the FCRA contains another preemption provision, § 1681h(e), which expressly preempts claims "in the nature of . . . invasion of privacy" asserted against "any person who furnishes information to a [CRA]. *See Lofton-Taylor v. Verizon Wireless*, 262 F. App'x 999, 1001–02 (11th Cir. 2008) (holding that a furnisher of information "is protected from state law . . . invasion of privacy claims unless the information it provided was both false and also given with the malicious or willful intent to damage the consumer."). Plaintiffs do not allege GM acted with "malicious or willful intent." *See also* CRA Defs.' Br. (Dkt. 140-1) § I.B.

### 1.     <u>Plaintiffs Base Claims on Non-Cognizable Injuries.</u>

To satisfy Article III's injury-in-fact requirement, a plaintiff must plead a "concrete harm" that is "real, and not abstract." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 422, 424 (2021). Several of Plaintiffs' claimed injuries do not qualify. For example, Plaintiffs allege for nearly all of their state statutory claims that they have suffered the "injury" of a "likelihood of future misuse of their Driving Data." *E.g.,* ¶¶ 1123, 1235, 1380, 1818. Similarly, for their tort claims (and most of their statutory claims), Plaintiffs allege a "diminution of the value of their personal data" or that they have "lost value in their personal information." *E.g.,* ¶¶ 1065, 1320, 1767. Neither harm amounts to an injury in fact under Article III.

The Supreme Court has held that the "mere risk of future harm" does not confer standing on a claim for money damages. *Ramirez,* 594 U.S. at 437; *see also Banks v. Sec'y, Dep't of Health & Hum. Servs.*, 38 F.4th 86, 95 (11th Cir. 2022) (rejecting claim based on plaintiff having to pay medical "bill[s] in the future"). That rule applies here because, as Plaintiffs acknowledge, GM sunset the Smart Driver program—and ceased sharing data with LNRS/Verisk—last year. ¶ 953.[33]

The latter theory, based on the "lost value" of Plaintiffs' data, also fails to confer standing. Where "Plaintiffs do not allege any specifics, such as trying to sell

---

[33] Plaintiffs' request for declaratory and injunctive relief (*see* MC, Request for Relief) fails for the same reason. *See Mack v. USAA Cas. Ins. Co.*, 994 F.3d 1353, 1357 (11th Cir. 2021).

their PII but being unable to do so," courts in "the Eleventh Circuit have held that such claims do not constitute legally cognizable injury." *Sheffler v. Americold Realty Tr.*, 2022 WL 1815505, at \*4 (N.D. Ga. Jan. 19, 2022), *rev'd on other grounds*, 2023 WL 3918491 (11th Cir. June 9, 2023); *see also Bland v. Urology of Greater Atlanta, LLC*, 2024 WL 3313348, at \*7–8 (N.D. Ga. Mar. 14, 2024) (plaintiff lacked standing where allegations did not show "the data breach actually reduced the value of Plaintiff's PII/PHI"); *Provost v. Aptos, Inc.*, 2018 WL 1465766, at \*4 (N.D. Ga. Mar. 12, 2018) (holding "hypothetical diminution of value" of data is not injury in fact).

It is also doubtful that Plaintiffs' nebulous allegations of "loss of privacy," "unauthorized dissemination," or damage to "privacy interest[s]" in their data satisfy Article III. *E.g.,* ¶¶ 1033, 1135, 1277. Courts reject such informational injuries when they are premised on the collection of non-sensitive data or otherwise lack an element essential to a traditionally recognized harm. *See, e.g.*, *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1245 (11th Cir. 2022) (finding "invasion of privacy" injury insufficient given lack of publicity); *In re BPS Direct, LLC*, 705 F. Supp. 3d 333, 353–58 (E.D. Pa. 2023) (website's tracking of consumer information did not confer standing where no "sensitive personal information" was at issue); *Baker v. Akumin Corp.*, 2024 WL 1931480, at \*6 (S.D. Fla. Apr. 16, 2024) (holding "loss of privacy" insufficient where plaintiff did not explain "how the loss of privacy . . . damaged him"). Here, Plaintiffs' driving took place on public roads,

and their Driving Data was not disseminated to the public at large. *See infra* § II.C.

Even if these injuries sufficed under Article III, they do not satisfy the higher standards imposed by many state consumer statutes. Eighteen of the statutes under which Plaintiffs assert claims require "monetary" or "economic damages," and eleven of those require that such damages be "ascertainable." *See* Ex. 4, UDAP Chart. Plaintiffs' non-economic and non-monetary injuries (e.g., "loss of privacy," "unauthorized dissemination") are not cognizable under these statutes. *See, e.g.*, *Pearson v. Philip Morris, Inc*., 361 P.3d 3, 22 (Or. 2015) (noting that an "ascertainable loss" must "be objectively verifiable," constitute "money or property," and that "noneconomic losses. . . will not [suffice]"); *Ramirez v. LexisNexis Risk Sols*., 729 F. Supp. 3d 838, 850 (N.D. Ill. 2024) (claim that plaintiff's data lost its economic value did not constitute "lost money" under the ICFA).[34]

The only economic harm that any Plaintiffs allege is increased insurance premiums or insurance denials, but only 38 of 47 Plaintiffs make such allegations.

---

[34] *Accord Hart v. TWC Prod. & Tech. LLC*, 526 F. Supp. 592, 603 (N.D. Cal. 2021) (collecting cases and finding that alleged diminution in value of personal data was not an economic injury under the California UCL); *In re ZF-TRW Airbag Control Units Prods. Liab. Litig*., 601 F. Supp. 3d 625, 790 (C.D. Cal. 2022), *opinion clarified*, 2022 WL 1925927 (C.D. Cal. Mar. 2, 2022) (collecting cases); *Lynn v. Fort McClellan Credit Union,* 2013 WL 5707372, at *7 (N.D. Ala. Oct. 21, 2013) (similar); *In re Michaels Stores Pin Pad Litig*., 830 F. Supp. 2d 518, 527–28 (N.D. Ill. 2011) ("[U]nder the ICFA, a plaintiff does not suffer actual damage simply because of the increased risk of future identity theft or because the plaintiff purchased credit monitoring services.").

*See* Ex. 3 (detailing Plaintiffs' allegations). The statutory claims of the nine Plaintiffs who allege *no* such harm should be dismissed.[35] As explained below, the claims of the 38 Plaintiffs who do allege insurance premium increases should also be dismissed because Plaintiffs fail to plausibly allege that GM caused such injuries.

## 2.    **Plaintiffs Have Not Alleged That GM Proximately Caused Their Economic Injuries.**

A plaintiff cannot state a tort claim without alleging proximate causation. *See, e.g.*, *Damian for PFGBI, LLC v. Nelson Mullins Riley & Scarbrough, LLP*, 317 F. Supp. 3d 1228, 1242 (N.D. Ga. 2017) (noting that, "[a]s with any tort claim," a plaintiff must prove the defendant's conduct proximately caused his damages). The same is true for Plaintiffs' consumer statute claims.  *See, e.g.*, *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 68 (S.D.N.Y. 2002) ("[A] consumer fraud theory would require individualized proof concerning reliance and causation, which are hornbook elements of a fraud claim."); *see also* Ex. 4. But Plaintiffs' allegations demonstrate that any causal connection between GM's collection of Driving Data and Plaintiffs' alleged economic injuries is far too attenuated to be actionable.

First, the vast majority of Plaintiffs allege that, without their consent, their car

---

[35] The following Plaintiffs make no allegations of increased insurance premiums: Gray, Brunet, Brockington, Matthews, Gordin, Davids, Parkhurst, Guc, and Brakefield. Although these Plaintiffs also allege as tort injuries "mental anguish" (Invasion of Privacy, *see* ¶ 1065) and "loss of control over their Driving Data" (Trespass to Chattels, *see* ¶ 1093), those claims fail for other reasons. *See infra* § II.C. and D.

"dealer activated OnStar before [they] took possession of the vehicle." *E.g.*, ¶¶ 57, 299, 547; *see also* Ex. 3. This is critical because Plaintiffs allege GM sold Verisk and LNRS "Driving Data from cars enrolled in OnStar Smart Driver." ¶¶ 702, 742–44. Thus, if Plaintiffs' dealers had not enrolled them in OnStar Smart Driver without their consent (in violation of GM's own stated policy), GM never would have collected any of their Data in the first place. *See, e.g.*, *Conti v. Am. Honda Motor Co.*, 2019 WL 10371067, at *5–6 (C.D. Cal. Oct. 17, 2019) (dismissing consumer statutory claims that were based on the conduct of car dealers).

The second intervening cause concerns Plaintiffs' insurers and the telematics exchanges. Plaintiffs allege that nine insurers used the Verisk telematics exchange while "42% of the U.S. auto insurance market" used the LNRS exchange, but they identify only seven insurers by name. *See* ¶¶ 709, 751-52. Many Plaintiffs were not insured by those companies—and Plaintiffs do not otherwise plausibly allege that their premiums increased due to insurers accessing their Driving Data (as opposed to the myriad other factors that can result in increased insurance premiums).[36]

For example, Plaintiff Block alleges that her insurance premiums (for a six-month term) increased by $177—i.e., $30 per month. *See* ¶ 144. While Block alleges

---

[36] ABC News reports that insurance premiums increased 36% nationwide from 2020 to 2024. *See* Max Zahn, "Car insurance rates have soared 36% since 2020. Here's why.," *available at* abcnews.go.com/Business/car-insurance-rates-soared-36-2020-heres/story?id=106714266.

upon "information and belief" that her premium increased due to her insurer accessing Driving Data, that *de minimis* increase is more plausibly the result of routine rate inflation—or the fact that Block was in a car accident in 2022. *See* ¶¶ 145–46. The allegations made by Plaintiff Gaddis are even worse. He alleges that "his vehicle insurance premiums were increasing significantly" (without quantifying the amount), but his insurance agents expressly "told him that insurance rates were increasing nationwide." ¶ 167. His "belief" that the increase was actually caused by access to his Driving Data is therefore not plausible. Plaintiffs have not shown that GM's conduct—as opposed to other factors—caused their economic injuries.

These are just a few examples. GM joins and incorporates by reference the arguments made by LNRS and Verisk on these points, which discuss Plaintiffs' failure to plead causation in more detail. *See* CRA Defs.' Br. (Dkt. 141-1) § VII.C.

## C. Plaintiffs' Invasion of Privacy Claim Must Be Dismissed.

Plaintiffs allege a claim for "invasion of privacy" in Count 5. It is unclear which species of the tort[37] Plaintiffs intend to assert, but Plaintiffs' claims are defective under any available theory.

### 1. Choice of Law

Under Georgia's *lex loci delicti* rule, "the law of the jurisdiction where each

---

[37] "Invasion of privacy" generally encompasses four distinct torts, including intrusion upon seclusion, appropriation of name or likeness, publication of private facts, and false light publication. *See, e.g.*, Restatement (Second) of Torts § 652A.

[plaintiff] suffered harm would apply" to Plaintiffs' invasion of privacy claims. *Peterson*, 2017 WL 364094 at *5; *see also Risdon Enters, Inc. v. Colemill Enters, Inc*., 324 S.E.2d 738, 740 (Ga. App. 1984). Plaintiffs allege that their privacy was invaded, and that they suffered "mental anguish" and "actual damages" while they "dr[o]ve their GM cars[.]" ¶¶ 1051, 1065. The *locus delicti* is thus Plaintiffs' home states—where they drove and allegedly experienced harm. *See Peterson*, 2017 WL 364094, at *5 (applying law of plaintiffs' home states to invasion of privacy claim concerning surveillance of computer behavior)*; Maynard v. Melton*, 2021 WL 6845008, at *6 (D.D.C. Apr. 7, 2021) (similar) (citations omitted).

Georgia recognizes an exception to the *lex loci delicti* rule: if "no foreign statutes are involved . . . Georgia courts apply the common law as developed in Georgia." *In re Tri-State Crematory Litig*., 215 F.R.D. 660, 677 (N.D. Ga. 2003). For this exception to trigger, however, application of Georgia law must be consistent with due process. "Georgia must have 'significant contact or significant aggregation of contacts to the claims asserted by each member of the plaintiff class, contacts creating state interests, in order to ensure that the choice of [Georgia] law is not arbitrary or unfair." *Peterson*, 2017 WL 364094, at *6 (citation omitted).

Applying Georgia law to all of Plaintiffs' invasion of privacy (or other tort) claims would be inconsistent with due process. Excepting the two Georgia Plaintiffs, Plaintiffs have no connection to Georgia. They engaged with dealerships, purchased

and drove their vehicles, and allegedly suffered harm in their home states. ¶¶ 192–654. Nor is there any allegation GM developed, managed, or made any key decisions regarding the Smart Driver program in Georgia. ¶¶ 655–657. Applying Georgia law to the non-Georgia Plaintiffs' claims would therefore violate due process. *See Peterson*, 2017 WL 364094, at *6–7 (applying Georgia law to class invasion of privacy claims would violate due process, even where defendant was headquartered in Georgia, because there were no "significant connections" between plaintiffs and Georgia); *Krise*, 2017 WL 3608189, at *8 (same). Plaintiffs' invasion of privacy claims should therefore be governed by the laws of their respective home states.[38]

### 2. Plaintiffs Fail to Allege an Invasion of a Privacy Interest Because Driving Behavior Is Public.

Plaintiffs fail to allege an invasion of a privacy interest—as required for claims of intrusion upon seclusion and public disclosure of private facts—because the alleged invasion concerned public conduct: driving on public roads. Although "state laws governing [invasion of privacy] claims vary significantly," *Fleites v. MindGeek S.A.R.L.*, 2022 WL 1314035, at *6 (C.D. Cal. Feb. 10, 2022), states do

---

[38] The same reasoning applies to Plaintiffs' other tort claims. Their civil conspiracy claim is derivative of their invasion of privacy claim. *See* ¶¶ 1068–77; *State St. Bank & Tr. Co. v. Canal Ins. Co.*, 2015 WL 11256569, at *8 (N.D. Ga. Sept. 8, 2015) (holding that the state where plaintiff suffered damage supplied the substantive law for civil conspiracy claim). And Plaintiffs' trespass to chattels claim is likewise based on harm allegedly caused by intrusions into "the confines of their own vehicles," ¶¶ 1090–92, which occurred in their home states. In the event the Court disagrees, however, GM analyzes the tort law of both Georgia and other jurisdictions here.

not permit invasion of privacy claims that are based on public conduct, *see* Ex. 5, Invasion of Privacy Chart. In Georgia, observing a person "in a public place is not an intrusion upon one's privacy" unless it "aims to frighten or torment." *Summers v. Bailey*, 55 F.3d 1564, 1566 (11th Cir. 1995); *see also Heinisch v. Bernardini*, 211 F. Supp. 3d 1294, 1297 (S.D. Ga. 2016) (holding that facts must be "private"). And the Restatement—which most of Plaintiffs' states follow—provides that observation of an individual's conduct in public, including on a "public highway," cannot constitute an intrusion because "his appearance is public and open to the public eye." *See* Restatement (2d) of Torts (the "Restatement") § 652B, cmt. c; *id.* § 652D (no liability for publicity of private facts that plaintiff "leaves open to the public eye," including on a "public street"); *see also* Ex. 5. States that do not follow the Restatement also reject claims concerning public conduct. *See id.*; *see also*, *e.g.*, *Allstate Inc. v. Ginsberg*, 863 So.2d 156, 163 (Fla. 2003) (requiring "physically or electronically" intruding into "private quarters").[39]

Plaintiffs allege they have a "reasonable expectation of privacy" in their "driving . . . behavior engaged in while they are in their own vehicles." ¶ 1050. But

---

[39] Several jurisdictions—including Alabama, California, Connecticut, Florida, Illinois, Indiana, Kansas, Michigan, New Jersey, Pennsylvania, and South Carolina—explicitly require that an invasion relate solely to *private* affairs. *See, e.g.*, *Orhan v. Nihem*, 2014 WL 1721797, at *1 (Mich. App. Apr. 29, 2014) (private affairs include details regarding medical treatment and sexual relations); *see also* Ex. 5.

roadways are public, and these behaviors are observable by all. Driving Data includes vehicle location, driving routes, braking events, and speed, ¶ 1, all of which occur on "public thoroughfares," *Summers*, 55 F.3d at 1566; *see also Blanton v. Deloach,* 2015 WL 6758230, at *5 n.4 (S.D. Ga. Nov. 5, 2015) (surveillance by drone did not invade privacy because it occurred in a "public place"); *HSG, LLC v. Edge-Works Mfg. Co*., 2015 WL 5824453, at *9 (N.C. Super. Oct. 5, 2015) (GPS tracker did not invade privacy because journey "could have been publicly observed" on "public roads where [plaintiff] has no reasonable expectation of privacy").

In the context of data collection, courts hold that information that is viewable in public does not constitute an invasion of privacy. *See Cook v. GameStop, Inc.*, 689 F. Supp. 3d 58, 66 (W.D. Pa. 2023) (collecting browsing history was "no different from what GameStop" could have observed if plaintiff began browsing the inventory" in store). And if the collection of location information does not suffice, then there can be no invasion for collecting *less sensitive* data (e.g., a person's seatbelt usage, ¶¶ 771, 833, or vehicle fuel level, ¶ 1), as explained below.

### 3.    Plaintiffs Fail to Allege "Publication" of Private Facts.

If Plaintiffs are traveling under a "public disclosure of private facts" theory, *see* ¶ 1061, that specific tort claim fails for additional reasons. *First,* New York and North Carolina have rejected it altogether. *See Fisher v. Commc'n Workers of Am*., 2008 WL 4754850, at *5 (N.C. Super. Oct. 30, 2008); *Farrow v. Allstate Ins. Co*.,

862 N.Y.S.2d 92, 93 (App. Div. 2008). Claims under these states' laws must be dismissed.[40] *Second*, to be "public," a disclosure must be made to the "public at large." *See Williams v. Cobb Cnty. Farm Bureau, Inc*., 718 S.E.2d 540, 544 (Ga. App. 2011); *see also* Ex. 5. But some Plaintiffs allege their Driving Data was disclosed only to LNRS and Verisk while others allege LNRS and Verisk shared this Data with their insurers. *See* Ex. 3. This limited disclosure was not to the "public at large." *See e.g., Baatz v. Mohawk ESV, Inc.*, 2021 WL 2449856, at *6 (N.D. Ga. Apr. 22, 2021) (no publicity where facts were only disclosed to "a few" employees and other persons); *Woodward v. ViroPharma Inc*., 2013 WL 1485110, at *6 (Pa. Super. Apr. 3, 2013) (information about plaintiff's work performance were not shared with "public at large" and instead only to "small group" involved in an investigation).[41]

### 4.    GM's Alleged Conduct Was not "Highly Offensive."

Every jurisdiction requires an invasion to be sufficiently offensive to state a claim for intrusion upon seclusion, public disclosure of private facts, or false light. *See* Restatement §§ 652B, 652D, 652E; *Dep't of Lab. v. McConnell*, 828 S.E.2d 352 360–61 & n.7 (Ga. 2019) (tort of public disclosure of *embarrassing private facts*

---

[40] This includes Plaintiffs Davids, Smith, Baker, and Fuhrer. ¶¶ 427–89.
[41] If Plaintiffs are alleging a claim for false light, that theory fails for the same reason. *See Wells v. Enhanced Recovery Co., LLC*, 2011 WL 13319655, at *13–14 (N.D. Ga. May 12, 2011) (informing credit agency of debt was not to "public at large" despite credit agency later including debt in credit report); *Marques v. JP Morgan Chase N.A.*, 2017 WL 11358416, at *12 (N.D. Ga. Jan. 17, 2017) (dismissing false light claim where information was only shared with three law firms); *see also* Ex. 5.

encompasses things like the "disclosure of extramarital affairs" and "the publication of a partially nude photograph"); *Ass'n Servs., Inc. v. Smith*, 549 S.E.2d 454, 459 (Ga. App. 2001) (similar for false light). Although the exact degree of required offensiveness varies by jurisdiction,[42] Plaintiffs fail to plead it under any standard.

Plaintiffs assert that GM's collection and disclosure of Driving Data is "highly offensive," ¶ 1058, but courts routinely hold that collecting and sharing ordinary consumer data does not qualify. *See Covington v. Gifted Nurses, LLC*, 2023 WL 5167366, at *10 (N.D. Ga. July 19, 2023) (dismissing claims because disclosure of SSNs was not embarrassing); *In re iPhone App.*, 844 F. Supp. 2d at 1063 (disclosure of personal data and geolocation information was not highly offensive); *Ramirez*, 729 F. Supp. 3d at 851. Nor is the Driving Data GM allegedly collected sufficiently personal to satisfy this element. *See, e.g., Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1091 (N.D. Cal. 2022) (collection of information about "religion, political affiliation, or sexual preference" was not sufficiently offensive compared to "egregious intrusions" like "surreptitious recording of people's voices and conversations"); *In re BPS*, 705 F. Supp. 3d at 355–56 (contrasting "routine

---

[42] Some jurisdictions require an intrusion to be "highly offensive," *see, e.g., Armijo v. Yakima HMA, LLC*, 2012 WL 2576624, at *2 (E.D. Wash. Jul. 3, 2012), while others require it to be "blatant and shocking," *Nelson v. Sci. Applications Int'l Corp.*, 2013 WL 764664, at *8–9 (D.S.C. Feb. 7, 2013), "serious and offensive," *Baldwin v. First Nat'l Bank of Black Hills*, 362 N.W.2d 85, 88 (S.D. 1985), or conduct that would cause outrage, suffering, shame, or humiliation, *see, e.g.*, *Boring v. Google Inc.*, 362 F. App'x 273, 278 (3d Cir. 2010); *see also* Ex. 5.

commercial" data collection with collecting sensitive "medical diagnosis information"). Indeed, Plaintiffs allege GM's conduct amounted to "corporate surveillance," *e.g.*, ¶ 666, but courts hold that general allegations of "surveillance" do not establish offensive conduct, *see, e.g.*, *Bell v. Bank of Am. NA*, 2017 WL 380930, at *3 (M.D. Ga. Jan. 26, 2017) (mere surveillance was not a privacy violation when not "conducted in a way deliberately calculated to frighten or torment"); *Acosta v. Scott Lab. LLC*, 377 F. Supp. 2d 647, 651–52 (N.D. Ill. 2005).

## 5.    Plaintiffs' Misappropriation of Likeness Claim Fails.

Nor can Plaintiffs prevail on a misappropriation theory (to the extent they advance one). Some states do not recognize common-law misappropriation claims. *See Messenger ex rel. Messenger v. Gruner + Jahr Printing & Pub.*, 727 N.E.2d 549, 551 (N.Y. 2000); *Am. Biomedical Grp., Inc. v. Techtrol, Inc.*, 374 P.3d 820, 825–26 (Okla. 2016).[43] For most states that do permit such a claim, Plaintiffs must allege an appropriation of some *unique* element of their *identity* for value. *See Toffoloni v. LFP Publ'g Grp., LLC*, 572 F.3d 1201, 1207 (11th Cir. 2009) (appropriation must concern some aspect of plaintiff's identity for which there is "market value"); *Allison v. Vintage Sports Plaques*, 136 F.3d 1443, 1447 (11th Cir. 1998) (requiring a "unique

---

[43] Plaintiffs assert a claim under New York Civil Rights Law §§ 50 and 51 (Count 49), but this statute is "narrowly construed and 'strictly limited to nonconsensual commercial appropriations of the name, portrait, or picture of a living person." *Leviston v. Jackson*, 43 Misc. 3d 229, 234, 980 N.Y.S.2d 716 (Super. 2013). Plaintiffs do not make such allegations. *See also* CRA Defs.' Br. (Dkt. 141-1) § VI.C.

quality or value in [his] likeness"); *see also* Ex. 5. Plaintiffs' driving history is not an element of their personalities—nor do they allege as much. *See* ¶ 1074(b).

### 6.    Plaintiffs Fail to State a Claim for False Light.

Finally, if Plaintiffs allege a claim for false light, that claim fails for additional reasons.[44] In all relevant jurisdictions, including Georgia, a plaintiff must allege that defendant (1) issued false and *highly offensive* publicity that depicts plaintiff as something he is not and (2) knew of or was reckless to this falsity. *See Smith v. Stewart*, 660 S.E.2d 822, 834 (Ga. App. 2008); *see also* Ex. 5. GM's sharing of Driving Data was not "highly offensive" because such Data is not embarrassing or personal, as explained above. And Plaintiffs also fail to allege that GM "knowingly or recklessly published falsehoods." *Smith v. Stewart*, 660 S.E.2d 822, 834 (Ga. App. 2008). Plaintiffs allege their Driving Data was "fundamentally flawed" and lacked proper context, ¶¶ 916–31, but they focus primarily on the way such information was *later presented by LNRS/Verisk* to insurers, *id.* In any event, the vast majority of Plaintiffs do not identify any actual inaccuracies in their Driving Data. *See* CRA Defs.' FCRA Br. (Dkt. 140-1) § II.A (explaining that only five Plaintiffs allege specific inaccuracies). Because Plaintiffs fail to allege that GM knew or recklessly disregarded that its disclosures of Driving Data were false, this claim fails. *Robinson*

---

[44] Florida, New York, Texas, and North Carolina do not recognize false light, *see* Ex. 5, so the claims of Plaintiffs from these states fail, ¶¶ 123–61, 427–89, 627–639.

*v. Akal Sec., Inc.*, 2020 WL 13746174, at *27 (N.D. Ga. Feb. 4, 2020).[45]

###    D.    Plaintiffs' Trespass to Chattels Claim Must Be Dismissed.

Plaintiffs assert a claim for trespass to chattels (Count 9) based on allegations that GM "intentionally interfered" with their "possessory interest in their private property"—i.e., their vehicles and information—by "accessing and utilizing Driving Data" and "embedding" technology "to extract" that data. ¶¶ 1090–94. Under the Restatement (which most states follow), "trespass to a chattel may be committed by intentionally (a) dispossessing another of the chattel, or (b) using or intermeddling with a chattel." *see id.* § 217; *see also* Ex. 6, Trespass to Chattels Chart. Under Georgia law, the tort is defined as "[a]ny unlawful abuse of or damage done to the personal property of another" or any "deprivation" of personalty. *See* O.C.G.A. §§ 51-10-1, 51-10-3. As explained *supra* (*see* § II.C.1), the law of Plaintiffs' home states should govern these claims since (1) the harm Plaintiffs allege occurred in their home states, *see* ¶¶ 1090, 1093, and (2) it would be inconsistent with due process to apply

---

[45] Finally, because Plaintiffs' invasion of privacy claim fails, their civil conspiracy claim also fails. Most jurisdictions treat civil conspiracy claims as derivative, meaning plaintiffs must plead an underlying tort. *See, e.g.*, *Oconee Fed. Sav. & Loan Ass'n v. Brown*, 831 S.E.2d 222, 232 (Ga. App. 2019); *see also* Ex. 5. Plaintiffs also assert a claim under California's Constitutional Right to Privacy (Count 13). The California Constitution sets a "high bar" for establishing an invasion of privacy claim. *In re Yahoo Mail Lit.*, 7 F. Supp. 3d 1016, 1038 (N.D. Cal. 2014) (requiring an "egregious breach of social norms"). Courts typically consider this claim "together" with common law claims. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 601. Thus, this claim should be dismissed for the same reasons above. *See also* CRA Defs.' Br. (Dkt. 141-1) § VI.A.

Georgia law to those claims. But whether the Restatement or Georgia law is applied, the claim fails.

### 1.    <u>Plaintiffs Fail to Allege Any Damage to Their "Property."</u>

Many states, including Georgia, require a plaintiff to allege damage to their property or property interest to state a trespass claim. *See* O.C.G.A. § 51-10-3; *Perrin v. City of Elberton, GA*, 2005 WL 1563530, at \*13 (M.D. Ga. July 1, 2005) (rejecting claim where there was "no evidence of abuse of or damage" to property).[46] Plaintiffs' assertion that their "chattel was harmed and diminished in value" seems to pertain to both their vehicles and their Driving Data. ¶¶ 1090, 1093. Neither injury suffices.

There is no allegation that GM's conduct caused any actual damage to Plaintiffs' vehicles or placed any meaningful burden on the vehicle's computer systems, mandating dismissal under any state's laws. *See, e.g., Perrin*, 2005 WL 1563530, at \*13; *Mount v. PulsePoint, Inc.*, 2016 WL 5080131, at \*9 (S.D.N.Y. Aug. 17, 2016) (dismissing trespass to chattels claim where there were "no particularized allegations of diminished device performance"), *aff'd*, 684 F. App'x 32 (2d Cir. 2017); *Discovery Educ.*, 2021 WL 2292223, at \*2–3 (similar); *Kurowski v. Rush Sys. for Health*, 683 F. Supp. 3d 836, 850 (N.D. Ill. 2023) (dismissing claim where

---

[46] *See also Discovery Educ., Inc. v. SchoolsPLP, LLC*, 2021 WL 2292223, at \*3 (D. Del. June 4, 2021) (dismissing claim where plaintiff did not allege that conduct "damaged the actual website (by slowing it down, for example)"); *Intel Corp. v. Hamidi*, 30 Cal. 4th 1342, 1352–53 (2003) (citing Prosser & Keeton, Torts (5th ed.1984) § 14, pp. 85–86.)) (similar); *see also* Ex. 6.

alleged trespass was "so invisible and surreptitious that [plaintiff] was completely unaware of it"); *see also* Ex. 6. Nor do Plaintiffs allege any facts establishing that their data was "damaged" or decreased in value. Absent specific allegations showing that the quality or value of their personal information was in any way diminished, this claim fails. Put simply, "harm to [Plaintiffs'] privacy interests" is not "the type of harm that may be redressed through a claim for trespass to chattels." *In re Jetblue Airways Corp. Privacy Litig.*, 379 F. Supp. 2d 299, 328 (E.D.N.Y. 2005).

### 2.    Plaintiffs' Fail to Allege that GM "interfered" with Their Physical Property Through Dispossession or Intermeddling.

Plaintiffs' trespass claim also fails for two additional reasons. *First,* Plaintiffs' Driving Data cannot support a trespass to chattels claim because it is not tangible property. In Georgia, as in most jurisdictions to consider the issue, a defendant must deprive a plaintiff of "possession of *physical* property" or cause physical injury to physical property. *Dial HD, Inc. v. Clearone Commc'ns, Inc.*, 2010 WL 3732115, at *10 (S.D. Ga. Sept. 7, 2010) (rejecting claim regarding stolen "confidential business information" in part because it was not a deprivation of "*physical* property"); *see also* O.C.G.A. § 44-1-3 (defining "personalty" as "property which is movable in nature"); *Savidge v. Pharm-Save, Inc.*, 2020 WL 265206, at *6 (W.D. Ky. Jan. 17, 2020) (rejecting allegation that PII is a chattel); *see also* Ex. 6. Consequently, intangible data does not constitute "chattel." *Bell v. Blizzard Ent., Inc.,* 2013 WL 12132044, at *9 (C.D. Cal. July 11, 2013) ("No court has held that personal

information is a chattel that can be bailed."); *In re iPhone App. Litig.*, 844 F. Supp. at 1075 ("a plaintiff's 'personal information' does not constitute property."); *Great Am. Ins. Co. v. Lexington Ins*. Co., 671 F. Supp. 3d 948, 958 (N.D. Ind. 2023).

*Second*, in Georgia and every other relevant jurisdiction, a defendant can be liable only where it "dispossesses" or deprives a plaintiff of his property or intermeddles with his possession. *See, e.g.*, *Euroboor B.V. v. Grafova*, 2021 WL 4325694, at *20 (N.D. Ala. Sept. 23, 2021); *Soc'y of St. Vincent De Paul in the Arch. of Detroit v. Am. Textile Recycling Servs.*, 2014 WL 65230, at *5 (E.D. Mich. Jan. 8, 2014); *see also* Ex. 6. Dispossession requires physical control of property. *See Koepnick v. Sears Roebuck Co*., 762 P.2d 609, 617–618 (Ariz. App. 1988) (noting that Restatement § 217 requires "physical control over the chattel in a way which will be destructive of the possessory interest"); *BIOMILQ, Inc. v. Guiliano*, 2023 WL 1879466, at *11 (N.C. Super. Feb. 10, 2023) (similar). And intermeddling requires that a chattel is "is impaired as to its condition, quality, or value." *Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 697 (D. Md. 2011).

Plaintiffs do not—and cannot—allege that GM dispossessed or deprived them of their vehicles. Nor do they allege that GM's access to and collection of Driving Data deprived them of such Data. *See Dial HD*, 2010 WL 3732115, at *10 (dismissing claims where plaintiff was not "deprived of possession of any physical property"); *Ollodart v. Intel Corp*., 2021 WL 4165387, at *2 (D. Or. Sept. 11, 2021)

69

(noting plaintiff was not deprived of "control" over his accounts) *aff'd*, 2022 WL 17176490 (9th Cir. Nov. 23, 2022). Without dispossession, deprivation, or intermeddling in a manner that impairs value, this claim fails. *See Dixon v. Nat'l Hot Rod Ass'n*, 2021 WL 1175198, at *3 (S.D. Ind. Mar. 29, 2021) (plaintiffs were not "deprived of their ability to use a chattel"); *Hamidi*, 71 P.3d at 302–08.

### E.    Plaintiffs' Breach of Contract Claim Must Be Dismissed.

Plaintiffs assert a breach of contract claim (Count 8) in the alternative. ¶ 1085. While Count 8 does not identify any specific contract, the MC alleges there was an "onboarding process" where GM customers were presented with the User Terms. ¶¶ 891–95. This process required customers to click an "I accept" box to agree to the Terms, ¶ 897, and ten Plaintiffs allege that they enrolled in OnStar themselves, meaning they must have accepted, *see* Ex. 3 (setting forth Plaintiffs' allegations regarding enrollment); ¶ 906. A binding contract thus exists as to at least those 10 Plaintiffs; under the choice-of-law clause in the User Terms, these claims are governed by Michigan law. *See* Ex. 1 § 28.8; *Rayle Tech, Inc. v. DeKalb Swine Breeders, Inc.*, 133 F.3d 1405, 1409 (11th Cir. 1998).

Under Michigan law, there must be a "meeting of the minds" as to a contract's material terms. *See Stanton v. Dachille*, 463 N.W.2d 479, 483 (Mich. App. 1990). And mutual assent can be established by electronically accepting a contract. *See Tariq v. Tenet Healthcare Corp.*, 2022 WL 880629, at *2 (Mich. App. Mar. 24, 2022).

While Plaintiffs allege the User Terms were "impossible" to comprehend, ¶ 860, ignorance of a contract's terms does not prevent contract formation, *see Webb v. Fid. Brokerage Servs.*, 2021 WL 3234362, at *8 (Mich. Ct. App. July 29, 2021).

As for the 37 Plaintiffs who do not allege affirmative enrollment, they generally allege OnStar was "activated" by the dealer before they "took possession." *See* Ex. 3. These Plaintiffs do not explain how OnStar was "activated"; nor do they allege that their dealers completed the enrollment process without their consent. Moreover, the User Terms provide that "access or use" of OnStar services "indicat[es] that You have read . . . and agree to be bound by these User Terms." Ex. 1 § 1. By using OnStar, these Plaintiffs also expressed consent to the Terms. *Lee v. Panera Bread Co.*, 2023 WL 2606611, at *3 (E.D. Mich. Mar. 6, 2023) (use of subscription services following constructive notice of user terms manifested assent to terms), *R&R adopted*, 2023 WL 2603934 (E.D. Mich. Mar. 22, 2023).[47]

Turning to the question whether GM's User Terms permit the collection and sharing of Driving Data, the answer is yes. The User Terms themselves disclosed that: "GM collects, uses, and shares information from and about You and your Vehicle." Ex. 1 § 26. And the User Terms incorporate and require consent to the Privacy Statement, *id.*, which further disclosed, *inter alia*, that:

---

[47] The User Terms also contain a binding arbitration clause. *See* Ex. 1 § 28.9. While GM does not seek to compel Plaintiffs to arbitration now, it expressly preserves that defense as to unnamed class members.

- GM "may collect . . . ***Information about the use of your vehicle, including operational and safety related information***" such as "geolocation, route history, driving schedule, speed, air bag deployments . . . [and] sensor data." Ex. 2 at 2 (emphasis original);

- GM "may use your information in order to provide our products, programs, and services," and with third-party "businesses"; *Id.* at 3-4.

- GM "may also share data with third parties for marketing activities (with necessary consents) or where you have elected to receive a service from them and/or authorized them to request data from GM (for example, . . . ***usage based insurance providers***." *Id.* at 4 (emphasis added).

Because the User Terms and Privacy Statement plainly allow for the collection and sharing of the Driving Data in dispute here, Plaintiffs cannot state a breach of contract claim. *See, e.g.*, *Herhold v. Green Tree Servicing, LLC*, 2014 WL 806848, at *3 (E.D. Mich. Feb. 28, 2014) (no breach alleged where contract "expressly allow[ed]" the conduct at issue), *aff'd*, 608 F. App'x 328 (6th Cir. 2015).[48]

## F.      The Unjust Enrichment Claim Must Be Dismissed.

Under Georgia choice-of-law principles, unjust enrichment is a quasi-contractual claim, making it subject to contractual choice-of-law provisions. *Texas Ed Tech Sols., LLC v. Authentica Sols., LLC*, 2020 WL 5774015, at *3 (N.D. Ga. Sept. 28, 2020). The User Terms' Michigan choice-of-law clause therefore applies to the unjust enrichment claims of the 10 Plaintiffs who voluntarily activated OnStar

---

[48] Finally, to the extent that Plaintiffs assert a claim for breach of the implied covenant, *see* ¶ 1086, this claim fails because the User Terms and Privacy Statement expressly address the collection and sharing of data. *See Jacobson v. BH Assocs. Ltd. P'ship*, 2001 WL 738408, at *1 (Mich. App. June 29, 2001) ("[T]he implied covenant of good faith cannot override an express provision in a contract.").

or Smart Driver. *Id.* Michigan law also applies to the remaining Plaintiffs' claims to the extent the User Terms/Privacy Statement are found to be enforceable contracts.

Alternatively, if no valid contract exists, Georgia common law would usually apply absent due process concerns. *Terrill v. Electrolux Home Prods., Inc.*, 753 F. Supp. 2d 1272, 1280 (S.D. Ga. 2010). But here, due process concerns abound because the unjust enrichment claims have no connection to Georgia. *See supra* § II.C.1. Since the relevant "transactions and occurrences" took place in Plaintiffs' home states, the laws of those states should apply. *Parker v. Perdue Foods, LLC*, 2024 WL 3993855, at *8 (M.D. Ga. Aug. 29, 2024). These state laws vary considerably. *See Conagra*, 251 F.R.D at 696 (describing a "morass" of state unjust enrichment laws). Regardless of which law applies, Plaintiffs' unjust enrichment claim fails.

*First*, as to those Plaintiffs who voluntarily enrolled in OnStar—and any other Plaintiff who consented to the User Terms—unjust enrichment is not available under Michigan law because an express contract governs their relationship with GM. *See Belle Isle Grill Corp. v. City of Detroit*, 666 N.W.2d 271, 281 (Mich. App. 2003).

*Second*, many of Plaintiffs' homes states, including Georgia and Michigan, require an expectation of payment for the alleged benefit. *See, e.g.*, *White v. Alcon Film Fund, LLC*, 2013 WL 12067479, at *7 (N.D. Ga. Aug. 13, 2013) (rejecting claim where plaintiff "never acted with the expectation that he would be

compensated by Defendants"); *Roznowski v. Bozyk*, 251 N.W.2d 606, 608 (Mich. App. 1977); *In re Equifax*, 362 F. Supp. 3d 1295, 1330 (N.D. Ga. 2019) (similar); *Melzer v. Johnson & Johnson Consumer Inc.*, 2023 WL 3098633, at *7 (D.N.J. Apr. 26, 2023) (dismissing claim because plaintiff did not expect "remuneration" for biometric information); Ex. 7, Unjust Enrichment Chart.[49] Plaintiffs do not allege that they expected to be paid for their Driving Data—to the contrary, they allege that they "unknowingly conferred the benefit of their Driving Data on GM." ¶ 1079.

*Third*, a number of jurisdictions require that a plaintiff suffer a detriment *caused* by defendant's conduct.[50] But Plaintiffs do not allege that GM's collection of Driving Data, by itself, cost them anything. *See Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 946 (N.D. Cal. 2023) (dismissing claim where plaintiffs had "neither directly expended their own resources, nor shown that their property has become less valuable" after alleged data sharing); *Melzer*, 2023 WL 3098633, at *7.

*Finally*, all jurisdictions require that no adequate remedy at law exist. *Schechner v. Whirlpool Corp.*, 237 F. Supp. 3d 601, 618 (E.D. Mich. 2017); *Hix v. Acrisure Holdings, Inc.*, 2022 WL 2803633, at *10 (N.D. Ga. July 18, 2022); *see*

---

[49] Alabama, California, Georgia, Indiana, Massachusetts, Michigan, and New Jersey all require that a plaintiff have an expectation of payment; several other states consider that as a factor when analyzing the equities. *See* Ex. 7 (collecting cases).

[50] Connecticut, Mississippi, New York, New Jersey, Oklahoma, and Washington require a benefit to be conferred "at plaintiff's expense." Arizona, Delaware, and Illinois require plaintiff suffer "an economic detriment." Others require a "detriment" or "expense." *See* Ex. 7 (collecting cases).

*also* Ex. 7. But Plaintiffs assert a plethora of other claims for which they seek various damages. *See* MC, Request for Relief. The fact that monetary damages are available—even if not warranted—is sufficient to preclude this claim. *See Hix*, 2022 WL 2803633, at *10.

## III. Plaintiffs' State Consumer Statute Claims Must Be Dismissed.

Plaintiffs assert claims under 40 consumer statutes on behalf of 33 state "subclasses" (the "UDAP claims"). *See* Counts 11–13, 17–22, 24, 26, 28–29, 31–34, 37, 39–40, 44–54, 57–65. These claims fail on numerous grounds.

### A. No Private Right of Action Exists As To Certain Claims.

First, Plaintiffs cannot assert a claim under New York's SHIELD Act (N.Y. Gen. Bus. Law §§ 899-aa; 899-bb) (Count 48) because it does not provide a private right of action.[51] Nor may Plaintiffs seek damages under the California Constitutional Right to Privacy (Count 13); that provision does not confer a private right of action for damages—it only allows for injunctive relief.[52]

### B. Claims Lacking a Representative Plaintiff Must Be Dismissed.

Second, Plaintiffs attempt to assert UDAP claims from states in which no named Plaintiff resides (Counts 37, 38, 41–43, 57, 61–63, and 65).[53] Because no

---

[51] *See In re USAA Data Sec. Litig.*, 621 F. Supp. 3d 454, 471 (S.D.N.Y. 2022) (the New York Shield Act does not "create[] or impl[y] a private right of action").

[52] *See Moore v. Rodriguez*, 2021 WL 2222590, at *20 (S.D. Cal. June 2, 2021); *Meyer v. Cnty. of San Diego*, 2025 WL 449747, at *26 (S.D. Cal. Feb. 10, 2025).

[53] Specifically, there is no named Plaintiff from Massachusetts, Nebraska, New Hampshire, Rhode Island, Utah, Vermont, Virginia, or West Virginia. *See* ¶¶ 10–654.

Plaintiff resides in these states, Plaintiffs lack standing to assert these claims.

It is black-letter law that a plaintiff can assert only his or her own legal rights—"not the rights of third parties." *Church v. City of Huntsville*, 30 F.3d 1332, 1335 (11th Cir. 1994). And "a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim." *Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987). That is why "named plaintiffs in class actions have, time and again, been prohibited from asserting claims under a state law other than that which the plaintiff's own claim arises." *Feldman v. BRP US, Inc.*, 2018 WL 8300534, at *6 (S.D. Fla. Mar. 28, 2018); *see also Riley v. Gen. Motors, LLC*, 664 F. Supp. 3d 1336, 1344 (M.D. Fla. 2023) (plaintiffs had "standing to bring claims on behalf of [class] members who bought cars in" plaintiffs' home states but not "consumers who bought their cars in other states"); *In re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp. 2d 1365, 1371 (S.D. Fla. 2001) ("Named plaintiffs cannot rely on unidentified persons within those states to state a claim for relief.").[54] Counts 37, 57, 61, 62, 63, and 65 must be dismissed under Rule 12(b)(1).

## C.    Plaintiffs Failed to Comply with the Pre-Suit Notice Requirements of Eight State Statutes.

Plaintiffs' claims under eight UDAP statutes are subject to dismissal for

---

[54] *Accord Callen v. Daimler AG*, 2021 WL 4523436, at *3–4 (N.D. Ga. Oct. 4, 2021); *In re Takata Airbag Prods. Liab. Lit.*, 2016 WL 1266609, at *4–6 (S.D. Fla. Mar. 11, 2016).

failure to comply with pre-suit notice requirements.[55] Four statutes require written notice of the alleged violation at least 30 days before filing suit: California (30 days), Massachusetts (30 days), Texas (60 days), and West Virginia (60 days).[56] Plaintiffs sent a letter to GM purporting to provide notice and demand on November 22, 2024—just 21 days before filing the Master Complaint. Ex. 8, Notice Letter. Thus, Counts 19, 31, 37, 69, and 65 should be dismissed. Moreover, under each of these eight statutes, the pre-suit notice must clearly identify the claimant and specify the violative conduct.[57] These statutes also require claimants to specify their economic damages. *See, e.g.*, Tx. Bus. & Com. Code § 17.505(a); Ind. Code § 24-5-0.5-5. Plaintiffs' notice (Ex. 8) did not meet these requirements. Plaintiffs' failure to provide pre-suit notice requires dismissal.

### D. Plaintiffs Fail to Satisfy Federal Rule of Civil Procedure 9(b).

#### 1. <u>Rule 9(b) Applies to the UDAP Statute Claims.</u>

Next, all of Plaintiffs' UDAP claims should be dismissed for failure to meet the heightened pleading standards of Rule 9(b). Claims that "sound in fraud" must

---

[55] Ala. Code § 8-19-10(e); Cal. Civ. Code § 1782(a); Ind. Code §§ 24-5-0.5-5; Mass. Gen. Laws ch. 93A, § 9(3); Miss. Code § 75-24-15(2); Tex. Bus. & Com. Code § 17.505; W. Va. Code § 46A-6-106(b); Utah Code Ann. § 13-11a-4(a).

[56] *See* Cal. Civ. Code § 1782(a); Mass. Gen. Laws ch. 93A, § 9(3); Tex. Bus. & Com. Code § 17.505; W. Va. Code § 46A-6-106(b). Indiana requires notice within six months of discovery of the deceptive act, *see* Ind. Code § 24-5-0.5-5(a), which the Indiana Plaintiff (Lima) failed to satisfy. Count 31 must also be dismissed.

[57] *See, e.g.*, Ala. Code § 8-19-10(e); Mass. Gen. Laws. Ann. Ch. 93A, § 9(3); W. Va. Code § 46A-6-106(b).

comply "not only with [Rule 8's] plausibility standard," but "also the heightened pleading requirements of Rule 9(b)." *Young v. Grand Canyon Univ., Inc.*, 57 F.4th 861, 875 (11th Cir. 2023). A plaintiff must allege:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and, (2) the time and place of each such statement and the person responsible for making (or in the case of omissions, not making) same, and (3) the content of each such statement and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Brooks v. Blue Cross & Blue Shield of Fla., Inc*., 116 F.3d 1364, 1370 (11th Cir. 1997). Rule 9(b) applies to Plaintiffs' UDAP claims because they "sound in fraud," *Young*, 57 F.4th at 875, as courts in this Circuit routinely conclude. *Stires v. Carnival Corp*., 243 F. Supp. 2d 1313, 1322 (M.D. Fla. 2002); *Ace Tree Surgery, Inc. v. Terex Corp*., 2017 WL 1836307, at *3 (N.D. Ga. Feb. 21, 2017); *see also* Ex. 4.

Rule 9(b) applies here because Plaintiffs allege that GM engaged in deceptive conduct by (1) "misrepresenting" the purpose of OnStar and that GM "would protect the privacy of Plaintiffs' . . . Driving Data," (2) "[o]mitting" and "concealing" that LNRS and Verisk "used and sold" Driving Data, (3) omitting "material facts" regarding OnStar and customer "privacy," and (4) misrepresenting the "security and privacy of Driving Data." ¶¶ 1116, 1130, 1227, 1921. Because Plaintiffs allege that GM engaged in "fraudulent" conduct and made "intentional misrepresentations" regarding its collection and use of Driving Data, Rule 9(b) applies. *Young*, 57 F.4th at 875; *Mitchell v. Litton Loan Servicing*, 2011 WL 13319002, at *13 n.16 (N.D. Ga.

Mar. 3, 2011) (applying Rule 9(b) to UDAP claims based on "allegations of fraud"), *R&R adopted*, 2011 WL 13319035 (N.D. Ga. June 13, 2011).

### 2. Plaintiffs Failed to Allege Misstatements, Omissions, Causation, or Reliance with Sufficient Specificity.

Plaintiffs' allegations fail to meet the heightened standards of Rule 9(b). They do not allege (1) the particular misstatements, omissions, or deceptive conduct each Plaintiff was specifically exposed to, (2) that any such misrepresentations or conduct caused their injuries, or (3) that they relied on such conduct. Indeed, for eight of the UDAP claims, Plaintiffs fail even to identify which provision of these lengthy and complicated statutory schemes GM allegedly violated.[58]

While the MC references certain statements made by GM, *see, e.g.*, ¶¶ 792–822, Plaintiffs do not allege with particularity any specific "pre-purchase communications" they had with GM nor any statements they "saw in which GM should have disclosed" the challenged conduct. *See Divis v. Gen. Motors LLC*, 2019 WL 4735405, at *8 (E.D. Mich. Sept. 27, 2019); *Conti*, 2019 WL 10371067, at *6 (it is "not sufficient" to "generally" allege consumers were exposed to carmaker's "advertisements and representations'). Instead, Plaintiffs allege generally that GM "misrepresent[ed] the purpose of OnStar," omitted "material facts" about its collection of Driving Data, and otherwise "deceived" Plaintiffs." ¶¶ 1959, 1962.

---

[58] *See* Counts 18, 20-22, 32, 37, 45, and 65 (asserting UDAP claims under California, Connecticut, Delaware, Kansas, Massachusetts, New Jersey, and Washington law).

These generalized allegations are not "enough to satisfy the who, what, when, where, and how required by Rule 9(b)." *See Young*, 57 F.4th at 876 (plaintiffs failed to "point to any other precise statements, documents, or misrepresentations, much less the time, place, and person making them"); *Divis*, 2019 WL 4735405, at *8; *Murphy v. Capella Educ. Co.*, 589 F. App'x 646, 657 (4th Cir. 2014) (affirming dismissal of Virginia Consumer Protection Act claims that were not pleaded with particularity)*; Wynn's Extended Care, Inc. v. Bradley*, 619 F. App'x 216, 220 (4th Cir. 2015) (plaintiff failed to allege the "the time, place, and contents of the false representations" or the "identity of the person making" them).

Nor have Plaintiffs alleged causation with the required particularity. Each UDAP statute requires Plaintiffs to allege they "suffered an injury as a result of th[e] deceptive, unfair, or fraudulent practice."[59] *Beeney v. FCA US LLC*, 2023 WL 6962116, at *3 (D. Del. Oct. 20, 2023) (addressing numerous statutes); *see also Mirkin v. Wasserman*, 858 P.2d 568, 573 (Cal. 1993) (allegations must show a "complete causal relationship between the alleged misrepresentations and the" claimed harm); Ex. 4. And many UDAP statutes require Plaintiffs to allege reliance.[60] *See In re Toyota RAV4 Hybrid Fuel Tank Litig.*, 534 F. Supp. 3d 1067,

---

[59] As explained *supra*, § II.B, many Plaintiffs also fail to allege cognizable injuries.
[60] The following UDAP statutes include a reliance requirement: Arizona, California, Connecticut, Georgia, Indiana, Maryland, Michigan, North Carolina, Pennsylvania, Vermont, and Virginia. *See* Ex. 4.

1112 (N.D. Cal. 2021) (dismissing UDAP claims for failing to "allege, with adequate specificity, that Plaintiffs were aware of, and relied on" alleged misstatements about fuel tank capacity); *Bey v. Shapiro Brown & Alt, LLP*, 997 F. Supp. 2d 310, 319 (D. Md. 2014) (plaintiff "did not rely on Defendants' representations"); *see also* Ex. 4.

Plaintiffs do not meet this requirement. Although Plaintiffs recite various statements made by GM, *not a single* Plaintiff claims to have read or reviewed such statements. *See* ¶¶ 10–654. Instead, Plaintiffs allege in conclusory fashion that they "were deceived and/or could reasonably be expected to be deceived by GM's material misrepresentations and omissions[.]" *See, e.g.*, ¶¶ 1120, 1133, 1230, 1260. That does not suffice to identify specific deceptive conduct or statements by GM that "substantially induce[d]" Plaintiffs' decisions to buy their vehicles. *Washington Cnty. Bd. of Educ. v. Mallinckrodt ARD, Inc.*, 431 F. Supp. 3d 698, 713 (D. Md. 2020); *In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*, 601 F. Supp. 3d 625, 777 (C.D. Cal. 2022) (dismissing UDAP claims for failure to allege reliance).

To the extent Plaintiffs *do* identify any allegedly deceptive conduct, it concerns the conduct of GM *dealers*—i.e., that they were "told by the GM dealer that OnStar was mandatory" or "included with the vehicle's purchase," and critically, for most Plaintiffs, that the "dealer activated OnStar *before Plaintiff* [ ] took possession of the vehicle." *E.g.,* ¶¶ 57, 299, 547; *see also* Ex. 3. These allegations do not establish a causal nexus between Plaintiffs' injuries and any conduct of GM.

81

*See Conti*, 2019 WL 10371067, at *5 (no causation where plaintiff improperly relied on allegations of "actions and inactions of dealerships" whose communications could not be "attribute[d]" to automaker). Plaintiffs' failure to allege with specificity that they were "ever exposed to any Defendant's alleged misrepresentations or fraudulent omissions," as required to "establish a causal nexus," warrants dismissal. *In re ZF-TRW*, 601 F. Supp. 3d at 790–91 (no causation absent allegations "Plaintiff has seen, read or relied on any particular statements").

### E. Plaintiffs Cannot Maintain Omissions-Based UDAP Claims.

Unable to identify misstatements, Plaintiffs repeatedly allege GM "omitt[ed]" "material fact[s]" about "collecting" and "using" Plaintiffs' data. *E.g.*, ¶¶ 1130(b)-(d), 1386 (b)-(d). That is false. GM *disclosed* that it "collects, uses, and shares information . . . about You and Your Vehicle," Ex. 1 § 26, including information about "the use of your vehicle," Ex. 2 at 2. GM even disclosed it may "share data with third parties" such as "usage-based insurance providers"—the core of Plaintiffs' claims. *Id.* at 4. These facts undermine Plaintiffs' claims, for "[t]he presence of true information or a disclaimer can rebut a claim of deception," *Kurimski v. Shell Oil Co.*, 2022 WL 2913742, at *7 (S.D. Fla. June 30, 2022), and a reasonable consumer cannot be misled in the face of such disclosures, *Serrano v. Cablevision Sys. Corp.*, 863 F. Supp. 2d 157, 167 (E.D.N.Y. 2012).

Plaintiffs contend GM's disclosures were inadequate because they did not

expressly disclose that "Driving Data will be sold to" LNRS and Verisk. ¶ 861. But that does not save Plaintiffs' omissions-based claims because, again, Plaintiffs do not allege they reviewed any relevant GM terms or disclosures. Logically, one cannot be misled by "inadequate disclosures" in a document "he never saw." *Fox v. Loews Corp.*, 309 F. Supp. 3d 1241, 1250 (S.D. Fla. 2018).

Setting that aside, Plaintiffs' omissions-based claims fail because an omission is not actionable absent a duty to disclose—and numerous statutes do not impose a free-standing duty to disclose.[61] *Kaswell v. Wells Fargo Bank, N.A.*, 2014 WL 3889183, at *5 (D. Md. Aug. 6, 2014) ("[F]ailure to disclose a material fact does not constitute fraud under" unless "accompanied by a legal duty to disclose."); *see also* Ex. 4. Moreover, many courts hold that "no duty to disclose exists when parties are engaged in arm's-length business negotiations." *In re Equifax*, 362 F. Supp. at 1337; *see also In re Subaru Battery Drain Prods. Liab. Litig.*, 2021 WL 1207791, *25 (D.N.J. March 31, 2021) (noting that under New Jersey, Michigan, Illinois, and Florida law, there is no "duty to disclose based merely on superior knowledge in an arm's-length transaction").[62] This is especially true in the context of car purchasing,

---

[61] These states include Arizona, California, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Kentucky, Maryland, Michigan, Nevada, Ohio, Oklahoma, Pennsylvania, Texas, and Washington. *See* Ex. 4.
[62] *See also Kesling v. Hubler Nissan, Inc.*, 997 N.E.2d 327, 332 (Ind. 2013) ("[E]ven when a seller's failure to disclose known problems is sufficiently deceptive to be actionable on grounds such as fraud, it is not actionable as a 'deceptive act' because

where customers do not buy directly from the carmaker. *See Adams v. Nissan N. Am., Inc.*, 395 F. Supp. 3d 838, 850 (S.D. Tex. 2018) ("No duty arises in an arms-length transaction between a manufacturer and consumer, particularly where Plaintiffs did not purchase or lease their vehicles directly from the manufacturer.").

Even states that do impose a duty to disclose in arm's length transactions only do so where a defendant has knowledge of a "latent defect" the plaintiff "is unable to discover through reasonable diligence." *See, e.g.*, *Gonzales v. Mazda Motor Corp.*, 2017 WL 3283957, *4 (N.D. Cal. Aug. 1, 2017) (North Carolina law); *see also* Ex. 4. Far from concealing an undiscoverable defect, GM disclosed its collection of Driving Data. Plaintiffs' UDAP claims based on omissions must be dismissed.

## F. Plaintiffs Fail to Allege Scienter.

Plaintiffs also fail to allege that GM acted with scienter, which is required by 11 UDAP statutes. *See* Ex. 4. Under those statutes, Plaintiffs must allege, *e.g.*, that GM "knowingly engage[d] in the conduct made illegal by the Act." *See* Ala. Code § 8-19-13; *Olivera v. Amoco Oil Co.*, 776 N.E.2d 151, 160 (Ill. 2002) (intent to deceive required); *Morris v. BMW of North Am., LLC*, 2014 WL 793550, at *8 (D.N.J. 2014) (similar). While Plaintiffs generally allege GM acted "intentionally," or

---

a nondisclosure is not a 'representation' of any fact."); *Gladue v. Cummins*, 1999 WL 793783, *3 (Super. Conn. 1999) ("In short, the plaintiffs' allegations are devoid of facts to elevate Neal's conduct from that of contract breach or negligent performance to the type of immoral, unethical, unscrupulous or offensive trade practices which CUTPA was designed to prevent.").

"maliciously," ¶¶ 1790, 1805, that conclusion is not entitled to deference. Most Plaintiffs allege their dealers activated OnStar at the time of purchase. *See* Ex. 3. If that was done without Plaintiffs' knowledge, it violates GM's own stated policies, *see supra* at 7, and means that GM had no way of knowing these Plaintiffs did not consent. Plaintiffs' claims under these statutes should therefore be dismissed. *Lynn v. Fort McClellan Credit Union*, 2013 WL 5707372, at *7 (N.D. Ala. Oct. 21, 2013) (dismissing ADPTA claim for failure to show "any intent by [defendant] to deceive" the plaintiff). At minimum, the claims of the 10 Plaintiffs who voluntarily enrolled in or activated OnStar and Smart Driver must be dismissed.

### G.    Plaintiffs' CCPA Claim Must Be Dismissed.

Finally, California Plaintiffs assert a claim under the California Consumer Privacy Act ("CCPA," Count 17). But the CCPA only provides a private right of action for "personal information security breaches." *McCoy v. Alphabet, Inc.*, 2021 WL 405816, at *8 (N.D. Cal. Feb. 2, 2021). Plaintiffs do not allege such a security breach here, so this claim must be dismissed. *Id; see also* CRA Defs.' Br. (Dkt. 141-1) § VI.B.

## CONCLUSION

For the foregoing reasons, the MC should be dismissed in its entirety.

Dated:  April 14, 2025

By: */s/ Susan M. Clare*

**KING & SPALDING LLP**
David L. Balser
Georgia Bar No. 035835
Susan M. Clare
Georgia Bar No. 262830
John C. Toro
Georgia Bar No. 175145
Peter Starr
Georgia Bar No. 648453
Matthew B. Rosenthal
Georgia Bar No. 871852
1180 Peachtree Street NE, Suite 1600
Atlanta, GA 30309
Tel: (404) 572-4600
Fax: (404) 572-5100
dbalser@kslaw.com
sclare@kslaw.com
jtoro@kslaw.com
pstarr@kslaw.com
mrosenthal@kslaw.com

*Attorneys for Defendants*
*General Motors LLC and OnStar, LLC*

## <u>RULE 7.1(D) CERTIFICATION</u>

The undersigned counsel certifies that this document has been prepared with

one of the font and point selections approved by the Court in Local Rule 5.1(C).


<u>*/s/ Susan M. Clare*</u>
Susan M. Clare
Georgia Bar No. 262830

*Attorney for Defendants General
Motors LLC and OnStar, LLC*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this day a copy of the foregoing was filed and served using the Court's CM/ECF system which will send notification of such filing to ECF registered participants.

DATED this 14th day of April, 2025.

_/s/ Susan M. Clare_
Susan M. Clare
Georgia Bar No. 262830

_Attorney for Defendants General Motors LLC and OnStar, LLC_