**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| In re: Consumer Vehicle Driving Data Tracking Collection Litigation | MDL Docket No. 3115<br>Case No. 1:24-md-3115-TWT |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO GENERAL MOTORS LLC AND ONSTAR, LLC'S MOTION TO DISMISS THE MASTER CONSOLIDATED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

I. PLAINTIFFS ALLEGED VIABLE FEDERAL CLAIMS. ....6

A. Plaintiffs State a Claim for Violation of the Federal Wiretap Act ("FWA") (Count 1). ....6

1. The Electronic Signals GM Intercepts Are, By Definition, "Electronic Communications." ....7

2. GM Intercepts The "Content" Of Driving Data. ....8

3. The "Tracking Device" Exception Does Not Apply to Non-Geolocation Data. ....11

4. GM "Intercepts" Electronic Communications. ....12

5. The Party Exception Does Not Apply. ....14

6. GM Knew or Should Have Known it Violated the FWA's Use Or Disclosure Prohibitions. ....18

B. Plaintiffs State Claims for Violation of State Wiretapping Statutes (Counts 14, 23, 25, 30, 35, 38, 41, 43, and 55). ....20

C. Plaintiffs State a Claim for Violation of the Stored Communications Act ("SCA") (Count 3). ....21

1. Plaintiffs Plausibly Allege That In-Vehicle Storage Components Are "Facilities." ....21

2. Plaintiffs Adequately Allege Electronic Communications Are In Electronic Storage. ....23

3. The SCA Exceptions Do Not Apply. ....25

D. Plaintiffs State a Claim for Violation of the Computer Fraud and Abuse Act ("CFAA") (Count 4). ....26

1. GM Was Not Authorized to Access Driving Data. ....27

2. Plaintiffs Pled a Loss Under the CFAA. ....36

E. Plaintiffs State a Claim for Violation of the California Computer Data Access and Fraud Act ("CDAFA") (Count 16). ....38

II. THE FCRA DOES NOT PREEMPT PLAINTIFFS' STATE LAW CLAIMS. ....38

III. PLAINTIFFS ALLEGED PLAUSIBLE COMMON LAW CLAIMS. ....45

A. Applying Georgia Law to Plaintiffs' Common Law Claims Is Appropriate At The Pleadings Stage. ....45

B. Plaintiffs State Legally Cognizable Injuries. .......... 46
C. Plaintiffs' Injuries Are Traceable to GM's Conduct; They Have Adequately Alleged Causation. .......... 50
D. Plaintiffs State a Claim for Invasion of Privacy (Count 5). .......... 51
1. Courts Recognize the Existence of an Actionable Privacy Interest Concerning Electronic Surveillance. .......... 52
2. GM's Conduct Is Highly Offensive. .......... 54
3. GM Committed a "Flagrant Abuse" of Consumer Privacy. .......... 55
4. Plaintiffs Adequately Allege Invasion of Privacy By False Light. .......... 58
E. Plaintiffs State a Claim for Trespass to Chattels (Count 9). .......... 59
1. Plaintiffs' Driving Data is Protected Property. .......... 60
2. GM Unlawfully Intermeddled With Plaintiffs' Property. .......... 61
3. Plaintiffs Allege Resulting Damage to Their Property. .......... 62
F. Plaintiffs State a Claim for Unjust Enrichment (Count 7). .......... 64
G. Plaintiffs State a Claim for Breach of Contract (Count 8). .......... 67
IV. PLAINTIFFS STATE PLAUSIBLE CONSUMER PROTECTION CLAIMS (Counts 11–13, 17–22, 24, 26, 28–29, 31–34, 37, 39–40, 44–54, and 57–65). .......... 69
A. Plaintiffs Can Bring Claims for Violations of a State's Consumer Protection Laws Regardless of Whether a Named Plaintiff Resides There. .......... 69
B. Plaintiffs Satisfied Any Pre-Suit Notice Requirements. .......... 70
C. Plaintiffs Satisfy the Applicable Pleading Standards. .......... 72
1. Plaintiffs' Unfair and Unlawful Claims are Not Subject to Rule 9(b). .......... 72
2. Plaintiffs Can Maintain Their Omissions-Based UDAP Claims. .......... 73
D. Plaintiffs Plausibly Allege Scienter. .......... 80
E. Plaintiffs' CCPA Claims Should not be Dismissed (Count 17). .......... 81
F. Plaintiffs State a Claim Under the California Constitution (Count 13). .......... 82
V. PLAINTIFFS' REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF SHOULD NOT BE DISMISSED. .......... 82

# TABLE OF AUTHORITIES

*Abu v. Dickson*,
107 F.4th 508 (6th Cir. 2024) .......... 34, 35

*Acosta v. Hopper (USA), Inc.*,
2023 WL 3072358 (N.D. Ill. Apr. 25, 2023) .......... 80

*ACW Flex Pack LLC v. Wrobel*,
2023 WL 4762596 (N.D. Ill. July 26, 2023) .......... 21

*Adams v. Nissan N. Am., Inc.*,
395 F. Supp. 3d 838 (S.D. Tex. 2018) .......... 76

*Aghaeepour v. N. Leasing Sys., Inc.*,
378 F. Supp. 3d 254 (S.D.N.Y. 2019) .......... 40

*Aklagi v. Nationscredit Financial Services Corp.*,
196 F. Supp. 2d 1186 (D. Kan. 2002) .......... 44

*Allstate Ins. Co. v. Ginsberg*,
351 F.3d 473 (11th Cir. 2003) .......... 52

*Amin v. Mercedes-Benz USA, LLC*,
301 F. Supp. 3d 1277 (N.D. Ga. 2018) .......... 83

*Aquino v. Mobis Alabama, LLC*,
739 F. Supp. 3d 1152 (N.D. Ga. 2024) .......... 74

*In re Arby's Res. Grp. Inc. Litig.*,
2018 WL 2128441 (N.D. Ga. Mar. 5, 2018) .......... 65

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 4

*AT&T Mobility LLC v. Does 1-4*,
2011 WL 13213864 (N.D. Ga. May 26, 2011) .......... 61

*Atifah v. Union Sec. Ins. Co.*,
694 F. Supp. 2d 668 (E.D. Mich. 2010) .......... 68

*Austrian Motors, Ltd. v. Travelers Ins. Co.*,
156 Ga. App. 618 (1980) .......... 60

*Automotive Assurance Group v. Giddens*,
2022 WL 18460629 (N.D. Ga. Sept. 20, 2022) .......... 31, 32

*Banks v. Sec'y, Dep't of Health & Hum. Servs.*,
38 F.4th 86 (11th Cir. 2022)....................................................................50

*Bazemore v. U. S. Bank Nat'l Ass'n*,
872 S.E.2d 491 (Ga. App. 2022) ............................................................ 58, 59

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...................................................................................5

*Bland v. Urology of Greater Atlanta, LLC*,
2024 WL 3313348 (N.D. Ga. Mar. 14, 2024)................................................49

*Blanton v. Deloach*,
2015 WL 6758230 n.4 (S.D. Ga. Nov. 5, 2015) ............................................57

*Blon v. Bank One, Akron, N.A.*,
519 N.E.2d 363 (Ohio 1988) .......................................................................76

*Boghossian v. Capella Univ., LLC*,
2025 WL 934878 (S.D.N.Y. Mar. 27, 2025)...................................................77

*Bowen v. Porsche Cars, N.A., Inc.*,
561 F. Supp. 3d 1362 (N.D. Ga. 2021) ..................................................... passim

*Bracy v. Americold Logistics LLC*,
2025 WL 552676 (N.D. Ga. Feb. 19, 2025)...................................................82

*Braden v. Wal-Mart Stores, Inc.*,
588 F.3d 585 (8th Cir. 2009).......................................................................46

*Brown Jordan Int'l, Inc. v. Carmicle*,
846 F.3d 1167 (11th Cir. 2017)...................................................................23

*Brown v. Google LLC*,
685 F. Supp. 3d 909 (N.D. Cal. 2023)..................................................... 20, 49

*Brown v. Mortensen*,
51 Cal. 4th 1052 (Cal. Ct. App. 2011) ..................................................... 43, 44

*Bullard v. MRA Holding, LLC*,
740 S.E.2d 622 (Ga. 2013) .........................................................................56

*Burgess v. Busby*,
544 S.E.2d 4 (N.C. 2001) ...........................................................................52

*Callen v. Daimler AG*,
2020 WL 10090879 (N.D. Ga. June 17, 2020) ..............................................82

*Campbell v. Ailion*,
790 S.E.2d 68 (Ga. App. 2016) ...................................................................68

*Carlson v. Trans Union, L.L.C.*,
259 F. Supp. 2d 517 (N.D. Tex. 2003) ....................................................................44

*Carpenter v. United States* decision, (2018)|
585 U.S. 315 (2018) ............................................................................... 53, 57

*Chemence, Inc. v. Doherty*,
2007 WL 10025204 (N.D. Ga. Mar. 23, 2007) ..............................................66

*Clements-Jeffrey v. City of Springfield, Ohio*,
810 F. Supp. 2d 857 (S.D. Ohio 2011)...............................................................19

*Clemons v. Waller*,
82 F. App'x 436 (6th Cir. 2003)........................................................................17

*Cohen v. Casper Sleep, Inc.*,
2018 WL 3392877 (S.D.N.Y. July 12, 2018).......................................................24

*Cole v. U.S. Capital, Inc.*,
389 F.3d 719 (7th Cir. 2004) ............................................................................41

*CompuServe Inc. v. Cyber Promotions, Inc.*,
962 F. Supp. 1015 (S.D. Ohio 1997).................................................................61

*Consumer Fin. Prot. Bureau v. Frederick J. Hanna & Assocs., P.C.*,
114 F. Supp. 3d 1342 (N.D. Ga. 2015) .............................................................72

*Council on Am.-Islamic Rels. Action Network, Inc. v. Gaubatz*,
793 F. Supp. 2d 311 (D.D.C. 2011) .......................................................... 22, 26

*Counts v. Gen. Motors, LLC*,
606 F. Supp. 3d 678 (E.D. Mich. 2022) ............................................................75

*Credit Data of Ariz., Inc. v. Arizona*,

602 F.2d 195 (9th Cir. 1979) ...................................................................... 39, 40

*Crook v. Foster*,
333 Ga. App. 36 (2015)........................................................................................65

*CSX Transp., Inc. v. Easterwood*,
507 U.S. 658 (1993) ............................................................................................39

*Design Mark Indus., LLC v. Unbeaten Path Int'l, Ltd.*,
2025 WL 915771 (D. Mass. Mar. 26, 2025) ........................................................76

*Drew v. Equifax Info. Serv.*,
2007 WL 2028745 (N.D. Cal. July 11, 2007) .......................................................43

*Duncan v. Ellis*,
11 S.E.2d 841 (Ga. App. 1940) ....................60

*eBay, Inc. v. Bidder's Edge, Inc.*,
100 F. Supp. 2d 1058 (N.D. Cal. 2000).................... 62, 63

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017)....................46

*Erickson v. Pardus*,
551 U.S. 89 (2007)....................5

*Expert Janitorial, LLC v. Williams*,
2010 WL 908740 (E.D. Tenn. Mar. 12, 2010)....................25

*Fish v. Tesla*,
2022 WL 1552137 (C.D. Cal. May 12, 2022)....................33

*Galper v. JP Morgan Chase Bank, N.A.*,
802 F.3d 437 (2d Cir. 2015)....................41

*Gernhart v. Specialized Loan Servicing LLC*,
2019 WL 1255053 (E.D. Pa. Mar. 18, 2019)....................79

*Gonzales v. Raich*,
545 U.S. 1 (2005)....................14

*Grayhawk Homes, Inc. v. Addison*,
845 S.E.2d 356 (Ga. App. 2020).................... 68, 69

*Gutierrez v. Carmax Auto Superstores California*,
19 Cal. App. 5th 1234 (Cal. App. Ct. 2018)....................77

*Hately v. Watts*,
917 F.3d 770 (4th Cir. 2019)....................26

*Healthcare Advocates, Inc. v. Harding, Earley, Follmer & Frailey*,
497 F. Supp. 2d 627 (E.D. Pa. 2007).................... 37, 38

*Heeger v. Facebook, Inc.*,
509 F. Supp. 3d 1182 (N.D. Cal. 2020)....................53

*Hilderman v. Enea TekSci, Inc.*,
551 F. Supp. 2d 1183 (S.D. Cal. 2008)....................24

*hiQ Labs, Inc. v. LinkedIn Corp.*,
31 F.4th 1180 (9th Cir. 2022)....................31

*Hogin v. Cottingham*,
533 So. 2d 525 (Ala. 1988)....................54

*Holmes v. Securities Inv. Protection Corp.*,
503 U.S. 258 (1992) ....................................................................................51

*Howell v. New York Post Co*.,
612 N.E.2d 699 (N.Y. 1993) .......................................................................52

*HSG, LLC v. Edge-Works Mfg. Co.*,
2015 WL 5824453 (N.C. Super. Oct. 5, 2015) ...............................................57

*Hummel v. Teijin Auto. Techs., Inc*.,
2023 WL 6149059 (E.D. Mich. Sept. 20, 2023) ............................................68

*In re Application for an Order Authorizing Disclosure of Location Information of a Specified Wireless Telephone*,
849 F. Supp. 2d 526 (D. Md. 2011) ..............................................................12

*In re Application for Pen Reg. & Trap/Trace Device with Cell Site Location Auth.*,
396 F. Supp. 2d 747 (S.D. Tex. 2005)............................................................12

*In re Cardizem CD Antitrust Litig*.,
105 F.Supp.2d 618 (E.D. Mich. 2000) ......................................................... 64, 65

*In re ConAgra Peanut Butter Prods. Liab. Litig.*,
2008 WL 2132233 (N.D. Ga. May 21, 2008) .................................................46

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*.,
2015 WL 3988488 (N.D. Ill. June 29, 2015) ...................................................64

*In re DoubleClick Inc. Priv. Litig.*,
154 F. Supp. 2d 497 (S.D.N.Y. 2001) ......................................................... 15, 25

*In re Equifax, Inc. Customer Data Security Breach Litig.*,
362 F. Supp. 3d 1295 (N.D. Ga. 2019) ....................................................... passim

*In re Facebook Priv. Litig.*,
572 F. App'x 494 (9th Cir. 2014)....................................................................49

*In re Flonase Antitrust Litig*.,
692 F. Supp. 2d 524 (E.D. Pa. 2010)..............................................................65

*In re Google Inc. Cookie Placement Consumer Priv. Litig.*,
806 F.3d 125 (3d Cir. 2015) ........................................................................ passim

*In re Hair Relaxer Mktg. Sales Pracs. & Prods. Liab. Litig.*,
2024 WL 4333246 (N.D. Ill. Sept. 27, 2024)...................................................72

*In re Home Depot, Inc.*,
2016 WL 2897520 (N.D. Ga. May 18, 2016) ..................................................83

*In re iPhone Application Litig.*,
844 F. Supp. 2d 1040 (N.D. Cal. 2012)........................................................ 10, 56

*In re Jetblue Airways Corp. Privacy Litig.*,
379 F. Supp. 2d 299 (E.D.N.Y. 2005)..............................................................64

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
440 F. Supp. 3d 447 (D. Md. 2020) ..................................................................48

*In re Pharmatrak, Inc.*,
329 F.3d 9 (1st Cir. 2003) ........................................................................ passim

*In re Processed Egg Prods. Antitrust Litig.*,
851 F. Supp. 2d 867 (E.D. Pa. 2012)................................................................65

*In re Target Corp. Data Sec. Breach Litig.*,
66 F. Supp. 3d 1154 (D. Minn. 2014) ..............................................................70

*In re TFT-LCD Antitrust Litig.*,
599 F. Supp. 2d 1179 (N.D. Cal. 2009).............................................................64

*In re United States for an Order Pursuant to 18 U.S.C. § 2705(b)*,
289 F. Supp. 3d 201 (D.D.C. 2018) ..................................................................23

*In re Vizio, Inc., Consumer Priv. Litig.*,
238 F. Supp. 3d 1204 (C.D. Cal. 2017).................................................. 52, 55, 79

*In re Zynga Privacy Litig.*,
750 F.3d 1098 (9th Cir. 2015)........................................................................9, 10

*Jennings v. Univ. of N. Carolina at Chapel Hill,*
340 F. Supp. 2d 666 (M.D.N.C. 2004)..............................................................52

*Konop v. Hawaiian Airlines, Inc.*
302 F.3d 868 (9th Cir. 2002)...............................................................................7

*Lan Li v. Walsh*,
2017 WL 3140522 (S.D. Fla. July 24, 2017) .....................................................66

*Leach v. Honeywell Int'l Inc.*,
2014 WL 12585799 (D. Mass. Nov. 17, 2014)...................................................71

*Leitner v. Morsovillo*,
2021 WL 2669547 (W.D. Mo. June 29, 2021)....................................... 27, 29, 33

*Leon v. Fed. Home Loan Mortg. Corp.*,
2017 WL 3112739 (D.N.J. July 20, 2017) .........................................................80

*Libman v. Apple, Inc.*,
2024 WL 4314791 (N.D. Cal. Sept. 26, 2024)....................................................78

*Lisk v. Lumber One Wood Preserving, LLC*,
792 F.3d 1331 (11th Cir. 2015) .......... 80

*Lombard's, Inc. v. Prince Mfg., Inc.*,
753 F.2d 974 (11th Cir. 1985) .......... 5

*Loper Bright Enterprises v. Raimondo*,
144 S. Ct. 2244 (2024) .......... 40

*M.G. v. Therapymatch, Inc.*,
2024 WL 4219992 (N.D. Cal. Sept. 16, 2024) .......... 81

*Marsikian v. Mercedes Benz USA, LLC*,
2009 WL 8379784 (C.D. Cal. May 4, 2009) .......... 77

*McCann v. Iroquois Memorial Hosp.*,
622 F.3d 745 (7th Cir. 2010) .......... 19

*Mey v. Got Warranty, Inc.*,
193 F. Supp. 3d 641 (N.D. W. Va. 2016) .......... 61

*Miller v. NextGen Healthcare, Inc.*,
742 F. Supp. 3d 1304 (N.D. Ga. 2024) .......... 5, 74, 82

*Mobley v. State*,
834 S.E.2d 785 (2019) .......... 53

*Mollaei v. Otonomo, Inc.*,
2025 WL 1163727 (9th Cir. 2025) .......... 20

*Moonlight Mountain Recovery, Inc. v. McCoy*,
2024 WL 4027972 (D. Idaho Sept. 3, 2024) .......... 28, 30, 35

*Murphy v. Berlin Const. Co.*,
1999 WL 41633 (Del. Super. Ct. Jan. 22, 1999) .......... 76

*Mustava v. State*,
323 Md. 65 (Md. Ct. App. 1991) .......... 20

*N.L.R.B. v. Reliance Fuel Oil Corp.*,
371 U.S. 224 (1963) .......... 13

*NetApp, Inc. v. Nimble Storage, Inc.*,
41 F. Supp. 3d 816 (N.D. Cal. 2014) .......... 29

*Nix v. O'Malley*,
160 F.3d 343 (6th Cir. 1998) .......... 19

*NovelPoster v. Javitch Canfield Grp.*,
140 F. Supp. 3d 954 (N.D. Cal. 2014) .......... 36, 38

*Orbit One Communications, Inc. v. Numerex Corp.*,
692 F. Supp. 2d 373 (S.D.N.Y. 2010)....................29

*Patel v. Facebook*,
932 F.3d 1264 (9th Cir. 2019).................... 47, 52

*Peterson v. Aaron's, Inc.*,
2017 WL 364094 (N.D. Ga. Jan. 25, 2017)....................45

*Provost v. Aptos, Inc.*,
2018 WL 1465766 (N.D. Ga. Mar. 12, 2018)....................49

*Ragland v. Shattuck Nat. Bank*,
36 F.3d 983 (10th Cir. 1994)....................75

*Ramirez v. Allstate Vehicle & Prop. Ins. Co.*,
490 F. Supp. 3d 1092 (S.D. Tex. 2020)....................78

*Register.com, Inc. v. Verio, Inc.*,
356 F.3d 393 (2d Cir. 2004)....................63

*Rene v. G.F. Fishers, Inc.*,
817 F. Supp. 2d 1090 (S.D. Ind. 2011)....................14

*Riley v. California*,
573 U.S. 373, (2014)....................52

*Robinson v. Akal Sec., Inc.*,
2020 WL 13746174 (N.D. Ga. Feb. 4, 2020)....................59

*Rodriguez v. Google LLC*,
2025 WL 50425 (N.D. Cal. Jan. 7, 2025)....................49

*Rogers v. Stanton*,
2024 WL 4543192 (N.D. Ga. Feb. 15, 2024)....................33

*Salinas v. Cornwell Quality Tools Co.*,
2022 WL 3130875 (C.D. Cal. June 10, 2022)....................31

*Sanchez v. Navy Fed. Credit Union*,
2023 WL 6370235 (C.D. Cal. Aug. 14, 2023)....................76

*Sanjuan v. American Bd. of Psychiatry & Neurology, Inc.*,
40 F.3d 247 (7th Cir. 1994)....................5

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
559 U.S. 393 (2010)....................71

*Shah v. Cap. One Fin. Corp.*,
2025 WL 714252 (N.D. Cal. Mar. 3, 2025)....................81

*Sheffler v. Americold Realty Trust*,
2022 WL 1815505 (N.D. Ga. Jan. 19, 2022) ....................................................49

*Simpson v. Pendergast*,
659 S.E.2d 716 (Ga. App. 2008) ....................................................................69

*Sitton v. Print Direction, Inc.*,
718 S.E.2d 532 (Ga. App. 2011) ....................................................................51

*Skapinetz v. CoesterVMS.com, Inc.*,
2018 WL 805393 (D. Md. Feb. 9, 2018)...........................................................61

*Smith v. Ford Motor Co.*,
749 F. Supp. 2d 980 (N.D. Cal. 2010)...............................................................77

*Smith v. Stewart*,
660 S.E.2d 822 (Ga. App. 2008) ....................................................................59

*Sonneveldt v. Mazda Motor of Am., Inc.*,
2021 WL 4813753 (C.D. Cal. July 29, 2021) ...................................................77

*Sowa v. Mercedes-Benz Grp. AG Mercedes-Benz USA, LLC*,
2024 WL 5290887 (N.D. Ga. Dec. 31................................................................83

*Speed of Light Ops, LLC v. Elliot*,
2023 WL 2815875 (D. Utah. Mar. 21, 2023)......................................................28

*Steffey v. Ameris Bank*,
883 S.E.2d 918 (Ga. App. 2023) ....................................................................67

*Stevens v. Ford Motor Co.*,
2020 WL 12573279 (S.D. Tex. Nov. 2, 2020)....................................................76

*Stuart v. County of Riverside*,
2024 WL 3086634 (C.D. Cal. June 14, 2024).....................................................82

*Summers v. Bailey*,
55 F.3d 1564 (11th Cir. 1995)..........................................................................57

*Sunshine Children's Learning Ctr., LLC v. Waste Connections of Fla., Inc.*,
2022 WL 218896 (S.D. Fla. Jan. 25, 2022)........................................................71

*T.D. v. Piedmont Healthcare, Inc.*,
No. 1:23-CV-5416-TWT, 2024 WL 3972984 (N.D. Ga. Aug. 28, 2024) ...........17

*Thompson v. Dulaney*,
970 F.2d 744 (10th Cir. 1992) ..........................................................................19

*Trans Union Corp. v. Fed. Trade Comm'n*,
267 F.3d 1138 (D.C. Cir. 2001).........................................................................42

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ....................47

*U.S. Bank Nat'l Ass'n v. BFPRU I, LLC*,
230 F. Supp. 3d 253 (S.D.N.Y. 2017) ....................76

*U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*,
489 U.S. 749 (1989) ....................47

*U.S. v. Szymuszkiewicz*,
622 F.3d 701 (7th Cir. 2010) .................... 13, 16

*United Rentals (N.A.), Inc. v. Keizer,*
355 F.3d 399 (6th Cir. 2004) ....................68

*United States v. Barrington*,
648 F.3d 1178 (11th Cir. 2011) ....................14

*United States v. Campagnuolo*,
592 F.2d 852 (5th Cir. 1979) ....................17

*United States v. Eddings*,
2021 WL 2527966 (E.D. Pa. June 21, 2021) ....................28

*United States v. Forey-Quintero*,
626 F.3d 1323 (11th Cir. 2010) ....................41

*United States v. Koyomejian*,
970 F.2d 536 (9th Cir. 1992) ....................11

*United States v. Ropp*,
347 F. Supp. 2d 831 (C.D. Cal. 2004) ....................14

*United States v. Steiger*
318 F.3d 1039 (11th Cir. 2003) ....................7, 23

*Van Buren v. United States*,
593 U.S. 374 (2021) .................... 28, 29, 32

*Vox Marketing Group v. Prodigy Promos*,
556 F. Supp. 3d 1280 (D. Utah 2021) .................... 27, 29, 31

*WESI, LLC v. Compass Env't, Inc.*,
509 F. Supp. 2d 1353 (N.D. Ga. 2007) ....................66

*WhatsApp Inc. v. NSO Group Technologies Ltd.*,
472 F. Supp. 3d 649 (N.D. Cal. 2020) ....................37

*Wigod v. Wells Fargo Bank, N.A.*,
673 F.3d 547 (7th Cir. 2012) ....................80

*Williams v. Rosenblatt Sec. Inc.*,
136 F. Supp. 3d 593 (S.D.N.Y. 2015) ........................................................24

*Yarbray v. S. Bell Tel. & Tel. Co.*,
409 S.E.2d 835 (1991) ........................................................51

*Young v. Grand Canyon Univ., Inc.*,
57 F.4th 861 (11th Cir. 2023) ........................................................78

*Zap Cellular, Inc. v. Weintraub*,
2022 WL 4325746 (E.D.N.Y. Sept. 19, 2022) ........................................................35

*Zarach v. Atlanta Claims Ass'n*,
500 S.E.2d 1 (1998) ........................................................58

Statutes

6 Del. Code § 2513(a) ........................................................78

15 U.S.C. § 1681h(e) ........................................................45

15 U.S.C. § 1681s-2(a) ........................................................43

15 U.S.C. § 1681t(a) ........................................................39

15 U.S.C. § 1681t(b) ........................................................ 42, 44, 45

18 U.S.C. § 1030(a) ........................................................ 27, 33

18 U.S.C. § 1030(e) ........................................................ 32, 36, 37

18 U.S.C. § 1030(g) ........................................................36

18 U.S.C. § 2510(8) ........................................................9

18 U.S.C. § 2510(12) ........................................................ 7, 8, 13, 23

18 U.S.C. § 2510(17) ........................................................24

18 U.S.C. § 2511(c), (d) ........................................................ 18, 19

720 ILCS 5/14-2(a)(3) ........................................................20

Ala. Code § 8-19-10(e) ........................................................71

Cal. Bus. & Prof. Code § 17500 ........................................................78

California Penal Code § 637.7 ........................................................20

Conn. Gen. Stat. § 41-110b(a) ........................................................78

Fla. Stat. § 934.03(3)(d) ........................................................20

Ind. Code § 24-5-0.5-5 ........................................................71

Mass. Gen. Laws ch. 93A, § 2(a) ......78

Mass. Gen. Laws ch. 93A, § 9(3) ......71

N.H. Rev. Stat. § 570-A:2(1) ......20

N.Y. Gen. Bus. Law §§ 899-aa ......82

W. Va. Code § 46A-6-106(b) ......71

Rules

Fed. R. Civ. P. 12(b) ......4

Fed. R. Civ. P. 9(b) ......80

Other Authorities

CFPB, The Fair Credit Reporting Act's Limited Preemption of State Laws, 87 Fed. Reg. 41 (July 11, 2022) ......40

Restatement (Second) of Torts § 217 ...... 59, 61

Restatement (Second) of Torts § 431 ......51

Restatement (Third) of Restitution and Unjust Enrichment § 1 ......65

S. Rep. No. 90-1097 ......16

S. Rep. No. 91-517 ......39

**INTRODUCTION**

GM seeks to gut basic privacy expectations and establish an extremely dangerous and damaging precedent: that corporations may install surveillance systems in private consumer spaces, collect and sell sensitive data at will, and then deny any obligation to obtain consent or protect that data from sale and abuse.

Since launching OnStar as the industry's first embedded telematics system in 1996, GM[1] has deflected fears and criticisms that OnStar could be used to spy on consumers and invade their privacy. Pitching OnStar as a driver-focused "in-vehicle safety and security system," GM promised consumers and the public that OnStar was not a surveillance mechanism, that it was a system "designed to help protect you and your family and provide peace of mind on the road," and that GM would not use OnStar to invade consumers' private lives without their consent.[2]

GM lied. For nearly a decade, GM quietly transformed millions of vehicles into surveillance devices, using Smart Driver to intercept and monetize intimate Driving Data from at least 16 million consumers.[3] GM then used and sold that data

---

[1] "GM" refers to Defendants General Motors LLC and OnStar, LLC.

[2] Master Consolidated Class Action Complaint ("MCC") ¶ 665. Citations to "¶" are to paragraphs of the MCC.

[3] Referred to as "Driving Data," the data GM harvested from each consumer was tied to individual drivers and vehicles and included geolocation, route history, driving schedule, fuel or charging levels, hard braking events, hard acceleration

to Verisk, LNRS, and other third parties—including governments, marketing firms, universities, and various other companies and entities—to advance GM's commercial interests.[4]

GM's Motion to Dismiss rests on two propositions: first, that consumers have no right to privacy in their own vehicles; and second, that GM lawfully obtained consent to harvest and profit from drivers' most sensitive behavioral data. These arguments defy the Complaint and the law—and should alarm any consumer who enters a modern GM vehicle expecting basic respect for their privacy and personal data.

The MCC sets forth detailed factual allegations, spanning nearly 2,000 paragraphs and supported by concrete examples from 47 named Plaintiffs, establishing that GM's misconduct is a serious breach of consumer trust—one widely condemned by regulators, consumer advocates, political officials, journalists, and, most importantly, by GM's consumers. These allegations are not scattershot. They reflect the scope, scale, and systematic nature of GM's misconduct. GM may

---

events, tailgating, time spent idle, speeds over 80 miles per hour, vehicle speed, average speed, late night driving, driver attention, and more. ¶ 1.

[4] *See, e.g.,* ¶¶ 2, 693 ("we want to partner with industry service providers. By that I mean we want to partner with the weather stations, we want to partner with traffic monitoring, we want to partner with again insurance companies, we want to share this data…it's a win-win…for GM and for these industry service providers[.]").

try to contest these facts, but it must do so before a factfinder—not by rewriting privacy law or Plaintiffs' well-pled complaint at the motion to dismiss stage. The Court should deny GM's Motion to Dismiss in its entirety.

## BACKGROUND

GM is one of the world's largest multinational automotive manufacturers. ¶ 660. As detailed in Plaintiffs' MCC, GM secretly collected, stored, and monetized highly sensitive driving behavior data—such as speed, hard braking, rapid acceleration, cornering, time and frequency of driving, and trip routes—without disclosing these practices to consumers or seeking their informed consent. ¶¶ 1–5.

Since 2015, GM secretly and continuously collected consumers' Driving Data through its "Smart Driver" program. ¶¶ 844–57. Plaintiffs did not consent to GM's interception, sale, or use of their Driving Data. GM's OnStar Terms did not request consumer consent, nor did they authorize the interception or sale of Driving Data to LNRS, Verisk, and other third parties. ¶¶ 858–71. Instead, GM structured its car-buying process in a way that forced consumers to participate in the Smart Driver program whether they chose to or not, ¶¶ 872–915, so GM could seize and then sell their Driving Data without knowledge or consent. ¶¶ 769–85. As a result, GM sold consumers' Driving Data to Verisk, LNRS, and other third parties, each of which used it to grow their businesses and their bottom lines. ¶¶ 695–37, 738–68. GM also

used the Driving Data to build a lucrative insurance business. ¶¶ 786–91. GM concealed these practices for years while duplicitously claiming to respect, and even protect, consumer consent and privacy. *See* ¶¶ 792–22.

GM's conduct injured Plaintiffs and the putative classes. Consumers own their Driving Data, a highly valuable asset. ¶¶ 691–92, 700, 757, 760. GM's conduct caused Plaintiffs to lose control over the use of their Driving Data, which is now in the possession of third parties that have and will continue to use it for their own financial gain. *See, e.g.,* ¶ 24. GM's surreptitious interception, use, sale, and disclosure of Plaintiffs' Driving Data also invaded the privacy rights of consumers, including Plaintiffs, who have a reasonable expectation of privacy in their vehicles, including that detailed data about their locations, routes, schedules, and driving behaviors would not be intercepted or later shared without their consent or authorization. *See, e.g.* ¶¶ 25, 679–80.

Although GM attempts to cast a different version of the events than is alleged in the MCC, the Court must accept the truth of these allegations at this stage. Thus, for the reasons set forth here, GM's Motion should be denied.

## LEGAL STANDARD

A complaint should only be dismissed under Rule 12(b)(6) if the facts alleged fail to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A complaint survives even if it is "improbable" that a plaintiff would be able to prove those facts and even if the possibility of recovery is extremely "remote and unlikely." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). At this stage, the court must accept all well-pled facts as true and view them in the light most favorable to the plaintiff. *Miller v. NextGen Healthcare, Inc.*, 742 F. Supp. 3d 1304, 1314 (N.D. Ga. 2024) (citing *Sanjuan v. American Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994) (the plaintiff "receives the benefit of imagination")). Generally, notice pleading is all that is required, meaning the plaintiff need only provide fair notice of the claims and their grounds. *See Lombard's, Inc. v. Prince Mfg., Inc.*, 753 F.2d 974, 975 (11th Cir. 1985); *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555). Plaintiffs meet this standard and GM's Motion to Dismiss should be denied.[5]

---

[5] In a footnote, GM "joins and incorporates by reference" LNRS and Verisk's argument that the MCC is a shotgun pleading. Doc. 142-1 at 35 n.11 (citing Doc. 141-1). For the same reasons stated in Plaintiffs' Opposition to Doc. 141-1 ("LNRS/Verisk MTD. Opp.") Section I, the MCC clearly alleges what each Defendant did, when, and what claims Plaintiffs bring against them. The MCC is anything but a shotgun pleading.

# ARGUMENT

## I. PLAINTIFFS ALLEGED VIABLE FEDERAL CLAIMS.

### A. Plaintiffs State a Claim for Violation of the Federal Wiretap Act ("FWA") (Count 1).

To state an FWA claim, Plaintiff need only allege that GM: (1) intentionally (2) intercepted (3) the contents of (4) an electronic communication (5) using a device. *In re Pharmatrak, Inc.*, 329 F.3d 9, 18 (1st Cir. 2003); *see* Doc. 142-1 at 37.

Plaintiffs' FWA claim is simple: GM bugged their vehicles. GM installed telematics control units ("TCUs") that intercept and divert electronic signals transmitted within the vehicles to GM. ¶ 844. When Plaintiffs operate their vehicles, telematic sensors create and process detailed data regarding the driver's activities. ¶¶ 846–48. The TCU acts as a bug: unbeknownst to Plaintiffs, it takes detailed, private data and diverts some of it to GM. ¶¶ 850–52. Some of the data is diverted in real time (*i.e.*, intercepted), while other data is stored and later transmitted. ¶¶ 853–54. The TCU maintains connection to cellular and GPS networks, constantly bridging the vehicle's internal communications with those external networks. ¶¶ 851–54.

Given the well-pled allegations and the FWA's plain language, GM asks the Court to impose requirements found nowhere in the statute. As discussed below, each of GM's challenges fail.

### 1. The Electronic Signals GM Intercepts Are, By Definition, "Electronic Communications."

First, GM contends that Plaintiffs have not alleged an "electronic communication" or "contents" under the FWA. *See* Doc. 142-1 at 38–42. This argument ignores the FWA's plain language. The FWA "adopts a 'broad, functional' definition of an electronic communication." *In re Pharmatrak*, 329 F.3d at 18. Specifically, "electronic communication" means "*any* transfer of signs, *signals*, . . . *data*, or intelligence *of any nature*. . . ." 18 U.S.C. § 2510(12) (emphasis added). GM argues the FWA should only apply only to communications to and from individuals. Doc. 142-1 at 38. But that argument conflicts with the statute's broad definition of "electronic communication" and precedent in this and other Circuits.

For example, in *United States v. Steiger*, the Eleventh Circuit determined that using a "trojan horse" computer virus to "discover and download files stored on [a] hard drive" constituted an "electronic communication." 318 F.3d 1039, 1047 (11th Cir. 2003). In *Steiger*, the Court held that transferring electronic information satisfies this element, even absent any attempt to communicate with another person. *Id.*[6]

[6] Similarly, in *Konop v. Hawaiian Airlines, Inc.*, the Ninth Circuit held that a website host engages in "electronic communications" whenever a user visits the site, because the transfer of information is accomplished by servers sending documents and information electronically. 302 F.3d 868, 876 (9th Cir. 2002). Like the Eleventh Circuit in *Steiger*, the Ninth Circuit read no requirement into the statute that an individual be attempting to communicate with an intended recipient.

To support its argument that "electronic communications" must be between two individuals, GM relies on a single sentence from *In re Google Inc. Cookie Placement Consumer Priv. Litig*. ("*Google Cookie*"), 806 F.3d 125, 143 (3d Cir. 2015). *See* Doc. 142-1 at 38. But the facts of that case undermine GM's argument. *Google Cookie* dealt with data transferred by cookies placed by advertisers, which "allow these companies to keep track of and monitor an individual user's web activity" over various websites. 806 F.3d at 131. The court found the plaintiffs did not state an FWA violation, but only because "the defendants were the intended recipients" of the signals sent from the browsers. 806 F.3d at 143. The court thus presumed an "electronic communication" occurred even though it was originated by a *web browser* rather than a person.[7]

**2. GM Intercepts The "Content" Of Driving Data.**

Again ignoring statutory text, GM contends it did not intercept the "contents" of any electronic communication. Doc. 142-1 at 25. Like "electronic communication," Congress defined "contents" broadly to mean "*any information*

[7] GM further argues that because the FWA includes a "party" exception, Congress must have meant "every communication has at least two parties capable of providing consent." Doc. 142-1 at 38. But, again, Congress defined "electronic communication" to include "any transfer of . . . data, or intelligence of any nature" without limitation. 18 U.S.C. § 2510(12). That Congress created a *defense* for an individual who is a party to a particular communication is no basis to rewrite the statutory definition.

concerning the *substance*, purport, or *meaning* of" the communication. 18 U.S.C. § 2510(8) (emphasis added). Plaintiffs allege the "substance" or "meaning" of the Driving Data harvested by GM consists of details about the vehicle's operation—including driving schedule, hard braking events, hard acceleration events, tailgating, time spent idle, speeds over 80, and driver attention. *See* ¶¶ 1, 17, 47, 154, 232, 278, 349, 365, 378, 414, 435, 448, 480, 584, 614, 632, 654, 703, 745, 771, 833. By intercepting this information, GM intercepted its "contents." This ends the inquiry.

GM confuses the issues by relying on a line of irrelevant cases regarding "record information," which hold that information identifying a user is not "contents" of a user's communication. Specifically, GM relies heavily on *In re Zynga Privacy Litig*., 750 F.3d 1098, 1106 (9th Cir. 2015), concerning information transmitted when clicking on Facebook ads under the Stored Communications Act ("SCA"). There, the Ninth Circuit reasoned that, since the SCA "generally precludes a covered entity from disclosing the *contents* of a communication, but permits disclosure of *record information*" in some circumstances, "contents" do not include "record information." 750 F.3d at 1104, 1106 (emphasis added). "Record information," in turn, included the "name," "address," and "subscriber number or identity" of a user. *Id.* at 1104. Because the plaintiffs alleged the *only* information

transmitted was (1) their Facebook User ID and (2) the address of the website visited, only "record information" was transmitted. *See id.* at 1102.

Not so, here. The information GM intercepted goes far beyond Plaintiffs' names or addresses, *see, e.g.,* ¶¶ 1, 846, or information about the timing of their data transmissions. *Cf. In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1061 (N.D. Cal. 2012) (data "*about* a telephone call, such as the call's time of origination and its duration" are not "content" because they do not reflect the "substance, purport, or meaning" of the communication) (emphasis added). Because GM collected much broader information, including driver attention and hard braking, this case is more analogous to the First Circuit's decision in *In re Pharmatrak*, which the Ninth Circuit distinguished in *Zynga*. In *Pharmatrak*, a browser cookie collected information regarding visitors to pharmaceutical company websites based on the user's internet browsing. The court found that this information, including date of birth and medical condition, constituted "contents" of electronic communications. 329 F.3d at 18. This Court should follow suit with respect to the detailed Driving Data collected here.

Last, GM asks the Court to abandon the FWA's text entirely when it argues the fact that video surveillance without sound is not covered somehow "[p]rov[es] the point" that the electronic transmissions GM intercepts here have no content. Doc. 142-1 at 41–42. But courts reaching this conclusion have begun and ended their

inquiries with the text of the statute itself. *See, e.g.*, *United States v. Koyomejian*, 970 F.2d 536, 538 (9th Cir. 1992), *opinion corrected* (July 16, 1992) (because the *definition* of "'wire, oral, or electronic communication[s]' . . . does not include silent video surveillance," the FWA does not apply). Those cases cited by Defendants have no bearing on what "content" means under the FWA.

### 3. The "Tracking Device" Exception Does Not Apply to Non-Geolocation Data.

GM claims that because the FWA excludes communications intercepted by a "tracking device," and the TCU is referred to as such in *one paragraph* of the MCC, all data GM intercepts through the TCU is excepted from the FWA. *See* Doc. 142-1 at 39.[8] Not so. Courts have long recognized where a device captures both location data and other non-location data, the tracking device exception applies *only* to the location data, not to other non-location data. Using a smartphone as an example:

> The majority of courts that have examined these issues are now recognizing that advances in technology have transformed cell phones into multi-function devices that perform, in many cases, identical functions to traditional tracking devices. The logical approach embraced by these courts concludes that cell phone signals are electronic communications and cell phone providers are electronic

[8] Congress's inclusion of a "tracking device" exception from "electronic communications" further undermines GM's argument that the FWA only covers communications made from one person to another. If "electronic communications" did not include transmission of data from a device (as opposed to a message from a person), no such exception would be required.

> communications service providers, *except to the extent* that a cell phone is being used as a tracking device, e.g., to provide location data.

*In re Application for an Order Authorizing Disclosure of Location Information of a Specified Wireless Telephone*, 849 F. Supp. 2d 526, 576 (D. Md. 2011) (emphasis added; collecting cases); *see also In re Application for Pen Reg. & Trap/Trace Device with Cell Site Location Auth.,* 396 F. Supp. 2d 747, 756 (S.D. Tex. 2005) (it is a "fallacy" to argue "classifying cell site data as tracking information means that a cell phone must be regarded *solely* as a tracking device for all purposes, so that any form of communication from a cell phone *ipso facto* becomes a communication from a tracking device"). Here, Plaintiffs allege GM causes the TCU to transmit vast information collected beyond location information. *See, e.g.*, ¶¶ 1, 846. Thus, GM cannot avoid FWA liability simply because the TCU also transmits location data.

**4. GM "Intercepts" Electronic Communications.**

GM ignores Plaintiffs' allegations that GM contemporaneously intercepts data. Plaintiffs allege the flow of information: from vehicle sensors, to processing units, and then to the TCU. ¶¶ 845–48. Plaintiffs plausibly allege the TCU both diverts certain Driving Data to GM through cellular networks in real time and stores certain information, which GM taps later. *See* ¶¶ 851, 854–55. The TCU is no different from a splitter on a garden hose: it simultaneously diverts a single stream of water (*i.e.*, data) in at least two directions: part to GM, part to storage. Such

"[s]eparate, but simultaneous and identical, communications satisfy even the strictest realtime requirement[.]" *In re Pharmatrak*, 329 F.3d at 17. And, critically, transmission following a momentary delay still is "contemporaneous by any standard." *U.S. v. Szymuszkiewicz*, 622 F.3d 701, 705 (7th Cir. 2010), *as amended* (Nov. 29, 2010); *see also Steiger,* 318 F.3d at 105 (recognizing simultaneous transmission is an interception where "*some type of automatic routing software is used* (for example, a duplicate of all of an employee's messages are automatically sent to the employee's boss)").

Plaintiffs also allege the electronic communications are "transmitted in whole or in part" by a "system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12). The Supreme Court has long recognized that Congress's use of the term "affecting commerce" evinces Congress's intent to cover the "fullest . . . breadth constitutionally permissible under the Commerce Clause." *N.L.R.B. v. Reliance Fuel Oil Corp.*, 371 U.S. 224, 226 (1963). Even were that not the case, GM's conduct falls within the statute's scope. First, the system through which Driving Data is transmitted has allowed GM to "amass[] petabytes of at least 16 million consumers' Driving Data covering billions of miles of trips," ¶ 2, many of which presumably crossed state lines—easily rendering the system one that affects interstate commerce

in the aggregate. *See, e.g., Gonzales v. Raich*, 545 U.S. 1, 19 (2005) (assessing effect on commerce in the aggregate).

Second, and more importantly, GM's in-vehicle systems are part of an interstate cellular network: GM tethered in-vehicle systems to cellular networks, such that each vehicle constantly communicates with, and transmits information to and through, those networks. *See, e.g.*, ¶ 853 (OnStar "works by 'leverag[ing] cellular networks for connectivity'" and GM "partners with multiple wireless carriers to provide coverage across the nation"); ¶ 852 (TCU receives data from GPS satellites); ¶ 851. GM's attempt to sever the in-vehicle system from the broader network through which it constantly communicates makes no sense.[9]

**5. The Party Exception Does Not Apply.**

The "party exception" does not insulate GM from liability. The "one-party consent rule" or "party exception" is an exception to liability, and the burden of proof falls on the party seeking to apply it. *In re Pharmatrak, Inc.*, 329 F.3d at 19. GM contends that "because the driving data was sent directly to GM," GM was an "intended recipient" and a "party to the communications." Doc. 142-1 at 46. That is

[9] The three cases on which GM relies all dealt with keystroke loggers on individual computers. *United States v. Barrington*, 648 F.3d 1178, 1202 & n.25 (11th Cir. 2011); *Rene v. G.F. Fishers, Inc.*, 817 F. Supp. 2d 1090, 1094 (S.D. Ind. 2011); *United States v. Ropp*, 347 F. Supp. 2d 831, 831 (C.D. Cal. 2004).

not true. To be clear, GM was *never* an intended recipient of the relevant communications. Whether Plaintiffs affirmatively or unknowingly enrolled in Smart Driver, Plaintiffs intended to communicate Driving Data (if at all) exclusively to themselves. ¶ 665 (OnStar "is and 'in-vehicle safety and security system' . . . designed to help protect you and your family and provide peace of mind on the road."); ¶ 828 (OnStar Smart Driver promoted as a new service that "'provided customers with information about their driving behavior[.]'"); ¶¶ 800–01, 835, 836 (similar); ¶ 840 (GM represented that "Driving Data collected would be kept completely private and sent 'only' to the customer."); ¶ 866 ("GM expressly represented that it would not collect Driving Data at all unless consumers enrolled separately in Smart Driver.").

Plaintiffs do not, as GM suggests, allege that GM was an intended recipient of those communications, which defeats this argument. *In re DoubleClick Inc. Priv. Litig.*, 154 F. Supp. 2d 497, 507–08 (S.D.N.Y. 2001) (plaintiffs need not plead denials of affirmative defenses). GM builds this argument around a misreading of ¶¶ 849, 851–52, 854, which merely describe the technology GM uses to surreptitiously divert the contents of Driving Data.

GM cites the Third Circuit's decision in *Google Cookie* for the proposition that the party exception applies "when a communication is sent directly to a

defendant or using a defendant's platform" irrespective of any fraud or deceit. Doc. 142-1 at 46 (citing 806 F.3d at 143). But, myriad on-point decisions following the Third Circuit's *Google Cookie* decision, including from the First, Seventh, and Ninth Circuits reject this argument. Foremost is *In re Facebook*.

There, the Ninth Circuit reversed dismissal of an FWA claim and its California corollary arising from Facebook's use of plug-ins to track users' browsing histories across third-party websites to compile personal profiles sold to advertisers. The Ninth Circuit concluded that *Google Cookie* was at odds with the FWA's "legislative history evidenc[ing] Congress's intent to prevent the acquisition of the contents of a message by an unauthorized third-party or 'an unseen auditor.'" 956 F.3d at 608 (quoting S. Rep. No. 90-1097, *reprinted in* 1986 U.S.C.C.A.N. 2112, 2154, 2182).

Instead, the court adopted the First and Seventh Circuits' rationale that "simultaneous, unknown duplication and communication of [data] do not exempt a defendant from liability under the party exception." 956 F.3d 589, 608 (9th Cir. 2020) (discussing *In re Pharmatrak*, 329 F.3d 22, and *Szymuszkiewicz*, 622 F.3d 701). Users' consent to the eventual recipients' receipt of the communication was central to the *Facebook* court's analysis, as it was in cases like *Pharmatrack*. *See* 329 F.3d at 22 (reversing summary judgment where neither website visitors nor

pharmaceutical companies knew or consented to collection of users' personal information).

This result makes sense: As the Ninth Circuit explained, allowing an eavesdropper to claim the party protection because it directly received communications sent by a "bug" it planted without consent would be akin to "[p]ermitting an entity to engage in the unauthorized duplication and forwarding of unknowing users' information [and] would render permissible the most common methods of intrusion, allowing the exception to swallow the rule." 956 F.3d at 608.[10]

This case is also different than *T.D. v. Piedmont Healthcare, Inc.*, 2024 WL 3972984 (N.D. Ga. Aug. 28, 2024). In *Piedmont*, this Court dismissed an FWA claim, finding that a health system was an intended recipient of communications made through the hospital's website (which permitted users to input health data to facilitate appointments). *Id.* at *4. Unlike patients submitting health data to a hospital, Plaintiffs did not intend to send *any* Driving Data to GM—only to themselves. *See supra*.

[10] *Clemons v. Waller*, 82 F. App'x 436, 441–42 (6th Cir. 2003) and *United States v. Campagnuolo*, 592 F.2d 852, 861–63 (5th Cir. 1979) are inapposite, as they deal with circumstances of impersonation, where the communication at issue was clearly intended for the party who received it, despite that party not being who the speaker thought they were. *See* Doc. 142-1 at 48 n.16.

Thus, GM's argument flatly fails under *In re Facebook.* It also fails under *Google Cookie* (and *Piedmont*), where the focus of the analysis is on the *intended recipient* of the communication. No Plaintiff intended to transmit their Driving Data to GM, whether they affirmatively enrolled in Smart Driver[11] or not.[12] GM's "simultaneous, unknown duplication" of electronic communications does not render it a party to—or an intended recipient of—those communications.

**6. GM Knew or Should Have Known it Violated the FWA's Use Or Disclosure Prohibitions.**

GM's defense to alleged use-and-disclosure violations is that "Plaintiffs do not allege GM *knew* that any purported interception violated the FWA." Doc. 142-1 at 48 (emphasis in original); *id.* at 49. But Plaintiffs do not need to establish that GM "knew" it was violating the FWA; it is sufficient for Plaintiffs to plausibly allege GM used or had "reason to know" that the information was obtained through an unlawful wiretap. 18 U.S.C. § 2511(c), (d). This requirement is satisfied where a defendant "know[s] or ha[s] reason to know sufficient facts concerning the

[11] ¶¶ 73,101, 315 (enrolled in Smart Driver to privately learn about own driving behavior); *see also* ¶¶ 665, 800, 801, 828, 835, 836, 840, 866 (generally, Smart Driver reports only to enrolled user for personal use).

[12] *See* ¶¶ 13 27, 43, 57, 88, 112, 124, 140, 151, 163, 175, 193, 204, 227, 246, 261, 263, 273, 275, 286, 299, 325, 344, 361, 373, 389, 399, 410, 428, 443, 457, 473, 491, 509, 538, 547, 568, 580, 591, 610, 628, 641 (no knowing enrollment); *see also* ¶ 866 (no data collection if not enrolled in Smart Driver).

circumstances of the interception such that the defendant could . . . determine that the interception was prohibited" by the FWA. *McCann v. Iroquois Memorial Hosp.*, 622 F.3d 745, 753 (7th Cir. 2010); *accord Thompson v. Dulaney*, 970 F.2d 744, 749 (10th Cir. 1992).

This case is unlike *McCann v, Iroquois Memorial Hosp.*, on which GM relies, because the defendant in that case did not intercept the communication at issue himself and did not know how it had been intercepted. *See* Doc. 142-1 at 49 (citing 622 F.3d at 753). Here, GM cannot genuinely claim it was unaware of the facts giving rise to Plaintiffs' underlying FWA claim—it sold Plaintiffs vehicles that it designed, manufactured, and equipped with software to carry out its plan to intercept Driving Data; it then actually intercepted that data and used it for profit. These facts are sufficient to allege the "knowledge" requirement to survive a motion to dismiss and the Court should defer the ultimate resolution of this question to summary judgment or trial. *See, e.g., Nix v. O'Malley*, 160 F.3d 343, 349 (6th Cir. 1998) (denying summary judgment); *Clements-Jeffrey v. City of Springfield, Ohio*, 810 F. Supp. 2d 857, 875 (S.D. Ohio 2011) (denying summary judgment). Plaintiffs' claims under Sections 2511(1)(c) and (d) are well-stated.

### B. Plaintiffs State Claims for Violation of State Wiretapping Statutes (Counts 14, 23, 25, 30, 35, 38, 41, 43, and 55).[13]

GM also seeks dismissal of Plaintiffs' nine claims that GM violated various state wiretapping laws. *See* MCC at Counts 14, 23, 25, 30, 35, 38, 41, 43, and 55. Federal and state wiretapping claims are often analyzed together, and thus these claims survive for the same reasons as Plaintiffs' FWA claim. Doc. 142-1 at 50 n.19. Further, as GM concedes, the Florida, Maryland, Massachusetts, New Hampshire, and Pennsylvania wiretapping laws do not contain the party exception on which GM bases much of its argument concerning the FWA. *Id.* at 51.

But GM fails to recognize that California, Florida, Illinois, Maryland, New Hampshire, and Pennsylvania are two-party consent jurisdictions.[14] For those states, unless the eavesdropper obtains the consent of *all* parties to a communication, the wiretap statute is violated. And, because GM failed to obtain Plaintiffs' informed

[13] In light of the recent decision in *Mollaei v. Otonomo, Inc.*, 2025 WL 1163727 (9th Cir. 2025), Plaintiffs withdraw Count 15, California Penal Code § 637.7.

[14] *See, e.g.*, *Brown v. Google LLC*, 685 F. Supp. 3d 909, 933, 937 n.33 (N.D. Cal. 2023); Fla. Stat. § 934.03(3)(d); 720 ILCS 5/14-2(a)(3) (prohibiting eavesdropping without "the consent of all parties to the private electronic communication"); *Mustava v. State*, 323 Md. 65, 72 (Md. Ct. App. 1991) (finding the "Maryland [Act has a] more restrictive two-party consent provision" than the FWA); N.H. Rev. Stat. § 570-A:2(1); 18 Pa. Stat. § 5704(4).

consent before recording the communications[15] and Plaintiffs sufficiently alleged GM intercepted "electronic communications," *see supra,* Section I(A)(1)–(2) (GM intercepted the content of electronic communications); *see also* LNRS/Verisk MTD Opp. Section III (Driving Data is an electronic communication under the state wiretap statutes). Plaintiffs' state wiretapping claims prevail.

### C. Plaintiffs State a Claim for Violation of the Stored Communications Act ("SCA") (Count 3).

Each of the three arguments GM raises concerning the SCA fail on their own, and regardless, each is "a factual question for summary judgment or trial." *See ACW Flex Pack LLC v. Wrobel*, 2023 WL 4762596, at *11–12 (N.D. Ill. July 26, 2023).

#### 1. Plaintiffs Plausibly Allege That In-Vehicle Storage Components Are "Facilities."

GM asks this Court to determine that the in-vehicle storage components are not "a facility through which an electronic communication service is provided." 18 U.S.C. § 2701(a). None of GM's cases establish that the storage repositories at issue are not "facilities" within the SCA. Doc. 142-1 at 53–54 & n.21.

[15] *See, e.g.*, ¶¶ 13, 27, 43, 57, 88, 112, 124, 140, 151, 163, 175, 193, 204, 227, 246, 261, 263, 273, 275, 286, 299, 325, 344, 361, 373, 389, 399, 410, 428, 443, 457, 473, 491, 509, 538, 547, 568, 580, 591, 610, 628, and 641.

"Facility" is not defined by the SCA but is typically defined as "a place, usually including buildings, used for a particular purpose or activity."[16] Congress "intended the term to include the physical equipment used to facilitate electronic communications." *Council on Am.-Islamic Rels. Action Network, Inc. v. Gaubatz*, 793 F. Supp. 2d 311, 334 (D.D.C. 2011). Plaintiffs allege that at least some of their Driving Data is "stored in electronic components of [Plaintiffs'] vehicles." ¶¶ 1020–21. The Driving Data is stored in the units that are part of the cellular network, which are accessed by GM to transmit the communications without Plaintiffs' consent. *See* ¶¶ 850–52.

"[T]he interaction between the terms 'facility' and 'electronic communication service' will not always present an easy question." *Gaubatz*, 793 F. Supp. 2d at 335. Importantly, however, *no* case has held that in-vehicle storage components, like the ECUs and TCUs, are categorically *not* facilities under the SCA. Nor should ECUs and TCUs be treated like personal computers or cell phones. TCUs and ECUs are not subject to user control. *See* ¶ 1020 (in-vehicle computer storage components are not "devices with which a user accesses electronic communications" like a personal computer or a smart phone). The components are more like cloud-based email

[16] *See* Oxford's English Dictionary, Facility,https://www.oxfordlearnersdictionaries.com/us/definition/english/facility.

servers than iPhones.[17] At best, whether the ECUs and TCUs are like smart phones is a question of fact that cannot be resolved at the initial pleading stage.

**2. Plaintiffs Adequately Allege Electronic Communications Are In Electronic Storage.**

GM contests whether Driving Data is an "electronic communication," and whether this data was ever "in 'electronic storage.'" Doc. 142-1 at 54–55. But there can be no real dispute that the Driving Data described is an electronic communication because it falls within the broad definition under the SCA. *See* 18 U.S.C. § 2510(12) (defining electronic communications). The flaw in GM's argument is that it requires grafting an "intended recipient" element on to the statutory definition. There is no such requirement. *See supra*, Section I(A)(1) (discussing "electronic communications" in context of FWA). GM's first argument fails.

GM also asserts that the data is not in "electronic storage," arguing that the vehicle components are akin to personal devices, not email servers. Doc. 142-1 at

[17] Several courts within this Circuit and elsewhere, have concluded that cloud-based e-mail management and storage programs and user-to-user electronic messaging systems constitute a "facility" within the meaning of the SCA. *See Brown Jordan Int'l, Inc. v. Carmicle*, 846 F.3d 1167 (11th Cir. 2017)); *In re United States for an Order Pursuant to 18 U.S.C. § 2705(b)*, 289 F. Supp. 3d 201, 208 (D.D.C. 2018); *United States v. Steiger,* 318 F.3d 1039, 1049 (11th Cir. 2003) (noting "SCA may apply to the extent [unauthorized party] accessed and retrieved any information stored with [an] Internet service provider.").

55. But Plaintiffs allege precisely that the in-vehicle storage components temporarily stored driving data incidental to electronic transmission of that data. *See* 18 U.S.C. § 2510(17) (defining "electronic storage" as, *e.g.*, "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof"); ¶¶ 855, 856 (GM harvests Driving Data by "accessing temporarily stored information"), 1020, 1024 (GM, without [authorization], accessed certain data stored in the vehicle and transmitted it to GM's servers via cellular network from storage after the completion of a trip or at the end of the day or on some other periodic basis."). GM's cited cases are readily distinguishable on their facts.[18] GM asks the Court to draw inferences in its favor, rather than in Plaintiffs. But taking Plaintiffs' allegations as true and drawing reasonable inferences from those allegations in Plaintiffs' favor, Plaintiffs have more than sufficiently alleged that the Driving Data here is in "electronic storage."

---

[18] *See Cohen v. Casper Sleep, Inc.*, 2018 WL 3392877, at *5 (S.D.N.Y. July 12, 2018) (dismissing SCA claims against e-commerce retailers related to their use of code permitting them to scan website visitors' computers where plaintiff conceded that any electronic communications were "stored" on his personal computer); *Williams v. Rosenblatt Sec. Inc.*, 136 F. Supp. 3d 593, 607 (S.D.N.Y. 2015), *opinion reinstated on reconsideration,* 2015 WL 6509112 (S.D.N.Y. Oct. 28, 2015) (dismissing SCA claims because plaintiff failed to allege defendants lacked or exceeded authorization in accessing emails, noting that once emails were downloaded from server to a computer terminal they were not in "electronic storage"); *Hilderman v. Enea TekSci, Inc.*, 551 F. Supp. 2d 1183, 1205 (S.D. Cal. 2008) (employee's storage of emails on hard drive of company-issued laptop did not constitute "electronic storage").

Essentially restating its first argument, GM challenges Plaintiffs' ability to allege "electronic storage" because, it argues, communications are not stored during "transmission" to an "intended recipient." Doc. 142-1 at 55. Although aspects of the technology are unknown, Plaintiffs allege the in-vehicle storage components temporarily stored Driving Data incidental to electronic transmission of that data, all without authorization, which sufficiently states an SCA claim.

**3. The SCA Exceptions Do Not Apply.**

The thrust of GM's final argument for dismissing the SCA claim is that if the in-vehicle storage components are facilities through which an electronic communication service is provided, then GM is the provider of that service, and thus exempt from liability. 18 U.S.C. § 2701(c)(1). But GM bears the burden of proof as to statutory exceptions, and a claim may only be dismissed based on a statutory exception that appears on the face of the complaint. *In re DoubleClick*, 154 F. Supp. 2d 497, 507–08.

Plaintiffs do not allege facts supporting a GM-as-provider theory. The physical electronic and wire components within Plaintiffs' vehicles belong to Plaintiffs. Thus, where a plaintiff provides an ECS through its own system that defendant intentionally and without authorization accessed to obtain stored communications, the plaintiff states a claim under Section 2701(a). *Expert*

*Janitorial, LLC v. Williams*, 2010 WL 908740, at *5 (E.D. Tenn. Mar. 12, 2010) (plaintiff housed proprietary communications itself and defendants' unauthorized access violated the SCA).

At the very least, these are questions unsuited for resolution at the initial pleading stage. *See Hately v. Watts*, 917 F.3d 770, 789–90 (4th Cir. 2019) (reversing summary judgment on an SCA claim; "where so many facts regarding the functioning of the underlying technology are currently unknown, there is a real question of fact that cannot be decided on a motion to dismiss."); *see also Council on Am.-Islamic Rels. Action Network, Inc. v. Gaubatz*, 793 F. Supp. 2d 311, 336 (D.D.C. 2011) (discovery needed as to which of plaintiffs' systems, if any, were accessed by defendants and whether those systems were used to provide an electronic communication service).

### D. Plaintiffs State a Claim for Violation of the Computer Fraud and Abuse Act ("CFAA") (Count 4).

To state a CFAA claim, Plaintiffs need only allege that GM: (1) intentionally accessed (2) a protected computer (3) without authorization, and (4) as a result of such conduct, has (5) intentionally, recklessly or otherwise caused (6) damage. *Bowen v. Porsche Cars, N.A., Inc.*, 561 F. Supp. 3d 1362, 1368 (N.D. Ga. 2021) (internal quotation omitted). GM challenges only the third and sixth elements:

whether its access was without (or exceeded) authorization, and whether Plaintiffs' losses fall within the scope of the CFAA. GM is wrong on both issues.

**1. GM Was Not Authorized to Access Driving Data.**

An entity violates the CFAA by accessing a protected computer either "without authorization" or "exceed[ing] authorized access." 18 U.S.C. § 1030(a)(2). A plaintiff states a claim by alleging the defendant accessed a computer—or files or data therein—that the defendant was not authorized to access. *Leitner v. Morsovillo*, 2021 WL 2669547, at *4 (W.D. Mo. June 29, 2021). Plaintiffs allege GM accessed the computers in their vehicles without authorization. If GM had any authorization, it exceeded it: Plaintiffs did not consent for GM to have unfettered, unlimited access to their vehicles and data. To the extent GM claims it was authorized by Plaintiffs to obtain their data, that is a factual dispute that cannot be resolved now.

To state a "without authorization" claim, a plaintiff need only allege that the defendant was not permitted to access the system or data therein. *See Vox Marketing Group v. Prodigy Promos*, 556 F. Supp. 3d 1280, 1285 (D. Utah 2021).[19] It is not

[19] "To be sure, in *Van Buren v. United States*, the Supreme Court endorsed a "gates-up-or-down" inquiry to determine whether an individual's access to a computer was "without authorization" under the CFAA, explaining that "one either can or cannot access a computer system, and one either can or cannot access certain areas within the system." But the court expressly declined to decide whether "this inquiry turns only on technological (or 'code-based') limitations on access, or instead also looks to limits contained in contracts or policies." *Vox Mktg. Grp.*, 556 F. Supp. 3d at 1285.

necessary to allege that the defendant "hacked" into the protected computer. *Speed of Light Ops, LLC v. Elliot*, 2023 WL 2815875, at *4 (D. Utah. Mar. 21, 2023).

GM relies on *Van Buren v. United States*, 593 U.S. 374 (2021), to argue that because OnStar is "preinstalled" in vehicles and GM has the technical capability to access Driving Data, GM's access cannot be "without authorization." Doc. 142-1 at 60–61. But GM ignores that *Van Buren* is limited to "exceed[ing] authorized access" claims, and does not apply to claims alleging access "without authorization." *See, e.g.*, *Speed of Light Ops, LLC v. Elliot*, 2023 WL 2815875, at *3 (D. Utah Mar. 21, 2023) (discussing cases, recognizing that *Van Buren*'s holding applied to "exceeding authorized access" claims and "did not equally limit the scope of the other provisions of the CFAA, including the without authorization element."); *see also Bowen*, 561 F. Supp. 3d at 1370 ("in *Van Buren*. . . the defendant was authorized to. . . log into the law enforcement computer database to acquire license plate information.").

Further, contrary to GM's assertion, to state a claim that the defendant's access was "without authorization," the defendant is not required to have circumvented any technical or code barrier. *See Moonlight Mountain Recovery, Inc. v. McCoy*, 2024 WL 4027972, at *3 (D. Idaho Sept. 3, 2024); *United States v. Eddings*, 2021 WL 2527966 (E.D. Pa. June 21, 2021) (merely possessing ability to access a computer does not equate to having authorization if system accessed

without owner's permission); *NetApp, Inc. v. Nimble Storage, Inc.*, 41 F. Supp. 3d 816, 829–32 (N.D. Cal. 2014) ("a nontechnological barrier can revoke authorization"). To state a "without authorization" claim, a plaintiff merely needs to allege that defendant "accessed data which was off-limits." *Leitner*, 2021 WL 2669547, at *4.

Thus, contrary to GM's contention, it is immaterial whether the gate was open or closed "from GM's perspective." Doc. 142-1 at 61.[20] The proper question is whether GM was authorized to access the system, which is an objective "yes or no" inquiry. *See Vox Marketing Group*, 556 F. Supp. 3d at 1285 ("'one either can or cannot access a computer system, and one either can or cannot access certain areas within the system.'") (quoting *Van Buren*, 593 U.S. at 376).

Plaintiffs have amply pled that the answer to that question is an emphatic "no": Plaintiffs did not give GM permission to access their Driving Data. Specifically, Plaintiffs allege that they were never given the choice to activate

[20] Further, *Orbit One Communications, Inc. v. Numerex Corp.*, 692 F. Supp. 2d 373 (S.D.N.Y. 2010), is wholly inapposite, as (1) the court did not address whether an individual's perspective that the "gates" were "up" matters; and (2) the accused individuals were executives who obtained the data "prior to leaving the company," and therefore had authorization to access the system, even if the data was used for an improper purpose. *Id.* at 386.

OnStar, and did not knowingly enroll in OnStar.[21] For Plaintiffs' "without authorization" claim, it is immaterial that the *dealerships* enrolled Plaintiffs, as authorization cannot be given by a third party. *See Moonlight Mountain Recovery*, 2024 WL 4027972, at *4 (sustaining the CFAA claim because "the allegations in the Complaint make clear that the gates were up, so to speak, because McCoy impermissibly raised them."). As to the three Plaintiffs who allege they intended to enroll in Smart Driver, they did so with the understanding that data from their vehicles would be provided only to them for their own personal use—*not* to GM. *See* ¶¶ 665, 800, 801, 828, 835, 836, 840, 866 (generally, Smart Driver reports only to enrolled user for personal use).

This case goes beyond the allegations deemed sufficient in *Bowen v. Porsche Cars, N.A., Inc.*, 561 F. Supp. 3d 1362 (N.D. Ga. 2021), which GM ignores. In *Bowen*, the court sustained the CFAA claim when Porsche accessed a portion of the vehicle's infotainment system through the Sirius XM Radio hardware installed in the vehicles. *Id.* at 1366. The *Bowen* court held consent to access the computer for one purpose does not equate to consent for all purposes. *Id.* at 1370–71. For the same

[21] *See* ¶¶ 13, 27, 43, 57, 88, 112, 124, 140, 151, 163, 175, 193, 204, 227, 246, 261, 263, 273, 275, 286, 299, 325, 344, 361, 373, 389, 399, 410, 428, 443, 457, 473, 491, 509, 538, 547, 568, 580, 591, 610, 628, 641; *see also* ¶ 866 (no data collection if not enrolled in Smart Driver).

reasons, Plaintiffs sufficiently allege that GM was not authorized to access the Driving Data in their vehicles. The MCC satisfies the "without authorization" element.

GM's reliance on *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180 (9th Cir. 2022), actually supports Plaintiffs' claims and opposition. There, data scraping the plaintiff's website did not constitute accessing a computer "without authorization" because the "computer network generally permits public access to its data." *Id.* at 1201. Here, in contrast, Plaintiffs' Driving Data was not generally available to the public, but could only be obtained by covertly accessing the TCU in the vehicles. ¶¶ 851–56. To the extent GM contends that *hiQ* held that a technical or code barrier must be circumvented to state a CFAA claim, its reading of *hiQ* is incorrect, as the *hiQ* court merely held that accessing a network using usernames and passwords is a violation of CFAA, it did not hold that using a password is the ***only*** way to violate CFAA. *See Vox Marketing*, 556 F. Supp. 3d at 1285 ("It does not follow, however, that hacking a password is the *only* way that one can obtain access 'without authorization.'").[22]

[22] For the same reasons, GM's reliance on *Salinas v. Cornwell Quality Tools Co.*, 2022 WL 3130875 (C.D. Cal. June 10, 2022), is also inapposite. *Auto. Assurance Group v. Giddens*, 2022 WL 18460629 (N.D. Ga. Sept. 20, 2022), is even further afield, as the plaintiff's claim was under the "exceeded authorized access" prong, and the plaintiff failed to produce evidence on a motion for summary judgment to

To the extent that GM had *any* authorization, Plaintiffs sufficiently allege that GM exceeded it. The CFAA defines "exceeds authorized access" as "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6). As interpreted by *Van Buren*, it is not the defendant's motive, but whether the defendant "obtains information located in particular areas of the computer—such as files, folders, or databases—that are off limits to him." *Van Buren*, 593 U.S. at 396.

GM exceeded any authorization because Plaintiffs' Driving Data was "off limits" to GM whether or not Plaintiffs intentionally enrolled in Smart Driver. While GM may have had access to certain portions of OnStar and the vehicle navigation system, ¶¶ 662–63, GM was not authorized to access Plaintiffs' vehicles' TCUs and sensors to obtain Driving Data. ¶ 866 ("GM expressly represented that it would not collect Driving Data at all unless consumers enrolled separately in Smart Driver."); *see also* ¶ 828 (OnStar Smart Driver promoted as a new service that "'provided customers with information about their driving behavior[.]'"); ¶¶ 800–01, 835, 836 (similar); ¶ 840 (GM represented "Driving Data collected would be kept completely

---

support a finding that the defendant intentionally exceeded authorized access. *Id.* at *7 (stating that the employee "unknowingly still had access . . . during his mistaken log-in.") (cleaned up).

private and sent 'only' to the customer."). To the extent that GM asserts—contrary to the allegations in the MCC—that its access to Driving Data was within the scope of its authorization to access other features of the vehicles, that is a fact issue that is not suited to resolution at this stage. *See Leitner*, 2021 WL 2669547, at *4 ("questions regarding a person's authorized access and the scope of that authorization. . . are fact-intensive inquiries."). As such, Plaintiffs sufficiently allege that GM used its access to the TCU's on their vehicles "to obtain . . . information [*e.g.*, the Driving Data] in the [vehicles] that [GM] is not entitled so to obtain."[23]

GM's reliance on *Fish v. Tesla*, 2022 WL 1552137 (C.D. Cal. May 12, 2022), is also misplaced. First, in *Fish*, the plaintiffs alleged violation of § 1030(a)(4), not § 1030(a)(2), as Plaintiffs do here. Second, the *Fish* plaintiffs sustained damage to their vehicles' batteries as a result of updates Tesla pushed to their vehicles, but Plaintiffs failed to allege that Tesla accessed a physical part of the vehicle without authorization. *Id.* at *9. Thus, plaintiffs failed to allege that Tesla's access exceeded authorization. *Id.* In contrast, here, Plaintiffs alleged that GM did not have

[23] Plaintiffs' CFAA claim is focused on GM's conduct in obtaining information GM was not authorized to access. Thus, GM's argument and reliance on *Rogers v. Stanton*, 2024 WL 4543192 (N.D. Ga. Feb. 15, 2024), concerning authorized access but for an improper purpose, are irrelevant.

authorization to access their Driving Data, even if GM was authorized to access other aspects of the vehicles' many computer systems. ¶¶ 864, 866, 867.

GM claims it did not *intentionally* exceed authority when accessing Driving Data. Doc. 142-1 at 63. That argument does not square with Plaintiffs' allegations. GM's accessing Driving Data was not inadvertent or mistaken.[24] By design, GM intercepted Plaintiffs' Driving Data without their consent, even continuing to access and obtain Driving Data from drivers whose Smart Driver enrollment had terminated.[25] GM went to great lengths to obtain Driving Data while concealing its conduct. *See, e.g.,* ¶¶ 822, 830, 880.

*Abu v. Dickson*, 107 F.4th 508 (6th Cir. 2024), is inapposite. There, on review of summary judgment, the court held that the record did not support a finding of intent for either the principal or agent where plaintiff failed to present evidence that the employee knew that he did not have authorization to access accounts he had been administering when the business sales agreement fell apart. *Id.* at 513, 517–18. Importantly, the *Abu* court confirmed that principals may be vicariously liable under

---

[24] ¶¶ 681–88, 693, 702–03, 710–713, 739, 742–48, 769–73, 778–79. 781–83, 786–807, 822–915.
[25] ¶¶ 30, 60, 179, 207, 208, 220, 231, 233, 303, 330, 348, 350, 403, 434, 436, 447–48, 479–80, 525, 551, 796, 823, 826–830, 880.

the CFAA for offenses of their agent, but that the factual record could not support liability in that case. *Id.* at 520.

The *Abu* court's concern with exempting principles is relevant, as GM contends that it cannot know which consumers authorized access because dealerships (GM's agents) enrolled consumers. Doc. 142-1 at 63. But GM ignores the allegations, which must be taken as true, that GM instructed and incentivized dealerships to enroll consumers irrespective of their consent. ¶¶ 884–904. Permitting GM to shield itself from CFAA liability by virtue of instructing dealers to improperly grant access would "create[] a troubling loophole." *Abu*, 107 F.4th at 522 (White, J. concurring); *see also Moonlight Mountain Recovery*, 2024 WL 4027972, at *4.

Moreover, for those Plaintiffs who intentionally enrolled in OnStar, GM most certainly intentionally exceeded its authorized access when it continued to access data after the subscription period ended.[26] *See Zap Cellular, Inc. v. Weintraub*, 2022 WL 4325746, *7 (E.D.N.Y. Sept. 19, 2022) (finding a violation of the CFAA when the former CEO accessed computers after termination of employment). The Court

[26] ¶ 30, 60, 179, 207, 208, 220, 231, 233, 303, 330, 348, 350, 403, 434, 436, 447–48, 479–80, 525, 551, 880.

should deny GM's request to dismiss the CFAA claim because Plaintiffs sufficiently alleged that GM exceeded its authority.

**2. Plaintiffs Pled a Loss Under the CFAA.**

Plaintiffs' damages and losses as a result of GM's unauthorized access to their Driving Data are cognizable under the CFAA. For a private action under CFAA, plaintiff must allege, *inter alia*, a loss caused by a violation of the CFAA, aggregating at least $5,000 in value. 18 U.S.C. § 1030(g). GM acknowledges the allegations satisfy the monetary minimum, but challenges whether the described losses fall within the scope of the CFAA. Because Plaintiffs suffered actual monetary losses, they state a CFAA claim.

The CFAA defines "loss" as not only the cost to the victim, but also costs for investigating, responding to or restoring the data, systems, or information accessed, as well as any lost revenue, costs, or other consequential damages suffered as a result of the loss of service. 18 U.S.C. § 1030(e)(11). In contrast, "damage" is "any impairment to the integrity or availability of data, a program, a system, or information." *Id.* at § 1030(e)(8). "Thus, while 'damage' covers harm to data and information, 'loss' refers to monetary harms sustained by the plaintiff." *NovelPoster v. Javitch Canfield Grp.*, 140 F. Supp. 3d 954, 961 (N.D. Cal. 2014).

Contrary to GM's assertion, "loss" under the CFAA encompasses more than just pure informational losses. Doc. 142-1 at 65. Indeed, courts have found sufficient alleged losses can include lost time, *Healthcare Advocs., Inc. v. Harding, Earley, Follmer & Frailey*, 497 F. Supp. 2d 627, 647 (E.D. Pa. 2007), and "the expenditure of resources to investigate and remediate defendants' conduct." *WhatsApp Inc. v. NSO Group Technologies Ltd.*, 472 F. Supp. 3d 649, 683 (N.D. Cal. 2020). All that is required is that the loss be reasonable and causally linked to GM's misconduct.

As alleged throughout the MCC, Driving Data was used in a variety of manners that caused Plaintiffs financial harm, including the loss of their privacy in and control over Driving Data. ¶¶ 664, 825, 843, 1047. These out-of-pocket costs were not *de minimis*. And as alleged, the aggregate value of this stolen data is estimated to be in the millions if not billions of dollars. ¶¶ 664, 825, 843, 1047. Further, some Plaintiffs suffered increases in insurance premiums; indeed Plaintiff Carnine's insurance premium increased approximately $6,000 per year, and Plaintiff Skyers' premium increased approximately $4,500 per year. ¶¶ 64, 156. These harms are "costs to the victim" of GM's CFAA violations. *See* 18 U.S.C. § 1030(e)(11).

Further, Plaintiffs spent time investigating the accuracy of their reports and increases to their insurance premiums (despite a lack of claims or accidents) and seeking out alternative insurance, which further support their claimed losses. ¶¶ 17,

34, 35, 51, 61, 63, 66, 82, 133, 157, 186, 211, 240, 254, 293, 304, 319, 331, 337, 368, 378, 384, 420, 466, 499, 517, 552, 553, 559, 601, 621. The lost value of time is a cognizable loss under the CFAA. *See Healthcare Advocs.*, 497 F. Supp. 2d at 647. Plaintiffs allege various cognizable losses.

### E. Plaintiffs State a Claim for Violation of the California Computer Data Access and Fraud Act ("CDAFA") (Count 16).

GM simply argues that Plaintiffs' CDAFA claim should rise or fall with the CFAA claim. Doc. 142-1 at 67. Because Plaintiffs sufficiently allege GM was not authorized to access their Driving Data and they suffered cognizable losses as a result, the Court should sustain the CDAFA claim as well. *See NovelPoster*, 140 F. Supp. 3d at 963–64, 966–67.

## II. THE FCRA DOES NOT PREEMPT PLAINTIFFS' STATE LAW CLAIMS.

GM argues Plaintiffs' state law claims are either conflict preempted or expressly preempted by FCRA. Doc. 142-1 at 44–51. Not so.[27] FCRA conflict

---

[27] As discussed in depth in Plaintiffs' Opposition to Defendants LexisNexis Risk Solutions Inc. and Verisk Analytics, Inc.'s Motion to Dismiss, FCRA expressly preserves state law; FCRA preemption is limited by its text and must be construed narrowly; there is a presumption against preempting state law here; and FCRA preempts a non-FCRA claim only where (1) complying with the non-FCRA claim would *violate* FCRA (conflict preemption) or (2) where the non-FCRA claim is *explicitly* covered by limited, enumerated FCRA provisions (express preemption). *See CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993) (the text of a statue

preemption is bound and limited by its text: state law is only preempted "to the extent that those laws are inconsistent with any provision of this title," and "*only to the extent of the inconsistency*." 15 U.S.C. § 1681t(a) (emphasis added). State law is inconsistent only where complying with it would "cause a violation" of FCRA.[28] Here, Plaintiffs' state law claims are not in conflict with FCRA because they challenge conduct beyond that contemplated by FCRA and GM may comply with state law without violating FCRA:

- GM "deliberately design[ed] devices and programs that surreptitiously obtain, improperly gain knowledge of, review, retain, package, and sell [Plaintiffs' data,]" *see, e.g.*, ¶ 1057, including by "embedding, enabling, and activating software/hardware to extract Driving Data from Plaintiffs' vehicle without informed consent to do so." ¶ 1092;

- GM engaged in fraud, deception, misrepresentation, and unfair conduct by misrepresenting, *inter alia*, the true nature of its cars and services. ¶ 1241;

- GM knew or should have known that notice and consent were legal prerequisites to obtaining Plaintiffs' Driving Data, but that Plaintiffs

---

is "the best evidence of Congress' pre-emptive intent."). Plaintiffs incorporate these arguments here as they apply equally to GM's arguments.

[28] *See* Petruccelli, FTC Informal Staff Opinion Letter (July 15, 1981) (appended at Ex. 1 at 474) ("[FCRA] was intended to preempt state law *only* where compliance with the state law would cause a *violation* of the Federal statute.") (emphasis added); *see also* FTC 40 Year Report at § 625(a); Senate Report 91-517, 91st Cong., 1st Sess. at 8 (Nov. 5, 1969); *Credit Data of Ariz., Inc v. Arizona*, 602 F.2d 195, 198 (9th Cir. 1979) ("compliance with the [state law] would not trigger a federal *enforcement action* on the ground that the [state law] is inconsistent with [FCRA].").

were unlikely to give such consent if Defendants' practices were revealed to Plaintiffs. *See* ¶¶ 792–822; and

- Plaintiffs' Driving Data was provided to third parties, including insurers, service providers, data brokers, other business, and even governments. *See* ¶¶ 770, 933.

Further, a state law is not inconsistent with FCRA merely because it gives consumers *more* protection than FCRA. *See Aghaeepour v. N. Leasing Sys., Inc.*, 378 F. Supp. 3d 254 (S.D.N.Y. 2019) (holding law *explicitly* requiring notice to a consumer before a consumer report was obtained not preempted by FCRA); *see also* CFPB, The Fair Credit Reporting Act's Limited Preemption of State Laws, 87 Fed. Reg. 41, 42 (July 11, 2022);[29] *Credit Data of Ariz.*, 602 F.2d at 198 (upholding law requiring free disclosure of file to consumer even though FCRA allowed a "reasonable charge").[30]

---

[29] Available at https://www.consumerfinance.gov/rules-policy/final-rules/the-fair-credit-reporting-acts-limited-preemption-of-state-laws/. Although this guidance was recently withdrawn by the current administration, its reasoning was not challenged and it remains the reasoned analysis of FCRA preemption by subject area experts. *See Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2262 (2024) ("[C]ourts may—as they have from the start—seek aid from the interpretations of those responsible for implementing particular statutes."); CFPB, Compendium of Recent CFPB Guidance (Jan. 14, 2025) ("[The CFPB's] interpretations [ ] reflect the best reading of the federal consumer financial laws and [ ] the reasoning provided therein will therefore prove to be durable.").

[30] This interpretation is also in line with FCRA qualified immunity provision, which only applies to negligence-based invasion of privacy theories. In short, if, as GM argues, FCRA preempts all state law related to credit reporting, it would be unnecessary to provide qualified immunity from *any* state laws. Such a reading impermissibly renders the qualified immunity provision mere "surplusage." *See United States v. Forey-Quintero*, 626 F.3d 1323, 1327 (11th Cir. 2010) (explaining

Plaintiffs allege GM sold this information to third parties in ways not covered, not permitted, or preempted by FCRA, including to start-ups, service providers, marketing analytics firms, and even governmental entities and schools. ¶¶ 689, 693, 770–75, 933; *see Galper v. JP Morgan Chase Bank, N.A.,* 802 F.3d 437, 446 (2d Cir. 2015) (holding state law claim not preempted where it did not depend on bank's FCRA furnisher responsibilities; bank just happened to be a furnisher). Even if, as GM argues, it furnished information *only* to be used in insurance underwriting as permitted by FCRA 1681b(a)(3)(C) (which is not true), that provision does not allow—and has no preemptive effect regarding—the provision of *inaccurate* information, as Plaintiffs allege in support of their FCRA violations claims.[31] GM's analogies to traditional consumer reporting, Doc. 142-1 at 50, are of no moment: GM is not a bank. Neither is *purchasing* a car the same as applying for a credit card, an apartment, or a job, which a person may expect will appear on a consumer report.

---

that the canon against surplusage is a "basic premise of statutory construction" (citation and internal quotation omitted)).

[31] The only marketing-related permissible purpose under the Act is prescreening firm offers of credit or insurance, under the limitations of the prescreening provision. Otherwise, marketing is not a permissible purpose under the Act: "It is clear that Congress did not intend to allow access to consumer credit information 'for catalogs and sales pitches.'" *Cole v. U.S. Capital, Inc.*, 389 F.3d 719, 727 (7th Cir. 2004), *quoting Trans Union Corp. v. Fed. Trade Comm'n*, 267 F.3d 1138, 1143 (D.C. Cir. 2001); *see also Trans Union*, 267 F.3d at 1143 ("the FCRA's express purpose is to facilitate credit, not target marketing").

Plaintiffs did not expect that by buying a car they were giving up when, where, and how they drive to unknown third parties. ¶ 1241. Merely requiring GM to *tell* Plaintiffs otherwise before they drive off the lot would not upend the "banking system," as GM argues, nor would it violate FCRA.

Regarding express preemption, Section 1681t(b) states that "[n]o requirement or prohibition may be imposed under the laws of any State *with respect to*" five different areas (emphasis added). Of these, only two are relevant here: Sections 1681t(b)(1) ("subject matter" express preemption) and 1681t(b)(5) ("conduct required" express preemption).[32]

The "subject matter" express preemption provision states "[n]o requirement or prohibition may be imposed under the laws of any State *with respect to*" subject matter regulated by eleven enumerated provisions (emphasis added). Of these, only Section 1681s-2 concerns furnishers, and only subsection 2(a)(1)(A) is relevant here.[33] A furnisher must "refrain from reporting information the furnisher 'knows or

---

[32] Plaintiffs' claims do not concern the exchange of information among affiliates as GM, LNRS, and Verisk are separate entities (1681t(b)(2)); designated disclosures in response to consumer requests for their own consumer reports as required by section 1681g (as Plaintiffs' claims do not seek disclosures in their consumer reports from Defendants in addition to those required pursuant to FCRA (1681t(b)(3)); or the frequency with which consumers can obtain free consumer reports, as Plaintiffs make no allegations regarding the cost of consumer reports (1681t(b)(4)).

[33] Section 1681s-2's other subsections are not relevant here because Plaintiffs' state law claims do not arise from GM's duty as a furnisher to take specific actions

has reasonable cause to believe' is inaccurate." 15 U.S.C. § 1681s-2(a)(1)(A). Plaintiffs' state law claims are not preempted because they do not impose a "requirement" or "prohibition" *with respect to* GM's duty to not pass along inaccurate information. *See, e.g., Brown v. Mortensen*, 51 Cal. 4th 1052, 1072 (Cal. Ct. App. 2011) (holding state medical confidentiality law not preempted where defendant shared information beyond that covered by FCRA); *Drew v. Equifax Info. Serv.*, 2007 WL 2028745, at *5 (N.D. Cal. July 11, 2007) (refusing to dismiss claims based on state law requiring users to verify and correct credit information).

Here, while Plaintiffs' state law allegations *reference* that the Driving Data harvested by GM is fundamentally inaccurate, "their gravamen issues [are] neither of accuracy nor of credit dispute resolution," *Mortensen*, 51 Cal. 4th at 1072, but rather GM's years-long stealth campaign to generate, harvest, and sell new kinds of valuable, intimate Driving Data, and their efforts to conceal the same. Indeed, none of Plaintiffs' state law claims require as an element that GM reported or failed to correct inaccurate information. *See Carlson v. Trans Union, L.L.C.*, 259 F. Supp. 2d 517 (N.D. Tex. 2003) (claims not preempted where they require no proof concerning

---

regarding inaccuracies in consumer reports or identity theft. *See* 1681s-2(a)(1)(B), 2(a)(2)), (2(a)(3)), ((2)(b)), (2)(a)(6)), (2(a)(8)). And subsections 2(a)(3)-(4), (7), and (9) are inapplicable: GM does not maintain Plaintiffs' financial accounts, is not a "creditor" or "financial institution," and GM's "primary business" is not medical.

enumerated FCRA furnisher duty). Plaintiffs' state law claims do not impose any additional "requirement" or "prohibition" with respect to GM's obligations regarding accuracy and thus are not expressly preempted by Sections 1681t(b)(1). *See Mortensen*, 51 Cal. 4th at 1072.[34]

Further, regarding "conduct required" express preemption (1681t(b)(5)), Plaintiffs' state law claims "impose no requirement or prohibition with respect to" conduct required by the enumerated provisions—*i.e.*, the provision of a free annual consumer report or concerning identity theft—and thus are not preempted.[35] Finally, with no substantive argument, GM references 15 U.S.C. § 1681h(e), which preempts certain claims "in the nature of invasion of privacy." *See* Doc. 142-1 at 51 n. 32. This section is inapplicable to the present case. *See* Plaintiffs' Opposition to Doc. 140-1, Section II. In the alternative, to the extent some state law claims are subject

[34] Even if Plaintiffs' state law claims imposed a "requirement" or "prohibition" with respect to GM's obligations regarding accuracy (which they do not), that portion may be excised while preserving the portion of those state law claims concerning GM's other alleged misconduct. *See Aklagi v. Nationscredit Financial Services Corp.*, 196 F. Supp. 2d 1186, 1195 (D. Kan. 2002) (holding defamation claim was not preempted to the extent it was based on furnisher's furnishing of inaccurate information to a CRA *before* the furnisher received notice that the consumer disputed the information).
[35] Except for the right to a free annual consumer report (1681j(a)), all the provisions listed under section 1681t(b)(5) relate explicitly to identity theft. *See* 1681c(g), c-1, c-2, g(a)(1)(A), m(e)–(g); s(f); s-2(a)(6), and w.

to qualified immunity, Plaintiffs adequately allege GM acted intentionally and with malice.[36]

## III. PLAINTIFFS ALLEGED PLAUSIBLE COMMON LAW CLAIMS.

### A. Applying Georgia Law to Plaintiffs' Common Law Claims is Appropriate at the Pleadings Stage.

Georgia courts apply the "common law developed in Georgia rather than foreign case law" when no specific statute is involved for ruling on a motion to dismiss. *In re Equifax, Inc. Customer Data Security Breach Litig*., 362 F. Supp. 3d 1295, 1311–12 (N.D. Ga. 2019). While a more fact-intensive choice of law analysis will likely be necessary when determining if a class may be certified, *Peterson v. Aaron's, Inc.*, 2017 WL 364094, at *6 (N.D. Ga. Jan. 25, 2017), it is "premature to conduct a rigorous choice of law analysis at this stage." *In re ConAgra Peanut Butter Prods. Liab. Litig.*, 2008 WL 2132233, at *1, 4 (N.D. Ga. May 21, 2008) ("concerns regarding the variations of state law-especially a small minority of states-are more properly considered at the class certification stage").

[36] *See, e.g.* ¶¶ 2, 916–31, 1031, 1061, 1067, 1069, 1118, 1131, 1203, 1210, 1228, 1258, 1272, 1314, 1355, 1372, 1387, 1423, 1443, 1457, 1464, 1472, 1484, 1544, 1587, 1603, 1606, 1636, 1654, 1690, 1700, 1716, 1726, 1763, 1754, 1777, 1790, 1805, 1819, 1867, 1878, 1897, 1904, 1911, 1932, 1946, 1960, 1972, 1986.

**B. Plaintiffs State Legally Cognizable Injuries.**

Conflating Article III "traceability" with causation—a question that will be ultimately determined by a jury[37]—GM argues Plaintiffs have not suffered any actionable injury. Doc. 142-1 at 75–78. GM is wrong. Plaintiffs allege multiple forms of injury that are both cognizable in federal court and sufficient to survive dismissal.[38]

First, Plaintiffs suffered privacy injuries when GM intercepted, stored, used, and disclosed Plaintiffs' Driving Data without their notice or consent. *See* ¶¶ 667–80, 1060, 1065, 1076. A right to privacy "encompass[es] the individual's control of information concerning his or her person." *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017) (quoting *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763 (1989)). Privacy harms are concrete injuries that "have long been actionable at common law." *Patel v. Facebook*, 932 F.3d 1264, 1272, 74 (9th Cir. 2019) (collection of biometric data without consent constituted

[37] *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 591 (8th Cir. 2009) ("It is crucial, however, not to conflate Article III's requirement of injury in fact with a plaintiff's potential causes of action, for the concepts are not coextensive.").

[38] GM consented to the removal of an action asserting the same types of injuries, asserting that the federal court had jurisdiction to hear the matter. Ex. 2, *Martin v. General Motors, LLC, et al.*, No. 25-cv-00120, Joinder in and Consent to Removal of Defendants General Motors LLC and OnStar LLC, Doc. No. 1-9 (E.D. Tex. Feb. 7, 2025).

concrete injury; "advances in technology can increase the potential for unreasonable intrusions into personal privacy."); *TransUnion LLC v. Ramirez,* 594 U.S. 413 (2021);[39] *Facebook, Inc. Internet Tracking*, 956 F.3d at 598–99 (unauthorized collection of browsing data).[40]

GM's suggestion that Plaintiffs' privacy injuries are "nebulous" and "premised on the collection of non-sensitive data" contradicts the well-pled allegations in the MCC. *See* ¶¶ 667–80 (explaining "[t]he importance of consumer privacy in the auto industry"); ¶ 858 (alleging Senators Wyden and Markey condemned GM's conduct as a "flagrant abuse of[] customers' privacy" for which both GM and senior company officials responsible should be held responsible). There is nothing "nebulous" about secretly harvesting and selling driving data. GM's efforts to downplay this harm only illustrates the problem.

Further, GM's assertion that Plaintiffs allege only increased insurance premiums as economic harm is incorrect and misrepresents the Complaint.

---

[39] Unlike *TransUnion*, where a subset of class members' credit reports were never disseminated to third parties, all Plaintiffs allege their data was collected, shared, and monetized without their consent. Doc. 142-1 at 75. *See* ¶¶ 1–3, 1033, 1065, 1076, 660–961.

[40] *See also Google Cookie*, 934 F.3d at 325 ("[i]n an era when millions of Americans conduct their affairs increasingly through electronic devices, the assertion . . . that federal courts are powerless to provide a remedy when an internet company surreptitiously collects private data . . . is untenable. Nothing in *Spokeo* or any other Supreme Court decision suggests otherwise.").

Defendants deprived Plaintiffs and Class Members of the right to control how their Driving Data is collected, used, or disseminated and by whom. ¶ 1062. This constitutes a concrete harm. *See e.g., In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 460–62 (D. Md. 2020) ("the personal data of Americans . . . has economic value.").[41]

Driving Data has independent and quantifiable market value, as GM itself recognizes by selling such data to third parties like insurers, marketers, and data brokers. *See* ¶ 691 (estimating connected car data could deliver between $250-$400 billion in annual value, projecting 2030 "annual revenue potential" per vehicle to be $400 to $610 for advanced connectivity" and "annual cost savings" per vehicle to be $120 to $210" per vehicle). By secretly collecting, retaining, and monetizing this data without consent, GM unjustly enriched itself at Plaintiffs' expense, depriving them of the opportunity to control, use, or benefit from the economic value of their own information. *See* ¶¶ 24–25, 70–71, 137–38, 258–59, 322–23, 710, 743, 747, 750, 758, 761, 770, 779, 783, 787–90.

---

[41] Contrary to GM's assertion, Plaintiffs need not demonstrate they were attempting to sell their information to be injured. *See* Doc. 142-1 at 52–53.

Courts across the country increasingly recognize that individuals possess a property interest in their personal data, and that unauthorized collection and exploitation of that data gives rise to compensable injury.

The cases GM cites regarding the "lost value" of personal information are inapposite. *See* Doc. 142-1 at 75–76. *Sheffler v. Americold Realty Trust*, 2022 WL 1815505 (N.D. Ga. Jan. 19, 2022), *Bland v. Urology of Greater Atlanta, LLC*, 2024 WL 3313348 (N.D. Ga. Mar. 14, 2024), and *Provost v. Aptos, Inc.*, 2018 WL 1465766 (N.D. Ga. Mar. 12, 2018), involved data breaches where information was stolen by third parties, not a case where defendants themselves unjustly enriched themselves by exploiting consumer data. Courts recognize this distinction as legally significant. *See In re Facebook Priv. Litig.*, 572 F. App'x 494, 494 (9th Cir. 2014) (recognizing injury where defendant itself monetized plaintiffs' data in overruling the district court's dismissal of the state law claims); *Rodriguez v. Google LLC*, 2025 WL 50425, at *10 (N.D. Cal. Jan. 7, 2025) (recognizing Article III injury where plaintiffs alleged that defendant misappropriated and monetized plaintiffs' private information); *Brown v. Google LLC*, 685 F. Supp. 3d 909, 940 (N.D. Cal. 2023) (finding plaintiffs sufficiently alleged concrete harm based on allegations that their data had economic value).

Further, unlike *Banks v. Sec'y, Dep't of Health & Hum. Servs.*, 38 F.4th 86 (11th Cir. 2022), which involved speculative future expenses, Plaintiffs allege actual, realized economic harm from the exploitation of Plaintiffs' Driving Data without compensation. ¶ 1076.

In short, GM cannot both profit millions from Plaintiffs' Driving Data and deny that it has value or that Plaintiffs have suffered economic loss. Pretending Driving Data has no worth to its rightful owner is not just inaccurate, it is unconscionable. *See* ¶¶ 800(c), (f) (alleging a GM executive explained, during announcement of partnership with Verisk, that Driving Data: "[is] not the manufacturers data, in our view it's the customer's data and we need to act as a custodian for it"); ¶ 812.

### C. Plaintiffs' Injuries Are Traceable to GM's Conduct; They Have Adequately Alleged Causation.

GM's causation arguments can be summarily rejected. At this stage, Plaintiffs need only plausibly allege a causal connection—not prove it—and they have done so in detail. GM attempts to evade liability by blaming their dealers and insurance companies. Doc. 142-1 at 79–80. But a defendant can be liable even if other actors contributed to the plaintiff's injury, so long as the defendant's conduct was a substantial factor in bringing about the harm. Restatement (Second) of Torts § 431.

GM's attempt to shift the blame to dealers ignores Plaintiffs' allegations. GM pre-installed OnStar in Plaintiffs' cars. ¶ 1. GM designed, directed, and profited from the onboarding process. ¶¶ 864, 884–85, 890–91. GM intercepted and used Plaintiffs' data and then sold it to third parties. ¶¶ 703, 743, 769. In short, GM cannot avoid liability at the motion to dismiss stage by making proximate cause arguments relating to a system it designed and controlled. *See Holmes v. Securities Inv. Protection Corp.*, 503 U.S. 258, 268-69 (1992) (proximate cause satisfied when there is "some direct relation between the injury asserted and the injurious conduct alleged").

### D. Plaintiffs State a Claim for Invasion of Privacy (Count 5).[42]

GM unreasonably intruded in Plaintiffs' private affairs when it "conducted surveillance on the plaintiff or otherwise monitored [plaintiff's] activities." *Sitton v. Print Direction, Inc.*, 718 S.E.2d 532, 537 (Ga. App. 2011). GM's constant and systemic surveillance of driving "behavior" is the type of "unreasonable intrusion" contemplated by precedent. *Yarbray v. S. Bell Tel. & Tel. Co.*, 409 S.E.2d 835, 837 (1991) (quoting Keeton, Prosser & Keeton on Torts § 117 at pp. 855–56 (5th ed.

---

[42] GM only challenges Plaintiffs' "invasion of privacy" claim in Count 5. Doc. 142-1 at 81. Plaintiffs also allege a civil conspiracy to commit invasion of privacy (Count 6) that GM does not independently challenge. *See* Doc. 142-1 at 66, n.45.

1984).[43] While GM's choice of law analysis is premature, GM's egregious behavior constitutes a violation of the common law right to privacy under every state's laws. *Cf. In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1217 (C.D. Cal. 2017) ("[T]he tort of invasion of privacy has been firmly established in the American common law for approximately a century.").

### 1. Courts Recognize the Existence of an Actionable Privacy Interest Concerning Electronic Surveillance.

Courts have increasingly recognized that comprehensive, long-term monitoring of an individual's movements creates unique privacy concerns, even when individual movements occur in public. The Supreme Court acknowledged in

[43] This is also an invasion of "private affairs." *See Allstate Ins. Co. v. Ginsberg*, 351 F.3d 473, 474 (11th Cir. 2003) (invasion of privacy claim requires an "intrusion—physically or *electronically* intruding into one's private quarters."); *see also Riley v. California*, 573 U.S. 373, 396, (2014) (digital data collection of many distinct types of information reveal much more in combination than any isolated record can provide and form a revealing montage of an individual's life); *Patel*, 932 F.3d at 1272–73 ("advances in technology can increase the potential for unreasonable intrusions into personal privacy."). Defendants assert that New York and North Carolina have rejected the public disclosure of private facts claim entirely in their respective jurisdictions. Doc. 142-1 at 84-85. But both states maintain robust protection for intrusion upon seclusion. *Jennings v. Univ. of N. Carolina at Chapel Hill,* 340 F. Supp. 2d 666, 678 (M.D.N.C. 2004) (recognizing "intrusion into the seclusion, solitude, or private affairs of another ('intrusion tort')."); *Burgess v. Busby*, 544 S.E.2d 4, 10 (N.C. 2001) ("Our Court has recognized the intrusive invasion into the private affairs of another as a valid cause of action."); *Howell v. New York Post Co*., 612 N.E.2d 699, 704 (N.Y. 1993) (providing that New York recognizes common law intrusion claims).

*Carpenter v. United States* that technological monitoring reveals a "detailed chronicle of a person's physical presence compiled every day, every moment, over several years. Such a chronicle implicates privacy concerns far beyond those considered" previously. 585 U.S. at 315. Technological monitoring over time—what Plaintiffs have alleged here—creates a detailed chronicle that exceeds what would be observable through traditional public surveillance.

Notably, the Georgia Supreme Court's decision in *Mobley v. State*, 834 S.E.2d 785, 788, 792, n.1 (2019), directly contradicts GM's argument that data generated by an individual's vehicle cannot be private. In *Mobley*, the court recognized that data retrieved from a vehicle's electronic systems—including information about the vehicle's speed, status of brakes, status of driver's seatbelt, and other driving behaviors—implicate privacy interests that require protection. The *Mobley* court held that accessing such data without proper legal authorization constituted an impermissible search. *Id.* at 792.

Although the *Mobley* decision arose in the criminal context, its reasoning applies with equal force here. If such data is sufficiently private to require a warrant, it is certainly private enough to support a civil invasion of a privacy interest when collected and sold without proper authorization or consent. *See Heeger v. Facebook, Inc.*, 509 F. Supp. 3d 1182, 1190, n.3 (N.D. Cal. 2020) ("while 'the Fourth

Amendment imposes higher standards on the government than those on private, civil litigants. . . we have nonetheless found analogies to Fourth Amendment cases applicable when deciding issues of privacy related to technology[.]' Hence it is useful to look to Fourth Amendment cases such as *Carpenter*[.]") (quoting *In re Facebook*, 956 F.3d at 604 n.7).

### 2. GM's Conduct Is Highly Offensive.

The "offensiveness" inquiry for invasion of privacy claims considers both the nature of the intrusion and the circumstances. *See Hogin v. Cottingham*, 533 So. 2d 525, 531 (Ala. 1988) ("Two primary factors are considered in determining whether or not an intrusion which effects access to private information is actionable. The first is the means used. The second is the defendant's purpose for obtaining the information"). Here, the means—systematic collection through vehicle systems without meaningful consent—and the purpose—commercial exploitation of private behavioral data—both support a finding of offensiveness. ¶¶ 1062–63.[44] GM did not merely collect data necessary for vehicle operation but created comprehensive behavioral profiles to sell to third parties for profit. *See* ¶ 843. Plaintiffs' allegations that "Defendants' conduct is highly offensive to a reasonable person and constitutes

[44] *See also* ¶¶ 17, 47, 154, 232, 278, 349, 365, 378, 414, 435, 448, 480, 584, 614, 632, 654, 703, 745, 771, 833.

an egregious breach of social norms underlying the right to privacy" (¶ 1058) are sufficient to satisfy this requirement under common law invasion of privacy principles.

### 3. GM Committed a "Flagrant Abuse" of Consumer Privacy.[45]

GM's argument that collecting "ordinary consumer data" cannot meet the "highly offensive" standard (Doc. 142-1 at 86) mischaracterizes both the nature of the surveillance conducted and the legal standards governing offensiveness determinations. GM did not collect "ordinary" data—it collected detailed behavioral profiles including geolocation, route history, driving patterns, speeds, braking patterns, and driver attention, creating detailed comprehensive profiles on Plaintiffs' personal lives beyond what casual public observation could reveal. Courts consistently find such comprehensive commercial surveillance highly offensive. In *In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1232 (C.D. Cal. 2017), the court held that unauthorized collection of viewing habits for commercial purposes was "highly offensive," noting that such comprehensive tracking "reveals deeply personal details" about individuals' lives. Similarly, the detailed driving patterns and behavior collected by GM reveal intimate details about Plaintiffs' lives.

[45] ¶ 858.

The offensiveness of this intrusive surveillance is heightened by GM's deceptive practices used to conceal its intentions and attempt to obtain consent. *See In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1063 (N.D. Cal. 2012) (noting that deception regarding data collection practices is a factor in assessing offensiveness). GM specifically marketed OnStar as a "safety and security system," (¶¶ 665–66), leading consumers to believe it was for their protection, not for commercial exploitation. Plaintiffs also allege GM employed manipulative design to coerce consumer enrollment, including employment of "dark patterns," making optional services appear mandatory, and burying disclosures. ¶¶ 872–76. GM's deceptive practices are highly offensive.[46]

GM's argument that driving behavior is "public" and thus cannot support an invasion of privacy claim is similarly unavailing. Plaintiffs do not allege that Driving Data is limited to public conduct—it includes behavior recorded inside the vehicle, across time, and linked to individual identities, usage patterns, and historical locations.

---

[46] Adding to the offensiveness is the fact that GM profited from Plaintiffs' private, driving behavior. *See Bullard v. MRA Holding, LLC*, 740 S.E.2d 622, 626 (Ga. 2013) (holding that even private citizens may pursue misappropriation claims where their names or *unique elements of their identity* are used without consent for another's commercial gain, regardless of whether the name previously held independent commercial value).

GM's reliance on *Summers v. Bailey*, 55 F.3d 1564, 1566 (11th Cir. 1995) and *Blanton v. Deloach*, 2015 WL 6758230, at *5 n.4 (S.D. Ga. Nov. 5, 2015), is misplaced. *Summers* involved visual real-time observations of a person in public near their private residence, and *Banton* involved drone surveillance in a public outdoor place. Both are fundamentally different from GM's systematic, secretive, and continuous electronic collection and transmittal of detailed behavioral data no matter where an individual is located. ¶¶ 1, 703, 844–57.[47]

Similarly, *HSG, LLC v. Edge-Works Mfg. Co.*, 2015 WL 5824453, at *9 (N.C. Super. Oct. 5, 2015) involved basic GPS tracking of vehicle location—a single data point that reveals limited information. The *HSG* court's conclusion that basic GPS tracking does not violate privacy interests because a journey "could have been publicly observed" does not apply because of the vast gap between what information can be publicly observed and the data GM collected.

[47] *Summers* predates the digital revolution in data collection and the Supreme Court's *Carpenter v. United States* decision, 585 U.S. 296, 315 (2018), such that applying the 1995 *Summers* decision to the allegations made by Plaintiffs here would leave them and consumers nationwide "at the mercy of advancing technology." *Carpenter*, 585 U.S. 296, 305 (2018).

### 4. Plaintiffs Adequately Allege Invasion of Privacy By False Light.

At the motion to dismiss stage, a plaintiff claiming false light invasion of privacy must allege the existence of false publicity that depicts the plaintiff as something or someone which they are not, and that the false light in which they were depicted would be highly offensive to a reasonable person. *Bazemore v. U. S. Bank Nat'l Ass'n*, 872 S.E.2d 491, 499 (Ga. App. 2022). GM argues that "[b]ecause Plaintiffs fail to allege that GM knew or recklessly disregarded that its disclosures of Driving Data were false, this claim fails." (Doc. 142-1 at 88),[48] but this argument ignores Plaintiffs' detailed allegations establishing GM's sophisticated understanding of the limitations and misleading nature of the Driving Data

[48] GM also raises issue with the highly offensive requirement for False Light. Plaintiffs have already addressed this argument in prior sections. *See supra* Section III(D)(2). Note, "[T]o constitute the tort of invasion of privacy by publicity which places one in a false light in the public eye, there must be established … that the publicity was false; to wit, it depicts the plaintiff as something or someone which he is not." *Zarach v. Atlanta Claims Ass'n*, 500 S.E.2d 1, 6 (1998). GM does not address this element.

it collected and scoring systems it designed.[49] ¶¶ 927–31 (emphasis added). This is sufficient to allege false light invasion of privacy.

### E. Plaintiffs State a Claim for Trespass to Chattels (Count 9).

GM argues this claim fails because Plaintiffs have not alleged "damage to their property" or that GM "interfered" with their physical property. Doc. 142-1 at 89–90. These arguments ignore Plaintiffs' allegations and the evolution of tort law in the digital age.

Under the law of trespass to chattels, liability exists for "intentionally (a) dispossessing another of the chattel, or (b) using or intermeddling with a chattel in the possession of another." Restatement (Second) of Torts § 217. Harm can include not just physical damage but also impairment of the chattel's condition, quality, or value, or deprivation of the owner's use of the chattel for a substantial time. *Id.* at §

[49] GM misconstrues case law in attempt to support their argument. *Smith v. Stewart*, 660 S.E.2d 822, 834 (Ga. App. 2008) and *Robinson v. Akal Sec., Inc.*, 2020 WL 13746174, at *27 (N.D. Ga. Feb. 4, 2020) (Doc. 142-1 at 65), are summary judgment opinions subject to different standards than those at the motion to dismiss stage. *Compare Bazemore v. U. S. Bank Nat'l Ass'n*, 872 S.E.2d 491, 496 (Ga. App. 2022) ("[I]t is no longer necessary for a complaint to set forth all of the elements of a cause of action in order to survive a motion to dismiss for failure to state a claim. If, within the framework of the complaint, evidence may be introduced which will sustain a grant of relief to the plaintiff, the complaint is sufficient") with *Robinson v. Akal Sec., Inc.*, 2020 WL 13746174, at *12 (N.D. Ga. Feb. 4, 2020) ("Summary judgment is authorized when the pleadings, the discovery and disclosure materials … show that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law").

218. While the Restatement was drafted before widespread electronic systems, common law principles inherently adapt to technological developments. "The gist of such an action of trespass [to personal property] is the injury done to the possession of the property." *Duncan v. Ellis*, 11 S.E.2d 841, 843 (Ga. App. 1940). Further, an action for trespass requires that the trespass be without the owner's consent. *Bowen v. Porsche Cars, N.A., Inc.*, 561 F. Supp. 3d 1362 (N.D. Ga. 2021). Plaintiffs have adequately alleged all elements for trespass to chattel.

**1. Plaintiffs' Driving Data is Protected Property.**

Interference with an integral component part of a chattel, such as a vehicle's infotainment system, is considered trespass to the whole chattel. *See Bowen v. Porsche Cars, N.A., Inc.*, 561 F. Supp. 3d 1362, 1372–74 (N.D. Ga. 2021) (finding unauthorized electronic access to a vehicle's infotainment system through satellite software updates constituted trespass); *Austrian Motors, Ltd. v. Travelers Ins. Co.*, 156 Ga. App. 618 (1980) (discussing the conversion of property affixed to an automobile, treating the automobile itself as personal property). Under accepted common law principles, Plaintiffs' vehicles, and the highly private data they generate, constitute personal property. More importantly, the embedded systems within these vehicles—which GM accessed to extract Driving Data—are integral parts of the vehicles themselves.

### 2. GM Unlawfully Intermeddled with Plaintiffs' Property.

The Restatement defines "intermeddling" as "intentionally bringing about a physical contact with the chattel." § 217, cmt. e. "[T]he intermeddling is actionable even though the physical condition of the chattel is not impaired." *CompuServe Inc. v. Cyber Promotions, Inc.*, 962 F. Supp. 1015, 1022 (S.D. Ohio 1997) (quoting Restatement (Second) of Torts § 217, cmt. d).

Courts widely recognize that a "digital trespass" can sustain a claim for trespass upon one's personal belongings. *See, e.g., AT&T Mobility LLC v. Does 1-4*, 2011 WL 13213864, at *2 (N.D. Ga. May 26, 2011) (finding that the defendant's transmittal of unsolicited telemarking calls interfered with the plaintiff's property rights); *Skapinetz v. CoesterVMS.com, Inc.*, 2018 WL 805393, at *5 (D. Md. Feb. 9, 2018) (finding that the plaintiff plausibly established a trespass claim by alleging that the defendant accessed his email account without authorization); *Bowen v. Porsche Cars, N.A., Inc.*, 561 F. Supp. 3d 1362, 1375 (N.D. Ga. 2021). Further, courts recognize that "temporary electronic intrusion upon another person's computerized electronic equipment" can constitute trespass. *See Mey v. Got Warranty, Inc.*, 193 F. Supp. 3d 641, 646-47 (N.D. W. Va. 2016) (listing cases); *CompuServe Inc.*, 962 F. Supp. at 1021 (the court applying common law principles held that "electronic signals" accessing plaintiffs' computer equipment without

authorization constituted trespass to chattels); *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1070 (N.D. Cal. 2000) (unauthorized electronic access to computer systems constitutes intermeddling sufficient for a trespass claim).

Plaintiffs allege GM "intentionally interfered" with Plaintiffs' "possessory interest in their private property" by "accessing and utilizing Driving Data" (¶¶ 1090–94) through "electronic control units" and "telematics control units" GM embedded in their vehicles (¶¶ 844–57) without consent (¶ 1091–95). This unauthorized access to Plaintiffs' vehicle computer systems, as alleged, constitutes interference with their property.

**3. Plaintiffs Allege Resulting Damage to Their Property.**

GM argues that Plaintiffs failed to allege "damage to their property" as grounds for dismissal. Doc. 142-1 at 90. This argument ignores both the Plaintiffs' allegations and modern courts' recognition of non-physical harms in the digital era. As discussed, *supra*, Section III (E)(2), Georgia and common law recognize that harm for trespass need not be limited to physical damage.

GM's unauthorized access interfered with the intended function of Plaintiffs' vehicles by converting them into surveillance devices without consent. Further, the Restatement explains that "impairment" includes any interference that affects the chattel's usefulness or value to its owner. § 218, cmt. e. Plaintiffs specifically allege

their property, which includes their respective vehicles as well as "the Driving Data collected while they are in the confines of their own vehicles and conducting private matters, and in any compilation of highly personalized driving behavior profiles resulting from the nonconsensual intrusive collection and disclosures of such data from their personal vehicles" (¶ 1090) were "harmed and diminished in value" through GM's unauthorized and intrusive use, access, and interference and that they suffered "loss of their ability to control the use and dissemination of their private information" ¶ 1093.

Plaintiffs further allege that "Defendants' interference caused Plaintiffs to suffer damages, including economic harm related to the unauthorized exploitation of Plaintiffs' Driving Data." ¶ 1094. The vehicles were purchased by Plaintiffs as personal transportation tools. Defendants' conversion of such property into commercial data collection devices without proper consent fundamentally altered their character and diminished their value to Plaintiffs as privately controlled property. *See eBay, Inc. v. Bidder's Edge*, 100 F. Supp. 2d at 1069-70 (allowing trespass to chattels claim to proceed based on allegation that the defendant had accessed the plaintiff's computer system); *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004) (affirming district court's preliminary injunction for trespass to chattels after defendant's use of search robots consumed a significant portion of the

capacity of the plaintiff's computer systems). Plaintiffs specifically allege that GM "intentionally interfered" with Plaintiffs' "possessory interest in their private property" by "accessing and utilizing Driving Data" and "embedding" technology "to extract" that data. ¶¶ 1090–94. Plaintiffs have sufficiently alleged their trespass to chattels claim.[50]

### F. Plaintiffs State a Claim for Unjust Enrichment (Count 7).

Under Georgia law, the essential elements of a claim for unjust enrichment are: (1) the plaintiff has conferred a benefit on the defendant; (2) compensation has not been given for receipt of the benefit; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying for it. *In re Equifax*, 362 F. Supp. 3d at 1329. Plaintiffs satisfy each element, alleging that GM knowingly obtained a benefit when it seized Plaintiffs' Driving Data, did not compensate Plaintiffs, and should be required to return the benefit. ¶¶ 1079–81. These allegations state a claim for unjust enrichment across virtually every state.[51]

---

[50] GM's reliance on *In re Jetblue Airways Corp. Privacy Litig.*, 379 F. Supp. 2d 299, 328 (E.D.N.Y. 2005) is misplaced. *Jetblue* involved pure information sharing without unauthorized access to physical property, whereas, here, Plaintiffs allege systematic subversive electronic access to integrated vehicle computer systems.

[51] *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig..*, No. 9 CV 3690, 2015 WL 3988488, at *36 (N.D. Ill. June 29, 2015) (quoting *In re Cardizem CD Antitrust Litig*., 105 F.Supp.2d 618, 669 (E.D. Mich. 2000) ("[C]ourts often award equitable remedies under common law claims for unjust enrichment in circumstances where claims based upon contract or other state law violations prove unsuccessful."); *In re*

*See In re Arby's Res. Grp. Inc. Litig.*, 2018 WL 2128441, at *17 (N.D. Ga. Mar. 5, 2018) (sustaining consumer plaintiffs' claim for unjust enrichment); Restatement (Third) of Restitution and Unjust Enrichment § 1 (defining unjust enrichment as occurring when "a person obtains a benefit from another by conduct that is . . . unjust to allow the recipient to retain.").

GM contends that Plaintiffs do not have an "expectation of payment for the alleged benefit" because they were unaware that GM was siphoning their data. Doc. 142-1 at 96–97. Plaintiffs did not receive compensation for the illicitly-collected data. ¶¶ 1062, 1081. But they seek compensation now that they know it was collected. Regardless, the purpose of the expectation of remuneration requirement is

---

*TFT-LCD Antitrust Litig*., 599 F. Supp. 2d 1179, 1189–90 (N.D. Cal. 2009) (applying Michigan, North Carolina, North Dakota law); *In re Cardizem CD Antitrust Litig*., 105 F. Supp. 2d 618, 671, 668–70 (E.D. Mich. 2000) (applying Alabama, California, D.C., Illinois, Michigan, New York, North Carolina law); *In re Flonase Antitrust Litig*., 692 F. Supp. 2d 524, 541 (E.D. Pa. 2010) (applying the laws of Arizona, Florida, Illinois, Iowa, Massachusetts, North Carolina, Wisconsin) ("The elements necessary to allege unjust enrichment vary state by state. However, almost all states at minimum require plaintiffs to allege that they conferred a benefit or enrichment upon defendant and that it would be inequitable or unjust for defendant to accept and retain the benefit")); *In re Processed Egg Prods. Antitrust Litig*., 851 F. Supp. 2d 867, 912 (E.D. Pa. 2012) (applying the laws of Arizona, California, the District of Columbia, Florida, Iowa, Kansas, Massachusetts, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin) ("the common denominator [for unjust enrichment claims] is the shared principle that it is unjust for a defendant who is enriched at the expense of the plaintiff to accept and retain the ill-gotten benefit. *See Flonase*, 692 F.Supp.2d at 541; *SMW*, 737 F.Supp.2d at 424")).

to distinguish between benefits voluntarily given such as gifts, and those "which the benefitted party equitably ought to return or compensate for." *Crook v. Foster*, 333 Ga. App. 36, 39–40 (2015) (internal citation omitted). Thus, such an allegation is unnecessary when something is taken without consent. *Chemence, Inc. v. Doherty*, 2007 WL 10025204, at *3 (N.D. Ga. Mar. 23, 2007) (plaintiff entitled to damages equaling the "benefit of [plaintiff's] research, development, and marketing" due to defendant's theft of trade secrets because defendant "would have been required to expend approximately the same amount as [plaintiff] on the research, development and marketing of its [process] from scratch."); *Lan Li v. Walsh*, 2017 WL 3140522, at *8 (S.D. Fla. July 24, 2017) (claim for unjust enrichment properly stated for stolen funds).

GM argues that GM's misconduct did not "cost [Plaintiffs] anything" and so they suffered no detriment (Doc. 142-1 at 97), but Plaintiffs allege facts to the contrary.[52] Finally GM argues for dismissal because Plaintiffs also allege breach of contract, and because "monetary damages are available[.]" Doc. 142-1 at 97–98. But Plaintiffs are entitled to plead inconsistent and alternative claims and remedies. *In*

[52] *See, e.g.*,¶¶ 24, 40, 54, 70, 85, 98, 106, 121, 137, 148, 160, 171, 190, 201, 213, 224, 243, 258, 270, 283, 296, 311, 322, 341, 358, 370, 386, 396, 407, 425, 440, 454, 470, 488, 503, 522, 535, 544, 565, 577, 588, 607, 625, 638, 653, 664, 680, 690, 692, 1079-81.

*re Equifax, Inc.*, 362 F. Supp. 3d at 1330–31; *WESI, LLC v. Compass Env't, Inc.*, 509 F. Supp. 2d 1353, 1363 (N.D. Ga. 2007) (party entitled to assert unjust enrichment as alternative to breach of contract claim but can only recover for one).

### G. Plaintiffs State a Claim for Breach of Contract (Count 8).

Plaintiffs' breach of contract claim is pled in the alternative to their unjust enrichment claim. GM breached its agreements with consumers by exceeding the scope of any authorization for data collection and commercial exploitation. If any contract existed between plaintiffs and GM regarding Plaintiffs' Driving Data, no provision permitted GM to collect Plaintiffs' Driving Data, use it for financial gain, or sell it to third parties. ¶¶ 1084–88.[53] Further, the implied covenant of good faith and fair dealing prohibits GM from doing anything which has the effect of injuring Plaintiffs' rights to receive the benefits of any such contract. ¶ 1086. By collecting and selling Plaintiffs' Driving Data to third parties without Plaintiffs' consent, GM has done just that. *Id.*

Regardless of the law applied, to sustain a claim for breach of any form of contract (express or implied), plaintiffs must plead: (1) a contract, (2) defendants'

[53] For purposes of this argument on behalf of Count 9 plead in the alternative, Plaintiffs will assume that "[b]y using OnStar," as GM contends, (Doc. 142-1 at 94) Plaintiffs expressed consent to the Terms rendering the existence of a contractual relationship between the parties. Plaintiffs expressly preserve argument to refute such contention when timely.

breach of the contract, and (3) damages to plaintiffs caused by the breach. *Steffey v. Ameris Bank*, 883 S.E.2d 918, 923 (Ga. App. 2023); *Campbell v. Ailion*, 790 S.E.2d 68, 73 (Ga. App. 2016); *Hummel v. Teijin Auto. Techs., Inc.*, 2023 WL 6149059, at *8 (E.D. Mich. Sept. 20, 2023). GM's sole argument is that the User Terms and Privacy Statement "plainly allow for the collection and sharing of the Driving Data" and therefore no breach of contract could have occurred. Doc. 142-1 at 95. This argument fails because, assuming valid contracts were formed at point of sale with Plaintiffs and GM, GM breached the agreed-upon terms by systematically exceeding the scope of any informed consent Plaintiffs provided for data collection and commercial exploitation.

When interpreting a contract, courts start with the contract's text and construe it as a whole. *Grayhawk Homes, Inc. v. Addison*, 845 S.E.2d 356, 361 (Ga. App. 2020). Where ambiguities exist, they are interpreted against the drafter of the agreement. *Id.*[54] The User Terms and Privacy Statement did not disclose the extensive nature of GM's data collection or that Driving Data would be sold to third parties for profit. *See* ¶¶ 860, 899. The conduct and relationship of the parties along

[54] GM argues that Michigan law should govern Plaintiffs' breach of contract claim. Regardless of whether that is the case for Plaintiffs' cause of action, the result is the same: ambiguities are interpreted against the drafter. *Atifah v. Union Sec. Ins. Co.*, 694 F. Supp. 2d 668, 671 (E.D. Mich. 2010) (quoting *United Rentals (N.A.), Inc. v. Keizer,* 355 F.3d 399, 409 (6th Cir. 2004) (emphasis added)).

with the vague disclosures in the User Terms and Privacy Statement, as alleged, cannot reasonably be interpreted as consent to GM's extensive data collection and sales practices—even so, it is an issue which cannot be resolved at the pleading stage. *Grayhawk Homes*, 355 Ga. App. at 619 (reversing in part summary judgment determination); *Simpson v. Pendergast*, 659 S.E.2d 716, 719 (Ga. App. 2008) (providing that issues regarding ambiguity go to the jury if the court cannot determine the parties' intent).

## IV. PLAINTIFFS STATE PLAUSIBLE CONSUMER PROTECTION CLAIMS (COUNTS 11–13, 17–22, 24, 26, 28–29, 31–34, 37, 39–40, 44–54, AND 57–65).

Plaintiffs properly pled claims under numerous state consumer protection statutes: MCC Counts 11–13, 17–22, 24, 26, 28–29, 31–34, 37, 39–40, 44–54, and 57–65 (collectively, the "UDAP claims").

### A. Plaintiffs Can Bring Claims for Violations of a State's Consumer Protection Laws Regardless of Whether a Named Plaintiff Resides There.

GM asserts Plaintiffs lack standing to bring claims under the laws of states in which no named Plaintiff resides. Doc. 142-1 at 98–99 (citing Counts 37, 57, 61, 62, 63, and 65). This Court has previously rejected this very argument and should do so again here. *See In re Equifax, Inc.*, 362 F. Supp. 3d at 1343–44 (holding that whether plaintiffs could assert claims on behalf of citizens of other states should be addressed

at the class certification stage under Rule 23 rather than on a motion to dismiss because it "serves no useful purpose" for this Court "[t]o force Plaintiffs' attorneys to search out those individuals at this stage") (quoting *In re Target Corp. Data Sec. Breach Litig.*, 66 F. Supp. 3d 1154, 1160 (D. Minn. 2014)).

Whether a named plaintiff can represent citizens of states in which they do not reside is not an issue of Article III standing, but rather implicates only commonality and predominance under Rule 23. This Court should reject GM's misplaced standing argument.

**B. Plaintiffs Satisfied Any Pre-Suit Notice Requirements.**

Plaintiffs sent a Consumer Notice Letter to GM on November 22, 2024 (prior to filing the MCC in December 2024) that notified GM of its wrongdoing, violations of UDAP statutes, and Plaintiffs' injuries. Doc. 142-9; ¶¶ 1114, 1220.

GM seeks dismissal of Counts 11, 19, 31, 37, 40, 60, 61, and 65, on the grounds that Plaintiffs failed to comply with various pre-suit notice requirements under the UDAP statutes of Alabama, California, Indiana, Massachusetts, Mississippi, Texas, Utah, and West Virginia, respectively. Doc. 142-1 at 99–100. Specifically, GM argues that the Notice Letter failed to "clearly" identify the claimant, the violative conduct, and the specific economic damages sought. *Id.* GM also claims that the Notice Letter was untimely. *Id.* However, the sufficiency and

timeliness of a notice are an issue of fact that cannot be decided on the pleadings. *Sunshine Children's Learning Ctr., LLC v. Waste Connections of Fla., Inc.*, 2022 WL 218896, at *4 (S.D. Fla. Jan. 25, 2022) (holding that the adequacy of a notice is a factual issue that cannot be determined on a motion to dismiss) (citation omitted); *Leach v. Honeywell Int'l Inc.*, 2014 WL 12585799, at *5 (D. Mass. Nov. 17, 2014) (same, timeliness). The Court should reject GM's arguments on this basis alone.

Additionally, even if Plaintiffs had not sent the Notice Letter, dismissal on that basis would still be inappropriate for several reasons. The pre-suit requirements under Alabama, Massachusetts, Indiana, and West Virginia law do not apply to Plaintiffs' claims in this case based on those statutes' own terms.[55]

Also, the statutory provisions requiring notice and other pre-suit conduct are procedural rather than substantive, meaning a technical failure does not preclude Plaintiffs from pursuing their claims in federal court. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 407 (2010) (holding that state procedural rules do not control in federal court because Rule 23 sets forth the only requirements to file a class action). Indeed, federal courts consistently permit

[55] Ala. Code § 8-19-10(e) (notice requirement does not apply where a defendant does not have a place of business or assets in this state); Mass. Gen. Laws ch. 93A, § 9(3) (same); Ind. Code § 24-5-0.5-5 (notice requirement does not apply when defendant causes incurable harm); W. Va. Code § 46A-6-106(b) (statute does not contain a notice requirement).

consumer protection claims to proceed notwithstanding non-compliance with statutory pre-suit notice provisions. *See, e.g.*, *In re Hair Relaxer Mktg. Sales Pracs. & Prods. Liab. Litig.*, 2024 WL 4333246, at *13 (N.D. Ill. Sept. 27, 2024). An alleged failure to comply with these state procedural rules should not bar Plaintiffs' claims.

### C. Plaintiffs Satisfy the Applicable Pleading Standards.

#### 1. Plaintiffs' Unfair and Unlawful Claims are Not Subject to Rule 9(b).

Not all UDAP claims "sound in fraud." Doc. 142-1 at 100–02. Some state UDAP laws prohibit unfair or unlawful acts, and such claims are not subject to Rule 9(b)'s particularity requirement. *In re Equifax.,* 362 F. Supp. 3d at 1335-36 (holding Rule 9(b) does not apply to the unfair and deceptive trade practices statute claims); *see also Consumer Fin. Prot. Bureau v. Frederick J. Hanna & Assocs., P.C.*, 114 F. Supp. 3d 1342, 1373-74 (N.D. Ga. 2015) ("Absent some clear, binding directive from Congress, the Supreme Court, or the Eleventh Circuit, this Court finds it inappropriate to impose a heightened pleading standard in a consumer protection case, even if there is a fraud dimension to any of the claims.").

Plaintiffs easily meet the standard of Rule 8 notice pleading. Plaintiffs allege GM acted "unlawfully" by intercepting, disclosing, and using Plaintiffs' Driving Data without consent in violation of myriad laws such the Federal and State

Wiretapping laws, the SCA, the CFAA, and unlawful intrusion into Plaintiffs' privacy. Plaintiffs also adequately allege these same practices constitute unfair or unconscionable conduct. *See* ¶¶ 1116, 1130, 1227, 1257, 1312, 1354, 1370, 1371, 1422, 1441, 1452, 1462, 1585, 1586, 1714, 1760, and 1775. To the extent their claims are based on the unlawful and unfair prongs of these consumer protection statutes,[56] Plaintiffs need only satisfy Rule 8, as they have.

### 2. Plaintiffs Can Maintain Their Omissions-Based UDAP Claims.

GM attempts to re-cast Plaintiffs' UDAP fraud claims as premised on affirmative misrepresentations. Doc. 142-1 at 102-03. But Plaintiffs' UDAP claims are based not on affirmative misrepresentations, but rather on GM's years' long failure to disclose to Plaintiffs and other class members its unlawful data collection and use practices. *See, e.g.,* ¶¶ 1116, 1130, 1812, 1918.Specifically, Plaintiffs allege GM *failed to disclose* that it was using OnStar to collect Driving Data, and that GM

[56] Plaintiffs allege GM violated the unlawful or unfair conduct prongs of the following consumer protection statutes: Alabama (¶ 1116); Arizona (¶ 1130); California (¶ 1225); Connecticut (¶¶ 1254 and 1257); Florida (¶¶ 1308 and 1312); Idaho (¶ 1370); Illinois (¶ 1386); Indiana (¶ 1422); Kansas (¶¶ 1441, 1452); Kentucky (¶ 1462); Maryland (¶¶ 1482–83); Massachusetts (¶¶ 1540–41); Michigan (¶ 1585); Mississippi (¶1601); New Jersey (¶¶ 1713–14); North Carolina (¶ 1760); Ohio (¶ 1772); Oklahoma (¶¶ 1784–85); Oregon (¶ 1800); Pennsylvania (MCC ¶¶ 1808, 1811); Rhode Island (¶ 1877); South Carolina (¶¶ 1887, 1892); Texas (¶¶ 1914, 1917); Vermont (¶¶ 1941, 1945); Virginia (¶ 1959); Washington (¶¶ 1969, 1971); and West Virginia (¶¶ 1981, 1985).

used the Driving Data for a variety of purposes, including selling it to third parties for its own financial benefit. *Id.* Plaintiffs' claims thus are subject to a "somewhat relaxed" Rule 9(b) applicable to omission-based claims. *Miller v. NextGen Healthcare, Inc.*, 742 F. Supp. 3d 1304, 1323 (N.D. Ga. 2024) (Thrash, J.) (citation omitted).[57]

GM contends it provided adequate notice for its comprehensive data collection and sharing practices through its User Terms and Privacy Statement. Doc. 142-1 at 105; 142-2; 142-3. However, there is no evidence that these documents were ever provided to Plaintiffs—let alone that Plaintiffs assented to their terms. *See* ¶¶ 12–654.[58]

Further, the updated 2018 User Terms for Connected vehicles and the updated 2023 Privacy Statement fall woefully short of disclosing the full extent of GM's data collection and sharing practices. Specifically, GM's User Terms failed to fully disclose that Plaintiffs' Driving Data could be used to underwrite insurance policies, and its Privacy Statement made only a vague reference to sharing data with usage-

---

[57] The "relaxed" standard applies for the additional reason that Defendants engaged in "prolonged multi-act schemes." *Aquino v. Mobis Alabama, LLC*, 739 F. Supp. 3d 1152, 1180 (N.D. Ga. 2024). "Under this relaxed standard, a plaintiff can plead the overall nature of the fraud and then allege with particularity one or more illustrative instances of the fraud." *Id.* (citation and quotation omitted).

[58] GM concedes this point by stating that, "*not a single* Plaintiff claims to have read or reviewed such statements." Doc. 142-1 at 81 (emphasis in original).

based insurance providers, failing to identify which providers. *See supra,* Section IV(G); ¶¶ 705, 749, 843. Contrary to GM's assertion, its documents do not provide complete and truthful information that adequately discloses GM's practices.

Beyond those documents, Plaintiffs also allege that GM failed to disclose its data collection, use, and dissemination practices either generally in its vague public statements concerning the practice, ¶¶ 799–803, 805, 807, 817–22, 828–43, or in GM's communications to consumers, including instructions to dealerships on how to describe and enroll consumers in OnStar / Smart Driver. ¶¶ 859–67, 871–12.

Contrary to GM's argument, Plaintiffs assert several bases for GM's duty to fully disclose its data collection and dissemination practices. First, GM's duty to provide full information concerning GM's partially disclosed practices arose out of its partial and misleading statements. *See, e.g., Ragland v. Shattuck Nat. Bank*, 36 F.3d 983, 992 (10th Cir. 1994) ("one who has no duty to speak, but makes a disclosure nevertheless, undertakes to speak truthfully . . . . One who assumes to speak when under no duty to do so cannot suppress pertinent facts or state less than the whole truth.") (quotation omitted).

GM's statements and policies are, at best, partial disclosures or half-truths that gave rise to a "duty to correct a false impression conveyed by a partial disclosure." *Counts v. Gen. Motors, LLC*, 606 F. Supp. 3d 678, 716 (E.D. Mich. 2022); *see also,*

*e.g., U.S. Bank Nat'l Ass'n v. BFPRU I, LLC*, 230 F. Supp. 3d 253, 260 (S.D.N.Y. 2017) (duty to disclose under New York law arises if "the defendants made a partial or ambiguous statement that required additional disclosure in order to avoid misleading the other party."); *Design Mark Indus., LLC v. Unbeaten Path Int'l, Ltd.*, 2025 WL 915771, at *8 (D. Mass. Mar. 26, 2025) (duty to disclose under Massachusetts law when "matters known to the speaker that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading."); *Sanchez v. Navy Fed. Credit Union*, 2023 WL 6370235, at *9 (C.D. Cal. Aug. 14, 2023) (duty to disclose under California law "when the defendant makes partial representations but also suppresses some material facts."); *Stevens v. Ford Motor Co.*, 2020 WL 12573279, at *7 (S.D. Tex. Nov. 2, 2020) (duty to disclose under the Texas DTPA when partial disclosure conveys a false impression) (distinguishing *Adams v. Nissan N. Am., Inc.*, 395 F. Supp. 3d 838 (S.D. Tex. 2018)).[59]

[59] GM argues that there is no free-standing duty to disclose in several states, but cites to cases imposing a duty to make full disclosure where a defendant makes a partial disclosure that creates a misleading impression. *See, e.g.,* Doc. 142-5 citing *Murphy v. Berlin Const. Co.*, 1999 WL 41633, at *3 (Del. Super. Ct. Jan. 22, 1999) ("A duty to speak can be created by a pre-existing relationship between the parties or a partial disclosure of facts that require the disclosure of additional facts to prevent a misleading impression.") and *Blon v. Bank One, Akron, N.A.*, 519 N.E.2d 363, 367 (Ohio 1988) ("Full disclosure may also be required of a party to a business transaction where such disclosure is necessary to dispel misleading impressions that

Second, GM had a duty to disclose its data collection and sharing practices, because they are material to purchasers and users of GM vehicles, but unavailable to Plaintiffs and other consumers. *See, e.g.*, *Gutierrez v. Carmax Auto Superstores California*, 19 Cal. App. 5th 1234, 1260, 1262 (Cal. App. Ct. 2018) (finding a duty to disclose material information known to the seller, but which is unknown to a purchaser).[60] The materiality of GM's undisclosed data practices is clear from the fact that GM immediately ceased the practice once it became public. ¶¶ 865–66.

Third, GM had a duty to disclose its data collection and sharing practices precisely because it actively concealed them from Plaintiffs and other consumers. *See, e.g.*, *Marsikian v. Mercedes Benz USA, LLC*, 2009 WL 8379784, *6 (C.D. Cal. May 4, 2009) (duty to disclose when defendant concealed the problem from the general customer base and made "measured and selective" comments regarding the issue.). Plaintiffs pled in detail GM's concealment of its data collection and selling practices. ¶¶ 792–802, 805, 807, 817–22.

---

are or might have been created by partial revelation of the facts.") (internal citations and quotations omitted).

[60] This is true even in states that impose a duty to disclose only when a defendant has superior knowledge of a material fact, or where that fact could not be discovered by a plaintiff through reasonable diligence. *E.g., Boghossian v. Capella Univ., LLC*, 2025 WL 934878, at *7 (S.D.N.Y. Mar. 27, 2025); *Sonneveldt v. Mazda Motor of Am., Inc.*, 2021 WL 4813753, at *5 (C.D. Cal. July 29, 2021); *Smith v. Ford Motor Co.*, 749 F. Supp. 2d 980, 987 (N.D. Cal. 2010). GM's practices did not come to light until March 2024. ¶¶ 944–46.

And because Plaintiffs' fraud claims arise from GM's omissions, Plaintiffs have alleged all that Rule 9(b) requires under the circumstances: the who, when, where, and what of GM's fraud by omission.[61] *Young v. Grand Canyon Univ., Inc.*, 57 F.4th 861, 873 (11th Cir. 2023); *Ramirez v. Allstate Vehicle & Prop. Ins. Co.*, 490 F. Supp. 3d 1092, 1116 (S.D. Tex. 2020). Simply put, Plaintiffs allege GM failed to disclose prior to and at the point of sale that it would collect voluminous, specific, and detailed Driving Data, and use the data in a variety of manners, including selling it to the CRAs. *See, e.g.,* ¶¶ 1116, 1130, 1812, and 1918.

Plaintiffs also adequately allege that GM's conduct caused Plaintiffs' injuries. Many of the consumer protection laws under which Plaintiffs bring their claims simply require that the conduct complained of was a "substantial factor" in causing plaintiffs' injuries. *See e.g.*, *Libman v. Apple, Inc.*, 2024 WL 4314791, at *17 (N.D.

[61] The Court should reject GM's footnote argument that Plaintiffs failed to identify the exact provision violated for eight consumer protection statutes, Doc. 142-1 at 102 n.58. Plaintiffs have set forth the provisions of the seven of those consumer protection acts and how GM violated them: ¶¶ 1223, 1227 (violation of California Code § 17200 for Count 18); ¶¶ 1246, 1248 (violation of Cal. Bus. & Prof. Code § 17500 for Count 20); ¶¶ 1254, 1257 (violation of Conn. Gen. Stat. § 41-110b(a) for Count 21); ¶¶ 1268, 1271 (violation of 6 Del. Code § 2513(a) for Count 22); ¶¶ 1452, 1453 (violation of Kansas Code § 50-627 for Count 32); ¶¶ 1540–41 (violation of Mass. Gen. Laws Ann. Ch. 93A, § 2(a) for Count 37); ¶¶ 1981, 1985 (violation of W. Va. Code. Ann. §46-A-104 for Count 65). Plaintiffs also set forth the practices prohibited under the New Jersey Consumer Fraud Act, and GM's conduct in violation of that act, in Count 45. ¶¶ 1713–14.

Cal. Sept. 26, 2024) ("Plaintiffs need not prove that the omission was the only cause or even the predominant cause, only that it was a substantial factor" that caused their harm to succeed on their consumer protection statue claims) (internal quotation and citation omitted). GM's conduct plainly was a "substantial factor" in causing Plaintiffs' injuries because absent GM's failure to disclose or fully disclose its data collection and sharing practices, Plaintiffs would not have purchased or leased their vehicles nor enabled GM to track their driving behavior, and GM would not have been able to obtain Plaintiffs' Driving Data.[62] *See In re Vizio, Inc., Consumer Priv. Litig*., 238 F. Supp. 3d 1204, 1217 (C.D. Cal. 2017) (sustaining consumer protection claims because "Plaintiffs allege that they would not have purchased, or would have paid less for, their Vizio Smart TVs had Defendants not concealed their collection and disclosure of Plaintiffs' personal information.") (internal quotations and citation omitted).[63] The injuries Plaintiffs suffered beyond the point of sale—invasion of privacy, increased insurance premiums, loss of control of their personal information, and likelihood of future misuse of their private information—likewise resulted

[62] ¶¶ 23, 39, 53, 69, 84, 97, 105, 120, 136, 147, 159, 170, 189, 200, 212, 223, 242, 257, 269, 282, 295, 310, 316, 340, 357, 362, 374, 395, 406, 424, 439, 453, 469, 487, 502, 521, 534, 539, 564, 576, 587, 606, 624, 637, and 652.

[63] Plaintiffs allege they relied on GM's non-disclosures because they purchased their vehicles based on them. *Gernhart v. Specialized Loan Servicing LLC*, 2019 WL 1255053, at *3 (E.D. Pa. Mar. 18, 2019) (plaintiff alleged reliance under Rule 9(b) where a plaintiff bought a product based on a defendant's deceptive conduct).

directly from their uninformed purchase of GM vehicles and Defendants' illegal data collection and use.

### D. Plaintiffs Plausibly Allege Scienter.

GM next argues that eleven separate UDAP claims fail because Plaintiffs have not alleged scienter. Doc. 142-1 at 107–08. GM is wrong.[64] "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). *See also Lisk v. Lumber One Wood Pres., LLC*, 792 F.3d 1331, 1338 (11th Cir. 2015) (holding that intent and other states of mind may be alleged generally); *Leon v. Fed. Home Loan Mortg. Corp.*, 2017 WL 3112739, at *2 (D.N.J. July 20, 2017) (holding malice, intent, knowledge and other state of mind may be alleged generally). Plaintiffs have properly alleged GM intentionally, knowingly, and maliciously violated these eleven UDAP statutes.[65] Indeed, Plaintiffs allege GM designed a comprehensive scheme to conceal its data collection, use, and sharing

[64] GM incorrectly argues that intent to deceive is required for a violation of the ICFA. Doc. 142-1 at 107. "[A] claim for deceptive business practices under [ICFA] does not require proof of intent to deceive. It is enough to allege that the defendant committed a deceptive or unfair act and intended that the plaintiff rely on that act." *Acosta v. Hopper (USA), Inc.*, 2023 WL 3072358, at *4 (N.D. Ill. Apr. 25, 2023) (quoting *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 575 (7th Cir. 2012)) (internal quotations omitted).

[65] Alabama (¶ 1118); Arizona (¶ 1131); Illinois (¶ 1387); Indiana (¶ 1423); Kansas (¶ 1443); Maryland (¶ 1484); Nevada (¶ 1700); New Jersey (¶ 1716); Ohio (¶ 1777); South Dakota (¶ 1904); and Utah (¶ 1932).

practices, and that once those practices were discovered, GM represented to the public that it had discontinued the practices, but the Driving Data has already been released to other third parties and is still at risk of disclosure. ¶¶ 953–54. GM's conduct is evidence of its knowledge; intent is sufficiently alleged.

**E. Plaintiffs' CCPA Claims Should not be Dismissed (Count 17).**

GM incorrectly argues that the California Consumer Protection Act ("CCPA") (Count 17) provides a private right of action only for a personal information security breach. Doc. 142-1 at 108. The CCPA is not so narrow: it covers a wide range of injuries to consumers' privacy rights. *See, e.g.*, *Shah v. Cap. One Fin. Corp.*, 2025 WL 714252, at *8 (N.D. Cal. Mar. 3, 2025) ("Because Plaintiffs allege that Defendant allowed third parties to embed trackers, such as Google and Microsoft, on its website and that these trackers transmitted Plaintiffs' personal information, Plaintiffs need not allege a data breach [for their CCPA claim]."); *M.G. v. Therapymatch, Inc.*, 2024 WL 4219992, at *7 (N.D. Cal. Sept. 16, 2024). As in *Shah*, Plaintiffs here allege GM failed to maintain reasonable security measures by collecting and selling Plaintiffs' Driving Data to third parties without Plaintiffs' their consent. ¶ 1217. Thus, Plaintiffs state a CCPA claim.

### F. Plaintiffs State a Claim Under the California Constitution (Count 13).[66]

GM argues that the California Constitution does not confer a private right of action for damages. Doc. 142-1 at 98. But courts permit damage claims brought under the California Constitutional Right to Privacy to proceed to trial. *See Stuart v. County of Riverside*, 2024 WL 3086634, *5 (C.D. Cal. June 14, 2024). In any case, GM concedes that the injunctive relief Plaintiffs seek is available. ¶ 1150. The Court should allow Count 13.

## V. PLAINTIFFS' REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF SHOULD NOT BE DISMISSED.

GM contends Plaintiffs have adequate remedies at law precluding injunctive relief. Doc. 142-1 at 98. But Plaintiffs are entitled to seek both legal and equitable relief. *Miller v. NextGen Healthcare, Inc.*, 742 F. Supp. 3d 1304, 1325 (N.D. Ga. 2024); *Bracy v. Americold Logistics LLC*, 2025 WL 552676, at *10 (N.D. Ga. Feb. 19, 2025) ("existence of another adequate remedy does not preclude a declaratory judgment"). Plaintiffs should be permitted to develop the evidentiary record on their request for equitable relief. *See Callen v. Daimler AG*, 2020 WL 10090879, at *25 (N.D. Ga. June 17, 2020) (denying request to dismiss claims for equitable relief as

---

[66] Plaintiffs withdraw Count 48—Violation of N.Y. Gen. Bus. Law §§ 899-aa; 899-bb (SHIELD Act).

premature before development of evidentiary record); *Amin v. Mercedes-Benz USA, LLC*, 301 F. Supp. 3d 1277, 1297 (N.D. Ga. 2018) ("Plaintiffs may later prove that they are entitled to injunctive relief, or they may not, but they will not be stripped of the opportunity to do so before the Court has the opportunity to weigh equitable relief factors upon a fuller evidentiary record.").

GM also claims Plaintiffs are not at risk of future harm because GM has stopped sharing Driving Data with the LNRS and Verisk. Doc. 142-1 at 72; Doc 142-1 at 75. But Plaintiffs continue to be at risk of misuse because GM also shares Plaintiffs' Driving Data with third parties that are not GM's co-Defendants, a fact GM ignores. ¶¶ 1056, 1066.[67] Injunctive relief is necessary to protect Plaintiffs from future misuse. In an analogous case, a car manufacturer argued there was no real and immediate threat of future injury to plaintiffs because it no longer sold the vehicle at issue. *See Sowa v. Mercedes-Benz Grp. AG Mercedes-Benz USA, LLC*, 2024 WL 5290887, at *7 (N.D. Ga. Dec. 31, 2024). The court disagreed, finding plaintiffs' allegation that vehicles still on the road posed a safety hazard was sufficient to show a likelihood of future injury. *Id.* at 22; *In re Home Depot, Inc.*, 2016 WL 2897520, at *3 (N.D. Ga. May 18, 2016) (ongoing security inadequacies following a data

[67] Likewise, the January 16, 2025, Consent Agreement between the Federal Trade Commission and GM for the FTC's Decision and Order does not obviate the Class Members' future harms because Driving Data has been transmitted to third parties.

breach that may cause substantial harm are sufficient to seek injunctive relief). Plaintiffs in the instant case have sufficiently pled a risk of ongoing and future harm: absent injunctive relief, the Driving Data wrongfully acquired by Defendants will continue to be "viewed, distributed, and used by unauthorized third parties for years to come." ¶ 1066. For these reasons and those stated in Plaintiffs' LNRS/Verisk MTD Opp. Section VII, GM's Motion to Dismiss Plaintiffs' request for injunctive and declaratory relief should be denied.

## CONCLUSION

For the reasons stated herein, the Court should deny GM's Motion to Dismiss.[68]

[68] To the extent the Court finds that any claim is deficiently-pled, Plaintiffs request an opportunity to amend.

Date: May 27, 2025

Respectfully submitted,

/s/ *John R. Bevis*
John R. Bevis
**THE BARNES LAW GROUP, LLC**
31 Atlanta Street
Marietta, Georgia 30060
Tel: (770) 227-6375
bevis@barneslawgroup.com

/s/ *Norman E. Siegel*
Norman E. Siegel, MO Bar No. 44378
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Tel: (816) 714-7100
siegel@stuevesiegel.com

***MDL Co-Lead Counsel***

Bryan L. Clobes
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
135 S. LaSalle St., Suite 3210
Chicago, Illinois 60603
Tel: (312) 782-4880
bclobes@caffertyclobes.com

Amy Keller
**DICELLO LEVITT LLP**
Ten North Dearborn Street
Sixth Floor
Chicago, Illinois 60602
Tel: (312) 214-7900
akeller@dicellolevitt.com

***OnStar Track Co-Lead Counsel***

Joseph P. Guglielmo
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
230 Park Avenue, 24th Floor
New York, New York 10169
Tel: (212) 223-4478
jguglielmo@scott-scott.com

Sabita J. Soneji
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, California 94612
Tel: (510) 254-6808
ssoneji@tzlegal.com

***LexisNexis/Verisk Track Co-Lead Counsel***

Kiley L. Grombacher
**BRADLEY/GROMBACHER LLP**

Emily E. Hughes
**THE MILLER LAW FIRM, P.C.**

31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Tel: (805) 270-7100
Kgrombacher@bradleygrombacher.com

950 W. University Dr., Suite 300
Rochester, Michigan 48307
Tel: (248) 841-2200
eeh@millerlawpc.com

P. Graham Maiden
**MOTLEY RICE LLC**
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9670
gmaiden@motleyrice.com

Thomas E. Loeser
**COTCHETT, PITRE & MCCARTHY LLP**
999 N. Northlake Way, Suite 215
Seattle, WA 98103
Tel: (206) 802-1272
tloeser@cpmlegal.com

Adam E. Polk
**GIRARD SHARP LLP**
601 California St., Suite 1400
San Francisco, California 94108
Tel: (415) 981-4800
apolk@girardsharp.com

John A. Yanchunis
**MORGAN & MORGAN COMPLEX LITIGATION GROUP**
201 North Franklin Street, 7th Floor
Tampa, Florida 33602
Tel: (813) 223-5505
jyanchunis@forthepeople.com

***OnStar Track Steering Committee***

Gayle M. Blatt
**CASEY GERRY SCHENK FRANCAVILLA BLATT & PENFIELD, LLP**
110 Laurel Street
San Diego, California 92101
Tel: (619) 238-1811
gmb@cglaw.com

Gary S. Graifman
**KANTROWITZ, GOLDHAMER & GRAIFMAN, P.C.**
135 Chestnut Ridge Rd., Suite 200
Montvale, New Jersey 07645
Tel: (201) 391-7000
ggraifman@kgglaw.com

Jennifer M. French
**LYNCH CARPENTER, LLP**
1234 Camino Del Mar
Del Mar, California 92014
Tel: (619) 762-1903

Chris Springer
**KELLER ROHRBACK LLP**
801 Garden Street, Suite 301
Santa Barbara, California 93101
Tel: (805) 456-1496

jennf@lcllp.com
cspringer@kellerrohrback.com

Jeff Ostrow
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Tel: (954) 332-4200
ostrow@kolawyers.com

***LexisNexis/Verisk Track Steering Committee***

M. Brandon Smith
**CHILDERS, SCHLUETER & SMITH LLC**
1932 N. Druid Hills Road, Suite 100
Atlanta, Georgia 30319
Tel: (404) 419-9500
bsmith@cssfirm.com

***Plaintiffs' Liaison Counsel***

**CERTIFICATE OF COMPLIANCE**

I hereby certify pursuant to L.R. 7.1D that the foregoing complies with the font and point selections permitted by L.R. 5.1C. This brief was prepared on a computer using the Times New Roman font (14 point).

*/s/ John R. Bevis*

John R. Bevis
**THE BARNES LAW GROUP, LLC**
31 Atlanta Street
Marietta, Georgia 30060
Tel: (770) 227-6375
bevis@barneslawgroup.com

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was filed with this Court via its CM/ECF service, which will send notification of such filing to all counsel of record this 27th day of May, 2025.

*/s/ John R. Bevis*
John R. Bevis
**THE BARNES LAW GROUP, LLC**
31 Atlanta Street
Marietta, Georgia 30060
Tel: (770) 227-6375
bevis@barneslawgroup.com