KING & SPALDING

King & Spalding LLP
1180 Peachtree Street N.E.
Ste. 1600
Atlanta, GA 30309-3521
Tel: +1 404 572 4600
Fax: +1 404 572 5100
www.kslaw.com

Susan M. Clare
Direct Dial: +1 404 572 3556
Fax: +1 404 572 5100
sclare@kslaw.com

August 10, 2026

**VIA CM/ECF**
The Honorable Thomas W. Thrash, Jr.
Senior United States District Judge
Northern District of Georgia, Atlanta Division
2188 Richard B. Russell Federal Building and United States Courthouse
75 Ted Turner Drive, SW
Atlanta, Georgia 30303-3309

**Re: *In re: Consumer Vehicle Driving Data Tracking Collection Litig.*, No. 1:24-md-03115-TWT (N.D. Ga.), GM Defendants' Letter Brief Regarding the Scope of Discovery and Relevant Time Period**

Dear Judge Thrash,

Pursuant to the Court's instruction at the July 27, 2026 status conference and July 28, 2026 Order (ECF No. 294), Defendants General Motors LLC and OnStar, LLC (together, "GM") submit the attached letter brief to address the proper scope of discovery in this case, including with respect to subject matter and relevant time period. For the reasons explained therein, GM submits that the Court should hold Plaintiffs to the theories espoused in Complaint and impose appropriate discovery limits.

Sincerely,

*/s/ Susan M. Clare*
Susan M. Clare
Partner

cc: Counsel of Record

## INTRODUCTION

This dispute concerns Plaintiffs' attempt to transform this case—through discovery—into something far broader than what they pled. Rather than pursue discovery into the OnStar Smart Driver program and insurance-related injuries at the heart of their Master Consolidated Class Action Complaint (the "Complaint" or "MC"), Plaintiffs demand unfettered access to all of GM's vehicle data practices regardless of relevance and time. The Court should establish appropriate discovery limits predicated on the claims Plaintiffs chose to assert and resist the far-ranging fishing expedition desired by Plaintiffs.

The instant discovery dispute centers on three main issues: (1) whether Plaintiffs should be given discovery into all of GM's vehicle data practices, regardless of their purpose, nature, or impact; (2) whether the relevant time period for all discovery should run through the present, even though the Smart Driver program at issue in this case ended in 2024; and (3) whether Plaintiffs are entitled to all data GM may have concerning the named Plaintiffs, regardless of its relevance. Each of these disputes raises the same fundamental question: whether Plaintiffs are entitled to discovery into topics that have nothing to do with the allegations set forth in their Complaint.

There is no serious dispute that this case centrally concerns GM's collection of data through the Smart Driver program, the sharing of that data with Defendants

LexisNexis Risk Solutions, Inc. ("LNRS") and Verisk Analytics, Inc. ("Verisk," collectively, the "CRA Defendants"), and the CRA Defendants' provision of that data to automobile insurers. Smart Driver was the focus of the March 11, 2024 *New York Times* article that gave rise to this litigation. It was the central factor in the Judicial Panel on Multidistrict Litigation's ("JPML's") decision to consolidate these actions before this Court. And it is also the centerpiece of Plaintiffs' Complaint—the supposed cause of the harms alleged by each of the named Plaintiffs, including their claims of insurance premium increases and coverage denials.

Now, however, Plaintiffs demand discovery into *all* data collected by GM and all data shared with any third party for any purpose, without limitation. They further demand that this unbounded discovery continue into the present. The reason Plaintiffs' discovery demands have become unmoored from their Complaint is that Plaintiffs have realized their claims based on Smart Driver and insurance-related injuries are untenable. The theories they pled are plagued by deficiencies that will prevent them from certifying a class or proving damages. Because of these flaws, Plaintiffs seek to salvage their case by fishing for new theories through sweeping discovery requests that go beyond the scope of the Complaint. Equally problematic, Plaintiffs are emboldened by the Court's rulings on discovery issues thus far and have refused to meaningfully meet and confer on a reasonable path forward.

The Court should deny Plaintiffs' request to engage in a fishing expedition that is untethered from the claims they assert. The Federal Rules of Civil Procedure make clear that Plaintiffs have "no entitlement to discovery" to develop "new claims" that "are not already identified in the pleadings." Fed. R. Civ. P. 26, 2000 Advisory Committee Notes. The Court should require Plaintiffs to tailor their discovery requests to the allegations in the Complaint.

## BACKGROUND

***Commencement of These Proceedings.*** The filings consolidated into this MDL were triggered by the publication of a March 11, 2024 *New York Times* article asserting that GM shared driving-behavior data collected through the Smart Driver program with LNRS and Verisk, which in turn made that data available to certain insurers.[1] The first federal class action regarding Smart Driver was filed on March 13, 2024, just two days after the *New York Times* article was published. *See Chicco v. General Motors, et al.*, No. 9:24-cv-80281-DMM (S.D. Fla.). Dozens of other cases asserting similar allegations were subsequently filed.

In April 2024, the parties initiated the process of consolidating these actions into an MDL. *See* Ex. 1. In proceedings before the JPML, counsel for plaintiffs

[1] *See* Kashmir Hill, "Automakers Are Sharing Consumers' Driving Behavior With Insurance Companies," *The New York Times* (Mar. 11, 2024), *available at* https://www.nytimes.com/2024/03/11/technology/carmakers-driver-tracking-insurance.html.

repeatedly explained that their allegations concerned the sharing of Smart Driver data with LNRS and Verisk, and the subsequent provision of that information to insurers. *See* Ex. 2. To cite a few examples, plaintiffs argued that:

- "***[T]he real center of this litigation***, even though GM certainly is one of the prime defendants, ***is LexisNexis Risk Solutions' activities*** in the Northern District of Georgia." *Id.* at 10 (emphasis added).

- "All of the data, the driver behavior data, the telematics . . . , is sent to LexisNexis in the Northern District of Georgia. And then critically, they then turn this data around and sell it and negotiate and all of these are negotiations, discussions, these all take place in Georgia. ***They sell it to the insurers which is where we believe the actual damages is taking place***." *Id.* (emphasis added).

- "In other words, ***the plaintiffs are actually damaged by the fact that the information is being given to their insurers*** without their knowledge and consent and very often resulting in raising of their rates which is really pretty outrageous conduct." *Id.* (emphasis added).

In fact, Kiley Grombacher, counsel for the MDL Plaintiffs and a member of the OnStar Steering Committee leadership in this MDL, asked the JPML to consolidate these cases in front of this Court because "we'll be doing a lot of business here in Georgia" given "***Lexis is the hub of this case***." *Id.* at 14 (emphasis added).

The JPML likewise recognized the centrality of this conduct. At a JPML hearing, Judge Kennelly noted that, according to plaintiffs' counsel, "the core of the case isn't the collection of the data, it's the monetization of the data which isn't being done by GM or OnStar . . . it's being done by Lexis or whoever the other data brokers

are." *Id.* at 21. Subsequently, on June 7, 2024, the JPML consolidated these actions before this Court. ECF No. 1. In doing so, the JPML found that:

> These putative class actions share complex factual questions arising from allegations that General Motors equipped its vehicles with sensors and computer modules to collect information about personal driving behavior, and that it sold that information to data analytics companies like LexisNexis and Verisk, which then created reports of individuals' driving history and sold them to automobile insurance providers.

*Id.* at 2.

Once the MDL was created, Lead Counsel for Plaintiffs told this Court what "this case is about." ECF No. 51 at 4–5. Governor Barnes said that the "the overall allegations in the complaint" were "that the information was gathered by [GM], was laundered through Analytics, and then sold by two Analytics companies . . . to insurance companies so they could increase your insurance rates based on your driving history." ECF No. 51 at 4–5. He emphasized that this was "the information that will be presented in this case and will be discovered." *Id.* at 5; *see also* ECF No. 84, Joint Preliminary Report and Discovery Plan at 1–2 (stating similarly that this litigation concerns GM's "collection" and "monetization of consumers' Driving Data, including by selling their Driving Data to" the CRA Defendants, who, "in turn, sold Driving Data to auto insurers, causing additional harm to consumers including increased insurance rates, termination or denial of insurance coverage").

***Plaintiffs' Master Complaint.*** On December 13, 2024, Plaintiffs filed their Complaint. ECF No. 109. Consistent with Plaintiffs' theory of the case, the core of

the Complaint focuses on allegations concerning the collection of driving data via the Smart Driver program and the sharing of that data with the CRA Defendants and insurers. The Complaint confirms this scope. It includes sections titled:

- "GM sells consumers' Driving Data to Verisk, which uses it to develop products and power its insurance business";
- "GM sells consumers' Driving Data to LexisNexis, which uses it to build its telematics business and expand its market share";
- "To maximize the amount and quality of Driving Data collected from its consumers, GM upgraded its technology and launched Smart Driver";
- "GM used Smart Driver to surreptitiously and continuously collect consumers' Driving Data";
- "GM's Smart Driver Terms do not authorize the interception or sale of Plaintiffs' Driving Data to third parties"; and
- "GM structured OnStar and Smart Driver to force consumer participation."

The specific allegations further underscore the focus on Smart Driver. As one example, Plaintiffs alleged that, "[t]o maximize its ability to harvest Driving Data from its customers and their vehicles . . . GM launched a series of coordinated changes to its vehicles and OnStar offerings, ultimately leading to its launch of the Smart Driver program in 2016." *Id.* ¶ 823. Plaintiffs also alleged that GM developed a "framework" to "maximize mass Driving Data collection," which culminated with the launch of "OnStar Smart Driver." *Id.* ¶ 827.

The allegations regarding each named Plaintiff's specific circumstances—which span 654 paragraphs—are likewise directed to Smart Driver. Without

exception, the 47 Plaintiffs' allegations follow a uniform pattern: (1) the Plaintiff was enrolled in Smart Driver; (2) GM intercepted Driving Data through Smart Driver; (3) GM sold that Driving Data to LNRS or Verisk; and (4) insurers accessed reports containing that Driving Data and raised the Plaintiff's insurance premiums or denied coverage. *See generally id.* ¶¶ 12–654. No named Plaintiff alleges economic injury from any other type of data collection or data-sharing practice.[2]

***Plaintiffs' Pivot.*** Once discovery in this case commenced, Plaintiffs pivoted. On April 28, 2026, Plaintiffs served their First Set of Requests for Production on GM, which contained 49 requests. *See* Ex. 3. Rather than focusing on the collection of data via the Smart Driver program and the alleged dissemination of that data, Plaintiffs sought unbounded discovery into all of GM's data practices, regardless of their connection to the allegations. They also demanded that the relevant time period for these discovery requests run through the present, even though the Smart Driver program ended in 2024 and this litigation commenced more than two years ago.

GM objected to these requests on those bases. *See* Ex. 4. GM then sought to engage with Plaintiffs to resolve the dispute. Counsel explained that GM vehicles

[2] The Complaint's consumer-deception theory—which underlies each of Plaintiffs' dozens of state consumer protection statute claims—is likewise tied to Smart Driver. Plaintiffs allege that GM used "dark patterns to coerce consumers into enrolling in its Smart Driver program," MC ¶ 872, and that "GM grouped 'Smart Driver' and 'Notifications' together during the Online Enrollment process in a deceptive attempt to force Smart Driver enrollment," *id.* ¶ 910.

generate data for many purposes, including emergency response, anti-theft services, vehicle diagnostics, and more, and that most of this data is unrelated to Smart Driver and Plaintiffs' claims. GM is not attempting to stymie discovery, but to agree with Plaintiffs on the information Plaintiffs believe are relevant to their claims. *See* Ex. 5.

GM sought to anchor these discussions in certain documents GM provided to the Federal Trade Commission as part of its investigation (and produced to Plaintiffs over a year ago). *See id.* at 2–3. As part of the FTC's investigation, GM was required to provide a list of data collected from vehicles from 2021–2024 (the period at issue in that matter). *See* Ex. 5 at 2. This spreadsheet categorized data collections by "task code," which is the internal mechanism GM uses to categorize data collections. It also provided an explanation of each task code and the specific data elements that were collected. For instance, GM refers to data collected for the Smart Driver program as "Task 220" data. Enrollment of a vehicle in Smart Driver triggered the activation of Task 220 and the collection of data for that Task. *Id.* at 2–3. This is the data at issue in Plaintiffs' Complaint: hard braking events, acceleration events, and other elements of driving behavior. Certain of this data was provided to LNRS and Verisk and to Wejo and Jacobs (two other entities mentioned in the Complaint).[3] GM also provided Wejo and Jacobs with Task 114 data, which consists of certain

[3] As Plaintiffs acknowledge, the data GM shared with Wejo and Jacobs was "de-identified" and was used primarily for transportation, engineering, construction, and public safety purposes. MC ¶¶ 770–76, 782.

geolocation information. For that reason, GM has also agreed to produce information regarding Task 114 in this case. *See* Ex. 5. GM also produced a spreadsheet to Plaintiffs that was provided to the FTC and lists other third parties that received driving behavior data and geolocation data from 2021–2024. *See* Ex. 5 at 3–4.

GM proposed using these documents as a framework to identify which categories of data collection and which type of third-party recipients are relevant to Plaintiffs' claims, and to rule out those that are not. This is the same collaborative approach that is being used effectively in related litigation with State Attorneys General. Plaintiffs rejected this approach, however.[4] GM then proposed two alternatives: (i) focusing on data that was "monetized" by GM (which would exclude, for example, emergency response, diagnostic, theft, and research data), or (ii) focusing on the type of data (e.g., driving-behavior and geolocation data, which would likewise exclude unrelated categories). Plaintiffs rejected these proposals too. Ultimately, Plaintiffs refuse to engage on the scope of discovery until GM incurs

[4] Plaintiffs have argued that these "tasks" are not exclusive, meaning that data elements collected for one task may also be collected through another. They further assert that they lack a complete task list from 2015 to present, which would require them to narrow their case "in the dark." This mischaracterizes GM's proposal, which was merely to provide a framework for negotiation based on the manner in which GM classifies its own data collection and the types of vehicle data collected by GM generally. GM has produced these FTC documents, offered to discuss additional time periods, and invited Plaintiffs to identify any category of data they contend is relevant beyond Tasks 220 and 114. Plaintiffs refused to engage, demanding capitulation rather than compromise.

substantial burdens and first produces everything—all data and all third parties—so that Plaintiffs may decide, in their discretion, what they believe is relevant.

## ARGUMENT

### I. THE SCOPE OF DISCOVERY SHOULD BE TAILORED TO PLAINTIFFS' CLAIMS AND LIMITED TO SMART DRIVER.

Under the Federal Rules, discovery must be (1) relevant to the claims pled and (2) proportional to the needs of the case. Plaintiffs satisfy neither requirement. Instead of confining discovery to the data practices challenged in the Complaint, Plaintiffs seek to probe the entirety of GM's vehicle data ecosystem—including data collected for emergency crash response, anti-theft services, dealer maintenance notifications, vehicle diagnostics, EV charging programs, and research and development—and all third parties that received this data, essentially an examination into all of OnStar's business operations for over ten years and running into the future.

#### A. Discovery Must Correlate to Plaintiffs' Claims.

Although the Federal Rules provide for broad discovery, it is limited to matters that are "relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1); *see also Dockens v. DeKalb Cnty. Sch. Sys.*, 2008 WL 11334020, at *4 (N.D. Ga. Oct. 16, 2008) ("[D]iscovery is designed to help define and clarify the issues."). The "starting point for ascertaining whether or not discovery may be had on a topic is the Complaint and the defenses." *United States v. Am. Intercontinental Univ., Inc.*, 2012 WL 12878365, at *1 (N.D. Ga. Jan.

20, 2012). The relevancy standard is "not so liberal as to allow a party to 'roam in the shadow zones of relevancy and to explore matter which does not presently appear germane on the theory that it might conceivably become so." *Donahay v. Palm Beach Tours & Transp., Inc.*, 2007 WL 1119206, at *1 (S.D. Fla. Apr. 16, 2007). Instead, the Rules make clear that discovery should "focus on the *actual* claims and defenses involved in the action." Fed. R. Civ. P. 26(b)(1), 2000 Advisory Committee Notes (emphasis added). Parties "have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings." *Id.*

**B. Discovery into All of GM's Data Practices Is Impermissible.**

As explained above, this litigation has, since inception, concerned the collection and alleged dissemination of information from the Smart Driver program. Yet Plaintiffs' discovery requests aim to investigate the entirety of GM's vehicle data practices without limitation. The problem begins with Plaintiffs' unilateral definition of "Driving Data" to mean: "telematics data collected, recorded, analyzed, transmitted, or shared from GM vehicles, including, ***without limitation***, geolocation, route history, driving schedule, fuel or charging levels, hard braking events, hard acceleration events, tailgating, time spent idle, speeds over 80 miles per hour, vehicle speed, average speed, late night driving, driver attention, ***and other data***." Ex. 3 at 15 (emphasis added). This definition is not limited to "driving" data and includes essentially *any* vehicle data collected for *any* purpose.

From there, Plaintiffs propound broad requests, seeking, among other things:

- "All Documents and Communications concerning or relating to the collection, storage, transmission, use, sale, leasing of, or access to Driving Data or products, services, or insights derived from or relating to Driving Data, including, without limitation, Driving Scores." (RFP 11);

- "All Documents and Communications, including, without limitation, written reports, concerning or relating to Personal Information, Driving Data, or products, services, or insights derived from or relating to Driving Data[.]" (RFP 12);

- "All Documents and Communications concerning or relating to strategies for leasing, sharing, selling, or licensing Driving Data, or using Driving Data to develop products, services, or insights." (RFP 26);

- A copy of each agreement and amendments thereto between You and any Defendant or third party concerning or relating to the access, collection, transmission, use, storage, sharing, leasing, licensing, marketing, or sale of Driving Data or products, services, or insights derived from or relating to Driving Data, including, without limitation, Telematics Exchange containing Driving Data." (RFP 8); and

- All Personal Information, including, without limitation, Driving Data, concerning each Plaintiff, including, without limitation, any information necessary to decipher and understand the Personal Information and Driving Data You produce." (RFP 34).

These broad requests, coupled with the unlimited definition of "Driving Data," are unworkable because GM vehicles generate data for many purposes that are essential to the basic operation of the vehicles but wholly unrelated to Smart Driver or Plaintiffs' claims. For example, OnStar collects and shares data with emergency service providers and first responders in the event of a crash.[5] Vehicle data is also

[5] https://www.onstar.com/features/safety

used to locate and recover stolen vehicles.[6] Vehicle diagnostic data—such as oil life and tire pressure—is collected to monitor vehicle performance.[7] And maintenance notifications use diagnostic data sent to a consumer's dealership to schedule service. Data is also used in EV charging programs, as well as for research and development, including work with universities and governmental agencies for safety purposes.[8]

None of these categories of vehicle data has anything to do with Plaintiffs' theories of liability. No Plaintiff alleges harm due to (i) sharing emergency data with first responders, (ii) sharing diagnostic data with a dealership, (iii) EV charging programs, or (iv) the sharing of research data with universities. Yet Plaintiffs' requests would require GM to undergo the burden of searching for, reviewing, and producing *all* documents concerning the collection, storage and use of vehicle data for these and other irrelevant purposes for more than a 10-year period.

In meet and confer discussions, Plaintiffs explained their view that the Complaint is merely the "starting point" for discovery. They contend that they should be able to seek discovery into the *entire universe* of GM's vehicle data (as well as all third parties this vehicle data was shared with to the present) and *then* determine what they believe is relevant or not.

---

[6] https://www.onstar.com/features/safety/stolen-vehicle-assistance
[7] https://www.onstar.com/support/faq/advanced-diagnostics
[8] https://www.onstar.com/tips/connected-vehicles

There is a reason for this. In the time since Plaintiffs filed their Complaint, they have realized that their central theory of liability—based on Smart Driver-related insurance injuries—is not viable. As one example, the majority of the putative class members' Driving Data never went to insurers at all. Numerous insurers never received any Driving Data or never used the data they received. For instance, it is legally prohibited in California—the most populous state in the nation—to use such data to price insurance. Discovery will also show that, when Driving Data was used by insurers, many putative class members benefited from insurers' consideration of their Driving Data because they received *discounts* rather than increases.[9] Nor can Plaintiffs prove on a class-wide basis that any insurance-related injuries were caused by the sharing of their Driving Data, as there are countless factors underlying any given individual's insurance rate, which vary by person. Likewise, as to consent, discovery will show not only that GM obtained consumer consent, but also that the CRA Defendants only sold Driving Data to insurers who obtained a *second* layer of consumer consent.

Given these hurdles, Plaintiffs are in search for a new theory of liability—and they intend to do so by demanding production of records and ultimately witnesses to attest to all of GM vehicle data practices and the entire OnStar business.

---

[9] Kara McGinley, "How Does Usage-Based Car Insurance Work?," *The Wall Street Journal* (Feb. 20, 2026), *available at* https://www.wsj.com/buyside/personal-finance/auto-insurance/usage-based-insurance.

Such requests are not permitted by the Federal Rules. The Eleventh Circuit proscribes this approach, stating that parties cannot pursue a "fishing expedition" in lieu of targeted discovery requests. *Porter v. Ray*, 461 F.3d 1315, 1324 (11th Cir. 2006); *Corines v. Broward Cnty. Sheriff's Dep't*, 326 F. App'x 493, 497–98 (11th Cir. 2009). Plaintiffs are "not entitled to use discovery to expand the scope of [their] claims beyond those stated in [their] complaint." *Irving v. Dish Network LLC*, 2011 WL 13122271, at *5 (N.D. Ga. June 10, 2011) (plaintiff "failed to show how the information he seeks is relevant to the particular claims he has stated in his complaint"); *Leisman v. Archway Med., Inc.*, 2015 WL 4994084, at *2 (E.D. Mo. Aug. 19, 2015) ("Plaintiffs are limited to those allegations specifically pled in the complaint. [Discovery] beyond those allegations is overbroad, unduly burdensome, and constitutes a fishing expedition by Plaintiffs to develop new claims.").

Requiring GM to canvass the entirety of its data operations—to identify, collect, review, and produce documents concerning emergency services, anti-theft programs, EV charging, and research, among others—because those programs involve "vehicle data" in some generic sense would be disproportionate and would serve no purpose other than to unreasonably burden GM. Plaintiffs cannot demand irrelevant materials in search of a new case. *See Filippelli v. Grow, LLC*, 2023 WL 11799558, at *2 (S.D. Fla. Apr. 25, 2023) (discovery not proportional where Plaintiff sought information "solely to identify new parties or support new claims").

The Court has already recognized this. Plaintiffs previously sought to issue preservation subpoenas to a variety of third parties that allegedly "licensed, marketed, or received driving data[.]" ECF No. 94 at 14. They argued that the focus of the case was "not just the provision by General Motors of data to the credit reporting agencies" but also "the provision of data to other entities." ECF No. 115 at 42:15–43:9. The Court rejected Plaintiffs' request, finding that Plaintiffs failed to show "good cause" for those third-party subpoenas, and had "not shown that the need for the Plaintiffs to obtain the information from ***those other third-party entities were proportional to the needs of the case***." *Id.* at 45:18–24 (emphasis added).

### C. That Verisk and LNRS Are Defendants Confirms the Scope of the Case.

Although the Complaint contains some passing references to third parties like Wejo and Jacobs (*see, e.g.*, MC ¶¶ 770, 777, 782), only two entities are named as co-defendants: Verisk and LNRS. That fact alone confirms the proper scope of discovery. This is further underscored by the JPML's mandate in consolidating these cases before this Court. The JPML found that the cases shared "complex factual questions" concerning the alleged collection of "information about personal driving behavior," the "sale" of that information to "data analytics companies like LexisNexis and Verisk," and the creation and sale of "reports of individuals' driving history" to automobile insurance providers. ECF No. 1 at 2. These "core common factual allegations . . . form the basis for the MDL's transfer and instructions to this

court to preside over coordinated or consolidated pretrial proceedings." *In re Jamster Mktg. Litig.*, 2008 WL 4482307, at *6 (S.D. Cal. Sept. 29, 2008).

Plaintiffs' position would result in a "sweeping expansion of the scope of the MDL mandate" by "fold[ing]" all questions regarding GM's data practices into the MDL. *Id.* Plaintiffs cannot "use the MDL proceedings as a means to expand the scope of the litigation beyond the core issues identified by JPML." *Id.* This "broad view" of the "scope of the MDL action . . . would exceed the scope of this court's MDL jurisdiction" and should be rejected for that reason. *Id.*

## II. THE RELEVANT TIME PERIOD SHOULD END WITH THE DISCONTINUATION OF THE SMART DRIVER PROGRAM.

For related reasons, the relevant discovery period for this case should run from January 1, 2015 to the end of the Smart Driver program on June 26, 2024—it should not extend "to the present," as Plaintiffs argue. Courts in the Eleventh Circuit routinely set the end of the discovery period as the date on which the litigation was filed. *See, e.g.*, *Warren v. Credit Pros Int'l Corp.*, 2021 WL 3552254, at *8 (M.D. Fla. Apr. 26, 2021) ("Defendant shall . . . provid[e] documents and information limited to the four years prior to the date of the original Complaint[.]"); *Sliwa v. Bright House Networks, LLC*, 2018 WL 1183350, at *4 (M.D. Fla. Feb. 14, 2018) (similar); *Henderson v. Holiday CVS, LLC*, 269 F.R.D. 682, 689 (S.D. Fla. 2010) (similar); *Louis v. Wendy's of N.E. Fla., Inc.*, 2009 WL 10667484, at *3 (S.D. Fla. Feb. 3, 2009) (setting discovery period as "three years immediately preceding the

date of filing of the Complaint"). Likewise, "it is proper to deny discovery of . . . events that occurred before an applicable limitations period[.]" *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 352 (1978); *see also Coca-Cola Co. v. Allianz Ins. Co.*, 2004 WL 7308665, at *2 (N.D. Ga. Mar. 4, 2004) (same); *Dryer v. Nat'l Football League*, 2010 WL 11469574, at *3 (D. Minn. Oct. 25, 2010) (rejecting attempt to obtain discovery from 1962 to the present and limiting discovery to six-year limitations period); 8A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2040 (3d ed. 2010) ("The court also has discretion whether to limit discovery to matters occurring in a particular period of time[.]").

Here, GM has *already agreed* to provide Plaintiffs with discovery extending beyond these well-established boundaries. Although the first named Plaintiff filed his case on March 13, 2024, GM has nonetheless already agreed to a relevant time period extending to the sunset of the Smart Driver program more than three months later on June 26, 2024. This cutoff date also extends beyond the March 11, 2024 publication of the *New York Times* article that underlies Plaintiffs' claims, *see* MC ¶¶ 944–45, and the termination of GM's sharing of Smart Driver data with Verisk and LNRS in March of 2024. GM has also agreed to extend the relevant time period back nearly *ten* years to January 1, 2015—months before the start of the Smart Driver program and far beyond the relevant statutes of limitations applicable to Plaintiffs' claims, which are generally only five or six years at most.

GM is also agreeable to extending the discovery period for discrete topics where appropriate, for example for certain topics related to Plaintiff's claim for injunctive relief, such as the maintenance of Task 220 data, and discovery regarding Jacobs since part of that relationship has continued. In short, GM has *already* made substantial concessions to accommodate Plaintiffs' far-reaching discovery requests and has *already* agreed to a period that extends far beyond the norm.

### A. Ending Discovery in June 2024 Is Consistent with Plaintiffs' Claims and Avoids Unnecessary Burden to GM.

GM's suggested default discovery cutoff of June 26, 2024 makes sense, as it is expressly tied to the allegations in Plaintiffs' Complaint. Plaintiffs allege that GM sold Driving Data to Verisk "from cars enrolled in OnStar Smart Driver from 2015 until 2024, when GM was forced to discontinue Smart Driver after the true nature of the program was exposed." MC ¶ 702. The Complaint likewise alleges that GM sold "Driving Data to Lexis . . . from 2019 until 2024, when it was forced to discontinue Smart Driver." *Id.* ¶ 744.

Given the weight of authority and Plaintiffs' own allegations, Plaintiffs have not stated why the relevant time period should be extended—for all requests—from the end of the Smart Driver program "to the present." Moreover, since early 2024, GM has been involved in federal and state regulatory investigations (including an FTC investigation that resulted in a consent order), lawsuits filed by the attorneys general of multiple states, and the myriad consumer cases consolidated before this

Court. *Supra* at 3–5. Accordingly, a vast amount of privileged material concerning GM's data collection and sharing practices has been generated since the summer of 2024. It would be extremely burdensome and disproportionate to the needs of this case for GM to be forced to review all this privileged information. *See, e.g.*, *In re Arby's Rest. Grp. Inc. Litig.*, 2018 WL 8666473, at *4 (N.D. Ga. Aug. 16, 2018) (limiting discovery period to six months after data breach because "a significant amount of information after the breach will likely be privileged").

**B. Plaintiffs' Likely Counterarguments Fail.**

Plaintiffs are likely to argue that this Court's motion-to-dismiss order supports wholesale extending the discovery period "to the present." It does not. Specifically, Plaintiffs have seized on this Court's statement that there is "no indication within the Amended Complaint that GM has ceased [its data collection and sharing] practices." ECF No. 203 at 198. But the Court made this statement in the context of ruling on Plaintiffs' requests for the forward-looking remedies of "injunctive and declaratory relief[.]" *Id.* As noted below, GM is willing to extend the relevant time period "to the present" for documents relevant to Plaintiffs' narrow requests for prospective relief. Further, the "practices" the Court referred to were Defendants' collection and sharing of data in connection with "the Smart Driver program" specifically. *Id.* (citing allegations concerning GM's sharing of Smart Driver data with Wejo and Jacobs). And the Court's motion-to-dismiss ruling was based only on

Plaintiffs' *allegations*—in reality, GM ended the Smart Driver program on June 26, 2024. Moreover, even though GM stopped sharing Smart Driver data with Jacobs in 2024, it is willing to compromise and agree to extend the time period for discovery related to Jacobs to today since aspects of that relationship have continued.[10] The Court's remark though does not support Plaintiffs' attempt to extend the relevant time period "to the present" to obtain discovery related to *other* data "practices."

Finally, Plaintiffs' demand for across-the-board discovery "to the present" is impractical and unclear. For instance, would GM be required to recollect custodial documents every week the litigation continues? If so, what would the scope of the collection be, given that GM discontinued Smart Driver more than two years ago? How is GM to know what new data practices Plaintiffs object to given that the Complaint is facially limited to Smart Driver? Plaintiffs cannot answer these questions. At bottom, Plaintiffs' proposed relevant time period would effectively give them unlimited and continual oversight of GM's current business practices without regard to the alleged wrongdoing in the Complaint. This Court should not endorse such an absurd and improper result.

* * *

Notwithstanding the already-expansive relevant time period, GM has offered to further compromise with Plaintiffs by offering to extend the relevant time period

[10] GM has continued to share deidentified Task 114 data with Jacobs.

"to the present" for certain discovery requests. Specifically, during the June 17 meet and confer, GM offered to consider extending the relevant time period beyond June 26, 2024 for certain discrete topics and information, including requests pertaining to Plaintiffs' claim for injunctive relief. Plaintiffs rejected this proposed compromise. GM nonetheless renewed its offer one month later. GM explained that it "remain[ed] willing to confer . . . to reach a compromise" and "continue[d] to believe that it will be most productive to address [the relevant time period] on a request-by-request basis," an approach that was "agreed to by parties in the other related litigations[.]" Ex. 5 at 4. Plaintiffs rejected this offer too. Put simply, GM is willing to compromise with Plaintiffs—as it has done with other litigants—to reach an agreement that is tailored to Plaintiffs' allegations and avoids imposing unnecessary discovery burdens on GM. Plaintiffs, however, have been unwilling to compromise.

## III. PLAINTIFFS' REQUESTS FOR UNDERLYING DATA SHOULD BE LIMITED TO CATEGORIES RAISED BY THE COMPLAINT AND A PROPORTIONATE DATA SAMPLE.

Consistent with tailoring discovery to the scope of Plaintiffs' claims, Plaintiffs' requests for their underlying data should be limited to a demonstrative sample of the data raised in the Complaint. Plaintiffs have repeatedly suggested that their discovery focuses on "driving data" collected by GM, but the truth is that Plaintiffs' requests seek to include *all* types of data and personal information.

During discovery, Plaintiffs have served various requests asking GM to identify "[a]ll Driving Data" for each named Plaintiff and produce "[a]ll Personal Information, including, without limitation, Driving Data concerning each Plaintiff." *See* Ex. 3, RFPs 14 & 34; ROG 2. Plaintiffs broadly define "Personal Information" to include anything described in GM's privacy statement. And, as noted above, they broadly define "Driving Data" to mean essentially any data from GM vehicles.

Of course, not all types of data and information concerning Plaintiffs' interactions with GM products or services are relevant to Plaintiffs' claims. And even with respect to relevant categories of vehicle data, including Smart Driver data, Plaintiffs have not shown a need for producing all such data when a sample will suffice. GM's responses and objections noted these concerns and offered to confer with Plaintiffs regarding the scope of these requests and the data sought.

Rather than take GM up on that offer, Plaintiffs sought Court intervention. Plaintiffs waited until shortly before the July 27, 2026 status conference to raise the issue for the first time and then elected to bring the issue before the Court immediately. Since the conference, GM made an additional attempt to confer with Plaintiffs on August 5, during which GM offered to provide a sample of Task 220 and Task 114 data, but Plaintiffs continued to insist that GM produce "all" data regardless of type.

Plaintiffs' requests for all data relating to the named Plaintiffs sweeps in numerous categories of data that are not relevant and that would not lead to relevant evidence. Plaintiffs do not challenge, *e.g.*, data that is necessary for basic services that come with GM vehicles, including remote commands, automatic crash response, stolen vehicle assistance, and dealer maintenance notifications. Similarly, no Plaintiff has alleged any harm related to EV charging or data collected to monitor battery health. Plaintiffs have not justified their requests for these and other irrelevant categories of data.

Nor are Plaintiffs' requests for all types of data for all Plaintiffs proportional to the needs of this case. Extracting all vehicle data for more than sixty vehicles identified in the Complaint over the course of a decade—including data that has no relevance to this case—would be a time-consuming and technically burdensome task. Given the marginal (if any) relevance of most of this data, GM should not be required to collect and produce all data for all Plaintiffs' vehicles for a more than 10-year period.

In place of the sweeping categories proposed by Plaintiffs, GM requests that this Court limit Plaintiffs' data requests to a reasonable sample of the categories raised specifically by the Complaint—*i.e.,* Smart Driver (Task 220) data and Task 114 data (because it was shared with Wejo and Jacobs). As stated above, GM has offered to produce a reasonable sample of these types of data for Plaintiffs to

review. GM believes a reasonable approach would be to first provide a month of this data for one of the named Plaintiffs before determining what additional data, if any, is necessary for Plaintiffs to demonstrate how the data was maintained in GM's possession.[11] In the alternative, GM requests that Plaintiffs be ordered to confer in good faith on this issue and an appropriate sample methodology.

## CONCLUSION

For the foregoing reasons, GM respectfully requests that the Court enter an order holding that: (1) the scope of discovery should be limited to Plaintiffs' allegations regarding the collection of driving-behavior data through the Smart Driver program (Task 220 data) and Task 114 data and the subsequent disclosure of that data for insurance-related or other data monetization purposes, including to LNRS, Verisk, Wejo and Jacobs; (2) the relevant time period for Plaintiffs' discovery requests should generally be from January 1, 2015 to June 26, 2024; and (3) discovery of the named Plaintiffs' data and personal information should be limited to Task 220 and Task 114 data.

Dated: August 10, 2026

By: *\/s/ Susan M. Clare*
**KING & SPALDING LLP**
David L. Balser

[11] With respect to Smart Driver data, LNRS and Verisk have already agreed to produce the data that GM provided to them regarding the named Plaintiffs, which is not data GM maintained. Thus, Plaintiffs will have the underlying data that forms the basis for their claims and do not require GM to produce all Smart Driver data.

Georgia Bar No. 035835
Susan M. Clare
Georgia Bar No. 262830
John C. Toro
Georgia Bar No. 175145
Peter Starr
Georgia Bar No. 648453
Matthew B. Rosenthal
Georgia Bar No. 871852
1180 Peachtree Street NE, Suite 1600
Atlanta, GA 30309
Tel: (404) 572-4600
Fax: (404) 572-5100
dbalser@kslaw.com
sclare@kslaw.com
jtoro@kslaw.com
pstarr@kslaw.com
mrosenthal@kslaw.com

*Attorneys for Defendants*
*General Motors LLC and OnStar, LLC.*

## **RULE 7.1(D) CERTIFICATION**

The undersigned counsel certifies that this document has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1(C).

*/s/ Susan M. Clare*
Susan M. Clare
Georgia Bar No. 262830

*Attorney for Defendants General Motors LLC and OnStar, LLC.*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this day a copy of the foregoing was filed and served using the Court's CM/ECF system which will send notification of such filing to ECF registered participants.

DATED this 10th day of August, 2026

*/s/ Susan M. Clare*
Susan M. Clare
Georgia Bar No. 262830

*Attorney for Defendants General Motors LLC and OnStar, LLC.*